UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

George DC Parker II, and

Lori A Parker,

                    Plaintiff(s),

        v.

THE SOCIETY FOR CREATIVE :
ANACHRONISM, INC., a/k/a/ "SCA" :
or "SCA, Inc.", et.al,

                    Defendant(s).

Case No. 3:23-cv-05069-RJB
DECLARATION OF LORI PARKER

I, Lori Parker, am over the age of 21 and competent to testify to the facts contained in this declaration under penalty of perjury under the laws of the State of Washington and California. I declare and state as follows:

1. In 2018, like many others, we, George and Lori Parker, acquired property in Arizona. Near the end of 2019, we changed our SCA membership address to the Arizona address, as we wished to remove ourselves from the Kingdom of An Tir membership rolls. We maintain both residency and business interests in Washington, dividing our time and activities between the two.

2. SCA persona's, names and heraldry are not the exclusive property of the organization, and instead belong to the members, as per their corporate webpage. See EXHIBIT N. Use of names and heraldry does NOT constitute a "connection" as many of us use it in other venues (such as LARP, EMP, Ren Fairs or other reenactment groups, etc). Therefore, use

DECLARATION OF LORI PARKER - 1

of such to *"demonstrates a direct connection to SCA Inc.,"* when related to social media activity is an abuse of power and is overreaching their authority.

3. In 2017 I applied for the Kingdom Seneschal office. While I was not chosen, Julia Sempronia asked if I would like to take on the Youth and Family Achievement (hereafter noted as "YAFA") officer, a deputy position of the seneschals office, which I happily did. Shortly thereafter, Julia Sempronia stepped down, and Tami Hayes (Lenora Trubble) took her place. That is when my problems with the office began.

4. Initially, it was the procedures and processes for background checks. The issue got so bad, that I contacted the Society Level officer regarding Ms. Hayes and her lack of cooperation. The Corporate officer eventually asked the then-Vice President of Operations Mike Watkins to step in to clarify the matter for her. Both Ms. Hayes and the then Social Media officer May LaRose then circumvented the procedures and got an Admin to add them to the private Youth and Family Achievement page I had started for families who were participating in the program. Almost immediately, Mary LaRose began demanding that I make the page public. While I initially was in favor of the idea, my training suggested that it would put the children at risk, whose names and identifying information would then be made public, and so I chose to take a stand to protect those kids. I attempted to dis-associate the group, renaming it and updating the "About" section as appropriate. Ms. LaRose continued to attack my efforts. When I pointed out that the then-media policy allowed me to do what I was doing, she clearly contacted Ms. Hayes, and I was shortly removed from my Kingdom Office, in part, as evidenced in the email I received dated Friday, October 20, 2017, I was removed from office over a post I made on my personal page, that Ms. Hayes quoted as part of the reason. This proves once more

DECLARATION OF LORI PARKER - 2

that the SCA does in fact control what members and officers post to Social Media, as claimed in DKT 9.

5.  During my tenure as YAFA Officer for An Tir, I received no less than 8 commendations to the Board, as well as other local and Kingdom awards (EXHIBIT H).  Shortly after being removed as local YAFA officer, I took on the Society Deputy YAFA officer, and eventually, took over the position at Society Level. Clearly, the issues I experienced were local in nature. I resigned in May of 2021, as the corporation began the investigation into his April 1st posting.

6.  The problems my husband George Parker and I have with the SCA officers escalated in July, 2019 when we filed a complaint to the local seneschal regarding a member of the "Peerage".

7.  In that complaint, we enumerated the many ways the woman harassed us and belittled us publically, in front of witnesses, up to and including allegations of being abusive and being a Nazi. (EXHIBIT K Page 38) We were told to bring the issue to our local seneschal, Beth Park, for reporting and action.

8.  We submitted the requested information to Beth Park, following the guidelines given to us. We then had a personal face-to-face interview with Beth Park, Fancissica Ossiander and one other where we were able to speak to the depth of the accusations Raphaella DiContino levied against us. However, we came to find out later that Ms. Park was good, personal friends with the woman we were complaining about. (See EXHIBIT P) We enclosed screenshots of conversations online, as well as screenshots others had with her regarding us. We wrote the Bullying Impact Statements that were requested. By January, we were informed the matter was closed, and would be going to the King and Queen (Christian and Helene, aka Emerson Waite and Helen Holmes) for judgment. (See

EXHIBIT K, pages 45-49) The investigator of the incident was Amanda Greyson (aka Attia Prima) It is important to note that these are the same people who practiced the discrimination and bias, to be noted later. Neither we nor our witnesses were interviewed at all prior to this time, as per corporate documents. See EXHIBIT R, section IV page 3-4.

9.  Once complete, we waited months for Ms. Park to send us her complete accounting, as outlined in the Grievance Policy and in the Investigation Document (Exhibit R page 5 *Follow up to a Kingdom Investigation*)**.** To date, we have yet to receive that documentation, nor did we receive a copy of the complaints made against us. Instead, there was a list of alleged complaints, with no facts, evidence or any examples given, despite being asked for specific instances where the alleged infractions occurred. Such becomes hearsay, and should be discounted as such.

10.  We then appealed upline to the Corporate Office, Vice President of Operations-Seneschal Mike Watkins (EXHIBIT M pg 8) who then instructed his officer Amanda Greyson to THEN follow procedure as written in the Corporate documents.

11.  Once the interviews were conducted with several, but not all of the witnesses,  the Crown deemed the complaint "a personal conflict". The local seneschal informed us of the results of the investigation via email, and of the sanction that was imposed - a 6 month restriction on baronial social media. *"Therefor it the (sic) Crown's decision that these three parties, Alizand, Hakon, and Raffaella take a 6 month leave of absence from all Baronial Facebook pages/forums/lists, and also refrain from engaging the other parties in any direct or indirect communications."* (EXHIBIT M, page 1). Defendants once again are trying to mislead the court by mis-representing the fact, claiming the restriction was a year long, thereby damaging the reputation of Plaintiffs even further.

12. Persons directly involved in this matter were: Kirsten Chow (aka, Alianora Greymoor), her duly appointed investigator Amanda Greyson (aka Attia Prima), Heather Holmes and Emerson Waite.

13. This incident is the basis of the bias we then began encountering within the group. George was targeted because of his disability, Autism Spectrum Disorder. He has a long standing diagnosis of Asperger's, and has struggled for years with it. Many were aware of his disability, and it had been mentioned in multiple communications.

14. It is well known in the SCA world that to complain about the behavior of leadership, including Peers, will get you ostracized or worse. But the egregious manner and long history of wrongdoing in which we were treated prompted our actions.

15. On April 1st, 2021, after a long bout of Covid (which landed him in the hospital) George entered into a conversation on the personal page of someone he considered a friend, Maude Louisiana d'Orleans (aka LaToya M. Johnson). He responded to a posted meme (EXHIBIT M pgs 28-38)**.** He was then attacked, harassed and baited until he lost his temper and responded in a poor way. I would like to note that the post was almost immediately removed, but was subsequently re-posted by one of the persons involved in the conversation with the caption "dirty deletion". Many of the persons involved in that conversation were Peers, and most were, including the original poster, are/were deeply involved with the SCA Diversity, Equity and Inclusion facebook group, as well as local DEI committees.

16. George has ASD, a fact known to LaToya Johnson, and reported to both the Kingdom of An Tir officers as well as the Board of Directors in his statement (and his later appeal). His Autism has a direct correlation to his action and posting. He had no clue at the time that he was crossing a line. His social disability does not see why it was okay for the

other posters to constantly call him names, yet he could not return that "favor". He made

no direct threat to any specific individual, and instead made a broad comment. It should

also be noted that Facebook itself did nothing about his comment. He was not banned or

censored in any way because of it. This is, in fact, one of the criteria, set forth in the

video regarding the Social Media Policy, that of using social media guidelines to gauge

the severity of a comment.

17. On April 2nd, 2021, George received an email (EXHIBIT G page 1) that informed him of

his sanction within the Kingdom of An Tir. He was informed that the incident would be

forwarded to the Corporate Vice-President for Operations.

18. Note there was LESS THAN 24 hours between the post made and the email removing

him from participation. This goes directly against the Board authorized document, The

Seneschals Handbook:

   a. Section VI C 1 states:

   b. *" They must make attempts to interview the complainant or complainants, any*
   *witnesses, and the accused. These interviews must take place separately. They can*
   *be in person, or by phone or videoconference. Attempts to contact interviewees*
   *need to be documented, and multiple attempts need to be made if necessary,*
   *preferably by more than one method."*

19. No attempt was made to contact George. There was no investigation of the incident, nor

any way for George to explain or appeal. Defendants EXHIBIT 2, DKT 34-2,page 5,

clearly states at the bottom of the report that *"There was no in depth (sic) kingdom*

*investigation."*  The representatives of the Diversity, Equity and Inclusion office also

failed to contact George to help him adjust his behavior, as per published statements via

their webpage:  (https://www.sca.org/resources/dei-office/):

DECLARATION OF LORI PARKER - 6

a. *Lastly, that we take action. We value chivalry and live by those tenets we claim to hold as ideal.* **When a participant violates the code of conduct we require, we let them know so they can adjust their behavior.** *The phrase, "if you see something, say something" can be applied here.* (emphasis for clarity)

20. The Office of Diversity, Equity and Inclusion does NOT concern itself with disabilities, especially the silent or hidden ones, and instead only concerns itself with high-profile issues such as people of color or LGBTQ populations.

21. According to SCA policy as noted on the webpage, George's action was not brought to DEI, so he could "adjust his behavior", instead, he was removed from the organization through faulty procedure and hearsay evidence.  Citing a violation of Corporate policy to violate corporate policy by removing the membership of a paid member.

22. Defendants own evidence EXHIBIT 34-1 shows that procedures were not followed. If they had been, a complete packet of an investigation of the incident, including a statement from George, as well as a clear statement from the Crowns as to WHY the sanction (Exile) was imposed. Had this information been submitted as per corporate documents, the Society investigator Stacy Hall would not have needed to contact the Crowns to "clarify" why they made the decision to exile George instead of utilizing the temporary removal sanction.(EXHIBIT 34-2 page 10) Clearly, with the option of Temporary Removal from Participation at their disposal, they did not deem the comment or thread worthy of such a harsh sanction. Instead, they chose a lesser form of simply not allowing him in the Kingdom, a sanction that would expire upon their stepping down in 6 months or less.

23. The persons involved in this incident were: Attia Prima (aka Amanda Greyson) who has stepped into the position of Seneschal ( legal representative), Queen Helene (aka Heather

Holmes) and King Christian Bane (aka Emerson Waite). These are the very same people who were involved in the previous complaint that we submitted. Clearly, they approached this incident with bias.

24. The information sent to the Corporate Vice President did not include the following from Section 6 of the Society for Creative Anachronism Inc., Sanctions Procedures and Policies:

25. *"Section 6 A. The Kingdom Seneschal transmits the sanction package to the Society Seneschal. The package will include the following:*

    a. *1. A complete statement of facts from both the Crown and Kingdom Seneschal. Both statements must state why the sanction was issued.*

    b. *2. The statement of facts from the Kingdom Seneschal must also describe the initial notice or attempt at initial notice of the Sanction to the sanctioned person; a copy*

    c. *of the initial notification letter; and proof of sending the letter by certified mail to the sanctioned party.*

    d. *3. Proof of publication in the Kingdom newsletter or information indicating when the publication will take place.*

    e. *4. Any statements from the Complainant(s) and any witnesses.*

    f. *5. Statement from the sanctioned person, if any."*

26. Nor was Section VI C of the Society Seneschal Handbook followed. Section VI C states:

    a. *"C. Investigative Procedures*

    b. *1. The job of the investigator is to collect statements and evidence. They must make attempts to interview the complainant or complainants, any witnesses, and the accused. These interviews must take place separately. They can be in person,*

*or by phone or videoconference. Attempts to contact interviewees need to be*

*documented, and multiple attempts need to be made if necessary, preferably by*

*more than one method. If someone refuses to talk to the investigator, that needs to*

*be noted. If someone only wants to submit a written statement, that should be*

*allowed, but it should be noted in the investigator's report that the person*

*declined to be interviewed."*

27. Note the word "MUST" in this section. Also note the statement regarding the multiple attempts to contact the interviewees. There is no room for interpretation at all. It is clear and concise. Yet it was not followed by the officers in An Tir in regards to the April 1st FB posting.This is another incident in which the written policies were not followed by the Corporate officers.

28. Eventually, on August 31st, George was sent an email explaining that the corporate "investigation" had been completed. Once again, the matter was "completed" BEFORE George had a chance to tell his side. Only after Ms. Schraer contacted us telling us that, did it come out that Stacy Hall "had the wrong email". Documents attesting to that are submitted. This did not explain why a phone call was not made, nor mail sent via postal service….as stated was proper procedure in the Sanction document and the Seneschals handbook. George and I cooperated fully with the resulting "investigation" done by Stacy Hall, appointed by Lis Schraer.

29. In DKT 34, Ms. Du Crey submits "evidence" of the investigation. However, by her own words, the evidence is an "excerpt" (DKT 34 ¶3) rather than a complete and accurate copy. Portions of documents scanned in have been redacted, and there is clear hearsay included. No evidence or facts have been submitted to show George or myself having been investigated for failure to follow the Code of Conduct, or for violating any other

corporate policy. No evidence was submitted to support the claim of harassment or threatening behavior. Hearsay should be disregarded.

30. George and I both submitted lengthy documentation which included screenshots, attesting to the behavior of people in the local groups, explaining George's actions, his disability and why we felt he should not be removed from membership. In those documents, we brought forth complaints against the persons involved, which the Board and Lis Schraer all ignored. To date, nothing has been done regarding our complaint. This shows a clear bias on the part of the officers and SCA.

31. At no time did the SCA or its officers allude to any additional complaint regarding myself or George. There were no investigations or sanctions excluding the 6 month social media ban. Defendants perpetuate the myth of a year-long removal from social media, when in fact it was 6 months, and only from the Baronial pages (EXHIBIT M, page 1). The evidence presented by Ms. DuCrey contains innuendo and hearsay, and should be disregarded.

32. Defendants Exhibits 1 and 2 DKTs 34-1 and 34-2 are comprised of the so-called "investigation" documents, emails and investigator summary of George, yet my own statement to the investigator and others is glaring by its absence. Instead, Defendants include innuendo and unsubstantiated allegations, as well as several demonstrably false statements.

33. On October 24, 2021, George was formally "R&D'd" (Revocation and Denial of Membership) for the one post he made on a personal page of a person who lived in Louisiana, and was not an official SCA page as defined by the corporate media policy.

34. Additionally, in the week after the Board meeting on October 24th, the Board saw fit to immediately remove and deny membership of Emerson Waite, King of An Tir. His

DECLARATION OF LORI PARKER - 10

removal was posted, but no explanation was given as to why he was removed so abruptly. We cited his removal in our appeal documents, stating that the Board should consider reviewing all the sanctions handed down by Emnerson Waite during his tenure as "King", since whatever he had done was bad enough to warrant an emergency removal. This too was ignored by the Board and Lis Schraer, and was given no response.

35. Since that time, we had been in contact with the Corporate Vice President of Operations several times. In February of 2022, George formally asked for an appeal, and in typical SCA fashion, was denied with no explanation. This is another case of not following Corporate Policy, Section F of the Governing Documents states:

    a.   "F. Sanctions

    b.   *1. Sanctions and administrative actions should be **proportionate and appropriate**. Major sanctions, such as a ban on attendance or participation, should not be a substitute for appropriate administrative or legal action.* (emphasis for clarity)

36. Clearly, being removed from the Organization on the basis of one comment (quickly removed) is an overly harsh sanction. It is in no way proportionate, nor is it appropriate, especially since it was on a personal and NOT official page, which SCA claims to not monitor or have rights over. No one tried to work with George to rectify his comment. He was handed what the above would describe as a "Major" sanction (see #1) for a minor infraction that took place on a private, personal page.

37. George has over 30 years within the organization (SEE EXHIBIT I). He was even receiving awards until 2020. He has no history of behavior that would suggest that he be removed from the organization. I sent in a request for documents, as a current member in good standing, and his spouse in a community property state, and was told that the request would not be heard (because the corporate documents state that only the

sanctioned person can ask for an appeal). George asked the Vice President to forward his request for reinstatement to the membership on March 15, 2022, but has not received a reply.

38. Defendants Exhibit 34-1 has a garbled account by Mary LaRose as to the post and her reaction to it, which mixes in her animosity of me with George's actions. She claims threats and harassment where none existed, and states such as fact without supporting evidence. She presents as a person with a vendetta, who is clutching at straws to make a point for which she has no factual basis. Clearly, if the corporation used this account in their decision-making regarding George's sanction, they obviously fail to understand what constitutes factual evidence. The SCA, in allowing this kind of slanderous, libelous "evidence" to be used in an investigation shows that the SCA will go to great lengths to cover up the abuses of its populace by members of the Peerage, as Mary LaRose is a Peer.

39. Had George and I been as disliked in the organization, particularly within our local group, as Defendants would claim, that statement should be brought into question as to its veracity. Clearly, had we been as disliked as Defendants would have this court believed, none of those awards would have been given.

40. No where in the corporate documents does there appear to be a statement that the Board of Directors has the ability to revoke a membership. A revocation and denial of membership is listed as a possible sanction in many places, but who may hand down such a weighty decision is not in the policies. It is not in the ByLaws, Corporate Policy or Seneschals Handbook etc. Nor is it to be found in any other document. Even the Sanctions handbook fails to give the board power to revoke paid membership. This shows the most egregious failure on the part of the Defendants, the Board and its officers in

failing to follow corporate policies, and overstepping their authority by revoking George Parker and many others memberships.

41. The SCA Core Values state: To deal fairly with others, and value and respect the worth and dignity of all individuals, To act with transparency, fairness, integrity, and honesty; To maintain a harassment-free environment in SCA spaces; and, To avoid behavior that reflects adversely on the SCA or other SCA members and participants. The SCA officers and peers have failed to abide by the standards as listed above, and yet, despite formal complaints, they are allowed to continue their action with impunity. Yet we have been vilified, harassed, been slandered against and  eventually removed from the organization with no proof of bad behavior barring the one online post. Defendants continue to try and make us out as the bad guys in an attempt to deflect from and cover up the bad behavior of their officers and peers.

42. The SCA claims that George violated the Hate Speech clause of the documents, while failing to follow policy themselves, and encouraging their officers to continue to fail to follow procedures.

43. Hate speech is defined by the Cambridge Dictionary as "public speech that expresses hate or encourages violence towards a person or group based on something such as race, religion, sex, or sexual orientation". His comment did none of that. There is no legal definition of "hate speech" under U.S. law, just as there is no legal definition for evil ideas, rudeness, unpatriotic speech, or any other kind of speech that people might condemn. While "hate speech" is not a legal term in the United States, the U.S. Supreme Court has repeatedly ruled that most of what would qualify as hate speech in other western countries is legally protected free speech under the First Amendment. See:

*Village of Skokie v. National Socialist Party of America, 373 N. E. 2d 21 (Ill. 1978),*
wherein the Court found that:

    a.   *"public expression of ideas may not be prohibited merely because the ideas are*
         *themselves offensive to some of their hearers."*

and *Terminiello v. Chicago, 337 U.S. 1 (1949)* wherein the Court states:

    b.   *"The Court ruled that by permitting conviction for speech that "stirred people to*
         *anger, invited public dispute, or brought about a condition of unrest," the law*
         *"seriously invaded" the protection of speech afforded by the First Amendment.*
         *"A function of free speech," Douglas wrote, "under our system of government is*
         *to invite dispute." Speech "may indeed best serve its high purpose when it*
         *induces a condition of unrest, creates dissatisfaction with conditions as they are,*
         *or even stirs people to anger."*

44. Defendants continue to try to make the case about the removal of George Parker,
however, it is about long-term sustained abuses by officers and peers both local and
corporate, and in the SCA's continual avoidance of following their own published
corporate policies. Had the officers in the SCA followed procedure in regards to the
complaint against Raphaella Di Contino, and further, had the Kingdom officers followed
procedure as clearly shown in EXHIBIT R, the issues presented in DKT 9 would never
have been submitted to the Court. Had Defendants simply come to the table in an effort
to settle this at any time prior to January 23, 2023, as Plaintiffs requested, this could have
been settled.

45. In closing, Defendants EXHIBIT 2, DKT 34-2, page 5, clearly states at the bottom of the
report that *"There was no in depth (sic) kingdom investigation."* The Society Seneschal,

the Board and the investigator were all aware of the lack of due process regarding the initial investigation in An Tir, and as such, should have thrown the complaint out. Time and again, we have been the target of harassment and bullying by officers and general members, yet nothing has been done to protect us, even when complaints were filed, showing a lack of concern and clear negligence on the part of Defendants. Defendants' continued submission of false documents and provable false information, such as my membership, clearly show an attempt to use falsehood and innuendo to influence the court to arrive at a conclusion favorable to Defendants.

I declare under penalty of perjury and the laws of the State of Washington that the foregoing is true and correct.

DATED this 11th day of June, 2023, at Graham, Washington.

Dated: June 10, 2023

Respectfully submitted,

Lori A Parker,

DECLARATION OF LORI PARKER - 15