**Exhibit W**

**Subject:** Board action regarding your appeal
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 3/3/2022, 9:25 PM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org


Dear Mr. Parker:

On January 15, 2022 you submitted to the SCA Board of Directors an appeal of the Revocation of Membership and Denial of Participation in the SCA issued by the Board at the October 2021 quarterly meeting. The appeal, and all accompanying documentation, was presented to the Board at its February 28, 2022 conference call meeting. At that meeting the Board took the following action (from the unapproved minutes):

    C.    *George Parker (Ha'kon Thorgeirsson)*

*By consensus, the Board declined to hear the appeal of George Parker (Ha'kon Thorgeirsson).*

As a result of this decision by the Board, their October decision stands as presented at that time.

I understand that this is a disappointment.  If you have any questions regarding the process, please do not hesitate to contact me.

Sincerely,
Lis Schraer
Society Seneschal

**Subject:** Re: Request for Appeal
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 7/26/2022, 9:02 PM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org

Dear Mr. Parker:

Thank you for your email of June 15. Your email constitutes a second appeal of your sanction. The Corporate Policies of the SCA state that an appeal to the Board "must be accompanied by new evidence that warrants re-examination by the Board." At their quarterly meeting, the Board concurred that this requirement was not met.

Sincerely,

Lis Schraer

Society Seneschal

On 6/15/2022 8:42 PM, Ha'kon Thorgeirsson wrote:

> I hereby request a removal of the Revocation and Denial of Membership handed down in October 2021. I request this based on the following:
>
> Failure of SCA Officers to follow Corporate Policy regarding the investigation of myself, George Parker, regarding the April 2nd exile as outlined in the Seneschals Handbook, Section VI.C.1
>
> Failure of the Officers to follow the Sanctions and Procedures and Policies Manual, Section 6A, specifically #2 and #5.
>
> Failure of the Society DEI Office to address the transgression as outlined in the DEI Mission Statement and the statements made on the publicly accessible web page ( Society for Creative Anachronism (sca.org).
>
> George Parker II
>
>
> *Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

**Stephanie Johnson**

| | |
|---|---|
| **From:** | Louise Du Cray <louise@sca.org> |
| **Sent:** | Monday, February 7, 2022 2:13 PM |
| **To:** | 'Sheldon, Brian J' |
| **Subject:** | RE: CT Corp Account Review |

Hello Brian,

Thank you for today's call! As discussed, here is the updated contact information for the SCA account going forward:

**Main Contact:** Louise Du Cray
**Title:** VP of Corporate Operations & Corporate Secretary
**Email:** louise@sca.org
**Ph#:** (408) 263-9305

And just in case, since I'm 50% of this office, here's the other 50% if you can't reach me for whatever reason:

**Alternate Contact:** Nataalya Urosevic
**Title:** Administrative Assistant
**Email:** nataalya@sca.org
**Ph#:** (408) 263-9305

**PO Box/Primary Mailing Address:**

PO Box 611928
San Jose, CA 95161

**Physical Address (if necessary):**

1580 Oakland Road   Ste C-104
San Jose, CA 95131


**Please update your records to *remove*:**

Renee Signorotti / renee@sca.org [Retired as of October 1, 2021]
Theresa Anderson / theresa@sca.org [Retired as of October 2, 2021 – I don't know if she would have been listed.]

1759 S Main St Ste 108 Bldg 5
Milpitas, CA  95035-6765
[We moved from this address in August 2021.]

PO Box 360789
Milpitas, CA 95036-0789
[We are still getting mail forwarded from this box for the time being, but it's now out-of-date.]


Thanks very much, and please let me know if you need any other information from me!

SCA_000003

Louise

---
Louise Du Cray
VP for Corporate Operations
Society for Creative Anachronism
Ph: 408-263-9305 | Fax: 408-263-0641
PO Box 611928, San Jose, CA 95161

---

**From:** Louise Du Cray
**Sent:** Wednesday, February 2, 2022 9:51 AM
**To:** Sheldon, Brian J <Brian.Sheldon@wolterskluwer.com>
**Subject:** RE: CT Corp Account Review

Hello Brian,

Absolutely! We've been swamped over here, but now that our quarterly board meeting is over, I have some time and would love to touch base about this account. I've taken over this role from somebody who was in it for quite some time, so I could use all the orientation I can get. 😊

I'll schedule something for next week using the link provided.

Thank you,
Louise

---
Louise Du Cray
VP for Corporate Operations
Society for Creative Anachronism
Ph: 408-263-9305 | Fax: 408-263-0641
PO Box 611928, San Jose, CA 95161

---

**From:** Sheldon, Brian J <Brian.Sheldon@wolterskluwer.com>
**Sent:** Thursday, January 20, 2022 5:18 AM
**To:** Louise Du Cray <louise@sca.org>
**Subject:** CT Corp Account Review

Hello Louise,

I wanted to follow up with you in regard to your recent correspondence with our service team regarding your invoice request to introduce myself as your CT Account Manager, and see if you were available for have a quick account review call. As your business is ever-changing, it is important that we take the opportunity to connect on your account with CT.

My agenda is as follows:

SCA_000004

- Update Contact information on Account.
- ***Confirm and make any changes necessary to Delivery Instructions*** (i.e. Renewal Invoice Recipients and Paperless Service of Process transmittals)
- Go over Secretary of State Audit
- Discuss current processes for Compliance Action Items to include any **Global Compliance**
- Discuss any questions or concerns you may have.


If there is someone else that I should be in contact with, please feel free to forward this email. **You can reach me at (332)215-9076, reply directly to this email, or use the links below** to schedule your **complimentary Account Review**.

Schedule call (30 minutes) - http://calendly.com/brian-sheldon/30min
Schedule call (45 minutes) - http://calendly.com/brian-sheldon/45min


Brian Sheldon
Account Manager
CT Corporation

Mobile +1(332)215-9076
Brian.Sheldon@Wolterskluwer.com

 Wolters Kluwer

3 Winners Circle, Albany, NY 12205
www.ctcorporation.com

Join Wolters Kluwer on  Facebook   Twitter   Linkedin   Youtube

**Confidentiality Notice:** This email and any attachments may contain confidential or privileged information that is intended for the addressee only. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. If you have received this email in error, please immediately notify the sender at the address shown herein and permanently delete any copies of this email (digital or paper) in your possession. Wolters Kluwer shall not be liable for the incorrect or incomplete transmission of this email or any attachments, nor for unauthorized use by its employees.

SCA_000005

**Stephanie Johnson**

| | |
|---|---|
| **From:** | Christine O'Connor <christine.oconnor@wolterskluwer.com> |
| **Sent:** | Monday, May 22, 2023 8:37 AM |
| **To:** | Louise Du Cray |
| **Cc:** | brian.sheldon@wolterskluwer.com |
| **Subject:** | RE: FW: Handoff from Sales: Society For Creative Anachronism, Inc.  -  Account Maintenance |

Hi Louis,

Debbie is out of the office today and I am answering her emails.  I am going to find out who can get a signed declaration.  Once I find out I will let you know.

Thank you,

Christine O'Connor
Senior Customer Service Representative
CT/NRAI, a Wolters Kluwer Business

888-579-0286
affiliateteam@wolterskluwer.com
7-6 PM EST Monday - Friday



www.ctcorporation.com
www.wolterskluwer.com

Confidentiality Notice: This email and its attachments (if any) contain confidential information of the sender. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. If you have received this email in error, please immediately notify the sender at the address shown herein and permanently delete any copies of this email (digital or paper) in your possession.

--------------- Original Message ---------------
**From:** Louise Du Cray [louise@sca.org]
**Sent:** 5/19/2023 8:00 PM
**To:** debora.cokbilen@wolterskluwer.com
**Cc:** brian.sheldon@wolterskluwer.com
**Subject:** RE: FW: Handoff from Sales: Society For Creative Anachronism, Inc. - Account Maintenance

Thank you, Debbie. The below contact information is indeed correct.

1

I'm hoping we can get (because unfortunately I think we're going to need) a signed declaration of some sort which states that this summons & complaint was accidentally sent to our old address. Would you mind connecting me to your legal department, or whoever would manage that sort of thing?

Kind Regards,

Louise

_____

**Louise Du Cray** (she/her)

**VP for Corporate Operations**

Society for Creative Anachronism

Ph: 408-263-9305  Fax: 408-263-0641

PO Box 611928 San Jose, CA 95161

*Office Hours*: Mon-Thu 9am-4pm Pacific

Visit the new SCA Member Portal at: https://sca.app.neoncrm.com/

---

**From:** Debbie Cokbilen <debora.cokbilen@wolterskluwer.com>
**Sent:** Thursday, May 18, 2023 11:48 AM
**To:** Louise Du Cray <louise@sca.org>
**Cc:** brian.sheldon@wolterskluwer.com; Eben Kurtzman <legal@sca.org>; John Fulton <president@sca.org>
**Subject:** RE: FW: Handoff from Sales: Society For Creative Anachronism, Inc. - Account Maintenance

Hi Louise,

I'm sorry the address was not updated previously, I am not sure who was handling that update.

I have made the update, please see below and let me know if all looks correct now:

SCA_000007

Mailing                                                 Alternate

PO BOX 611928                                           1580 OAKLAND RD STE C104

SAN JOSE                                                SAN JOSE

CA, 95161-1928                                          CA, 95131-2441

I will also obtain more information on the service of process we received and get back to you shortly.

Thank you,

Debora Cokbilen
Senior Customer Service Representative
CT/NRAI, a Wolters Kluwer Business

(888) 579-0286
affiliateteam@wolterskluwer.com
7-5 PM EST Monday - Friday



www.ctcorporation.com
www.wolterskluwer.com

Confidentiality Notice: This email and its attachments (if any) contain confidential information of the sender. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. If you have received this email in error, please immediately notify the sender at the address shown herein and permanently delete any copies of this email (digital or paper) in your possession.

--------------- Original Message ---------------
**From:** Louise Du Cray [louise@sca.org]
**Sent:** 5/18/2023 12:43 PM
**To:** debora.cokbilen@wolterskluwer.com; brian.sheldon@wolterskluwer.com
**Cc:** president@sca.org; legal@sca.org
**Subject:** FW: Handoff from Sales: Society For Creative Anachronism, Inc. - Account Maintenance

Hello Debbie,

SCA_000008

Thank you for the information. Please provide a log of exactly how and in what format (i.e., USPS, email) these notices were sent from CT Corporation.

We requested our contact details be updated in February of 2022 – please see attached email thread.

Below is the full list of requested updates, requested **February 7, 2022.**

Here is the updated contact information for the SCA account going forward:

**Main Contact:** Louise Du Cray

**Title:** VP of Corporate Operations & Corporate Secretary

**Email:** louise@sca.org

**Ph#:** (408) 263-9305

**Alternate Contact:** Nataalya Urosevic

**Title:** Administrative Assistant

**Email:** nataalya@sca.org

**Ph#:** (408) 263-9305

**PO Box/Primary Mailing Address:**

PO Box 611928

San Jose, CA 95161

**Physical Address (if necessary):**

SCA_000009

1580 Oakland Road   Ste C-104

San Jose, CA 95131

**Please update your records to *remove:***

Renee Signorotti / renee@sca.org [Retired as of October 1, 2021]

Theresa Anderson / theresa@sca.org [Retired as of October 2, 2021 – I don't know if she would have been listed.]

1759 S Main St Ste 108 Bldg 5

Milpitas, CA  95035-6765

[We moved from this address in August 2021.]

PO Box 360789

Milpitas, CA 95036-0789

[We are still getting mail forwarded from this box for the time being, but it's now out-of-date.]

Please send confirmation as soon as these updates have been made.

As you can imagine, this delay is quite serious as it has put us at significant legal risk. Who can we speak with to escalate this matter?

Louise

5

_____

**Louise Du Cray** (she/her)

**VP for Corporate Operations**

Society for Creative Anachronism

Ph: 408-263-9305  Fax: 408-263-0641

PO Box 611928 San Jose, CA 95161

*Office Hours*: Mon-Thu 9am-4pm Pacific

Visit the new SCA Member Portal at: https://sca.app.neoncrm.com/

---

**From:** Debbie Cokbilen <debora.cokbilen@wolterskluwer.com>
**Sent:** Thursday, May 18, 2023 6:18 AM
**To:** Louise Du Cray <louise@sca.org>
**Subject:** RE: Handoff from Sales: Society For Creative Anachronism, Inc. - Account Maintenance

Hi Louise,

I checked the recent service of process history on your accounts and have attached one from 4/24/2023 & one from 5/4/2023.

I have also updated the contact information on all of the accounts so you are now listed as the contact.

We also have a free service called First Serve.  With this service you can receive a scanned copy of the service of process the same day we receive it.  For this service I would need to create a login to our website.  You will receive an email when an entity is served and it will instruct you to login to the website and view the documents.  More than one person can be listed to receive the email.

Please let me know if you would like me to add this service to your account.

Here is the updated contact information, please let me know if any changes are needed.

Louise Du Cray
      Title :   --
Customer :   SOCIETY FOR CREATIVE ANACHRONISM, INC.
  Address :   1759 S MAIN ST STE 108 BLDG 5, MILPITAS, CA - 95035-6765
    Email :   louise@sca.org
    Phone :   -4082639305

SCA_000011

Thank you,

Debora Cokbilen
Senior Customer Service Representative
CT/NRAI, a Wolters Kluwer Business

(888) 579-0286
affiliateteam@wolterskluwer.com
7-5 PM EST Monday - Friday



www.ctcorporation.com
www.wolterskluwer.com

Confidentiality Notice: This email and its attachments (if any) contain confidential information of the sender. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. If you have received this email in error, please immediately notify the sender at the address shown herein and permanently delete any copies of this email (digital or paper) in your possession.

--------------- Original Message ---------------
**From:** Debbie Cokbilen [debora.cokbilen@wolterskluwer.com]
**Sent:** 5/18/2023 8:52 AM
**To:** louise@sca.org
**Subject:** Handoff from Sales: Society For Creative Anachronism, Inc. - Account Maintenance

Hi Louise,

I received a request to contact you regarding a service of process.  Can you please provide the full name of the entity that was served so I can research this further?

Thank you,

Debora Cokbilen
Senior Customer Service Representative
CT/NRAI, a Wolters Kluwer Business

(888) 579-0286
affiliateteam@wolterskluwer.com
7-5 PM EST Monday - Friday

SCA_000012



[www.ctcorporation.com](http://www.ctcorporation.com)
[www.wolterskluwer.com](http://www.wolterskluwer.com)

Confidentiality Notice: This email and its attachments (if any) contain confidential information of the sender. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. If you have received this email in error, please immediately notify the sender at the address shown herein and permanently delete any copies of this email (digital or paper) in your possession.

ref:_00D00hg2v._500Ho1BSU54:ref



SCA_000013



## the society for creative anachronism, inc.

P.O. Box 360789 • Milpitas, California 95036-0789 • Tel (408) 263-9305 • Fax (408) 263-0641

Lis Schraer
Society Seneschal/VP for Operations
seneschal@sca.org
October 28, 2021

George Parker
5705 S. Charro Lane
Hereford, AZ 85615

Dear Mr. Parker:

At its October 24, 2021 quarterly meeting, the Board of Directors of the SCA reviewed the results of an investigation into the circumstances surrounding your Exile from the Kingdom by the Crown of An Tir in April 2021. That review resulted in the following Board action:

*Motion by Dan Watson to revoke the membership of, and deny participation to, George Parker (Hakon Thorgeirsson Von Eignersfojord) effective immediately. Second by Ross Roegner. Opposed: None. Recused: Gigi Coulson. Absent: Jennifer Krochmal. Motion carried.*

Per the SCA's Corporate Policies, a revocation or denial of membership by the Board enforces exclusion from all SCA functions in all SCA kingdoms.

You have the right to appeal this action. Per the Corporate Policies of the SCA, Inc., "A revocation or denial of membership may be appealed, but such appeal must be accompanied by new evidence that warrants re-examination by the Board." You may refer to the SCA Sanctions Manual, located at https://www.sca.org/wp-content/uploads/2021/09/Seneschal-Sanctions-Manual-2020.pdf, for more information on this sanction and your rights of appeal.

Sincerely,

Lis Schraer
Vice-President for Operations/
Society Seneschal
cc: Amanda Grayson, Kingdom Seneschal, An Tir
    Nichelle Vargo, Kingdom Seneschal, Atenveldt

**MINUTES OF THE CONFERENCE CALL MEETING**
**OF THE BOARD OF DIRECTORS**
**OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.**

February 28, 2022

CALL TO ORDER

The meeting was called to order by Chair Dale Fong-Frederick via VoIP at 7:07 p.m. CT.

ATTENDANCE:

Directors Present:        Dale Fong-Frederick– Chair
                         Pug Bainter – Vice-Chair
                         Natalie Degerstrom
                         Jennifer Krochmal
                         Ross Roegner
                         Dan Watson

Directors Absent:        Gigi Coulson

Directors-Elect:         K.T. Sheppard – Seat F

Staff and Officers Present:   John Fulton – President
                             Lis Schraer – Society Seneschal
                             Stacy Hall – Deputy Society Seneschal
                             Louise Du Cray – Vice President of Corporate Operations
                             Patrick Anderson – In-House Legal
                             Bonnie Stringer – Interim Treasurer / Society Exchequer
                             Caroline Richmond – Treasurer - Elect
                             Brigid Costello – Corporate Communications Officer
                             Leslie Luther-Fulton - Executive Assistant

I.     ESTABLISHMENT OF AGENDA

Motion by Dan Watson to accept the agenda as presented and take agenda items out of order, as necessary. Second by Natalie Degerstrom.  Opposed: None.  Absent: Gigi Coulson.  Motion carried.

II.    OLD BUSINESS:

       A.     Covid-19 Vaccine Policy Updates

Motion by Natalie Degerstrom to remove contact tracing from the Board of Directors' *Resolution to Further Lift Suspension of In-Person Activity in the SCA as of August 1, 2021*, effective immediately.  Second by Dan Watson.  Opposed: None.  Absent: Gigi Coulson.  Chair exercised

his option to vote and did so in favor of the motion.  Motion carried.

      B.    *2022-02-17 COVIDSafe Acknowledgement*

Motion by Dan Watson to accept the COVIDSafe Acknowledgement for common use as presented by the Society Seneschal to confirm vaccine status effective immediately.  Second by Ross Roegner.  Opposed: None.  Absent: Gigi Coulson.  Chair exercised his option to vote and did so in favor of the motion.  Motion carried.

      C.    Variances Granted by the Society Seneschal

          1.    Aethelmearc – Request for Virtual Courts on February 5, 12, and 26, 2022

Motion by Dan Watson to uphold a variance granted to the Kingdom of Aethelmearc by the Society Seneschal on January 20, 2022, to allow official business to be conducted at virtual courts to be held on February 5, 12, and 26, 2022.  Second by Jennifer Krochmal. Opposed: None. Absent: Gigi Coulson.  Motion carried.

          2.    Aethelmearc – Request for Official Courts at Fighter Practices – March 13 and April 2, 2022

Motion by Dan Watson to uphold a variance granted to the Kingdom of Aethelmearc by the Society Seneschal on January 26, 2022, to allow official business to be conducted at courts to be held at Fighter Practices on March 13 and April 2, 2022.  Second by Natalie Degerstrom. Opposed: None. Absent: Gigi Coulson.  Motion carried.

          3.    Ansteorra – Winterkingdom in the Barony of Northkeep

Motion by Dan Watson to uphold a variance granted to the Barony of Northkeep of the Kingdom of Ansteorra by the Society Seneschal on January 29, 2022, to allow their Winterkingdom event to change from in-person to virtual, and also to allow for a change in venue.  Second by Jennifer Krochmal.  Opposed: None. Absent: Gigi Coulson.  Motion carried.

          4.    East – Request for Virtual Court on February 20, 2022

Motion by Pug Bainter to uphold a variance granted to the East Kingdom by the Society Seneschal on February 2, 2022, to allow a virtual court to be held on February 20, 2022, in order to conduct official business. Second by Jennifer Krochmal.  Opposed: None. Absent: Gigi Coulson.  Motion carried.

          5.    Blanket Variance for Virtual Courts and Events

The Society Seneschal issued the following blanket variance for virtual courts and events:

    A temporary variance is granted to <u>Corpora II.C</u>, *Business Requiring Prior*

*Announcement*, to allow kingdoms, principalities, and baronies to hold virtual courts to conduct such business without prior publication in the kingdom newsletter. Such virtual courts must be announced in advance on the kingdom web page and official social media channels, with instructions on how to attend/view the virtual court. Any awards granted or other business covered in Corpora II.C must be published in the next available edition of the kingdom newsletter. This variance will expire March 31, 2022 unless extended by the Society Seneschal.

Motion by Ross Roegner to uphold the *Blanket Variance for Virtual Courts and Events* as issued by the Society Seneschal on February 3, 2022, with a termination date of March 31, 2022. Second by Dan Watson. Opposed: None. Absent: Gigi Coulson. Chair exercised his option to vote and did so in favor of the motion. Motion carried.

      6.      Gleann Abhann – Candlemas in the Barony of Grey Niche

Motion by Dan Watson to uphold a variance granted to the Barony of Grey Niche of the Kingdom of Gleann Abhann by the Society Seneschal on February 3, 2022, to postpone their Candlemas event originally scheduled to be held on February 5, 2022, to February 12, 2022, due to dangerous weather conditions. Second by Pug Bainter. Opposed: None. Absent: Gigi Coulson. Motion carried.

      7.      Atlantia – Ymir in the Barony of Windmasters' Hill

Motion by Natalie Degerstrom to uphold a variance granted to the Barony of Windmasters' Hill of the Kingdom of Atlantia by the Society Seneschal on February 10, 2022, to allow a one-event waiver from enforcing the COVIDSafe Vaccine/testing policy on children ages 5-11 only at their Ymir event, scheduled for February 11-13, 2022, due to confusion over the wording of the change which had taken effect on February 1, 2022. Second by Dan Watson. Opposed: None. Absent: Gigi Coulson. Motion carried.

      8.      Aethelmearc – Queen's Rapier Championship

Motion by Dan Watson to uphold a variance granted to the Kingdom of Aethelmearc by the Society Seneschal on February 15, 2022, to postpone their Queen's Rapier Championship originally scheduled to be held on January 29, 2022 to March 5, 2022, and to allow official business to be conducted at that event, without publication of the date change in the Kingdom newsletter. Second by Natalie Degerstrom  Opposed: None. Absent: Gigi Coulson. Motion carried.

III.    NEW BUSINESS:

      A.      Corporate Communication Guidelines

Motion by Ross Roegner to approve Corporate Communication Guidelines as presented by the

Communications Officer.  Second by Pug Bainter.  Opposed: None.  Absent: Gigi Coulson.  The Chair exercised his option to vote and did so in favor of the motion.  Motion carried.

      B.      Corporate Policies Change – Minors as Crown  Corpora II.C.2.c

Motion by Dan to remand the matter of Corporate Policies II.C.2.c to the April 2022 quarterly meeting.  Second by Pug Bainter.  Opposed: None. Absent: Gigi Coulson.  Motion carried.

      C.      Database/CRM System Update

The report of the Vice-President of Corporate Operations was accepted as presented.

IV.     EXECUTIVE SESSION

      A.      Jay Eggett (Nathaniel Longbow)

Motion by Jennifer Krochmal to table the matter of Jay Eggett (Nathaniel Longbow) to the March 28 conference call.  Second by Ross Roegner.  Opposed: None.  Absent: Gigi Coulson.  Motion carried.

      B.      Janis James (Sine Gunnsdottir)  Appeal

By consensus, the Board declined to hear the appeal of Janis James (Sine Gunnsdottir). The Chair refers Ms. James back to the July 13, 2013 ruling by the Board of Directors.

      C.      George Parker (Ha'kon Thorgeirsson)

By consensus, the Board declined to hear the appeal of George Parker (Ha'kon Thorgeirsson).

      D.      Confidential Report from the Chair

Motion by Dan Watson to make confidential the special Board investigation dated February 2022 and to restrict its release to the Board of Directors, the President, the Vice-President of Corporate Operations, the Vice-President of Operations, and the Executive Assistant.  Dissemination to SCA outside legal counsel and/or In-House counsel is permitted.  Dissemination to any other individuals not so named will be considered a breach of fiduciary responsibility and grounds for immediate termination or impeachment from the Board.  Second by Pug Bainter.  Opposed: None.  Absent: Gigi Coulson.  The Chair exercised his option to vote and did so in favor of the Motion.  Motion carried.

Motion by Natalie Degerstrom to remand the remainder of the discussion regarding the special Board investigation dated February 2022 to the March 28, 2022 conference call.  Second by Dan Watson.  Opposed: None.  Absent: Gigi Coulson.  Motion carried.

ADJOURNMENT

Motion by Natalie Degerstrom to adjourn the meeting. Second by Dan Watson.   Opposed: None.  Absent:  Gigi Coulson.  Motion carried.

The meeting adjourned at 8:14 p.m. CDT.

Respectfully submitted,

/S/ Leslie Luther-Fulton
Executive Assistant

**MINUTES OF THE CONFERENCE CALL MEETING**
**OF THE BOARD OF DIRECTORS**
**OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.**

May 25, 2021

CALL TO ORDER

The meeting was called to order by Chairman Dan Watson via VoIP at 6:58 p.m. CT.

ATTENDANCE:

| | |
|---|---|
| Directors Present: | Dan Watson – Chairman |
| | Natalie Degerstrom – Vice-Chairman |
| | Craig Carter |
| | Gigi Coulson |
| | Dale Fong-Frederick |
| | Jennifer Krochmal |
| | Ross Roegner |
| | |
| Directors-Elect: | Open – Seat D |
| | |
| Staff and Officers Present: | John Fulton – President |
| | Lis Schraer – Society Seneschal |
| | Renee Signorotti – Vice President of Corporate Operations |
| | Louise DuCray – Vice President of Corporate Operations – Elect |
| | Jessica Van Hattem – Society DEI Officer |
| | Brigid Costello – Society Social Media Officer |
| | Leslie Luther-Fulton - Executive Assistant |

I.      ESTABLISHMENT OF AGENDA

Motion by Craig Carter to accept the agenda as presented and take agenda items out of order, as necessary.  Second by Natalie Degerstrom.  Opposed:  None.  Motion carried.

II.     OLD BUSINESS

        A.      Committees Discussion

                1.      Finance Committee

By consensus, it was determined that the Finance Committee would be placed on hiatus, and that reporting notations for this item would be removed from future agendas until further notice.

2.          Audit Committee

By consensus, it was determined that the Audit Committee would be composed of the following individuals:  Dan Watson, Ross Roegner and Natalie Degerstrom.

3.          Membership Committee

By consensus, it was decided to dissolve the Membership Committee, effective immediately.

4.          Revenue Committee

Regarding appointments to the Revenue Committee: by consensus, no action was taken.

B.          Board Travel Moratorium

By consensus, this item was remanded to the July 2021 quarterly meeting.

C.          Reopening Update

The report of the Society Seneschal was accepted as presented.  Ms. Schraer noted that questions regarding specific event policies should be directed to the appropriate Kingdom Seneschal for response.

D.          Resolution to Further Lift Suspension of In-Person Activity

Motion by Ross Roegner to approve the *Resolution to Further Lift Suspension of In-Person Activity in the SCA as of July 1st, 2021,* as amended.  Second by Natalie Degerstrom.  Opposed: None.  Chairman Watson exercised his option to vote and did so in favor of the motion.  Motion carried.

**A copy of the *Resolution to Further Lift Suspension of In-Person Activity in the SCA as of July 1st, 2021* is attached hereto as Addendum A.**

E.          Infectious Disease Warning

Motion by Dale Fong-Frederick to approve the following language, and require that it appear on all event notices, flyers, online announcements, and advertisements, as well as being posted in multiple locations, including Troll [Registration], at all events:

>*Although the SCA complies with all applicable laws to try to ensure the health and safety of our event participants, we cannot eliminate the risk of exposure to infectious diseases during in-person events.  By participating in the in-person events of the SCA, you acknowledge and accept the potential risks.  You agree to take any additional steps to protect your own health and safety and those under your control as you believe to be necessary.*

Seconded by Gigi Coulson.  Opposed: None.  Motion carried.

III.   NEW BUSINESS

A.   Covid-19 Variances

1.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of Calontir by the Society Seneschal on April 22, 2011, allowing replacement of the Kingdom Chronicler without a court announcement.  Second by Ross Roegner. Opposed:  None.  Motion carried.

2.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of Drachenwald by the Society Seneschal on April 22, 2021, to a delay of Crown Tournament until October 2021.  Second by Ross Roegner.  Opposed:  None. Motion carried.

3.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of Ansteorra by the Society Seneschal on April 28, 2021, to allow the hiring of a third-party food truck for an event to be held in a rural area on June 26, 2021.  Second by Ross Roegner.  Opposed:  None.  Motion carried.

4.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of the West by the Society Seneschal on May 8, 2021, as a condition of insurance, to allow overnight camping by the event steward and her partner on the event site intended for the West Kingdom Crown Tournament on September 4, 2021.  Second by Ross Roegner.  Opposed:  None.  Motion carried.

5.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of An Tir by the Society Seneschal on May 5, 2021, to allow that the An Tir/West War for 2021 be cancelled. Second by Ross Roegner.  Opposed:  None.  Motion carried.

6.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of Gleann Abhann by the Society Seneschal on May 7, 2021, to allow the date of Kingdom A&S to be moved by two (2) weeks to September 4, 2021.  Second by Ross Roegner.  Opposed:  None.  Motion carried.

7.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of Trimaris by the Society Seneschal on May 12, 2021, to allow the Barony of Wyvernwoode (Tampa, Florida) to hold an indoor demo at MetroCon at the end of July, 2021.  Second by Ross Roegner.  Opposed:  None.  Motion carried.

8.   Motion by Gigi Coulson to approve a variance granted to the Kingdom of the Middle by the Society Seneschal on May 15, 2021, waiving the requirement that bids for Crown Tournaments and Coronations provide a nine-month lead time. Second by Ross Roegner.  Opposed:  None.  Motion carried.

9.      Motion by Gigi Coulson to approve a variance granted to the Kingdom of Ansteorra by the Society Seneschal on May 17, 2021, to permit the Shire of Rosenfeld (Tyler, Texas) to participate in a demo at a local Celtic Festival on May 21-23 and May 28-30, 2021.  Second by Ross Roegner.  Opposed:  None.  Motion carried.

B.      Peerage Proposal FAQ

By consensus, this item was remanded to the July 2021 quarterly meeting.

C.      2020 Audit – Letter of Engagement

The report of the Vice-President of Corporate Operations was accepted as presented.

IV.     Executive Session

A.      George Parker (Hakon Thorgeirsson Von Eignersfojord)

Motion by Gigi Coulson to uphold the exile of George Parker (Hakon Thorgeirsson Von Eignersfojord) by Christian and Helene, Crown of the Kingdom of An Tir, on April 2, 2021, and to direct the Society Seneschal to begin an investigation into possible sanctions up to and including revocation of membership and denial of participation.  Second by Natalie Degerstrom.  Opposed: None.  Motion carried.

B.      Formation of Corporate Communications Committee

Motion by Dale Fong-Frederick to form a Corporate Communications Committee with the limited purpose of this committee is to draft a manual of guidelines for internal and external communication by Board Members, Officers, Committee members, and Project members.  Second by Jennifer Krochmal. Opposed: None.  Motion carried.

*The formal description of this committee is as follows:*

*The Corporate Communications Committee is a committee with the limited purpose of drafting a manual of guidelines for internal and external communication by Board Members, Officers, Committee members, and Project members.   The committee shall automatically be dissolved upon Board approval of a completed guideline manual.  The committee shall be comprised of the President of the SCA, Communications Officer, Legal Counsel, Social Media Officer, DEI Officer, and a Board Member.  The President shall call the first meeting to order, and the committee shall select its own chair by majority vote.  The committee may nominate and select a new chair by majority vote at any committee meeting as needed.  The board member may cast a second vote to break a tie.*

      C.      Ryan Davidson (Jose Cabrera de Castille)

Motion by Craig Carter to uphold the Temporary Removal from Participation ("TRP") of Ryan Davidson (Jose Cabrera de Castille) as issued by Christian and Helene, Crown of the Kingdom of An Tir, and their Kingdom Seneschal, on April 26, 2021, to extend the TRP, and to direct the Society Seneschal to begin an investigation into possible sanctions up to and including revocation of membership and denial of participation. Second by Natalie Degerstrom. Recused: Gigi Coulson. Opposed: None. Motion carried.

      D.      Updates from the Society Seneschal

The report of the Society Seneschal was accepted as presented.

      E.      Belegarth Medieval Combat Society Request

The report of the President was accepted as presented.

      F.      Appointment of Vice-Chairman

Motion by Natalie Degerstrom to appoint Dale Fong Frederick as Vice-Chairman for the Board of Directors, effective at the close of the May 25, 2021, conference call. Second by Jennifer Krochmal. Opposed: None. Motion carried.

ADJOURNMENT

Motion by Natalie Degerstrom to adjourn the meeting. Seconded by Craig Carter. Opposed: None. Motion carried.

The meeting was adjourned at 8:53 p.m. CDT.

Respectfully submitted,
/S/ Leslie Luther-Fulton
Executive Assistant

 **the society for creative anachronism, inc.**

P.O. Box 360789 • Milpitas, California 95036-0789 • Tel (408) 263-9305 • Fax (408) 263-0641

On May 25, 2021, the Board of Directors passed the following:

### Resolution to Further Lift Suspension of In-Person Activity in the SCA as of July 1st, 2021

I.    Whereas the challenge created by the COVID-19 Global Pandemic demanded heightened safety standards which led to a suspension of in-person activity and a subsequent partial lifting of that suspension in North America by the SCA Board of Directors;

II.    Whereas the crisis of the Pandemic is being addressed through a combination of social policy, as well as scientific and medical advancements;

III.    Whereas the SCA Board of Directors continues to prioritize the health and well-being of the membership and participants of the SCA; and

IV.    Whereas the directed suspension of in-person events in North America expires after May 31st, 2021, and the previous partial lifting of said suspension takes effect on June 1, 2021; now, therefore, be it

V.    *Resolved*, that the SCA Board of Directors further lifts the suspension of in-person activity in North America, effective July 1, 2021 provided adherence to the items in this resolution;

VI.    *Resolved*, that all attendees in North America must follow all province, territory, state, and local health guidelines at SCA events. In addition, at all North American SCA events:

    A.  Kingdoms may require the use of masks at their events;

    B.  The SCA may not provide shared drinking containers or any food served in a buffet-style. Attendees who accept shared drinking containers or buffet-style food from other attendees do so at their own risk. Feast will not be allowed at this time; and

    C.  All events shall require preregistration.

VII.    *Resolved*, that the SCA Board of Directors mandates any Kingdoms who propose any deviation from the above restrictions to request a variance from the Society Seneschal in order to hold the proposed event. The Society Seneschal shall have the authority to grant or deny these requests. These requests will be reviewed by the Board using the same review method used for variances to Corpora;

VIII.    *Resolved*, that enforcement of this resolution will be handled by the Society Seneschal and President of SCA Inc.; and,

IX.    *Resolved*, that the SCA Board of Directors commends the hard-working officers, royalty, membership, and participants who have allowed the SCA to continue to flourish virtually

as we lift this suspension and transition forward in a manner consistent with recommended health and safety standards.

The President and the Society Seneschal have been given the responsibility of implementing the resumption of events within the rules above and adjusting the strictures as needed with Board approval.

As per item (C) in the Resolution, SCA, Inc. has available the Event Module for the mandatory pre-registration process. All kingdoms are encouraged to utilize this tool. If you would like to contact  the SCA Accounting Specialist, Mazelle Attiya about this available option, she can be reached at Mazelle@sca.org.

Questions or comments should be sent directly to president@sca.org and seneschal@sca.org or your board Ombudsman.

This is the next step toward the resumption of normal in-person SCA events. Working with the corporate officers  and with input from the various kingdoms, we will continue to assess the pandemic environment  and make changes going forward as needed, either to add further restrictions or relax existing  ones as the situation allows.

No matter what safety precautions we put in place, there is no substitute for each individual being educated about the risk to themselves and their loved ones and making responsible choices to protect themselves and others from this virus.

MINUTES OF THE QUARTERLY MEETING OF
THE BOARD OF DIRECTORS OF
THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

October 24, 2021

CALL TO ORDER

The meeting was called to order by Chairman Dan Watson via VoIP at 12:04 p.m. CT.

ATTENDANCE:

Directors Present:      Dan Watson – Chairman
                        Dale Fong-Frederick– Vice-Chairman
                        Natalie Degerstrom
                        Craig Carter
                        Gigi Coulson
                        Ross Roegner

Directors Absent (Open Session Only):   Jennifer Krochmal

Directors-Elect:        Pug Bainter – Seat E

Staff and Officers Present:    John Fulton – President
                               Lis Schraer – Society Seneschal
                               Louise Du Cray– Vice President of Corporate Operations
                               Mazelle Attiya – Corporate Treasurer
                               Bonnie Stringer – Society Exchequer
                               Patrick Anderson – In-House Counsel
                               Ray Dubose – Society Marshal
                               Brigid Costello – Society Communications Officer
                               Jessica Van Hattem – Corporate DEI Officer
                               Ellen Rawson – Editor, *Compleat Anachronist*
                               Jennifer Smith – Laurel Queen of Arms
                               Leslie Luther-Fulton - Executive Assistant

I.  ESTABLISHMENT OF AGENDA

Motion by Craig Carter to accept the agenda as presented and take agenda items out of order, as
necessary. Second by Dale Fong-Frederick.  Opposed:  None. Absent:  Jennifer Krochmal.
Motion carried.

II.  APPROVAL OF MINUTES

Motion by Gigi Coulson to approve the July 18, 2021, quarterly meeting minutes, the July 27,
2021, conference call meeting minutes, the August 17, 2021, conference call meeting minutes,
the September 2, 2021, conference call meeting minutes and the September 25, 2021, conference

call meeting minutes as presented. Second by Ross Roegner  Opposed: None.  Absent:  Jennifer Krochmal.  Motion carried.

III.   RECURRING BUSINESS

A. Status Changes - *None this quarter.*

B.  Quarterly Meeting Schedule

1.  Establishment/Confirmation of Meeting Dates & Locations

By consensus, Chairman Watson took note of the following meeting schedule:

a.  January 30, 2022, Quarterly Board Meeting – Virtual
b.  April 24, 2022, Quarterly Board Meeting – Virtual (Tentative)
c.  July 24, 2022, Quarterly Board Meeting – Virtual (Tentative)
d.  October 16, 2022, Quarterly Board Meeting – Virtual (Tentative)

2.  Invited Guests

By consensus, it was decided that the Director-Elect and all major Society officers be invited to the January 2022, quarterly meeting. The officers were instructed to monitor their emails for more information.

3.  Conference Call Schedule

By consensus, Chairman Watson took note of the following conference call meeting schedule:

a.  Tuesday, November 29th – 5:00 p.m. PDT
b.  Tuesday, December 28, 2021 – 5:00 p.m. PDT

C.  Bank Account Authorizations:

Vice-President of Corporate Operations Louise Du Cray noted there that all pending bank authorizations have been handled at this time.

D.  Warrants:  There were no warrants presented for signature.

E.  Ongoing Projects

1.  Board Recruiting:

Director Natalie Degerstrom stated that there are at present thirty-nine (39) candidates on the list of Board nominees.  A breakdown by kingdom is as follows:

2

| | | | |
|---|---|---|---|
| Æthelmearc | 3 | Ealdormere | 0 |
| An Tir | 4 | East | 5 |
| Ansteorra | 2 | Gleann Abhann | 3 |
| Artemisia | 0 | Meridies | 4 |
| Atenveldt | 1 | Middle | 3 |
| Atlantia | 5 | Northshield | 1 |
| Avacal | 0 | Outlands | 1 |
| Caid | 2 | Trimaris | 1 |
| Calontir | 4 | West | 0 |
| Drachenwald | 0 | | |

Director Degerstrom stated that commentary from the membership on the nominees is always welcomed, as are new nominations.

    2.  Board Representation

By consensus, no action was taken.

IV.  OLD BUSINESS:

    A.  Marshal's Handbook

Motion by Ross Roegner to approve the Marshal's Handbook as presented by the Society Marshal.  Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

    B.  Armoured Combat with Rebated Blades Marshal's Handbook

Motion by Ross Roegner to approve the Armoured Combat with Rebated Blades Marshal's Handbook as presented by the Society Marshal. Second by Dale Fong-Frederick. Opposed: None. Absent:  Jennifer Krochmal.  Motion carried.

    C.  Society Chronicler Policies Handbook

Motion by Dale Fong-Frederick to approve the Society Chronicler Policies Handbook as presented by the Society Chronicler. Second by Craig Carter. Opposed: None.  Absent:  Jennifer Krochmal. Motion carried.

 V.  NEW BUSINESS

    A.  Variances Granted by Society Seneschal

      1.  Gleann Abhann: A variance was granted for the barony of Grey Niche's Samhain event to hold business requiring prior announcement despite not appearing in the October edition of the kingdom newsletter due to unavoidable circumstances. Granted 10/5/2021.

3

Motion by Dale Fong-Frederick to uphold a variance granted to the Kingdom of Gleann Abhann by the Society Seneschal on October 5, 2021, to allow the Barony of Grey Niche's Samhain event to hold business requiring prior announcement despite not appearing in the October edition of the kingdom newsletter. Second by Craig Carter. Opposed: None. Absent: Jennifer Krochmal. Motion carried.

> 2.  Ansteorra: A variance was granted for the barony of Namron to hold Namron Protectorate (October 22-24, 2021) at a different site than that published in the kingdom newsletter, due to an unavoidable last-minute site change.

Motion by Dale Fong-Frederick to uphold a variance granted to the Kingdom of Ansteorra by the Society Seneschal on October 5, 2021, to allow the Barony of Namron to hold Namron Protectorate (October 22-24, 2021) at a different site than that published in the kingdom newsletter, due to an unavoidable last-minute site change.  Second by Craig Carter.  Opposed: None. Absent: Jennifer Krochmal.  Motion carried.

> 3.  Ansteorra: A variance was granted for the Barony of Loch Soilleir to hold Coastal Grant Baronials at a different site than that published in the kingdom newsletter, due to flooding concerns on the original site.

Motion by Dale Fong-Frederick to uphold a variance granted to the Kingdom of Ansteorra by the Society Seneschal on October 5, 2021, to allow the Barony of Loch Soilleir to hold Coastal Grant Baronials at a different site than that published in the kingdom newsletter, due to flooding concerns on the original site. Second by Ross Roegner.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

> 4.  The Kingdom of Ealdormere was granted the following variance to the Board's "Proof of Fully Vaccinated Status or Negative COVID Test" policy:

>> A variance is granted to the Kingdom of Ealdormere in order to bring the policy into line with Ontario's provincial regulations requiring proof of vaccination for all indoor events, which must be followed. The purpose of this variance is to provide Ealdormere with one uniform set of rules, rather than different rules for indoor events versus outdoor events.

>> In Ealdormere, at all SCA events, all persons ages 12 and over must produce either:

>> 1. Proof of vaccination as defined by Ontario's Proof of Vaccination Guidance; or

>> 2. Proof of a medical exemption granted by the Canadian Health Service as defined by the Ontario Proof of Vaccination Guidance. No other exemption will be accepted. Negative COVID tests will not be accepted.

>> In addition, identification as described in the Ontario Proof of Vaccination Guidance will be accepted.

4

There are no exceptions to these rules. This variance only applies to events held within the Kingdom of Ealdormere.

Motion by Gigi Coulson to uphold a variance granted to the Kingdom of Ealdormere allowing for proof of vaccination as defined by the <u>Ontario Proof of Vaccination Guidance</u>, in accordance with Ontario's provincial regulations. Second by Ross Roegner.   Opposed: None.   Motion carried.

B.   COVIDSafe Policy – Checking Vaccine Statu

Motion by Dale Fong-Frederick to approve amending Section 7 of the COVIDSafe Policy regarding vaccination checks as requested by the Society Seneschal. Second by Craig Carter. Opposed: None. Absent:  Jennifer Krochmal.  Motion Carried.

The new language now reads

The Kingdom must check for proof of being fully vaccinated or a negative COVID test at an event. The event organizer may designate multiple people to perform the vaccination/negative COVID test check where each person performing the check is responsible for all people whose last name begins within a specified subset of the alphabet (for example, one person for A-H, one person for I-M, etc.)

The event organizer, or their designee, shall maintain a list of names and times of the person(s) conducting the check at the entrance. A separate list shall be maintained for each alphabet group. Once the entrance is closed at the event, said person(s) will sign a statement at the bottom of the list of names and times, which reads:

*"I have monitored the event entrance at the times noted above, and I have verified that each person age 12 and over with last names through \_, entering the event during that time to have shown me proper identification, along with either proof of being fully vaccinated or a negative COVID test taken within 72 hours of the start of the event."*

The event organizer, or their designee, shall forward the signed statement(s) to the Kingdom Seneschal, or their designee, who shall maintain such records in accordance with the standards for retention of waivers.

***The full policy language can be found here: https://www.sca.org/news/covidsafe-proof-of-fully-vaccinated-status-or-negative-covid-test-policy-resolution/***

5

C.  2022 Preliminary Budget

This item was remanded to the Tuesday, November 29th – 5:00 p.m. PDT Conference Call.

D.  2021 Executive Summary Through August

The report of the Corporate Treasurer was accepted as submitted.

VI.  REPORTS

A.  President – John Fulton (John the Bearkiller)

The report of John Fulton, President, was summarized and accepted as submitted. The report contained the following action items:

2.  POLICY INTERPRETATIONS:  Some of the variances issued by Society Seneschal Lis Schraer over the last quarter were done after careful discussion with my office.

While technically not an interpretation, I do think it is important to state that several times in the past quarter questions were presented to me on whether Crowns/Coronets were officers of the SCA, Inc.  Below is the verbiage from the glossary in Corpora that defines those positions as officers.  I hope this helps prevent confusion in the future.
Per Corpora (glossary):

Officer: A Society member serving in an appointed office as defined in Corpora, or as an appointed deputy in such an office, or in another office as may be defined by Kingdom Law, at any level of the Society, or in the role of organizer of a Society event (commonly referred to as "Autocrat" or "Steward"), or as a Territorial Baron or Baroness, or as Crown or Coronet or heir to a Crown or Coronet.

By consensus, this policy interpretation was noted.

***Report filed.***

A.1.  Manager for Information Technology – Aaron Rusty Lloyd (Aaron Palomides of Buckminster)

The report of Aaron Rusty Lloyd, Manager for Information Technology, was summarized and accepted as submitted.  There were no action items.

***Report filed.***

A.2.  Society Communications Officer – Brigid Costello (Anne de Tournai)

***No Report filed.***

6

A.3.  Social Media Officer – Brigid Costello (Anne de Tournai)

The report of Brigid Costello, Social Media Officer, was summarized and accepted as submitted. The report contained no action items.

**Report filed.**

A.4.  Society DEI Officer – Jessica Van Hattem (Zahra Astridr Tesfave)

The report of Jessica Van Hattem, Society DEI Officer, was summarized and accepted as submitted.  The report contained no action items.

**Report filed.**

B.  Vice President for Operations (Society Seneschal) – Lis Schraer (Elasait ingen Diarmata)

The report of Lis Schraer, Vice President for Operations, was summarized and accepted as submitted.  The report contained the following action items:

1.  Requested Board Actions

a.  The President and I would like to request that the Board make a change to Corporate Policies II.C.2.c, General Conditions and Privileges of Membership— Eligibility for Office - Minors as Officers. This is located on Page 52 of the Governing Documents.

This point currently reads:  *Minors may not serve as group marshals or as marshal in charge, seneschal or exchequer.*

We would like the sentence to be changed to read: *Minors may not serve as royalty, territorial barons or baronesses, seneschals, exchequers, group marshals, or marshals in charge.*

Motion by Ross Roegner to approve for commentary publication of the following proposed change Corporate Policies II.C.2.c, General Conditions and Privileges of Membership - Eligibility for Office - Minors as Officers: *Minors may not serve as royalty, territorial barons or baronesses, seneschals, exchequers, group marshals, or marshals in charge.* Second by Gigi Coulson. Opposed:  None. Absent: Jennifer Krochmal.  Motion carried.

b.  Please approve the dissolution of the Shire of Adamastor (Cape Town, South Africa).

Motion by Dale Fong-Frederick to approve the dissolution of the Shire of Adamastor (Cape Town, South Africa). Second by Ross Roegner.  Opposed:  None. Absent: Jennifer Krochmal. Motion carried.

7

2. Policy Interpretations:

    a.   Corpora VII.A.2, Kingdom Officers - General, located on Page 27 of the Governing Documents, reads:

> *Kingdom Great Officers are responsible directly to the Crown, but also report to a corresponding Society officer if such a Society officer exists. Each Kingdom's Great Officer corps must include the Seneschal, the Principal Herald, the Earl Marshal, the Minister of Arts and Sciences, the Chancellor of the Exchequer, and the Chronicler. No person may hold more than one of these Great offices at a time. The Crown may create additional Great Offices.* **Kingdom Lesser Officers and deputies are created by the Crown according to the needs of the kingdom.** *These officers may be supervised directly by the Crown or be placed under the jurisdiction of a Greater Officer, and report accordingly. However, Great Officers retain ultimate responsibility for delegated functions.* (Emphasis added.)

I was asked whether the bolded sentence above gives the Crown the power to appoint deputies to kingdom officers over the objection of the kingdom officer, which could leave the kingdom officer holding the bag if the Crown-chosen deputy was derelict in their duties. My interpretation is that the Crown may <u>not</u> unilaterally appoint deputies to kingdom officers, or lesser officers that serve under a kingdom officer. They may appoint lesser officers that are "supervised directly by the Crown".

In Section VII.I, Appointment to Office (Page 29), Corpora states that kingdom Greater Officers are appointed by the Crown, to be ratified by the corresponding Society Officer. It then states that Lesser Officers are appointed "in a parallel manner, where the Great Officer takes the place of the Society Officer." Further, in the section on Warrants, Corpora states that warrants must be signed by "the appropriate Royalty and the responsible superior officer."

As no officer can be compelled to sign a warrant, it seems clear that Royalty may not appoint a deputy or lesser officer who will be under the supervision of a superior officer other than the Royalty, without that superior officer's consent to the appointment. I ask that the Board uphold this interpretation.

Motion by Gigi Coulson to uphold the policy interpretation of the Society Seneschal the Crown may not unilaterally appoint deputies to kingdom officers, or lesser officers that serve under a kingdom officer, but that they may appoint lesser officers that are supervised directly by the Crown. Second by Ross Roegner. Opposed: None. Absent: Jennifer Krochmal. Motion carried.

**Report filed.**

    B.1.  Society Chatelaine – Anne Stevenson (Giovanna Adimari)

The report of Anne Stevenson, Society Chatelaine, was summarized and accepted as submitted. There were no action items.

8

SCA_000034

C.   Vice President for Corporate Operations – Louise Du Cray

1.  Requested Board Action

The report of Louise Du Cray, Vice President for Corporate Operations, was summarized and accepted as submitted.  The report contained the following action item:

a.   Please approve the addition of myself, Mazelle Attiya as Accounting Specialist, and Nataalya Urosevic as Administrative Assistant, as new contacts for the SCA Investment Account.

Motion by Dale Fong-Frederick to approve the addition of myself, Mazelle Attiya as Accounting Specialist, and Nataalya Urosevic as Administrative Assistant, as new contacts for the SCA Investment Account.  Second by Gigi Coulson.  Opposed: None.  Motion carried.

***Report filed.***

C.1.  *Tournaments Illuminated* - Dar'C O'Neal (*Riordan MacGregor*)

The report of Dar'C O'Neal Editor for *Tournaments Illuminated*, was summarized and accepted as submitted.  There were no action items.

***Report filed***.

C.2.  *Compleat Anachronist* - Ellen Rawson (Ariel of Lindisfarne)

The report of Ellen Rawson, Editor for *Compleat Anachronist*, was summarized and accepted as submitted.  There were no action items.

***Report filed***.

C.3.  Society Chronicler – Stephanie Sitzes (Arianna Stefana Falconi)

The report of Stephanie Sitzes, Society Chronicler, was summarized and accepted as submitted.  There was one action item:

a.  Requested Board Actions

i.  Please accept and approve the new Chronicler Policies.

*Handled under Item IV.C.*

***Report filed***.

9

D.   Corporate Treasurer Mazelle Attiya (Alysia Gabrielle de Fougeres)

The report of Mazelle Attiya, Corporate Treasurer, was summarized and accepted as submitted. There was one action item:

    1.   Requested Board Actions

        a.   Discussion and approval of the 2022 SCA Corporate Office Budget.

*Handled under Item V. C.*

**Report filed**.

D.1.   Society Exchequer – Bonnie Stringer (Marcel Orillion)

The report of Bonnie Stringer, Society Exchequer, was summarized and accepted as submitted. The report contained the following action items:

    a.   Requested Board Action

        i.   Please approve the Kingdom of the Outlands PayPal addendum to Financial Policy.

Motion by Gigi Coulson to approve the Kingdom of the Outlands PayPal addendum to their Financial Policy, as submitted by the Society Exchequer, effective immediately. Second by Dale Fong-Frederick. Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

        ii.   Please approve the Kingdom of An Tir Financial Policy.

Motion by Dale Fong-Frederick to approve the Kingdom of An Tir Financial Policy, as submitted by the Society Exchequer.   Second by Ross Roegner. Opposed: None. Absent: Jennifer Krochmal.  Motion carried.

        iii.   Please uphold a variance granted to the Society Heralds to test the use of PayPal for payments of submissions that are accepted virtually.

Motion by Ross Roegner to uphold a variance granted to the Society Heralds by the Society Exchequer to test the use of PayPal for payments of submissions that are accepted virtually Second by Dale Fong-Frederick.  Opposed: None.  Absent: Jennifer Krochmal. Motion carried.

        iv.   Please uphold a variance granted to the Barony of Axemoor and the Kingdom of Gleann Abhann allowing for paper checks to be issued for Crown List refunds. The Barony of Axemoor was scheduled to host Crown List; however, the event date was altered due to Hurricane Ida.  (Society PayPal Policy #8 – "group will issue paper refund checks")

10

Motion by Dale Fong-Frederick to uphold a variance granted to the Barony of Axemoor and the Kingdom of Gleann Abhann by the Society Exchequer allowing for paper checks to be issued for Crown List refunds. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal. Motion carried.

***Report filed.***

 E.  Laurel Principal Queen of Arms - Jennifer Smith (Emma de Fetherstan)

The report of Jennifer Smith, Laurel Principal Queen of Arms, was summarized and accepted as submitted.  The report contained the following action items:

 1.  Requests for Board Action:

  a.  Please approve the following changes to SENA (Standards for Evaluation of Names and Armory): In Section GP "General Principles", a revision of GP3 "Definition of Period" to remove the geographic definition. Also, a change in GP4 "Definition of Terms" to recognize the change in terminology from "steps from period practice" to "steps from core practice". This was done to both better reflect how we are using that phrase in practice, and to make it easier to register non-European names and armory.

Motion by Craig Carter to approve revisions to SENA GP3 "Definition of Period" and  SENA GP4 "Definition of Terms" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson. Opposed: None. Absent: Jennifer Krochmal.  Motion carried.

  b.  Please approve the following changes to SENA (Standards for Evaluation of Names and Armory): Updates throughout the armory rules to reflect the change in terminology from "steps from period practice" to "steps from core practice" and the removal of geographic restrictions (as noted above). These changes affect A1A "Definitions of Rule Sets"; A2B1 "Attested Elements"; A2B2 "Constructed Elements"; and A2B4 "Elements which are a Step from Core (Period) Practice". These changes make it easier to register armory including documented items, plants, and animals from non-Western European cultures.

Motion by Craig Carter to approve revisions to SENA A1A "Definitions of Rule Sets"; A2B1 "Attested Elements"; A2B2 "Constructed Elements"; and A2B4 "Elements which are a Step from Core (Period) Practice" as presented by the Laurel Principal Queen of Arms.  Second by Gigi Coulson. Opposed: None. Absent: Jennifer Krochmal.  Motion carried.

  c.  Please approve the following changes to SENA (Standards for Evaluation of Names and Armory): The removal of the geographic restriction (old GP3B) required two changes the Non-Personal Names section NPN1B "Designators". The first is the removal of the restriction of branch names to European languages only in NPN1B1.

11

The second simply removes the reference to GP3B under "Heraldic Titles" in NPNB4; it has no effect on the types of heraldic titles that are registrable.

Motion by Craig Carter to approve revisions to SENA NPN1B "Designators" and GP3B "Heraldic Titles" in NPNB4 as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent:  Jennifer Krochmal.  Motion carried.

> d.  Please approve the following change to SENA (Standards for Evaluation of Names and Armory): Revision of the Armory section A3A3 "Augmentations of Honor" to allow poor-contrast augmentations, which matches patterns we have found in period armory.

Motion by Craig Carter to approve revisions to SENA A3A3 "Augmentations of Honor" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent:  Jennifer Krochmal.  Motion carried.

> e.  Please approve the following change to SENA (Standards for Evaluation of Names and Armory): Revision of the Armory section A6G3 "Presumption - Claims through Marshalling" to remove Libya's flag *Vert* from an example and to clarify that the use of a fur is considered a "plain section". These are clarifications only and do not affect registrability of armory.

Motion by Craig Carter to approve revisions to SENA A6G3 "Presumption - Claims through Marshalling"  as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

> f.  Please approve the following change to SENA (Standards for Evaluation of Names and Armory): Revision of the examples in the Personal Names section PN4C "Presumption - Claim of Powers" to make it clearer that names used by normal humans in period can be registered even if the meaning implies supernatural powers.

Motion by Craig Carter to approve a revision to SENA PN4C "Presumption - Claim of Powers" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent:  Jennifer Krochmal.  Motion carried.

> g.  Please approve the following change to the Administrative Handbook:  Revised III.B.2 to exclude single-tincture flags from protection as armory of significant geographical locations outside the Society. This specifically only applies to the "plain" tinctures, *argent, azure, gules, Or, purpure, vert,* and *sable.*

Motion by Craig Carter to approve a revision to the College of Arms Administrative Handbook III.B.2 to exclude single-tincture flags from protection as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

SCA_000038

h.  Revised IV.G.4 to include a reference to a standard form (which has been added to an appendix, see below) that legal heirs can use to attest that they have the right to transfer, release, or grant permission to conflict with items registered to a deceased person.

Motion by Craig Carter to approve a revision to the College of Arms Administrative Handbook IV.G.4 to include a reference to a standard form (which has been added to an appendix, see below) that legal heirs can use to attest that they have the right to transfer, release, or grant permission to conflict with items registered to a deceased person as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

2.  New Policies

a.  Please approve the following revision to SENA Appendices: We have revised the Baltic section of SENA Appendix A, "Patterns That Do Not Need Further Documentation by Language Group" to remove Latvian, to add Estonian, and to significantly increase the patterns for Lithuanian names that do not require additional documentation.

Motion by Craig Carter to approve a revision to SENA Appendix A "Patterns That Do Not Need Further Documentation by Language Group" as presented by the Laurel Principal Queen of Arms.  Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

b.  Please approve the following revisions to SENA **Appendices:** We have updated Appendix C "Regional Naming Groups and Their Mixes" to change the name of the Russian/East Slavic naming group to East Slavic and to add Ruthenian as a language in this group.

Motion by Craig Carter to approve a revision to SENA Appendix C "Regional Naming Groups and Their Mixes" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson. Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

c.  Please approve the following revisions to SENA **Appendices:** We have updated Appendix F "Some Armorial Elements that Do Not Need Further Documentation" to remove several non-period postures and to clarify those that are a step from core practice. Only the sub-section titled "A Partial List of Registrable Postures" is affected. Additionally (and not shown in the appendix of this report) all references to *a step from period practice* have been replaced by *a step from core practice*.

Motion by Craig Carter to approve a revision to SENA Appendix F "Some Armorial Elements that Do Not Need Further Documentation" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

13

d.   Please approve the following revisions to SENA **Appendices**: We have updated Appendix G "Some Specific Elements that are a Step from Core Practice". Several elements have been removed from the list while a few have been added. These changes align the lists in the appendix with current precedent. Additionally, all references to *a step from period practice* have been replaced by *a step from core practice*.

Motion by Craig Carter to approve a revision to SENA Appendix G "Some Specific Elements that are a Step from Core Practice" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

f.   Please approve the following revisions to SENA **Appendices**: We have updated Appendix J "Documented and Forbidden Arrangements of Charge Groups on Armory" to include more patterns based on period evidence. The effect of these changes mean that submitters don't need to document these patterns to register them.

Motion by Craig Carter to approve a revision to SENA Appendix J "Documented and Forbidden Arrangements of Charge Groups on Armory" as presented by the Laurel Principal Queen of Arms.  Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

g.   Please approve the following revisions to SENA **Appendices**: Appendix M "Some Resources for Conflict Checking" has been reformatted for ease of use and to add information from useful precedents to various sections.

Motion by Craig Carter to approve a revision to SENA Appendix M "Some Resources for Conflict Checking" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

h.   Please approve the following change to the Glossary of Terms: The term SFCP (step from core practice) was added to the section "Some common acronyms". This is the term now used instead of SFPP (step from period practice), which is now noted as obsolete.

Motion by Craig Carter to approve the addition of the term SFCP "Some common acronyms" to the SCA College of Arm's Glossary of Termsvas presented by the Laurel Principal Queen of Arms.  Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

i.   Please approve the following change to the Glossary of Terms: Updated the Glossary of Terms to reflect the change from step from period practice to step from core practice. This is a terminology change only, intended to reflect the fact that SENA is based on a "core style" practice, not on all known period practices. Also, the definitions for "Period" has been modified and the limitation on the domain (geographic area) of the Society ("Period and domain of the Society") has been eliminated in accordance with the March 3, 2021 revision to the SCA Governing

14

SCA_000040

Documents. Finally, cross-references have been added for "Grey Period", "Grey Area" and "Gray Period" to match the various spellings and terminology used in various older rulings and documents. This is intended to make it easier for people searching for these terms to find the definitions.

Motion by Craig Carter to approve an update to the SCA College of Arm's Glossary of Terms to reflect the change from step from period practice to step from core practice as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson. Opposed: None. Absent: Jennifer Krochmal. Motion carried.

> j.    Please approve the following change to the Table 1 "Reserved Regalia" to include dated references for all items and clarification notes for several items. We also added royal consorts to those for whom a wreath of roses is reserved; it was already listed as a reserved charged for them.

Motion by Craig Carter to approve a change to the SCA College of Arm's Glossary of Terms Table 1 "Reserved Regalia" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson. Opposed: None. Absent: Jennifer Krochmal. Motion carried.

> k.    Please approve the following change to the Table 2 "Reserved Charges" (charges usable only by certain people/groups in the SCA), has been revised to include dated references for all items and clarification notes for serval items. It has also been rearranged so the items are in alphabetical order. "Three rapiers in pall inverted tips crossed" was added to the list of charges as reserved for members of the Order of Defense (as noted in the 09/2015 Cover Letter). The crancellin, a period charge that is usually displayed like a bend, has previously been ruled a variant of a ducal coronet and was restricted to those of ducal rank by precedent; it has been added to the table.

Motion by Craig Carter to approve a change to the SCA College of Arm's Glossary of Terms Table 1 "Reserved Regalia" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson. Opposed: None. Absent: Jennifer Krochmal. Motion carried.

> l.    Please approve the following change to the Table 3 "Restricted Charges" (charges not usable by anyone in the SCA), has been revised to include dated references for all items. Four charges have been added to the table in accordance with established precedent: Biscione, Chrysanthemum, Red Crescent, and Red Crystal. Two charges were removed from the table, also in accordance with established precedent. The protection provided to symbols of England, Ireland, and Scotland (crowned harp, crown Tudor rose, crowned shamrock, and crowned thistle) was reduced - they are protected only in the tinctures actually used by those countries. Finally, some minor rearrangement was done so that the charges are in alphabetical order.

15

SCA_000041

Motion by Craig Carter to approve a change to the SCA College of Arm's Glossary of Terms Table 3 "Restricted Charges" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

> m.  Please approve the following change to the Table 4 "Conventional 'Proper' Colorings", has been significantly revised to update definitions to match precedent, provide definitions for things that were registered as *proper* but lacked any definition, and to provide dated references. These updates affect how we blazon (describe) armory but do not affect its registrability.

Motion by Craig Carter to approve a change to the SCA College of Arm's Glossary of Terms Table 4 "Conventional 'Proper' Colorings" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

> n.   Please approve the following changes to the Administrative Handbook:  Appendix D was updated with the Letter for Heirs (mentioned above). Also, an introductory paragraph was added to the appendix to explain that Society name can be omitted if it is not applicable. These updates are included in the appendix to this report.

Motion by Craig Carter to approve an update to the SCA College of Arm's Administrative Handbook Appendix D -Letter for Heirs as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

> o.   Please approve the following changes to the Administrative Handbook:  Renamed Appendix F from "Name Sources to Be Avoided in Documentation" to "Name Sources to Be Used with Caution and to Be Avoided in Documentation" and added information to the introduction to clarify the types of sources included in the appendix. No sources were added or changed.

Motion by Craig Carter to approve a change to the SCA College of Arm's Administrative Handbook renaming Appendix F from "Name Sources to Be Avoided in Documentation" to "Name Sources to Be Used with Caution and to Be Avoided in Documentation" as presented by the Laurel Principal Queen of Arms. Second by Gigi Coulson.  Opposed: None.  Absent: Jennifer Krochmal.  Motion carried.

***Report filed.***

F.  Marshal – Ray Dubose (Rey RiBeaumont)

The report of Ray Dubose, Society Marshal, was summarized and accepted as submitted.  It contained the following action items:

> 1.  Submitted for review and approval - Armored Combat with Rebated Blades (Armored Steel Combat) Marshal's Handbook.  In order to maintain continuity, I requested this

16

section be removed from the current Marshal's Handbook.  No changes from the previously approved rules have been made, and the final version is attached.

*Handled under Item IV. B.*

2.  Submitted for review and approval: Marshal's Handbook. Several revisions to the handbook, including but not limited to the removal of the Armored Combated with Rebated Blades section. Redline and Final versions are attached.

*Handled under Item IV. A.*

***Report filed.***

G.  Minister of Arts and Sciences – Richard Allen LeMons (Etienne Le Mons d'Anjou)

The report of Richard Allen LeMons, Society Minister of Arts and Sciences, was summarized and accepted as submitted.  There were no current action items.

***Report filed.***

H.   Standing Committees

1.  Peerage Committee – Director Dan Watson, Chair

***No report received this quarter.***

2.  Communications Committee

***No report received this quarter.***

3.  Census Committee – Julia Smith, Chair

The report of Julia Smith, Chair of the Census Committee, was summarized and accepted as submitted.  There were no current action items.

***Report filed.***

4.  Social Media Committee – Director Gigi Coulson, Chair

***No report received this quarter.***

VII.  Correspondence.

All correspondence was distributed as appropriate.

SCA_000043

## VIII.  EXECUTIVE SESSION

Executive Session was opened on Saturday, October 23, 2021, at 2:52 p.m. CT, and adjourned at 5:52 p.m. CT.

    A.  Lee Cockerham (Kief av Kiersted)

***Director Craig Carter recused himself from acting on this matter.***

Motion by Gigi Coulson to revoke the membership of, and deny participation to, Lee Cockerham (Kief av Kiersted), effective immediately. Second by Natalie Degerstrom. In favor: Gigi Coulson, Natalie Degerstrom, Dale Fong-Frederick, Ross Roegner. Opposed: None. Recused: Craig Carter.  Chairman Dan Watson exercised his option to vote and did so in favor of the motion.  Motion carried.

    B.  Faunus Michael Doney (Faunus de Arden)

Motion by Dale Fong-Frederick to revoke the membership of, and deny participation to, Faunus Michael Doney (Faunus de Arden), effective immediately. Second by Craig Carter.  Opposed: None. Motion carried.

    C.  Hayes Holland (Halvdan Lynkehand):

Motion by Ross Roegner to revoke the membership of, and deny participation to, Hayes Holland (Halvdan Lynkehand), effective immediately.  Second by Dale Fong-Frederick.  Opposed: None. Motion carried.

    D.  George Parker (Hakon Thorgeirsson Von Eignersfojord)

***Director Gigi Coulson recused herself from acting on this matter.***

Motion by Dan Watson to revoke the membership of, and deny participation to, George Parker (Hakon Thorgeirsson Von Eignersfojord) effective immediately. Second by Ross Roegner. Opposed: None.  Recused: Gigi Coulson.  Motion carried.

    E.  Newton Scott (James Newton de Stile)

Motion by Gigi Coulson to revoke the membership of, and deny participation to, Newton Scott (James Newton de Stile), effective immediately. Second by Dale Fong-Frederick. Opposed: None. Motion carried.

    F.  Charles Spence (Argyll of Bruce)

Motion by Dale Fong-Frederick to revoke the membership of, and deny participation to, Charles Spence (Argyll of Bruce), effective immediately. Second by Natalie Degerstrom.  Opposed: None. Motion carried.

18

G.  David Mitchell (Damingo de Vasquez): Appeal of Revocation of Membership

This item was returned to the Society Seneschal for additional work.

H.  October 24, 2021, Subsidiaries – Action by Written Consent.

By consensus, all actions for subsidiaries of the Society for Creative Anachronism, Inc. are accepted by consent.

I.   Director Resignation

By consensus, the resignation of Craig Carter as a member of the Board of Directors for the Society for Creative Anachronism is accepted as of the close of the October 24, 2021, quarterly meeting.

J.   Director Appointment

By consensus, the appointment of Pug Bainter as a member of the Board of Directors for the Society for Creative Anachronism is accepted as of the close of the October 24, 2021 quarterly meeting.

K.  Director Selection – Seat F

By consensus, no action was taken.

L.  Chairman Assignment

By consensus, no action was taken.

M. Vice-Chairman Assignment

By consensus, no action was taken.

N.  Ombudsman Assignments

Chairman: Dan Watson (Sir Bartholomew Hightower)
    Ombudsman for: President, Society Seneschal, Corporate Office, Executive Assistant,
    Financial Officers, Financial Committee, Peerage Committee, Census Committee

Vice Chairman: Dale Fong-Frederick (Sir Jibril al-Dakhil)
    Ombudsman for: An Tir, Ansteorra, Gleann Abhann, Trimaris

Director: Pug Bainter (Phelim Gervase)
    Ombudsman for: Heralds, East, Caid, West

Director: Gigi Coulson (Maestra Giata Magdalena Alberti)

19

Ombudsman for: Æthelmearc, Avacal, Drachenwald, Ealdormere, Lochac, DEI, Social Media Committee

Director: Natalie Degerstrom (The Honorable Lady Saruca bint Lazari)
    Ombudsman for: Atlantia, Meridies, Middle, Marshal, Board Recruiting

Director: Jennifer Krochmal (Duchess Kalisa Aleksandrovna)
    Ombudsman for: Calontir, Northshield, Outlands, Communications Committee, Information Technology (Webminister and Webmaster)

Director: Ross Roegner (Count Barthelemy of Illyria)
    Ombudsman for: Artemisia, Atenveldt, A&S, Publications (TI, CA, Chronicler)

PRE-ADJOURNMENT BUSINESS

It was noted that this was the last meeting for Director Craig Carter.  Director Carter was thanked for his extensive service to the Board and presented with a token of appreciation.

ADJOURNMENT

Motion by Natalie Degerstrom to adjourn the meeting. Second by Craig Carter. Opposed: None. Absent: Jennifer Krochmal.  Motion carried.

The meeting was adjourned at 3:04 p.m. CT.

Respectfully submitted,

/S/ Leslie Luther-Fulton
Executive Assistant

20

Received 2/20/22

**George Parker (Ha'kon Thorgeirsson) Appeal of R&D**
**Received January 15, 2022**
**Society Seneschal's Summary**

At the October quarterly meeting, the Board of Directors took the following action:

*Motion by Dan Watson to revoke the membership of, and deny participation to, George Parker (Hakon Thorgeirsson Von Eignersfojord) effective immediately. Second by Ross Roegner. Opposed: None. Recused: Gigi Coulson. Absent: Jennifer Krochmal. Motion carried.*

This action was taken following an investigation by the Society Seneschal's office into circumstances surrounding a comment Mr. Parker made in late March, 2021 on another SCA member's personal Facebook page. The kingdom of An Tir had issued an Exile due to Mr. Parker's having recently moved out of An Tir where he had participated for years; the Board subsequently upheld that action and further ordered a Temporary Removal from Participation and investigation.

On January 15, 2022 I received from Mr. Parker an appeal of his Revocation of Membership and Denial of Participation in the SCA. The appeal letter is attached. In a separate folder the Board will find the extensive additional information Mr. Parker sent as a part of his appeal. As there are well over 100 separate documents, I did not attempt to incorporate them into a single document. I did read through all of the documents. The majority of them appear to relate to occurrences involving Mr. Parker and his wife dating back three or four years, rather than to the exact incident that led to the Board's decision.

At the October meeting I recommended a limited-term R&D of three to five years, due to the fact that while Mr. Parker's post undeniably violates the Hate Speech Policy, it was a single incident unlike other hate speech actions the Board has acted upon, and he took at least some responsibility for his action. As is its right, the Board chose to issue an unlimited R&D. As is his right, Mr. Parker is appealing that action.

Mr. Parker argues that he is on the autism spectrum and this affects his communication style. He believes this fact was not taken into consideration by those involved at the Kingdom, Society, and Corporate level. He also argues that he was singled out by the kingdom because of animus toward him; I can find no evidence of this being the case. I do wish to state that, contrary to his assertion, the investigator (Stacy Hall) did not "complain" to me. Rather, when she contacted Mr. Parker and offered him the chance to submit a statement or evidence or be interviewed, he responded in a way I regarded as overly hostile. I was copied on the email, and I responded directly to Mr. Parker explaining that his aggressive tone toward Ms. Hall was not appropriate, and that he could either deal civilly with her or he could send any statement or evidence directly to me. Following that email exchange, he and Ms. Hall did indeed have professional and appropriate correspondence. I do not believe there is any indication of bias on Ms. Hall's part.

My recommendation on this matter is unchanged from October; I continue to believe that a few years' R&D would have been appropriate. However, it is the Board's prerogative to decide whether to consider Mr. Parker's appeal and, if so, whether to modify or remove its sanction.

**Please see also the folder "George Parker Appeal File" which is also on this Sharepoint for the complete file of Mr. Parker's additional documents submitted.**

SCA_000047

Greetings to the Board of Directors,

Recently I was R&D'd for an online incident (one comment) on the page of a (at the time) friend.

I would like to appeal that decision.

> *1. Only a sanctioned person may file an appeal.*
>
> *2. Appeals may only be filed if there exists either sufficient evidence to conclude that*
>
> *the Board would have reached a different decision had the evidence discovered been*
>
> *reviewed by the Board, or a discovery of a material error of fact.*

(SOCIETY FOR CREATIVE ANACHRONISM, INC.: SANCTIONS PROCEDURES AND POLICIES MANUAL Effective as of 11/15/2019 Updated January 2020 Further updated October 2020)

To refresh- the incident occurred April 2nd. Immediately, I was Exiled by the Crown of An Tir. I was Exiled for "Hate speech against a protected class".

The SCA Policy on Hate Speech state:

> *4. Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions **up to and including revocation of membership and denial of participation.***

I contend that rather than the horrible, hateful person claimed in the complaint, I am, in actuality, a VICTIM of the very hate I've been accused of. There was clear bias on the part of the crowns, the senaschalate and those party to that conversation.

I am one of the "protected classes" your policies claim to protect, yet I was unmercifully baited and called names by those members in the conversation, with no regard to my disabilities. I did not and still do not know or care what their sexual orientation is- only that they continued their UNCHIVALRIC and HOSTILE behavior.  I was the target of "hate speech" yet nothing has been done to those who perpetrated the hate on me. My comment was not made to any individual- it was unspecific and generalized, and there was no threat involved. My comment is protected by the US Constitution via the First Amendment. In addition to the First Amendment, as I stated in my first response to the R&D, even Facebook did not deem the comment offensive enough to ban me or censure me in any way.

My name was then put forth to the BoD for R&D. An officer of the Society Seneschal's office contacted me and asked that I give my "side" of the story for the investigation.

At that time, I informed her that I have been long diagnosed with Asperger's, one of the Autism Spectrum Disorders. This fact seems to have been ignored by the investigator, the Society Seneschal and the Members of the Board.

For your information- please note the items in BOLD:

> *Asperger's syndrome (also known as Asperger's Disorder) was first described in the 1940s by Viennese pediatrician Hans Asperger, who observed autism-like behaviors and **difficulties with social and communication skills in boys who had normal intelligence and language development.** Many*

*professionals felt Asperger's syndrome was simply a milder form of autism and used the term "high-functioning autism" to describe these individuals. Uta Frith, a professor at the Institute of Cognitive Neuroscience of University College London and editor of Autism and Asperger Syndrome, describes individuals with Asperger's as "having a dash of autism."*

*Asperger's Disorder was added to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) in 1994 as a separate disorder from autism. However, there are still many professionals who consider Asperger's Disorder a less severe form of autism.* **In 2013, the DSM-5 replaced Autistic Disorder, Asperger's Disorder and other pervasive developmental disorders with the umbrella diagnosis of autism spectrum disorder.**
*(https://www.autism-society.org/what-is/aspergers-syndrome/)*

*Asperger's syndrome is one of the autism spectrum disorders. Asperger's patients usually display a distinctive symptom pattern. **Because their ability to intuitively recognize nonverbal signals in other persons is impaired, patients are considerably limited in their social interactions.** Their interest in other people is often limited; on the other hand, Asperger's patients typically have "special interests" that may seem unusual because of their subject matter or the intensity with which patients pursue them. Asperger's patients are also often fixated on ensuring that their external environment and daily routines remain constant; sudden changes may exceed their coping mechanisms.*

*Depending on the severity of their symptoms, Asperger's patients **may either exhibit unusual social behavior or be severely impaired in their social and professional life.***

*Although Asperger's syndrome is one of the more common differential diagnoses in child and adolescent psychiatry, in adults the disorder has received particular attention only recently.*

### DSM-IV extensions after Adult Asperger Assessment (AAA) (modified)

**A) Difficulties in understanding social situations and other people's thoughts and feelings**

**B) Tendency to think of issues as being black and white, rather than considering multiple perspectives in a flexible way**

Additionally: Qualitative impairments in verbal or nonverbal communication with at least three of the following symptoms:

1. **Tendency to turn any conversation back on to self or own topic of interest**

2. **Marked impairment in the ability to initiate or sustain a conversation with others. Cannot see the point of superficial social contact, niceties, or passing time with others, unless there is a clear discussion point/debate or activity.**

3. **Pedantic style of speaking, inclusion of too much detail**

4. **Inability to recognize when the listener is interested or bored**

5. **Frequent tendency to say things without considering the emotional impact on the listener**

*(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2695286/)*

I have included the above excerpts to more clearly illustrate the problem that I have. It is real, and debilitating. It is verifiable, diagnosed and part of my life.

3

I have Asperger's/Autism. As such, I am not always aware of the impact of my actions or words on others. I have never been able to communicate fully or clearly, and indeed, my wife is helping me with this missive, since words fail me.

While I do not doubt my words on the post were poorly said, I was given no chance at all to remedy the situation. Neither by the Kingdom, nor the BoD.

I see on the SCA DEI website where disabilities are included in the DEI statements of Values. However, the actions mentioned on the website were never offered to me, instead, I was dismissed out of hand.

The SCA DEI website states:

> *The DEI office develops activities and training to cultivate a climate in which all members are treated fairly and able to thrive in a welcoming atmosphere.*

I do not believe I was treated fairly. There was ONE incident being investigated, not a long history of behaviors. I feel I was discriminated against because I was never offered any of the remedies mention on the website:

> *Lastly, that we take action. We value chivalry and live by those tenets we claim to hold as ideal. **When a participant violates the code of conduct we require, we let them know so they can adjust their behavior.** The phrase, "if you see something, say something" can be applied here.*

I was never given the chance to "adjust" my behavior.  This clearly violated the Value statement so clearly seen on the website.

So which is it? Do you, the BoD, simply remove anyone who falters? Or do you stand by your words and help people like me adjust and amend their behavior?

The website further state*:*

> *Our job as members isn't to judge other members but to be clear on what actions are acceptable. You can simply let a member know that, "we don't treat people that way in the SCA", or "that violates our core values", or "that action/statement isn't acceptable".*

Again, this alternative was never given to me. The Crowns of An Tir didn't offer me a way to apologize or indicate in any way that an apology would even be acceptable. No communication regarding how to amend my behavior or words, no suggestions as to how I could alleviate or rectify the situation at all, just an immediate and final banishment. Where was the DEI policy for me?

The Americans with Disabilities Act (ADA) became law in 1990. The ADA is a civil rights law that ***prohibits discrimination against individuals*** with disabilities in all areas of public life, including jobs, schools, transportation, and all public and private places that are open to the general public. The SCA frequently utilizes public places in their meetings, practices and events and is in fact bound by the ADA.

According to the Americans with Disabilities Act of 1990 (ADA) an individual with a disability is a person who: Has a physical or mental impairment that substantially limits one or more major life activities; has a record of such an impairment or is regarded as having such an impairment (Disability Discrimination).

I have told the Board, Stacy Hall as well as Lis Schraer that I have ASD. Yet this was not taken into consideration during the "investigation" that was done by Stacy Hall (indeed, there was a point where she complained to Lis Schraer about my behavior- behavior that was categorically my disability in action.  Please see Addendum

Parker Case, An Tir, Investigator Assigned #1 thru 4, wherein I explained myself and subsequently apologized for my words as they were not intended to be adversarial.

The seneschal Attia Prima (Amanda Grayson) and Crowns of An Tir (Emerson Waite and Heather Holmes) King Christian Bane and Queen Hélène d'Anjou discriminated against me when they did not take my disability into account when handing down the sanction. They did not offer me a remedy as laid out by the DEI Values on the webpage, even though they had been made aware of my disability in a prior complaint I filed against a peer in An Tir. They knew I have ASD. Neither did the BoD take this into consideration, even though they were also made aware of my disability. To my mind, that feels targeted, and in direct violation of your own policies and Values.

The Social Media Policy states: *III. Policy Statement*

> *A. SCA Inc.'s expectations for functioning in an online world are stated in Corpora II.b* ‘All participants are expected to behave in an appropriate and respectful manner.’ *Participants must consider how their online actions may impact the reputation of SCA Inc. 'Society for Creative Anachronism' and 'SCA' are trademarked by the Society and SCA Inc. reserves its rights to manage the use of these trademarks.*

> *B. Everyone taking part in an official SCA social media channel shall:*

> *a. adhere to SCA Inc. Core values,*

> *b. behave with courtesy, honor, chivalry, and respect, even in times of inevitable differences of opinion,*

> *Snip e. avoid personal attacks and limit their comments to the issues under discussion,*

The comment made was not in any official channel of the SCA. While I may not have adhered to the Policy, others in the conversation clearly DID NOT either. I made no personal attacks, while the others in the conversation clearly attacked me very personally. Where are their sanctions?

My words were rude and offensive. I get that. BUT- it was one instance. One time. And, honestly, the only time I have ever said anything remotely like that online or in person. No person was threatened or put in harm's way. No laws were broken. Not even Facebook felt it required sanction. I feel that the punishment does not come close to fitting the offense. In fact, there are no laws in the US defining Hate Speech, as it directly opposes the Right to Free Speech (please see the Legalities of Hate Speech document).

An Tir is a hotbed of racism, elitism and cancel-culture, and I got caught up in it. It is a kingdom where Peers do and say what they want, without repercussions. Peers are know by the populace to bait, denigrate and attack overtly and covertly those they don't like. I have been a target for Peers in An Tir for the last several years (I have additional screenshots if requested) and the comment I made is a result of that near-constant assault on me. See addendum "Doc EEE", a post made by Amanda Grayson a mere month after my exile, showing the state of An Tir in her own words.

Maude de Louisiana (LaToya Johnson) is also culpable. She constantly and consistently baits, hate-mongers and fosters resentment against many, many SCA folk. The post I responded to was hers. Even today, she continues to stir trouble and talk about people while claiming to be a friend. I was her target many times, unknown to me, and I regret even knowing her. She has been responsible for at least one other person's Sanctions via An Tir (removed from the SCA for a period of 3 years), a person who also suffers from some disability and was discriminated against. She is and will continue to spread hatred and animosity wherever she goes.

In addition, the removal of Emmerson Waite should also play a part in this. His abrupt removal (less than 1 week following the BoD meeting where my R&D was handed down) should speak loudly to his personal ethics.

5

The sheer number of sanctions issued by him and Heather Holmes (the Queen of An Tir) during their reign should be cause for concern and further investigation. Each sanction should be reviewed for merit. He sanctioned me, a member not even of his Kingdom, for posting on the page of a person not even of his kingdom.

The seneschal who issued the statement to me (Amanda Grayson aka Attia Prima) was biased- she was the "investigator" who greatly mis-managed the investigation by refusing to interview our witnesses and ourselves until we complained upline to the then SoSen, Mike Watkins. Records of these conversations are available from the Society Seneschal, and I have included some emails here as part of my addendum. In short, all three An Tir parties, the two crowns and seneschal, had reason to be biased against me. Is that the reason I was judged so harshly?

Bias should not play a part in these kinds of decisions. The bias of those in An Tir and in the current Society Seneschal's office (Stacy Hall) should be of major concern to the Board Members. Clearly, I was not given fair treatment by those in offices where fair treatment is expected and required. Personal friendships between BoD members, Crowns and seneschals should not be allowed weight when deciding the fate of members.

You may feel as if I am strewing blame all over, but in reality, it all plays a part in what happened, and my responses to those in the thread. After being continually attacked over the last several years, my fuse was short. In fact, even now that I've been away from those people for over two years (having removed myself from An Tir in 2019), I am finding it difficult to offer the benefit of the doubt concerning their motives in any interaction. Check my facebook- there's nothing there, and never has been. It was one error in judgment.

I am not saying that the statement I made was right, appropriate or acceptable, but I feel the "punishment" far outweighs the incident. Do you want me to apologize? Just ask. I offered in my original response, even though I still contend it would fall on deaf ears, I am still willing. I have an abundance of accessory evidence that I am including with this missive. Please contact me if you have any additional questions, or if I can provide more information.

As a Board of Directors, you have the ability to mitigate the sanction imposed on me October 24th, 2021. The policy states "up to and including"....I am asking for relief from the worst possible outcome. Does the punishment handed down to me really fit? Was one comment, one instance of thoughtlessness really enough to remove me completely? I will happily accept any other sanction- removal from all SCA social media, temporary removal, no offices or official positions…..?

I ask that you reconsider the R&D. I cannot take back the words, but I can comport myself better, given the chance. All I am asking is that you give me that chance as outlined in your own policies.

George Parker II

.

SCA_000053

*Motion by Dan Watson to revoke the membership of, and deny participation to, George Parker (Hakon Thorgeirsson Von Eignersfojord) effective immediately. Second by Ross Roegner. Opposed: None. Recused: Gigi Coulson. Absent: Jennifer Krochmal. Motion carried.*

SCA_000054



A Member of the Tokio Marine Group

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900 • Fax 610.617.7940 • PHLY.com

04/19/2023

Society For Creative
Anachronism, Inc.
PO Box 611928
San Jose, CA 95161-1928

**Tg<sup>2</sup>PHSD1791133**

Dear Valued Customer:

Thank you very much for choosing Philadelphia Insurance Companies (PHLY) for your insurance needs.  Our A++ (Superior) AM Best financial strength rating is one reason why over 700,000 policyholders have put their trust in us.  We invite you to experience The PHLY *Difference,* which includes:

- Exceptional Customer Service
- Complimentary & Tailored Risk Management
- Best in Class Claims Experience
- Industry Leading Coverage
- Team PHLY Working for You!

We realize you have a choice in insurance companies, and we truly appreciate your business.
Welcome to TeamPHLY, and please visit us at PHLY.com to learn more about  The PHLY *Difference*!

Sincerely,

John W. Glomb, Jr.
President & CEO
Philadelphia Insurance Companies

JWG/sm

SCA_000055

# **PHLY** Customer Service

## VISIT My**PHLY.COM** TO GET STARTED



### MyPHLY ONLINE PORTAL

- Enhanced Self Service Options and Mobile Browsing
- View Payment History, Invoices, and Policy Documents
- Report and Search Claims
- Direct Deposit Commission Payments
- Edit User Profile and Contact Information



### DIRECT CUSTOMER BILLING BENEFITS

- Receive invoice direct from PHLY
- Go Paperless with e-billing
- Never forget a payment with PHLY Recurring Payments
- Flexible Payment Plans
- Automated Payment Application for faster processing



### PAYMENT OPTIONS

- Online – PHLY.com/MyPHLY
- Phone – 877.438.7459, option 1
- Mail – P.O. Box 70251, Philadelphia, PA 19176-0251



### ON DEMAND CUSTOMER SERVICE ACCESS

- Live Chat - PHLY.com
- Phone - 877.438.7459
- Email - service@phly.com
- Hours: Monday - Friday 8:30 a.m. - 8:00 p.m. ET


PHILADELPHIA INSURANCE COMPANIES
A Member of the Tokio Marine Group

The PHLY *Difference*

800.873.4552
**PHLY.com**

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2007-2019 Philadelphia Consolidated Holding Corp., All Rights Reserved.



A Member of the Tokio Marine Group

# The PHLY *Difference*



**PHLY**Customer Service

### Exceptional Customer Service

- Net Promoter Score among the industry's best
- Voice of the Customer empowers customer feedback
- Self Service at MyPHLY.com
- Direct Bill with payment plans
- Dedicated billing representative



**TEAMPHLY**

### TEAM**PHLY** - working for you!

- Marketing/Underwriting/Account Management team advocating on your behalf
- Account Stewardship
- Giving back to local communities



**PHLY** RISK MANAGEMENT SERVICES

### Complimentary & Tailored Risk Management

- PHLYTrac GPS Program
- SmarterNow Online Learning Management System
- Abuse Prevention Systems Program
- PHLYSense Temperature/Water Monitoring Program



### Industry Leading coverages

- Full Suite of coverages - package, automobile, umbrella, D&O, Cyber, A&H, Environmental, Surety
- Industry specific coverage enhancements
- Admitted & Non-admitted

### Best in class Claims Experience

- 96%+ Customer Satisfaction Rating
- Industry and Type-of-Loss Claims Specialists
- In-house Recovery and Subrogation
- Claim-specific reserving practices



*Hear what our agents are saying about their experience with The PHLY Difference.*

**Learn more:** ThePHLYDifference.com

# 800.873.4552 | **PHLY.com**

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2021 Philadelphia Consolidating Holding Corp., All Rights Reserved.

Ed. 022321




TOKIO MARINE GROUP
*To Be a Good Company*

SCA_000057



# Risk Management Services

## PHLY RMS RESOURCES

Welcome to Philadelphia Insurance Companies (PHLY)! As a PHLY customer, your organization now has access to tools and services that can assist in your risk management efforts. Our Risk Management Services (RMS) Consultants can provide in-person assistance, from leading employee safety meetings to providing valuable guidance regarding safety best practices.

PHLY also provides various risk management tools and resources at little or no additional cost to your organization.

To access these resources, please take a moment to **register on our website**. If you already have an account on PHLY.com, please **log in** to access Risk Management Services resources.

### Risk Management Resources
We encourage you to explore the following risk management resources:



**PHLYTrac:** PHLY's telematics tool providing an online dashboard that tracks location, speeding, hard breaking, and other fleet statistics - PROVIDED AT NO COST TO ELIGIBLE PHLY CUSTOMERS!
**PHLY**TRAC



The **PHLY**Sense System is a property monitoring tool that uses a sensor to provide immediate alerts to hazardous property conditions, such as low temperature or the presence of moisture. Provided at no cost to our customers with property coverage.
**PHLY**SENSE

**ABUSEPREVENTIONSYSTEMS**

**Abuse Prevention Resources:** Online training and policy support to help improve the safety of child-serving operations (at no cost to our customers with Abuse coverage).
Abuse Prevention System



**IntelliCorp:** Provides a discounted background check package as well as discounted pricing for add-on services, such as Motor Vehicle Reports (MVRs).
IntelliCorp



**SmarterNow:** PHLY's no-cost Learning Management System that provides online training, assignment, and reporting capabilities. Trainings include defensive driver, discrimination in the workplace, security awareness, and many more
SMARTER**NOW!**



**Wilson Elser Hotline:** Provides two hours of legal consultation per occurrence. Provided at no cost for our Management and Professional and EPLI policyholders.
Wilson Elser

## CONTACT
For questions about your organization's risk management needs and information on PHLY's Risk Management Services please contact PHLY RMS:
Phone: 1.800.873.4552 #4 (Mon-Fri 8:30 a.m. - 5:00 p.m. ET)
E-mail: phlyrms@phly.com

## 800.873.4552 | **PHLY.com**                The PHLY *Difference*

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Coverage(s) described may not be available in all states and are subject to underwriting and certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2021 Philadelphia Consolidating Holding Corp., All Rights Reserved.




Ed. 022321



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

## Philadelphia Indemnity Insurance Company

# Commercial
# Lines
# Policy

THIS POLICY CONSISTS OF:

– DECLARATIONS
– COMMON POLICY CONDITIONS
– ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
• ONE OR MORE COVERAGE FORMS
• APPLICABLE FORMS AND ENDORSEMENTS

SCA_000059

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless signed by our authorized representative.

John W. Glomb, Jr.
President & CEO

Secretary

BJP-190-1 (12-98)



# Risk Management Services

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

As a free service benefit to its policyholders, PHLY has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman & Dicker LLP (WEMED), to offer a toll-free Loss Assistance Hotline. The telephone number is 877.742.2201 or you can contact a WEMED attorney online at: apps.wilsonelser.com/pic/. This hotline provides you with 2 free hours of legal consultation with a knowledgeable attorney on any matter that you feel could result in a Claim under your professional or management liability policy. The Loss Assistance Hotline is NOT a Claim reporting service. To report a Claim, follow the Claim reporting instructions in your policy and also notify your insurance agent. If you have any questions concerning the Loss Assistance Hotline, please contact us at 800.759.4961 x2967.



800.873.4552

Philadelphia Insurance Companies is the marketing name for the insurance company subsidiaries of the Philadelphia Consolidated Holding Corp., a Member of the Tokio Marine Group. Your insurance policy, and not the information contained in this document, forms the contract between you and your insurance company. If there is a discrepancy or conflict between the information contained herein and your policy, your policy takes precedence. All coverages are not available in all states due to state insurance regulations. Certain coverage(s) may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds. | © 2013 Philadelphia Insurance Companies, All Rights Reserved.





SCA_000061

Ed.081513

**IL N 177 09 12**

# CALIFORNIA PREMIUM REFUND DISCLOSURE NOTICE

In accordance with CAL. INS. CODE § 481.(c), we are notifying you that in the event that the first Named Insured cancels the insurance policy, we shall retain 10% of the unearned premium. The premium refunded to you will therefore be calculated as 90% of the pro rata unearned premium. But if cancellation takes place during the first year of a multiyear prepaid policy, we will return 90% of the pro rata unearned premium for the first year and the full annual premium for the subsequent years.

If you have an Equipment Breakdown policy or your policy contains an Equipment Breakdown Coverage Part, then the following premium refund calculation applies instead of that provided in the preceding paragraph. For the Equipment Breakdown policy premium or for the premium attributable to the Equipment Breakdown Coverage Part, we shall retain 25% of the unearned premium. The premium refunded to you will therefore be calculated as 75% of the pro rata unearned premium. But if cancellation takes place during the first year of a multiyear prepaid policy, we will return 75% of the pro rata unearned premium for the first year and the full annual premium for the subsequent years.

However, the penalties set forth in the preceding paragraphs will not apply under the following circumstances, even if the first Named Insured cancels the policy:

1. The Insured(s) no longer has a financial or insurable interest in the property or business operation that is the subject of insurance;

2. Cancellation takes place after the first year for a prepaid policy written for a term of more than one year; or

3. The policy is rewritten in the same insuring company or company group.

 © Insurance Services Office, Inc., 2012

SCA_000062



PI-FEES-NOTICE 1 (11/19)

# NOTICE
# LATE FEE
# NON-SUFFICIENT FUNDS FEE
# REINSTATEMENT FEE

**Late Fee**
Please be advised that if your payment is late (payment is not received within five days of the payment due date indicated on the invoice), you will be charged a late fee of $25* (where permitted).

**Non-Sufficient Funds Fee**
Please be advised that if your payment is returned for non-sufficient funds, you will be charged a fee of $25** (where permitted).

**Reinstatement Fee**
Please be advised that if your policy is cancelled due to non-payment of the premium and we agree to reinstate your policy, you will be charged a reinstatement fee of $50*** (where permitted).

These fees are in addition to any premium owed on the policy and each fee can apply more than once during the policy term.

*$10 in Florida, Maryland, South Carolina

**$15 in Florida and $20 in New York

***$25 in Delaware, Georgia, New Hampshire and New Mexico; and $15 in Kansas and Nebraska

PI-FEES-NOTICE 1 (11/19)

SCA_000063

PP 20 20 (02/20)

ALL COMMERCIAL LINES

# PRIVACY NOTICE FOR COMMERCIAL LINES

**This notice is provided on behalf of Philadelphia Indemnity Insurance Company**

## PURPOSE OF THIS NOTICE

When you apply for or become an insured under, the insurance policies we issue, we gather certain non-public information or "**NPI**" about your business and its employees. We are committed to safeguarding the NPI you entrust to us. The purpose of this notice is, therefore, to let you know how we collect, use, share and protect the NPI you provide to us in those contexts.

That means this notice applies only to your business interactions with us involving your application for a quote or as a policy holder. NPI we may collect from you in connection with other interactions, such as when you or your employees visit one of our general interest, publicly accessible websites, is governed by the separate notices and policies we publish on those relevant sites or otherwise provide to you.

When we refer in this notice to your "NPI", we mean non-public information as that term is generally defined and applied under the New York Department of Financial Services' Cybersecurity Regulation, the Gramm-Leach-Bliley Act and the National Association of Insurance Commissioners' Data Security Model Law which includes non-public information about your business, such as financial information, account numbers, loss history, personal non-public information of your employees including social security number, address or medical information and any proprietary information we obtain about your business or your customers.

Due to a variety of factors, including certain explicit exemptions they contain, this notice and the NPI we collect from you in connection with the above-described business interactions ***is not*** governed by the EU General Data Protection Regulation, its related EU and Swiss Privacy Shield or the California Consumer Privacy Act.

## COLLECTING YOUR NPI

In the course of, or as part of a business interaction, we collect your NPI both directly from you, or from the agents, brokers or other intermediaries acting on your or our behalf, as well as from a variety of additional sources including:

- the applications or other forms you provide to us (these forms may contain your name, address, social security number, marital status, date of birth, gender, length of employment, prior insurance information, home ownership, residency history, vehicle type, vehicle use, or driving history)
- your transactions with us, our other affiliates of the Tokio Marine Group as well as third parties (this information would include, for example, premium payment and claims history)
- consumer or independent reporting agencies (for example your motor vehicle report, property inspection report, accident report or claim report)

## USING YOUR NPI

We use your NPI in a variety of ways such as creating and issuing a quote, underwriting or otherwise processing and servicing your insurance policy, handling claims you may have and offering you additional products and services that we think may be of interest to you as well as for related research and analytics purposes.

© Copyright 2020 Tokio Marine Management, Inc.

SCA_000064

## SHARING YOUR NPI

We do not disclose or share any NPI about our customers or former customers outside of the Tokio Marine Group, except as permitted by law. We do not sell or disclose or share your NPI for third party marketing purposes. We do, however, share your NPI with third parties that we use to service your account or process your insurance policy or your claim, or administer related transactions. These third parties may include:

- your agent, broker or producer
- independent claims adjusters, investigators, data processors or attorneys
- persons or organizations that conduct scientific research, including actuarial or underwriting studies
- an insurance support organization or another insurer, to prevent or prosecute fraud or to properly underwrite the risk
- another insurer, if you are involved in an accident with their insured
- State insurance departments or other governmental or law enforcement authorities, if required by law, to protect our legal interests or in cases of suspected fraud or illegal activities
- a court of law

We also are required to disclose your NPI if we receive a subpoena, search warrant or other court order.

## RETAINING YOUR NPI

The NPI we collect is kept in your policy and/or claim files for as long as needed in connection with your business interactions with you and, if longer, as required by law.

## HOW WE PROTECT YOUR NPI

We have adopted and implemented a security and privacy program that includes technical, organizational, administrative, and other measures designed to protect, as required by applicable law and in accordance with industry standards, against reasonably anticipated or actual threats to the security of your NPI. Our security program was created by reference to widely recognized standards such as those published by the International Standards Organization and National Institute of Standards and Technology. It includes, among many other things, procedures for assessing the need for, and as appropriate, either employing encryption and multi-factor authentication or using equivalent compensating controls. As part of our security program, we have specific incident response and management procedures that are activated whenever we become aware that your NPI was likely to have been compromised.

## CHANGES TO THIS NOTICE

We may amend this notice from time to time and will inform you of these changes as required by law.

## QUESTIONS AND CONTACT INFORMATION

If you have any questions about this notice or how we collect, use, share and protect your NPI, please contact the Chief Privacy Officer of TMNA Services, LLC, who acts as the privacy and data security administrator for most of the Tokio Marine Group in North America. The Chief Privacy Officer's contact information is:

Attn: Privacy Office
TMNA Services, LLC
3 Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
610-227-1300

© Copyright 2020 Tokio Marine Management, Inc.

SCA_000065



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**Philadelphia Indemnity Insurance Company**
**A Stock Company (Nonparticipating)**
# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD1791133

**Named Insured and Mailing Address:**
Society For Creative
Anachronism, Inc.
PO Box 611928
San Jose, CA 95161-1928

**Producer:** 5688
CRIST FRITSCHI & PATERSON INC
101 Ygnacio Valley Road Ste 200
Walnut Creek, CA 94596

(925)956-7700
at 12:01 A.M. Standard Time at your mailing
address shown above.

**Policy Period From:** 04/10/2023  **To:** 04/10/2024

**Business Description:** Non-Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS
POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS
INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

|  | PREMIUM |
|---|---|
| **Commercial Property Coverage Part** | |
| **Commercial General Liability Coverage Part** | |
| **Commercial Crime Coverage Part** | |
| **Commercial Inland Marine Coverage Part** | |
| **Commercial Auto Coverage Part** | |
| **Businessowners** | |
| **Workers Compensation** | |
| | |
| Flexi Plus Five | ▮ |
| | |
| **Total** | **$   23,437.00** |

CPD-PIIC-CW (02/21)
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
<u>Refer To Forms Schedule</u>

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

**Secretary**                    **President and CEO**

CPD-PIIC-CW (02/21)
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

SCA_000067

PI-POL-FORM-SCH (08/20)

# Philadelphia Indemnity Insurance Company
## Form Schedule – Policy

**Policy Number:** PHSD1791133

## Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 0813 | Policyholder Notice (Loss Assistance Hotline) |
| IL N 177 | 0912 | California Premium Refund Disclosure Notice |
| PI-FEES-NOTICE 1 | 1119 | Notice Late/Non-Sufficient Funds/Reinstatement Fee |
| PP2020 | 0220 | Privacy Notice For Commercial Lines |
| CPD-PIIC-CW | 0221 | Common Policy Declarations |
| PI-CANC-CA 1 | 1013 | California Cancellation Amendment |
| PI-TER-DN1 | 0121 | Disclosure Notice Of Terrorism Ins Coverage Rejection |

SCA_000068

PI-NPD-1 (01-02)



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

**FLEXIPLUS FIVE**
NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE
WORKPLACE VIOLENCE INSURANCE
INTERNET LIABILITY INSURANCE

**Philadelphia Indemnity Insurance Company**

Policy Number: PHSD1791133

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item   1.   Parent Organization and Address:
            Society For Creative
            Anachronism, Inc.
            PO Box 611928
            San Jose, CA 95161-1928

            Internet Address: www. sca.org

Item   2.   Policy Period:          From: 04/10/2023 To: 04/10/2024
                                    (12:01 A.M. local time at the address shown in Item 1.)

Item   3.   Limits of Liability:
            (A)   Part 1, D&O Liability:        $    2,000,000  each Policy Period.
            (B)   Part 2, Employment Practices: $    2,000,000  each Policy Period.
            (C)   Part 3, Fiduciary Liability:  $               each Policy Period.
            (D)   Part 4, Workplace Violence:   $               each Policy Period.
            (E)   Part 5, Internet Liability:   $               each Policy Period.
            (F)   Aggregate, All Parts:         $    4,000,000  each Policy Period.

SCA_000069

PI-NPD-1 (01-02)

Item    4.      Retention:
                (A)      Part 1, D&O Liability:              $    10,000 for each Claim under Insuring
                                                                        Agreement B & C.
                (B)      Part 2, Employment Practices:       $    25,000 for each Claim.
                (C)      Part 3, Fiduciary Liability:        $          for each Claim.
                (D)      Part 4, Workplace Violence:         $          for each Workplace Violence Act.
                (E)      Part 5, Internet Liability:         $          for each Claim.


Item    5.      Prior and Pending Date:  Part 1    04/10/2010    Part 2    04/10/2010    Part 3 No Date Applies
                                         Part 4 No Date Applies  Part 5 No Date Applies


Item    6.      Premium:                ████  ████████   ███  ████████  ████
                                        ████             ███

                State Surcharge/Tax:                     ████████ : ██████


Item    7.      Endorsements:   PER SCHEDULE ATTACHED


In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized
officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.


*[signature]*

John W. Glomb, Jr.                    _____    _____
President & CEO                       Countersignature        Countersignature Date

SCA_000070

Philadelphia Indemnity Insurance Company

Form Schedule – Flexi Plus Five

**Policy Number:** PHSD1791133

# Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-NPD-1 | 0102 | FlexiPlus Five Declarations Page |
| PI-BELL-1 | 1109 | Bell Endorsement |
| PI-CME-1 | 1009 | Crisis Management Enhancement Endorsement |
| PI-NPD-2 | 0102 | Flexi Plus Five Coverage Form |
| PI-NPD-20 | 0102 | Known Circumstances Revealed in Application Exclusion |
| PI-NPD-24 | 0102 | Prior Acts Exclusion |
| PI-NPD-25 | 0102 | Professional Services Exclusion(Supervision Carve-Out) |
| PI-NPD-27 | 1119 | Abuse Exclusion With Workplace Harassment Carveback |
| PI-NPD-49 | 0603 | Failure to Maintain Insurance |
| PI-NPD-52 | 1203 | Amendment of Exclusions |
| PI-NPD-91 | 1011 | Breach Of Contract - Absolute |
| PI-NPD-137 | 0120 | Biometric Information Claim Exclusion |
| PI-MANU-1 | 0100 | ABSOLUTE BODILY INJURY/PROPERTY DAMAGE EXCLUSION |
| PI-MANU-1 | 0100 | IMMIGRATION CLAIM COVERAGE |
| PI-NPD-CA-1 | 0112 | California Changes - Cancellation And Nonrenewal |
| PI-SLD-001 | 0716 | Cap On Losses From Certified Acts Of Terrorism |

SCA_000071

PI-CANC-CA 1 (10/13)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## CALIFORNIA CANCELLATION AMENDMENT

The following provision is added to the Cancellation Policy Condition and supersedes any language to the contrary:

If this policy is cancelled, we will send the first Named Insured any premium refund due.

**1.**  If we cancel, the refund will be pro rata.

**2.**  If the first Named Insured cancels, the refund may be less than pro rata pursuant to a disclosure notice attached to this policy.

The cancellation will be effective even if we have not made or offered a refund.

SCA_000072

PI-TER-DN1 (1/21)

**Policy Number: PHSD1791133** _____   **Named Insured: Society For Creative** _____



PHILADELPHIA
**INSURANCE COMPANIES**

A Member of the Tokio Marine Group

One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Terrorism Premium (Certified Acts) $ ███████ _____

## DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE REJECTION OPTION

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. *As defined in Section 102(1) of the Act*: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT'S FEDERAL SHARE OF TERRORISM LOSSES IS 80% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

**Your attached proposal (or policy) includes a charge for terrorism. We will issue (or have issued) your policy with terrorism coverage unless you decline by placing an "X" in the box below.**

**NOTE 1:** If "included" is shown on your proposal (or policy) for terrorism you WILL NOT have the option to reject the coverage.

**NOTE 2:** You will want to check with entities that have an interest in your organization as they may require that you maintain terrorism coverage (e.g. mortgagees).

**EXCEPTION:** If you have property coverage on your policy, the following Standard Fire Policy states do not permit an Insured to reject fire ensuing from terrorism:  CA, CT, GA, HI, IA, IL, MA, ME, MO, NJ, NY, NC, OR, RI, VA, WA, WV, WI. Therefore, if you are domiciled in the above states and reject terrorism coverage, you will still be charged for fire ensuing from terrorism as separately designated on your proposal.

SCA_000073

PI-TER-DN1 (1/21)

|  | **I decline to purchase terrorism coverage. I understand that I will have no coverage for losses arising from "certified" acts of terrorism, EXCEPT as noted above.** |
|---|---|

**You, as the Insured, have 30 days after receipt of this notice to consider the selection/rejection of "terrorism" coverage.   After this 30 day period, any request for selection or rejection of terrorism coverage WILL NOT be honored.**

**REQUIRED IN GA – LIMITATION ON PAYMENT OF TERRORISM LOSSES** (applies to policies which cover terrorism losses insured under the federal program, including those which only cover fire losses)
The provisions of the Terrorism Risk Insurance Act, as amended, can limit our maximum liability for payment of losses from certified acts of terrorism.  That determination will be based on a formula set forth in the law involving the national total of federally insured terrorism losses in an annual period and individual insurer participation in payment of such losses.  If one or more certified acts of terrorism in an annual period causes the maximum liability for payment of losses from certified acts of terrorism to be reached, and we have satisfied our required level of payments under the law, then we will not pay for the portion of such losses above that maximum.  However, that is subject to possible change at that time, as Congress may, under the Act, determine that payments above the cap will be made.

INSURED'S SIGNATURE_____
DATE_____

SCA_000074

PI-BELL-1 (11/09)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## BELL ENDORSEMENT



One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
610.617.7900 Fax 610.617.7940
PHLY.com

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

**I.    SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS**

The following is a summary of Limits of Liability or Limits of Insurance and/or additional coverages provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

| COVERAGE | LIMITS OF INSURANCE |
|---|---|
| Business Travel Accident Benefit | $50,000 |
| Conference Cancellation | $25,000 |
| Donation Assurance | $50,000 |
| Emergency Real Estate Consulting Fee | $50,000 |
| Fundraising Event Blackout | $25,000 |
| Identity Theft Expense | $50,000 |
| Image Restoration and Counseling | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Kidnap Expense | $50,000 |
| Political Unrest | $5,000 per employee: $25,000 policy limit |
| Temporary Meeting Space Reimbursement | $25,000 |
| Terrorism Travel Reimbursement | $50,000 |
| Travel Delay Reimbursement | $1,500 |
| Workplace Violence Counseling | $50,000 |

© 2009 Philadelphia Insurance Companies

SCA_000075

## II.   CONDITIONS

### A.   Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

### B.   Limits of Liability or Limits of Insurance

**1.**   When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limits of liability or limits of insurance will apply.  In no instance will multiple limits apply to coverages which may be duplicated within this policy.  Additionally, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum limits of liability or limits of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limits of liability or limits of insurance under any one coverage part or policy.

**2.**   Limits of liability or limits of insurance identified in Section **I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS** above are not excess of, but are in addition to the applicable Limits of Liability or Limits of Insurance stated in the Declarations.

### C.   Claim Expenses

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III.   ADDITIONAL COVERAGES

### A.   Business Travel Accident Benefit

We will pay a Business Travel Accident Benefit to the insured if a director or officer suffers injury or death while traveling on a common carrier for your business during the policy period.

For the purpose of Business Travel Accident Benefit coverage, injury means:

**1.**   Physical damage to the body caused by violence, fracture, or an accident that results in loss of life not later than one hundred eighty (180) days after the policy expiration, the date of cancellation or the date of non-renewal;

**2.**   Accidental loss of limbs or multiple fingers;

**3.**   Total loss of sight, speech or hearing.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

The Business Travel Accident Benefit shall not be payable if the cause of the injury was:

**1.**   An intentional act by the insured;

**2.**   An act of suicide or attempted suicide;

**3.**   An act of war; or

**4.**   A disease process.

© 2009 Philadelphia Insurance Companies

SCA_000076

**B.  Conference Cancellation**

We will reimburse the insured for any business-related conference expenses, paid by the insured and not otherwise reimbursed, for a canceled conference that an employee was scheduled to attend.  The cancellation must be due directly to a "natural catastrophe" or a "communicable disease" outbreak that forces the cancellation of the conference.

With respect to a conference cancellation claim, it is further agreed as follows:

**1.**  The insured employee must have registered for the conference at least thirty (30) days prior to the cancellation; and

**2.**  The cancellation must be ordered by a local, state or federal Board of Health or other governmental authority having jurisdiction over the location of the conference.

The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**C.  Donation Assurance**

If the insured is a 501(c)(3) status non-profit organization as defined in the United States Internal Revenue Code, we will reimburse the insured for "failed donation claim(s)."

With respect to any "failed donation claim," it is further agreed as follows:

**1.**  The donor must not have been in bankruptcy, nor have filed for bankruptcy or reorganization in the past seven (7) years prior to the time said pledge was made to the insured;

**2.**  For non-cash donations, our payment of a "failed donation claim" shall be based on the fair market value of said non-cash donation at the time of the "failed donation claim";

**3.**  In the case of unemployment or incapacitation of a natural person donor and as a condition of payment of the "failed donation claim":

    **a.**  Neither the natural person donor nor the insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date; and

    **b.**  The donor shall be unemployed for at least sixty (60) days prior to a claim being submitted by the insured;

**4.**  No coverage shall be afforded for a written pledge of funds or other measurable, tangible property to the insured dated prior to the policy period; and

**5.**  A donation amount which is to be collected by the insured over more than a twelve (12) month period shall be deemed a single donation.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**D.  Emergency Real Estate Consulting Fee**

We will reimburse the insured any realtor's fee or real estate consultant's fee necessitated by the insured's need to relocate due to the "unforeseeable destruction" of the insured's "principal location" listed in the Declarations during the policy period.  The limit of insurance for this

SCA_000077

coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**E.  Fundraising Event Blackout**

We will reimburse the insured for "fundraising expenses" that are incurred due to the cancellation of a fundraising event caused by the lack of electric supply resulting in a power outage, provided the fundraising event is not re-scheduled.  The fundraising event must have been planned at least thirty (30) days prior to the power outage.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**F.  Identity Theft Expense**

We will reimburse any present director or officer of the named insured for "identity theft expenses" incurred as the direct result of any "identity theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the insured's first policy with us.  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**G.  Image Restoration and Counseling**

We will reimburse the insured for expenses incurred for image restoration and counseling arising out of "improper acts" by any natural person.

Covered expenses are limited to:

1.  The costs of rehabilitation and counseling for the accused natural person insured, provided the natural person insured is not ultimately found guilty of criminal conduct; this reimbursement to occur after acquittal of the natural person insured;

2.  The costs charged by a recruiter or expended on advertising, for replacing an officer as a result of "improper acts"; and

3.  The costs of restoring the named insured's reputation and consumer confidence through image consulting.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

**H.  Key Individual Replacement Expenses**

We will pay "key individual replacement expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the policy period which results in the loss of life during the policy period.  The limit of insurance for this coverage is the lesser of $50,000 or ten (10) times the annual premium paid for this policy.  No deductible applies to this coverage.

**I.  Kidnap Expense**

We will pay on behalf of any director or officer of the insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner," parent or child during the policy period.  Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

SCA_000078

1. Fees and costs of independent negotiators;

2. Interest costs for any loan from a financial institution taken by you to pay a ransom demand or extortion threat;

3. Travel costs and accommodations incurred by the named insured;

4. Reward money paid to an informant which leads to the arrest and conviction of parties responsible for loss covered under this insurance; and

5. Salary, commissions and other financial benefits paid by you to a director or officer.  Such compensation applies at the level in effect on the date of the kidnap and ends upon the earliest of:

   a. Up to thirty (30) days after their release, if the director or officer has not yet returned to work;

   b. Discovery of their death;

   c. One hundred twenty (120) days after the last credible evidence following abduction that they are still alive; or

   d. Twelve (12) months after the date of the kidnapping.

The limit of insurance for this coverage is $50,000 each policy period for all insureds combined.  No deductible applies to this coverage.

**J.  Political Unrest Coverage**

We will reimburse any present director, officer, employee or volunteer of the named insured while traveling outside the United States of America for "emergency evacuation expenses" that are incurred as a result of an incident of "political unrest."  This "political unrest" must occur during the policy period.  No coverage is granted for travel to countries in a state of "political unrest" at the time of departure of the travel.  The limit of insurance for this coverage is $5,000 per covered person, subject to a maximum of $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**K.  Temporary Meeting Space Reimbursement**

We will reimburse the insured for rental of meeting space which is necessitated by the temporary unavailability of the insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period.  Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy.  The limit of insurance for this coverage is $25,000 per policy period for all insureds combined.  No deductible applies to this coverage.

**L.  Terrorism Travel Reimbursement**

We will reimburse any present director or officer of the named insured in the event of a "certified act of terrorism" during the policy period which necessitates that he/she incurs "emergency travel expenses."  The limit of insurance for this coverage is $50,000 per policy period for all insureds combined.  No deductible applies to this coverage.

© 2009 Philadelphia Insurance Companies

SCA_000079

PI-BELL-1 (11/09)

**M. Travel Delay Reimbursement**

We will reimburse any present director or officer of the named insured for any "non-reimbursable expenses" they incur as a result of the cancellation of any regularly scheduled business travel on a common carrier.  The limit of insurance for this coverage is $1,500 per policy period for all insureds combined.  A seventy-two (72) hour waiting period deductible applies to this coverage.

**N. Workplace Violence Counseling**

We will reimburse the insured for emotional counseling expenses incurred directly as a result of a "workplace violence" incident at any of the insured's premises during the policy period.  The emotional counseling expenses incurred must have been for:

**1.** Your employees who were victims of, or witnesses to the "workplace violence";

**2.** The spouse, "domestic partner," parents or children of your employees who were victims of, or witnesses to the "workplace violence"; and

**3.** Any other person or persons who directly witnessed the "workplace violence" incident.

The limit of insurance for this coverage is $50,000 per policy period for all insureds combined. No deductible applies to this coverage.

## IV.   DEFINITIONS

For the purpose of this endorsement, the following definitions apply:

**A.** "Certified act of terrorism" means any act so defined under the Terrorism Risk Insurance Act, and its amendments or extensions.

**B.** "Communicable disease" means an illness, sickness, condition or an interruption or disorder of body functions, systems or organs that is transmissible by an infection or a contagion directly or indirectly through human contact, or contact with human fluids, waste, or similar agent, such as, but not limited to Meningitis, Measles or Legionnaire's Disease.

**C.** "Domestic partner" means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the named insured.

**D.** "Emergency evacuation expenses" mean:

**1.** Additional lodging expenses;

**2.** Additional transportation costs;

**3.** The cost of obtaining replacements of lost or stolen travel documents necessary for evacuation from the area of "political unrest"; and

**4.** Translation services, message transmittals and other communication expenses.

provided that these expenses are not otherwise reimbursable.

**E.** "Emergency travel expenses" mean:

SCA_000080

1. Hotel expenses incurred which directly result from the cancellation of a scheduled transport by a commercial transportation carrier, resulting directly from and within forty-eight (48) hours of a "certified act of terrorism"; and

2. The increased amount incurred which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "certified act of terrorism";

provided that these expenses are not otherwise reimbursable.

F.  "Failed donation claim" means written notice to the insured during the policy period of:

1. The bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable, tangible property to the insured; or

2. The unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable, tangible property to the insured.

G.  "Fundraising expenses" mean deposits forfeited and other charges paid by you for catering services, property and equipment rentals and related transport, venue rentals, accommodations (including travel), and entertainment expenses less any deposits or other fees refunded or refundable to you.

H.  "Identity theft" means the act of knowingly transferring or using, without lawful authority, a means of identification of any director or officer (or spouse or "domestic partner" thereof) of the named insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

I.  "Identity theft expenses" mean:

1. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors; and

3. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

J.  "Improper acts" means any actual or alleged act of:

1. Sexual abuse;

2. Sexual intimacy;

3. Sexual molestation; or

4. Sexual assault;

committed by an insured against any natural person who is not an insured.  Such "improper acts" must have been committed by the insured while in his or her capacity as an insured.

K.  "Injury" whenever used in this endorsement, other than in Section **III. A. Business Travel**,

© 2009 Philadelphia Insurance Companies

SCA_000081

means any physical damage to the body caused by violence, fracture or an accident.

**L.** "Key individual replacement expenses" mean the following necessary expenses:

    **1.** Costs of advertising the employment position opening;

    **2.** Travel, lodging, meal and entertainment expenses incurred in interviewing job applicants for the employment position opening; and

    **3.** Miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up an employment contract.

**M.** "Natural catastrophe" means hurricane, tornado, earthquake or flood.

**N.** "Non-reimbursable expenses" means the following travel-related expenses incurred after a seventy-two (72) hour waiting period, beginning from the time documented on the proof of cancellation, and for which your director or officer produces a receipt:

    **1.** Meals and lodging;

    **2.** Alternative transportation;

    **3.** Clothing and necessary toiletries; and

    **4.** Emergency prescription and non-prescription drug expenses.

**O.** "Political unrest" means:

    **1.** A short-term condition of disturbance, turmoil or agitation within a foreign country that poses imminent risks to the security of citizens of the United States;

    **2.** A long-term condition of disturbance, turmoil or agitation that makes a foreign country dangerous or unstable for citizens of the United States; or

    **3.** A condition of disturbance, turmoil or agitation in a foreign country that constrains the United States Government's ability to assist citizens of the United States, due to the closure or inaccessibility of an embassy or consulate or because of a reduction of its staff

for which either an alert or travel warning has been issued by the United States Department of State.

**P.** "Principal location" means the headquarters, home office or main location where most business is substantially conducted.

**Q.** "Unforeseeable destruction" means damage resulting from a "certified act of terrorism," fire, collision or collapse which renders all of the insured's "principal locations" completely unusable.

**R.** "Workplace violence" means any intentional use of or threat to use deadly force by any person with intent to cause harm and that results in bodily "injury" or death of any person while on the insured's premises.

© 2009 Philadelphia Insurance Companies

SCA_000082

PI-CME-1 (10/09)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## CRISIS MANAGEMENT ENHANCEMENT ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

Solely for the purpose of this endorsement:  1) The words  "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  2) The words "we," "us" and "our" refer to the company providing this insurance.

**I.   SCHEDULE OF ADDITIONAL COVERAGE AND LIMITS**

The following is the Limit of Liability provided by this endorsement.  This endorsement is subject to the provisions of the policy to which it is attached.

Crisis Management Expense                                                                       $25,000

**II.   CONDITIONS**

**A.  Applicability of Coverage**

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.  All other terms and conditions of the policy or coverage part to which this endorsement is attached remain unchanged.

**B.  Limits of Liability or Limits of Insurance**

When coverage is provided by this endorsement and any other coverage form or endorsement attached to this policy, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Liability or Limit of Insurance.

**C.  Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III.   ADDITIONAL COVERAGES**

**A.**  We will reimburse you for "crisis management emergency response expenses" incurred because of an "incident" giving rise to a "crisis" to which this insurance applies.  The amount of such reimbursement is limited as described in Section **II. CONDITIONS, B. Limits of Liability or Limits of Insurance**.  No other obligation or liability to pay sums or perform acts or services is covered.

**B.**  We will reimburse only those "crisis management emergency response expenses" which are incurred during the policy period as shown in the Declarations of the policy to which this coverage is attached and reported to us within six (6) months of the date the "crisis" was initiated.

SCA_000083

PI-CME-1 (10/09)

## IV.   DEFINITIONS

**A.**   "Crisis" means the public announcement that an "incident" occurred on your premises or at an event sponsored by you.

**B.**   "Crisis management emergency response expenses" mean those expenses incurred for services provided by a "crisis management firm."   However, "crisis management emergency response expenses" shall not include compensation, fees, benefits, overhead, charges or expenses of any insured or any of your employees, nor shall "crisis management emergency response expenses" include any expenses that are payable on your behalf or reimbursable to you under any other valid and collectible insurance.

**C.**   "Crisis management firm" means any service provider you hire that is acceptable to us.   Our consent will not be unreasonably withheld.

**D.**   "Incident" means an accident or other event, including the accidental discharge of pollutants, resulting in death or serious bodily injury to three or more persons.

**E.**   "Serious bodily injury" means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

SCA_000084

# Philadelphia Insurance Companies

# FLEXI PLUS
# FIVE



Not-for-Profit Organization Directors
& Officers Liability Insurance

Employment Practices
Liability Insurance

Fiduciary Liability Insurance

Workplace Violence Insurance

Internet Liability Insurance

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
610.617.7900    Fax: 610.617.7940

PI-NPD-2 (01/02)

# FLEXI PLUS FIVE
## NOT-FOR-PROFIT ORGANIZATION DIRECTORS & OFFICERS LIABILITY INSURANCE
## EMPLOYMENT PRACTICES LIABILITY INSURANCE
## FIDUCIARY LIABILITY INSURANCE
## WORKPLACE VIOLENCE INSURANCE
## INTERNET LIABILITY INSURANCE

**EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS-MADE POLICY.**

**CLAIMS-MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## Part 1

### Not-for-Profit Organization Directors & Officers Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

    A. The **Underwriter** will pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Organization** has indemnified the **Individual Insureds** for such **Loss**.

    B. The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Organization** has indemnified such **Individual Insureds** for such **Loss**.

    C. The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II. DEFINITIONS

    A. **D&O Wrongful Act** means any actual or alleged:

        1. Act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or by the **Organization**; or

        2. Act, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** while

SCA_000086

serving as a director, officer, governor or trustee of any **Outside Entity**, if such service is at the written request or direction of the **Organization**.

However, **D&O Wrongful Act** does not include an **Employment Practice Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B.  **Outside Entity** means:

1.  Any not-for-profit entity described in Section 501(c) of the Internal Revenue Code of 1986 (as amended); or

2.  Any other entity listed as an **Outside Entity** in an endorsement to this Policy.

C.  **Personal & Advertising Injury** means any actual or alleged:

1.  False arrest, detention or imprisonment, or malicious prosecution; or

2.  Oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services; or

3.  Oral or written publication of material that violates a person's right of privacy; or

4.  Wrongful eviction or entry or other invasion of the right of privacy; or

5.  Misappropriation of advertising ideas, unauthorized use of title or slogan, or plagiarism; or

6.  Infringement of copyright or trademark.

III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

A.  Arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

B.  Arising out of, based upon or attributable to any actual or alleged:

1.  Publication or utterance of material by or at the direction of such **Insured** with knowledge of its falsity; or

2.  Composing, editing, designing, publishing, distributing or printing periodicals, advertisements or other materials by the **Insured** for another party if such activity is not in connection with and not a regular part of the **Insured's** own publications; or

3.  Failure of goods, products or services to conform with advertised quality or performance; or

4.  Wrong description of the price of goods, products or services;

C.  Arising out of, based upon or attributable to any actual or alleged breach of contract or agreement. However, this exclusion shall not apply to the following:

1.  Liability of the **Insured** which would have attached even in the absence of such contract or agreement; or

SCA_000087

2. **Defense Costs**.

IV. PRESUMPTIVE INDEMNIFICATION

If the **Organization** is permitted or required by common or statutory law, but fails to indemnify the **Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Organization** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## Part 2

### Employment Practices Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practices Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. Wrongful dismissal, discharge or termination of employment;

2. Breach of a written or oral employment contract or implied employment contract;

3. Employment related misrepresentation;

4. Wrongful failure to promote;

5. Violation of employment discrimination laws (including harassment);

6. Wrongful deprivation of a career opportunity;

7. Employment related wrongful discipline;

8. Negligent employee evaluation;

9. Employment related invasion of privacy;

10. Employment related defamation (including libel and slander);

11. Sexual or workplace harassment of any kind;

12. Constructive discharge of employment;

13. Employment related retaliation;

14. Employment related humiliation;

15.   Wrongful demotion;

16.   Negligent reassignment;

17.   Violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practices Act** means any actual or alleged wrongful failure to employ, discrimination, sexual harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

However, **Employment Practices Act** does not include a **D&O Wrongful Act**, **Fiduciary Liability Act**, or **Internet Liability Act**.

B.   **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Organization**.

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   Arising out of, based upon or attributable to any failure to comply with any law concerning Workers Compensation, Unemployment Insurance, Social Security, Disability Benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above laws;

B.   Arising out of, based upon or attributable to any violation of any of the responsibilities, obligations, or duties imposed by the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for retaliatory treatment against any **Individual Insured** who is attempting to exercise his/her rights under the above statute, law, rule, regulation or order;

C.   Arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements;

D.   Arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1.   Liability of the **Organization** which would have attached even in the absence of such contract or agreement; or

   2.   **Defense Costs**.

E.   To the extent such **Loss** constitutes employment related benefits, stock options, perquisites, deferred compensation or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay.

# Part 3

## Fiduciary Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I.   INSURING AGREEMENTS

A.   The **Underwriter** will pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II.   DEFINITIONS

A.   **Administration** means: (i) giving counsel to employees, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of employees or participants under any **Benefit Plan**.

B.   **Benefit Plan** means:

   1.   Any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Organization** solely for the benefit of the employees of the **Organization**;

   2.   Any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Organization** solely for the benefit of the employees of the **Organization**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

   3.   Any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the employees of the **Organization**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

   4.   Any government-mandated benefit program for Workers Compensation, Unemployment, Social Security or Disability Benefit for employees of the **Organization**.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

However, **Benefit Plan** does not include any multi-employer plan.

SCA_000090

C. **Fiduciary Liability Act** means any actual or alleged:

    1. Breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

    2. Negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

    However, **Fiduciary Liability Act** does not include a **D&O Wrongful Act** or an **Internet Liability Act**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. Arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. To the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. Arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. Arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

## Part 4

### Workplace Violence Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

I. INSURING AGREEMENTS

A. The **Underwriter** will pay on behalf of the **Organization** any **Violence Damage**, resulting from a **Workplace Violence Act** occurring during the **Policy Period** and reported to the **Underwriter** pursuant to the terms of this Policy.

II. DEFINITIONS

A. **Violence Damage** means:

    1. **Business Interruption Expense**

    2. **Public Image Restoration Expense**

SCA_000091

    3.   **Workplace Violence Expense**

B.   **Business Interruption Expense** means the amount calculated as set forth below for a period of time commencing on the day the **Workplace Violence Act** occurs until the earlier of ninety (90) days following such date, or until the **Organization** restores operations with due diligence and dispatch to the level that existed prior to the **Workplace Violence Act**:

    1.   The sum of:

        a.   Net profits before income taxes that would have been earned had no **Workplace Violence Act** occurred; and

        b.   The actual cost of continuing the activities which are necessary for the **Organization** to resume operations with substantially the same quality of service which existed immediately preceding the **Workplace Violence Act**; and

        c.   Reasonable expenses which would not have been incurred except for such **Workplace Violence Act** and which were incurred by the **Organization** for the sole purpose of reducing **Business Interruption Expense** described in B.1. (a. or b.) above, not to exceed the amount of actual reduction of such **Business Interruption Expense**; and

    2.   Less the sum of:

        a.   All recoveries, other insurance, suretyship and other indemnity which cover **Business Interruption Expense** described in B.1. above; and

        b.   The amount by which the **Organization** reasonably could have but fails to reduce **Business Interruption Expense** described in B.1. above.

C.   **Public Image Restoration Expense** means reasonable fees and expenses for, or cost of:

    1.   An independent public relations consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

    2.   An independent security consultant for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

    3.   A counseling seminar for **Individual Insureds** conducted by an independent consultant following the **Workplace Violence Act**;

    4.   Independent security guard service for up to thirty (30) days following the date the **Workplace Violence Act** occurs;

    5.   An independent forensic analyst for up to ninety (90) days following the date the **Workplace Violence Act** occurs;

D.   **Workplace Violence Expense** means the reasonable fees and expenses for, or cost of:

    1.   The **Salary** or **Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays **Individual Insureds** victimized by **Workplace Violence Acts** and unable to continue to work because of such **Workplace Violence Acts**. The **Salary** or **Wages** in effect at the time of the **Workplace Violence Act** shall apply;

2.   The **Salary** or **Wages**, for up to ninety (90) days following the date the **Workplace Violence Act** occurs, that the **Organization** pays a newly hired person(s) to conduct the duties of **Individual Insureds** victimized by **Workplace Violence Acts** and who is/are unable to continue to work because of such **Workplace Violence Acts**; however such **Salary** or **Wages** shall not exceed the **Salary** or **Wages** of the victimized **Individual Insured** in effect at the time of the **Workplace Violence Act**.

E.   **Workplace Violence Act** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Premises**.

F.   **Premises** means any building, facility or property occupied by the **Organization** in conducting its operations.

G.   **Salary** or **Wages** means compensation the **Organization** pays an **Individual Insured**, including but not limited to bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

## III.  EXCLUSIONS

The **Underwriter** shall not be liable under this Part 4 to make any payment for **Violence Damage**:

A.   Arising out of, based upon or attributable to war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action;

B.   Arising out of, based upon or attributable to a **Workplace Violence Act** which occurs at any location other than the **Premises**;

C.   Arising out of, based upon or attributable to the use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property;

D.   Arising out of, based upon or attributable to a **Workplace Violence Act** occurring prior to the Prior and Pending Date shown in Item 5. of the Declarations.

## Part 5

### Internet Liability Insurance

(To be read in conjunction with the Common Policy
Definitions, Exclusions, and Conditions Sections, Parts 6, 7, 8 below)

## I.  INSURING AGREEMENTS

A.   The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or, if applicable, during the Extension Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Internet Liability Act**.

## II.  DEFINITIONS

A.   **Internet Activity** means any display, transmission, dissemination, or other use of **Matter** on an **Internet Site**.

B.   **Internet Site** means the internet address(es) shown in Item 1. of the Declarations.

C.   **Matter** means printed, verbal, numerical, audio or visual expression, or any other expression, regardless of the medium upon which such expression is fixed.

D.   **Product** means any tangible property offered for sale or otherwise disseminated by or through any **Insured**.

E.   **Internet Liability Act** means any actual or alleged act, error, or omission committed or attempted by an **Insured** in their capacity as an **Insured** solely in connection with **Internet Activity** by or on behalf of the **Organization**, including:

    1.   Libel, slander, or oral or written publication of defamatory or disparaging material; or

    2.   Invasion of or interference with the right of privacy; or

    3.   Infringement of copyright, service mark, trademark, trade dress or trade name or title or slogan or improper use of literary or artistic titles, formats or performances.

III.   EXCLUSIONS

The **Underwriter** shall not be liable under this Part 5 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   Arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair trade practices or any violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving anti-trust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto; or any rules and regulations promulgated thereunder or in connection with such statutes; or any similar provision of any federal, state, or local statutory law or common law anywhere in the world;

B.   Arising out of, based upon or attributable to any actual or alleged breach of contract or agreement, or for liability assumed by the **Organization** under a contract or agreement; however, this exclusion shall not apply to any of the following:

    1.   Liability of the **Organization** which would have attached even in the absence of such contract or agreement;

    2.   **Defense Costs**;

C.   Arising out of, based upon or attributable to any actual or alleged:

    1.   Wrong description of the price or authenticity of a **Product**; or

    2.   Failure of any **Product** to conform with advertised quality or performance; or

    3.   Sale or offer for sale of any **Product** that infringes upon the name, design or logo of another entity's **Product**;

D.   Arising out of, based upon or attributable to any actual or alleged infringement of any patent or misappropriation of trade secrets;

E.   To the extent such **Loss** constitutes amounts charged to or due from clients or customers of the **Organization**, or the value of any electronic fund transfer or transaction by or on behalf of the **Organization** which is lost or damaged during transfer into, from or between **Organization** accounts;

F.   Brought or maintained by or on behalf of any federal, state, or local regulatory agency or other administrative body alleging the violation of any federal, state or local laws or regulations;

G. Arising out of, based upon or attributable to the development, distribution, dissemination, installation, implementation, operation, maintenance and/or filtering software, or of policies, equipment or procedures for establishing or managing a secure method for exchanging electronic information;

H. Arising out of, based upon or attributable to any costs, expenses or other payment incurred by the **Insured** or others in connection with the withdrawal or recall from the marketplace of the **Insured's Products**, including other products which incorporated the **Insured's Products**;

I. Arising out of, based upon or attributable to coupons, price discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount;

J. Arising out of, based upon or attributable to (i) a computer virus, (ii) the unauthorized access to or use of a computer, computer system or computer network, or (iii) the inability of an authorized **Third Party** to access services provided by the **Organization** through the **Internet Site**.

## Part 6

### Common Policy Definitions

A. **Application** means:

1. The **Application** for this Policy, including any material submitted therewith; and

2. The **Application(s)**, including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means for the purpose of Parts 1, 2, 3, and 5:

1. Any written demand for monetary or non-monetary relief; or

2. Any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or

3. Any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

C. **Damages** means a monetary judgment, award or settlement including punitive, exemplary or multiple portion thereof, or, with respect to Part 4 (Workplace Violence Insurance), **Violence Damage**.

D. **Defense Costs** means:

1. Any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

    a.    Any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b.    Salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c.    Salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**.

2.    A $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E.    **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

F.    **Individual Insured** means:

1.    Any individual who has been, now is or shall become a director, officer, governor, trustee, equivalent executive, employee (whether salaried or not), volunteer, leased or temporary employee, or committee member of the **Organization** or, solely with respect to Part 3 (Fiduciary Liability Insurance), of any **Benefit Plan**;

2.    The lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Organization**, but only for actual or alleged **Wrongful Acts** of such executive for which such spouse may be liable as the spouse of such executive;

3.    The estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in 1. above which, in the absence of such death or incompetence, would have been covered by this Policy;

4.    With respect to an **Organization** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Organization** that is equivalent to any position described in 1. above.

G.    **Insured** means the **Organization** and **Individual Insured**.

H.    **Interrelated Wrongful Act** means any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

I.    **Loss** means:

1.    **Damages**;

2.    **Defense Costs**;

but **Loss** does not include:

1.    Criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (I) of **ERISA**; or

2.    Taxes; or

PI-NPD-2 (01/02)

3.    Matters deemed uninsurable under the law to which this Policy shall be construed; or

4.    Any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

5.    Any costs other than **Defense Costs** associated with any accommodation required pursuant to the Americans With Disabilities Act, the Civil Rights Act of 1964, rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

J.    **Organization** means:

1.    The **Parent Organization**,

2.    Any **Subsidiary**, and

3.    Solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

K.    **Parent Organization** means the first entity named in Item 1. of the Declarations.

L.    **Policy Period** means the period of time specified in Item 2. of the Declarations.

M.    **Subsidiary** means:

1.    Any not-for-profit entity for which, on or before the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, provided such entity is identified as a **Subsidiary** in the **Application**;

2.    Any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total less than 35% of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**. The **Parent Organization** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3.    Any not-for-profit entity for which, after the inception of the **Policy Period**, the **Parent Organization** has the right to elect or select a majority of the directors or trustees, and whose assets total 35% or more of the total consolidated assets of the **Parent Organization** as of the inception date of this **Policy Period**; but only upon the condition that before the end of the **Policy Period** or within 90 days from having the right to elect or select a majority of the directors or trustees, whichever is lesser, the **Parent Organization** shall have provided the **Underwriter** with full particulars and agreed to any additional premium and/or amendment of the provisions of this Policy;

4.    Any for profit entity or the directors, officers, or trustees of a for profit entity for which, the **Underwriter**, at its sole discretion, agrees by written endorsement to provide coverage upon such terms or additional premium charged.

Further, coverage as shall be afforded by paragraphs 3. and 4. above, is conditioned upon the **Parent Organization** paying when due any applicable additional premium required by the **Underwriter** relating to such new **Subsidiary**.

N.    **Underwriter** means the stock insurance company check marked on the Declarations of this Policy.

SCA_000097

PI-NPD-2 (01/02)

O.   **Wrongful Act** means:

    1.   With respect to Part 1, any **D&O Wrongful Act**,

    2.   With respect to Part 2, any **Employment Practices Act**,

    3.   With respect to Part 3, any **Fiduciary Liability Act**,

    4.   With respect to Part 5, any **Internet Liability Act**.

## Part 7

## Common Policy Exclusions

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A.   Arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B.   Arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission. This exclusion shall not apply to a **Workplace Violence Act** under Part 4 (Workplace Violence Insurance);

No **Wrongful Act** of any **Insured** shall be imputed to any **Individual Insured** for the purpose of determining the applicability of Exclusions A. and B. above.

C.   Arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D.   Arising out of, based upon or attributable to any bodily injury or property damage regarding tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E.   Arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto, and any similar provisions of any federal, state or local statutory or common law;

F.   Arising out of, based upon or attributable to:

    1.   Any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5. of the Declarations, or the same or essentially the same facts as alleged in such prior litigation; or

2.   Any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3.   Any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5. of the Declarations, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G.   Arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H.   To the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I.   For any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; however, this exclusion shall not apply to Part 4 (Workplace Violence Insurance) or to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J.   Brought or maintained by, at the behest, or on behalf of the **Organization**;

K.   For any actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA**; however, this exclusion shall not apply to Part 3 (Fiduciary Liability Insurance);

L.   For a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M.   For service by the **Individual Insured** in any position or capacity in any entity other than the **Organization**, a **Benefit Plan** or an **Outside Entity**, even if the **Organization** directed or requested the **Individual Insured** to serve in such other position or capacity.

## Part 8

### Common Policy Conditions

I.   LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made or **Workplace Violence Acts** committed, the **Underwriter's** liability under the Policy is limited as follows:

A.   With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B.   With respect to coverage under Part 2, Part 3, Part 4, or Part 5 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made, and all **Workplace Violence Acts** taking place, during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B), 3.(C), 3.(D) or 3.(E), respectively, of the Declarations.

SCA_000099

PI-NPD-2 (01/02)

C.  The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made, and all **Workplace Violence Acts** taking place, during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(F) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), 3.(C), 3.(D) and 3.(E) are sub-limits which do not increase the **Underwriter's** maximum liability as set forth in Item 3.(F).

D.  **Defense Costs** is in addition to and is not part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall not serve to reduce the Limit of Liability stated in Item 3. of the Declarations, but the **Underwriter** is not obligated to pay any **Defense Costs** after the applicable Limit of Liability has been exhausted by payment of **Damages**.

E.  The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

## II.   RETENTION CLAUSE

A.  The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** or **Workplace Violence Act** which is in excess of the respective Retention stated in Item 4. of the Declarations.  Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Organization** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts** and all related **Workplace Violence Acts**.

## III.   DEFENSE AND SETTLEMENT

A.  The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B.  If the **Insured** has assumed the defense of a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Defense Costs** incurred, settlements made or judgments admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld.

C.  The **Underwriter** may investigate and, with the consent of the **Insured**, settle any **Claim** or **Workplace Violence Act** as the **Underwriter** deems expedient, but the **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D.  In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall take reasonable measures to protect their interests.

E.  If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F.  The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agrees that in the event of a **Claim** or a

SCA_000100

PI-NPD-2 (01/02)

**Workplace Violence Act**, the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G.  If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability which is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations, even if consent is given to a subsequent settlement.

IV.  NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A.  In the event that a **Claim** is made against the **Insured** or a **Workplace Violence Act** occurs, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice of such **Claim** or **Workplace Violence Act** as soon as practicable to the **Underwriter** during this **Policy Period**, or, if applicable, during any Extension Period, but, not later than 60 days after the expiration date of this Policy or any Extension Period, if applicable.

B.  If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C.  All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts**, or the same or related **Workplace Violence Acts**, shall be deemed one **Loss** on account of one **Claim** or one **Workplace Violence Act**. Such **Claim** or **Workplace Violence Act** shall be deemed to be first made or to have first occurred when the earliest of such **Claims** or **Workplace Violence Acts** were first made or first occurred.

V.  CANCELLATION AND NON-RENEWAL

A.  The **Underwriter** may not cancel this Policy except for failure to pay premium when due, in which case 10 days written notice shall be given to the **Parent Organization** for such cancellation to be effective.

B.  The **Parent Organization** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Parent Organization** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C.  The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be sent to the **Parent Organization** at least 30 days prior to expiration of the **Policy Period**.

VI.  REPRESENTATIONS AND SEVERABILITY

A.  The **Insured** represents that the particulars and statements contained in the **Application** are true and agrees that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B.  Except for material facts or circumstances known to the **Individual Insured** signing the **Application**, no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII.  SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII.  EXTENSION PERIOD

A.  If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Parts 1, 2, 3, and 5 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim**.

Upon expiration of the Automatic Extension, the **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, or 100% of this Policy's annual premium to an extension of

PI-NPD-2 (01/02)

the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B.   If the **Parent Organization** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium, the following will apply:

The **Parent Organization** shall have the right, upon payment of an additional 50%, 75%, or 100% of this Policy's annual premium, to an extension of the coverage granted under Parts 1, 2, 3 and 5 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C.   All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII., any change in premium or terms on renewal shall not constitute a refusal to renew.

IX.   CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** or **Workplace Violence Act**, except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X.   ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI.   AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Parent Organization** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Parent Organization** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Parent Organization** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Parent Organization** shall be the agent of any **Insured** to effect changes in this Policy.

SCA_000103

PI-NPD-2 (01/02)

XII.  OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** or **Workplace Violence Acts** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

XIII.  TERMS OF POLICY CONFORMED TO STATUTE

Terms of this Policy which are in conflict with the statutes of any state in which this Policy is issued are hereby amended to conform to such statutes.

XIV.  ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance.

XV.  ACTION AGAINST THE UNDERWRITER; ARBITRATION

A.  No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B.  Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XVI.  CHANGE IN OWNERSHIP OR CONTROL

A.  If after the inception of the **Policy Period**:

1.  The **Organization** merges into or consolidates with another entity such that the other entity is the surviving entity; or

2.  Another entity or person or group of entities and/or persons acting in concert acquires more than fifty percent (50%) of the assets of the **Organization**; or

3.  Another entity or person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of the **Organization's** directors or trustees;

(1., 2., and 3. above, hereinafter referred to as the "Merger"), then coverage under Parts 1, 2, 3, and 5 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** (or the Extension Period, if purchased) for **Wrongful Acts** committed prior to the effective date of the Merger and only if the following conditions are met:

1.  The **Insured** provides written notice of the Merger to the **Underwriter** within 45 days of the effective date of such Merger; and

2.  The **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary.

SCA_000104

PI-NPD-2 (01/02)

If **Insured** fails to meet conditions 1. and 2. above, this Policy shall be deemed cancelled by the **Underwriter** as of the effective date of the Merger and the **Underwriter** shall return any unearned premium on a pro rata basis. The **Insured** shall have the right to purchase the Extension Period.

Coverage under Part 4 of this Policy shall cease with respect to any **Workplace Violence Act** occurring after the effective date of the Merger.

B.   If after the inception of the **Policy Period**:

1.   The **Organization** acquires or assumes more than fifty percent (50%) of the assets, liabilities, or equity of, or merges with any for profit entity or creates a for profit subsidiary, no coverage shall be afforded under this Policy for **Claims** arising out of, based upon or attributable to such transaction unless all of the following conditions are met:

   a.   The **Underwriter** receives from the **Parent Organization** full details of such transaction; and

   b.   The **Underwriter**, at its sole discretion, agrees by written endorsement to this Policy to provide coverage to the for profit entity upon such terms, conditions and limitations as it may require.

XVII.   TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed or any **Workplace Violence Act** occurring anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVIII.   TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim** or **Workplace Violence Act**. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Parent Organization** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, **Workplace Violence Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX. ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Organization**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered **Loss**. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

SCA_000105

PI-NPD-2 (01/02)

IN WITNESS WHEREOF, the **Underwriter** has caused this Policy to be signed by its President and Secretary, but the same shall not be binding upon the **Underwriter** unless signed by an authorized representative of the **Underwriter**.

John W. Glomb, Jr.
President & CEO

Secretary

PHILADELPHIA INSURANCE COMPANIES

SCA_000106

PI-NPD-20 (1-02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## KNOWN CIRCUMSTANCES REVEALED IN APPLICATION EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part(s) 1, 2          , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any matter, fact, or circumstance disclosed in connection with question 1 of the "application" dated 02/07/2017 and submitted on behalf of the **Insured**.

The referenced **Application** is attached and made a part of this policy.

Page 1 of 1

PI-NPD-24 (1-02)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## PRIOR ACTS EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part(s) 1, 2          , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** based upon, arising out of, directly or indirectly resulting from any **Wrongful Act** committed on or before  04/10/2010 .

Page  1  of  1

SCA_000108

PI-NPD-25 (1-02)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## PROFESSIONAL SERVICES EXCLUSION (SUPERVISION CARVE-OUT)

This endorsement modifies and is subject to the insurance provided under the following:

FLEXIPLUS FIVE

The Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

Provided, however, that the foregoing shall not be applicable to any derivative action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

SCA_000109

PI-NPD-27 (11/19)

**<u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>**

# ABUSE EXCLUSION WITH WORKPLACE HARASSMENT CARVEBACK

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

The Policy is amended as follows:

1. The Underwriter shall not be liable to make any payment for **Loss** in connection with any **Claim** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the actual or alleged **Abusive Acts** of any person(s).

2. The Underwriter shall not be liable to make any payment for **Loss** in connection with any **Claim** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the actual and/or alleged negligent hiring, retention, employment, assignment, placement, training, supervision, oversight, evaluation, assessment, discipline and/or investigation of any person(s) who actually or allegedly committed **Abusive Acts.**

For purposes of this Exclusion, **Abusive Acts** means any actual or alleged:

   a) Sexual abuse;
   b) Sexual harassment;
   c) Sexual assault;
   d) Sexual molestation;
   e) Sexual exploitation;
   f) Physical abuse, harm, assault or battery; or
   g) Psychological or mental abuse or neglect

However, paragraphs 1. and 2.above of this Exclusion shall not apply to the following:

1. **Claims** involving actual and/or alleged acts of harassment committed against an **Individual Insured** occurring in the workplace or in the course of employment or service with the **Organization.**

2. **Claims** involving an **Insured's** actual and/or alleged acts of harassment against a non-**Insured** person(s) in the course, scope or process of their application or interview for employment or service with the **Organization.**

All other terms and conditions remain the same.

SCA_000110

PI-NPD-49 (6/03)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## FAILURE TO MAINTAIN INSURANCE

This endorsement modifies and is subject to the insurance provided under the following:

FLEXI PLUS FIVE

The Policy is amended as follows:

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the failure of the **Insured** to procure and/or maintain insurance.

All other terms and conditions of the Policy remain unchanged.

SCA_000111

PI-NPD-52 (12/03)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

With regard to Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for retaliation; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B.  for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act  (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 6 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

SCA_000112

PI-NPD-91 (10/11)

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## BREACH OF CONTRACT – ABSOLUTE

This endorsement modifies insurance provided under the following:

**FLEXI PLUS FIVE**

Part 1 Not-for-Profit Organization Directors & Officers Liability Insurance, Section III. EXCLUSIONS, Item C. is deleted in its entirety and replaced with the following:

C.   Arising out of, based upon or attributable to any actual or alleged liability under any written or oral agreement.


All other terms and conditions remain unchanged.

SCA_000113

## <u>THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.</u>

## BIOMETRIC INFORMATION CLAIM EXCLUSION

This endorsement modifies insurance provided under the following:

**FLEXI PLUS FIVE**

This endorsement modifies Part 1 and Part 2 of your Policy.

I.   The following DEFINITIONS are added to **Part 1,** II. DEFINITIONS and **Part 2**, II. DEFINITIONS as follows:

**Biometric Information** means any information used to identify a natural person based on an anatomical scan or any record of biological pattern or characteristic, including but not limited to such natural person's retina or iris scan, fingerprint, voiceprint or any record of hand or face geometry. **Biometric Information** does not include any information that is protected or regulated pursuant to the Health Insurance Portability and Accountability Act of 1996.

**Biometric Information Claim** means a **Claim** brought or maintained against an **Insured** for a violation of any federal, state or local law that regulates or restricts the collection, storage, use and/or disposal of **Biometric Information,** including violations of any required notifications, disclosures or authorizations related to such **Biometric Information.**

II.   **Part 1**, III. EXCLUSIONS and **Part 2**, III. EXCLUSIONS are amended to include the following:

Based upon, arising from, or in any way related to **Biometric Information** and/or any **Biometric Information Claim.**

All other terms of the policy remain unchanged.

SCA_000114

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

### ABSOLUTE BODILY INJURY/PROPERTY DAMAGE EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

FLEXI PLUS FIVE

In consideration of the premium paid, PART 7, (COMMON POLICY EXCLUSIONS), item I. is deleted in its entirety and replaced with the following:

I.    arising out of, based upon or attributable any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including Loss of use thereof;

ALL OTHER POLICY TERMS AND CONDITIONS REMAIN UNCHANGED

All other terms and conditions of this Policy remain unchanged.

Page 1 of 1

PI-MANU-1 (01/00)

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY

### IMMIGRATION CLAIM COVERAGE

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

IMMIGRATION CLAIM COVERAGE

This endorsement modifies insurance provided under the following:

FLEXI PLUS FIVE

I. As a condition precedent to coverage provided by this endorsement, the Insured shall have adopted an employment verification system and shall adhere to the documentation requirements of the Federal Immigration and Nationality Act, 8 U.S.C. §1324a(b). The Insured agrees that failure to properly check employee documentation and to maintain evidence of the examination of said documentation as required by the Federal Immigration and Nationality Act, 8 U.S.C. §1324a(b), shall void coverage under this endorsement.

II. With respect to coverage under Part 2 Employment Practices Liability Insurance, any Immigration Claim made against any Insured shall be subject to a $50,000 Immigration Sublimit of Liability. This Immigration Sublimit of Liability is part of and not in addition to the Limit of Liability stated in Item 3 (B) of the Declarations.

The Underwriter shall not have any obligation to pay any Loss arising out of any Immigration Claim once the Immigration Sublimit of Liability has been exhausted.

III. For the purposes of this endorsement only, Damages arising out of an Immigration Claim shall include civil fines and penalties.

IV. For the purposes of this endorsement only, Immigration Claim means any civil complaint or proceeding based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving any actual or alleged violation of the Federal Immigration and Nationality Act, (8 U.S.C. §1324a) or any other Federal immigration law by any Insured.

All other terms of the policy remain unchanged.

All other terms and conditions of this Policy remain unchanged.

SCA_000116

PI-NPD-CA-1 (01/12)

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# CALIFORNIA CHANGES – CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**FLEXIPLUS FIVE**

The following is added to and supersedes any provisions to the contrary in Part 8. Section V. CANCELLATION AND NONRENEWAL:

1.  **All Policies In Effect For 60 Days Or Less**

    If this policy has been in effect for 60 days or less, and is not a renewal of a policy the Company has previously issued, the Company may cancel this policy by mailing or delivering to the "Parent Organization," at the mailing address shown in the policy, and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

    a.  10 days before the effective date of cancellation if we cancel for:

        (1)  Nonpayment of premium; or

        (2)  Discovery of fraud by:

            (a)  Any insured or his or her representative in obtaining this insurance; or

            (b)  You or your representative in pursuing a claim under this policy.

    b.  30 days before the effective date of cancellation if the Company cancels for any other reason.

2.  **All Policies In Effect For More Than 60 Days**

    a.  If this policy has been in effect for more than 60 days, or is a renewal of a policy the Company issued,  the Company may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

        (1)  Nonpayment of premium, including payment due on a prior policy the Company issued and due during the current policy term covering the same risks.

        (2)  Discovery of fraud or material misrepresentation by:

            (a)  Any insured or his or her representative in obtaining this insurance; or

            (b)  You or your representative in pursuing a claim under this policy.

        (3)  A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

Includes copyrighted material of Insurance Services Office, Inc., with permission

SCA_000117

**(4)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(5)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(6)** A determination by the Commissioner of Insurance that the:

**(a)** Loss of, or changes in, the Company's reinsurance covering all or part of the risk would threaten its financial integrity or solvency; or

**(b)** Continuation of the policy coverage would:

**(i)** Place the Company in violation of California law or the laws of the state where it is domiciled; or

**(ii)** Threaten the Company's solvency.

**(7)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**b.** The Company will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the "Parent Organization," at the mailing address shown in the policy, and to the producer of record, at least:

**(1)** 10 days before the effective date of cancellation if the Company cancels for nonpayment of premium or discovery of fraud; or

**(2)** 30 days before the effective date of cancellation if the Company cancels for any other reason listed in Paragraph **2.a.**

If this policy is cancelled, the Company will send the "Parent Organization" any premium refund due.

The refund, if any, will be computed on a pro rata basis. However, the refund may be less than pro rata if the Company made a loan to you for the purpose of payment of premiums for this policy.

The cancellation will be effective even if we have not made or offered a refund.

**3. Nonrenewal**

**a.** Subject to the provisions of Paragraphs **3.b.** below, if the Company elects not to renew this policy, the Company will mail or deliver written notice, stating the reason for nonrenewal, to the "Parent Organization" shown in the Declarations, and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

The Company will mail or deliver our notice to the "Parent Organization," and to the producer of record, at the mailing address shown in the policy.

**b.** The Company is not required to send notice of nonrenewal in the following situations:

Includes copyrighted material of Insurance Services Office, Inc., with permission

SCA_000118

PI-NPD-CA-1 (01/12)

**(1)** If the transfer or renewal of a policy, without any changes in terms, conditions or rates, is between the Company and a member of the Company's insurance group.

**(2)** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **3.a.**

**(3)** If you have obtained replacement coverage, or if the "Parent Organization" has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**(4)** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**(5)** If the "Parent Organization" requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**(6)** If the Company has made a written offer to the "Parent Organization," in accordance with the timeframes shown in Paragraph **3.a.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.



SCA_000119

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

PROFESSIONAL LIABILITY (OTHER THAN SPECIFIC PROFESIONAL SERVICES EXCLUDED BY TRIA)
DIRECTORES AND OFFICERS

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism subject to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy.

Includes copyrighted material of the Insurance Services Office Inc., used with its permission.

**Subject:** Request for Appeal
**From:** "Ha'kon Thorgeirsson" <thorgiersson@gmail.com>
**Date:** 6/15/2022, 8:42 PM
**To:** Seneschal SCA <seneschal@sca.org>

I hereby request a removal of the Revocation and Denial of Membership handed down in October 2021. I request this based on the following:

Failure of SCA Officers to follow Corporate Policy regarding the investigation of myself, George Parker, regarding the April 2nd exile as outlined in the Seneschals Handbook, Section VI.C.1

Failure of the Officers to follow the Sanctions and Procedures and Policies Manual, Section 6A, specifically #2 and #5.

Failure of the Society DEI Office to address the transgression as outlined in the DEI Mission Statement and the statements made on the publicly accessible web page ( Society for Creative Anachronism (sca.org).

George Parker II

*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

SCA_000121

RECEIVED
MAY 1 0 2021

IV. A.
5/25/2021

## SOCIETY FOR CREATIVE ANACHRONISM, INC.

### Casefile Cover Sheet
2019                                                                    CCS

| | |
|---|---|
| **Accused Modern Name / SCA** | George Parker / Hakon Thorgeirsson Von Eignersfojord |
| **Requested Board Action(s)** | Uphold Exile: ☒  TRP: ☐  Investigate: ☐ R&D: ☐ Other: ☐ |
| **Accused Mailing Address** | 5705 S. Charro Lane, Hereford, AZ 85615 |
| **Accused email / telephone** | Unknown |
| **Sanction Type/Date/Kingdom** | Exile, April 2, 2021 |
| **First and Final Board Review** | First Review Date:                    Final Review Date: |
| Date of Complaint | 4/1/2021    Kingdom An Tir |

| Complainant Information | |
|---|---|
| Modern Name | Came in from a few people, and I was also aware of it. |
| SCA Name | |
| Address | |
| Email / Telephone | |
| Member # | Date Kingdom Seneschal was notified    4/1/2021 |

| Incident Information | | | | |
|---|---|---|---|---|
| SCA Event | | Steward | | |
| City, State | | | Date | |

| CASEFILE FORM CHECKLIST - Enter YES if complete | | | |
|---|---|---|---|
| Complaint (Form 1) | x | Defendant Answer (Form 6) | |
| Witness Statements (Form 2) | x | SocSen Letter (Form 7A/7B) | |
| Newsletter Notice (Form 3) | x | SocSen Final Letter (Form 8) | |
| Kingdom Sen. Letter (Form 4) | x | Appeal Received (Form 9) | |
| Proof of Delivery (Form 5) | x | Board Review of Appeal | |
| Kingdom Investigator / email | | | |
| Society Investigator / email | | | |

| Casefile Instructions for Kingdom Seneschals and Investigators |
|---|
| 1. The Casefile Cover Sheet and Forms 1, 2, 3, 4, 5, and 6 must be **fully completed** before sending casefile to the Society Seneschal.   Incomplete casefiles will be returned. |
| 2. Form 5: Simply insert photo of Proof of Delivery receipt in box provided. |
| 3. Copy the Witness Form 2 as needed to complete additional witness statements for the casefile. |
| 4. The Accused must be contacted and provided a redacted copy of the complaint. If the accused declines to be interviewed or to offer a written statement, enter into the Form 6 narrative: |
| "THE ACCUSED DECLINED TO PROVIDE A STATEMENT WHEN  CONTACTED." |

| Casefile Progress Notes |
|---|
| |

1

SCA_000122

**Table of Contents**
**George Parker: Uphold Exile from the Realm**
**Prepared by Lis Schraer, Society Seneschal**
**May 4, 2021**

1. Society Seneschal's Summary…….………………………………………………….…………. 3

2. Complainants' Statements………………………………………………………….…………... 4

3. Required Documentation………………………………………………………….…………….13

4. Emails forwarded from Society DEI Officer……………………………………….………….17

5.Correspondence between Kingdom Seneschal and Society Seneschal………………...………..21

6.Screenshots (provided by Kingdom Seneschal)…………………………………….………….24

7. George Parker's Appeal……………………………………………………………….………...39

8. Correspondence between Mr. Parker and Society Seneschal…….…………………….……….49

SCA_000123

**George Parker (Ha'kon Thorgeirsson) Exile from the Realm**
**Crown: Christian and Helene**
**Kingdom: An Tir**
**Date of Sanction: April 2, 2021**

**Society Seneschal's Summary:**

On approximately March 30, 2021, an SCA member reposted on her Facebook page a statement regarding speaking up against bigotry. In the original statement the term "cis guys" was used. A lively discussion ensued, during which Mr. Parker took exception to the term "cis" and claimed it was an offensive term. For awhile the discussion was fairly reasonable, but eventually it got distinctly sharp. Mr. Parker (and others) made a few comments which skirted the edge of acceptability, and then referred to people in the discussion as "faggots". He then attempted to explain that other terms now considered offensive once were normal speech. At some point later he removed his comment.

Complaints were made to both the kingdom seneschal and the Society level; at least one of them was sent to the Directors via Comments. At least one complainant also referenced previous behavior by Mr. Parker toward the complainant via email or private message which she interpreted as harassment. The Crown of An Tir issued an Exile from the Realm on April 2, 2021, citing violations of the Hate Speech Policy by Mr. Parker.

It should be noted here that at the time of the incident, Mr. Parker and his wife were in the process of moving from An Tir to Atenveldt. The kingdom seneschal mentioned this to me and indicated the Crown was unsure of whether they could issue a sanction. I told her they could still do an Exile if they wished, and suggested that if they wanted to do a TRP instead, they should probably talk to the Crown of Atenveldt first. I do not know whether they ever did this, or indeed whether they ever considered a TRP.

Unfortunately, various official social media groups within An Tir chose to post the sanction announcement from the kingdom web page. (It was posted to the web page because An Tir is not currently holding virtual courts, and there have been several variances granted for this to be the procedure when a court announcement cannot be made.) One of those posts resulted in some unkind comments from a few members of the barony where the couple resided. This was dealt with by pulling the post, after which the baronial social media officer posted a statement expressing her dismay and displeasure with the behavior displayed.

Mr. Parker has submitted a lengthy response/appeal, which is included in the packet. He had also submitted some screenshots of the conversation, but since the kingdom seneschal had also sent me the entire conversation as of the date she collected the screenshots, I did not include Mr. Parker's less-complete screenshots.

Mr. Parker and his wife allege that the Crown and kingdom seneschal mishandled the sanction, but I do not find that to be the case. Their assertions are that the Crown and kingdom seneschal are biased against them and this is the reason for the swift action; that no investigation was conducted prior to the sanction; and that Mr. Parker was not asked to provide a statement. I cannot say whether the kingdom officials are biased against him or not, but the violation of the Society's hate speech policy was both clear and well-documented, which rendered a detailed kingdom investigation unnecessary. It might have been preferable for the kingdom to have informed Mr. Parker in advance of the sanction, but our rules do not actually require prior notice.

SCA_000124

# Complainants' Statements

SCA_000125

| SOCIETY FOR CREATIVE ANACHRONISM, INC. | | | |
|---|---|---|---|
| COMPLAINT FORM | | | Form 1 - 2019 |
| Date of Complaint | 4/1/2021 | Kingdom of Incident | AnTir |
| Complainant Information | | | |
| Modern Name | Nykera Daedra | | |
| Name and Kingdom | Nykera Daedra/AnTir | | |
| Address | 98422 | | |
| Email / Telephone | nykera98@gmail.com | | |
| Membership# | 244696 | Date Kingdom Seneschal was notified | 4/1/2021 |
| COMPLAINT  Page 1 | | | |

I,          *(name)*          , am making this statement to the best of my recollection.

5



## Bullying complaint                                         ⌷ 1 ⌄  ⊞

**ND**  Nykera Daedra <nykera98@gmail.com                👍  ↩  ↩  →  ⋯
         >
         Thu 4/1/2021 6:52 PM
         To: An Tir Seneschal
         Cc: An Tir Crown; Attia Prima

Hello!
So the "one year no SCA social media time is clearly up.
And as I am sure you've heard this among other things have been
posted

> **Hakon Thorgeirsson**
>
> To those who support my stand, thank you. To
> those who are interferent or don't understand it, I
> would encourage you to re-read the comments
> wherein I'm being called "sis dude" and tell me
> that that term isn't being used as much as an
> insult as calling a homosexual a homo or a fag.
> All you faggots can stick your reticule and scorn
> up your collective asses along with everything
> else you seem to like to stick there.
>
> 32 mins   Like   More

At what point does his behavior warrant a permanent Bann? How many
people
Need to be offended and suffer his abuse?
Please look Into this.
Thank you
Nykera

⋯

Reply   |   Reply all   |   Forward

6

SCA_000127

COMPLAINT CONTINUED  Page 2

| SOCIETY FOR CREATIVE ANACHRONISM, INC. | | | |
|---|---|---|---|
| | COMPLAINT FORM 2019 | | Form 1 - |
| Date of Complaint | 4/1/2021 | Kingdom of Incident | AnTir |
| Complainant Information | | | |
| Modern Name | Mary Larose | | |
| Name and Kingdom | Lucrezia Veneziano Martini/AnTir | | |
| Address | V3M 1Y2, BC | | |
| Email / Telephone | lucrezia@shaw.ca | | |
| Membership# | 97187 | Date Kingdom Seneschal was notified | 4/1/2021 |
| COMPLAINT  Page 1 | | | |
| COMPLAINT CONTINUED  Page 3 | | | |

7

SCA_000128

**FW: Unacceptable online behaviour**

**Mary Larose <lucrezia@shaw.ca>**
Fri 4/2/2021 10:50 AM
To: An Tir Seneschal <seneschal@antir.org>

2 attachments (386 KB)
Aizand.docx; Yafa Social media conversation Sept 2017 original screen capture.docx;

Greetings Mistress Attia,

I just wanted to make you aware that I have sent the attached compliant to the BOD in regard to a former An Tir citizen. Normally I would go through the An Tir chain, but they have moved to Arizona and she is a Society level officer.

Regards,

Isabella Lucrezia

_____

**From:** Mary Larose <lucrezia@shaw.ca>
**Date:** Friday, April 2, 2021 at 10:46 AM
**To:** <sca-comments@lists.sca.org>
**Subject:** Unacceptable online behaviour

Greetings members of the BOD,

I am writing today about someone, Hakon Thorgeirsson, who continues to be abusive and posts unacceptable rhetoric on Facebook. While not on official groups, this post was on an SCA member's post, where it has been seen by numerous members of our LGBTQ+ community. This person, once threatened me while I was the An Tir Social Media Deputy. The threat was because I was trying to get his wife to follow Society social media protocols for our Facebook YAFA group. Instead of following our protocols she block me, and our Kingdom Seneschal (who she actually reported to). Given the nature of the group, we could not have it be an official Kingdom group where the Kingdom Social Media Deputy, nor the Seneschal could monitor the contents. I had to create a new "official" group and she refused to shut down her "unofficial group. She was removed from being YAFA deputy for our Kingdom, but somehow was given the position at the Corporate level, which she appears to still hold. The reason I Mention this now, although it occurred in 2017/18, is on a thread where this screen capture was posted

**From:** Mary Larose <lucrezia@shaw.ca>
**Date:** Friday, April 2, 2021 at 10:46 AM
**To:** <sca-comments@lists.sca.org>
**Subject:** Unacceptable online behaviour

Greetings members of the BOD,

I am writing today about someone, Hakon Thorgeirsson, who continues to be abusive and posts unacceptable rhetoric on Facebook. While not on official groups, this post was on an SCA member's post, where it has been seen by numerous members of our LGBTQ+ community. This person, once threatened me while I was the An Tir Social Media Deputy. The threat was because I was trying to get his wife to follow Society social media protocols for our Facebook YAFA group. Instead of following our protocols she block me, and our Kingdom Seneschal (who she actually reported to). Given the nature of the group, we could not have it be an official Kingdom group where the Kingdom Social Media Deputy, nor the Seneschal could monitor the contents. I had to create a new "official" group and she refused to shut down her "unofficial group. She was removed from being YAFA deputy for our Kingdom, but somehow was given the position at the Corporate level, which she appears to still hold. The reason I Mention this now, although it occurred in 2017/18, is on a thread where this screen capture was posted numerous people have posted about being bullied and harassed by both these people...including my successor as Kingdom Social Media Deputy. I feel it reflects badly on the BOD for a woman with this type of record to hold a Society level position. I feel that we, as populace need to start doing a better job at pushing these types of instances up the chain. While I held the Social Media position in An Tir we did not yet have the Bullying and Harassment policy or social media policies we have now.

I would normally go up the chain with or current Kingdom Sensechal, but these people no longer live in An Tir as they have moved to Arizona.

This is the current post

https://outlook.office.com/mail/AAMkADNjZTJjYTdmLWFiMGMtNDc1NC1hNzhLTE3NzE2ZJgxZDVkYgAuAAAAAAC6X5ETDx5vRrFOYmOop4z3AQA...   1/3

9

Mail - An Tir Seneschal - Outlook



**Hakon Thorgeirsson**

To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

32 mins    Like    More

The threat he sent to me was this, the one and only post I made to his wife's now "unofficial" Facebook group. I had never posted about his wife anywhere, nor had I ever bullied her. This is an example of what he considers me "bullying" her.



Mary Larose shared a group.
15 April at 15:02

Hello all, This is just a reminder that this group is an unofficial group and is not at all sanctioned by the Kingdom. The official group is:

https://www.facebook.com/groups/127088954719158/

An Tir - Official Youth and Family Achievement (YAFA) Gro

10



**Mary Larose** shared a group.
15 April at 15:02                                        ...

Hello all, This is just a reminder that this group is an unofficial group and is not at all sanctioned by the Kingdom. The official group is:

https://www.facebook.com/groups/127088954719158/

**An Tir - Official Youth and Family Achievement (YAFA) Group**
72 Members

✓ Joined

👍 2                                      2 Comments  Seen by 49

👍 Like

This is the threat I received the next day.

https://outlook.office.com/mail/AAMkADNjZTJjYTdmLWFlMGMtNDc1NC1hNzlhLTE3NzE2ZjgxZDVkYgAuAAAAAAC6X5ETDx5vRrFOYmOop4z3AQA...   2/3

4/12/2021                          Mail - An Tir Seneschal - Outlook

11

SCA_000132

It seems to me that your continuous effort to undermine the YAFA unoffical FB page is vindictive, petty and inexcusable.  Just because the official page is unsuccessful is no excuse to attack Alizaunde's page just because it's out performing yours by leaps and bounds.

These attacks are NOT within your purview as the Media officer of the Kingdom and reflects very poorly on you. As moderator of the list it is within MY purview to remove you and/or delete any post I feel is harassing, bullying or otherwise offensive.

It is also within my purview to report your constant harassment and bullying of Alizaunde to the Society.  Please review the new Societies anti-bullying rules.  If you do not end your constant attacks on this wonderful person I will be force to take the appropriate action against you.



Thank you for your consideration of this matter.

Mary Larose known as Isabella Lucrezia Veneziano Martini, OL, OP – An Tir
Member # 97187

12

SCA_000133

# Required Documentation:
- **Newsletter Announcement**
- **Letter to Mr. Parker**
- **Proof of Mailing**

SCA_000134

## SOCIETY FOR CREATIVE ANACHRONISM, INC.

Sanction Announcements Form    Form 3 - 2019

Format of Announcements in Royal Court AND Published in the Kingdom Newsletter

| Sanction: Form | **Banishment from the Royal Presence (BRP) Sanction 3.B** |
|---|---|
| | On *(date)* , (SCA names of Sovereign and Consort), The Crown of *(kingdom)* have issued a Royal Sanction of Banishment from the Royal Presence against *(Modern name)* , known in the Society as *(SCA Name)* . This sanction will expire on (date) or at the end of our Reign. |
| | Crown signature and title |
| | Crown signature and title |

### Reporting Calendar of An Tir

| | | Report Due |
|---|---|---|
| Q1 | Jan–Mar | 01-May |
| Q2 | Apr–Jun | 01-Aug |
| Q3 | July–Sep | 01-Nov |
| Q4 | Oct–Dec | 01-Feb |

### Notice of Sanction

On April 2, 2021, Their Majesties, King Christian III and Queen Hélène III of An Tir have issued the sanction of Exile from the Kingdom against George Parker, also known in the Society as Hakon Thorgeirsson Von Eignersfojord. Exile from the Kingdom precludes engaging in any SCA activity in the Kingdom. This sanction precludes participation in any Kingdom-controlled social or electronic media. This sanction does not preclude participation in activities in other Kingdoms.

### Branch Announcement

Effective March 14, 2021 the branch known as the Canton of Bearwood is in suspension. The suspension will last for no more than 2 years and will be reviewed by the Kingdom Seneschal every 6 months to determine restoring the branch status.

An Tir Crier • Page 2    Who is who | Announcements

| Sanction: Form | **Temporary Removal from Participation (TRP) Sanction 3.D** |
|---|---|
| | On *(date)* , (SCA names of Sovereign and Consort), The Crown of *(kingdom)* have issued a Temporary Removal from Participation from the SCA against *(Modern Name)* , known in the Society as *(SCA Name)* . |
| | Crown signature and title |
| | Crown signature and title |

Note: The Royal Court and Newsletter announcement are to be the same announcement.

14

Amanda Grayson
Regional Vice-President for Operations, SCA Inc.
PO Box 360789
Milpitas, CA 95036-0789
seneschal@antir.org
April 2, 2021

George D.C. Parker
5705 S. Charro Lane
Hereford, AZ 85615

Dear Mr. Parker:

On *April 2, 2021* Their Majesties Christian and Helene III of the Kingdom of An Tir issued the following sanction against you: *Exile from the Kingdom.* This sanction was issued for the following reason(s):

*On April 1, 2021 you participated in a discussion on a page of another SCA member. In this discussion you used Hate speech towards a protected class. This violates the SCA Core Values and the policy against Hate speech.*

Exile from the Kingdom means that you may not engage in any SCA activity in the Kingdom that issued the sanction. This also precludes participation in any Kingdom-controlled social or electronic media. This sanction does not preclude participation in activities in other Kingdoms. This sanction will be reviewed by the Board of Directors. You will receive a notification from the Society Seneschal of the results of this review. This sanction will continue until at such time that the Crown steps down.

If this sanction is the result of a complaint and the complainant is known to you, you shall not contact them nor harass them directly or through others about this matter. You may refer to the SCA Sanctions Manual, located at http://socsen.sca.org/, for further information on this sanction's restrictions on your SCA participation, your responsibilities, and your rights of appeal. Questions regarding the information in the Sanctions Manual may be directed to the Society Seneschal's office.

Regards,

Amanda Grayson
cc: *Christian and Helene III, Crown An Tir*
*Lis Schraer, Society Seneschal*

15

SCA_000136

SOCIETY FOR CREATIVE ANACHRONISM, INC.
Proof of Certified Mail Delivery    Form 5 - 2019



16

# Emails to Society DEI Officer

SCA_000138

Fwd: Oh boy do I have a doozie for ya

**Subject:** Fwd: Oh boy do I have a doozie for ya
**From:** Jessica Van Hattem <equity@sca.org>
**Date:** 4/4/2021, 11:26 AM
**To:** Lis Schraer <seneschal@sca.org>, Brigid Costello <socialmedia@sca.org>, John Fulton
<president@sca.org>

I got two emails about this guy - forwarding both over to y'all.

Thanks,

Jessica

---

**From:** Jamie P <jcpratt78@gmail.com>
**Sent:** Friday, April 2, 2021 12:35:24 AM
**To:** Jessica Van Hattem <equity@sca.org>
**Subject:** Oh boy do I have a doozie for ya

Greetings your most excellent excellency;
I hope that you are well. I look forward to a time when we are able to gather safely again. This person
made a severely homophobic comment on a post and from what I understand he has threatened
multiple kingdom Seneschals in An-Tir with physical harm to the point where he was banned from sca
social media for a year. His year is up and he is in full swing.

I am sorry to add more drama to your plate as I am certain you have had a Chinese buffet style plate
this past year.  If there is any way I can be of service to you, please don't hesitate to reach out.
In service,
Hattori Fuyutsukime

—Image.jpeg——

18

SCA_000139

Fwd: Oh boy do I have a doozie for ya



SCA_000140
4/20/2021, 3:39 PM

Image-1.jpeg



**Hakon Thorgeirsson**

To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.



32 mins    Like    More

Attachments:

| Image.jpeg | 238 KB |
| Image-1.jpeg | 72.7 KB |

20

SCA_000141

# Correspondence between Kingdom Seneschal and Society Seneschal

SCA_000142

## Re: Alizand's husband Hakon

Lis Schraer <seneschal@sca.org>

Thu 4/1/2021 8:59 PM

**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** Lis Schraer <seneschal-elect@sca.org>

Wow, what a weird conversation. I wonder why he suddenly felt compelled to go completely off the rails? Because before that he wasn't being awful...maybe a little disingenuous. Actually kind of reminded me of the Blaine Hebert stuff I investigated before I was on the Board...where he said something to the effect of "The SCA is plenty diverse...we have Vikings, Italians, French, Irish, Russians..."

Sigh.

Lis

On 4/1/2021 10:40 PM, An Tir Seneschal wrote:

> Here you go!  I've labeled them 1-13.  The Crown decided tonight they will issue an exile.  It has grown since my screen shots.  He deleted his comment, but of course it was it was screenshotted and posted again.
>
> Attia
>
> Attia
>
> ----
> Regards,
>
> Mistress Attia Prima, OP (Amanda Grayson)
> Kingdom Seneschal, An Tir
> seneschal@antir.org
>
> _____
>
> **From:** Lis Schraer <seneschal@sca.org>
> **Sent:** Thursday, April 1, 2021 8:09 PM
> **To:** An Tir Seneschal <seneschal@antir.org>
> **Cc:** Lis Schraer <seneschal-elect@sca.org>
> **Subject:** Re: Alizand's husband Hakon
>
> Hi Attia,
> So you had better send me the entire conversation. I just got my first complaint from someone who apparently does not agree with us that spouses do not necessarily share a brain. I fully intend to point that out, but I would like to know what the entire thing said.
> Thanks,
> Lis
> On 4/1/2021 8:55 PM, An Tir Seneschal wrote:
>
>> Well! I have the entire conversation. I'm friends with her and she seems to like me so there is that. I absolutely agree about wives, spouses and partners. Alex

22

SCA_000143

would kick my butt, but what I say is what I say. And I would have probably flipped a lid too so I'm with John's wife. 😄 with that said it has taken flight so to speak. I did let Adenveldt know of it. And I'd totally like to see a chiv trying to control LaToya. 😄😄😄😄

Attia

Get Outlook for iOS

**From:** Lis Schraer <seneschal@sca.org>
**Sent:** Thursday, April 1, 2021 6:49:40 PM
**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** Lis Schraer <seneschal-elect@sca.org>
**Subject:** Re: Alizand's husband Hakon

Hi Attia,
Um, yes, that's pretty bad. I know they are moving very soon (I think Alizand said within the week--she has quit her job in preparation.) The Crown can still do an exile if they feel it is appropriate. It would ban him from all in-kingdom official social media for the duration of the reign, and would make a statement.
I cannot hold her responsible for what he said; the other day I had a call with Bearkiller in which LaToya came up and John said something about people on the chiv list in Gleann Abhann were implying that the knight she is dating should "control" her behavior. John mentioned that to his wife and she flew up and turned left; "control your woman" is definitely not a thing. :) But in fairness, it works the other way too.
I don't know if you/your Crown want to share with your Atenveldt counterparts.
I am not Facebook friends with LaToya. I wish I had the entire conversation. But then I always wish that. It looks as though it's just possible he might have been trying to make a different point than the literal words...badly, if so, but without the whole conversation I can't entirely rule that out.
Thanks,
Lis
On 4/1/2021 8:36 PM, An Tir Seneschal wrote:

Lis,

The Crown is contemplating Exile, but rumors they might be in Adenveldt now. This was hate speech posted on a FB page under SCA name and about SCA events. This happened today. This is not good. Ironically it was posted on Maude (LaToya) page. This kinda goes back to what I was saying this morning.

23

SCA_000144

# Screenshots (provided by Kingdom Seneschal; partial screenshots provided by Mr. Parker matched but were not as complete)

SCA_000145



**Maude Louisiana d'Orleans**
7h · 👥

Remember, at events, on Facebook, etc....

**mister dickoris**
@stump_water

i don't think cis guys realize how much power they can shift in a conversation just by casually telling their friends "that's fucked up, man" when someone says something bigoted

4:17 PM · 3/30/21 · Twitter Web App

Errin Edlin, Jeff Preston and 64 others          60 Comments

👍 Like                    💬 Comment

**James M Bain**
The look on people's faces when you say, "Hey! I don't think that's really appropriate." is precious.
25

SCA_000146

👍 Like        💬 Comment

**James M Bain**
The look on people's faces when you say, "Hey! I don't think that's really appropriate." is precious.

Like · Reply · 6h    👍❤️ 2

**Brad Hawk Sparks**
Some of us are aware and use it like a secret weapon. Some of us are also 50+ and can add the devastating "disappointed dad head shake" that negates any approval that their peers may have provided.

Like · Reply · 5h    👍❤️ 7

> **Gilbert Hattier**
> **Brad Hawk Sparks** this is exactly my tactic. As a 50+ dad of 4 boys I'm good at it
>
> Like · Reply · 4h    👍 2

> **Jessica Smith-Carlock**
> **Brad Hawk Sparks** indeed. I deploy that and 'are you kidding me right now?' parent eybrows to good effect.
>
> Like · Reply · 2h    👍 3

> Write a reply...     💬 🙂 📷 GIF 🙂

**Hakon Thorgeirsson**
Although I do certainly agree with the sentiment of positive peer pressure and calling people out on ignorant shit, but while we are on the subject, what the fuck does sis even stand for? What the fuck ever happened to simply calling us straight men??

Like · Reply · 5h · Edited

∧ Hide 41 Replies

> **Skamp Widegrin**
> **Hakon** google it. Cis men has been in usage since the 90s and my 0.47 google search tells me popular since 2007ish. [20]
>
> Like · Reply · 4h    👍 2

SCA_000147



Hide 41 Replies ∨

**Skamp Widegrin** Cis men has been in usage since the 90s and my 0.47 google
search tells me popular since 2007ish.

Hakon google it.

Like · Reply · 4h

**Hakon Thorgeirsson**
I was in college in the 90's. Strange, though I most certainly don't know a lot,
never mind everything. I have never heard of it before. And I have only seen it
in use over the past few months now that throwing insulting labels around has
become so popular. Perhaps it was a popular slur for straight men among the
lgbt community back then? That would certainly explain why I never heard it
before.

You implicitly trust google? how cute.

Like · Reply · 4h

**Skamp Widegrin** And the time it's taking you to bitch on Facebook and
declare the term a slur, You could've learned at least four new things.

Like · Reply · 4h

**Hakon Thorgeirsson** In recognition of the fact that intent doesn't always come
across correctly in written word, are you interficially being as condescending as
it seems?

Like · Reply · 4h



**∧ Hide 41 Replies**

**Skamp Widegrin**
**Hakon** google it. Cis men has been in usage since the 90s and my 0.47 google search tells me popular since 2007ish.

Like · Reply · 4h   👍 2

**Hakon Thorgeirsson**
I was in college in the 90's. Strange, though I most certainly don't know a lot, never mind everything, I have never heard of it before. And I have only seen it in use over the past few months now that throwing insulting labels around has become so popular. Perhaps it was a popular slur for straight men among the lgbt community back then? That would certainly explain why I never heard it before.

You implicitly trust google? how cute.

Like · Reply · 4h

**Skamp Widegrin**
**Hakon Thorgeirsson** And the time it's taking you to bitch on Facebook and declare the term a slur, You could've learned at least four new things.

Like · Reply · 4h   👍 1

**Hakon Thorgeirsson**
**Skamp Widegrin** In recognition of the fact that intent doesn't always come across correctly in written word, are you intertidally being as condescending as it seems?

Like · Reply · 4h

SCA_000149



SCA_000150



Like · Reply · 4h

**Hakon Thorgeirsson**
Latoya, as you know, I consider the most pungent part of ignorance to be not what you don't know, but what you think you know and it's wrong. So to insure I wasn't being ignorant on this subject; I did check some of my favorite sources for such topics. I'm not wrong, I'm not being ignorant, I'm not alone. Some of us do find "cis" to be an offensive term.

https://metro.co.uk/.../cisgender-word-come-offensive.../

METRO.CO.UK
What is cisgender, where does the word come from, and is it offensive?

Like · Reply · 3h

**Skamp Widegrin**
**Hakon Thorgeirsson**

Like · Reply · 3h

**Skamp Widegrin**
Thought he promised to go away? Alas.

Like · Reply · 3h

**Rachel Somers**
Why is the term cisgender offensive? I don't get it.

Like · Reply · 2h

**Kateryne Hindscroft**
**Rachel Somers** Some people don't like being called out for their inappropriate attitudes. I'm sure that he knows full well what it means (since he said he thought it was a slur on "straight".)

Like · Reply · 2h

**Elisabethe Phipps**



Like · Reply · 2h

**Elisabethe Phipps**
**Rachel**, me, staring blankly at cis-dude....

Like · Reply · 2h

**Michelle Height**
**Hakon Thorgeirsson** Just because you aren't alone in your opinion doesn't make you right. Sheesh.

The term cis has been around for over a decade. Just because you are new to it does not mean it is new. As noted in the post you shared.

Like · Reply · 2h

**Alycia Z DuBry**
**Hakon Thorgeirsson** The more I read up on it and the way cis has been used to make good men ashamed of being men the more I'm offended as a loving wife, sister, daughter, niece and friend of several wonderful champion men.

Like · Reply · 2h · Edited

**Olena Wilshanetsky**
Die mad about it, my cis dude. Lots of trans people have died terrified and screaming in pain because of cis people's feeling offended.

Like · Reply · 2h

**Alycia Z DuBry**
**Hakon Thorgeirsson** This strand has gotten very ugly for wanting support from across identities... This should tell us something about the entire subject and people's opinions.

Like · Reply · 1h · Edited

**Alycia Z DuBry**
**Olena Wilshanetsky** That's awful to wish someone dead and or to die not at peace.

Like · Reply · 1h

**Olena Wilshanetsky**
Let me see if I can adequately express my indifference to your opinion:

Like · Reply · 1h

**Alycia Z DuBry**
**Rachel Somers** My geek out: On cisgender being considered offensive: its been used in derogatory and nasty manners to men for just being of male gender and straight. Its been used as a slur in a few different areas or a dismissal of a man's thoughts.... **See More**

Like · Reply · 1h

SCA_000152

**Alyda Z Dubry**
Rachel Somers My geek out: On cisgender being considered offensive: its been used in derogatory and nasty manners to men for just being of male gender and straight. Its been used as a slur in a few different areas or a dismissal of a man's thoughts. Whatever the actual definition is the social definition/usage of it in other type dialogues on dismissing people is what makes it not well received now.

Like · Reply · 1h

**Skamp Widegrin**
Just because there are people offended by the use of the term does not invalidate the term nor its use.

Like · Reply · 1h

**Alyda Z Dubry**
Olena Wilshanetsky You present yourself as an awful human being. I hope this is just anger and being hyped up on volatile conversations. I will pray for you.

Like · Reply · 1h

**Angela Gallant**
Question, are you also offended at being called monogamous? heterosexual? Seriously, it is a term to describe actual facts about you in relation to others. Like Parent, child...it's relational.
Actually using Cis was a choice to help take Othering Transgender People out of our conversation. It is a proactive accommodation just like using/introducing our own pronouns to hold space and help embrace marginalized people.
When you give an attitude over this, you're showing yourself to be closed to kindness and caring for those who have suffered plenty enough.
Stop it. You're not doing yourself any favours and showing yourself to be a disrespectful type that has no welcome in welcoming space.

Like · Reply · 1h

**Olena Wilshanetsky**
*Yawn*

Like · Reply · 1h

**Tamra Enchantadorea Kinzel-Wood**
So...just to clarify...Cis dude is mad because society defined him usin' a term he doesn't like??? Maybe just my neuro-divergence showing but hmmm.

Like · Reply · 1h · Edited

**Rachel Somers**
**Alycia Z DuBry** That's weird, I've never heard it used as a slur against men, it literally just means "not trans". What's wrong with people calling someone not-trans if they aren't trans?

Like · Reply · 1h

**Alycia Z DuBry**
**Rachel Somers** Nothing. Although I just like to call people by their names, for the pronoun preferences, I have a few personal experiences (mental health inferences) that interfere with some of it so I just go out of my way to use names more. For general population references, since there's so much out there that people are offended on these days I just go with supporters.

Like · Reply · 1h · Edited

**Skamp Widegrin**
"They" as a singular has existed in common usage for over a century. This stuff is not that hard.

Like · Reply · 1h · Edited

**Alycia Z DuBry**
**Angela Gallant** this makes the best sense.

Like · Reply · 1h

**Hakon Thorgeirsson**
To those of you who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

Like · Reply · 1h

**Michelle Height**
Also, if you want to dialogue in good faith, don't throw "I'll pray for you" into this mix. FYI I am a Christian and say this as such. And here is why and how it sounds.

https://ventrelloquest.com/.../why-saying-ill-pray-for.../... See More



VENTRELLOQUEST.COM
Why saying "I'll pray for you" is insulting to non-believers

Like · Reply · 1h

**Hakon Thorgeirsson**

**Hakon Thorgeirsson**
I would point out to you, **Angela Gallant,** that there are a plethora of words that USED TO be relatively innocuous with logical meanings that have been perverted over the years to mean something bad. The infamous "N" word is a prime example. It is a derivative of the Spanish word for black and used to mean no more that that. Over the years had following the Emancipation Proclamation it been to be used in an ever increasingly derogatory manner until today it is considered even more ugly than the "F" word. Which, by the way, is an example of exactly the opposite, wherein a word that used to be considered too ugly to say in polite company is not used by a "lady".
Like · Reply · 1h

**Angela Gallant**
Thankfully, cis is not one of them. So go hang your hat elsewhere.
Like · Reply · 1h

**Hakon Thorgeirsson**
Angela Gallant several of us here have tried to explain to you the fact that it IS offensive. Just because YOU don't find it offensive in no way negates our disgust for it. So if you don't mind, I identify as a Straight Male(man), or (to a lessor extent) as Hetero Male (man), LGBTQ are not the only ones entitled to be address by preferred "labels". If they have that right, so do I.

I have attempted to engage in open, polite and cordial dialog.

I have been nothing but respectful to you and anyone else who wishes to do the same. But at your request, I'll not come into your space, however, other than that, I'll hang my hat where ever I damn well please. Here is usually a good place. I think I'll stay.
Like · Reply · 42m

**Alyda Z DuBry**
Michelle Height Article above noted. Thank you for sharing, good quick read. I like this: "I'll pray for you" also depends on the context. If you're saying that because I'm in the hospital, then I know it means "I am wishing you well" and I am happy to receive such thoughts. I take no offense, because it means you care." and this too (although I think I would go with the smarter phrase if I knew their belief system): "I'll pray for you" as soon they find out I'm a non-believer is equivalent to me saying "I hope you get smarter".
Like · Reply · 42m · Edited

**Bledyn Drwg de Caerdydd**
I agree that Cis has been used in offensive contexts, though the term itself is rooted in simple definition of identity. I don't quite understand how anyone who is earnestly acting inclusive should be offended unless a particular statement is blatantly... **See More**

I agree that Cis has been used in offensive contexts, though the term itself is rooted in simple definition of identity. I don't quite understand how anyone who is earnestly acting inclusive should be offended unless a particular statement is blatantly offensive and either unjustifiably directed at them specifically or widely generalized.

Cisgender has its origin in the Latin-derived prefix cis-, meaning "on this side of"... So a cisgender person identifies with their biological.

So yeah, it's been twisted and used offensively. However, here's and idea: rather than let that continue and be offended, let's reclaim it to be neutral and use other terms to insult the assholes who don't want to be respectful or Transgender individuals.

Like · Reply · 36m                                                             1

**Bledyn Drwg de Caerdydd**
The meme is a perfect example

Like · Reply · 35m          1

**Näomi Lazarus**
**Hakon Thorgeirsson** cis and straight are not on the same axis.

Cis means "the same gender your parents thought you were at birth" and straight means "heterosexual".

There are cis gay men and trans straight men.

And cis straight men, and trans gay men.

And people who are neither cis nor trans, and people who are neither straight nor gay.

Humans are complicated and varied.

Like · Reply · 34m                                                         2

**Hakon Thorgeirsson**
**Michelle Height** As a proud Heathen, I too find it a little offensive for someone to say "I'll pray for you". In the context stated in the article, I 100% agree, my response is something less than polite. However, that is not the case here. So in the context here I don't see it that way. It's just like Marry Christmas. I will try to take it in the spirit intended and let it slide. To Marry Christmas I may reply with Happy Yule an "I'll pray for you" with "and I'll call to the gods to tell them to look after you too." I do not to mean that I should have faith in their beliefs, but that THEY have faith in their own god and they believe that praying to that god may help me. So it is clearly intended to be simply asking for good fortune on to you. How can that be offensive? Though the comment seems to have been deleted I can't double check the context I will acknowledge the possibility that I could be misremembering it.

Like · Reply · 25m                                                            1

Like · Reply · 26m



**Angela Gallant**
The only reason cis-gender people have been offended is because they received a label that was in relation to Transgender people. That is literally the ONLY offence and cis-people took it on themselves.

Like · Reply · 23m



**Alycia Z DuBry**
**Hakon Thorgeirsson** yeah. Olena left the convo. thank you for reading my comment the way it was intended. She seemed in a very dark place. I'm debating about deleting my comments back to her as she is no longer here, but others are commenting on them and I did not want to disrespect their responses to me.

Like · Reply · 22m



**Alycia Z DuBry**
**Angela Gallant** interesting....

Like · Reply · 22m



**Hakon Thorgeirsson**
**Näomi Lazarus** OOOOHHHHH I do see that distinction. One refers to actual gender while the other refers to sexual preference. Thank you for the clarification.

Like · Reply · 21m



**Hakon Thorgeirsson**
**Angela Gallant** Wrong, but thank you for showing how ignorant blanket, generalized statements can truly be. Under the explanations here of what cis means, has meant, is intended to mean, and what it has been bastardized to mean, nothing you said is correct. And yes, as a natural born Man I choose to take offense to the term cis. HOWEVER there is no offensive word that someone doesn't CHOOSE to take offense to. If black people didn't chose to take offense to the "n" word, it wouldn't be offensive. If I didn't chose to take offense to the word cis it wouldn't be offensive.

Like · Reply · 16m

**Hakon Thorgeirsson**
It seems to me (and according to my own experiences) that LGBTQ people are fighting back against the prejudism perpetuated onto them so hard that they are reversing that prejudism onto all straight / cisgendered people. Sadly enough it's the same thing that is happening with PoC. You do not have to hate me to hate those who hate you. You do not have to try to be cruel to me to push back on those who hurt you.  36

As Latoya can attest, I am totally open to allaying my ignorance



**Skamp Widegrin**
Aaaand it is super satisfying to step on an idiots lines!!

Like · Reply · 5h   👍 6

**Marc Barber**
I, personally, also find that being a half-giant seems to add to interactions even with people I don't know...

Like · Reply · 4h   😂 1

**Caroline Ros Vur**
Another favorite: "I don't understand. What does that mean?" It works with fucked up jokes, proxy language, etc. Force someone to be specific. Repeat it back to them. Keep a straight face, like data from Star Trek.

Like · Reply · 4h   👍❤️ 5

**Elisabethe Phipps**
**Caroline**, also my go-to response. "I don't understand. Could you please explain it?"

Like · Reply · 4h   👍 1

**Styrkarr Jarlsskald**
My personal favorite. Makes them have to explain just how racist/bigoted/stupid the thing they just said really is. Delightfully evil. They usually just back off and say something like, "Well that was inappropriate anyway..." Which, of course, is the point.

Like · Reply · 1h   👍🤗 5

**Rachel Somers**
The one I used on patients when I worked in healthcare was just to stare blankly at them in silence until they felt awkward. That way they couldn't complain about my response but they got the hint. Worked like a charm on the patient who decided to make... See More

Like · Reply · 2h   👍❤️🤗 6

37

SCA_000158

4/8/2021                                   Mail - An Tir Seneschal - Outlook



**Skamp Widegrin**

"They" as a singular has existed in common usage for over a century. This stuff is not that hard.

49 mins    Like    More

**Alycia Z DuBry**

**Angela Gallant** this makes the best sense.

44 mins    Like    More

**Hakon Thorgeirsson**

To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

32 mins    Like    More

**Michelle Height**

Also, if you want to dialogue in good faith, don't throw "I'll pray for you" into this mix. FYI I am a Christian and say this as such. And here is why and how it sounds.

**https://ventrellaquest.com/2017/05/06/why-saying-ill-pray-for-you-is-insulting-to-non-believers/**

Why saying "I'll pray for you" is...
ventrellaquest.com

32 mins    Like    More

**Hakon Thorgeirsson**

I would point out to you, **Angela Gallant**, that there are a plethora of words that USED TO be relatively

Get Outlook for iOS

38

https://outlook.office.com/mail/search/id/AAQkADNjZTJjYTdmLWFlMGMtNDc1NC1hNzlhLTE3NzE2ZjgxZDVkYgAQAIMkg2gf3x5lm0q2SWBsTG0%3D    3/3

SCA_000159

# George Parker's Appeal

SCA_000160

Hello;

The King and Queen of An Tir have chosen to exile me from the kingdom for their reign. The email from their seneschal stated this:

> On *April 2, 2021* Their Majesties Christian and Helene III of the Kingdom of An Tir issued the following sanction against you: *Exile from the Kingdom.* This sanction was issued for the following reason(s):
>
> *On April 1, 2021 you participated in a discussion on a page of another SCA member. In this discussion you used Hate speech towards a protected class. This violates the SCA Core Values and the policy against Hate speech.*

They did not give any details of where I violated any rules. As you can see in the above statement, explanation of what I did was so brief that I have to guess exactly which discussion, on what page did I engage in, wherein I did anything and what I could have said that was to be defined as hate speech. Nowhere does it state any fact supporting the sanction save to say that at some time I offended some one and engaged in hate speech. Nor does it spell out my appeal rights but only to tell me in what publication I might find them.

Sanction policy Paragraph C. has several subparagraphs that were not adhered to:

> *4. For Kingdom Sanctions, the event at which the Sanction was announced*
> *6. A brief statement of facts supporting the sanction*
> *7. Right of appeal*

I was not given an opportunity to respond to this sanction, nor was I told that I even had that right. Additionally, I cannot find anywhere that I might have violated any "hate speech" rules. The only "hate speech" rules I can find is in the Media Policies. Which state:

**Outward Facing Outlets and being "Official"**
> *Social Media pages/outlets considered Official include Kingdom and Regional Branch Outlets. Social media pages/outlets for unrecognized groups such as households, fan groups and communities are not considered official. While there are many pages, groups, and other outlets, if you conduct the official business in that page/outlet, then it is Official and should be treated as such.*

**Restriction on content; paragraph 2 states;**
> *"The SCA encourages creativity and innovation in the use of social media by its entities. Certain activities and information are inappropriate to any social media page/outlet. The following material, including but not limited to posted messages, comments, threads of discussion, or media, collectively known as "content," shall not be permitted on any presence associated with the SCA."*

SCA_000161

I have not been on any official SCA social media in an exceptionally long time.  It clearly states that unrecognized groups are not covered, which would lead one to conclude, by extension, that this policy does not include personal pages either.  I think the incident (if it's what I think it is) did not take place on a "presence associated with the SCA".  It was on a personal page of a former member the kingdom, who now resides in a different kingdom.  As far as I know, this is a member who chose to allow her membership laps in December 2020 and did not intend to reinstate it.  So is it the intention of the SCA to monitor and lay claim the right to monitor and discipline "offensive activity" on the personal page of any member who uses the same name they use in the SCA on all social media posts? And to the posts on the personal pages of all it's members AND former members? Is it now the corporate policy to allow monarchs to bring sanctions for infractions committed in any kingdom under the aforementioned circumstances, theirs or not? This is an important question for all populace members.  While I was in fact on my game profile, the SCA is not the only game I play, wherein I use the same name/profile/persona.  Including, but not limited to online MMORPGs, and other historical reenactment groups.

I only mention this because I can only find one incident wherein people have called what I said as "hate speech", however, I don't see it that way.  Hate speech requires intent, I had none.  In fact much earlier in the thread I had defended the very group I am accused of hating on.  But what exactly is considered "offensive material" or "hate speech"?  I did not consider faggot as hate speech when intended to be directed at non LGBTQ people.  While there may or may not have been anyone who were LGBTQ in the conversation, I had no intent on hurting anyone from that community and I made it a statement in general and not directed AT anyone. Had I targeted it directly at someone from the LGBTQ community this would be a different discussion, wherein I am dead wrong. As a fact, the comment was immediately deleted (though it seems some may have had a chance to take a screenshot),

**Paragraph 2, Bullet point 1 states**

> • *Content that involves modern politics or political subjects, particularly any activity that may be interpreted as an endorsement of a particular political party, candidate for political office, legislation or referendum.*

 This post was all about modern politics, which is why I actually assumed that it was the person's mundane page.  I didn't check since I receive posts from both her

41

modern profile and her game profile.  She had stated some time ago that she was no longer using her game profile so I was unaccustomed to seeing posts from it, therefore I assumed it was her modern page.

**Bullet point 3 states:**

> • *Content that broadcasts false or misleading information, including content which is intended to disparage, intimidate or negatively impact the reputation of an individual, branch, event, or other group.*

Not to engage in "whataboutism", but if the SCA intends to police people's personal social media content, a person who stated that he is a baron in the SCA on this thread clearly violated this rule in his very first interactions with me, well before I ever said anything that could even be considered inappropriate at all.  I would like to point out that several people are also currently violating this rule on several official SCA FaceBook pages in reference to this incident, as well as making disparaging comments about my wife and me.   As I stated above, this incident took place on a personal page, not on any "SCA official presence".  This means they are posting mundane issues on **OFFICAL** SCA pages.  At the very least they are posting personal "drama" on official pages.  This is in direct violation of the stated rules. In fact, whether or not I was wrong, to say the things they are saying on an official presence is a violation of the "*or negatively impact the reputation of an individual*" clause.  Therefore, they too should have sanctions or at the very least these posts should be taken down and the moderator of these pages have a discussion on appropriate content.  Allowing these kinds of content on an official page is not ok.

**Bullet point 5 states;**

> • *Content that involves potentially lewd or offensive material, harassment, hate speech, profanity, or pornography.*

Again, not to engage in "whataboutism", however, it seems to me that the aforementioned baron is also guilty of violating this rule as well. He continued to refer to me with a term that I and others informed him is offensive.  Again there have been no sanctions against him or anyone else that joined him in bullying me so far, that I know of.  Whereas I made one comment, one time, he berated me and called me names several times throughout the conversation.  He is engaging in the exact same hate speech that I am being accused of and sanctioned for.  If this is the kind of behavior that I am supposed to look up to, I think I need to find new role models.  Why can he get away with this and I cannot?  Also, as mentioned

SCA_000163

above the current activity on official FB pages also falls under this rule under the harassment clause. However, I have not been on any official pages.

While I will admit that what I said may have been inappropriate in today's new society, due to my diagnosed disability, I'm still struggling to get a handle on what is and is not ok speech. I was always taught that you have a right to say anything you want, however, it seems that is not the case any more. For those with my particular disability, we do not accept changes to the rules easily, especially if that change seems unfair for anyone. Also, I was not aware that so many people would take such offense to me insulting anyone, especially when so loosely directed. After all, no one took exception to them insulting me. It was a general statement to all those attacking me and NOT an insult/slur against any particular group, gay or straight nor to any one person. If these people can decide at whim what is to be defined as hate speech and what is not, how is anyone supposed to know what they can say?

In my defense, upon my very first comment stating that I find the term used in the meme in question offensive, the aforementioned Landed Baron could do nothing but antagonize me, hurl insults at me and do everything in his power to get a rise out of me. I let him know that I was not going to engage in ad hominem with him. This did little to dissuade him. I tried to tell him that I would rather engage in civil debate in this topic. But rather than act like a peer of the realm and try to have a civil dialog with me he felt his best course was to act like a barroom brawler and antagonize me using the very slur several of us had informed him was such. I even posted an article from the BBC that explains why his term was a slur. He was the one who really started the bullying off with his condescending and insulting comments. Many seem to build on his foundation, until it got to the point that very few people seemed interested in civil dialog, but all wanted to slam me (and anyone who agreed with me) in one way or another, just because I felt that the term they were using was an insult/slur. My opinion didn't matter, and I was told as much. Any evidence that I offered was dismissed out of hand, stating that "just because others agree with you doesn't make you right." One person deleted all of their comments and they were some of the most offensive.

I'm sure you have received several copies of the thread in question, but I am including the screenshots I took and have attached them as a separate word document. Upon reading it I'm sure you will notice that all through the insults, attacks, and condescending comments I was respectful to everyone until I had

43

finally had enough and blew up.  Once again, I recognize that in light of today's attitude in protecting the LGBTQ community and the fact that some do still find the word faggot a slight against that community, it was not the best term I could have used.  But you must understand that to me, it was never a slight against "the community", it was an insult used against straight people.  Using fag/faggot against LGBTQ had long since died to my knowledge.  So I never intended it as an insult to anyone in the LGBTQ community.

I would also like to point out that nowhere in the rules can I find exactly what is to be defined as hate speech spelled out.  Otherwise, calling me a term that I have already called out as a slur would theoretically qualify as such (which would include the Baron who used it against me).  Also, in mundane law, "hate speech" is not actually defined either.  In fact, mundane law continues to protect the people's right to free speech, protected under the 1st amendment, and to try to limit mine is a violation of that protected activity.

So in summary, the BOD should not allow this exile to stand because:
1. The incident in question took place on a personal page (whether their membership is current or not is irrelevant), especially wherein the person lives in another kingdom.
2. There is no definition of what constitutes "hate speech", whether or not intent is required and who gets to define what exactly is hate speech.  I (and many people here and in other countries) consider their use of the term cis to be hate speech.  Therefore, if the word I used is hate speech, so is the word cis and all those who call me that word especially AFTER I informed them that it is offensive speech should also be sanctioned, including the original poster.  My rights are as important as anyone else's.  If you defend their right to be offended by something I said, and not mine, no one is safe.  After all that is the exact reason I used the word I did.  They were intentionally offending me because I told them as much, so I concluded that offending anyone was fair game.
3. The social media had until just recently not recognized the word I used as a violation of their hate speech policy.  I have attached an article which shows a quote from Facebook on this very topic.  The article outlines a petition to change Facebook policy, which may or may not have happened.

In closing, if this sanction stands, and/or no sanctions are levied against those who have slandered me and my wife (who was not a party to this, yet is being maligned just the same), I would like to inform you that we have an excellent case that could be taken to mundane courts.  What I said has no standing in a mundane court.  The insults that the officers and members of the SCA have engaged in is liable and will hold up in court.  These acts of libel are likely to shut down my business.  Several BOD members are attorneys, I would expect you to understand the merits of my case.

--

Kveðja í þjónustu við drauminn, (yours in service to the dream)

44

**Hans Drottinvald Hákon Þorgeirsson von Eignersfjord**
AoA, CLA,CSD,CST,GoS.OoGB, CoB
*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

45



# Facebook: Classify fag/faggot/dyke as hate speech.

SCA_000167



This petition had 144 supporters

---



**Christopher Rathbun** **started this petition to** **Facebook Mark Zuckerburg**

A post can be removed from Facebook and the user can be given a warning or banned for repeated offenses for using hate speech. Fag/Faggot/Dyke are no different than other words that aren't tolerated on Facebook because they are classified as hate speech, but are used frequently by many, but aren't classified as hate speech. There are many words that society has deemed unacceptable because they are racial/ethnic slurs. In this day and age of increasing acceptance, or at least tolerance, of the GLBT community, there are words that are just as hurtful to them, as racial slurs are to ethnic groups. While, the GLBT community isn't classified as a race or ethnic group, they are a demographic and a minority that deserve respect as much as any other minority group. If racial/ethnic slurs are shunned because they are hate speech, then these should also be shunned and classified as hate speech.

I reported someone one day for using the word fag in a derrogatory context during the Marriage Equality fight in MN on the MPR thread:
https://www.facebook.com/MPRnews/posts/10151474497528591

This is the reponse I got back from FB admin:
Thanks for your report. We reviewed the comment you reported, but found it doesn't violate Facebook's Community Standard on hate speech, which includes posts or photos that attack a person based on their race, ethnicity, national origin, religion, sex, gender, sexual orientation, disability, or medical condition.

There needs to be consistency among FB admins and people need to know that just because it's a word that is socially acceptable to those insensitive to the issue, it's still a hurtful word.

47

SCA_000168

## Updates

[100!](#)

Thank you all to those who have signed this. I will being doing more in the near future to continue this petition, but I was waiting until we reached 100 signatures. Thanks again and have a good weekend. Keep up the momen...

[100!](#)

Thank you all to those who have signed this. I will being doing more in the near future to continue this petition, but I was waiting until we reached 100 signatures. Thanks again and have a good weekend. Keep up the momentum and get the word out.



**Christopher Rathbun**
8 years ago
**View all updates**

## Reasons for signing



**Karen Howard**·8 years ago
So Facebook only protects SOME of its members. Racial and ethnic slurs are banned, but those associated with sexual orientation are not. Glad I'm not a Facebook member. I wouldn't want to belong to such a discriminatory site.

- •
- 1

.

Share

48

SCA_000169

# Correspondence between Mr. Parker and Society Seneschal

SCA_000170

**Subject:** Re: An Tir Sanction
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 4/8/2021, 2:23 PM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org
**BCC:** elasait1@gmail.com

Greetings:

I wanted to acknowledge receipt of your email. The Board of Directors must review all sanctions above the level of Banishment from the Royal Presence; however, the agenda for the upcoming quarterly meeting is closed, so that review will not happen until their midquarter conference call, currently scheduled for June 1 (that date may be subject to change). In the meantime, please understand that sanctions imposed by a kingdom stand until the Board has had a chance to review them and decide whether or not to uphold them.

You do have the right to appeal the sanction. If I am understanding correctly, your letter to the Board, and the other material you submitted, constitutes your appeal. I will see that this is presented to the Board along with the material from the kingdom at their midquarter conference call. If you wish to submit any other materials in support of your appeal, you will need to either email them to me at this email address, or send them to the SCA's corporate mailing address. Any such material should reach me (or the corporate address) by May 20, 2021.

In service,

Lis Schraer

(Elasait ingen Diarmata)

Society Seneschal


On 4/8/2021 12:03 AM, Ha'kon Thorgeirsson wrote:

> Hello;
> The kingdom of An Tir has exiled me. I have attached a statement, and documents that contain screenshots of the relevant Facebook posts.
> --
>
> Kveðja í þjónustu við drauminn,
>
> Hans Drottinvald Hákon Þorgeirsson von Eignersfjord
> AoA, CLA,CSD,CST,GoS.OoGB, CoB
> *Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

50

SCA_000171

**Subject:** Re: An Tir Sanction
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 4/9/2021, 10:59 AM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org
**BCC:** elasait1@gmail.com

Hello Hakon,

Complaints and appeals are entirely separate actions, so a complaint must be submitted separately from an appeal.

Also, my apologies, but yesterday I did not include all the information I intended to. (I was under the weather due to having gotten my second COVID vaccine.) You had cited Society social media policy a number of times. The applicable hate speech policy is actually found in Corpora, Section X.A.4:

*Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions up to and including revocation of membership and denial of participation.*

*Please report any possible instances of hate speech to your Kingdom Seneschal, the Society Seneschal or the President of the SCA immediately. For more information about hate speech and the reporting of same, please refer to the Society Seneschal's Handbook.*

I do need to add that despite the wording above, there is no particular additional information in the Seneschal's Handbook regarding this subject, except possibly in the Bullying and Harassment Policy.

In service,

Lis Schraer

Society Seneschal

On 4/8/2021 6:32 PM, Ha'kon Thorgeirsson wrote:

> Greetings and well met Elasait ingen Diarmata,
> Thank you so much for your prompt response to my email. I do apologize for the appeal being so long, but I felt it needed to be said. Yes, the letter does constitute an appeal, however, can it double as a complaint on those I mentioned in my letter or do I need to submit a separate form for that? I especially want to file a complaint against the landed barron who attacked me on the page as well as all of the moderators who allowed me to be attacked on the official SCA pages.
> Thank you for your assistance.

51

SCA_000172

Hakon

On Thu, Apr 8, 2021 at 12:23 PM Lis Schraer <seneschal@sca.org> wrote:

Greetings:

I wanted to acknowledge receipt of your email. The Board of Directors must review all sanctions above the level of Banishment from the Royal Presence; however, the agenda for the upcoming quarterly meeting is closed, so that review will not happen until their midquarter conference call, currently scheduled for June 1 (that date may be subject to change). In the meantime, please understand that sanctions imposed by a kingdom stand until the Board has had a chance to review them and decide whether or not to uphold them.

You do have the right to appeal the sanction. If I am understanding correctly, your letter to the Board, and the other material you submitted, constitutes your appeal. I will see that this is presented to the Board along with the material from the kingdom at their midquarter conference call. If you wish to submit any other materials in support of your appeal, you will need to either email them to me at this email address, or send them to the SCA's corporate mailing address. Any such material should reach me (or the corporate address) by May 20, 2021.

In service,

Lis Schraer

(Elasait ingen Diarmata)

Society Seneschal

On 4/8/2021 12:03 AM, Ha'kon Thorgeirsson wrote:

Hello;
The kingdom of An Tir has exiled me.  I have attached a statement, and documents that contain screenshots of the relevant Facebook posts.
--

Kveðja í þjónustu við drauminn,

Hans Drottinvald Hákon Þorgeirsson von Eignersfjord

AoA, CLA,CSD,CST,GoS.OoGB, CoB
*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

--

Kveðja í þjónustu við drauminn,

52

SCA_000173

**Hans Drottinvald Hákon Þorgeirsson von Eignersfjord**
**AoA, CLA,CSD,CST,GoS.OoGB, CoB**
*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

SCA_000174

# SOCIETY FOR CREATIVE ANACHRONISM, INC.

Casefile Cover Sheet

CCS
2019

| Accused Modern Name / SCA | George Parker / Hakon Thorgeirsson Von Eignersfojord | | |
|---|---|---|---|
| Requested Board Action(s) | Uphold Exile: ☐  TRP: ☐  Investigate: ☐  R&D: ☒  Other: ☐ | | |
| Accused Mailing Address | 5705 S. Charro Lane, Hereford, AZ 85615 | | |
| Accused email / telephone | Unknown | | |
| Sanction Type/Date/Kingdom | Exile, April 2, 2021 | | |
| First and Final Board Review | First Review Date: 5/25/2021   Final Review Date: | | |
| Date of Complaint | 4/1/2021 | Kingdom | An Tir |
| Complainant Information | | | |
| Modern Name | Multiple complaints—social media incident | | |
| SCA Name | | | |
| Address | | | |
| Email / Telephone | | | |
| Member # | | Date Kingdom Seneschal was notified | 4/1/2021 |
| Incident Information | | | |
| SCA Event | | Steward | |
| City, State | | Date | |
| CASEFILE FORM CHECKLIST - Enter YES if complete | | | |
| Complaint (Form 1) | x | Defendant Answer (Form 6) | |
| Witness Statements (Form 2) | x | SocSen Letter (Form 7A/7B) | |
| Newsletter Notice (Form 3) | x | SocSen Final Letter (Form 8) | |
| Kingdom Sen. Letter (Form 4) | x | Appeal Received (Form 9) | |
| Proof of Delivery (Form 5) | x | Board Review of Appeal | |
| Kingdom Investigator / email | | | |
| Society Investigator / email | | | |
| Casefile Instructions for Kingdom Seneschals and Investigators | | | |
| 1. The Casefile Cover Sheet and Forms 1, 2, 3, 4, 5, and 6 must be **fully completed** before sending casefile to the Society Seneschal.    Incomplete casefiles will be returned. | | | |
| 2. Form 5: Simply insert photo of Proof of Delivery receipt in box provided. | | | |
| 3. Copy the Witness Form 2 as needed to complete additional witness statements for the casefile. | | | |
| 4. The Accused must be contacted and provided a redacted copy of the complaint. If the accused declines to be interviewed or to offer a written statement, enter into the Form 6 narrative: | | | |
| "THE ACCUSED DECLINED TO PROVIDE A STATEMENT WHEN  CONTACTED." | | | |
| Casefile Progress Notes | | | |

1

**Table of Contents**
**George Parker**

1. Investigator's Report………………………………………………………………………  3

2. An Tir kingdom seneschal notification to Atenveldt….………….………………………………… 8

3. Investigator email with An Tir Crown…………………………………………………………11

4. Investigator email with An Tir seneschal……………………………………………………14

5. George Parker Response to Investigator……………………………………………………18

6. Society Seneschal Notifications…………………………………………………………..28

7. Original Packet: Society Seneschal's Summary………………………………………………..32

8. Original Packet: Complainants' Statements……………………………………………………34

9. Original Packet: Required Kingdom Documentation……………………………………………..43

10. Original Packet: Emails forwarded from Society DEI Officer………………………………..47

11. Original Packet: Correspondence between Kingdom Seneschal and Society Seneschal…………..51

12. Original Packet: Screenshots (provided by Kingdom Seneschal)………………………………54

13. Original Packet: George Parker's Appeal………………………………………………..69

14. Original Packet: Correspondence between Mr. Parker and Society Seneschal………..………...79

2

# Investigator's Report

SCA_000177

**INVESTIGATION REPORT:** George Parker, AN TIR (Exile)

Investigator's Name: Stacy Hall

Date(s) of Investigation: 24 July 2021-17 September 2021

**REASON FOR INVESTIGATION:** George Parker (SCA: Hakon Thorgeirsson) was formally accused by several Complainants of engaging in hate speech on the personal SCA-centric Facebook page of LaToya Johnson (Maude Louisianna d'Orleans) using his SCA name. On 2 April 21**,** the Crown of An Tir, Christian and Helene, issued an Exile from the Kingdom against G. Parker. The Board of Directors upheld this action in May 2021, and ordered an investigation into possible sanctions up to and including revocation and denial of membership for Mr. Parker.

**SUMMARY TIMELINE:**
**1 April 2021**: After a lengthy online argument, G. Parker, using his SCA name (Hakon Thorgeirsson) made remarks defined as hate speech, including the term "faggot" used in-context as a derisive slur in the presence of numerous online witnesses. G. Parker later deleted the comment, however his remarks were screencaptured by several and complaints were filed (see LaToya screencaptures, Rachel Sommers, "dirty deleted" comment).
  See:
    1. Interview: "080321 Email Response from TRMs An Tir, G. Parker case"
    2. Interview: "080321 Email response interview AnTirKS"
    3. "George Parker Board uphold exile" Screen caps LaToya, see page 47 in PDF.
    4. "Nykera.jpg" complaint letter, see "Exhibits: Nykera" and attachment "Nykera.jpg"

**2 April 2021:** Their Royal Majesties (TRMs) Christian and Helene Exiled G. Parker from An Tir. Sanction was delivered by USPS, and announced in the kingdom newsletter, but not read into Court as TRMs An Tir were not holding courts due to ongoing COVID19 concerns. The Kingodm Seneschal (KS) An Tir sent notification to KS Atenveldt (See "040121Email to Adenveldt with screen shot") to be assured TRMs Atenveldt were aware of the situation surrounding G. Parker, who resided in Atenveldt at the time of sanction.

**May 2021:**  Exile of G. Parker was upheld by the Board in May 2021 (See "George Parker Board uphold exile")

**LISTING OF INDIVIDUALS CONTACTED/INTERVIEWED:**
    1. M. Grayson (Attia Prima); Kingdom Seneschal An Tir, seneschal@antir.org
    2. TRMs An Tir, Helene and Christian; sanctioning Crown; crown@antir.org
    3. G. Parker (Hakon Thorgeirsson), Subject; thorgeirsson@gmail.com . After an initial issue with a typo in his email address, G. Parker did respond to requests for statement and/or interview. See Email string: "091721 email string G. Parker Re_ Parker Case, An Tir; Investigator assigned"

4

SCA_000178

**INTERVIEWS AND INFORMATION PRESENTED:**
1. Interview: "080321 Email Response from TRMs An Tir, G. Parker case" (TRM An Tir, Helene and Christian)
2. Interview: "080321 Email response interview AnTirKS" [KS An Tir, M. Grayson (Attia Prima)]
3. Email string: "091721 email string G. Parker Re_ Parker Case, An Tir; Investigator assigned"
4. Interview: "091721 G. Parker email response to investigator questions"

**EXHIBITS:** Items 2 and 3 are from the Original file from Society Seneschal and are listed here as the pertinent items for this particular investigation involving only G. Parker's comments.
1. "040121Email to Adenveldt with screen shot" Email from KS An Tir to KS Atenveldt regarding G. Parker relocation and Exile (from Investigator's email conversation with KS An Tir) 1 April 2021.
2. "George Parker Board uphold exile", screencaps LaToya: From the Society Seneschal's report to the Board, screencaptures of the escalating online conversation between G. Parker and numerous persons.
3. "Nykera.jpg" complaint letter: From the Society Seneschal's report to the Board, letter of complaint including screencapture of G. Parker engaging in hate speech.

**KINGDOM CASEFILE OR INVESTIGATION REPORT:** There was no in depth kingdom investigation. The documentation of the Subject's comments were very clear. TRMs An Tir issued Exile immediately. This documentation is also at the Society level.

5

**INVESTIGATOR'S SUMMARY:**

Prior to the inflammatory online statements made by G. Parker, he and others, were put in an "online time-out" by TRMs An Tir for the duration of one year due to continuing online social media arguments.

After this year ended, around 1 April 2021, there was a series of escalating social media postings in one thread on a personal, SCA-centric, Facebook page where G. Parker (using his SCA name, Hakon Thorgeirsson Von Eignersfojord) ultimately made clear, in-context, remarks (including the slur "faggot") that are defined in Corpora as hate speech.

As G. Parker had moved to Atenveldt by the time of this online exchange, TRMs An Tir stated in interview that They sanctioned G. Parker with Exile from An Tir as an immediate measure to prevent him from participating in SCA activities in An Tir, including making further statements in An Tir social media*. TRMs further stated that They considered TRP, but ultimately decided upon Exile as They did not wish to overstep Their authority with (now) another kingdom's subject. The KS An Tir emailed the KS Atenveldt 1 April 2021 informing Atenveldt of TRMs An Tir's sanction and alerting Atenveldt to possible issues.

The screen captures sent to KS An Tir, Corporate DEI, and the Society Seneschal are an accurate documentation of this incident of hate speech.

It is clear from his statements in interview that G. Parker feels attacked and is angry; he was defended in the thread by a few people who agreed with his opinion that "cis" was being used in a degrading manner. G. Parker is of the opinion that he was defending himself from the slur "cis-dude" multiple times in the social media thread. In his rebuttals to Corporate and in interview G. Parker does not deny making the post. He did regret making the post "in the heat of anger" and deleted the post without comment, but not before the capture was taken and then reposted by those who were "out to get him".

G. Parker complains that he was not given the same opportunity to apologize as others would have prior to his Exile, which was rendered within 24 hours of his regretted statement. G. Parker believes that any attempts made by him to apologize after the Exile would have been seen as merely apologizing to get out of trouble. He maintains that:

1. He was not accurately informed of the complaints against him;
2. He was not given the opportunity to apologize prior to his Exile
3. Corpora X.A.4 was not specific in its definition of hate speech to include personal social media pages; and
4. The Social Media policy does specifically delineate the parameters of hate speech in social media and the updated policy post-dates his transgressions.

6

G. Parker's comments are well documented and are in violation of several SCA governing documents including but not limited to: Corpora Section X.A.4 regarding hate speech (including definition); Corpora Section II b; the current (which post-date this incident) Society's Social Media policy (Sections II, III A-D, and G).

*[NB]: The reaction to the announced Exile caused a flurry of additional threatening posts from numerous people, particularly in Blatha an Oir. The investigator considered contacting the SMOs for BaO and An Tir [Jen Harper (Lucia Robertsdottir) SMO An Tir; socialmedia@antir.org; and Anne Asplund (Baroness Anne) SMO BaO; dachsiehaven@gmail.com] for their experiences, but decided these could be separate forthcoming complaints that are not related to the individual actions of G. Parker which resulted in his Exile.*

7

# An Tir kingdom seneschal notification to Aten-veldt

SCA_000182

**Hakon**

**An Tir Seneschal** <seneschal@antir.org>

Thu 4/1/2021 6:45 PM

To: seneschal@atenveldt.org <seneschal@atenveldt.org>

Hello Seneschal Atenveldt, 😄

Attia here from AnTir. We got wind of a posting that is pretty much hate speech. We aren't  sure if they are sheltering down their for the pandemic of if they are coming back up here. He is originally from Atenveldt. This was on a post about SCA, under SCA names and I just wanted to give you a heads up. Our Crown is contemplating exile. But I thought you should know. I hope you are hanging in there!

Attia
Kingdom Seneschal, AnTir



 **Skamp Widegrin**
"They" as a singular has existed in common usage for over a century. This stuff is not that hard.

👍 2

49 mins   **Like**   More

**Alycia Z DuBry**
**Angela Gallant** this makes the best sense.

44 mins   **Like**   More

 **Hakon Thorgeirsson**
To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

 1

32 mins   **Like**   More

9

SCA_000183



**Michelle Height**

Also, if you want to dialogue in good faith, don't throw "I'll pray for you" into this mix. FYI I am a Christian and say this as such. And here is why and how it sounds.

https://ventrellaquest.com/2017/05/06/why-saying-ill-pray-for-you-is-insulting-to-non-believers/



Why saying "I'll pray for you" is...

ventrellaquest.com

  Like  More



**Hakon Thorgeirsson**

I would point out to you, **Angela Gallant**, that there are a plethora of words that USED TO be relatively

Get Outlook for iOS

SCA_000184

# Investigator email with An Tir Crown

SCA_000185

 **Gmail**

**S Hall <sdhall1970.sh@gmail.com>**

---

## Re: Investigator Assigned to Parker Case; Request for Interview
1 message

---

**Queen** <queen@antir.org>                                              Mon, Aug 2, 2021 at 3:30 PM
To: S Hall <sdhall1970.sh@gmail.com>
Cc: An Tir Crown <crown@antir.org>, sanctions deputy <sanctions@sca.org>

Good afternoon Stacy/Gwen!

We did indeed consider a TRP for Mr Parker, particularly due to the nature of his offence, and his history of poor
behaviour. We felt however, that due to his move to another Kingdom that it fell out of the scope of what We feel Our
judgement should cover. We felt that an exile from Our realm would protect Our Populace from the impact of any future
action he might take.
We were lead to believe that Our Seneschal reached out to the KSen of his current Kingdom to let them know about the
event, and to let them know what actions We were moving forward with.

We feel very strongly that when an issue takes place outside Our Kingdom borders (or especially across multiple
Kingdoms) that We are not the right level to decide the final outcome.  This is consistent with previous sanctions and
actions We have taken (or not taken), so as to not overstep Our authority.

Should the BoD decide to take a stronger action than We have already issued, We would absolutely support that in any
way possible. Hate language has no place in Our Society, modern or medieval.

Thank you again for your time in this unpleasant matter :)

Christian III
Hélène III

---

**From:** S Hall <sdhall1970.sh@gmail.com>
**Sent:** Monday, August 2, 2021 12:29:22 PM
**To:** Queen <queen@antir.org>
**Cc:** An Tir Crown <crown@antir.org>; sanctions deputy <sanctions@sca.org>
**Subject:** Re: Investigator Assigned to Parker Case; Request for Interview

Gracious Majesties,

Thank You for Your very prompt and thorough reply!

As my only follow up question to You: Did You consider stronger sanctions, i.e., TRP, given Mr. Parker's history before
deciding on Exile?

Slainte,
Gwen/Stacy

On Sun, Aug 1, 2021 at 6:40 PM Queen <queen@antir.org> wrote:
    Good afternoon Stacy/Gwendolynn, and well met!

    We feel this matter is fairly straightforward and can easily be related via email, thereby saving everyone's collective
    "Zoom Spoons" as it were; if however you would rather have a quick back and forth on videochat, We can of course
    make Ourselves available for that.

    On April 1st 2021 We were made aware of a comment that Mr Parker made on the Facebook Persona page of a lady
    who used to live in An Tir (Maude Louisiana d'Orléans mka LaToya Johnson).

    It has been some time since the incident, so the nature of the whole conversation is a little fuzzy; essentially in a thread
    where Mr Parker was defending his right to be offended by the adjective "cis-" he threw out an utterly non-sequitor use
    of hate speech against homosexuals.

SCA_000186

This is not the first time We have witnessed Mr Parker be inappropriate on Facebook; early on in this Reign we issued an Administrative sanction against him, his wife, and a third party who were all antagonising each other on SCA related pages. This was a 6-month hiatus from communicating with one another, and from participating in the Baronial forums; these terms were, for the most part, observed by all parties.

With this context of repeated behaviour, and his very clear-cut use of established hate language that appeared on the SCA Persona page of a member, We felt it was in the best interest of Our Populace to prevent him from participation in An Tir, for at least the rest of Our reign. It was Our understanding that at the time of the sanction Mr Parker was not currently residing in An Tir, and therefore this  was not likely to be an undue hardship on him and his business.

Feel free to reach out again if you need any clarification, or if you have any follow-up questions We can answer. Thank you for volunteering your time to the SCA in this manner; it is an unfortunate side of the administration, but We feel very strongly that it is important for impartial investigators to get both sides of a story so the General Populace can feel safe from retaliation or unfair actions.

We hope you and yours are safe and healthy, and that you have a lovely evening! Warmest regards,

Christian III
Rex An Tir

Hélène III
Regina An Tir

Get Outlook for Android

---

**From:** S Hall <sdhall1970.sh@gmail.com>
**Sent:** Saturday, July 31, 2021, 8:30 a.m.
**To:** An Tir Crown
**Cc:** sanctions deputy
**Subject:** Re: Investigator Assigned to Parker Case; Request for Interview

July 31, 2021

Greetings unto Your Noble Majesties An Tir, Christian and Helene

My hopes that I find You well.

My name is Stacy Hall (SCA: Gwenndolynn ní hÁilleacháin), and, as Ms. Clark mentioned in the introductory email, I am an investigator with the Society Seneschal's office for SCA, Inc.; I have been assigned to look into the complaint against G. Parker/Hakon Thorgeirsson, who made several inflammatory remarks online under his SCA name.

As Your Majesties sanctioned Mr. Parker with Exile, I would like to speak with You with regard to his postings, the subsequent complaints that followed, and Your Majesties decision for Exile. I will be happy to contact you via phone or Zoom at a mutually convenient time, or we may conduct our conversation via email as Your Majesties may wish to answer my questions together.  There may be follow-up questions as we move forward, and I would welcome any additional information or materials You wish to include in relation to this investigation.

If You agree to this conversation, You will receive a copy of the notes from the interview and are allowed to correct or add to them as necessary. You will not receive any statements from other parties involved or a copy of the final investigative report.

As Your Majesties already know, the identities of all parties are kept confidential. Likewise, should names of other witnesses come up in the course of the investigation, those names are also kept confidential. Should You know or guess the names of the persons involved, You are cautioned not to contact them regarding this matter or attempt to influence the investigation in any way beyond Your own communications with the investigator.

For more information about how the investigative process generally works, you may refer to the Investigator's Guide, located at: https://www.sca.org/wp-content/uploads/2021/01/InvestigatorsGuide.pdf

Very sincerely yours,

Stacy Hall

SCA_000187

# Investigator email with An Tir seneschal

SCA_000188

 **Gmail**

S Hall <sdhall1970.sh@gmail.com>

---

## Re: Investigator Assigned to Parker Case; Interview questions
1 message

---

**An Tir Seneschal** <seneschal@antir.org>           Tue, Aug 3, 2021 at 11:58 AM
To: S Hall <sdhall1970.sh@gmail.com>

Good Morning, Gwen,

- <u>I have a screencapture from Nykera, but the screencapture does not show the date or whether this was an official FaceBook page or a personal page: Do you have the date of the Nykera screen capture and from which page was this taken (Baronial, An Tir, personal)?</u>

Looking back at the emails I received this post happened on April 1, 2021. I received two screen shots from two different people. Nykera and Mary LaRose. This post was on Maude's facebook page. I've attached a screen shot of that page. Maude has very actively indicated this page is her SCA page and regularly discusses, argues, etc about the society on that page. I just went back and was able to pull the entire thread and take screen shots of it. I will put it in the one drive folder and share it with you.

- <u>Was Mr. Parker previously prohibited from making social media posts prior to the incidents around April 30, 2021?</u>

Yes, him, his wife and a person named Raphella were put on a social media time out. There had been ongoing complaints about Alizand and Hakon in Blatha An Oir. It was alleged they harassed, bullied and were just downright mean to people. When we/I looked into it, Alizand had supplied me with so many screen shots of Hakon and her acting out that the Crown just said you know what, just put them on timeout. All of them including Raphella were on time out from the Blatha an Oir pages. Supposedly during this time out, they got mad on other An Tir Pages and the previous Kingdom SMO actually removed them from those pages for a short period also. But that is just what I heard, not that I know for a fact.

- <u>It is my understanding that Mr. Parker was either moving or had moved to Atenveldt at the time of his abusive language: Do I understand correctly? And, is the Atenveldt Kingdom Seneschal aware of the sanctions from An Tir?</u>

Yes, I did. On April 2nd. I have attached those emails also in One drive.

Please let me know if you need anything further from me. I have copies of everything between Hakon and Blatha an oir also.

And let me know if you can't get into the one drive folder I just shared with you.

Attia

----

Regards,

SCA_000189

Mistress Attia Prima, OP (Amanda Grayson)
Kingdom Seneschal, An Tir
seneschal@antir.org

---

**From:** S Hall <sdhall1970.sh@gmail.com>
**Sent:** Tuesday, August 3, 2021 8:51 AM
**To:** An Tir Seneschal <seneschal@antir.org>
**Subject:** Re: Investigator Assigned to Parker Case; Interview questions

Good morning Attia,

And please call me Stacy or Gwen! My apologies for the delay in response to your email. Thank you so much for sending along the contact information for the SMOs and for agreeing to speak with me on the matter of G. Parker. I am a former kingdom seneschal myself, so I very much appreciate your time and consideration.

I just have a few questions, mainly for documentation of the timeline and verifying dates on screencaptures, etc. It sounds like you and I both have fairly hectic schedules, so I'll set my questions below for your review and answers. If I'm too vague or the question is unspecific and you'd like a qualifier, please let me know. Questions are underlined for ease of reading and reference.

- I have a screencapture from Nykera, but the screencapture does not show the date or whether this was an official FaceBook page or a personal page: Do you have the date of the Nykera screen capture and from which page was this taken (Baronial, An Tir, personal)?

- Was Mr. Parker previously prohibited from making social media posts prior to the incidents around April 30, 2021?

- It is my understanding that Mr. Parker was either moving or had moved to Atenveldt at the time of his abusive language: Do I understand correctly? And, is the Atenveldt Kingdom Seneschal aware of the sanctions from An Tir?

Thank you again for your time and considerable cooperation and I'll look forward to hearing from you.

Best,
Gwen/Stacy


On Sat, Jul 31, 2021 at 7:01 PM An Tir Seneschal <seneschal@antir.org> wrote:
> Hello Ms Hall,
>
> I am happy to speak with you through Zoom or email. Whatever can be most convenient. My schedule is open after 430pm pacific time. I'm not normally available on Monday.
>
> The Kingdom social media's email address is socialmedia@antir.org. Her name is Jenn Harper and her SCA name is Lucia Robertsdottir.
>
> I will work on getting contact information for the Baltha An Oir social media officer for you.
>
> Please let me know what works for you. Please feel free to call me Mandy or Attia.
>
> Attia
> Get Outlook for iOS

---

**From:** S Hall <sdhall1970.sh@gmail.com>
**Sent:** Saturday, July 31, 2021 8:40:46 AM
**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** sanctions deputy <sanctions@sca.org>; baroness_eilis@juno.com <baroness_eilis@juno.com>
**Subject:** Re: Investigator Assigned to Parker Case; request for interview

July 31, 2021

Dear Ms. Grayson (SCA: Attia Prima):

SCA_000190

Greetings Mistress Attia and my hopes that I find you well.

My name is Stacy Hall (SCA: Gwenndolynn ní hÁilleacháin), and, as Ms. Clark mentioned in the introductory email, I am an investigator with the Society Seneschal's office for SCA, Inc.; I have been assigned to look into the complaint against G. Parker (Hakon Thorgeirsson), who made several inflammatory remarks online under his SCA name and was subsequently Exiled from An Tir effective April 2, 2021.

As the Seneschal for An Tir, I would like to speak with you with regard to these postings and the subsequent complaints that followed. I will be happy to contact you via phone or Zoom at a mutually convenient time, or we may conduct our conversation via email.  This may lead to follow-up questions as we move forward, and I will welcome any additional information or materials you wish in relation to this investigation.

I would also ask for the contact information of the Social Media Officers for your Kingdom and Blatha an Or so that I may speak with them as well.

If you agree to this conversation, you will receive a copy of the notes from the interview and are allowed to correct or add to them as necessary. You will not receive any statements from other parties involved or a copy of the final investigative report.

As you know, the identities of all parties are kept confidential. Likewise, should names of other witnesses come up in the course of the investigation, those names are also kept confidential. Should you know or guess the names of the persons involved, you are cautioned not to contact them regarding this matter or attempt to influence the investigation in any way beyond your own communications with the investigator.

For more information about how the investigative process generally works, you may refer to the Investigator's Guide, located at: https://www.sca.org/wp-content/uploads/2021/01/InvestigatorsGuide.pdf

I look forward to hearing from you soon and pray you remain well.

Very sincerely yours,

Stacy Hall

(Gwenndolynn ní hÁilleacháin, OP)

Investigator


On Sun, Jul 25, 2021 at 6:42 PM baroness_eilis@juno.com <baroness_eilis@juno.com> wrote:

> Greetings to Your Majesties and to Mistress Attia:
>
> I wanted to inform you that an investigator has been assigned to the George Parker (Hakon Thorgeirsson) case. Her name is (Stacy Hall (SCA: Gwenndolynn ni hAileachain). She will be contacting you in the near future to begin the investigation, and is authorized to do so by the Society Seneschal. I would appreciate it if you offered her your full cooperation. Please remember that all information collected during an investigation is confidential.
>
> Mistress Attia, she may need email addresses for both the Kingdom and Blatha an Or Social Media Officers.
>
> Please let me know if you have any questions.
>
> In service to the Society,
>
> Lee Clark/Duchess Eilis O&#65533;Boirne
> Deputy to the Society Seneschal/Investigations
> sanctions@sca.org
> _____
> Sponsored by https://www.newser.com/?utm_source=part&utm_medium=uol&utm_campaign=rss_taglines_more
>
> Civil Rights Icon Who Taught Math, Too, Dies
> http://thirdpartyoffers.juno.com/TGL3141/60fdf6a82c2a776a8537fst02duc1
> Passengers Taken Off Plane After Teens Sends Gun Pic
> http://thirdpartyoffers.juno.com/TGL3141/60fdf6a84f9d976a8537fst02duc2
> Teen Pleads Guilty After Grandfather Dies in 'Swatting'
> http://thirdpartyoffers.juno.com/TGL3141/60fdf6a87343a76a8537fst02duc3

SCA_000191

# George Parker Response to Investigator

SCA_000192

 Gmail

**S Hall <sdhall1970.sh@gmail.com>**

## Re: Parker Case, An Tir; Investigator assigned
1 message

**Ha'kon Thorgeirsson** <thorgeirsson@gmail.com>      Fri, Sep 17, 2021 at 2:16 PM
To: S Hall <sdhall1970.sh@gmail.com>
Cc: Lis Schraer <seneschal@sca.org>, Lis Schraer <seneschal-elect@sca.org>, sanctions deputy <sanctions@sca.org>

To answer your questions, I am in possession of the entire thread with all responses. I am also in possession of your previous statements, where you have indicated that you were defending your position on terminology you felt was directed at you that you found insulting. The Society Seneschal has directed me to gather additional information for this situation in which you were Exiled; so when you mentioned that you were not certain which statement was in question in your explanations, I sent the aforementioned statement in an email to you for your clarification. I cannot divulge to you who I have interviewed or what was said in those interviews, per Corporate policy.

For clarity, as I want to directly respond to each comment, I will do so in red to ensure proper connection and to reduce the risk of missing anything.

I have received the copy you sent confirming which statement I made that this is all in reference to. Thank you for that. This is the first confirmation I have received. Yes, this is the comment that I suspected was in question all along. I am glad to have confirmation and no longer need to speculate. It seems to me there are two issues at hand here:

1. You are correct, the OP was NOT directed at me personally, but it was directed towards everyone like me i.e. those who identify as the gender they were born.

2. If you read all of the comments you will find where "cis dude" had in fact been directed exactly to me, by some ill intending people and in some comments, I was even called out by name. You may also notice that it is in fact being used to belittle, as a slur, as an intended insult. I feel the intent was clear.

**1. Having had a change of heart, did you consider making an apology for the remark before you deleted it?**

I felt that the first and foremost importance was to see the comment deleted so as to minimize the damage done in terms of unintentionally offending. Alas others would not allow that as they almost immediately reposted it. The owner of the page PMed me asking WFT, at which time I apologized to her. She also suggested that I do a public apology to which I responded that I was still far too angry at the treatment I received to apologise at that time. I told her that I would be happy to extend an apology to her daughter, whom she said was deeply offended, as it was never my intention to hurt her.

By the time I had cooled down, the next morning, I already had an exile letter in my inbox. At that point I felt that no apology was warranted, they got exactly what they were aiming for, my exile. Others have said worse before this, yet were warned for this behavior not immediately exiled for the first time they said

19
SCA_000193

anything offensive.  I personally know of 3 people who were warned before any sanctions.  Me, they slammed right away, first offense, no discussion, no warning, no opportunity to apologize, BAM you're gone within 24 hours.  Clearly I am not being paranoid, they really were out to get me.  Any apology at that point would have fallen on deaf ears.  And would have been viewed and received as a "you are only apologizing because you got into trouble" response.

**2. Did you hesitate before making the final statement (screencap shown in previous email), or was this a "heat of the moment" situation?**

Please understand, I am not on facebook all the time, I don't check it on my phone as many people do.  So when I logged back in to my computer, I saw that the discussion had exploded with comments.  It took me a while to read through them all where I found several people continuing to bash me.  I was infuriated, and made that post in a fit of anger without even stopping to think about it.   Evidence of that is in the fact that I said in the comment that the term "fag" would be offensive to "homosexuals" yet I unthinkingly used that the full version of the term (faggot) even though I wasn't addressing (nor intending to address) any particular person.  I did not know if any of the people attacking me were homosexual, nor was it my intention to personally attack them as such.  It was never my intention to directly offend/address anyone's sexual preference.  It was really only my intention to illustrate the double standard being applied.  If it was ok for them to call people like me "cis" and "cis dude" then it must be ok for me to call others "faggot".  **Let me be clear on my stand on this topic; It is NOT ok to insult anyone for their sexual orientation or lifestyle preferences whether it's straight or gay or anything in between.**  I truly believe that down in my soul.  It is every person's *given* right to choose their lifestyle with indifference to what anyone thinks about that choice- and no one has the right to harass you for that choice.  But that is exactly what I felt they were doing to me.  In retrospect, I absolutely believe they were baiting me to elicit the exact response they got.  I wish I had hesitated and exhibited more self control.  I am learning.

**3. How did you come to be involved in this particular thread? You were not specifically named in the initial posting regarding "cis-dudes"; why did you decide to comment?**

The original poster was a friend of mine.  We frequently traded information and opinions about what we find offensive in an open exchange of ideas, both on FB and in person.  This was a meme that she posted, in general and not to or at anyone specific, as she frequently did. I had no idea it would blow up like it did.  If you look at the first comment I made, it was directed to her explaining that I agree with the concept that everyone should use any influence they have to address the bullying of the LGBTQ community, however, I object to the apparent use of the word "cis" as it sounded derogatory in that context.  I admitted that, at that time, I didn't know what the word was being used as, I had never heard it used before that time.  So I looked it up.  Wherein I found that it was in fact being used as an insult to people who identified as the gender they were born into.  Many had come to the defense of the word.  Some of who were slamming me for objecting to it.  So I posted the article I found from the BBC that explains why it is offensive.  Wherein I was told that "just because others agree with you doesn't make you right".  The more comments I received, the harder they slammed me, and the madder I got.  Only one person entered the conversation in my defense, for which she was slammed.  A peer in the conversation went on a huge, hate filled tirade to dress her down, in public, on a public forum.  I would note that many who were slamming me in an extremely disrespectful manner were in fact peers. But since nothing has been said to them, and in light of my previous experience with making complaints about peers, I would have to conclude that this behavior from peers is acceptable.

SCA_000194

Ms. Johnson has a habit of posting controversial issues, usually bashing straight, white men for all the ills of the world. I had made it a habit to call her out (kindly and respectfully) when she posts BS. Our relationship had been based on mutual respect for differing views. Sadly, not anymore.

As to your complaint against another Peer in An Tir that would be involving a separate incident;. For example, in this investigation involving your Exile, you are the Subject of a complaint, filed by a Complainant. It sounds like you would like to make a separate complaint against a Peer in An Tir, if I understand you correctly? I also understand that you are no longer living in An Tir, but your complaint is against someone who does live in An Tir; if that is the case you would need to file a complaint with the Society Seneschal, with you as the Complainant.

No, that is not what I was saying in my previous comment. I was in reference to a complaint that I had already made to the kingdom and the society, wherein my wife and I were under the same sanctions as the peer for HER actions. Evidently the crowns felt that we were just as culpable for the incident as the peer, despite all of the evidence we presented to the contrary. I mentioned it only to highlight what I feel is an actual bias on the part of the crowns, peers and certain populace members of An Tir, mostly Blatha An Oir.

In that case, our complaint was duly filed and the judgement presented to the Crowns before we or our witnesses were ever interviewed. It was not until we presented the issue to the then Society Seneschal (Mike Watkins) that we and our witnesses were interviewed. However, by that time, we feel the crowns had already made their decision to back the peer and her behavior, and so we were punished in the same manner as she was. It appeared that the same thing was happening again in this new case that you are investigating.

In my statements above, I would expect that since you have the evidence in hand and can see where the peers behaved inappropriately PRIOR to my inappropriate comment, I would hope the society could take action against them without me needing to stick my head on the chopping block once again. They deliberately baited me (Sealioning?? Gaslighting???). Over and over, with the intent of making me angry. Which they did. It has been my experience and the experience of friends that anyone who complains about a peer will live to regret that mistake. The original poster has MANY peers as friends. In light of that fact, and the subsequent fireball that was created, it becomes obvious that it was in poor judgement to even enter into this conversation in the first place...but that's hindsight. But this is exactly why I have refrained from engaging any SCA member on anything controversial. Due to my disabilities it is very easy to rile me up, I have decided that it's better to not put myself into that position.

And by the way, it has come to my attention that someone DID file a complaint about the behavior of the peers on this thread. The complaint seems to have, once again, fallen on deaf ears, and seems to have been ignored. Again, making complaints about peers in the SCA seems to be guaranteed to get you ostracized and vilified, because the corporation will do nothing to address their bad behavior. Only non-peers get investigated and punished.

In closing- let me be clear about my reactions to all this. An Tir exiled me within 24 hours of the post (that by that time had been deleted). I was, and remain, angry over the treatment from the kingdom social media officer, seneschal and crowns. I was given no opportunity to rectify or apologize or retract publicly the statement I made. Instead, I was summarily dismissed.

The worst part of all of this is that the mistreatment from SCA officers has not ended with this investigation. The Arts & Science officer of Blatha an Oir (Denise Coyle), just yesterday (Sept.15) went onto a group owned by my wife and posted the exile announcement in an attempt to discredit me. On a private group held and maintained by someone not even in that kingdom. Her blatant, continued harassment is beyond belief-considering my wife complained about her behavior to the Kingdom seneschal right after the exile happened. This is an example of the extreme measures that persons in Blatha An Oir and the kingdom of An Tir will go to to see me discredited and hopefully (in their own words) R&D'd. A copy of that conversation on their baronial facebook page is available through my wife, should you have need of it.

This was a first time/one time offence. Had it been habitual this would be a different conversation.

In the end- do I regret how the thread devolved? Yes. But as stated above, apologies at this point would be worthless, as the ones it would be intended for would simply brush it aside with derision, and others would simply judge me as trying to dig myself out of a hole they see me as deserving. So what would be my options now???

Throughout this whole ordeal, beginning with the thread, continuing with the exile and now the R&D investigation, I have felt angry, abused, vilified, unheard and persecuted. All for one comment that was deleted shortly after it was made. The ramifications of that one comment have laid most heavily on my shoulders, and has had literally no effect on those who claim to be offended by it. Should you have any additional/follow up questions I would be happy to answer them.

Thank you for hearing my defence.

George Parker

---

 **An Tir Sanctions.docx**
13K

SCA_000196

*Investigator's note: This document was attached to the email string "091721 email string G. Parker Re_ Parker Case, An Tir; Investigator assigned", and originally titled "An Tir Sanctions.docx" by G. Parker. The title is changed to "091721 G. Parker email response to investigator questions" for ease of reading in the casefile. The investigator's questions are in black with Mr. Parker's responses in red and underlined.*

To answer your questions, I am in possession of the entire thread with all responses. I am also in possession of your previous statements, where you have indicated that you were defending your position on terminology you felt was directed at you that you found insulting. The Society Seneschal has directed me to gather additional information for this situation in which you were Exiled; so when you mentioned that you were not certain which statement was in question in your explanations, I sent the aforementioned statement in an email to you for your clarification. I cannot divulge to you who I have interviewed or what was said in those interviews, per Corporate policy.

For clarity, as I want to directly respond to each comment, I will do so in red to ensure proper connection and to reduce the risk of missing anything.

I have received the copy you sent confirming which statement I made that this is all in reference to. Thank you for that. This is the first confirmation I have received. Yes, this is the comment that I suspected was in question all along. I am glad to have confirmation and no longer need to speculate. It seems to me there are two issues at hand here:

1. You are correct, the OP was NOT directed at me personally, but it was directed towards everyone like me i.e. those who identify as the gender they were born.

2. If you read all of the comments you will find where "cis dude" had in fact been directed exactly to me, by some ill intending people and in some comments, I was even called out by name. You may also notice that it is in fact being used to belittle, as a slur, as an intended insult. I feel the intent was clear.

**1. Having had a change of heart, did you consider making an apology for the remark before you deleted it?**

I felt that the first and foremost importance was to see the comment deleted so as to minimize the damage done in terms of unintentionally offending. Alas others would not allow that as they almost immediately reposted it. The owner of the page PMed me asking WFT, at which time I apologized to her. She also suggested that I do a public apology to which I responded that I was still far too angry at the treatment I received to apologise at that time. I told her that I would be

23

happy to extend an apology to her daughter, whom she said was deeply offended, as it was never my intention to hurt her.

By the time I had cooled down, the next morning, I already had an exile letter in my inbox.  At that point I felt that no apology was warranted, they got exactly what they were aiming for, my exile.   Others have said worse before this, yet were warned for this behavior not immediately exiled for the first time they said anything offensive.  I personally know of 3 people who were warned before any sanctions.  Me, they slammed right away, first offense, no discussion, no warning, no opportunity to apologize, BAM you're gone within 24 hours.  Clearly I am not being paranoid, they really were out to get me.  Any apology at that point would have fallen on deaf ears.  And would have been viewed and received as a "you are only apologizing because you got into trouble" response.

**2. Did you hesitate before making the final statement (screencap shown in previous email), or was this a "heat of the moment" situation?**

Please understand, I am not on facebook all the time, I don't check it on my phone as many people do.  So when I logged back in to my computer, I saw that the discussion had exploded with comments.  It took me a while to read through them all where I found several people continuing to bash me.  I was infuriated, and made that post in a fit of anger without even stopping to think about it.   Evidence of that is in the fact that I said in the comment that the term "fag" would be offensive to "homosexuals" yet I unthinkingly used that the full version of the term (faggot) even though I wasn't addressing (nor intending to address) any particular person.  I did not know if any of the people attacking me were homosexual, nor was it my intention to personally attack them as such.  It was never my intention to directly offend/address anyone's sexual preference.  It was really only my intention to illustrate the double standard being applied.  If it was ok for them to call people like me "cis" and "cis dude" then it must be ok for me to call others "faggot".  **Let me be clear on my stand on this topic; It is NOT ok to insult anyone for their sexual orientation or lifestyle preferences whether it's straight or gay or anything in between.**  I truly believe that down in my soul.  It is every person's *given* right to choose their lifestyle with indifference to what anyone thinks about that choice- and no one has the right to harass you for that choice.  But that is exactly what I felt they were doing to me.  In retrospect, I absolutely believe they were baiting me to elicit the exact response they got.  I wish I had hesitated and exhibited more self control.  I am learning.

**3. How did you come to be involved in this particular thread? You were not specifically named in the initial posting regarding "cis-dudes"; why did you decide to comment?**

The original poster was a friend of mine.  We frequently traded information and opinions about what we find offensive in an open exchange of ideas, both on FB and in person.  This was a meme that she posted, in general and not to or at anyone specific, as she frequently did. I had no

24

idea it would blow up like it did.  If you look at the first comment I made, it was directed to her explaining that I agree with the concept that everyone should use any influence they have to address the bullying of the LGBTQ community, however, I object to the apparent use of the word "cis" as it sounded derogatory in that context.  I admitted that, at that time, I didn't know what the word was being used as, I had never heard it used before that time.  So I looked it up.  Wherein I found that it was in fact being used as an insult to people who identified as the gender they were born into.  Many had come to the defense of the word.  Some of who were slamming me for objecting to it.  So I posted the article I found from the BBC that explains why it is offensive.  Wherein I was told that "just because others agree with you doesn't make you right".  The more comments I received, the harder they slammed me, and the madder I got.  Only one person entered the conversation in my defense, for which she was slammed.  A peer in the conversation went on a huge, hate filled tirade to dress her down, in public, on a public forum.  I would note that many who were slamming me in an extremely disrespectful manner were in fact peers. But since nothing has been said to them, and in light of my previous experience with making complaints about peers, I would have to conclude that this behavior from peers is acceptable.

Ms. Johnson has a habit of posting controversial issues, usually bashing straight, white men for all the ills of the world.  I had made it a habit to call her out (kindly and respectfully) when she posts BS. Our relationship had been based on mutual respect for differing views. Sadly, not anymore.

As to your complaint against another Peer in An Tir that would be involving a separate incident;. For example, in this investigation involving your Exile, you are the Subject of a complaint, filed by a Complainant.  It sounds like you would like to make a separate complaint against a Peer in An Tir, if I understand you correctly? I also understand that you are no longer living in An Tir, but your complaint is against someone who does live in An Tir;  if that is the case you would need to file a complaint with the Society Seneschal, with you as the Complainant.

No, that is not what I was saying in my previous comment.  I was in reference to a complaint that I had already made to the kingdom and the society, wherein my wife and I were under the same sanctions as the peer for HER actions *[investigator's note: This is in reference to the previous year's "online time out" handed down by TRM An Tir]* .  Evidently the crowns felt that we were just as culpable for the incident as the peer,  despite all of the evidence we presented to the contrary. I mentioned it only to highlight what I feel is an actual bias on the part of the crowns, peers and certain populace members of An Tir, mostly Blatha An Oir.

In that case, our complaint was duly filed and the judgement presented to the Crowns before we or our witnesses were ever interviewed. It was not until we presented the issue to the then Society Seneschal (Mike Watkins) that we and our witnesses were interviewed. However, by that time, we feel the crowns had already made their decision to back the peer and her behavior, and so we were punished in the same manner as she was. It appeared that the same thing was happening again in this new case that you are investigating.

In my statements above, I would expect that since you have the evidence in hand and can see where the peers behaved inappropriately PRIOR to my inappropriate comment, I would hope the society could take action against them without me needing to stick my head on the chopping block once again.  They deliberately baited me (Sealioning?? Gaslighting???). Over and over, with the intent of making me angry. Which they did. It has been my experience and the experience of friends that anyone who complains about a peer will live to regret that mistake. The original poster has MANY peers as friends. In light of that fact, and the subsequent fireball that was created, it becomes obvious that it was in poor judgement to even enter into this conversation in the first place...but that's hindsight. But this is exactly why I have refrained from engaging any SCA member on anything controversial.  Due to my disabilities it is very easy to rile me up, I have decided that it's better to not put myself into that position.

And by the way, it has come to my attention that someone DID file a complaint about the behavior of the peers on this thread.  The complaint seems to have, once again, fallen on deaf ears, and seems to have been ignored.  Again, making complaints about peers in the SCA seems to be guaranteed to get you ostracized and vilified, because the corporation will do nothing to address their bad behavior.  Only non-peers get investigated and punished.

In closing- let me be clear about my reactions to all this. An Tir exiled me within 24 hours of the post (that by that time had been deleted). I was, and remain, angry over the treatment from the kingdom social media officer, seneschal and crowns. I was given no opportunity to rectify or apologize or retract publicly the statement I made. Instead, I was summarily dismissed.
The worst part of all of this is that the mistreatment from SCA officers has not ended with this investigation.  The Arts & Science officer of Blatha an Oir (Denise Coyle), just yesterday (Sept.15) went onto a group owned by my wife and posted the exile announcement in an attempt to discredit me.  On a private group held and maintained by someone not even in that kingdom. Her blatant, continued harassment is beyond belief- considering my wife complained about her behavior to the Kingdom seneschal right after the exile happened. This is an example of the extreme measures that persons in Blatha An Oir and the kingdom of An Tir will go to to see me discredited and hopefully (in their own words) R&D'd. A copy of that conversation on their baronial facebook page is available through my wife, should you have need of it.

This was a first time/one time offence.  Had it been habitual this would be a different conversation.

26

In the end- do I regret how the thread devolved? Yes. But as stated above, apologies at this point would be worthless, as the ones it would be intended for would simply brush it aside with derision, and others would simply judge me as trying to dig myself out of a hole they see me as deserving. So what would be my options now???

Throughout this whole ordeal, beginning with the thread, continuing with the exile and now the R&D investigation, I have felt angry, abused, vilified, unheard and persecuted. All for one comment that was deleted shortly after it was made.  The ramifications of that one comment have laid most heavily on my shoulders, and has had literally no effect on those who claim to be offended by it.

Should you have any additional/follow up questions I would be happy to answer them.

Thank you for hearing my defence.

George Parker

27

# Society Seneschal Notifications

SCA_000202



# the society for creative anachronism, inc.

P.O. Box 360789 • Milpitas, California 95036-0789 • Tel (408) 263-9305 • Fax (408) 263-0641

Lis Schraer
Society Seneschal/VP for Operations
seneschal@sca.org
May 27, 2021

George Parker
5705 South Charro Lane
Hereford, AZ 85615

Dear Mr. Parker:

On April 2, 2021, Christian and Helene, Crown of An Tir, issued the sanction of Exile from the Realm against you. This sanction was based on a statement you made on another individual's SCA-identifying Facebook page which appears to violate the SCA's Hate Speech Policy as listed in Corpora.

At their May 25, 2021 conference call meeting, the SCA's Board of Directors took the following action:

*Motion by Gigi Coulson to uphold the exile of George Parker (Hakon Thorgeirsson Von Eignersfojord) by Christian and Helene, Crown of the Kingdom of An Tir, on April 2, 2021, and to direct the Society Seneschal to begin an investigation into possible sanctions up to and including revocation of membership and denial of participation. Second by Natalie Degerstrom. Opposed: None. Motion carried.*

Exile from the Kingdom means that you may not engage in any SCA activity in the Kingdom that issued the sanction. This also precludes participation in any Kingdom-controlled social or electronic media. This sanction does not preclude participation in activities in other Kingdoms. This sanction will continue until the end of Their Majesties Christian and Helene's current reign. As I understand you are now residing in the Kingdom of Atenveldt, the Kingdom Seneschal of Atenveldt will receive a copy of this letter; however, the Exile imposed by Their Majesties of An Tir does not extend to Atenveldt.

The Board of Directors also instructed my office to conduct an investigation into this matter. An investigator will be assigned to conduct that investigation. You may expect to be contacted by the investigator at some future date to obtain any statement or evidence you wish to supply. Once the investigation is completed, the matter will be referred back to the Board of Directors for a final determination of action to be taken. You will be informed of when that review will occur.

You may refer to the current version of the 2019 SCA Sanctions Manual, available on the Society Seneschal's web page at: socsen.sca.org, with regard to your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.

Sincerely,

Lis Schraer
Society Seneschal/Vice President for Operations
cc: Kingdom Seneschals of An Tir and Atenveldt

29



**USPS.COM®** | Quick Tools | Send | Receive | Shop | Business | International | Help | 🔍

Locations   Support   Informed Delivery   Register / Sign In

# USPS Tracking®

Tracking / FAQs ›

Track Another Package +

**Track Packages Anytime, Anywhere**   Get the free Informed Delivery® feature to receive automated notifications on your packages   **Learn More**

Feedback

Tracking Number: 9405503699300399707886

Remove ✕

Your item was delivered in or at the mailbox at 12:56 pm on May 31, 2021 in HEREFORD, AZ 85615.

USPS Tracking Plus™ Available ⌄

**Status**

✓ **Delivered, In/At Mailbox**

May 31, 2021 at 12:56 pm
HEREFORD, AZ 85615

Get Updates ⌄

Delivered

| Text & Email Updates | ⌄ |
|---|---|
| Tracking History | ⌄ |
| USPS Tracking Plus™ | ⌄ |
| Product Information | ⌄ |

See Less ⌃

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs**



**HELPFUL LINKS**
Contact Us
Site Index
FAQs
Feedback

**ON ABOUT.USPS.COM**
About USPS Home
Newsroom
USPS Service Updates
Forms & Publications
Government Services
Careers

**OTHER USPS SITES**
Business Customer Gateway
Postal Inspectors
Inspector General
Postal Explorer
National Postal Museum
Resources for Developers

**LEGAL INFORMATION**
Privacy Policy
Terms of Use
FOIA
No FEAR Act EEO Data

Copyright © 2021 USPS. All Rights Reserved.

  

SCA_000204

**Subject:** Notification of Board consideration
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 9/29/2021, 2:05 PM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org
**BCC:** elasait1@gmail.com

Dear Mr. Parker:

I am emailing you to notify you that the Board of Directors will be reviewing the recently-completed Society investigation they ordered into circumstances surrounding your Exile from the Kingdom of An Tir earlier this year. They will review this in executive session at the quarterly meeting to be held October 23-24, 2021. As you have now had the opportunity to communicate with the investigator and I have received your statements to her, this matter is ready for the Board's review.

I do not know what action the Board will take; their options range from lifting the exile prior to the end of the reign, through a revocation and denial of membership. I will contact you shortly after the meeting to inform you of the results of their review.

Sincerely,

Lis Schraer

Society Seneschal

31

# Original Packet: Society Seneschal's Summary

32

**George Parker (Ha'kon Thorgeirsson) Exile from the Realm**
**Crown: Christian and Helene**
**Kingdom: An Tir**
**Date of Sanction: April 2, 2021**

**Society Seneschal's Summary:**

On approximately March 30, 2021, an SCA member reposted on her Facebook page a statement regarding speaking up against bigotry. In the original statement the term "cis guys" was used. A lively discussion ensued, during which Mr. Parker took exception to the term "cis" and claimed it was an offensive term. For awhile the discussion was fairly reasonable, but eventually it got distinctly sharp. Mr. Parker (and others) made a few comments which skirted the edge of acceptability, and then referred to people in the discussion as "faggots". He then attempted to explain that other terms now considered offensive once were normal speech. At some point later he removed his comment.

Complaints were made to both the kingdom seneschal and the Society level; at least one of them was sent to the Directors via Comments. At least one complainant also referenced previous behavior by Mr. Parker toward the complainant via email or private message which she interpreted as harassment. The Crown of An Tir issued an Exile from the Realm on April 2, 2021, citing violations of the Hate Speech Policy by Mr. Parker.

It should be noted here that at the time of the incident, Mr. Parker and his wife were in the process of moving from An Tir to Atenveldt. The kingdom seneschal mentioned this to me and indicated the Crown was unsure of whether they could issue a sanction. I told her they could still do an Exile if they wished, and suggested that if they wanted to do a TRP instead, they should probably talk to the Crown of Atenveldt first. I do not know whether they ever did this, or indeed whether they ever considered a TRP.

Unfortunately, various official social media groups within An Tir chose to post the sanction announcement from the kingdom web page. (It was posted to the web page because An Tir is not currently holding virtual courts, and there have been several variances granted for this to be the procedure when a court announcement cannot be made.) One of those posts resulted in some unkind comments by a few members of the barony where the couple resided. This was dealt with by pulling the post, after which the baronial social media officer posted a statement expressing her dismay and displeasure with the behavior displayed.

Mr. Parker has submitted a lengthy response/appeal, which is included in the packet. He had also submitted some screenshots of the conversation, but since the kingdom seneschal had also sent me the entire conversation as of the date she collected the screenshots, I did not include Mr. Parker's less-complete screenshots.

Mr. Parker and his wife allege that the Crown and kingdom seneschal mishandled the sanction, but I do not find that to be the case. Their assertions are that the Crown and kingdom seneschal are biased against them and this is the reason for the swift action; that no investigation was conducted prior to the sanction; and that Mr. Parker was not asked to provide a statement. I cannot say whether the kingdom officials are biased against him or not, but the violation of the Society's hate speech policy was both clear and well-documented, which rendered a detailed kingdom investigation unnecessary. It might have been preferable for the kingdom to have informed Mr. Parker in advance of the sanction, but our rules do not actually require <u>prior</u> notice.

33

# Complainants' Statements

SCA_000208

| SOCIETY FOR CREATIVE ANACHRONISM, INC. | | | |
|---|---|---|---|
| COMPLAINT FORM | | | Form 1 - 2019 |
| Date of Complaint | 4/1/2021 | Kingdom of Incident | AnTir |
| Complainant Information | | | |
| Modern Name | Nykera Daedra | | |
| Name and Kingdom | Nykera Daedra/AnTir | | |
| Address | 98422 | | |
| Email / Telephone | nykera98@gmail.com | | |
| Membership# | 244696 | Date Kingdom Seneschal was notified | 4/1/2021 |
| COMPLAINT  Page 1 | | | |

I,            *(name)*            , am making this statement to the best of my recollection.

SCA_000209



## Bullying complaint

Nykera Daedra <nykera98@gmail.com >

Thu 4/1/2021 6:52 PM
To: An Tir Seneschal
Cc: An Tir Crown; Attia Prima

Hello!
So the "one year no SCA social media time is clearly up.
And as I am sure you've heard this among other things have been posted

**Hakon Thorgeirsson**

To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

32 mins   Like   More

At what point does his behavior warrant a permanent Bann? How many people
Need to be offended and suffer his abuse?
Please look Into this.
Thank you
Nykera

. . .

Reply   |   Reply all   |   Forward

36

SCA_000210

| COMPLAINT CONTINUED  Page 2 |
|---|

<table>
<tr><td colspan="4" align="center"><strong>SOCIETY FOR CREATIVE ANACHRONISM, INC.</strong></td></tr>
<tr><td colspan="3" align="center">COMPLAINT FORM</td><td align="center">Form 1 - 2019</td></tr>
<tr><td>Date of Complaint</td><td>4/1/2021</td><td align="center">Kingdom of Incident</td><td>AnTir</td></tr>
<tr><td colspan="4" align="center">Complainant Information</td></tr>
<tr><td>Modern Name</td><td colspan="3">Mary Larose</td></tr>
<tr><td>Name and Kingdom</td><td colspan="3">Lucrezia Veneziano Martini/AnTir</td></tr>
<tr><td>Address</td><td colspan="3">V3M 1Y2, BC</td></tr>
<tr><td>Email / Telephone</td><td colspan="3">lucrezia@shaw.ca</td></tr>
<tr><td>Membership#</td><td>97187</td><td align="center">Date Kingdom Seneschal was notified</td><td>4/1/2021</td></tr>
<tr><td colspan="4" align="center">COMPLAINT  Page 1</td></tr>
<tr><td colspan="4" align="center">COMPLAINT CONTINUED  Page 3</td></tr>
</table>

37

### FW: Unacceptable online behaviour

**Mary Larose** <lucrezia@shaw.ca>
Fri 4/2/2021 10:50 AM
To:  An Tir Seneschal <seneschal@antir.org>

📎 2 attachments (386 KB)
Aizand.docx; Yafa Social media conversation Sept 2017 original screen capture.docx;

Greetings Mistress Attia,

I just wanted to make you aware that I have sent the attached compliant to the BOD in regard to a former An Tir citizen. Normally I would go through the An Tir chain, but they have moved to Arizona and she is a Society level officer.

Regards,

Isabella Lucrezia

---

**From:** Mary Larose <lucrezia@shaw.ca>
**Date:** Friday, April 2, 2021 at 10:46 AM
**To:** <sca-comments@lists.sca.org>
**Subject:** Unacceptable online behaviour

Greetings members of the BOD,

I am writing today about someone, Hakon Thorgeirsson, who continues to be abusive and posts unacceptable rhetoric on Facebook. While not on official groups, this post was on an SCA member's post, where it has been seen by numerous members of our LGBTQ+ community. This person, once threatened me while I was the An Tir Social Media Deputy. The threat was because I was trying to get his wife to follow Society social media protocols for our Facebook YAFA group. Instead of following our protocols she block me, and our Kingdom Seneschal (who she actually reported to). Given the nature of the group, we could not have it be an official Kingdom group where the Kingdom Social Media Deputy, nor the Seneschal could monitor the contents. I had to create a new "official" group and she refused to shut down her "unofficial group. She was removed from being YAFA deputy for our Kingdom, but somehow was given the position at the Corporate level, which she appears to still hold. The reason I Mention this now, although it occurred in 2017/18, is on a thread where this screen capture was posted

38

**From:** Mary Larose <lucrezia@shaw.ca>
**Date:** Friday, April 2, 2021 at 10:46 AM
**To:** <sca-comments@lists.sca.org>
**Subject:** Unacceptable online behaviour

Greetings members of the BOD,

I am writing today about someone, Hakon Thorgeirsson, who continues to be abusive and posts unacceptable rhetoric on Facebook. While not on official groups, this post was on an SCA member's post, where it has been seen by numerous members of our LGBTQ+ community. This person, once threatened me while I was the An Tir Social Media Deputy. The threat was because I was trying to get his wife to follow Society social media protocols for our Facebook YAFA group. Instead of following our protocols she block me, and our Kingdom Seneschal (who she actually reported to). Given the nature of the group, we could not have it be an official Kingdom group where the Kingdom Social Media Deputy, nor the Seneschal could monitor the contents. I had to create a new "official" group and she refused to shut down her "unofficial group. She was removed from being YAFA deputy for our Kingdom, but somehow was given the position at the Corporate level, which she appears to still hold. The reason I Mention this now, although it occurred in 2017/18, is on a thread where this screen capture was posted numerous people have posted about being bullied and harassed by both these people...including my successor as Kingdom Social Media Deputy. I feel it reflects badly on the BOD for a woman with this type of record to hold a Society level position. I feel that we, as populace need to start doing a better job at pushing these types of instances up the chain. While I held the Social Media position in An Tir we did not yet have the Bullying and Harassment policy or social media policies we have now.

I would normally go up the chain with or current Kingdom Sensechal, but these people no longer live in An Tir as they have moved to Arizona.

This is the current post

SCA_000213

4/12/2021                                    Mail - An Tir Seneschal - Outlook



The threat he sent to me was this, the one and only post I made to his wife's now "unofficial" Facebook group. I had never posted about his wife anywhere, nor had I ever bullied her. This is an example of what he considers me "bullying" her.





This is the threat I received the next day.

4/12/2021                                    Mail - An Tir Seneschal - Outlook

41

SCA_000215



It seems to me that your continuous effort to undermine the YAFA unoffical FB page is vindictive, petty and inexcusable.  Just because the official page is unsuccessful is no excuse to attack Alizaunde's page just because it's out performing yours by leaps and bounds.

These attacks are NOT within your purview as the Media officer of the Kingdom and reflects very poorly on you.  As moderator of the list it is within MY purview to remove you and/or delete any post I feel is harassing, bullying or otherwise offensive.

It is also within my purview to report your constant harassment and bullying of Alizaunde to the Society.  Please review the new Societies anti-bullying rules.  If you do not end your constant attacks on this wonderful person I will be force to take the appropriate action against you.

Thank you for your consideration of this matter.

Mary Larose known as Isabella Lucrezia Veneziano Martini, OL, OP – An Tir
Member # 97187

SCA_000216

**Required Documentation:**
- **Newsletter Announcement**
- **Letter to Mr. Parker**
- **Proof of Mailing**

SCA_000217

| SOCIETY FOR CREATIVE ANACHRONISM, INC. | |
| --- | --- |
| Sanction Announcements Form | Form 3 - 2019 |

| Format of Announcements in Royal Court AND Published in the Kingdom Newsletter | |
| --- | --- |
| Sanction:<br>Form | **Banishment from the Royal Presence (BRP) Sanction 3.B**<br>On *(date)* , (SCA names of Sovereign and Consort), The Crown of *(kingdom)*<br>have issued a Royal Sanction of Banishment from the Royal Presence against<br>*(Modern name)* , known in the Society as *(SCA Name)* .<br>This sanction will expire on (date) or at the end of our Reign.<br>Crown signature and title<br>Crown signature and title |



Reporting Calendar of An Tir

| | | Report Due |
| --- | --- | --- |
| Q1 | Jan–Mar | 01–May |
| Q2 | Apr–Jun | 01–Aug |
| Q3 | July–Sep | 01–Nov |
| Q4 | Oct–Dec | 01–Feb |

An Tir Crier • Page 2

Notice of Sanction

On April 2, 2021, Their Majesties, King Christian III and Queen Hélène III of An Tir have issued the sanction of Exile from the Kingdom against George Parker, also known in the Society as Hakon Thorgeirsson Von Eignersfojord. Exile from the Kingdom precludes engaging in any SCA activity in the Kingdom. This sanction precludes participation in any Kingdom-controlled social or electronic media. This sanction does not preclude participation in activities in other Kingdoms.

Branch Announcement

Effective March 14, 2021 the branch known as the Canton of Bearwood is in suspension. The suspension will last for no more than 2 years and will be reviewed by the Kingdom Seneschal every 6 months to determine restoring the branch status.

Who is who | Announcements

| Sanction:<br>Form | **Temporary Removal from Participation (TRP) Sanction 3.D**<br>On *(date)* , (SCA names of Sovereign and Consort), The Crown of *(kingdom)*<br>have issued a Temporary Removal from Participation from the SCA against<br>*(Modern Name)* , known in the Society as *(SCA Name)* .<br>Crown signature and title<br>Crown signature and title |
| --- | --- |
| Note: The Royal Court and Newsletter announcement are to be the same announcement. | |

44

Amanda Grayson
Regional Vice-President for Operations, SCA Inc.
PO Box 360789
Milpitas, CA 95036-0789
seneschal@antir.org
April 2, 2021

George D.C. Parker
5705 S. Charro Lane
Hereford, AZ 85615

Dear Mr. Parker:

On *April 2, 2021* Their Majesties Christian and Helene III of the Kingdom of An Tir issued the following sanction against you: *Exile from the Kingdom.* This sanction was issued for the following reason(s):

*On April 1, 2021 you participated in a discussion on a page of another SCA member. In this discussion you used Hate speech towards a protected class. This violates the SCA Core Values and the policy against Hate speech.*

Exile from the Kingdom means that you may not engage in any SCA activity in the Kingdom that issued the sanction. This also precludes participation in any Kingdom-controlled social or electronic media. This sanction does not preclude participation in activities in other Kingdoms. This sanction will be reviewed by the Board of Directors. You will receive a notification from the Society Seneschal of the results of this review. This sanction will continue until at such time that the Crown steps down.

If this sanction is the result of a complaint and the complainant is known to you, you shall not contact them nor harass them directly or through others about this matter. You may refer to the SCA Sanctions Manual, located at http://socsen.sca.org/, for further information on this sanction's restrictions on your SCA participation, your responsibilities, and your rights of appeal. Questions regarding the information in the Sanctions Manual may be directed to the Society Seneschal's office.

Regards,

Amanda Grayson

cc: *Christian and Helene III, Crown An Tir*
*Lis Schraer, Society Seneschal*

45

SCA_000219

SOCIETY FOR CREATIVE ANACHRONISM, INC.
Proof of Certified Mail Delivery     Form 5 - 2019



46

# Emails to Society DEI Officer

SCA_000221

**Subject:** Fwd: Oh boy do I have a doozie for ya
**From:** Jessica Van Hattem <equity@sca.org>
**Date:** 4/4/2021, 11:26 AM
**To:** Lis Schraer <seneschal@sca.org>, Brigid Costello <socialmedia@sca.org>, John Fulton <president@sca.org>

I got two emails about this guy - forwarding both over to y'all.

Thanks,

Jessica

---

**From:** Jamie P <jcpratt78@gmail.com>
**Sent:** Friday, April 2, 2021 12:35:24 AM
**To:** Jessica Van Hattem <equity@sca.org>
**Subject:** Oh boy do I have a doozie for ya

Greetings your most excellent excellency;
I hope that you are well. I look forward to a time when we are able to gather safely again. This person made a severely homophobic comment on a post and from what I understand he has threatened multiple kingdom Seneschals in An-Tir with physical harm to the point where he was banned from sca social media for a year. His year is up and he is in full swing.

I am sorry to add more drama to your plate as I am certain you have had a Chinese buffet style plate this past year.  If there is any way I can be of service to you, please don't hesitate to reach out.
In service,
Hattori Fuyutsukime

— Image.jpeg

48

SCA_000222

Fwd: Oh boy do I have a doozie for ya



Fwd: Oh boy do I have a doozie for ya

—Image-1.jpeg



**Hakon Thorgeirsson**

To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

 1

32 mins    Like    More

—Attachments:

| | |
|---|---|
| Image.jpeg | 238 KB |
| Image-1.jpeg | 72.7 KB |

50

SCA_000224

# Correspondence between Kingdom Seneschal and Society Seneschal

SCA_000225

## Re: Alizand's husband Hakon

## Lis Schraer <seneschal@sca.org>

Thu 4/1/2021 8:59 PM

**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** Lis Schraer <seneschal-elect@sca.org>

Wow, what a weird conversation. I wonder why he suddenly felt compelled to go completely off the rails? Because before that he wasn't being awful...maybe a little disingenuous. Actually kind of reminded me of the Blaine Hebert stuff I investigated before I was on the Board...where he said something to the effect of "The SCA is plenty diverse...we have Vikings, Italians, French, Irish, Russians..."

Sigh.

Lis

On 4/1/2021 10:40 PM, An Tir Seneschal wrote:

> Here you go! I've labeled them 1-13. The Crown decided tonight they will issue an exile. It has grown since my screen shots. He deleted his comment, but of course it was it was screenshotted and posted again.
>
> Attia
>
> Attia
>
> ----
> Regards,
>
> Mistress Attia Prima, OP (Amanda Grayson)
> Kingdom Seneschal, An Tir
> seneschal@antir.org

---

**From:** Lis Schraer <seneschal@sca.org>
**Sent:** Thursday, April 1, 2021 8:09 PM
**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** Lis Schraer <seneschal-elect@sca.org>
**Subject:** Re: Alizand's husband Hakon

Hi Attia,
So you had better send me the entire conversation. I just got my first complaint from someone who apparently does not agree with us that spouses do not necessarily share a brain. I fully intend to point that out, but I would like to know what the entire thing said.
Thanks,
Lis
On 4/1/2021 8:55 PM, An Tir Seneschal wrote:

> Well! I have the entire conversation. I'm friends with her and she seems to like me so there is that. I absolutely agree about wives, spouses and partners. Alex

SCA_000226

would kick my butt, but what I say is what I say.  And I would have probably flipped a lid too so I'm with John's wife. 😂 with that said it has taken flight so to speak. I did let Adenveldt know of it.  And I'd totally like to see a chiv trying to control LaToya. 😂😂😂😂

Attia

Get Outlook for iOS

**From:** Lis Schraer <seneschal@sca.org>
**Sent:** Thursday, April 1, 2021 6:49:40 PM
**To:** An Tir Seneschal <seneschal@antir.org>
**Cc:** Lis Schraer <seneschal-elect@sca.org>
**Subject:** Re: Alizand's husband Hakon

Hi Attia,
Um, yes, that's pretty bad. I know they are moving very soon (I think Alizand said within the week--she has quit her job in preparation.) The Crown can still do an exile if they feel it is appropriate. It would ban him from all in-kingdom official social media for the duration of the reign, and would make a statement.
I cannot hold her responsible for what he said; the other day I had a call with Bearkiller in which LaToya came up and John said something about people on the chiv list in Gleann Abhann were implying that the knight she is dating should "control" her behavior. John mentioned that to his wife and she flew up and turned left; "control your woman" is definitely not a thing. :) But in fairness, it works the other way too.
I don't know if you/your Crown want to share with your Atenveldt counterparts.
I am not Facebook friends with LaToya. I wish I had the entire conversation. But then I always wish that. It looks as though it's just possible he might have been trying to make a different point than the literal words...badly, if so, but without the whole conversation I can't entirely rule that out.
Thanks,
Lis
On 4/1/2021 8:36 PM, An Tir Seneschal wrote:

Lis,

The Crown is contemplating Exile, but rumors they might be in Adenveldt now. This was hate speech posted on a FB page under SCA name and about SCA events. This happened today. This is not good. Ironically it was posted on Maude (LaToya) page.  This kinda goes back to what I was saying this morning.

SCA_000227

# Screenshots (provided by Kingdom Seneschal; partial screenshots provided by Mr. Parker matched but were not as complete)

SCA_000228



**Maude Louisiana d'Orleans**
7h · 

Remember, at events, on Facebook, etc....



**mister dickoris**
@stump_water                                    ···

i don't think cis guys realize how much power they can shift in a conversation just by casually telling their friends "that's fucked up, man" when someone says something bigoted

4:17 PM · 3/30/21 · Twitter Web App

👍❤️😆  Errin Edlin, Jeff Preston and 64 others          60 Comments

👍 Like                          💬 Comment

**James M Bain**
The look on people's faces when you say, "Hey! I don't think that's really appropriate." is precious.

SCA_000229

👍 Like          💬 Comment

 **James M Bain**
The look on people's faces when you say, "Hey! I don't think that's really appropriate." is precious.

Like · Reply · 6h           2

 **Brad Hawk Sparks**
Some of us are aware and use it like a secret weapon. Some of us are also 50+ and can add the devastating "disappointed dad head shake" that negates any approval that their peers may have provided.

Like · Reply · 5h           7

 **Gilbert Hattier**
**Brad Hawk Sparks** this is exactly my tactic. As a 50+ dad of 4 boys I'm good at it

Like · Reply · 4h           2

 **Jessica Smith-Carlock**
**Brad Hawk Sparks** indeed. I deploy that and 'are you kidding me right now?' parent eybrows to good effect.

Like · Reply · 2h           3

 Write a reply...          💬 😊 📷 GIF 😀

 **Hakon Thorgeirsson**
Although I do certainly agree with the sentiment of positive peer pressure and calling people out on ignorant shit, but while we are on the subject, what the fuck does sis even stand for? What the fuck ever happened to simply calling us straight men??

Like · Reply · 5h · Edited

⌃ Hide 41 Replies

 **Skamp Widegrin**
**Hakon** google it. Cis men has been in usage since the 90s and my 0.47 google search tells me popular since 2007ish.

Like · Reply · 4h           2

SCA_000230

56



**Skamp Widegrin**
**Hakon** google it. Cis men has been in usage since the 90s and my 0.47 google search tells me popular since 2007ish.

Like · Reply · 4h                     2



**Hakon Thorgeirsson**
I was in college in the 90's. Strange, though I most certainly don't know a lot, never mind everything, I have never heard of it before. And I have only seen it in use over the past few months now that throwing insulting labels around has become so popular. Perhaps it was a popular slur for straight men among the lgbt community back then? That would certainly explain why I never heard it before.

You implicitly trust google? how cute.

Like · Reply · 4h



**Skamp Widegrin**
**Hakon Thorgeirsson** And the time it's taking you to bitch on Facebook and declare the term a slur, You could've learned at least four new things.

Like · Reply · 4h                     1



**Hakon Thorgeirsson**
**Skamp Widegrin** In recognition of the fact that intent doesn't always come across correctly in written word, are you intertidally being as condescending as it seems?

Like · Reply · 4h

SCA_000231

57



**Skamp Widegrin**
**Hakon** google it. Cis men has been in usage since the 90s and my 0.47 google search tells me popular since 2007ish.

Like · Reply · 4h                                                         2



**Hakon Thorgeirsson**
I was in college in the 90's. Strange, though I most certainly don't know a lot, never mind everything, I have never heard of it before. And I have only seen it in use over the past few months now that throwing insulting labels around has become so popular. Perhaps it was a popular slur for straight men among the lgbt community back then? That would certainly explain why I never heard it before.

You implicitly trust google? how cute.

Like · Reply · 4h



**Skamp Widegrin**
**Hakon Thorgeirsson** And the time it's taking you to bitch on Facebook and declare the term a slur, You could've learned at least four new things.

Like · Reply · 4h                                                         1



**Hakon Thorgeirsson**
**Skamp Widegrin** In recognition of the fact that intent doesn't always come across correctly in written word, are you intertidally being as condescending as it seems?

SCA_000232

Like · Reply · 4h

58

 **Skamp Widegrin**



Like · Reply · 4h

 **Hakon Thorgeirsson**
ok, clearly you would rather resort to ad hominem than engage in civil dialog. Have a nice day.

Like · Reply · 4h

 **Skamp Widegrin**



Like · Reply · 4h

SCA_000233

 **Hakon Thorgeirsson**

 **Hakon Thorgeirsson**
Latoya, as you know, I consider the most pungent part of ignorance to be not what you don't know, but what you think you know and it's wrong. So to insure I wasn't being ignorant on this subject; I did check some of my favorite sources for such topics. I'm not wrong, I'm not being ignorant, I'm not alone. Some of us do find "cis" to be an offensive term.

https://metro.co.uk/.../cisgender-word-come-offensive.../

 **METRO.CO.UK**
What is cisgender, where does the word come from, and is it offensive? 

Like · Reply · 3h    👍 1

 **Skamp Widegrin**
Hakon Thorgeirsson



Like · Reply · 3h

 **Skamp Widegrin**
Thought he promised to go away? Alas.

Like · Reply · 3h    👍 1

**Rachel Somers**
Why is the term cisgender offensive? I don't get it.

Like · Reply · 2h    👍 3

**Kateryne Hindscroft**
**Rachel Somers** Some people don't like being called out for their inappropriate attitudes. I'm sure that he knows full well what it means (since he said he thought it was a slur on "straight".)

Like · Reply · 2h    👍 1    60

SCA_000234

**Elisabethe Phipps**



**Elisabethe Phipps**
**Rachel**, me, staring blankly at cis-dude....

Like · Reply · 2h 👍 1



**Michelle Height**
**Hakon Thorgeirsson** Just because you aren't alone in your opinion doesn't make you right. Sheesh.

The term cis has been around for over a decade. Just because you are new to it does not mean it is new. As noted in the post you shared.

Like · Reply · 2h ❤️ 1

**Alycia Z DuBry**
**Hakon Thorgeirsson** The more I read up on it and the way cis has been used to make good men ashamed of being men the more I'm offended as a loving wife, sister, daughter, niece and friend of several wonderful champion men.

Like · Reply · 2h · Edited



**Olena Wilshanetsky**
Die mad about it, my cis dude. Lots of trans people have died terrified and screaming in pain because of cis people's feeling offended.

Like · Reply · 2h 👍 2

**Alycia Z DuBry**
**Hakon Thorgeirsson** This strand has gotten very ugly for wanting support from across identities... This should tell us something about the entire subject and people's opinions.

Like · Reply · 1h · Edited



**Alycia Z DuBry**
**Olena Wilshanetsky** That's awful to wish someone dead and or to die not at peace.

Like · Reply · 1h



**Olena Wilshanetsky**
Let me see if I can adequately express my indifference to your opinion:

Like · Reply · 1h 😂 1



**Alycia Z DuBry**
**Rachel Somers** My geek out: On cisgender being considered offensive: its been used in derogatory and nasty manners to men for just being of male gender and straight. Its been used as a slur in a few different areas or a dismissal of a man's thoughts.... **See More**

61

Like · Reply · 1h

SCA_000235



**Alycia Z DuBry**
**Rachel Somers** My geek out: On cisgender being considered offensive: its been used in derogatory and nasty manners to men for just being of male gender and straight. Its been used as a slur in a few different areas or a dismissal of a man's thoughts. Whatever the actual definition is the social definition/usage of it in other type dialogues on dismissing people is what makes it not well received now.

Like · Reply · 1h



**Skamp Widegrin**
Just because there are people offended by the use of the term does not invalidate the term nor its use.

Like · Reply · 1h                                     1



**Alycia Z DuBry**
**Olena Wilshanetsky** You present yourself as an awful human being. I hope this is just anger and being hyped up on volatile conversations. I will pray for you.

Like · Reply · 1h



**Angela Gallant**
Question, are you also offended at being called monogamous? heterosexual? Seriously, it is a term to describe actual facts about you in relation to others. Like Parent, child....it's relational.

Actually using Cis was a choice to help take Othering Transgender People out of our conversation. It is a proactive accomodation just like using/introducing our own pronouns to hold space and help embrace marginalized people.

When you give an attitude over this, you're showing yourself to be closed to kindness and caring for those who have suffered plenty enough.

Stop it. You're not doing yourself any favours and showing yourself to be a disrespectful type that has no welcome in welcoming space.

Like · Reply · 1h                                     4



**Olena Wilshanetsky**
*yawn*

Like · Reply · 1h



**Tamra Enchantadorea Kinzel-Wood**
So...just to clarify...Cis dude is mad because society defined him usin' a term he doesn't like??? Maybe just my neuro-divergence showing but hmmm.

Like · Reply · 1h · Edited                                    3

62

SCA_000236



**Rachel Somers**

**Alycia Z DuBry** That's weird, I've never heard it used as a slur against men, it literally just means "not trans". What's wrong with people calling someone not-trans if they aren't trans?

Like · Reply · 1h                                     3



**Alycia Z DuBry**
**Rachel Somers** Nothing. Although I just like to call people by their names. for the pronoun preferences, I have a few personal experiences (mental health inferences) that interfere with some of it so I just go out of my way to use names more. For general population references, since there's so much out there that people are offended on these days I just go with supporters.

Like · Reply · 1h · Edited



**Skamp Widegrin**
"They" as a singular has existed in common usage for over a century. This stuff is not that hard.

Like · Reply · 1h · Edited                           2



**Alycia Z DuBry**
**Angela Gallant** this makes the best sense.

Like · Reply · 1h



**Hakon Thorgeirsson**
To those who support my stand, thank you. To those who are interferent or don't understand it, I would encourage you to re-read the comments wherein I'm being called "sis dude" and tell me that that term isn't being used as much as an insult as calling a homosexual a homo or a fag. All you faggots can stick your reticule and scorn up your collective asses along with everything else you seem to like to stick there.

Like · Reply · 1h                                     2



**Michelle Height**
Also, if you want to dialogue in good faith, don't throw "I'll pray for you" into this mix. FYI I am a Christian and say this as such. And here is why and how it sounds.

https://ventrellaquest.com/.../why-saying-ill-pray-for-.../... **See More**



| |
|---|
| VENTRELLAQUEST.COM |
| Why saying "I'll pray for you" is insulting to non-believers |

 63

Like · Reply · 1h

**Hakon Thorgeirsson**

SCA_000237

**Hakon Thorgeirsson**
I would point out to you, **Angela Gallant**, that there are a plethora of words that USED TO be relatively innocuous with logical meanings that have been perverted over the years to mean something bad. The infamous "N" word is a prime example. It is a derivative of the Spanish word for black and used to mean no more that that. Over the years had following the Emancipation Proclamation it been to be used used in an ever increasingly derogatory manner until today it is considered even more ugly than the "F" word. Which, by the way, is an example of exactly the opposite, wherein a word that used to be considered too ugly to say in polite company is not used by a "lady".

Like · Reply · 1h    1

**Angela Gallant**
Thankfully, cis is not one of them. So go hang your hat elsewhere.

Like · Reply · 1h    1

**Hakon Thorgeirsson**
**Angela Gallant** several of us here have tried to explain to you the fact that it IS offensive. Just because YOU don't find it offensive in no way negates our disgust for it. So if you don't mind, I identify as a Straight Male(man), or (to a lessor extent) as Hetero Male (man). LGBTQ are not the only ones entitled to be address by preferred "labels". If they have that right, so do I.

I have attempted to engage in open, polite and cordial dialog.
I have been nothing but respectful to you and anyone else who wishes to do the same. But at your request, I'll not come into your space, however, other than that, I'll hang my hat where ever I damn well please. Here is usually a good place. I think I'll stay.

Like · Reply · 42m    1

**Alycia Z DuBry**
**Michelle Height** Article above noted. Thank you for sharing, good quick read. I like this: ""I'll pray for you" also depends on the context. If you're saying that because I'm in the hospital, then I know it means "I am wishing you well" and I am happy to receive such thoughts. I take no offense, because it means you care." and this too (although I think I would go with the smarter phrase if I knew their belief system): ""I'll pray for you" as soon they find out I'm a non-believer is equivalent to me saying "I hope you get smarter"."

Like · Reply · 42m · Edited

**Bledyn Drwg de Caerdydd**
I agree that Cis has been used in offensive contexts, though the term itself is rooted in simple definition of identity. I don't quite understand how anyone who is earnestly acting inclusive should be offended unless a particular statement is blatantly... See More

64

SCA_000238

I agree that Cis has been used in offensive contexts, though the term itself is rooted in simple definition of identity. I don't quite understand how anyone who is earnestly acting inclusive should be offended unless a particular statement is blatantly offensive and either unjustifiably directed at them specifically or widely generalized.

Cisgender has its origin in the Latin-derived prefix cis-, meaning "on this side of"... So a cisgender person identifies with their biological.

So yeah, it's been twisted and used offensively. However, here's and idea: rather than let that continue and be offended, let's reclaim it to be neutral and use other terms to insult the assholes who don't want to be respectful or Transgender individuals.

Like · Reply · 36m                                                           1

 **Bledyn Drwg de Caerdydd**
The meme is a perfect example
 1
Like · Reply · 35m

 **Näomi Lazarus**
**Hakon Thorgeirsson** cis and straight are not on the same axis.

Cis means "the same gender your parents thought you were at birth" and straight means "heterosexual".

There are cis gay men and trans straight men.

And cis straight men, and trans gay men.

And people who are neither cis nor trans, and people who are neither straight nor gay.

Humans are complicated and varied.

Like · Reply · 34m                                                           2

 **Hakon Thorgeirsson**
**Michelle Height** As a proud Heathen, I too find it a little offensive for someone to say "I'll pray for you". In the context stated in the article, I 100% agree, my response is something less than polite. However, that is not the case here. So in the context here I don't see it that way. It's just like Marry Christmas. I will try to take it in the spirit intended and let it slide. To Marry Christmas I may reply with Happy Yule an "I'll pray for you" with "and I'll call to the gods to tell them to look after you too." I do not to mean that I should have faith in their beliefs, but that THEY have faith in their own god and they believe that praying to that god may help me. So it is clearly intended to be simply asking for good fortune on to you. How can that be offensive? Though the comment seems to have been deleted I can't double check the context I will acknowledge the possibility that I could be misremembering it.                                65

Like · Reply · 25m

SCA_000239



**Angela Gallant**
The only reason cis-gender people have been offended is because they received a label that was in relation to Transgender people. That is literally the ONLY offence and cis-people took it on themselves.

Like · Reply · 23m



**Alycia Z DuBry**
**Hakon Thorgeirsson** yeah. Olena left the convo. thank you for reading my comment the way it was intended. She seemed in a very dark place. I'm debating about deleting my comments back to her as she is no longer here, but others are commenting on them and I did not want to disrespect their responses to me.

Like · Reply · 22m



**Alycia Z DuBry**
**Angela Gallant** interesting....

Like · Reply · 22m

**Hakon Thorgeirsson**
**Näomi Lazarus** OOOOHHHHH I do see that distinction. One refers to actual gender while the other refers to sexual preference. Thank you for the clarification.

Like · Reply · 21m                                    

**Hakon Thorgeirsson**
**Angela Gallant** Wrong, but thank you for showing how ignorant blanket, generalized statements can truly be. Under the explanations here of what cis means, has meant, is intended to mean, and what it has been bastardized to mean, nothing you said is correct. And yes, as a natural born Man I choose to take offense to the term cis. HOWEVER there is no offensive word that someone doesn't CHOOSE to take offense to. If black people didn't chose to take offense to the "n" word, it wouldn't be offensive. If I didn't chose to take offense to the word cis it wouldn't be offensive.

Like · Reply · 16m                                    

**Hakon Thorgeirsson**
It seems to me (and according to my own experiences) that LGBTQ people are fighting back against the prejudism perpetuated onto them so hard that they are reversing that prejudism onto all straight / cisgendered people. Sadly enough it's the same thing that is happening with PoC. You do not have to hate me to hate those who hate you. You do not have to try to be cruel to me to push back on those who hurt you.

As Latoya can attest, I am totally  my ignorance

66





**Skamp Widegrin**
Aaaand it is super satisfying to step on an idiots lines!!

👍 6

Like · Reply · 5h



**Marc Barber**
I, personally, also find that being a half-giant seems to add to interactions even with people I don't know...

😆 1

Like · Reply · 4h



**Caroline Ros Vur**
Another favorite: "I don't understand. What does that mean?" It works with fucked up jokes, proxy language, etc. Force someone to be specific. Repeat it back to them. Keep a straight face, like data from Star Trek.

👍❤️ 5

Like · Reply · 4h



**Elisabethe Phipps**
**Caroline**, also my go-to response. "I don't understand. Could you please explain it?"

👍 1

Like · Reply · 4h



**Styrkarr Jarlsskald**
My personal favorite. Makes them have to explain just how racist/bigoted/stupid the thing they just said really is. Delightfully evil. They usually just back off and say something like, "Well that was inappropriate anyway..." Which, of course, is the point.

👍🥰 5

Like · Reply · 1h



**Rachel Somers**
The one I used on patients when I worked in healthcare was just to stare blankly at them in silence until they felt awkward. That way they couldn't complain about my response but they got the hint. Worked like a charm on the patient who decided to make... See More

👍❤️🥰 6

Like · Reply · 2h

SCA_000241

**Katie Lagarde**



# George Parker's Appeal

SCA_000243

Hello;

The King and Queen of An Tir have chosen to exile me from the kingdom for their reign. The email from their seneschal stated this:

> On *April 2, 2021* Their Majesties Christian and Helene III of the Kingdom of An Tir issued the following sanction against you: *Exile from the Kingdom.* This sanction was issued for the following reason(s):
>
> *On April 1, 2021 you participated in a discussion on a page of another SCA member. In this discussion you used Hate speech towards a protected class. This violates the SCA Core Values and the policy against Hate speech.*

They did not give any details of where I violated any rules. As you can see in the above statement, explanation of what I did was so brief that I have to guess exactly which discussion, on what page did I engage in, wherein I did anything and what I could have said that was to be defined as hate speech. Nowhere does it state any fact supporting the sanction save to say that at some time I offended some one and engaged in hate speech. Nor does it spell out my appeal rights but only to tell me in what publication I might find them.

Sanction policy Paragraph C. has several subparagraphs that were not adhered to:

> *4. For Kingdom Sanctions, the event at which the Sanction was announced*
> *6. A brief statement of facts supporting the sanction*
> *7. Right of appeal*

I was not given an opportunity to respond to this sanction, nor was I told that I even had that right. Additionally, I cannot find anywhere that I might have violated any "hate speech" rules. The only "hate speech" rules I can find is in the Media Policies. Which state:

**Outward Facing Outlets and being "Official"**
*Social Media pages/outlets considered Official include Kingdom and Regional Branch Outlets. Social media pages/outlets for unrecognized groups such as households, fan groups and communities are not considered official. While there are many pages, groups, and other outlets, if you conduct the official business in that page/outlet, then it is Official and should be treated as such.*

**Restriction on content; paragraph 2 states;**
*"The SCA encourages creativity and innovation in the use of social media by its entities. Certain activities and information are inappropriate to any social media page/outlet. The following material, including but not limited to posted messages, comments, threads of discussion, or media, collectively known as "content," shall not be permitted on any presence associated with the SCA."*

70

I have not been on any official SCA social media in an exceptionally long time.  It clearly states that unrecognized groups are not covered, which would lead one to conclude, by extension, that this policy does not include personal pages either.  I think the incident (if it's what I think it is) did not take place on a "presence associated with the SCA".  It was on a personal page of a former member the kingdom, who now resides in a different kingdom.  As far as I know, this is a member who chose to allow her membership laps in December 2020 and did not intend to reinstate it.  So is it the intention of the SCA to monitor and lay claim the right to monitor and discipline "offensive activity" on the personal page of any member who uses the same name they use in the SCA on all social media posts? And to the posts on the personal pages of all it's members AND former members? Is it now the corporate policy to allow monarchs to bring sanctions for infractions committed in any kingdom under the aforementioned circumstances, theirs or not? This is an important question for all populace members.  While I was in fact on my game profile, the SCA is not the only game I play, wherein I use the same name/profile/persona.  Including, but not limited to online MMORPGs, and other historical reenactment groups.

I only mention this because I can only find one incident wherein people have called what I said as "hate speech", however, I don't see it that way.  Hate speech requires intent, I had none.  In fact much earlier in the thread I had defended the very group I am accused of hating on.  But what exactly is considered "offensive material" or "hate speech"?  I did not consider faggot as hate speech when intended to be directed at non LGBTQ people.  While there may or may not have been anyone who were LGBTQ in the conversation, I had no intent on hurting anyone from that community and I made it a statement in general and not directed AT anyone. Had I targeted it directly at someone from the LGBTQ community this would be a different discussion, wherein I am dead wrong. As a fact, the comment was immediately deleted (though it seems some may have had a chance to take a screenshot),

**Paragraph 2, Bullet point 1 states**

> • *Content that involves modern politics or political subjects, particularly any activity that may be interpreted as an endorsement of a particular political party, candidate for political office, legislation or referendum.*

 This post was all about modern politics, which is why I actually assumed that it was the person's mundane page.  I didn't check since I receive posts from both her

SCA_000245

modern profile and her game profile.  She had stated some time ago that she was no longer using her game profile so I was unaccustomed to seeing posts from it, therefore I assumed it was her modern page.

**Bullet point 3 states:**

> *• Content that broadcasts false or misleading information, including content which is intended to disparage, intimidate or negatively impact the reputation of an individual, branch, event, or other group.*

Not to engage in "whataboutism", but if the SCA intends to police people's personal social media content, a person who stated that he is a baron in the SCA on this thread clearly violated this rule in his very first interactions with me, well before I ever said anything that could even be considered inappropriate at all.  I would like to point out that several people are also currently violating this rule on several official SCA FaceBook pages in reference to this incident, as well as making disparaging comments about my wife and me.   As I stated above, this incident took place on a personal page, not on any "SCA official presence".  This means they are posting mundane issues on **OFFICAL** SCA pages.  At the very least they are posting personal "drama" on official pages.  This is in direct violation of the stated rules.  In fact, whether or not I was wrong, to say the things they are saying on an official presence is a violation of the "*or negatively impact the reputation of an individual*" clause.  Therefore, they too should have sanctions or at the very least these posts should be taken down and the moderator of these pages have a discussion on appropriate content.  Allowing these kinds of content on an official page is not ok.

**Bullet point 5 states;**

> *• Content that involves potentially lewd or offensive material, harassment, hate speech, profanity, or pornography.*

Again, not to engage in "whataboutism", however, it seems to me that the aforementioned baron is also guilty of violating this rule as well. He continued to refer to me with a term that I and others informed him is offensive.  Again there have been no sanctions against him or anyone else that joined him in bullying me so far, that I know of.  Whereas I made one comment, one time, he berated me and called me names several times throughout the conversation.  He is engaging in the exact same hate speech that I am being accused of and sanctioned for.  If this is the kind of behavior that I am supposed to look up to, I think I need to find new role models.  Why can he get away with this and I cannot?  Also, as mentioned

SCA_000246

above the current activity on official FB pages also falls under this rule under the harassment clause.  However, I have not been on any official pages.

While I will admit that what I said may have been inappropriate in today's new society, due to my diagnosed disability, I'm still struggling to get a handle on what is and is not ok speech.  I was always taught that you have a right to say anything you want, however, it seems that is not the case any more. For those with my particular disability, we do not accept changes to the rules easily, especially if that change seems unfair for anyone.  Also, I was not aware that so many people would take such offense to me insulting anyone, especially when so loosely directed.  After all, no one took exception to them insulting me.  It was a general statement to all those attacking me and NOT an insult/slur against any particular group, gay or straight nor to any one person.  If these people can decide at whim what is to be defined as hate speech and what is not, how is anyone supposed to know what they can say?

In my defense, upon my very first comment stating that I find the term used in the meme in question offensive, the aforementioned Landed Baron could do nothing but antagonize me, hurl insults at me and do everything in his power to get a rise out of me.  I let him know that I was not going to engage in ad hominem with him.  This did little to dissuade him.  I tried to tell him that I would rather engage in civil debate in this topic.  But rather than act like a peer of the realm and try to have a civil dialog with me he felt his best course was to act like a barroom brawler and antagonize me using the very slur several of us had informed him was such.  I even posted an article from the BBC that explains why his term was a slur.  He was the one who really started the bullying off with his condescending and insulting comments.  Many seem to build on his foundation, until it got to the point that very few people seemed interested in civil dialog, but all wanted to slam me (and anyone who agreed with me) in one way or another, just because I felt that the term they were using was an insult/slur.  My opinion didn't matter, and I was told as much.  Any evidence that I offered was dismissed out of hand, stating that "just because others agree with you doesn't make you right."  One person deleted all of their comments and they were some of the most offensive.

I'm sure you have received several copies of the thread in question, but I am including the screenshots I took and have attached them as a separate word document. Upon reading it I'm sure you will notice that all through the insults, attacks, and condescending comments I was respectful to everyone until I had

SCA_000247

finally had enough and blew up.  Once again, I recognize that in light of today's attitude in protecting the LGBTQ community and the fact that some do still find the word faggot a slight against that community, it was not the best term I could have used.  But you must understand that to me, it was never a slight against "the community", it was an insult used against straight people.  Using fag/faggot against LGBTQ had long since died to my knowledge. So I never intended it as an insult to anyone in the LGBTQ community.

I would also like to point out that nowhere in the rules can I find exactly what is to be defined as hate speech spelled out.  Otherwise, calling me a term that I have already called out as a slur would theoretically qualify as such (which would include the Baron who used it against me).  Also, in mundane law, "hate speech" is not actually defined either.  In fact, mundane law continues to protect the people's right to free speech, protected under the 1st amendment, and to try to limit mine is a violation of that protected activity.

So in summary, the BOD should not allow this exile to stand because:

1. The incident in question took place on a personal page (whether their membership is current or not is irrelevant), especially wherein the person lives in another kingdom.
2. There is no definition of what constitutes "hate speech", whether or not intent is required and who gets to define what exactly is hate speech.  I (and many people here and in other countries) consider their use of the term cis to be hate speech.  Therefore, if the word I used is hate speech, so is the word cis and all those who call me that word especially AFTER I informed them that it is offensive speech should also be sanctioned, including the original poster.  My rights are as important as anyone else's.  If you defend their right to be offended by something I said, and not mine, no one is safe.  After all that is the exact reason I used the word I did.  They were intentionally offending me because I told them as much, so I concluded that offending anyone was fair game.
3. The social media had until just recently not recognized the word I used as a violation of their hate speech policy.  I have attached an article which shows a quote from Facebook on this very topic.  The article outlines a petition to change Facebook policy, which may or may not have happened.

In closing, if this sanction stands, and/or no sanctions are levied against those who have slandered me and my wife (who was not a party to this, yet is being maligned just the same), I would like to inform you that we have an excellent case that could be taken to mundane courts.  What I said has no standing in a mundane court.  The insults that the officers and members of the SCA have engaged in is liable and will hold up in court.  These acts of libel are likely to shut down my business.  Several BOD members are attorneys, I would expect you to understand the merits of my case.

--

Kveðja í þjónustu við drauminn, (yours in service to the dream)

74

Hans Drottinvald Hákon Þorgeirsson von Eignersfjord
AoA, CLA,CSD,CST,GoS.OoGB, CoB
*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

SCA_000249

Case 3:23-cv-05069-RJB Document 41-5 Filed 12/29/23 Page 250 of 587



**Facebook: Classify fag/faggot/dyke as hate speech.**

SCA_000250



This petition had 144 supporters

---



**[Christopher Rathbun](#) started this petition to [Facebook Mark Zuckerburg](#)**

A post can be removed from Facebook and the user can be given a warning or banned for repeated offenses for using hate speech. Fag/Faggot/Dyke are no different than other words that aren't tolerated on Facebook because they are classified as hate speech, but are used frequently by many, but aren't classified as hate speech. There are many words that society has deemed unacceptable because they are racial/ethnic slurs. In this day and age of increasing acceptance, or at least tolerance, of the GLBT community, there are words that are just as hurtful to them, as racial slurs are to ethnic groups. While, the GLBT community isn't classified as a race or ethnic group, they are a demographic and a minority that deserve respect as much as any other minority group. If racial/ethnic slurs are shunned because they are hate speech, then these should also be shunned and classified as hate speech.

I reported someone one day for using the word fag in a derrogatory context during the Marriage Equality fight in MN on the MPR thread:
[https://www.facebook.com/MPRnews/posts/10151474497528591](https://www.facebook.com/MPRnews/posts/10151474497528591)

This is the reponse I got back from FB admin:
Thanks for your report. We reviewed the comment you reported, but found it doesn't violate Facebook's Community Standard on [hate speech](#), which includes posts or photos that attack a person based on their race, ethnicity, national origin, religion, sex, gender, sexual orientation, disability, or medical condition.

There needs to be consistency among FB admins and people need to know that just because it's a word that is socially acceptable to those insensitive to the issue, it's still a hurtful word.

77

SCA_000251

## Updates

[100!](#)

[Thank you all to those who have signed this. I will being doing more in the near future to continue this petition, but I was waiting until we reached 100 signatures. Thanks again and have a good weekend. Keep up the momen...](#)

[100!](#)

[Thank you all to those who have signed this. I will being doing more in the near future to continue this petition, but I was waiting until we reached 100 signatures. Thanks again and have a good weekend. Keep up the momentum and get the word out.](#)



**[Christopher Rathbun](#)**
[8 years ago](#)
**View all updates**

## Reasons for signing



**[Karen Howard](#)**·[8 years ago](#)
[So Facebook only protects SOME of its members. Racial and ethnic slurs are banned, but those associated with sexual orientation are not. Glad I'm not a Facebook member. I wouldn't want to belong to such a discriminatory site.](#)

- 
- 1

.

Share

SCA_000252

# Correspondence between Mr. Parker and Society Seneschal

SCA_000253

**Subject:** Re: An Tir Sanction
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 4/8/2021, 2:23 PM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org
**BCC:** elasait1@gmail.com


Greetings:

I wanted to acknowledge receipt of your email. The Board of Directors must review all sanctions above the level of Banishment from the Royal Presence; however, the agenda for the upcoming quarterly meeting is closed, so that review will not happen until their midquarter conference call, currently scheduled for June 1 (that date may be subject to change). In the meantime, please understand that sanctions imposed by a kingdom stand until the Board has had a chance to review them and decide whether or not to uphold them.

You do have the right to appeal the sanction. If I am understanding correctly, your letter to the Board, and the other material you submitted, constitutes your appeal. I will see that this is presented to the Board along with the material from the kingdom at their midquarter conference call. If you wish to submit any other materials in support of your appeal, you will need to either email them to me at this email address, or send them to the SCA's corporate mailing address. Any such material should reach me (or the corporate address) by May 20, 2021.

In service,

Lis Schraer

(Elasait ingen Diarmata)

Society Seneschal


On 4/8/2021 12:03 AM, Ha'kon Thorgeirsson wrote:

> Hello;
> The kingdom of An Tir has exiled me.  I have attached a statement, and documents
> that contain screenshots of the relevant Facebook posts.
> --
>
> Kveðja í þjónustu við drauminn,
>
> Hans Drottinvald Hákon Þorgeirsson von Eignersfjord
> AoA, CLA,CSD,CST,GoS.OoGB, CoB
> *Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

80

**Subject:** Re: An Tir Sanction
**From:** Lis Schraer <seneschal@sca.org>
**Date:** 4/9/2021, 10:59 AM
**To:** Ha'kon Thorgeirsson <thorgiersson@gmail.com>
**CC:** seneschal-elect@sca.org
**BCC:** elasait1@gmail.com

Hello Hakon,

Complaints and appeals are entirely separate actions, so a complaint must be submitted separately from an appeal.

Also, my apologies, but yesterday I did not include all the information I intended to. (I was under the weather due to having gotten my second COVID vaccine.) You had cited Society social media policy a number of times. The applicable hate speech policy is actually found in Corpora, Section X.A.4:

*Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions up to and including revocation of membership and denial of participation.*

*Please report any possible instances of hate speech to your Kingdom Seneschal, the Society Seneschal or the President of the SCA immediately. For more information about hate speech and the reporting of same, please refer to the Society Seneschal's Handbook.*

I do need to add that despite the wording above, there is no particular additional information in the Seneschal's Handbook regarding this subject, except possibly in the Bullying and Harassment Policy.

In service,

Lis Schraer

Society Seneschal

On 4/8/2021 6:32 PM, Ha'kon Thorgeirsson wrote:

> Greetings and well met Elasait ingen Diarmata,
> Thank you so much for your prompt response to my email.  I do apologize for the appeal being so long, but I felt it needed to be said.  Yes, the letter does constitute an appeal, however, can it double as a complaint on those I mentioned in my letter or do I need to submit a separate form for that?  I especially want to file a complaint against the landed barron who attacked me on the page as well as all of the moderators who allowed me to be attacked on the official SCA pages.
> Thank you for your assistance.

81

SCA_000255

*Hakon*

On Thu, Apr 8, 2021 at 12:23 PM Lis Schraer <[seneschal@sca.org](mailto:seneschal@sca.org)> wrote:

> Greetings:
>
> I wanted to acknowledge receipt of your email. The Board of Directors must review all sanctions above the level of Banishment from the Royal Presence; however, the agenda for the upcoming quarterly meeting is closed, so that review will not happen until their midquarter conference call, currently scheduled for June 1 (that date may be subject to change). In the meantime, please understand that sanctions imposed by a kingdom stand until the Board has had a chance to review them and decide whether or not to uphold them.
>
> You do have the right to appeal the sanction. If I am understanding correctly, your letter to the Board, and the other material you submitted, constitutes your appeal. I will see that this is presented to the Board along with the material from the kingdom at their midquarter conference call. If you wish to submit any other materials in support of your appeal, you will need to either email them to me at this email address, or send them to the SCA's corporate mailing address. Any such material should reach me (or the corporate address) by May 20, 2021.
>
> In service,
>
> Lis Schraer
>
> (Elasait ingen Diarmata)
>
> Society Seneschal
>
>
> On 4/8/2021 12:03 AM, Ha'kon Thorgeirsson wrote:
>
> > Hello;
> > The kingdom of An Tir has exiled me.  I have attached a statement, and documents that contain screenshots of the relevant Facebook posts.
> > --
> >
> > Kveðja í þjónustu við drauminn,
> >
> > Hans Drottinvald Hákon Þorgeirsson von Eignersfjord
> >
> > AoA, CLA,CSD,CST,GoS.OoGB, CoB
> > *Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

--

Kveðja í þjónustu við drauminn,

82

Hans Drottinvald Hákon Þorgeirsson von Eignersfjord
AoA, CLA,CSD,CST,GoS.OoGB, CoB
*Azure, a chevron enarched within and conjoined at the point to a chevron argent between a drakkar and a Thor's hammer Or*

SCA_000257

Bullying complaint

 Nykera Daedra <nykera98@gmail.com
>
Thu 4/1/2021 6:52 PM
To: An Tir Seneschal
Cc: An Tir Crown; Attia Prima

Hello!
So the "one year no SCA social media time is clearly up.
And as I am sure you've heard this among other things have been
posted

 **Hakon Thorgeirsson**
To those who support my stand, thank you. To
those who are interferent or don't understand it, I
would encourage you to re-read the comments
wherein I'm being called "sis dude" and tell me
that that term isn't being used as much as an
insult as calling a homosexual a homo or a fag.
All you faggots can stick your reticule and scorn
up your collective asses along with everything
else you seem to like to stick there.

32 mins   Like   More

At what point does his behavior warrant a permanent Bann? How many
people
Need to be offended and suffer his abuse?
Please look Into this.
Thank you
Nykera

. . .

Reply | Reply all | Forward                84

the society for creative anachronism, inc.



# ORGANIZATIONAL HANDBOOK

Including Corpora, the By-Laws, Corporate Policies, and the Articles of Incorporation

Revised August 12, 2018

© Copyright 2018 - The Society for Creative Anachronism, Inc. All Rights Reserved.

Printed copies of this document can be ordered from
SCA Marketplace, PO Box 360789, Milpitas, CA 95036-0789

*Members of the Society for Creative Anachronism, Inc. may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the text. The contents of this document will be posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.*

# TABLE OF CONTENTS

**A BRIEF INTRODUCTION TO THE SOCIETY FOR CREATIVE ANACHRONISM** ........................................................................ 6

**GLOSSARY** .......................................................................................................................................................... 7

**THE CORPORA OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ................................................................... 9

   **I.**   GENERAL .......................................................................................................................................... 9
      **A.**  *Precedence of Law* ..................................................................................................... 9
      **B.**  *Role of Corpora* ......................................................................................................... 9
      **C.**  *Role of the Board* ..................................................................................................... 10
         1.   Rules .................................................................................................... 10
         2.   Intervention ......................................................................................... 10
         3.   Publication of changes ......................................................................... 10
         4.   Relationship with branches .................................................................. 10
         5.   Right of appeal .................................................................................... 11
         6.   Impeachment ...................................................................................... 11
         7.   Communications with the Board of Directors of the SCA, Inc. ............... 11
         8.   Operations outside the USA ................................................................. 11
      **D.**  *Membership Requirements* ...................................................................................... 12
         1.   General ................................................................................................ 12
         2.   Officers ............................................................................................... 12
         3.   Awards ................................................................................................ 12
      **E.**  *Unofficial Entities* ................................................................................................... 12
      **F.**  *Sanctions* ................................................................................................................ 12
   **II.**  EVENTS .......................................................................................................................................... 13
      **A.**  *Society Events Defined* ............................................................................................ 13
      **B.**  *Requirements for Participants at Society Events* ....................................................... 13
      **C.**  *Business Requiring Prior Announcement* ................................................................... 13
      **D.**  *Individuals in Charge of Events* ................................................................................ 13
      **E.**  *Duty to Enforce Requirements* ................................................................................ 13
      **F.**  *Policy on Religion* .................................................................................................... 14
      **G.**  *Waterbearing* ......................................................................................................... 14
   **III.**  BRANCHES ...................................................................................................................................... 14
      **A.**  *General* .................................................................................................................. 14
      **B.**  *Borders* .................................................................................................................. 15
      **C.**  *Branch Designations* ............................................................................................... 15
      **D.**  *Establishment and Advancement* ............................................................................. 18
      **E.**  *Reservations to the Board* ....................................................................................... 19
   **IV.**  ROYALTY ........................................................................................................................................ 19
      **A.**  *Selection* ................................................................................................................ 19
      **B.**  *Qualifications* ......................................................................................................... 19
      **C.**  *Duties* .................................................................................................................... 19
      **D.**  *Privileges* ............................................................................................................... 20
      **E.**  *Limitations* ............................................................................................................. 20
      **F.**  *Kingdom and Principality Law* .................................................................................. 21
      **G.**  *The Crown* .............................................................................................................. 21
      **H.**  *The Coronet* ........................................................................................................... 23
   **V.**  TERRITORIAL BARONS AND BARONESSES ......................................................................................... 24
      **A.**  *Appointment and Removal* ...................................................................................... 24

SCA_000260

| | | |
|---|---|---|
| **B.** | Responsibilities | 24 |
| **VI.** | SOCIETY OFFICERS | 24 |
| **A.** | General | 24 |
| **B.** | Society Seneschal | 26 |
| **C.** | Laurel Sovereign of Arms and The College of Arms | 26 |
| 1. | Laurel Sovereign of Arms | 26 |
| 2. | College of Arms | 26 |
| 3. | Heraldic Administration | 26 |
| **D.** | Marshal of the Society | 26 |
| **E.** | Minister of Arts and Sciences | 27 |
| **F.** | Chronicler of the Society | 27 |
| **G.** | Society Chancellor of the Exchequer | 27 |
| **H.** | Webminister | 27 |
| **I.** | Reservations to the Board | 27 |
| **VII.** | KINGDOM, PRINCIPALITY, AND LOCAL OFFICERS | 27 |
| **A.** | General | 27 |
| **B.** | The Seneschal | 28 |
| **C.** | The Principal Herald | 28 |
| **D.** | The Earl Marshal | 28 |
| **E.** | The Minister of Arts and Sciences | 28 |
| **F.** | The Chancellor of the Exchequer | 29 |
| **G.** | The Chronicler | 29 |
| **H.** | Duties of Other Officers | 29 |
| **I.** | Appointment to office | 29 |
| **J.** | Warranting / Rosters | 29 |
| **K.** | Ending a term of office | 29 |
| **L.** | Suspension of an officer | 30 |
| **VIII.** | PERSONAL AWARDS AND TITLES | 30 |
| **A.** | Patents of Arms | 30 |
| 1. | General Requirements | 30 |
| 2. | Order of Precedence Within the Peerage | 31 |
| 3. | Departure from the Peerage | 31 |
| 4. | Patent Orders | 31 |
| **B.** | Other Awards | 33 |
| **C.** | Membership Requirements for Receiving Awards | 34 |
| **D.** | Titles | 34 |
| **E.** | Reservations to the Board | 35 |
| 1. | Degradation from the Peerage | 35 |
| 2. | Revocation of Awards and Grants of Arms | 35 |
| 3. | Granting and creation of new titles | 35 |
| **IX.** | SOCIETY COMBAT | 36 |
| **A.** | Society Combat-Related Activities | 36 |
| **B.** | The Rules of the Lists | 36 |
| **C.** | Royal Lists | 37 |
| **X.** | GRIEVANCES AND SANCTIONS | 37 |
| **A.** | General | 37 |
| **B.** | Grievances | 38 |
| 1. | Principles | 38 |
| 2. | Procedures | 38 |
| **C.** | Sanctions | 39 |

1.   Royal Sanctions ..................................................................................................................... 39
2.   Administrative Sanctions ....................................................................................................... 39
3.   Expulsion from the SCA ......................................................................................................... 39
4.   Reservations to the Board of Directors ................................................................................. 40

**THE BY-LAWS OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ................................................................. **45**

I.     NAME ............................................................................................................................................ 45
II.    OFFICES .......................................................................................................................................... 45
III.   OBJECTIVES AND PURPOSES ........................................................................................................... 45
IV.    DEDICATION OF ASSETS .................................................................................................................. 45
V.     MEMBERS ...................................................................................................................................... 45
       A.   *Statutory Members* ............................................................................................................. 45
       B.   *Nonstatutory Members* ...................................................................................................... 45
       C.   *General Conditions and Privileges Of Membership* ............................................................ 45
            1.   Access to Membership ................................................................................................ 45
            2.   Privileges of Members ................................................................................................. 45
            3.   Revocation/Denial of Membership ............................................................................. 46
            4.   Reservations to the Board ........................................................................................... 46
VI.    BOARD OF DIRECTORS .................................................................................................................... 46
       A.   *Powers* ............................................................................................................................... 46
       B.   *Number of Directors* .......................................................................................................... 46
       C.   *Qualifications of Directors* .................................................................................................. 46
       D.   *Restriction on Interested Directors* ..................................................................................... 47
       E.   *Election and Term* .............................................................................................................. 47
            1.   Probationary Period .................................................................................................... 47
            2.   Term of Service ........................................................................................................... 47
            3.   Resignation .................................................................................................................. 47
       F.   *Vacancies and Removal* ...................................................................................................... 47
            1.   Dismissal of a Director ................................................................................................ 48
            2.   Filling Vacancies .......................................................................................................... 48
            3.   Leave of Absence ........................................................................................................ 48
       G.   *Place of Meetings; Meetings by Telephone* ........................................................................ 48
       H.   *Regular Quarterly Meetings* ............................................................................................... 48
       I.   *Special Meetings* ................................................................................................................ 48
       J.   *Action at a Meeting; Quorum and Required Vote* ............................................................... 49
       K.   *Chairman and Vice-Chairman of the Board* ........................................................................ 49
       L.   *Committees* ........................................................................................................................ 49
       M.   *Reimbursement of Expenses* .............................................................................................. 49
VII.   ADMINISTRATION ........................................................................................................................... 49
       A.   *Officers* .............................................................................................................................. 49
       B.   *Corporate Office* ................................................................................................................ 49
       C.   *Compensation* .................................................................................................................... 50
VIII.  CONTRACTS, CHECKS AND FUNDS .................................................................................................. 50
       A.   *Execution of Corporate Instruments* .................................................................................. 50
       B.   *Checks, Drafts, Etc.* ............................................................................................................ 50
       C.   *Gifts* ................................................................................................................................... 50
IX.    INDEMNIFICATION .......................................................................................................................... 50
X.     BOOKS AND RECORDS ..................................................................................................................... 50
XI.    FISCAL YEAR .................................................................................................................................... 51
XII.   AMENDMENT TO BY-LAWS .............................................................................................................. 51

SCA_000262

XIII.  DEFINITION OF STRUCTURE ......................................................................................................... 51
    A.    *The Corpora* ........................................................................................................................... 51
    B.    *Corporate Policies of the SCA, Inc.* ........................................................................................ 51
XIV.  PARLIAMENTARY PROCEDURE ...................................................................................................... 51

**THE CORPORATE POLICIES OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ............................................ **52**

I. MEMBERSHIP TYPES ........................................................................................................................ 52
    *A. Statutory Members* ........................................................................................................... 52
    *B. Non-Statutory Members* ................................................................................................... 52
II. GENERAL CONDITIONS AND PRIVILEGES OF MEMBERSHIP ............................................................ 53
    *A. Access to Membership* ...................................................................................................... 53
    *B. Privileges of Members* ....................................................................................................... 53
    *C. Eligibility for Office* ............................................................................................................ 53
    *D. Revocation/Denial of Membership* ................................................................................... 53
        1. Grounds ....................................................................................................................... 533
        2. Board Consideration ..................................................................................................... 54
        3. Notification .................................................................................................................. 54
        4. Appeal ......................................................................................................................... 544
    *E. Reservation by the Board* ................................................................................................. 544
III. ADMINISTRATION ......................................................................................................................... 544
    *A. President* ........................................................................................................................... 55
    *B. Vice President for Operations* ............................................................................................ 55
    *C. Vice President for Corporate Operations* ........................................................................... 55
    *D. Secretary* ........................................................................................................................... 55
    *E. Treasurer* ........................................................................................................................... 55
    *F. Other Offices* ..................................................................................................................... 55
IV. WAIVERS – GENERAL ..................................................................................................................... 55
V. WAIVERS - COMBAT ....................................................................................................................... 56
    *A. Waivers for SCA Combat-Related Activities* ...................................................................... 56
    *B. Medical Authorization for Minors:* ................................................................................... 56
VI. WAIVERS - PROCEDURES .............................................................................................................. 56
VII. POLICY ON FINANCIAL RESPONSIBILITY AND REDRESS ............................................................... 57
VIII. POLICY ON ALCOHOL ................................................................................................................. 57
IX. POLICY ON FIRST AID AT EVENTS OR SCA ACTIVITIES ................................................................... 57
X. POLICY ON ELECTRONIC COMMUNICATIONS ................................................................................. 58
    *A. Electronic Publication of SCA Documents* ......................................................................... 58
    *B. Participation of SCA Officials in Electronic Communications Media* .................................. 58
    *C. Electronic Communications to and from SCA Officers* ....................................................... 58
XI. POLICY ON COINAGE AND CURRENCY ........................................................................................... 58
XII. POLICY ON TRADE MARKS ........................................................................................................... 59
XIII. POLICY ON ACCESSIBILITY TO SOCIETY FUNCTIONS .................................................................... 59
XIV. POLICY ON LAND USE / REAL ESTATE .......................................................................................... 59
XV. TRANSLATION OF CORPORATE DOCUMENTS ............................................................................... 59
XVI. AUTHORITY TO RETAIN LEGAL COUNSEL .................................................................................... 59
XVII. AMENDMENT TO CORPORATE POLICIES ................................................................................... 60

**THE ARTICLES OF INCORPORATION OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ......................................... **61**

# A BRIEF INTRODUCTION
# TO THE SOCIETY FOR CREATIVE ANACHRONISM

The Society for Creative Anachronism, Inc. (SCA, Society is a 501(c)3 Educational Not-for-Profit organization devoted to the study of the Middle Ages and Renaissance. Most of its activities take place in the context of a social structure adapted from the forms of the European Middle Ages, which allows participants to take a first-hand look at various aspects of the life, culture and technology of the times under study.

As a living history group, the Society provides an environment in which members can recreate various aspects of the culture and technology of the period, as well as doing more traditional historical research. We sponsor events such as tournaments and feasts where members dress in clothing styles worn in the Middle Ages and Renaissance, and participate in activities based on the civil and martial skills of the period. These activities recreate aspects of the life and culture of the landed nobility in Europe prior to 1600 CE. The dress, pastimes, and above all the chivalric ideals of the period serve to unify our events and activities.

For Society members, most of the world, and all of the centuries prior to the 17th, can serve as a source for personal research. However, the further you go from the core of Medieval and Renaissance Europe, the less the environment we offer will resemble what someone of your time and country would find natural or homelike. For example, you can be an Asian or African guest at a European court, but you cannot expect others to share your special interests - like any long-term visitor in a foreign land, you are the one who will have to adapt to the customs you find around you. Since members have free choice of what areas they will explore, it follows that Society branches cannot decide to specialize in a specific time and place, since that would make it hard for members there to pursue their own interests in other times and places.

The Society has active branches in the United States, Canada, Europe, Australia, Asia, and Africa. This "Known World" is divided into Kingdoms. Each Kingdom has a King and Queen selected by tournament combat, in which each entrant seeks the Crown both for him or herself and for a chosen consort. Some of the Kingdoms include Principalities ruled by Princes and Princesses also chosen by combat. These regional organizations are responsible for the smaller branches based in individual towns, cities or counties.

The SCA was incorporated in the United States in 1968, but counts its years from the first tournament held on May 1st, 1966. The corporation maintains a central membership registry; publishes a quarterly magazine, Tournaments Illuminated; publishes a monograph series, The Compleat Anachronist; and provides mailing lists for the monthly regional newsletters published by the Kingdoms for all subscribing members. It also sets overall standards for safety and organizational structure, within which each Kingdom works as an independent unit.

The documents in this book set forth the workings of the SCA, Inc. and of the Society. Except as otherwise noted, the rules of the modern corporation (the By-Laws and the Corporate Policies of the SCA, Inc.) apply only to the US and other areas not separately incorporated, while the document named Corpora governs all the Kingdoms of the Society, wherever they exist.

# GLOSSARY

In this volume, the following terms are used only with the meanings given here:

- **Society**: The entirety of the Society for Creative Anachronism (a worldwide group of affiliated organizations).

- **SCA, Inc. or SCA**: The Society for Creative Anachronism, Inc., California nonprofit (or not-for-profit) corporation

- **Board:** The Board of Directors of the SCA, Inc.

- **Governing documents**: *The Organizational Handbook*, which contains The Introduction, Corpora, The Articles of Incorporation of the SCA, Inc., the By-Laws of the SCA, Inc., the Corporate Policies of the SCA, Inc., and any amendments and appendices.

- **By-Laws**: The By-Laws of the SCA, Inc.

- **Corpora**: The policies governing historical re-creation within the Society, and those policies applicable to the entire Society.

- **Subscribing member**: A Sustaining or International member of the SCA, Inc. or its approved equivalent in an affiliated organization.

- **Society Member**: Membership in the Society is defined in the By-Laws of the SCA, Inc., or in the approved organizational documents of any corporation affiliated with the SCA, Inc.

- **SCA, Inc. Waiver Card:** A card which indicates that a properly executed waiver is on file at the corporate office. This card may also contain membership information.

- **Armigerous award:** An award that can convey Arms by Award, Grant, or Patent.

- **Consort**: The member for whom the combatant fights in a Royal Lists.

- **Coronet:** The Sovereign and Consort of a principality, acting together.

- **Court of Chivalry / Court of Inquiry:** A panel, defined according to kingdom law, convened to investigate issues and possibly recommend action to the appropriate Society authority.

- **Crown**: The Sovereign and Consort of a kingdom, acting together.

- **Officer:** A Society member serving in an appointed office as defined in Corpora, or as an appointed deputy in such an office, or in another office as may be defined by Kingdom Law, at any level of the Society, or in the role of organizer of a Society event (commonly referred to as "Autocrat" or "Steward"), or as a Territorial Baron or Baroness, or as Crown or Coronet or heir to a Crown or Coronet.

- **Peerage:** Collectively, the members of the Order of Chivalry, the Order of the Laurel, the Order of the Pelican and the Order of Defense are referred to as the Peerage. A member of any of these Orders is a Peer.

- **Period:** The era used by the Society as the base for its re-creation activities. The Society is based on the life and culture of the landed nobility of pre-17th Century Western Europe, focusing on the Middle Ages and the Renaissance.

SCA_000265

- **Realm:** A kingdom (including any principalities), or a principality.

- **Royal Lists**: Properly constituted armored combat tournament to determine the successors to current royalty. They are known as "Crown Lists" for kingdoms and "Coronet Lists" for principalities.

- **Royal heirs**: The victor in the Royal Lists and the victor's consort for the period between the victory and the Coronation (kingdom) or Investiture (principality).

- **Royal Peer:** An individual who has reigned as King or Queen, or as Prince or Princess of a principality, is referred to as a Royal Peer.

- **Royalty**: The persons who hold the offices of Sovereign or Consort of a kingdom or principality. The heirs to those positions are also considered royal, but Corpora uses the terms "royalty" and "reigning royalty" interchangeably, and only to refer to Sovereigns and Consorts.

- **Sovereign and Consort**: The victor in the Royal Lists and the victor's consort, respectively, after their Coronation or Investiture.

- **Subject**: Any person who physically resides within the borders of a realm for more than half the year. Those who do not maintain a residence meeting this definition may be considered subjects of the realm where they participate most frequently if they obtain written acknowledgment from the royalty of that realm. Those who participate in Society activities primarily in a realm other than the one where they reside may be considered subjects of that realm if they obtain written permission and acknowledgment from the royalty of both realms. Decisions of the Coronet in such matters depend upon the approval of the Crown.

SCA_000266

# THE CORPORA
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I.    GENERAL

### A.    Precedence of Law

1.    The approved English language version of any Society for Creative Anachronism, Inc. document is the official version.  In case of conflict between the English language version and a translation into another language, the English language version governs.

2.    Despite the use of the word "law" to describe the operating documents of its regional branches, the Society recognizes the absolute precedence of law issued by civil authorities over any of its internal rules. The SCA, Inc. as a corporate person, along with all of its members as citizens, must obey the law of whatever jurisdictions apply to them in exactly the same fashion as all other corporations or citizens in those jurisdictions.

3.    Within the Society, if there is any conflict among the provisions of the following types of rules, those higher on the list will govern over those lower:

      a.    The By-Laws of the appropriate organization

      b.    The Corporate Policies of the appropriate organization

      c.    The Corpora of the Society

      d.    Society Officers' Policies approved by the Board

      e.    Kingdom Law (within the kingdom that enacts it)

      f.    Decision of the Crown (within the kingdom and for the duration of the current reign)

      g.    Principality Law (within the principality that enacts it)

      h.    Decision of the Coronet (within the principality and for the duration of the current reign)

4.    If they find it useful to codify their customs, branches and organizations such as orders, guilds, et cetera, are permitted to create charters. Charters are primarily administrative tools that can help the group to define structure and procedures. Unless written into kingdom or principality law organizational charters do not have the force of law. Branch charters may not be written into law.

### B.    Role of Corpora

Corpora serves as a framework for the structure of the historical re-creation activities of the Society, and applies equally to all branches worldwide, regardless of corporate affiliation. The various Board-approved Policies of Society officers provide guidance for the operations of those offices. Kingdoms may follow custom or make law in areas where these policies are silent, as long as they remain consistent with the general approach embodied therein. They may also impose additional rules and requirements for branches, offices, and awards within their jurisdiction, but may not reduce or waive any specified requirement contained at a higher level in the Precedence of Law.

SCA_000267

## C.    Role of the Board

### 1.    Rules

The Board of Directors of the SCA Inc. establishes the rules of the Society's historical recreation activities and minimum administrative requirements for officers and branches; these are published in Corpora. It is the final arbiter of the interpretations of these rules as made by the officers of the Society. It reserves to itself various powers as described in Corpora, and these reservations apply to all branches, regardless of corporate affiliation.

### 2.    Intervention

If the Board finds it necessary to intervene in branch affairs to protect the SCA's legal standing, its action will be directed as nearly as possible at the individuals responsible for the lapse. The Board will move against a branch as a whole only if repeated failures prove it incapable of locating and maintaining reliable officers, to be determined and defined on a case-by-case basis.

### 3.    Publication of changes

a.    Under normal circumstances, the Board will publicize proposed changes to Corpora in sufficient time to allow comment from the membership before making a final determination.

b.    The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made Corpora. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

### 4.    Relationship with branches

a.    The Board will maintain a policy of non-interference with branch activities. The Board reserves the right to intervene in branch affairs if:

(i)    the events leading to such intervention appear to cause a threat to the integrity of the Society or the SCA, Inc.;

(ii)    the governing documents of the Society appear to have been violated;

(iii)    there is a threat to the SCA's legal standing; or

(iv)    the Board is asked to become involved.

b.    If the Board finds it necessary to intervene in branch affairs to protect the SCA's legal standing, its action will be directed as nearly as possible at the individuals responsible for the lapse. The Board will move against a branch as a whole only if repeated failures prove it incapable of locating and maintaining reliable officers.

c.    The application of any sanctions will depend upon the severity of the lapse, and the degree to which the affected parties were involved in either causing the problem or attempting to solve it.

d.    The Board shall ensure that each kingdom shall have a specific Board member, called an ombudsman, assigned to act as its representative to the Board, and vice versa, for matters concerning that kingdom.

SCA_000268

5.    Right of appeal

a.    The Board is the ultimate determiner and arbiter of the rules of the Society, regardless of what authority it may delegate elsewhere. All members of the Society shall therefore have the right of appeal to the Board, provided they follow proper channels for complaint and appeal.

b.    When individual actions or decisions are appealed to the Board, any Directors who have been personally involved with the matters in question within the medieval structure of the Society must declare the potential conflict of interest and withdraw from the ruling.

6.    Impeachment

A Director's tenure on the Board can be challenged by means of a petition presented to the Board (via the Corporate Office) by a majority of either the current Crowns or current Kingdom Seneschals. Such a petition will invoke the impeachment procedures presented in the By-Laws of the SCA, Inc.

7.    Communications with the Board of Directors of the SCA, Inc.

a.    The Corporate Office serves as the primary channel of communications to and from the Board, and materials intended for the agenda must be sent to the Corporate Office for distribution, with a copy to the ombudsman for the affected kingdom and/or office and the administration of the affiliated corporation of which the correspondent is a member, if applicable. The Corporate Office prepares and distributes Board minutes, and arranges for publication of any decisions by the Board pertaining to the Governing Documents, any proposals for such decisions which the Board wishes disseminated for comment, and any other communications from the Board to the membership.

b.    Decisions of the Board are effective immediately, but shall not be considered binding until made available to the segment of the membership they affect via direct mailing, printing in the appropriate corporate publications, or other methods the Board shall establish.

c.    Any communication with the Board is considered public unless the author stipulates at the time of writing that the document is to be considered confidential. Confidential documents will not be distributed outside the corporate staff unless the author's permission has been obtained. Reasonable requests for copies of other communications must be made in writing to the corporate office, and all such requests are automatically considered public documents.

d.    For communications to be considered by the Board, they must be dated and include the author's legal name. A Society name may also be included when appropriate. A method of contacting the author (either postal or email address) must be included.

e.    The Board does not accept anonymous communications, and electronic communications with no identifier of the sender other than an email address will be considered anonymous.

8.    Operations outside the USA

The Board recognizes that the development of branches outside the United States enhances the Society as a whole by providing additional sources of ideas and materials, and additional opportunities for travel and education among the membership. However, while it is desirable for the SCA, Inc. to make an effort to assist such branches in their early development, it is not appropriate for one group of members to subsidize another indefinitely. The members in each country must eventually contribute enough to cover the ongoing expenses of operation in their country.

SCA_000269

## D.  Membership Requirements

1.  General

Participants should expect to show proof of membership in order to qualify for member privileges. The level of proof required should be commensurate with the long-term risk to the Society posed by an erroneous claim to membership.

2.  Officers

a.  Officers at all levels of the Society must be Society members as defined in the Glossary and must have immediate access to the corporate newsletter for their area received at their residence. (Alternate access arrangements may be made for members of affiliated organizations or on a case-by-case basis for people with post office boxes and for International Members.) This standard also applies to deputies designated as successors to officers subject to this provision, or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

b.  The warrants and/or appointments of officers found to be without a valid membership shall be considered terminated as of the date of the lapse.

c.  Warrants terminated due to a lapse in membership may or may not be reinstated upon demonstration of a valid membership at the pleasure of the warranting authority and within the confines of the governing documents and kingdom law.

3.  Awards

Each Kingdom may, if it so desires, require paid membership in the Society for any of the following: receiving a Patent of Arms; receiving a Grant of Arms; receiving an Award of Arms; admission to an armigerous order. Such requirements must be written into Kingdom Law, and may not imply or state that a person must remain a member to retain such awards or titles once given. A Kingdom which establishes such laws must ensure that its populace is informed of these requirements, and is responsible for their enforcement.

## E.  Unofficial Entities

In many kingdoms, there are groups in which many people participate but which are not formally recognized by the Society. These can range from highly structured guilds to loosely associated camping groups. Entities that fall into this category can have many names, including but not limited to households, guilds, ships, and clans. Although these entities are not recognized by the Society in any formal way, some kingdoms have awards that can be given to these groups. Because they are not official Society groups, unofficial entities cannot sponsor Society events.

## F.  Sanctions

1.  Sanctions and administrative actions should be proportionate and appropriate. Major sanctions, such as a ban on attendance or participation, should not be a substitute for appropriate administrative or legal action.

2.  Administrative sanctions include, but are not limited to, suspension or removal from office, revocation of authorization, or removal of a disruptive element from an event by the individual responsible for the event, as defined in the appropriate section of Corpora. The Royalty should work with the appropriate officers to impose any sanctions.

3.  Offenses against contemporary civil or criminal law should be dealt with through the appropriate legal system. This does not preclude the SCA from taking other appropriate actions.

SCA_000270

## II.    EVENTS

### A.    Society Events Defined

The term "Society event" refers to tournaments, feasts, and other activities whereby participants can display the results of their researches into the culture and technology of the period in an environment which evokes the atmosphere of the pre-17th century European Middle Ages and Renaissance. It also refers to educational activities involving either one-time classes or ongoing Society university organizations, and meetings where participants share skills or discuss the business of the group. All Society events must be sponsored by official branches of the Society, registered with the Seneschal of the sponsoring branch, publicized at least to the members of that branch, and conducted according to Society rules.

### B.    Requirements for Participants at Society Events

Anyone may attend Society events provided he or she wears an attempt at pre-17th century clothing, conforms to the provisions in Corpora, and complies with any other requirements (including but not limited to site fees or waivers) which may be imposed. At business meetings and informal classes, the requirement to wear pre-17th century dress may be waived. All participants are expected to behave as ladies or gentlemen.

### C.    Business Requiring Prior Announcement

Formal actions and announcements with long-term impact on the Society may occur only at Society events for which a full announcement including date, time, and place has been published in advance in the appropriate corporate publication. These actions include Crown and Coronet Tournaments, Coronations and Investitures, appointment of officers, presentation of awards and titles, proclamation of law, and the establishment or advancement of branches. However, deputy officers and officers below principality level need not be appointed at published events.

### D.    Individuals in Charge of Events

Each Society event must have one Society member appointed by the sponsoring branch in attendance and responsible for the general conduct of the event. Where an event involves only one type of Society activity, the responsible member is the appropriate branch officer, or someone designated by that officer (usually called an Autocrat or Event Steward). Where an event includes a variety of activities, the responsible member is the branch Seneschal or someone designated by the branch Seneschal (usually called an Autocrat or Event Steward). Events including Society combat or combat-related activities must have at least one warranted marshal, designated by the Marshal of the sponsoring branch, in attendance and responsible for those activities.

### E.    Duty to Enforce Requirements

1.    The officer(s) of the sponsoring branch responsible for an event shall ensure that the event operates according to the rules set forth in this document. If transgressions occur which seriously compromise the integrity of the event or endanger the health and safety of the attendees, the responsible officers shall correct the problem immediately as follows:

2.    Disruptive elements at an event may be removed from the event by the individual responsible for that event or other appropriate officer. Offenses against contemporary civil or criminal law should be dealt with through the appropriate legal system. This does not preclude the Society from taking other appropriate actions as described in Corpora X.

3.    The responsible officer for the event may find it necessary to remove Society approval for the event, or call the appropriate civil authorities, such as police, fire, or medical personnel. If the responsible officer cannot or will not do so, the senior Seneschal present, or (in cases involving the Rules of the Lists) the senior Marshal present shall do whatever is necessary to end the transgressions, and notify the responsible officers and the owner of the site or the owner's agent

SCA_000271

that the Society will no longer be responsible for the event. In such a case, all official actions properly performed prior to the point when sanction was removed will be considered valid. However, no action taken after that point, including transfers of office or bestowal of awards, will be considered valid. If an event is terminated in this manner, the person(s) doing so must notify the Society Seneschal, the appropriate kingdom officers, and any other appropriate Society officers as soon as possible. They must also file a complete written report of the circumstances with the Society Seneschal, the appropriate kingdom officers, and any other appropriate Society officers within 30 days.

4. It is not the responsibility of Crowns to deal with violations of modern law. When asked to resolve situations that fall under the jurisdiction of modern authorities, it is the Crown's responsibility to cooperate in referring such violations to the modern authorities. Further, it is the responsibility of the officers, particularly the local or Kingdom Seneschal, to ensure that the modern authorities are promptly notified.

## F.    Policy on Religion

1. Having no wish to recreate the religious conflicts of the period under study, the Society shall neither establish nor prohibit any system of belief among its members. No one shall perform any religious or magical ceremony at a Society event (or in association with the name of the Society) in such a way as to imply that the ceremony is authorized, sponsored, or promulgated by the Society or to force anyone at a Society event, by direct or indirect pressure, to observe or join the ceremony. However, this provision is in no way intended to discourage the study of historical belief systems and their effects on the development of Western culture.

2. Except as provided herein, neither the Society nor any member acting in its name or that of any of its parts shall interfere with any person's lawful ceremonies, nor shall any member discriminate against another upon grounds related to either's system of belief.

## G.    Waterbearing

The activity of providing beverages to combatants and spectators at SCA Combat activities is not regulated, warranted, organized, controlled, or sanctioned by the SCA, Inc. or any affiliate or subsidiary entity.  Any warrants, authorizations, or other formal recognition of this activity which may currently exist are by publication of this change revoked.  The change does not address or restrict any volunteer activities regarding providing beverages to combatants or spectators at SCA Combat activities nor the methods by which such provisions may be made.  This does not preclude or affect SCA award recognition.

## III.   BRANCHES

## A.    General

1. The Society defines standard categories for branches based on several criteria. Groups are encouraged to develop well beyond the required minimum levels before petitioning for a change in status, to assure the stability and permanence of the branch if the petition is granted. Since members have free choice of what areas they will explore, it follows that Society branches cannot decide to specialize. The choice of a single time and place for a branch would make it hard for members there to pursue other interests of their own.

2. While international memberships may be used in the calculation of membership totals for branch status, a branch based on international memberships must have least one subscription to the appropriate corporate publication for their geographic area. The exact number required is a matter for negotiation among the Seneschals of the branch, principality, and kingdom, and the Society Seneschal. The required subscription(s) may be purchased communally by the branch.

SCA_000272

## B.    Borders

1.    Each branch must have established borders, enclosing a single, contiguous area. At the Board's discretion, exceptions may be made in the case of overseas areas dependent upon kingdoms or principalities. Branch borders need not necessarily follow state lines or similar political divisions, if other clearly definable lines are available. In some cases, the "border" may be defined in terms of an institution rather than a specific map reference.

2.    Branches below principality level may not cross over state or national borders without the authorization of the Society Seneschal. The Kingdom Seneschal, with the approval of the Crown, may approve border adjustments below the principality level; specifically including adjustments to Baronial level borders to allow areas to form independent branches, as long as such adjustments are consistent with branch organization and designations.

3.    All kingdom and principality border adjustment petitions should be prepared by the Kingdom Seneschal(s) involved, and sent to the Society Seneschal, who will present them to the Board.

## C.    Branch Designations

1.    The designations given below are considered standard, and their use for branches of the appropriate type needs no special justification:

    a.    Kingdom: area ruled by a King and Queen

    b.    Principality: area within a kingdom ruled by Prince and Princess

    c.    Barony: area administered by a Baron and/or Baroness, the ceremonial representative(s) of the Crown

    d.    Province: equivalent of barony without ceremonial representative

    e.    Shire: local branch reporting directly to a kingdom or principality

    f.    Canton: local branch reporting through a barony

    g.    Riding: local branch reporting through a province

    h.    College: institutional branch based at a school, research facility, etc.

    i.    Stronghold: institutional branch based at a military installation

    j.    Port: institutional branch based at a military installation in situations where groups of members will be detached for long periods, as with ships at sea

2.    The Society recognizes that the use of these terms has developed over time, and does not require branches which adopted any of them in a sense other than that described herein prior to release of the 1989 Governing Documents to conform to the policy. Further, the Society recognizes that equivalent terms exist in many languages, and permits a branch to use any valid equivalent for the standard designation for a branch of its level, as determined by the College of Arms. Any branch wishing to use a term which has not yet been included on the College's list of established alternates should apply through its kingdom's College of Heralds for permission to use the new designation.

3.    Lateral changes in branch designation (such as between barony and province or between shire and college) must be submitted to the Society Seneschal for review and approval, in order to provide an outside confirmation that the needs of the membership will be served by the change.

SCA_000273

4.      Kingdom: A kingdom is a sovereign entity within the Society which has the right to select a ruling King and Queen by armored combat. A branch or contiguous group of branches may petition for kingdom status if the resulting entity would fulfill the requirements listed below:

      a.      At least 400 members.

      b.      Candidates for all Great Officer positions, each of whom is acceptable to the Society Officer responsible for the direction of that aspect of Society activity.

      c.      A name and device registered with the College of Arms.

      d.      Consensus favoring advancement in branch status by the members in the proposed kingdom, demonstrated by procedures acceptable to the Kingdom and Society Seneschals.

      e.      A record of well-attended events together with regular study or guild meetings, demonstrations, and other educational activities for the benefit of the members and the community at large.

      f.      Sufficient members of the orders conferring Patents of Arms to advise the Crown regarding the admission of candidates to those orders and to foster the development of those orders and the skills they represent within the kingdom.

      g.      Sufficient fighters of such caliber as to invest the competition for the Crown with the dignity and value it merits.

      h.      A body of kingdom law which provides for the maintenance and succession of the Crown; for the definition and advancement of local branches; for the appointment and removal of territorial Barons and Baronesses; for the conduct of such courts as may be required for the maintenance of the realm; and for such other matters as are found necessary. Draft laws, in the form to be presented to the victors of the first Crown Lists, must accompany a petition for kingdom status.

      i.      A newsletter with quality and stability suitable for conversion to a corporate publication of the Society.

5.      Principality: A principality is a part of a kingdom which has the right to select a reigning Prince and Princess by armored combat. A branch or contiguous group of branches within a kingdom may petition for principality status if the resulting entity would fulfill the requirements listed below:

      a.      At least 100 members.

      b.      Candidates for all Great Officer positions, each of whom is acceptable to the kingdom officer responsible for the direction of that aspect of Society activity, and such other officers as kingdom law and custom may require.

      c.      A name and device registered with the College of Arms.

      d.      Consensus favoring advancement in branch status by the members in the proposed principality, demonstrated by procedures acceptable to the Kingdom and Society Seneschals.

      e.      A record of well-attended events together with regular study or guild meetings, demonstrations, and other educational activities for the benefit of the members and the community at large.

SCA_000274

f.      Sufficient members of the orders conferring Patents of Arms to foster the development of those orders and the skills they represent within the principality.

g.      Sufficient fighters of such caliber as to provide appropriate competition for the Coronet.

h.      A body of principality law which provides for the maintenance and succession of the Coronet, and for any other matters delegated or permitted by the parent kingdom. Draft laws, in the form in which they will be presented to the victors of the first Coronet Lists, must accompany a petition for principality status.

6.      Baronies and Provinces: Baronies and provinces are large branches within and subject to the administration of a kingdom (or principality, if any). They are alike in status and in the ability to administer other branches within their borders, but differ in that baronies possess a Baron and/or Baroness, ceremonial representatives appointed by the Crown, and therefore have the ability to create and administer awards, while provinces do not. A branch or contiguous group of branches may petition for baronial or provincial status at the members' option, subject to the approval of the Crown and (if applicable) the Coronet, if the resulting entity meets the requirements listed below:

a.      At least 25 members.

b.      A set of officers acceptable to the Crown (and Coronet, if applicable).

c.      A name and device registered with the College of Arms.

d.      Consensus favoring advancement in branch status, and favoring the type of branch (barony or province) specified in the petition. This consensus is determined by kingdom law and custom. If the branch is to be a barony, arrangements shall have been made with the Crown at the time of application for baronial status to select and appoint a Baron and/or Baroness in accordance with kingdom law and custom.

e.      A strong record of activity in a variety of fields of Society endeavor.

7.      Other local branches: Below baronial/provincial level, branch establishment proceeds according to kingdom law and custom, subject to the Society Seneschal's review and the requirements set forth below. These branches may adopt designations as provided for by the laws and customs of their kingdoms and as established in this document. Minimum requirements include:

a.      At least 5 members

b.      At least 3 officers, including a Seneschal, an Exchequer, and one of the following: a Herald, a Marshal, or a Minister of Arts and Sciences. Local branches are encouraged to fill all the latter positions.

c.      A name registered with the College of Arms.

d.      Consensus among members in the area favoring establishment of the proposed branch.

e.      A special type of local branch is available for use at schools or military bases, or in other situations where membership is likely to fluctuate for reasons beyond the members' control. The "territory" of such branches is defined in terms of affiliation with the institution where they are based, not in terms of physical boundaries. Institutional branches may report

SCA_000275

directly to a kingdom, but if their institution is located within the borders of a branch of any other class, they report through that branch. They differ from other local branches in that they go dormant if membership falls below five (5), rather than being disbanded.

## D.    Establishment and Advancement

1.    The Society and Kingdom Seneschals will work together as necessary to process petitions for branch establishment or advancement. Society members, who wish to form a branch, advance an existing branch in status, or advance a group of branches in status must first determine whether the area they have in mind is eligible for such treatment. This process shall involve consultation with the Kingdom (and Principality, if any) Seneschal, and with the Seneschals of any nearby branches.

2.    The Society permits very broad participation by people who are not members as defined in the By-Laws. However no part of the Society can be required to solicit or heed non-member views regarding branch status, or any other situation where the opinion of the populace is to be consulted. Law, custom, or actual practice may allow consultation with nonmembers, but it cannot be required.

3.    If necessary, the members shall reach a consensus as to a proposed name (and device, where required) and register it with the College of Arms before any petition for recognition can be granted.

4.    The members of the proposed branch shall prepare a petition for the proposed action, stating the proportion of their numbers favoring the move, and demonstrating that the requirements are met. The petition shall be submitted as specified by kingdom law and custom. The Kingdom Seneschal shall review the petition to determine whether the proposed branch elevation conforms to Corpora and kingdom law and custom, consulting royalty and other kingdom or principality officers as appropriate for the level of branch under consideration. If the Kingdom Seneschal decides to recommend that the petition should be granted, the action to be taken depends on the level of branch, as follows:

   a.    Kingdoms: The Kingdom Seneschal of the parent kingdom shall determine whether the petition package is complete. The Seneschal shall forward the entire petition package (together with the accumulated recommendations, comments, and reasons for approval) to the Society Seneschal for review. The Society Seneschal shall bring the petition before the Board for formal action.

   b.    Principalities: The Kingdom Seneschal shall forward the entire petition package (together with the accumulated recommendations, comments, and reasons for approval) to the Society Seneschal for review. The Society Seneschal shall bring the petition before the Board for formal action.

   c.    Baronies and provinces: The Kingdom Seneschal shall forward the entire petition package, including statements regarding the opinions of the relevant officers and royalty, to the Society Seneschal for review. The Society Seneschal shall determine the acceptability of the petition and either notify the Seneschal that the branch advancement may proceed, or that there are deficiencies which need to be corrected before the petition can be approved. The Society Seneschal will report the change in status to the Board.

   d.    Institutional branches and local branches other than baronies and provinces: The Kingdom Seneschal shall advise the Crown if the petition is acceptable. After the Crown acknowledges the creation of the branch, the Kingdom Seneschal shall inform the Society Seneschal of the name, location and date of elevation and the Society Seneschal shall then notify the Board.

5.    Appeals: If a petition to change branch status is denied at any stage, the petition will be returned to the originator(s) together with the accumulated recommendations, comments, and reasons for denial. Any denial may be appealed to the next level.

SCA_000276

## E.   Reservations to the Board

The Board specifically reserves to itself the following functions with respect to branches of the Society:

1.      To set and revise the borders of principalities and kingdoms.

2.      To deny recognition to any group, regardless of other criteria met, for just cause, stated in writing to the affected people.

3.      To change the status of any branch to reflect its current qualifications.

4.      To dissolve a branch should it fail to continue to meet the qualifications for a branch of any level, or for other just cause, stated in writing to the affected people.

5.      To authorize a branch or group of branches to experiment with a non-standard class of organization. Any such authorization is specific to the branch obtaining it.

# IV.   ROYALTY

## A.   Selection

1.      Royal Lists must be conducted at a tournament announced in the kingdom newsletter as being for that purpose. Crowns or Coronets who wish to conduct a royal list in a manner other than individual combat must obtain the prior approval of the Board of Directors.

2.      Each competitor and prospective consort must hold a valid membership on the day of the Royal Lists. Within ten business days after being declared victor in a Crown or Coronet Tourney, the Victor and Consort must present to the Kingdom Seneschal proof that their memberships are current through at least the end of the prospective reign. Positive confirmation consists of; a valid membership card, appearance of the name with a valid membership on a printout from the Corporate Office, a membership label issued by the Corporate Office showing the name and expiration date, receipt of online membership (as downloaded from the renewal website), or a postcard or letter from the Corporate office confirming that the membership has been received.

3.      Kingdoms and principalities will ensure that all competitors in Crown and Coronet Lists are aware of and meet the membership requirements for themselves and their prospective consorts at the time they register for the Lists. Any officer of the Society or representative of a Kingdom found responsible for allowing a non-member to participate as an entrant or prospective consort in a Royal List will be subject to sanctions.

## B.   Qualifications

1.      Each competitor in a Royal List must be fighting for a prospective consort of the opposite sex unless the Crown has elected to permit a competitor to fight for a prospective consort of the same sex.

2.      No one may take part in a Royal Lists, either as a competitor or as a prospective consort, who has any reason to believe that either member of that competing couple will be unable to fulfill the duties of royalty.

3.      Each competitor and prospective consort must have access to the appropriate corporate newsletter at their place of residence.

## C.   Duties

1.      Royalty must know and uphold the laws of their realm and Corpora.

SCA_000277

2.      The royal pair must attend their Coronation or Investiture, preside over the Royal Lists to select their successors, and attend the Coronation or Investiture of their successors. They must also attend such other events as may be dictated by the laws of their realm. Should extreme and extraordinary circumstances prevent a Crown, heir to the Crown, Coronet, or heir to the Coronet, from completing the these requirements, the Board of Directors may, upon substantial petition, and on a case by case basis, waive these requirements to allow the bestowing of a royal peerage or royal title.

3.      Royalty shall be the chief examples of chivalry, courtesy, and the other virtues appropriate to the ideals of the Society, and shall inspire these virtues in their subjects. They shall be true and faithful rulers for their subjects, uphold their subjects' rights and work for their benefit, and maintain an impartial justice for all in the realm.

4.      Royalty shall give appropriate recognition to those worthy of such honor.

5.      Royalty shall foster an atmosphere that encourages new and prospective members to feel welcome to participate in Society activities.

6.      Royalty shall foster an atmosphere that encourages their subjects to participate in arts and sciences activities.

7.      Royalty shall defend the realm from all foes, domestic and foreign.

8.      Royalty, acting with and through the officers of the realm, administer the lands and branches which comprise the realm. Royalty consult the officers of the realm in matters concerning the officers' areas of responsibility, and monitor the performance of their officers to the extent necessary to confirm that they are performing essential duties. They sign such internal documents as are necessary for the conduct of business within the realm.

9.      The Sovereign supervises combat on the field of honor.

10.     The Royal Heirs and Royalty must maintain their memberships until their term as Royalty is over. Should anyone serving as a Royal Heir, or as Royalty, be found in violation of the membership requirements, that individual's term ends as of the date of the membership lapse. Provisions for dealing with the situation are addressed in Kingdom Law within each individual kingdom. The individual shall not receive any recognition for having temporarily held the status of Royal Heirs or Royalty.

## D.    Privileges

1.      Royalty receive such gifts as may be made to the realm, use them appropriately in accordance with law and custom, and preserve them for their successors. If a gift is designated as personal by the donor, the royalty may retain it after the conclusion of the reign. During their reign, Royalty may use such items as the royal office shall already hold, in accordance with the law and custom of the realm.

2.      Royalty may delegate to any subject the execution of any legitimate royal power for a specific instance, such as the transmission of an award to an individual named and selected by them, subject to the laws and customs of the realm.

## E.    Limitations

1.      Royalty are subject to all current Society rules and kingdom and/or principality law.

2.      No Sovereign or Consort may fight or be fought for in any Royal Lists, nor may anyone hold more than one royal office, except for those held by virtue of holding another. (For example, a King may be temporarily Prince of a principality, if the Coronet is vacated and the Kingdom laws regarding succession make this provision.) Neither the Sovereign nor the Consort may become either Sovereign or Consort of that realm in the reign immediately following their own.

SCA_000278

3.    The Crown may delegate the following authority to those territorial princes and princesses within their Kingdeom and may not delegate these powers or authorities to anyone else:

a.    decision making powers on legislation or principality law within the approval of the Crown;

b.    distribution of armigerous awards and orders with prior approval of the Crown;

c.    banishment within the principality with prior approval of the Crown; and

d.    signature authority for warrants and rosters with prior approval of the Crown.

4.    Royalty may grant armigerous awards to subjects of other realms only if all the following conditions apply:

a.    the service or achievements being recognized must have taken place in the realm of the conferring royalty,

b.    the conferring royalty must comply with all consultation provisions and other restrictions in the law of its realm,

c.    the conferring royalty must obtain prior written consent from the Crown of the realm of the recipient.

d.    For patent orders, the Crown of the realm of the recipient must likewise comply with any consultation provisions and other restrictions in its own law.

## F.    Kingdom and Principality Law

1.    The Crown or the Coronet may make and amend such laws of their realm as they deem necessary, with the restriction that principality laws are subject to the approval of the Crown. (Note that law applies to all persons participating in Society activities within the borders of the realm, without regard to subject status or individual fealty.)

2.    Law must be kept current, and all changes thereto must be proclaimed at a Society event and published in the kingdom newsletter. No provision of law shall be in effect, nor shall the subjects of a realm be responsible for such provision, until such proclamation and publication have taken place.

3.    If a new law of the realm conflicts with an existing provision, the latter must be explicitly repealed. Any law declared null and void because of a conflict must be explicitly repealed. Laws that are repealed must be proclaimed and published in the same manner as the original law.

4.    No law may require members or branches to make donations to the treasury of the realm. Laws which discuss voluntary donations are acceptable, as are those which mandate reasonable fees for events and services or discuss financial arrangements for the realm's main events sponsored by local branches.

5.    Failure of the Reign or Succession: Procedures shall be established in the law of the realm to ensure the succession and to provide for the maintenance of the realm and its royal offices in the event of disaster, failure, or absence of any of the reigning royalty or their heirs. At kingdom option, the procedures for principality succession may be placed in kingdom law.

## G.    The Crown

1.    The Crown may present Awards of Arms, the titles of Court Baron and Court Baroness, and Grants of Arms in accordance with the laws and customs of the kingdom. The Crown may establish and present such other awards as the Crown shall deem proper, in accordance with the laws and customs of the kingdom.

SCA_000279

2.      The Crown may elevate subjects to the Peerage by granting membership in one of the Orders conferring a Patent of Arms, after consultation with the members of the Order within the Kingdom, and in accordance with the laws and customs of the kingdom. Restriction: to advance a candidate to the Order of Knighthood, a Knight of the Society must bestow the accolade.

3.      The Crown shall acknowledge attainment of Ducal, County or Viscounty rank by those who have met the requirements. The privilege of acknowledging Viscounty rank is designed for use when the Coronet is unavailable, as at the conclusion of a principality.

4.      The Crown may appoint, remove, and replace Great Officers of State, in conjunction with the appropriate Society Officers, if any. The Crown may appoint, remove, and replace lesser officers of the kingdom in conjunction with the appropriate Great Officers, if any.

5.      The Crown may either control the appointment, removal, and replacement of principality officers in conjunction with the Great Officers of State, or it may delegate this authority to the Coronet.

6.      The Crown may appoint, remove and replace territorial Barons and Baronesses in accordance with this document, kingdom law and custom.

7.      The Crown may suspend any officer of the kingdom for just cause, stated in writing to the affected person, for the duration of the reign.

8.      No Sovereign or Consort may hold any office in the kingdom other than territorial Baron or Baroness for the duration of the reign.

9.      The Crown may establish and call such courts as may be necessary for the governance of the realm, in accordance with kingdom law and custom.

   a.      Any courts within the Society are presumed to be within the historical context of the Society and pertain only to conduct within the structure and definitions of the Society.

   b.      The primary purpose for these courts within the Society is for the investigation of questions and issues, for opening communications on issues; and for the clarification of issues. Only secondarily are courts considered to be for the purpose of trying members of the Society for alleged behavior or incidents. No courts of the latter type are to be established by any branch below kingdom level.

   c.      No court shall be held within any kingdom on individual behavior that falls within the jurisdiction of a civil or criminal court maintained by the nation or other political division where it takes place, nor shall any recommendation about individuals be made on such issues. However, a given action may have implications both in law and in the Society's rules of courteous behavior. A court which restricts itself to the latter may be held as long as the act in question occurred in a Society context.

   d.      If a court concludes that the appropriate action is one beyond the powers of the Crown or Kingdom to enact, the judgment should be issued in the form of a request to the Society Seneschal.

10.     Reservations to the Board.

The Board explicitly reserves to itself the discipline of members for actions taken while serving as Sovereign or Consort of a kingdom. However, the Board will not consider appeals against the Crown before the aggrieved parties have attempted to resolve their problem directly with the Crown, and then with the appropriate kingdom and corporate officers, including the Society Seneschal.

11.     The Crown may sanction subjects of their realm and visitors thereto in accordance with Corpora X.A. (Royal Sanctions)

SCA_000280

## H.    The Coronet

1.    The Coronet shall administer the principality, its branches and subjects on behalf of the Crown, uphold their people's rights, work for their benefit, maintain the Crown's justice, and be true and faithful servants of their Crown.

2.    The Coronet shall recommend to the Crown those subjects whose achievements and service within the principality are worthy of recognition that cannot be granted by the Coronet.

3.    The Coronet may make armigerous awards only where the right has been formally delegated to them by the Crown. Any such general delegation extends only to subjects of their principality; the Coronet must obtain specific authorization from the Crown for armigerous awards to other persons. They shall acknowledge the attainment of Viscounty rank by those who have met the requirements. The Coronet may establish and present non-armigerous awards specific to their principality.

4.    If authority has been delegated by the Crown, the Coronet may appoint, remove, or replace Great Officers of the principality, in conjunction with the appropriate kingdom Great Officers. The Coronet may likewise appoint, remove, and replace Lesser Officers of the principality, in conjunction with the appropriate kingdom or principality Great Officers, if any. The Crown may require consultation and prior approval for any or all of these steps. The Coronet may suspend any officer of the principality for just cause, stated in writing to the affected person for the duration of the reign.

5.    No Sovereign or Consort may hold any office in the principality other than territorial Baron or Baroness, or any kingdom-level office, for the duration of the reign.

6.    The Coronet may call courts of inquiry only if the Crown approves.

7.    Reservations to the Crown

    a.    When the Crown believes the Coronet has overstepped the bounds of law and custom, the normal recourse should be to in-kingdom mediation and then to a Court of Chivalry.

    b.    If the Board upholds the judgment of such a Court, the affected parties may be subject to loss of any honors and privileges deriving from their reign, and nullification of any official acts dating back to the incident which led to the invocation of the Court.

    c.    If the Crown feels that rapid action is essential to protect the Society, it has the option of banishing the Coronet from the realm, effectively putting the principality reign into abeyance until either conditions change within the kingdom or the Board countermands the order. However, if the Board does not agree with the Crown's judgment regarding the urgency of the situation, the Board may choose to take action against the Crown as well as or instead of against the Coronet.

8.    Reservations to the Board

    a.    The Board reserves to itself the final determination regarding discipline of members for actions taken while serving as Sovereign or Consort of a principality. However, the Coronet remains subject to the Crown, and provisions regarding Courts of Chivalry and banishment still apply.

    b.    The Coronet may sanction subjects of their realm and visitors thereto in accordance with Corpora X.A. (Royal Sanctions).

SCA_000281

# V.   TERRITORIAL BARONS AND BARONESSES

## A.   Appointment and Removal

1.      The Crown shall appoint a territorial Baron and/or Baroness according to the laws and customs of the kingdom when a branch is granted baronial status, or whenever a new Baron and/or Baroness are required. The barony's opinion on the matter must be requested and received in writing, and the appointments must not be substantially opposed by the populace of the barony. Territorial Barons and Baronesses are officers and must maintain appropriate membership status.

2.      The Crown may suspend a territorial Baron and/or Baroness for the duration of a reign, for just cause stated in writing and presented only to the Baron and/or Baroness. Suspension would prohibit the use of the baronial titles and arms, the conduct of baronial courts, and the presentation of baronial awards.

3.      The Crown may remove a territorial Baron and/or Baroness for just cause stated in writing and presented only to the Baron and/or Baroness; however, the Crown must request a written opinion from the populace of the barony before taking such action.

## B.   Responsibilities

1.      The basic duties of the Baron and/or Baroness are ceremonial in nature in reflecting the royal presence in the barony. The Crown may assign additional duties and responsibilities, according to the laws and customs of the kingdom.

2.      Territorial Barons and/or Baronesses are responsible to the Crown and (if the barony is within a principality) to the Coronet. The Baron and/or Baroness shall work with the baronial officers as circumstances dictate, and shall keep these officers informed as necessary for the efficient performance of their duties and effective liaison within the barony.

3.      The privileges, duties, and rights, ceremonial and otherwise, of the office of territorial Baron and/or Baroness are established by the laws and customs of the kingdom, and shall include the right to make such awards as the Crown (or the Coronet, if applicable) shall specifically delegate, and to establish and present non-armigerous awards specific to the barony.

4.      A territorial Baron or Baroness may hold any other Society office for which he or she is fitted and qualified, save only those of Baronial Seneschal and Baronial Exchequer, but must not allow the duties and responsibilities of such office and the office of Baron or Baroness to conflict.

# VI.   SOCIETY OFFICERS

## A.   General

The term "Society Officer" refers to the officers listed below in their administrative roles within the historical structure of the Society.

1.      Responsibilities

a.      Each Society Officer shall carry out the duties assigned to that office, and may, with the approval of the Board, appoint such deputies as may prove necessary. The following duties are common to all Society Offices:

b.      Coordinating appointment of Great Officers of State for their areas of responsibility, in cooperation with the Crown of each kingdom.

c.      Maintaining communications with their subordinates, and assuring the flow of information on policies and developments in their areas of responsibility.

SCA_000282

d.      Reporting to the Board quarterly, with copies to the Society Seneschal, regarding the status and activities of the kingdoms in the areas of their responsibility, and also submitting annual summaries of this information. Failure to submit these reports is tantamount to resignation, which may be accepted at the pleasure of the Board.

e.      Maintaining communications with other Society Officers as appropriate.

2.      Requirements and Benefits

a.      Society Officers and their warranted deputies must be members.

b.      Society Officers and some deputies may receive certain corporate periodicals (except their home-kingdom newsletters) at Society expense, for the duration of their tenure. The Corporate Office maintains the distribution list for these publications, at the direction of the Board. The Kingdom Seneschal and Kingdom Chronicler may receive certain corporate periodicals other than their own kingdom newsletter at the Society's expense for the duration of their terms. The Board may from time to time designate additional officers to receive these publications.

c.      No Society Officer may hold more than one Society Office, or any kingdom or principality Great or Lesser Office of State.

d.      No Society Officer may serve as Crown or Coronet during their tenure in office. In order to fight or be fought for in a Crown or Coronet Lists, the officer must have served a minimum of one year in that office and must have an appointed deputy, approved by the Board, who is ready and willing to accept all responsibilities for that office. Committing to become a Crown or Coronet will be considered a resignation from office.

e.      The Board shall ensure that each Society Officer shall have a specific Board member, called an ombudsman, assigned to act as its representative to the Board, and vice versa, for matters concerning that office.

3.      Sanctions

Society Officers may impose Administrative Sanctions within their area of authority, in accordance with Corpora X.

4.      Appointment and Removal

a.      Appointment: Society Officers shall be appointed by the Board. All appointments will be for specific terms of service, renewable at the option of the Society Officer and the Board. The initial appointment will be for a trial period of six months. At the end of that period, the Board will either confirm the remainder of the term of office, or appoint another person to the office for the trial period.

b.      Warranting: Three Board members must sign the warrant for a Society Officer. For a deputy, two Board members and the appropriate Society Officer must sign the warrant.

c.      Resignation: Society Officers may resign by submitting written notification to the Board via the Secretary and Corporate Office.

d.      Removal: Any Society Officer or deputy may be removed by a two-thirds vote of the Board.

SCA_000283

## B.    Society Seneschal

The Society Seneschal is responsible for coordinating the administration of the Society's historical re-creation. This involves directing the activities of the Kingdom Seneschals and of Society-level deputies. Where questions arise concerning the intent of Corpora, the Board specifically authorizes the Society Seneschal to make interpretations and clarifications. Such rulings must be discussed with the Chairman at the earliest opportunity, and reported to the Board at the following meeting. The Society Seneschal's rulings will stand until and unless overruled by the Chairman or the Board. The Society Seneschal is also responsible for reviewing all sanction related activities.

## C.    Laurel Sovereign of Arms and The College of Arms

### 1.    Laurel Sovereign of Arms

The Laurel Sovereign of Arms (Laurel) is the principal heraldic officer of the Society and the head of the College of Arms. Laurel is responsible for fostering the study and practice of heraldry, and for establishing rules and making determinations regarding names and armory, royal and noble titles, and geographical designations to be approved for use in the Society.

### 2.    College of Arms

The College of Arms of the Society consists of the Principal Heralds of the kingdoms and such other persons as Laurel may deem to be of assistance. It aids Laurel in studying historical heraldic usage, developing heraldic rules for the Society's use, and reviewing individual items prior to their registration for use in the Society.

### 3.    Heraldic Administration

a.    Standards of difference and other rules: Laurel shall define standards suitable to the type of item to be registered, and apply them uniformly to all such submissions. These standards shall be designed to support the historical re-creations of the Society and to provide sufficient difference from names and armory registered within the Society to avoid undue confusion, to avoid the appearance of unearned honors or false claims, and to provide sufficient difference from historical or fictional personages to prevent offense due to obvious usurpation of identity or armory. Members are encouraged to develop unique, historically valid names and armory.

b.    Any item once registered shall remain registered unless the owner requests its release, and shall be accepted in the Society for the person for whom it was registered without regard to changes in the rules and standards applied to future submissions, or to the membership status of the owner.

c.    The standards and rules employed by Laurel and the College of Arms shall be published so that participants in Society activities can obtain copies for their own reference. The Ordinary and Armorial listing registered names and armory shall also be made available to the membership.

d.    Laurel shall ensure that fees for the Society's heraldic publications and for its services in registering names or armory are sufficient to cover the cost of such services, both at the corporate level and within the kingdoms.

## D.    Marshal of the Society

The Marshal of the Society is responsible for activities related to combat, archery and equestrian activities. This includes directing the Earls Marshal of the Kingdoms in matters concerning the supervision of combat and related activities at Society events and the manner and conduct of duties of all marshals throughout the Society; working to promote safety in the Society's martial arts; and working with the Minister of Arts and Sciences to encourage research in armor and weapons. The Board specifically authorizes the Marshal

SCA_000284

to make interpretations and clarifications regarding the Rules of the Lists, with the proviso that such rulings must be reported to the Board at the following meeting. The Marshal's rulings will stand until and unless overruled by the Board.

## E.    Minister of Arts and Sciences

The Minister of Arts and Sciences is responsible for fostering the study of period culture and technology, and of methods for producing historically accurate artifacts and performances. Duties include coordinating the efforts of kingdom officers in the field (regardless of whether or not the functions related to "Arts" and "Sciences" are combined in one job or kept separate); promoting the dissemination of accurate information about the fields under study; and assisting the Chronicler of the Society and the editors of the corporate publications in confirming the validity of research presented to the membership.

## F.    Chronicler of the Society

The Chronicler is responsible for overseeing the production of kingdom newsletters, local branch newsletters, kingdom and local branch websites, and any other publications the Board may designate. In addition, the Chronicler establishes overall policies for Society-sponsored event and branch-related paper publishing at all levels, and serves as a source of publishing expertise and advice for the benefit of the Society.

## G.    Society Chancellor of the Exchequer

1.    The Society Chancellor of the Exchequer reports directly to the Treasurer as identified in the By-Laws.

2.    The Society Chancellor of the Exchequer shall cause to be kept and maintained adequate and correct accounts of the properties and business transactions of all branches and divisions of the Society except those controlled by the Treasurer and the Corporate Office. Such accounts shall include records of assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial reports.

3.    This officer accomplishes this directly, through the Kingdom Chancellors of the Exchequer, Kingdom Chroniclers (for regional corporate publications) or through other special deputies. The Society Chancellor of the Exchequer additionally collects and compiles reports on all such accounts for the Society's tax returns and other financial reports.

## H.    Webminister

The Web Minister is responsible for overseeing the websites of kingdoms, local branches, and any other website the Board may designate. In addition the Web Minister serves as a source of web publishing expertise and advice for the benefit of the Society. The Web Minister of the Society is responsible for collecting reports from Kingdoms, be they Greater or Lesser Officers.

## I.    Reservations to the Board

The board reserves the right to appoint and remove Society Officers.

# VII.    KINGDOM, PRINCIPALITY, AND LOCAL OFFICERS

## A.    General

1.    Officers assist Royalty in the administration of the lands and branches of the realm. Each officer has a specific area of specialization, and a defined geographic scope. Within those bounds, an officer coordinates branch activities, and may supervise deputies or lesser officers.

2.    Kingdom Great Officers are responsible directly to the Crown, but also report to a

SCA_000285

corresponding Society officer if such a Society officer exists. Each Kingdom's Great Officer corps must include the Seneschal, the Principal Herald, the Earl Marshal, the Minister of Arts and Sciences, the Chancellor of the Exchequer, and the Chronicler. No person may hold more than one of these Great offices at a time. The Crown may create additional Great Offices. Kingdom Lesser Officers and deputies are created by the Crown according to the needs of the kingdom. These officers may be supervised directly by the Crown, or be placed under the jurisdiction of a Greater Officer, and report accordingly. However, Great Officers retain ultimate responsibility for delegated functions.

3.       Principality Great and Lesser Officer structure and duties generally parallel that of the Kingdom, with the Great Officers responsible to the Coronet and corresponding superior kingdom officer. Lesser officers may be supervised directly by the Coronet, or be placed under the jurisdiction of a Principality Great Officer. Specific reporting requirements are established by Kingdom and Principality law or custom.

4.       Local officers are responsible to a superior officer, and possibly Royalty, or a Territorial Baron and/or Baroness, depending on the particular administrative structure of that area.

5.       Kingdom and Principality Officers may impose Administrative Sanctions within their area of authority, in accordance with Corpora X.

6.       The duties of the Kingdom Great Officers are defined below:

## B.    The Seneschal

1.       The Seneschal is the chief administrative officer of the Society for the kingdom, which includes coordinating the other kingdom officers as required for the smooth operation of the kingdom and for its relations with outside agencies. The Seneschal is responsible for assisting new branches and branch elevations.

2.       The Seneschal shall review all proposed changes to kingdom law to determine compliance with the governing documents of the Society, and advise the Crown accordingly. The Seneschal shall with due promptness either acknowledge the propriety of the changes by signing them, prior to the Crown's enacting them, or shall state any conflicts in writing to the Crown and to the Great Officers of the kingdom. Once the law has been enacted, the Seneschal shall ensure that the Society Seneschal and the Board ombudsman for the kingdom receive current copies, which must include the Seneschal's opinion regarding apparent conflicts, if any.

## C.    The Principal Herald

The Principal Herald is the head of the kingdom's College of Heralds and is responsible for supervising field heraldry and court heraldry at events within the kingdom, and for College of Arms activities within the kingdom, including the timely processing of submissions for names and armory.

## D.    The Earl Marshal

The Earl Marshal is responsible for overseeing the conduct of all martial arts activities, including but not limited to tournament lists, wars, combat archery, and fencing, as well as such related activities as scouting and target archery. The Earl Marshal bears primary responsibility for promoting both the safety and the authenticity of the martial arts in the kingdom, but works with other officers in their areas of mutual interest.

## E.    The Minister of Arts and Sciences

The Minister of Arts and Sciences is responsible for supporting study into art forms, technologies, and those aspects of culture relating to their use, both in period and in Society activities.

SCA_000286

## F.    The Chancellor of the Exchequer

The Chancellor of the Exchequer is responsible for maintaining the financial records of the kingdom, supervising the finances of the kingdom, and assembling financial reports and submitting them to the Society Chancellor of the Exchequer in a timely fashion.

## G.    The Chronicler

The Chronicler supervises all publishing activities of the kingdom, and is the editor or supervises the editor of the kingdom newsletter, which is responsible for all required announcements and notices of Society events, kingdom law, and other kingdom business. The Chronicler works with the Society Registrar on matters of mailing and circulation. The Chronicler is also responsible for accounting for the corporate stipend and other kingdom newsletter income, and reporting all such income and expenditures to the Society Chancellor of the Exchequer as required by that officer.

## H.    Duties of Other Officers

Specific duties of Kingdom Lesser Officers, deputies, Principality Officers, and Local Officers are defined by Royalty and the appropriate superior officer.

## I.    Appointment to office

1.    Kingdom Great Officers of State are appointed by the Crown after due consultation with the outgoing officer, the Seneschal, and any other appropriate Great Officer. The appointments take effect when and if ratified by the corresponding Corporate Officer by countersignature of the warrant. If there is no Corporate Officer, the Crown shall act unilaterally.

2.    Kingdom Lesser Officers are appointed by the Crown in a parallel manner, where the Great Officer takes the place of the Society Officer.

3.    Principality Great and Lesser Officers are appointed in a similar fashion, although the specific details are governed by kingdom law or custom.

4.    Local officer appointments are usually done by the next superior officer, and confirmed by Royalty, according to kingdom law and custom. Local officers must not be substantively opposed by the people of the branch, but the final decision remains with the superior officer and Royalty.

## J.    Warranting / Rosters

1.    Kingdom Great Officers' appointments are confirmed by a signature from the Corporate Level and the Crown, on the standard warrant form. All other Officer appointments may be listed on a roster that includes the legal and Society names, address, phone number, and the appointment and expiration dates for each officer. It must be signed by the appropriate Royalty and the responsible superior officer, and be updated regularly. The roster must contain a statement that it is the current roster of (office) for the (kingdom, principality) of the Society as of (date).

2.    Local Branch officers may be officers in their own right, or be deputies of officers of an administering branch. Until a branch is proclaimed by the Crown, its officers must be deputies of their counterparts in the administering branch.

3.    Before a proposed officer can be placed on a roster or warrant, they must have a membership that provides immediate access to the corporate newsletter for their area. This also applies to deputies designated as an officer's successor.

## K.    Ending a term of office

1.    All office terms end upon the expiration date listed on the warrant or roster. Officers are normally responsible for presenting a potential successor to the appropriate Royalty before their term expires. Where a good-faith effort to fill the office is in progress, the Crown may authorize a

SCA_000287

Kingdom Great Officer to continue in office for up to 45 days after the expiration of the warrant. Officers may serve successive terms only as kingdom law and custom permit. Officers must turn over all office related materials to their successor in a timely and organized fashion when their term ends.

2.      All officers may resign by sending written notice to the people who signed their warrant or roster. Kingdom law may include provisions regarding levels of inactivity or non-reporting as equivalent to resignation.

3.      Officers may be removed for just cause, stated in writing to the officer, by joint action of the Crown and the corresponding superior officer. If there is no superior officer, the Crown may act unilaterally, in accordance with law and custom. An officer so removed may appeal to the Board.

## L.   Suspension of an officer

1.      Officers may be suspended by either the appropriate Royalty or the superior officer for just cause, stated in writing to the officer. Suspensions by the Royalty are for not more than the duration of the current reign. Suspensions by the superior officer are for not more than 90 days. A suspension takes effect upon declaration to the officer, but the Royalty or the superior officer must be informed as soon as possible. The suspension of a kingdom or principality great officer must be announced in the next available issue of the kingdom or principality newsletter.

2.      If a deputy has been designated as successor for the post, the deputy shall automatically assume the duties of the office at the moment of such suspension and shall continue fulfilling said duties until the suspension is terminated. In order to be assured of the succession in the event of the suspension of an officer, the deputy designated to succeed that officer must be on a roster or warrant signed by that officer, and the Royalty that signed that officer's roster or warrant. In addition, the officer must send a copy of that warrant to their superior officer. The deputy is considered an officer. If no designated successor exists for the post, the Royalty and superior officer (if any) shall reach an agreement as to how to carry out the duties of the post. The suspension stands until and unless overruled by the Board.

# VIII.  PERSONAL AWARDS AND TITLES

## A.   Patents of Arms

### 1.   General Requirements

Candidates for any order conferring a Patent of Arms must meet the following minimum criteria. Additional requirements may be set by law and custom of the kingdoms as deemed appropriate and necessary by the Crown.

a.      They shall have been obedient to the governing documents of the Society and the laws of the kingdom.

b.      They shall have consistently shown respect for the Crown of the kingdom.

c.      They shall have set an example of courteous and noble behavior suitable to a peer of the realm.

d.      They shall have demonstrated support for the aims and ideals of the Society by being as authentic in dress, equipment and behavior as is within their power.

e.      They shall have shared their knowledge and skills with others.

f.      They shall have practiced hospitality according to their means and as appropriate to

SCA_000288

the circumstances.

g.    They shall have made every effort to learn and practice those skills desirable at and worthy of a civilized court. To this end they should have some knowledge of a wide range of period forms, including but not limited to literature, dancing, music, heraldry, and chess, and they should have some familiarity with combat as practiced in the Society.

h.    They should participate in Society recreations of several aspects of the culture of the Middle Ages and Renaissance.

## 2.    Order of Precedence Within the Peerage

The Crown may establish the order of precedence within the peerage according to the laws and customs of the kingdom. However, the Chivalry, the Laurel, the Pelican and Defense are of equal precedence and must be considered as one group.

## 3.    Departure from the Peerage

Any member of an order conferring a Patent of Arms may resign from that order. To leave a Patent Order, the member must send a written resignation to the Crown, the Principal of the Order (if any), the Principal Herald, and the Board. The Crown bestows membership in Patent Orders. No 'interchangeability' exists from one order to another (as Knight to Master or Laurel to Pelican), and the acceptance of a person who has so resigned an order into any other order is solely at the discretion of the Crown according to the laws and customs of the kingdom.

## 4.    Patent Orders

The following institutions are established for all kingdoms in the Society. A Patent of Arms may be conferred only upon a person being admitted into one of these orders. Each candidate for a patent order must satisfy the general requirements listed above in A.1., as well as the specific requirements listed here.

a.    The Chivalry:

(i)    The Chivalry consists of two equal parts: Knighthood and Mastery of Arms. No one may belong to both parts of the order at one time. When a member is admitted to the Chivalry by the Sovereign, the choice of which part of the order to join is made by the new member. The candidate must be considered the equal of his or her prospective peers with the basic weapons of tournament combat. To become a Knight, the candidate must swear fealty to the Crown of his or her kingdom during the knighting ceremony. Masters of Arms may choose to swear fealty, but are not required to do so.

(ii)    The duties of the Chivalry are as follows:

(a)    To set an example of courtesy and chivalrous conduct on and off the field of honor.

(b)    To respect the Crown of the kingdom; to support and uphold the laws of the kingdom and Corpora.

(c)    To enrich the kingdom by sharing his or her knowledge and skills.

(d)    To support and uphold the Crown of his or her kingdom.

(e)    To enhance the renown and defend the honor of the peer's Lady or Lord.

SCA_000289

(f)      To advise the Crown on the advancement of candidates for the Chivalry.

(g)      To bestow the Accolade of Knighthood upon a candidate for the Order of Knighthood, by sole right as both Sovereign and knight, or acting directly for a Sovereign who is not a knight.

b.      The Order of the Laurel:

(i)      Members of the Order of the Laurel may choose to swear fealty, but are not required to do so. The candidate must have attained the standard of excellence in skill and/or knowledge equal to that of his or her prospective peers in some area of the Arts or Sciences. The candidate must have applied this skill and/or knowledge for the instruction of members and service to the kingdom to an extent above and beyond that normally expected of members of the Society.

(ii)      The duties of the members of the order are as follows:

(a)      To set an example of courtesy and chivalrous conduct.

(b)      To respect the Crown of the kingdom; to support and uphold the laws of the kingdom and Corpora.

(c)      If in fealty, to support and uphold the Crown of his or her kingdom.

(d)      To enrich the kingdom by sharing his or her knowledge and skills.

(e)      To advise the Crown on the advancement of candidates for the Laurel.

c.      The Order of the Pelican.

(i)      Members of the Order of the Pelican may choose to swear fealty, but are not required to do so. The candidate must have attained the standard of service to the Society or any of its branches equal to that of his or her prospective peers, which is above and beyond that normally expected of members of the Society.

(ii)      The duties of the members of the order are as follows:

(a)      To set an example of courtesy and chivalrous conduct.

(b)      To respect the Crown of the kingdom; to support and uphold the Laws of the kingdom and Corpora.

(c)      If in fealty, to support and uphold the Crown of his or her kingdom.

(d)      To enrich the kingdom by sharing his or her knowledge and skills.

(e)      To advise the Crown on the advancement of candidates for the Pelican.

d.      The Order of Defense

(i)      Members of the Order of the Defense may choose to swear fealty, but are not required to do so. The candidate must be considered the equal of his or her prospective peers with the basic weapons of rapier and/or cut-and-thrust combat. The candidate must have applied this skill and/or knowledge for the instruction of

SCA_000290

members and service to the kingdom to an extent above and beyond that normally expected of members of the Society.

(ii)     The duties of the members of the order are as follows:

(a)     To set an example of courtesy and chivalrous conduct on and off the field of honor.

(b)     To respect the Crown of the kingdom; to support and uphold the Laws of the kingdom and Corpora.

(c)     If in fealty, to support and uphold the Crown of his or her kingdom.

(d)     To enrich the kingdom by sharing his or her knowledge and skills.

(e)     To enhance the renown and defend the honor of the peer's Lady or Lord.

(f)     To advise the Crown on the advancement of candidates for the Order of Defense.

e.     Royal Peerages: The titles assumed by former Crowns and Coronets may convey Patents of Arms if the laws and customs of the kingdom so provide. However, in order to receive a patent with the title, the recipient must meet the general requirements listed for peerage.

f.     The Order of the Rose: The Order of the Rose consists of former Royal Consorts of a kingdom. It is specifically charged with encouraging chivalrous and courteous behavior among all members of the Society. It may be non-armigerous, or it may be defined as a Patent Order according to the laws and customs of the kingdom. In the latter case, the general requirements for peerage must be met.

## B.     Other Awards

1.     The title of Baron or Baroness, whether territorial or of the court, shall carry at least an Award of Arms if the recipient is not already armigerous.

2.     Kingdoms may establish awards and orders conferring Awards or Grants of Arms, and the Crown may award membership in such orders according to the laws and customs of the kingdom. The names and insignia of these awards and orders must be ratified by the Laurel Sovereign of Arms. The order of precedence among orders conferring Awards or Grants of Arms shall be established according to the laws and customs of the kingdoms. Principalities may establish their own awards and orders, but the approval of the Crown is required before these awards and orders may convey Arms.

3.     An armiger may resign any award or order. To do so requires a written statement, sent to the current royalty of the level which bestowed the award, the Principal of the Order, if any, the Principal Herald and the Board.

4.     Non-armigerous awards and orders may be established by a kingdom, principality or barony, according to the laws and customs of the kingdom. The names and insignia of these awards and orders must be ratified by the Laurel Sovereign of Arms. Below kingdom level, orders may not convey Arms, unless specifically delegated by the Crown. The Crown must approve any non-armigerous award or order before it may be recognized by the College of Heralds of a kingdom and given a place in its Order of Precedence.

5.     Only royalty and territorial Barons and Baronesses may bestow awards. If an award is

SCA_000291

established for a specific branch, only the royalty or Baronage of that branch may bestow the award, unless the power is specifically delegated in a manner consistent with Corpora and kingdom law and custom.

## C.    Membership Requirements for Receiving Awards

1.    The Board authorizes each Kingdom to determine if they require paid membership in the Society for any of the following:

      a.    receiving a Patent of Arms;

      b.    receiving a Grant of Arms;

      c.    receiving an Award of Arms;

      d.    admission to an armigerous order.

2.    Such requirements must be written into Kingdom Law, and may not imply or state that a person must remain a member to retain such awards or titles once given. A Kingdom which establishes such laws must ensure that its populace is informed of these requirements, and is responsible for their enforcement.

## D.    Titles

1.    "Landedness" in the Society is an attribute of the Crown, the Coronet, and the territorial Barons and Baronesses. Other titles within the Society do not confer land, and no form of any title shall be taken or used which states or implies ownership or control of any geographic, demographic or sociographic area within or external to the Society in any sense, medieval or otherwise.

2.    The Society's standard titles are defined in (4) below. The Society recognizes that equivalent titles from other cultures may be more appropriate for individual members. Such alternate titles may be used by those entitled to the rank or award associated with them, provided the College of Arms has ruled that the title in question is an equivalent for the rank or award in question. All standard and alternate titles are specific to the Society, and convey no rank or precedence outside it. They may be used in a Society context only by those who have achieved the appropriate rank or award within the Society.

3.    Names and terms that imply relationships between Society members (such as apprentice, page, squire, etc.) or that carry vocational connotations (religious, military, scholarly, etc.) may be used in the Society on an informal basis, subject to the following restrictions: They must not assert or imply noble rank or territorial jurisdiction. They must not be offensive in themselves or in the context in which they are used. They may carry no precedence and must not be used in any manner which would suggest that they do so.

4.    The titles listed here are considered standard, and may be used by those who have earned or been granted the appropriate rank or award within the Society. The College of Arms publishes a more extensive list of titles and alternative forms, which may also be used freely by qualified persons. In addition, the College of Arms has full approval authority over new alternative titles, which must be added to their list before being released for use in the Society.

| TITLE (masculine/feminine/collective) | RANK OR AWARD |
| --- | --- |
| King/Queen/Crown | Rulers of a kingdom |
| Crown Prince/Crown Princess/(Royal) Coronet | Heirs to the Crown |
| Prince/Princess/Coronet | Rulers of a principality |

SCA_000292

| TITLE (masculine/feminine/collective) | RANK OR AWARD |
|---|---|
| Duke/Duchess | Persons who have reigned over a kingdom two or more times. The title is assumed at the end of the second complete reign. |
| Count/Countess | Persons who have once reigned over a kingdom. The title is assumed at the end of the first complete reign. |
| Viscount/Viscountess | Persons who have reigned over a principality. The title is assumed at the end of the first complete reign. |
| Master/Mistress | Members of the Orders of the Laurel, the Pelican, Mastery of Arms and Defense. |
| Sir/Sir | Members of the Order of Knighthood. Note that most women who are members of the order have chosen to use 'Sir'. |
| Baron (of placename)/ Baroness (of placename) | Ceremonial heads of a barony |
| (Court) Baron/ (Court) Baroness | Armigerous titles awarded at the discretion of the Crown. The word "Court" is often left out when referring to this title. |
| Lord/Lady | Basic titles for persons who hold Arms by Award or Grant |
| "my lord"/ "my lady"/ "good gentles" | **These are general forms of address rather than titles**. They are properly used informally, or any time the speaker does not know another form that would be more appropriate for the listener. |
| Master of (job name)/ Mistress of (job name) | Alternates for 'Minister of (job name)'. As with the standard designation for the office, **these are not personal titles, and should in no case be abbreviated or prefixed to the officer's personal name.** |

## E.    Reservations to the Board

### 1.    Degradation from the Peerage

The Board reserves the right to degrade a person from the Peerage. However, kingdom law may define conditions and procedures under which a recommendation for such action may be made to the Board. Unless stipulated otherwise by the Board, the Board's decision in such a case applies only to the matter at hand. Nothing prohibits a person who has been degraded from any order of the peerage from being elevated to the peerage at a later date, should the Crown determine that the person in question now meets the requirements of the order to which he is being elevated.

### 2.    Revocation of Awards and Grants of Arms

As with Peerages, the Board specifically reserves the right to revoke any Award or Grant of Arms. Kingdom law may make provision for offering such a recommendation to the Board.

### 3.    Granting and creation of new titles

The Board reserves the right to define the circumstances for which new titles of rank may be granted and to coin any such titles either for general use or for specific individuals. A specific title granted by the Board upon just petition is unique to each case and does not make that title valid for any other use or person within the Society.

SCA_000293

## IX.  SOCIETY COMBAT

### A.  Society Combat-Related Activities

1.     Society combat-related activities are defined as armored combat, fencing, combat archery, marshaling, scouting, and banner bearing in combat. Other activities clearly falling within the scope of the above are also to be considered combat-related activities.

2.     A participant in any of the Society combat-related activities as defined above must be authorized by a marshal warranted and designated by the Earl Marshal of a kingdom or his representative as able to authorize individuals in the appropriate activity.

3.     Requirements for authorization for all combat-related activities are delineated in the Marshal's Handbook. Kingdoms may define such additional types of authorization (such as weapons forms) as they deem necessary.

4.     Authorizations shall be registered with and kept on file by the Earl Marshal or other designated official of each kingdom.

5.     Waivers, indemnities, or other required documents must be signed as appropriate before training for authorization, being authorized, or participating in SCA combat or related activities. Proof that the required document, if applicable, has been signed must be presented before an individual may participate in the above mentioned activities. (For more detailed information on waivers, see Corporate Policies of the SCA, Inc., section IV – VI.)

6.     A Combat Authorization Card shall be issued to each authorized participant in a Society Combat-Related Activity. This card shall be presented to the Lists Official at a Society event to register for such activities and shall establish that the person is authorized. This card must be shown to any marshal or lists official upon request. The Society Marshal shall establish procedures for the notification and registration of authorizations and the issuance of the Combat Authorization Cards.

7.     No person who has not attained his or her sixteenth (16th) birthday may be authorized in armored combat or the marshaling of armored combat. No person who has not attained his or her fourteenth (14th) birthday may be authorized for any form of Society combat-related activity.

8.     Prior to the authorization of a minor in any Society combat-related activity, the parent or guardian of the minor must witness the activity, discuss it with a witnessing marshal, and execute a waiver, indemnity, or other required document for the minor. The witnessing marshal must be explicitly authorized to perform this function by the Earl Marshal of the kingdom. The marshal who authorizes a minor person for any form of Society combat-related activity must be the Kingdom Earl Marshal or the Principality Marshal or a designated deputy. This need not be the same person as the witnessing marshal.

9.     Any minor involved in Society combat-related activities at an event must have a parent or a properly-executed document designating some adult person present at the event as able to authorize medical treatment for that minor in the case of any emergency.

### B.  The Rules of the Lists

1.     Each fighter, recognizing the possibilities of physical injury to himself or herself in such combat, shall assume unto himself or herself all risk and liability for harm suffered by means of such combat. Other participants shall likewise recognize the risks involved in their presence on or near the field of combat, and shall assume unto themselves the liabilities thereof.

2.     No person shall participate in Combat-Related Activities (including armored combat, fencing, combat archery, marshalling, scouting, and banner-bearing in combat) outside of formal training sessions unless and until he or she shall have been properly authorized under Society and kingdom

SCA_000294

procedures.

3.    All combatants must be presented to, and be acceptable to, the Sovereign or his or her representative.

4.    All combatants shall adhere to the appropriate Armor and Weapons Standards of the Society, and to any additional standards of the kingdom in which the event takes place. The Sovereign may waive the additional kingdom standards.

5.    The Sovereign or the Marshallate may bar any weapon or armor from use upon the field of combat. Should a warranted Marshal bar any weapon or armor, an appeal may be made to the Sovereign to allow the weapon or armor.

6.    Combatants shall behave in a knightly and chivalrous manner, and shall fight according to the appropriate Society and Kingdom Conventions of Combat.

7.    No one may be required to participate in Combat-Related Activities. Any combatant may, without dishonor or penalty, reject any challenge without specifying a reason. A fight in a tournament lists is not to be considered a challenge, and therefore may not be declined or rejected without forfeiting the bout.

8.    Fighting with real weapons, whether fast or slow, is strictly forbidden at any Society event. This rule does not consider approved weaponry that meets the Society and kingdom standards for traditional Society combat and/or Society rapier combat, used in the context of mutual sport, to be real weaponry.

9.    No projectile weapons shall be allowed and no weapons shall be thrown within the Lists of a tournament. The use of approved projectile weapons for melee, war, or Combat Archery shall conform to the appropriate Society and Kingdom Conventions of Combat.

## C.    Royal Lists

Only Chivalric (rattan) combat shall be used for formal tournament lists for royal ranks.

# X.    GRIEVANCES AND SANCTIONS

## A.    General

1.    While the Society is devoted to courtesy, trustworthiness, and personal responsibility, tensions and disputes do arise.

2.    The Board is the final court of appeal for disputes that have escalated beyond the ability of the participants or the officers to handle. However, it is reluctant to play that role because its rulings affect the entire Society –often by restricting everyone's freedom and reducing their enjoyment of the organization. Corpora provides a right of appeal to the Board, but members should make every effort to work out their disputes at as low a level in the organization as possible.

3.    While it is not possible to prescribe a specific list of things to do or people to consult that will serve in all disputes, the general procedure outlined here should be adaptable to most of them. If you are directly involved in a dispute, you must go through a process at least as comprehensive as this one before asking the Board for help. If you are asked to intervene in someone else's dispute because of the office or title you hold, please don't rush in. First, urge the principals to try all measures recommended for attempting to reach a settlement without involving your level of the organization. Then, if you do intervene, make every effort to find a resolution the participants can accept, instead of escalating the dispute to higher levels of the organization.

SCA_000295

4.      Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions up to and including revocation of membership and denial of participation.

Please report any possible instances of hate speech to your Kingdom Seneschal, the Society Seneschal or the President of the SCA immediately. For more information about hate speech and the reporting of same, please refer to the Society Seneschal's Handbook.

## B.     Grievances

1.      Principles

a.      Be understanding. There are many valid approaches to Society activity. Members should make room for each other to explore anything that supports the Society's goals, abides by its rules, is legal and does not actively interfere with the environment it attempts to create. Communication is the key to finding common ground.

b.      Look for common ground. It may be possible to find compromise by taking up both alternatives, either together or at different times.

c.      Keep a sense of perspective. There are always two sides to an issue. Make an effort to listen to the arguments of the other side with good will and honesty, and look for a solution everyone can live with.

d.      Go through the chain of command/appeal. If you can't solve the problem yourself, your requests for assistance should follow a line of authority without skipping anyone, and without spreading laterally through the organization any more than absolutely necessary. For example, when you reach a level that has royalty or royal representatives, include them on your copy list, but don't start out by copying all the royalty in your corner of the Known World and the board on your initial complaint. Try to be circumspect and polite.

e.      Be patient. Allow each level time to try to deal with the situation, and avoid the temptation to be aggressive to the people you've asked for help if they don't seem to be moving fast enough to suit you. Remember we are a volunteer society.

2.      Procedures

a.      Try to work things out face-to-face. When someone does something that interferes with your appreciation of the Society in a way you can't ignore, or that seems to be contrary to the rules, talk it over. Explain the problem as you see it, and listen to the reply. (Likewise, if someone comes to you, listen carefully before you frame your answer.) Hopefully this will resolve the matter. If you can't communicate, ask someone you and the other party both respect to help, either by relaying messages or by moderating a meeting between you. Try not to go to an officer in charge of the area in question, as such an officer may be tempted or compelled to make a ruling instead of letting you reach an informal agreement.

b.      Write to the person you're having difficulty with. Describe the way you feel you're being damaged, without insults or threats. Ask for the action you feel would set things right, and indicate how long you feel you can wait for a reply before making further distribution of the complaint. Do not send it to anyone else at this time. Hopefully this letter, or a series of direct letters and replies, will eventually lead you to a solution. As long as you feel you're making progress either in understanding or in getting you way, do not go on to step c.

c.      Write a formal letter to the other party. Outline any new points you may have thought of and refer to your previous correspondence. Send a copy to the officer in charge of the area in question, or to the royalty or royal representative nearest the level where you have a dispute. Depending on the situation, it may be a good idea to send copies of the letters you've already written or received on the matter with the copy of the current letter you send to the superior; if you are doing so, be sure to mention it in your letter. (It is very important to proceed openly as you pursue your complaint; things are tense enough already without adding a new–and justified–charge of sneakiness to the general dispute!) Again, set a reasonable time for a reply, and consider it carefully when it arrives. As with step b, continue at this level as long as it looks like there's any progress.

d.      Write directly to the officer in charge of the area in question, with copies to the subject of the dispute, the next higher officer, and the appropriate royalty or royal representative, if any. Explain how you feel you're being mistreated, and ask for specific help. Include the entire previous correspondence; if you have not already shared it with the officer–and mention the enclosures in the text. Evaluate the reply or replies before you decide to go forward.

e.      Repeat step d, moving up the organization and including everyone you've involved on your copy list. Follow you correspondents' advice as to whether or not anyone else at or below their level needs to be consulted. Eventually, you run out of levels.

f.      If no one else has managed to find a solution, the Board will do so. However, there is no guarantee that you will like what they come up with, and there is nowhere else to turn. Even if you get something resembling what you originally asked for, the effect on the Society may well be regrettable, as the Board finds it almost impossible to deal with a specific situation without touching anything else.

g.      While it appears cumbersome, this technique should reach some sort of resolution in a matter of months. The greatest number of levels between you and the Board is five, assuming a dispute between members of a canton whose barony is part of a principality. The important thing is getting a solution, NOT getting to the Board, and the approach outlined in this article will probably let you settle the matter without involving the corporate administration at all.

## C.    Sanctions

1.    Royal Sanctions

a.      The Crown of a Kingdom may sanction subjects, residents and visitors within the borders of the Crown's Kingdom, for just and stated cause. Royal Sanctions take effect from the moment of proclamation, but a notice must be announced in court and also be published in the next available issue of the kingdom newsletter if the sanction is to remain in effect. Within 15 business days of the imposition of the sanction, the specific cause and occasion of the sanction must be explained in writing to the sanctioned individual.

2.    Administrative Sanctions

a.      Officers may impose Administrative Sanctions within their areas of authority, for just and stated cause, only in accordance with the rules defined in their office handbooks or specifically granted to their offices by the Governing Documents of the SCA. Only the Society Seneschal may impose an Administrative Sanction that precludes the holding of any office, including that of Crown.

3.    Expulsion from the SCA

a.      Expulsion precludes the individual from attendance or participation in any way, shape or form in any SCA activity, event, practice, or official gathering for any reason, at any

SCA_000297

time. Expulsions are temporary until the Board imposes a Revocation of Membership and Denial of Participation (R&D). This includes a ban on participation on officially recognized SCA social media (Facebook) sites, officially recognized SCA electronic email lists, and officially recognized SCA webpages.

4.    Reservations to the Board of Directors

a.    Sanctions on Individuals for Actions taken as Crown

The Board explicitly reserves to itself the discipline of individuals for actions taken while serving as Sovereign or Consort of a kingdom. However, the Board will not consider complaints against the Crown before the aggrieved parties have attempted to resolve their problem directly with the Crown, and then with the appropriate kingdom and corporate officers.

b.    Sanctions upon Individuals for Actions taken as Coronet

The Board reserves to itself the final determination regarding discipline of members for actions taken while serving as Sovereign or Consort of a principality. However, the Coronet remains subject to the Crown, and provisions regarding Courts of Chivalry and sanctions. If the Crown believes the Coronet has overstepped the bounds of law and custom, the normal recourse should be in-kingdom mediation and then a Court of Chivalry. If the Board upholds the judgment of such a Court, the affected parties may be subject to loss of any honors and privileges deriving from their reign, and nullification of any official acts dating back to the incident which led to the invocation of the Court. If the Crown feels that rapid action is essential to protect the SCA, it has the option of imposing a Proscription from Active Participation upon the Coronet from the realm, effectively putting the principality reign into abeyance until either conditions change within the kingdom or the Board countermands the order. However, if the Board does not agree with the Crown's judgment regarding the urgency of the situation, the Board may choose to take action against the Crown as well as, or instead of, against the Coronet.

c.    Degradation from the Peerage

The Board reserves the right to degrade a person from the Peerage. However, kingdom law may define conditions and procedures under which a recommendation for such action may be made to the Board. Unless stipulated otherwise by the Board, the Board's decision in such a case applies only to the matter at hand. Nothing prohibits a person who has been degraded from any order of the peerage from being elevated to the peerage at a later date, should the Crown determine that the person in question now meets the requirements of the order to which he is being elevated.

d.    Revocation of Awards of Arms and Grants of Arms

As with Peerages, the Board specifically reserves the right to revoke any Award of Arms or Grant of Arms. Kingdom law may make provisions for offering such a recommendation to the Board.

SCA_000298

APPENDIX B: STANDARD WARRANT FORMS

SCA_000299



# the society for creative anachronism, inc.

P.O. Box 360789 •Milpitas, California 95036-0789 •Tel (408) 263-9305 •Fax (408) 263-0641

## WARRANT OF APPOINTMENT TO EXECUTIVE OFFICE

LEGAL NAME: _____

ADDRESS: _____

TELEPHONE: (HOME) _____ (OTHER) _____

EMAIL ADDRESS: _____ MEMBER NUMBER: _____

SCA REFERENCE NAME: _____

Let it be known that the above-referenced person is hereby appointed to the office of
[ ] President [ ] Vice-President for _____ [ ] Local President (Seneschal)  [ ] Other_____

FOR BRANCH: _____

EFFECTIVE AS OF: _____ AND EXPIRING AS OF: _____

with all rights, privileges, insignia, precedence, and responsibilities appertaining to the office while the Warrant is effective. This executive is specifically empowered to do business as a legal representative for the above-referenced branch of the Society for Creative Anachronism, Inc., including but not limited to making contracts involving the Society for Creative Anachronism, Inc. This Warrant supersedes any existing or previous Warrant for this office.

PRINT:                                          PRINT:

SIGN:                                           SIGN:

OFFICE:                                         OFFICE:

DATE:                                           DATE:

PRINT:
SIGN:
OFFICE:
DATE:

| Required signatures: |
| --- |
| **President:** 3 members of the SCA Board of Directors. **Vice President for Operations (Society Seneschal):** three Board members. **Regional Vice President (Kingdom Seneschal):** Society Seneschal and the current Crown. **Regional Vice President (Principality Seneschal):** Crown or Coronet and the Kingdom Seneschal. **Local President (Seneschal):** Kingdom Seneschal or Principality Seneschal and the current Crown. |

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

SCA_000300

August 2, 2018 Revision



# the society for creative anachronism, inc.

P.O. Box 360789 •Milpitas, California 95036-0789 •Tel (408) 263-9305 •Fax (408) 263-0641

## WARRANT OF APPOINTMENT TO FINANCIAL OFFICE

**LEGAL NAME:** _____

**ADDRESS:** _____

**TELEPHONE: (HOME)** _____ **(OTHER)** _____

**EMAIL ADDRESS:** _____ **MEMBER NUMBER:** _____

**SCA REFERENCE NAME:** _____

**Let it be known that the above-referenced person is hereby appointed to the office of**
[ ] Treasurer  [ ] Vice Treasurer for _____ [ ] Local Treasurer (Exchequer/Reeve) [ ] Other_____

**FOR BRANCH:** _____

**EFFECTIVE AS OF:** _____ **AND EXPIRING AS OF:** _____

**with all rights, privileges, insignia, precedence, and responsibilities appertaining to the office while the Warrant is effective. This treasurer is specifically empowered to do business as a financial representative for the above-referenced branch of the Society for Creative Anachronism, Inc., including but not limited to managing financial transactions with financial institutions. This Warrant supersedes any existing or previous Warrant for this office.**

| | |
|---|---|
| **PRINT:** | **PRINT:** |
| **SIGN:** | **SIGN:** |
| **OFFICE:** | **OFFICE:** |
| **DATE:** | **DATE:** |

**PRINT:**

**SIGN:**

**OFFICE:**

**DATE:**

> **Required signatures:**
> **Treasurer:** three members of the SCA Board of Directors.
> **Vice Treasurer (Society Exchequer):** three Board members.
> **Vice Treasurer (Kingdom Exchequer):** Society Exchequer and current Crown.
> **Vice Treasurer (Principality Exchequer):** Kingdom Exchequer and the current Crown or Coronet.
> **Local Treasurer (Exchequer/Reeve):** Kingdom Exchequer or Principality Exchequer and the current Crown.

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

SCA_000301

August 12, 2018 Revision



# the society for creative anachronism, inc.

P.O. Box 360789 •Milpitas, California 95036-0789 •Tel (408) 263-9305 •Fax (408) 263-0641

## WARRANT OF APPOINTMENT TO OFFICE

LEGAL NAME:

ADDRESS:

TELEPHONE: (HOME) (OTHER) MEMBER

EMAIL ADDRESS:

NUMBER:

SCA REFERENCE NAME:

Let it be known that the above-referenced person is hereby appointed to the office of [    ] A&S Officer

[   ] Herald  [  ] Chronicler [   ] Marshal  [   ] Other _____ FOR BRANCH: _____

EFFECTIVE AS OF: AND EXPIRING AS OF:                with all rights, privileges, insignia, precedence, and responsibilities thereto appertaining the office while the Warrant is effective. This Warrant supersedes any existing or previous Warrant for this office.

PRINT:                                        PRINT:

SIGN:                                         SIGN:

OFFICE:                                       OFFICE:

DATE:                                         DATE:

PRINT:

SIGN:

OFFICE:

DATE:

> **Required signatures:** Corporate and Society Officers: three members of the SCA Board of Directors.
> **Deputy Corporate/Society officers:** two Board members and the appropriate Corporate/Society officer.
> **Kingdom Officers with Corporate Superiors:** Crown and the appropriate Corporate Officer.
> **Other Great Officers and Lesser Officers:** Crown or Coronet and the appropriate kingdom or principality officer, if any.
> **Other officers:** as established by Kingdom Law and custom, but must include more than one signature, and must include royalty.

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

SCA_000302

# THE BY-LAWS OF
# THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I.    NAME

The name of this corporation shall be the Society for Creative Anachronism, Inc., herein referred to as the 'SCA'.

## II.    OFFICES

The principal office of the SCA shall be located in the State of California. The SCA may have other offices as the Board of Directors may determine or as the affairs of the SCA may require from time to time.

## III.    OBJECTIVES AND PURPOSES

The SCA shall be dedicated primarily to the promotion of research and re-creation in the field of pre-17thcentury Western culture, as stated in greater detail in Article II of the SCA's Articles of Incorporation.

## IV.    DEDICATION OF ASSETS

The properties and assets of the SCA are irrevocably dedicated to charitable purposes. No part of the net earnings, properties, or assets of this corporation, on dissolution or otherwise, shall inure to the benefit of any private person or individual, or any member, Director or officer of the SCA. On liquidation or dissolution, all properties and assets and obligations shall be distributed and paid over to an organization dedicated to charitable purposes which has established its tax-exempt status under Internal Revenue Service Code Section 501(c)(3).

## V.    MEMBERS

### A.    Statutory Members

The SCA is a public benefit corporation and shall not have any members within the meaning of Section 5056 of the California Corporations Code. It is not a mutual benefit nonprofit corporation permitting distributions to members.

### B.    Nonstatutory Members

The Board of Directors may designate categories of advisory membership. These will be detailed elsewhere in the Governing Documents of the SCA, Inc. Such advisory members are not members within the meaning of Section 5056 of the California Corporations Code.

### C.    General Conditions and Privileges Of Membership

1.    Access to Membership

Membership in the SCA is open to any interested individual, without restriction of age or citizenship. Memberships are not transferable or assignable. Membership can be terminated only by: (1) lapse following nonpayment of dues, or (2) action of the Board of Directors in accordance with the rules for Revocation and Denial of Membership as defined in the Corporate Policies of the Society for Creative Anachronism, Inc., II.D. (Revocation/Denial of Membership).

2.    Privileges of Members

    a.   General Privileges of Members and Non-members.

SCA_000303

Every member of the SCA is eligible for office and advancement within the SCA, subject to the requirements for such office or such advancement, and to the provisions established above. However, while a group or institution may obtain a membership in order to obtain the newsletters and/or increase its support of the SCA, such membership does not convey the privileges of membership to persons associated with that group or institution. Employment by the SCA as staff, as a contractual agent of the SCA, or as a paid consultant to the SCA does not require membership in the SCA.

b.  Eligibility for Office.

Officers at all levels of the SCA must be members and must have immediate access to the corporate newsletter for their area. This standard also applies to deputies designated as successors to officers subject to this provision, or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

3.  Revocation/Denial of Membership

Membership in the SCA may be revoked and/or denied as provided in Paragraph C.1 of this Article for the following reasons:

a.  conviction of violation of civil or criminal law

b.  actions that endanger the SCA;

c.  violation of the By-Laws or Corpora of the SCA;

d.  formal recommendation arising out of procedures for the purpose defined in Corpora for the medieval structure of the SCA.

4.  Reservations to the Board

The Board shall have the sole authority to define the classes of membership and to establish and revise a schedule of dues. No dues may be set by any branch of the SCA. However, fees for admission to events other than regular business meetings of branches of the SCA shall not be considered dues.

# VI.  BOARD OF DIRECTORS

## A.  Powers

Subject to the provisions of the California Nonprofit Corporation Law, the activities and affairs of the SCA shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors, herein referred to as the Board. The Board may delegate management of the day-to-day operation of the business of the SCA provided that the activities and affairs of the SCA shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board subject to the limitations in the Articles of Incorporation.

## B.  Number of Directors

The authorized number of Directors of the SCA shall not be less than five (5) or more than seven (7) until changed by amendment of this Article of the By-Laws.

## C.  Qualifications of Directors

Each Director shall be a natural person at least 21 years of age, and shall be qualified for independent office under V.C.2.a. of these By-Laws.

It is the intent of the SCA that the composition of the Board shall represent a diversity of skills and experience, to enable the Board to make informed, well-balanced decisions on the SCA's activities.

SCA_000304

August 2, 2018 Revision

## D.    Restriction on Interested Directors

1.    No Director may hold any office defined by the Governing Documents to be incompatible with active service on the Board. Any Director planning to take such an office must resign from the Board immediately upon committing to taking the office.

2.    In addition, not more than forty-nine percent (49%) of the Directors may be 'interested persons', defined as:

a.    any person compensated by the corporation for services rendered to it within the previous twelve (12) months, whether as a full-time or part-time employee, independent contractor, or otherwise, excluding any reasonable compensation paid to a Director as a Director; and

b.    any relative by blood or marriage of any such person. However, any violation of the provisions of this section shall not affect the validity or enforceability of any transaction entered into by the corporation.

## E.    Election and Term

Directors are elected by the unanimous vote of the Board.

### 1.    Probationary Period

Each Director shall be appointed for an initial trial period, commencing as of the date said Director assumes his position, and concluding with determination of confirmation by the remaining Directors. This confirmation shall occur within four (4) months of the end of the second regularly scheduled quarterly meeting of the Board of Directors following the date said Director assumes his position. If the Director is not confirmed, the remaining Directors shall appoint someone else to the Board to finish the assigned term, in which case the new Director is subject to the same initial trial period and confirmation vote as provided for in this section.

### 2.    Term of Service

Directors' terms shall be staggered so that one term ends each six months. Under ordinary circumstances, Directors shall serve fourteen quarters, dating from the meetings at which they are elected. A Director's term begins immediately upon election and acceptance. A Director whose term is expiring may, under extraordinary circumstances, be retained for up to two additional quarters. Such extensions may only be made by unanimous vote of the other Directors. The Director affected must abstain from voting, but may decline to serve. The Board Minutes must describe the circumstances requiring the extension. The extension shall be considered part of the next full term, and a new Director shall be chosen fill the remainder of that term. During the period between acceptance and his or her first meeting, a Director shall receive information routinely distributed to the Board, and shall be bound by its policies regarding the behavior of Directors. Former Directors of the SCA may not be reelected to the Board until a period of at least one (1) year has elapsed after their departure from the Board.

### 3.    Resignation

Should a Director be unable to serve his or her full term, the remaining Directors shall either leave the position vacant until the end of the term, or elect someone to fill the remainder of the term. Failure to attend the last meeting of a term or extension for any reason shall be considered equivalent to resignation at the beginning of that meeting, unless (in the case of a normal term) prior arrangements for an extension were made by the Board and voted in at the current meeting. As specified in VI.B, the number of active Directors may not be allowed to go below 5, except during a meeting affected by an automatic resignation resulting from this paragraph.

## F.    Vacancies and Removal

Directors remain on the Board until expiration of their term of service, resignation, or removal. By a majority

SCA_000305

vote, the Board may remove any Director without cause at any regular or special meeting, provided that the Director to be removed has been notified in writing that such action would be considered at that meeting.

1.     Dismissal of a Director

a.     Impeachment

A Director can be impeached by a letter signed by three (3) Directors, or by a petition signed by a majority of the Corporate Officers or 1,000 of the current advisory members. Additional procedures for petitions of impeachment arising out of the medieval structure of the SCA are defined in Corpora.

b.     Removal

The removal of a Director shall be considered by the Board at its next regular meeting after an impeachment is filed, or at a special election meeting called as provided in VI.I, except that there must be at least ten (10) days' notice in writing to all Directors. If the next regular meeting is more than forty-five (45) days from the time of receipt of a petition of impeachment, a special election meeting shall be called.

2.     Filling Vacancies

All vacancies may be filled by unanimous vote of the Directors then in office, whether or not their numbers constitute a quorum.

3.     Leave of Absence

A Director may take leave of absence from the Board with the concurrence of the remaining Directors. Such leave of absence shall not extend the absentee's term of service on the Board. An interim replacement may be appointed by the Board with the concurrence of the Director taking the leave for the duration of a leave of absence. An interim Director must meet the requirements for a regular term on the Board, and shall have the same voting rights as a regular Director.

## G.     Place of Meetings; Meetings by Telephone

Regular or special meetings of the Board may be held at any place within or outside the State of California that has been designated from time to time by the Board. In the absence of such designation, meetings shall be held at the principal executive office of the SCA.

Notwithstanding the above provisions of this Section, a regular or special meeting of the Board may be held at any place consented to in writing by all the Board members, either before or after the meeting. If consents are given, they shall be filed with the Minutes of the meeting. Any meeting may be held by telephonic (including VOIP) or video conference or similar communications equipment, as long as all Directors participating in the meeting can hear one another, and all such Directors shall be deemed to be present in person at such meeting.  Should a meeting be held in person, any Director may be permitted to attend via telephonic (including VOIP) or video conference or similar communications equipment upon approval of the Chairman of the Board.

## H.     Regular Quarterly Meetings

The Board shall hold a regular meeting in each calendar quarter, for the purpose of appointing Directors and officers of the SCA, and for the transaction of other business. These meetings are open to any advisory member of the SCA. Notice of these quarterly meetings shall be given via publication in the Minutes of the previous meeting.

## I.     Special Meetings

1.     Special meetings of the Board may be called for any purpose at any time by the Chairman of the Board, or by any two other Directors.

SCA_000306

2.      Written notice of the time and place of special meetings shall be delivered personally to each Director or communicated to each Director by telephone, electronic mail, or first-class mail, addressed to the Director at the Director's address as it is shown upon the records of the SCA. In case such notice is mailed, it shall be deposited in the United States mail at least ten (10) days prior to the time of the holding of the meeting. In case such notice is delivered personally or by telephone, or electronic mail, it shall be so delivered at least seventy-two (72) hours prior to the time of the holding of the meeting. Such mailing or delivery shall be due, legal and personal notice to each Director.

3.      Notice of a meeting need not be given to any Director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes of the meeting, whether before or after the meeting, or who attends the meeting without protesting, prior to the meeting or at its commencement, the lack of notice to such Director. All such waivers, consents, and approvals shall be filed with the corporate records or made part of the Minutes of the meeting.

## J.      Action at a Meeting; Quorum and Required Vote

An act of the Board consists of an affirmative decision by a majority of the maximum authorized number of Directors, except as otherwise provided for in the By-Laws. A quorum shall be a majority of the maximum authorized number of Directors.

## K.      Chairman and Vice-Chairman of the Board

The post of Chairman shall be held for such period as the Board shall from time to time determine. No member shall be required to serve as Chairman. If the Chairman is not present or may not serve as Chairman for any reason, the Vice-Chairman shall act as Chairman. Both the Chairman and the Vice-Chairman shall be selected by unanimous consent of the Board.

## L.      Committees

The Board may designate one or more committees to serve at the pleasure of the Board. These committees shall serve as advisory bodies, and shall not exercise the authority or power of the Board.

## M.      Reimbursement of Expenses

Directors and members of committees may receive such reasonable reimbursement for expenses as may be determined by the Board.

# VII.    ADMINISTRATION

## A.      Officers

1.      The officers of the corporation shall consist of a President, a Vice President for Operations, a Vice President for Corporate Operations, a Treasurer, a Secretary, and such others as the Board may from time to time designate. The office of President may be held by the Chairman of the Board of Directors.

2.      Officers of the corporation are elected by a unanimous save one vote of the Board, and shall hold office until their term of service is over, they resign, or they are removed by a two-thirds vote of the Board. The term of service shall be as agreed upon between the officer and the Board. It may be limited or open.

## B.      Corporate Office

The SCA shall maintain a business office to carry out regular administrative work of the SCA. Where overall benefit to the SCA will result, portions of the duties assigned to any officer described or referenced in Paragraphs VII.A.2-4 may be transferred to this office, and such duties as are not explicitly assigned to other officers may be assigned to and performed by this office.

SCA_000307

## C.    Compensation

The salary and other compensation of other officers shall be fixed from time to time by resolution of or in the manner determined by the Board.

# VIII.    CONTRACTS, CHECKS AND FUNDS

## A.    Execution of Corporate Instruments

The Board may, at its discretion, determine the method and designate the signatory officer or officers or other person or persons, to execute any corporate instrument or document, or to sign the corporate name without limitation, except when otherwise provided by law, and such execution or signature shall be binding upon the SCA. Unless otherwise specifically determined by the Board or otherwise required by law, formal contracts and other corporate instruments and documents shall be executed, signed or endorsed by the Chairman of the Board, Vice-Chairman of the Board or the President and by the Secretary or Treasurer.

## B.    Checks, Drafts, Etc.

All checks and drafts drawn on banks or other depositories of funds to the credit of the corporation, or on special accounts of the SCA, shall be signed by such person or persons as the Board shall authorize to do so.

## C.    Gifts

The Board may accept on behalf of the SCA any contribution, gift, bequest, or devise for the general purposes of or for any special purpose of the SCA not inconsistent with the charitable limitations in the Articles of Incorporation.

# IX.    INDEMNIFICATION

1.    To the fullest extent permitted by law, the SCA may indemnify its Directors, officers, employees, and other persons described in Section 5238(a) of the California Corporations Code including persons formerly occupying any such position, against all expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by them in connection with any "proceeding," as that term is used in said section 5238(a), and including an action by or in the right of the SCA, by reason of the fact that the person is or was a person described in that Section. "Expenses" shall have the same meaning as in said Section.

2.    To the fullest extent permitted by law and except as otherwise determined by the Board in a specific instance, expenses incurred by a person seeking indemnification in defending any "proceeding" may be advanced by the SCA before final disposition of the proceeding upon receipt by the SCA of a contract from that person to repay such amount unless it is ultimately determined that the person is entitled to be indemnified by the SCA for those expenses.

3.    The SCA shall have power to purchase and maintain insurance to the full extent permitted by law on behalf of its officers, directors, employees and other agents, against any liability asserted against or incurred by such persons in such capacity or arising out of the person's status as such.

# X.    BOOKS AND RECORDS

The SCA shall keep correct and complete books of account and records and shall also keep Minutes of the proceedings of the meetings of its Board, and shall keep in the Corporate Office a record giving the names and addresses of the persons described in Article V, which record shall not be copied or viewed by any person, except with the prior written permission of the Board. The books of account may be inspected by any member or member's agent, for any reasonable purpose at any reasonable time.

SCA_000308

# XI.   FISCAL YEAR

The Fiscal Year of the corporation shall begin on the first day of January and end on the last day of December in each year.

# XII.   AMENDMENT TO BY-LAWS

1.      These By-Laws may be altered, amended or repealed and new By-Laws may be adopted by the unanimous consent of the Board. Such amendments and alterations must be made in writing, and must immediately be placed in the records of the SCA, and appended to copies of the By-Laws available to the membership.

2.      Under normal circumstances, the Board will publicize proposed changes to the By-Laws in sufficient time to allow comment from the membership before making a final determination.

3.      The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made to the By-Laws. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

# XIII.   DEFINITION OF STRUCTURE

## A.      The Corpora

The Board shall establish and maintain a document defining the structure of the medieval organization used by the SCA in its re-creations, and including minimum requirements and guidelines for that organization. This document is referred to as the Corpora of the SCA. The Corpora may be altered, amended or repealed in part or in whole by a two-thirds vote of the Board. Such amendments and alterations must be made in writing and must immediately be placed in the records of the SCA, and appended to copies of the Corpora available to the membership.

## B.      Corporate Policies of the SCA, Inc.

The Board shall establish and maintain a document defining policies applying to the SCA. This document is referred to as the Corporate Policies of the SCA, Inc. The Corporate Policies may be altered, amended or repealed in part or in whole by a two-thirds vote of the Board. Such amendments and alterations must be made in writing and must immediately be placed in the records of the SCA, and appended to copies of the Corporate Policies available to the membership.

# XIV.   PARLIAMENTARY PROCEDURE

In the discretion of the Chairman of the Board, business meetings of the Board, or any portion of such meeting, shall be conducted according to the procedures defined in the latest edition of *The Standard Code of Parliamentary Procedure* by Alice Sturgis.

SCA_000309

# THE CORPORATE POLICIES
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I. MEMBERSHIP TYPES

Membership in the SCA is open to any interested individual. Membership takes effect when the Corporate Office receives a prospective member's application. Positive confirmation of membership consists of:

- a valid membership card;
- appearance of the name with a valid membership on a printout from the Corporate Office;
- a membership label issued by the Corporate Office showing the name and expiration date;
- a postcard or letter from the Corporate Office confirming that the membership has been received;
- a proof of membership letter generated from the SCA membership webpage.

### A. Statutory Members

The SCA is a public benefit corporation and shall not have any members within the meaning of Section 5056 of the California Corporations Code. It is not a mutual benefit nonprofit corporation permitting distributions to members.

### B. Non-Statutory Members

The Board of Directors has designated the following categories of advisory membership. Such advisory members are not members within the meaning of Section 5056 of the California Corporations Code. California law supports the SCA's use of the terms "member" and "membership" in the common English meaning, referring to persons who have paid to be associated with the organization.

1. Sustaining Membership conveys eligibility to hold office in the SCA, a subscription to a Kingdom newsletter, the option to subscribe to other Corporate publications, and any other privileges designated by the SCA or its subdivisions as accruing to members of the SCA. This type of membership is considered a subscribing membership.

2. International Membership conveys the privileges of Section I.B.1. This membership type is available only in locations outside the United States which are part of the SCA, Inc., and not subject to an affiliate corporation. This type of membership is considered a subscribing membership.

3. Associate Membership conveys eligibility to hold office in the SCA, except where other membership categories are required Governing Documents. Associate membership also entitles the holder to any privileges designated by the SCA or its subdivisions as accruing to members of the SCA, except where another membership type is specifically required by the organization defining the privilege. This type of membership is not considered a subscribing membership.

4. Family Membership extends the privileges of Section I.B.1 to one additional adult and any children aged 21 or younger who live at the same physical address as a member defined in paragraphs B.1-B.2 of this Article. This type of membership is not considered a subscribing membership.

5. Institutional Membership allows a library or school to subscribe to Tournaments Illuminated and The Compleat Anachronist without acquiring the regional newsletter, and without any of the other privileges of membership. The Board reserves the right to determine whether or not a given organization qualifies for this membership type.

SCA_000310

# II. GENERAL CONDITIONS AND PRIVILEGES OF MEMBERSHIP

## A. Access to Membership

Membership in the SCA is open to any interested individual, without restriction of age or citizenship. Membership can be terminated only by:

1.      lapse following nonpayment of dues, or

2.      action of the Board of Directors.

Memberships are not transferable or assignable.

## B. Privileges of Members

Every natural person holding membership in the SCA is eligible for office and advancement within the SCA, subject to the requirements for such office or advancement, and to the provisions established above. A group or institution may obtain a membership of the types listed in V.B.1-3 in order to obtain the newsletters and/or increase its support of the SCA; such membership does not convey the privileges of membership to any individual associated with that group or institution.

## C. Eligibility for Office

Officers at all levels of the SCA must be members as defined in I.B.1-4 above, and must have immediate access to the corporate newsletter for their area provided by a subscribing membership at their residence. (Alternate access arrangements may be made on a case-by-case basis for people with post office boxes and for International Members.) This standard also applies to deputies designated as successors to officers subject to this provision, or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

1. No Director may hold any Crown, Principality Coronet, or Great Office of State of a kingdom or principality while serving on the Board.

2. Minors as officers

   a. Subject to Section C.2.c. below minors fifteen (15) years of age or over may serve as officers, only with the express written approval of their parent or legal guardian and their kingdom superior, who must first be notified of the age of the minor.

   b. Minors under fifteen (15) years of age may not serve as officers.

   c. Minors may not serve as group marshals or as marshal in charge, seneschal or exchequer.

## D. Revocation/Denial of Membership

A revocation or denial of membership by the Board enforces exclusion from all SCA functions in all SCA kingdoms.

## 1. Grounds

Membership in the SCA may be revoked and/or denied at the sole discretion of the Board of Directors for the following reasons:

- Actions that endanger public health and safety, or disturb the peace of an SCA activity in a manner which would make it reasonable for the modern authorities to be called in for assistance.

- Actions in the course of performing official duties on behalf of the SCA which would make it reasonable for the modern authorities to be called in for assistance.

SCA_000311

- Actions that endanger the SCA.

- Violation of the Governing Documents or other rules of the SCA.

- Conviction of violation of civil or criminal law.

Membership may also be denied if the reasons for a previous revocation of membership are still considered valid by the Board.

## 2. Board Consideration

The Board will consider a request for revocation or denial of membership in the SCA under any of the following circumstances:

- Petition to the Board by 30% or more of the membership of the kingdom of residence of the person being considered for such revocation or denial who are currently members of the SCA.

- Petition by a majority of the kingdom great officers and peers of the kingdom of residence who are currently members of the SCA.

- The recommendation of a duly-constituted kingdom court of chivalry.

- Documentation of cause for absolute banishment.

- For such reasons described in the Sanctions Handbook.

## 3. Notification

Upon receipt of a request for Board action affecting membership, the Board shall notify the person(s) in question of when the matter will be considered and invite all relevant documentation and appeals.

Due to the serious nature of these proceedings the Board may elect to temporarily prohibit a person's participation in Society functions until a decision on revocation and denial of membership has been reached. In such a case, the Board shall make all reasonable efforts to expedite these proceedings and prevent unnecessary delay. See the Sanctions Handbook for details of the sanction process.

## 4. Appeal

A revocation or denial of membership may be appealed, but such appeal must be accompanied by new evidence that warrants re-examination by the Board. At the conclusion of the imposed term of revocation or denial, or if an appeal as provided above is accepted by the Board, exclusion from SCA events shall be lifted, and the individual shall be allowed to (re)apply for membership in the SCA, unless membership is again denied.

## E. Reservation by the Board

The Board shall have the sole authority to define the classes of membership and establish and revise a schedule of dues. No dues may be set by any branch of the SCA. However, fees for admission to events other than regular business meetings of branches of the SCA shall not be considered dues.

# III. ADMINISTRATION

The officers of the corporation shall consist of a President, a Vice President for Operations, a Vice President for Corporate Operations, a Treasurer, a Secretary, and such others as the Board may from time to time designate. The office of President may be held by the Chairman of the Board of Directors. The office of President may be held by the Chairman of the Board of Directors.

Officers of the corporation are elected and serve as described in the By-Laws.

SCA_000312

## A. President

The President is the principal spokesperson for the SCA. The President may sign and authorize such instruments as he or she deems appropriate to the conduct of the SCA's proper business, and may delegate similar responsibilities. In the event of absence or incapacity of the President, the duties shall be apportioned at the discretion of the Board.

## B. Vice President for Operations

The Vice President for Operations shall manage the administration of the SCA's historical re-creations through a network of Regional Vice Presidents, known as Kingdom Seneschals. The Vice President for Operations is authorized by the Board to sign instruments required for the conduct of the SCA's historical recreations, and may delegate similar responsibilities. This officer also serves as Society Seneschal. The duties of this position are further defined in Corpora.

## C. Vice President for Corporate Operations

The Vice President for Corporate Operations shall be responsible for maintaining the membership files of the SCA; for processing membership applications and depositing membership monies as instructed by the Treasurer; and for preparing mailing lists for publications of the corporation. The Vice President for Corporate Operations is in charge of the day-to-day operations of the Corporate Office, and will supervise any office staff. The Vice President of Corporate Operations shall be financially responsible for all membership monies to the Treasurer.

## D. Secretary

The Secretary shall be responsible for the regular administrative duties of the Board and the corporation, including correspondence, Minutes of all meetings of the Board, and such other administrative duties as shall be assigned by the Board or the President. The Secretary shall maintain all necessary records of the corporation not maintained by other officers or offices. The Secretary shall be responsible to the President and the Board for the regular performance of the administrative duties of the corporation.

## E. Treasurer

The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the SCA, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial statements.

The Treasurer shall deposit (or cause to be deposited) all monies and other valuables in the name of and to the credit of the SCA with all such depositories as may be designated by the Board. The Treasurer shall disburse (or cause to be disbursed) the funds of the SCA as may be ordered by the Board, shall render to the Board, whenever they request it, an account of all the Treasurer's transactions as Treasurer and of the financial condition of the SCA, and shall have such other powers and perform such other duties as may be prescribed by the Board or these By-Laws.

The Treasurer shall supervise a person known as the Exchequer holding a separate position within the structure of the Society's historical re-creation. The title and duties of this position are defined in Corpora.

## F. Other Offices

The Board may designate other offices as necessary.

# IV. WAIVERS – GENERAL

A. The General Membership waiver shall be incorporated into the Membership Application form, to be filled out by the prospective or renewing member at the time the membership application form is filled out. This Waiver covers attendance and participation at Society events.

SCA_000313

B. A membership card ("blue card") with a condensed form of the waiver text printed on the back shall be provided to members who have executed the general waiver as part of becoming members or renewing their memberships.

C. Members who have not executed the general waiver as a part of becoming members or renewing their memberships shall be issued a different colored membership card and shall be subject to the provisions contained in the General Waiver Policy as if they were not members of the SCA, Inc.

D. Non-members, and members who have not brought their blue membership cards, are required to comply with the waiver signing provisions contained in the General Waiver Policy or they shall be denied admittance to SCA sponsored activities coming within the purview of said Waiver Policy.

# V. WAIVERS - COMBAT

## A. Waivers for SCA Combat-Related Activities

Waivers are required for participation in SCA combat and related activities. The SCA General Membership waiver is the text required for use in the United States. Alternative texts may be approved by the Board for use in other countries. Proof of waiver will be established as follows:

1. To be authorized, or to engage as an authorized participant in SCA combat or related activities, a person must present a current valid membership card indicating that the appropriate waiver is on file with the SCA, Inc. or they must sign a waiver with the same text and comply with all the provisions of that policy.

2. To train for authorization at SCA-sponsored practice sessions, a person must either present a current valid membership card indicating that the appropriate waiver is on file with the SCA, Inc. or they must sign a waiver with the same text and comply with all the provisions of that policy.

3. Prior to the training of a minor in any SCA combat-related activity, the parent or guardian of the minor must witness the activity, discuss it with a witnessing marshal, and execute a Waiver for the minor. The witnessing marshal must be explicitly authorized to perform this function by the Earl Marshal of the kingdom. The marshal who authorizes a minor person for any form of SCA combat-related activity must be the Kingdom Earl Marshal or the Principality Marshal. This need not be the same person as the witnessing marshal.

## B. Medical Authorization for Minors:

Any minor involved in SCA combat-related activities at an event must have a parent or properly-executed Medical Authorization Form for Minors designating some adult person present at the event as able to authorize medical treatment for that minor in the case of any emergency.

# VI. WAIVERS - PROCEDURES

1. Anyone attending any event sponsored by a branch of the SCA Inc. who is not able to present a valid SCA Inc. waiver card/blue membership card must execute a waiver as follows:

   a. All US Branches: must execute a waiver with the text adopted by the Board of Directors at each such event, practice or function

   b. All non-US Branches

      i. must execute a waiver with the text adopted by the Board of Directors at each such event, practice or function, or

      ii. must use a country-specific waiver that has been approved by the US Board of Directors, or

      iii. must submit to the US Board of Directors a letter of legal opinion stating that the waiver

SCA_000314

requirement is not necessary in that particular country.

2. The text of all waivers must be the language approved by the Board of Directors for waiver usage, subject to individual modern jurisdictional requirements. Such alternative texts must be approved by the Board of Directors prior to usage. Roster style waivers are acceptable providing that the full text of the waiver language is included.

3. An event, for the purposes of this section only, is defined as any recreation function announced in the branch, Kingdom, or Principality newsletter. Business meetings, demos, guild meetings, dance practices, or planning sessions are specifically excluded from these provisions. Combat or Fighter practices are not excluded and waivers must be collected from those actively participating in the combat related activities at such practices.

4. Any function at which combat related activities will occur fall under the auspices of this waiver policy, regardless of what other activities may be occurring at the function. If there is a doubt about whether a specific function falls under this policy, the Kingdom Seneschal is directly empowered by the Board to make that determination and report same in their next regularly scheduled report.

5. The local Seneschal, or other officer in charge of any function at which waivers will be required, is responsible for ensuring that a copy of that Kingdom's Law and the current Organizational Handbook are available at that function.

6. Each Kingdom shall have a single responsible officer ("Waiver Secretary") as a deputy to the Kingdom Seneschal to ensure that all required waivers, rosters, and sign-in sheets are collected and safely stored within a reasonable time after each event. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required.

7. Each Kingdom shall store all original executed waivers, rosters, and sign-in sheets, or legally accepted facsimiles, including those stored on electronic media, in such a manner that a responsible party can easily retrieve any needed waiver.

Local groups need not maintain copies of these records. Kingdoms shall maintain the adult waivers for seven years and the minor waivers for 20 years.

## VII. POLICY ON FINANCIAL RESPONSIBILITY AND REDRESS

It is the policy of the Society for Creative Anachronism, Inc. to vigorously pursue legal action and redress on the part of the Society for Creative Anachronism, Inc. and its members in any case of financial malfeasance or misfeasance involving SCA funds.

## VIII. POLICY ON ALCOHOL

Manufacturing, distributing, selling, serving, or furnishing of alcoholic beverages by the SCA or its branches or subdivisions is prohibited within the United States and its territories.

The use of any SCA funds for the purchase of potable alcohol, except for such quantities as may be necessary for cooking, is prohibited in the United States and its territories.

Officers are not prohibited from serving alcohol; however, it must be done as individuals, and not as part of their official duties as officers.

Officers are not prohibited from giving gifts of alcohol; however, it must be done as individuals, and not as part of their official duties as officers. Giving or receiving gifts of alcohol in court is not considered to be part of an officer's official duties.

## IX. POLICY ON FIRST AID AT EVENTS OR SCA ACTIVITIES

While organized first aid services are desirable at events, the Society and its branches may not be placed in the position of promising to provide these services. Therefore, while branches are encouraged to have

SCA_000315

qualified volunteer first aid personnel available, they are specifically prohibited from requiring the presence of a medical or first aid officer at events, and from in any way implying that the Society's sponsorship of an event depends upon the presence of organized first aid services.

There shall be no ownership or possession by any branch or recognized guild of the Society for Creative Anachronism, Inc. of the following Medical Equipment: Automated External Defibrillators (AED).

# X. POLICY ON ELECTRONIC COMMUNICATIONS

## A. Electronic Publication of SCA Documents

When official corporate documents are published electronically on a site not sponsored by the SCA, Inc., the original copyright notice for the document must be provided along with the text. The following addition should be made to the copyright notice:

"In cases of conflict, the governing version of this document is (title of document), copyright (date) by the Society for Creative Anachronism, Inc., and obtainable in printed form from the SCA Stock Clerk, P.O. Box 360789, Milpitas CA 95036. Disputes over the contents of this document will be decided in favor of the printed version available from the SCA, Inc."

## B. Participation of SCA Officials in Electronic Communications Media

1. Unless otherwise stated as a prerequisite of office, electronic communication is not required of any officer. Traditional paper correspondence is always acceptable, and is the default means for official correspondence.

2. The SCA, Inc. neither prohibits nor requires members' or officers' participation in electronic communications media such as newsgroups or mailing lists.

## C. Electronic Communications to and from SCA Officers

1. Electronic communications to SCA officers may be regarded as formal communications only if approved in advance by the officer, or if a non-automated confirmation of receipt is obtained.

2. Messages posted for general attention on any public electronic communications forum are not regarded as formal communications to an officer, whether or not that officer is known to participate on the forum in question. Communications posted by corporate or kingdom officers to their officer-specific forums may be considered official communications to those officers subscribed to the forum only upon return of a non-automated confirmation of receipt.

3. Any policies or procedures governing the handling of correspondence, such as maintenance of file copies for correspondence with lasting effect, apply equally to electronic mail. Officers must ensure that any electronic files are passed on in a format readable by their successor.

4. SCA officers must distinguish between their personal opinions and official statements or policies of their office in electronic communications.

# XI. POLICY ON COINAGE AND CURRENCY

While the SCA, Inc. supports and encourages the study of period numismatics, it is not the policy of the SCA, Inc. to endorse or require the acceptance of privately minted coinage or other tokens at SCA-sanctioned events. The SCA, Inc. or its branches shall not require the acceptance of privately minted coinage or other tokens as payment for any goods or services at any SCA-sanctioned events. Any such transactions may be conducted at the discretion of the individuals involved, as with any other barter transaction. In such cases, compliance with applicable tax laws is the responsibility of the individuals.

SCA_000316

## XII. POLICY ON TRADE MARKS

The names and armory (devices and badges) of all groups and awards/orders which are registered on the registry of the Society Herald to any SCA Kingdom, Principality or any branch or subgroup thereof, are owned by the SCA. This includes names and armory of guilds and other artisan groups registered with the Society Herald by the SCA or branches thereof, including any other such marks as would be considered "collective marks" designating quality, origin or distinguishing features or goods or services. They may be used or reproduced only upon permission of the Society President or authorized delegate.

## XIII. POLICY ON ACCESSIBILITY TO SOCIETY FUNCTIONS

The SCA, Inc. will not discriminate against any member or participant on the basis of race, sex, religion, national origin, age or disability. The SCA, Inc. will comply with all laws of the nation in which the meeting or event is held. For any meeting or event held in the United States, the SCA, Inc. will comply with the Americans with Disabilities Act. The SCA, Inc. will provide reasonable accommodations to qualified individuals with disabilities to enable all participants to fully enjoy the events whenever it is possible to do so. The SCA, Inc. will at all times attempt to provide reasonable accommodations, while preserving the fundamental nature of the SCA event.

## XIV. POLICY ON LAND USE / REAL ESTATE

Funds may be designated to the purchase or improvement of real estate by branches, provided that the source, maintenance, and purpose of any such fund are clearly designated within the branch's financial policy.

No representative of the SCA may financially obligate the SCA to the purchase or substantial improvement of real estate without prior approval of the Board of Directors. An improvement will be considered substantial if:

    a. It requires a building permit or other clearance from the local government;

    b. It increases the fair market value of the property; or

    c. It is constructed in a manner that makes its portability to another site questionable or not feasible.

A separate incorporation for the purpose of holding real estate may be required by the Board of Directors.

## XV. TRANSLATION OF CORPORATE DOCUMENTS

The following clause will be placed in all documents published by the Society for Creative Anachronism, Inc. or any of its branches that are translated into a language other than English and contain rules or policies of the Society for Creative Anachronism, Inc. or that branch.

*The approved English language version of any Society for Creative Anachronism, Inc. document is the official version. In case of conflict between the English language version and a translation into another language, the English language version governs.*

## XVI. AUTHORITY TO RETAIN LEGAL COUNSEL

Only the President of the Society for Creative Anachronism, Inc., has the ability to retain legal counsel (attorney, barrister, solicitor, et. al.), whether paid or unpaid (pro bono) on behalf of the society for Creative Anachronism, Inc. or any of its branches. No other officer, at any level of governance of the Society for Creative Anachronism, Inc. has the authority to retain (even pro bono) legal counsel (attorney, barrister, solicitor, et. al.) to advise or represent the Society for Creative Anachronism, Inc. or any branch, without prior written authorization and confirmation of the retention of such counsel from the President.

SCA_000317

# XVII. AMENDMENT TO CORPORATE POLICIES

Under normal circumstances, the Board will publicize proposed changes to Corporate Policies in sufficient time to allow comment from the membership before making a final determination.

The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made to Corporate Policies. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

SCA_000318

# THE ARTICLES OF INCORPORATION
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

CERTIFICATE OF AMENDMENT OF ARTICLES OF INCORPORATION OF

THE SOCIETY FOR CREATIVE ANACHRONISM, INCORPORATED

HILDA POWERS and CLIVEDEN CHEW HAAS certify that:

They are the president and the secretary, respectively, of the SOCIETY FOR CREATIVE ANACHRONISM, INCORPORATED, a California Non-Profit Corporation.

The Articles of Incorporation shall be amended to read as herein set forth in full:

I.   The name of this corporation shall be Society for Creative Anachronism, Incorporated.

II.  This corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for charitable purposes. The purposes for which this corporation is formed include:

   a. Research and education in the field of pre-17th-Century Western Culture.

   b. Generally, to engage in research; publish material of relevance and interest to the field of pre-17th-Century Western Culture; to present activities and events which re-create the environment of said era, such as, but not limited to, tournaments, jousts, fairs, dances, classes, et cetera; to acquire authentic or reproduced replicas of chattels representative of said era; and to collect a library.

   c. This corporation shall have and exercise all rights and powers conferred upon nonprofit corporations under the laws of the State of California, provided that all activities shall be incidental to and in the furtherance of the purposes set forth in II.a. and b. above.

III. In accordance with the provisions of Section 9913 of the California Corporations Code, this corporation elects to be governed by all of the provisions of the California Nonprofit Public Benefit Corporation Law not otherwise applicable to this corporation under Sections 9910-9927 of the Corporations Code.

IV.  This corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (1) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law), or (2) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law).

   No substantial part of the activities of this corporation shall consist of the carrying on of propaganda or otherwise attempting to influence legislation, nor shall this corporation participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of (or in opposition to) any candidate for public office.

V.   The property of this corporation is irrevocably dedicated to charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for charitable purposes and which has established its tax exempt status under Section 501(c) (3) of the Internal Revenue Code.

SCA_000319



# SCA Sanction Guide
## January 2018 Edition

Copyright 2018 by The Society for Creative Anachronism, Inc. All Rights Reserved. This handbook is an official publication of The Society for Creative Anachronism, Inc., a nonprofit organization dedicated to research and recreation of pre-17th century European history. Copies of this document can be ordered from SCA Marketplace, P.O. Box 360789, Milpitas, CA 95036-0789, or downloaded at www.sca.org.

Members of The Society for Creative Anachronism, Inc., may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the content. The contents of the document are posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.

SCA_000320

## TABLE OF CONTENTS

**I.    SCOPE AND INTENT**                                                        **3**
    **A.    Purpose of this Document**                                         **3**
    **B.    Purpose of Sanctions**                                             **3**
    **C.    Code of Conduct**                                                  **3**
    **D.    Roles and Responsibilities**                                      **3**
    **E.    Mediation**                                                       **4**
    **F.    Notification**                                                    **4**

**II.   TYPES OF SANCTIONS**                                                       **5**
    **A.    Administrative Sanctions**                                        **5**
    **B.    Royal Sanctions**                                                 **6**
    **C.    Expulsion from the SCA**                                          **7**
    **D.    Revocation of Membership and Denial of Participation (R&D)**      **8**

**III.  SANCTION PROCEDURES**                                                      **8**

**IV.   SANCTION-RELATED TOPICS**                                                  **10**
    **A.    Revocation of Membership and Denial of Participation (R&D)**      **10**
    **B.    Violation of Terms of Sanction**                                  **11**
    **C.    Reservations to the Board**                                       **11**
    **D.    Guidelines for Drachenwald**                                      **11**
    **E.    Guidelines for Lochac**                                           **12**

**APPENDIX A: INVESTIGATOR'S GUIDE**                                               **15**
    **A.    Introduction: Purpose and Scope of this Guide**                   **15**
    **B.    Nature of the Investigation Process**                             **15**
    **C.    Selection & Appointment of Investigators**                        **15**
    **D.    Behavior of Investigators**                                       **16**
    **E.    The Investigation**                                               **17**
    **F.    The Report to the Society Seneschal or Kingdom Seneschal**        **18**
    **G.    Investigation Report Template**                                   **20**

**APPENDIX B: TEMPLATE ANNOUNCEMENT AND LETTERS**                                  **21**
    **A.    Announcements in Newsletter**                                     **21**
    **B.    Announcements in Court**                                          **22**
    **C.    Notification Letters**                                            **23**
    **D.    Voluntary Revocation of Membership & Denial of Participation**    **31**

SCA_000321

# I.  SCOPE AND INTENT

## A.  PURPOSE OF THIS DOCUMENT

This document sets forth the sanction policy for the Society for Creative Anachronism, Inc. In the hierarchy of governing documents of the Society, the policies and procedures set forth in this guide fall immediately below the Society Seneschal's interpretations of Corpora found in the Seneschals' Handbook. Policies for international groups and affiliates may differ according to their affiliate agreements and governing documents.

## B.  PURPOSE OF SANCTIONS

The purpose of a sanction is to protect the SCA and participants, by removing or limiting the participation of an individual who has violated the rules of the SCA, Kingdom law or modern law. Behavior, past or present, that places the SCA at risk is also subject to sanction. Sanctions should be tailored to the gravity of the offense. Interpersonal conflicts should be handled at the lowest level

## C.  CODE OF CONDUCT

It is expected that participants in the SCA shall treat each other with respect and civility and this extends beyond SCA gatherings. Participants expressing themselves in any forum on an issue related to the SCA shall likewise maintain civility and courtesy. When considering sanctions in response to behavior, the sanctioning authority shall consider the extent of the public comment as well as the gravity of injury done to an individual local branch, Kingdom or the SCA. Behavior that is disruptive to the peace and well-being of the SCA is subject to sanction from an expulsion to Revocation of Membership and Denial of Participation (R&D) especially where there is a continuing course of conduct.

## D.  ROLES AND RESPONSIBILITIES

1. The SCA, operating through its Board of Directors, reserves the right to sanction any individual or group of individuals in the SCA regardless of membership status, title or position (Corpora I.F). The Board reserves the right to modify these policies and reserves unto itself any and all rights related to sanctions not set forth in this sanction policy. The Board is the final arbiter of any sanction and shall hear any appeals.

2. The Society Seneschal may impose administrative sanctions, investigate matters that impact the SCA and/or its members, review all Royal Sanctions and Administrative Sanctions imposed at the Kingdom level.   An inquiry may be made by the Society Seneschal; however, the Society Seneschal shall seek the approval of the Chairman of the Board prior to initiating a formal Society level investigation.   The Society Seneschal may amend the sanction policy only with the approval of the Board of Directors.   The Society Seneschal may assign investigators to be his deputies (Kingdom Seneschals may also assign investigators); investigators are fact finders and must follow the guidelines as set out in this document.

3. The King & Queen or Sovereign & Consort, acting jointly as the Crown, may initiate a Royal Sanction; those sanctions shall be presented to the Society Seneschal for review (Corpora X). All royal sanctions, other than banishment from the Royal Presence, may be reviewed by the Board if the sanction is properly appealed with the exception of an expulsion from the SCA which is automatically reviewed by the Board . The Crown has

the responsibility to notify the Kingdom Seneschal of all Royal Sanctions; however, the Kingdom Seneschal must join in an expulsion from the SCA to be valid. In the event of a dispute between the Crown and a Kingdom Seneschal over an expulsion, the Society Seneschal shall determine whether the expulsion is valid. Before the Crown imposes a sanction on an individual who resides in another Kingdom, the sanctioning Crown must notify the Crown of that individual's Kingdom of residence and the Society Seneschal (Corpora IV.G.11).

4. Kingdom Seneschals and relevant Kingdom Officers shall oversee Administrative Sanctions in individual Kingdoms until those sanctions are presented to the Society Seneschal who shall be notified of the disposition of all sanctions originating in the Kingdom. The Society Seneschal and relevant Society Officers may endorse the administrative sanction and impose a further administrative sanction at the Society Level.    Administrative Sanctions imposed at a Kingdom level will not be automatically reviewed by the Board unless properly appealed (Corpora VII.b.x).

5. Persons Who Are Sanctioned:

    a. Shall be notified that they are being sanctioned in writing within fifteen (15) business days of the initiation of the sanction by the initiating authority. The sanctioning authority shall give a general notification of the factual basis giving rise to the sanction).

    b. May appeal to a higher authority except in the case of a Banishment from the Royal Presence (Corpora I.f);

    c. Shall be permitted to offer a statement of events upon appeal, to wit:

        (i)     to present any evidence that supports their position or actions,

        (ii)    afforded the right to supplement that evidence should additional facts come to light or in order to rebut subsequent allegations not contained in the initial complaint but discovered in the course of the investigation and

        (iii)   discuss the sanction in a manner consistent with the Code of Conduct (Corpora I.C.5).

6. While participants have a right to offer a confidential written complaint to the Kingdom Seneschal or Crown, the complainant must understand that if the complaint goes forward to an investigation, the complaint will no longer be confidential as their complaint will be made available to the Board of Directors and the Society Seneschal.

7. Confidentiality: Only modern and SCA names, the sanction type and the sanction term can be shared with the membership.

8. The facts put forward by an alleged victim of either physical or sexual assault which is the basis of the investigation may be provided to the alleged perpetrator through their interview by the investigator; however, the identity of alleged victims of physical or sexual assault (As well as any witnesses in an investigation who may be reasonably believed to be he potential subject of retaliation) should be limited to Complainant Doe or Witness Doe. The identity of a victim and witnesses shall be maintained by the investigator and ranking seneschal with all names and statements being provided to the Board of Directors. No written reports will be provided to any party or their agent as

those reports are <mark>the sole property of the Board of Directors and the SCA Inc.</mark> Furthermore, the alleged victim must not be contacted by said alleged perpetrator.

### E.  MEDIATION

While mediation is appropriate in some cases involving interpersonal conflict, it is not a precondition to the issuance of a sanction. Nor is mediation required when imposing administrative sanctions for violations of rules or policies of the Seneschal, Marshalate, Heralds, and Exchequers.

### F.  NOTIFICATION

Once a decision has been made to impose a sanction on an individual, the following notifications should take place, in the order as listed where ever possible:

1. Initial notice of sanction to subject of sanction:

   The individual must be timely notified in writing or in person (especially at an event) or by phone (before an event) followed up by written notice as described in Section D.5.a. as noted above. A notification letter and summary of verbal notice must be included in the sanction report.

   a.  The Royal Sanction must be read at an official SCA court at a published event.

   b.  The Royal Sanction must be published in the Kingdom newsletter.

   c.  The Royal Sanction, read or published, shall only include the sanctioned individual's modern and SCA name, the type of sanction imposed, the date upon which the sanction is imposed and the duration of the sanction.

2. <mark>The formal Royal Sanction letter to the subject of the sanction:</mark>

   a.  <mark>Shall be sent to the sanctioned individual within 20 business days from the imposition of the sanction;</mark>

   b.  <mark>Shall include:</mark>

       i.  <mark>Date of any attempted conflict resolution, mediation, or mitigation where applicable;</mark>

       ii.  <mark>Date sanction went into effect;</mark>

       iii. <mark>Type of sanction;</mark>

       iv.  <mark>Specific basis/reason(s) giving rise to the sanction;</mark>

       v.  <mark>Term/duration of the sanction;</mark>

3. Review of Expulsion

   <mark>If the Board upholds the expulsion, an expulsion letter shall be sent to the individual within a reasonable period of time. The expulsion letter shall include:</mark>

       a.  Date the expulsion went into effect;

       b.  Specific basis/reason(s) giving rise to the expulsion;

       c.  Term/duration of the expulsion, i.e. upon the close of the investigation;

       d.  A link or reference to the SCA Sanction Guide along with reference to the sanction; review process contained therein;

    e.   If the Board chooses to initiate a Revocation of Membership and Denial of Participation (R&D) investigation, then the subject shall be notified of this investigation by the Society Seneschal in the expulsion letter which should also include contact information for the Society Seneschal allowing for a response by the sanctioned individual.

4.  Society Seneschal shall send notice that the sanctioned individual's membership has been revoked and denied.

## II.  TYPES OF SANCTIONS

### A.  ADMINISTRATIVE SANCTIONS

1.  Definition:   A restriction or ban on holding an office or participation in certain SCA activities imposed by a warranted officer of the SCA.

2.  Authority: Kingdom and Society Officers may impose Administrative Sanctions within their areas of authority.

3.  The Crown may suspend or remove an officer for just cause; however, this is not an administrative sanction. If the Officer is suspended for just cause, cause will initially be determined by the Society Seneschal and that decision will be reviewed by the Board of Directors. The suspended officer may return to office upon the end of the Crown's reign; however, an officer removed for just cause, there is no right of reinstatement.

4.  Only the Society Seneschal may impose an Administrative Sanction that precludes the holding of all offices, including that of Crown and only with the approval of the Board.

5.  Types of Administrative Sanctions are:

    a.  Temporary suspension from office.

    b.  Removal from office.

    c.  Revocation of authorization to participate in certain SCA activities, e.g. fighting.

    d.  Removal of a disruptive individual or individuals from a single event by the officer responsible for the event as defined in the appropriate section of Corpora.

6.  Duration: The duration of an Administrative Sanction varies based on the level at which it was imposed. Officers at the Kingdom or Principality level may not impose sanctions lasting longer than two years. Society Officers may not impose indefinite sanctions; only the Board may impose indefinite or permanent Administrative Sanctions requested by Society Officers. Officers at all levels may request that their superior officer impose sanctions of a longer duration than they themselves may impose; however, nothing in this section is to be construed as interfering with the right of officers at all levels to appoint and remove deputy officers as they see fit. Administrative Sanctions should not be a substitute for appropriate action by the Crown; however, this does not preclude an officer from imposing additional appropriate sanctions upon an individual that the Crown has sanctioned.

### B.  ROYAL SANCTIONS

1.  Definition: A restriction or ban on any level of participation or activity of an individual imposed by the Royalty of a Kingdom or Principality of the SCA.

SCA_000325

2. Authority: The Crown may sanction subjects, residents, and visitors within the borders of the Crown's Kingdom, for just and stated cause. These sanctions are referred to collectively as Royal Sanctions. The Crown is granted broad discretion in the imposition of Royal Sanctions complying with section III of this document.

3. Types of Royal Sanctions

   a. Banishment from the Royal Presence precludes the sanctioned individual from attending any event at which the King and/or Queen will be present within their Kingdom and was published in advance on the Royal Progress. If the King and/or Queen attend an event that was NOT published in advance on the Royal Progress, the sanctioned individual is responsible for removing him or herself from eye-line/eye-sight in order to not to violate the sanction. It is incumbent upon the sanctioned individual to ensure that the sanction is NOT violated. Note that a Royal camp at an inter-Kingdom war is defined as the Royal Presence. Banishment from the Royal Presence may also be imposed upon a resident of a Principality by the Territorial Prince and Princess acting jointly as the Coronet within the boundaries of the Principality upon the written consent of the Crown.

   b. Prohibition from the Wearing or Display of the Insignia of the Realm precludes the sanctioned individual from wearing or displaying any badges or other armory specific to the realm or any of its branches, awards, or orders. This specifically does not preclude the wearing of peerage regalia, because they are registered to the SCA and not to specific Kingdoms. The Coronet of a Principality may prohibit the wearing or display of insignia of the Principality by a resident of the Principality upon the written consent of the Crown.

   c. Withdrawal of the Privileges of Rank precludes the sanctioned individual from exercising any privileges of rank in the realm of the issuing Crown. This includes, but is not limited to, the use of associated titles, taking part in peerage polling privileges and regalia (except for peerage regalia, as noted above).

   d. Proscription from Active Participation prohibits the individual from taking part in any official business or activity within that one Kingdom. This means the sanctioned individual can still attend events in Kingdom but cannot engage in activities subject to the jurisdiction of any officer except as required for event attendance (for example, no participation in marshal activities, no entry into A&S displays or competitions, no archery or equestrian activities, etc.). Additionally, Proscription carries with it the restrictions of Banishment from the Royal Presence, Prohibition of the Wearing or Display of Insignia of the Realm and Withdrawal of the Privileges of Rank. The sanctioned individual can still attend events in other Kingdoms with no restrictions.

   e. Exile from the Realm precludes active participation in SCA activities while attending SCA events in that one specific Kingdom. This means that the sanctioned individual cannot attend events in the Kingdom.    The sanctioned individual can still attend events in other Kingdoms with no restrictions.

4. Duration: Royal Sanctions continue for the stated duration of the sanction or until the end of the reign, whichever comes first.

5. The suspension or removal of a Kingdom Officer for just cause is not a sanction.    These actions are authorized in Corpora Chapter VII, Sections K and L.    The Coronet of a

Principality may suspend an officer of the Principality according to the law of the individual Kingdom and Principality consistent with the policies set forth in this document and with the agreement of the superior Kingdom officer.

**C.  EXPULSION FROM THE SCA**

1.  Definition: Expulsion temporarily bans an individual from attendance or participation in any form in any SCA activity, event, practice, official gathering or official SCA social media for any reason, at any time, until the issue that gave rise to the expulsion has been resolved. This includes a ban on participation on officially recognized SCA social media forums, officially recognized SCA electronic email lists and officially recognized SCA webpages.

2.  Authority: An expulsion may be imposed by the Kingdom Seneschal, in conjunction with the Crown. The Society Seneschal may impose an emergency expulsion when necessary, or when a Kingdom-initiated expulsion is inappropriate or logistically impractical.

3.  An expulsion may be imposed in response to:

    a.  Serious transgressions of SCA rules;

    b.  Serious violations of standards of behavior at an SCA event;

    c.  Conviction or violation of a civil or criminal law which could put the SCA or its participants at risk;

    d.  Behavior which could put the SCA or its participants at risk;

    e.  Serious violation of the Governing Documents or other rules of the SCA;

    f.  A formal recommendation arising from procedures defined in Corpora;

    g.  Actions that negatively affect or endanger the SCA;

    h.  Situations in which an individual is under criminal investigation by a modern law-enforcement agency and is considered to be a risk to the SCA or its participants;

    i.  Situations in which an individual is under investigation for a Board mandated R&D investigation.

    j.  Actions that endanger public health and safety, or disturb the peace of an SCA activity in a manner which would make it reasonable for the modern authorities to be called.

4.  Emergency Expulsion: Expulsion is effective immediately upon issuance by the Crown with the agreement of the Kingdom Seneschal or if issued in an emergency by the Society Seneschal, with the ratification of the Chairman of the Board and after consultation with Crown and Kingdom Seneschal of the applicable Kingdom. The expulsion is temporary and in place until the Board reviews the decision. Once the Board upholds an expulsion, it may direct the Society Seneschal to perform an R&D investigation. An R&D makes an expulsion sanction permanent.

**D.  REVOCATION OF MEMBERSHIP AND DENIAL OF PARTICIPATION (R&D)**

Definition: An individual may have his or her membership in the SCA revoked and the right to current and future participation banned. Only the Board of Directors may revoke and deny membership.

# III.  SANCTION PROCEDURES

The appropriate authorities (i.e. a specific officer) may impose sanctions as listed in Section II of this document, as per the following procedures:

1. Administrative Sanctions

   a. Notification must be completed as per Section I.G.1 to Section I.G.4.

   b. All Administrative Sanctions will be reviewed.

      i. Administrative Sanctions at the local, principality, or Kingdom level shall be reviewed by the immediate superior officer upon receipt of notification of the imposition of an administrative sanction.

      ii. Administrative Sanctions imposed by a Society Officer will be automatically reviewed by the Board.

      iii. There is no requirement to have administrative sanctions read into court or published in the Kingdom newsletter.

   c. Appeals: A sanctioned individual may appeal the sanction once it has been reviewed and upheld by the immediate superior of the officer who imposed it, in accordance with the appropriate procedures of that office.

2. Royal Sanctions

   a. Notification must be completed as per Section I.F.1 to Section I.F.2

      i. Whenever practical, before the Crown sanctions a visitor or potential visitor who is a resident of another Kingdom, the Crown shall first notify the Crown of the visitor's Kingdom of the intent to impose a sanction

      ii. Royal Sanctions take effect from the moment of proclamation, but as per Section I.F.2, a notice must be announced in court and also be published in the next available issue of the Kingdom newsletter if the sanction is to remain in effect. Within 15 business days of the imposition of the sanction, the specific cause and occasion of the sanction must be explained in writing to the sanctioned individual. These reasons must not be published in the Kingdom newsletter or otherwise made public.

      iii. All Royal Sanctions will be reviewed with the exception of Banishment from the Royal Presence and expulsions which are automatically reviewed.

      i. After the sanction is imposed, the Kingdom Seneschal will provide the Society Seneschal with all related documents including details of mediation attempts if any were appropriate.

      ii. The Society Seneschal will review all Royal Sanctions for procedural compliance and proportionality.

   b. Process for appeal to the Board of Directors is as follows: the appellant must notify the Society Seneschal and the Corporate Vice President no later than the first day of the month of a quarterly meeting of the Board of Directors, i.e. January 1st, April 1st, July 1st or October 1st.

   c. A Royal Sanction may only be appealed to the Board, in writing, by the sanctioned individual if the appeal is accompanied by substantive evidence of bias, malfeasance, or gross incompetence on the part of the Royalty issuing the Sanction, or the Officer

reviewing the sanction. Simple procedural errors do not constitute grounds for overturning a Royal Sanction.

3. Expulsions

   a. Notification must be given as per Section I.F.1 to Section I.F.2

   b. Review

      i. After an expulsion is imposed, the Crown and Kingdom Seneschal must provide the Society Seneschal any related documents including details of mediation attempts, as applicable.

      ii. The Society Seneschal will review all expulsions for procedural compliance and proportionality.

      iii. The Society Seneschal will contact the expelled individual to request any information the subject would like to include or, if the Society Seneschal deems necessary, may initiate a full investigation at that time.

      iv. The expulsion shall be reviewed by the Board at the next Board meeting, if time permits.

   c. Appeal

      If the Board upholds the temporary expulsion, a member may appeal, if he or she can show that substantive evidence was either overlooked or came to light after the imposition of sanction such that, if taken in to account at the time the sanction was imposed, would have made a different outcome substantially likely, or to evidence of bias, malfeasance, or gross incompetence directly related to the investigation or imposition of the sanction on the part of the Crown or Society Seneschal who issued the expulsion.

## IV. SANCTION-RELATED TOPICS

   A. REVOCATION OF MEMBERSHIP AND DENIAL OF PARTICIPATION (R&D)

   1. According to Corpora, an R&D by the Board enforces permanent expulsion from all SCA functions in all SCA Kingdoms. An R&D can only be issued by the Board. This step makes an expulsion sanction permanent.

   2. The Board will consider a request for an R&D of a current member in the SCA under any of the following circumstances:

      a. Petition to the Board by 30% or more of the membership of the Kingdom of residence of the individual;

      a. Petition by a majority of the Kingdom great officers and peers of the Kingdom of residence who are currently members of the SCA;

      b. The recommendation of a duly-constituted Kingdom court of chivalry;

      c. Documentation of cause for expulsion from the SCA;

      d. Conviction or violation of a civil or criminal law which could put the SCA or its participants at risk;

   e.   Actions that endanger the SCA or its participants;

   f.   Violation of the Governing Documents or other rules of the SCA;

   g.   Formal recommendation arising from procedures defined in Corpora.

3.  The Board will automatically review all findings from a Revocation of Membership and Denial of Participation investigation.

4.  Once the Board imposes an R&D, the recipient may appeal on a showing that:

   a.   Substantive evidence was either overlooked or came to light after the imposition of the expulsion which, if it had been available prior to the imposition of the expulsion, would have made a different outcome substantially likely.

   b.   Evidence of bias, malfeasance, or gross incompetence on the part of the Crown or Society Seneschal who issued the expulsion.

5.  An individual may agree to a voluntary Revocation of Membership and Denial of Participation in the SCA.

**B.   VIOLATION OF TERMS OF SANCTION**

Violation of the terms of a sanction imposed in accordance with the requirements of the governing documents may in itself be considered grounds for further sanction.

**C.   RESERVATIONS TO THE BOARD**

1.  Sanctions on Individuals for Actions taken as Crown

   a.   The Board explicitly reserves to itself the discipline of individuals for actions taken while serving as Sovereign or Consort of a Kingdom.

   b.   The Board will not consider complaints against the Crown before the aggrieved parties have attempted to resolve their problem directly with the Crown, and then with the appropriate Kingdom and corporate officers.

2.  Sanctions upon Individuals for Actions taken as Coronet

   a.   The Board reserves to itself the final determination regarding discipline of members for actions taken while serving as Sovereign or Consort of a principality.

   b.   If the Crown believes the Coronet has overstepped the bounds of law and custom, the normal recourse should be in-Kingdom mediation and if it is required, a Court of Chivalry. If the Board upholds the judgment of such a Court, the affected parties may be subject to loss of any honors and privileges deriving from their reign and nullification of any official acts dating back to the incident.

   c.   If the Crown feels that rapid action is essential to protect the SCA, it has the option of imposing an exile from the realm upon the Coronet, effectively putting the principality reign into abeyance until either conditions change within the Kingdom or the Board countermands the order; however, if the Board does not agree with the Crown's judgment regarding the urgency of the situation, the Board may choose to take action against the Crown as well as, or instead of, against the Coronet.

3.  Degradation from the Peerage

a. <mark>The Board reserves the right to degrade a person from the Peerage</mark>; however, Kingdom law may define conditions and procedures under which a recommendation for such action may be made to the Board.

b. Unless stipulated otherwise by the Board, the Board's decision in such a case applies only to the matter at hand. Nothing prohibits a person who has been degraded from any order of the peerage from being elevated to the peerage at a later date should the Crown determine that the person in question now meets the requirements of the order.

4. Revocation of Awards of Arms and Grants of Arms

a. As with Peerages, the Board specifically reserves the right to revoke any Award of arms or Grant of Arms. Kingdom law may make provisions for offering such a recommendation to the Board.

## D. GUIDELINES FOR DRACHENWALD

1. For areas of Drachenwald where there is no local incorporation, the full sanction process laid out in the SCA Sanction Guide shall be followed, unless there is a conflict with local law.

2. For those areas of Drachenwald where a local incorporation exists, the following will apply:

a. A sanction on an SCA participant will be honored by all SCA organizations and their affiliates.

b. The SCA Sanction policy will serve as a reference for all local organizations.    Any unacceptable behavior by a member of the local organization will be subject to censure by that organization, under local organization rules. The extent of the censure will be communicated to the Kingdom Seneschal, for adoption within the other areas of the Kingdom, and will be communicated to SCA Inc. following SCA Sanction reporting guidelines.

c. Any data collected in support of a local incorporated group censure will conform to local modern laws for confidentiality, collection and storage.

## E. GUIDELINES FOR LOCHAC

The Kingdom of Lochac is governed by two bodies with affiliation agreements with SCA Inc - in Australia by the Society for Creative Anachronism Ltd (SCA Ltd) and in New Zealand by the Society for Creative Anachronism New Zealand Inc (SCANZ). The Board of SCA Ltd reserves the right to determine membership of SCA Ltd, including the right to revoke and deny membership of SCA Ltd as given in its constitution and the Australian Corporations Act. The Committee of SCANZ reserves the right to determine membership of SCANZ, including the right to revoke and deny membership of SCANZ as given in the Rules for the Society of Creative Anachronism New Zealand Inc. and as per the New Zealand Incorporated Societies Act. However, in general, SCA Ltd and SCANZ members shall be sanctioned according to the Sanctions Guide with the differences stated below.

In this section, the sanctioning SCA Ltd or SCANZ members shall also include event members and non-members whose primary residential address is in Australia or New Zealand respectively and who causes issues at events, activities or online fora of branches in Australia or New Zealand. In all places in the sanctions document where "the Board" is mentioned, where the person being sanctioned is an SCA Ltd member, the relevant board will be the Board of SCA Ltd, and where the person being sanctioned is a SCANZ member, the relevant board will be the Committee of

SCANZ. This includes degradation from peerage, revocation of awards, and sanctioning of Royalty.

1. Code of Conduct

   The SCA Ltd Code of Conduct replaces any code of conduct specified in this sanctions document for SCA Ltd members. The Code of Conduct for SCA Ltd members can be found on the SCA Ltd website or obtained from the SCA Ltd Corporate Secretary.    Any code of conduct published by SCANZ will similarly replace any code of conduct specified in this sanctions document for SCANZ members.

2. Privacy

   Any information collected during the course of a sanction investigation or sanction procedure in Lochac shall be treated in accordance with the privacy laws of both Australia and New Zealand. The Privacy Policy for SCA Ltd shall apply within in Australia, while any privacy policy published by SCANZ as well as the Privacy Act will apply within in New Zealand. Cross-border sanctions shall attempt to comply with both policies, but in the case of a conflict, shall comply with the local policy of the body to which the person being sanctioned belongs.

   In these countries, the privacy policies of SCA Ltd and SCANZ and any legislation in their two countries, shall replace any SCA Inc or whole of SCA policies as these detail how to comply with local laws.

   SCANZ has previously received an exemption from the privacy laws of SCA, Inc. This exemption still stands.

3. Dispute Resolution

   Before a sanction following from a complaint may be considered by an officer within Lochac, the Kingdom Seneschal of Lochac, the Board of SCA Ltd or the Committee of SCANZ, the Lochac Dispute Resolution Procedure must be followed. In any cases where the Dispute Resolution Procedure is inappropriate (for example a person has been convicted of a crime or poses a clear and immediate risk to the SCA), the person imposing the sanction shall record the reasons why the Dispute Resolution Procedure was inappropriate in the sanctions file for the case.

4. Investigations

   Due to the size of the kingdom, and probable unfamiliarity of the persons imposing sanctions with local conditions, investigators may make recommendations regarding sanctions in investigation reports where requested by the person/body requesting the investigation.

   Non-cooperation by officers who are involved in an investigation by virtue of their office may result in suspension or removal from that office. Attempts to deliberately sabotage an investigation by biasing witnesses or other means may also result in sanctions.

   In line with New Zealand privacy law and the Rules for SCANZ (8.b) the Committee will not receive, consider or act on anonymous communications.

5. Role of the Lochac Kingdom Seneschal

   As the Lochac Kingdom Seneschal is familiar with affiliate organization rules and is a member of either SCA Ltd or SCANZ and the Society Seneschal is not, the Lochac Kingdom Seneschal

SCA_000332

shall be permitted to initiate expulsions of SCA Ltd or SCANZ members and conduct investigations on behalf of the Board of SCA Ltd or the Committee of SCANZ.

6.   Review of Sanctions

The Board of SCA Ltd shall act as the final reviewing body for all sanctions involving SCA Ltd members. The Committee of SCANZ shall act as the final reviewing body for all sanctions involving SCANZ members.

The process of reviewing sanctions shall be from Kingdom Seneschal directly to the Board of SCA Ltd or Committee of SCANZ. Those duties and privileges relating to sanctions reserved to the Society Seneschal shall be reserved to the Lochac Kingdom Seneschal within Lochac; however the Lochac Kingdom Seneschal shall inform the Society Seneschal of all sanctions proceedings.

7.   Appeals

Members of SCA Ltd or SCANZ shall not have the right to appeal to SCA, Inc. regarding a sanction. All described rights of appeal to the Board apply to the Board of SCA Ltd where SCA Ltd members and Australian residents are concerned or the Committee of SCANZ where SCANZ members and New Zealand residents are concerned.

8.   Notifications

In line with Australian and New Zealand community expectations, official notifications of major steps of the sanction process for members in Lochac are expected to be sent to the email address recorded with the relevant Registry, or in the most formal of cases or where an email receipt has not been acknowledged, by postal mail. Communication by other means (e.g. phone, in person or social media) is allowed where a timely message is of use, but an email or letter would be expected to follow formally confirming the message.

The Lochac Kingdom Newsletter, Pegasus, is also the corporate newsletter of the SCA Ltd and SCANZ. All notices relating to sanctions of an SCA Ltd or SCANZ Member which are required to be published in a kingdom or society newsletter or require notification of SCA members shall be published in Pegasus or by individual email/mail to members.

## APPENDIX A: INVESTIGATOR'S GUIDE

### A.   INTRODUCTION: PURPOSE AND SCOPE OF THIS GUIDE

The purpose of this guide is to set forth policies and procedures for the proper and orderly conduct of investigations within the SCA by the Society Seneschal. This guide also applies to the Kingdom level to assist in the sanction process. In order for the SCA to effectively investigate and respond to complaints of misconduct or malfeasance among its members, the process by which these complaints are investigated must be objective and thorough. The investigators who are appointed to investigate complaints must understand the nature and scope of their duties and the proper manner in which to proceed.

In matters involving previously imposed sanctions or a complaint requesting the imposition of sanctions by Crowns (Royal Sanctions) or Kingdom Officers (Administrative Sanctions), the Society Seneschal or the Board will determine if the matter requires a simple review of the prior proceedings and findings or if further investigation is warranted. In many cases, the Society Seneschal needs only to gather established facts (e.g. obtaining copies of the judgment and commitment from criminal conviction and civil judgements) and as such, the process set forth in this guide is unnecessary in view of Society's acceptance of the conviction or judgment as a factual truth. This guide pertains to those situations in which the Society Seneschal has determined further investigation is appropriate and where the Society Seneschal or has the appointed investigator(s) gather further evidence on behalf of the SCA. This guide may be employed in situations where the Board has directed the Society Seneschal to conduct an investigation into alleged conduct that has come directly to the Board's attention and has not previously been addressed at a subsidiary level.

Investigators who fail to follow the policies and procedures set forth in this guide may be subject to discipline or sanction.    Failure to adhere to the policies and procedures set forth in this guide shall not be cause for any action against the SCA, its directors, officers, or agents; furthermore, any such procedural violations of policies and procedures may render evidence null and void if there is any question of its validity.

### B.   NATURE OF THE INVESTIGATION PROCESS

The purpose of any investigation is to gather facts upon which governing authorities may base a decision. A determination of facts must be based upon evidence gathered from eye witnesses, documents and all other relevant circumstantial evidence.

### C.   SELECTION & APPOINTMENT OF INVESTIGATORS

The primary role of the investigator is to gather facts and write a comprehensive report of those facts to be presented to the Board by the Society Seneschal. Investigators are agents of the SCA.    The Society Seneschal is the primary investigator; however, Investigators shall be appointed by the Society Seneschal and will function as agents of the corporation. The letter of appointment shall contain a description of the alleged conduct being investigated to the extent it is known at the time of the appointment and a recitation of sanctions already imposed for the conduct at the Kingdom level, where applicable.    Individuals shall <u>not</u> be appointed as investigators to investigate complaints made by persons or against persons:

- With whom they have personal ties, such as family members, household members

- To whom they have ties of fealty

- To whom they are subordinate officers

- About whom the candidate-investigator or a family or household member of the candidate-investigator has made written complaints in the past or present (or *vice versa*),

- About whom they have an expressed or actual bias for or against

- An individual should not be appointed as an investigator if they were an eyewitnesses or who have personal first-hand knowledge of the events which form the basis of the allegations under investigation, or who were actively involved in the imposition of sanctions at a lower level.

- Individuals selected must be persons of good repute within their SCA communities.

**D. BEHAVIOR OF INVESTIGATORS**

- The Society Seneschal is the primary investigator; however, the Society Seneschal may appoint deputy investigators.    For purposes of this guide, the word "investigator" applies to either the Society Seneschal or one of the deputy assigned investigators.

- Investigators must approach their tasks as neutral and unbiased gatherers of factual information. The investigator's focus must be to impartially obtain the statements of the involved or knowledgeable persons, obtain relevant or helpful documents and records and gather whatever facts are necessary for the Society Seneschal and the Board to fairly and fully adjudicate the matter. The general goal of an investigation is to ascertain facts. The scope of the investigation will be dictated by the initial communications from the Society Seneschal to the appointed investigators. If there is any ambiguity or question as to the scope and methodology of their investigation, investigators shall resolve such issues with the Society Seneschal before commencing the investigation.

- The investigators must approach all witnesses, interviewees, and subject persons with the utmost courtesy. Investigators may not compel cooperation (non-cooperation should be reported in their report to the Society Seneschal).

- With the exception of their communications with the Society Seneschal, the investigation is confidential in nature and investigators will be precluded from making disclosures of the results of the investigation.    All interviews, correspondence, documents, and other information obtained by investigators in the course of the investigation are considered the confidential information of the corporation and should not be discussed with or disseminated to anyone other than another appointed SCA investigator on the same case, and/or the Society Seneschal.

- An investigator may discuss with a witness the statements to determine if there are any inconsistencies in the facts.    The investigator may also show relevant documents or records that were received previously to ascertain the accuracy of the documents or records.

SCA Sanction Guide                                                                                      16 of 31
January 2018

- Unless the statements must be reviewed for their veracity and accuracy by another witness as noted above, an investigator should not reveal to any witness statements to another witness. Documents and records prepared by one witness may be shown to another witness to test their veracity and accuracy as noted above.

- The investigator may question the subject of the investigation with the statements of other individual witnesses and may show the subject of the investigation relevant documents.

- Other than disclosing the general purpose of the investigation, investigators shall not reveal or confirm the identities of the complaining persons, other witnesses or any details of the information received in the course of the investigation, even if that information is known or supposedly known to others, except for the sole purpose of testing the veracity or accuracy of the evidence (statements, diagrams or records).

### E. THE INVESTIGATION

At the beginning of the investigation process the investigators shall:

- Receive from the Society Seneschal all materials of the complaint or previous action and findings, and immediately review all such materials.

- If a second investigator has been assigned, contact your fellow investigator assigned to the matter as soon as possible and establish the scope and purpose of the investigation in terms of which allegations or previous findings will be subject to the present investigation.

- Prepare a list of all persons and documents or records involved in the matter based on the reviewed materials.

- Outline all events or alleged events which are relevant to inquiry and which are presently known.

- As a team, develop a set of priorities and timeframe for conducting the investigation.

- Draw up a list of material witnesses, noting contact information.

During the course of the investigation the investigators shall:

- Obtain any other known documents or records that may be necessary to assist in the interview of witnesses or the determination of the facts.

- Schedule interviews with all possible witnesses, starting with the most relevant; that is, those witnesses who will most likely provide investigators with sufficient information to understand what occurred and enable them to make a coherent chronology of facts and events to facilitate the conduct of the investigation.

- Interview pertinent witnesses/interviewees [See Section 5 below for more information on how to conduct interviews] and take notes during the interviews.

- Generally, interview any subject person last in the initial scheme of interviews. This will facilitate asking questions based on all the facts as they have come to light during the investigation and interviews of other witnesses.

- Create written summaries of each interview as soon after the interview as possible when the statements and notes are still fresh in the investigators' minds. The summaries should contain

SCA_000336

all information and responses provided by the interviewee that are pertinent to the matter under investigation.

- Once all interview summaries are written, the reports should be organized by setting forth the facts as stated by each witness. Where important discrepancies are noted between the statements of witnesses, investigators should determine if follow-up interviews would be appropriate to clarify the information given.    All facts which tend to establish bias or an interest in the investigation should be noted, e.g. whether the witness has a motive, reason or interest to falsify or lie, whether or not the witness is biased for any reason and whether or not the witness(s)'s statements are inconsistent or evasive.    It is also important to note any act establishing a consciousness of guilt based upon the conduct of the individual who is the subject of the investigation or said individual's evasiveness or inconsistencies.

<u>Interviews and Meetings</u>

- When practical, initial interviews of critical witnesses and subjects should be done in person; however, in many cases, a face to face interview is prohibited by the distance between the witness and the investigator. Follow-up interviews and interviews of persons of lesser relevance may also be done by telephone.

- Witnesses must be interviewed individually and separately from and out of the hearing of other witnesses. Although the presence of other persons can be requested by the witness who is a minor or who is in need of a support person (alleged victims of sexual assault or domestic violence); however, under no circumstances shall another witness to the investigation be allowed to be present, with the following exception: where the witness being interviewed is a minor or mentally infirm, the parent or guardian or caregiver must be present, even if that parent or guardian or caregiver is also a witness.

- During the interview, the investigator should verbally refer to the documents by a title, a description or a date if appropriate. Once titled, use that title consistently.

- The investigator(s) should prepare in advance a written list or outline of questions they intend to ask the witness and any documents they intend to show the witness/interviewee. The investigators should not provide the question list to the witness in advance; however, the investigators may request that the witnesses bring or make available copies of documents in their possession that the investigator may not have, but which the investigator believes would be helpful to the gathering of facts and evidence.    If the witness refuses to tender the documents or records to the investigator, the investigator must note this refusal to cooperate in their report.

- A summary of a witness interview should be reviewed the witness (or the noted parent, guardian or caregiver) upon their request within a reasonable time after the interview. No person other than the Society Seneschal will be provided a copy.

- **F. THE REPORT TO THE SOCIETY SENESCHAL OR KINGDOM SENESCHAL**

Concluding the Investigation, the investigators shall:

1.  Draft the final report to be submitted to the Society Seneschal, which could include;

- A brief statement of the matter or allegations being investigated,

- A list of all persons contributing to the investigation or named in the investigation as a person with knowledge, including their SCA names and offices or ranks if any, their modern names and contact information. If a listed witness was not interviewed, an entry should be made as to why the person was not interviewed,

- Detailed accounts of all witness interviews and statements, including the date, time, and place of the interview or statement as well as who was present.

- Detailed accounts of any statements, interviews or other information obtained from persons who are the subjects of the investigation.

- A list or index of all attached documents,

- Copies of all pertinent documents,

- Synopsis of the facts gathered during the investigation.

- A certification or attestation signed by the investigators that the report contains the true and accurate findings of their investigation. Once the investigator transfers the reports to the Society Seneschal and the Society Seneschal confirms the receipt of said report, the investigator shall destroy all copies. All copies retained by the Society Seneschal are considered solely the property of the SCA, to be retained confidentially and may not be communicated, transferred, discovered, or obtained by others without the express permission of the SCA.

SCA_000338

**G.   INVESTIGATION REPORT TEMPLATE**



### INVESTIGATION REPORT: Subject of Investigation

Investigator's Name:
Date(s) of Investigation:

**REASON FOR INVESTIGATION:**

**SUMMARY TIMELINE:**

**INVESTIGATOR'S SUMMARY:**

**LISTING OF INDIVIDUALS CONTACTED/INTERVIEWED:**

| Kingdom Seneschal: | Witness #1 |
|---|---|
| Name: | Name: |
| Email: | Email: |
| Phone: | Phone: |

| Former Monarchs | Witness #2 |
|---|---|
| Name: | Name: |
| Email: | Email: |
| Phone: | Phone: |

| Current Monarchs | Subject |
|---|---|
| Name: | John Smith: |
| Email: | Email: |
| Phone: | Phone: |

**INTERVIEWS AND INFORMATION PRESENTED:**

**EXHIBITS:**

SCA_000339

## APPENDIX B:

**A. ANNOUNCEMENTS IN NEWSLETTER**

1.    Sanction by Reigning Royalty
       Royal Sanction—Banishment from the Royal Presence or Exile from the Realm; Proscription from
       Active Participation; or Exile from the Realm

On  [**Date sanction was issued in open SCA Court**], we issued a Royal Sanction -  [**Type of Royal Sanction**]
against  [**Recipient Name**], known in the Society as  [**Recipient's Society Name**].    The sanction will expire
on  [**Date Royal Sanction will end - no later than end of reign**]
**[Crown's Names and Title]**

2.    Sanction by Reigning Royalty
       Royal Sanction-- Expulsion from SCA

On  [**Date sanction was issued in open SCA Court**], we issued a Royal Sanction –Expulsion from the SCA
against  [**Recipient Name**], known in the Society as  [**Recipient's Society Name**].    The sanction will expire
on **[Date of the end of the Royalty's Reign]**
**[Crown's Names and Title]**

3.    Suspension or removal from Kingdom or Principality office for due cause Reign

On [date], We, [Crowns name and title], [removed—or—Suspended during the duration of Our Reign],
[**Recipient Name**], known in the Society as  [**Recipient's Society Name**],
from the office of **[name office]**
**[Crown's Names and Title]**

**B.  ANNOUNCEMENTS IN OPEN COURT**

1. Sanction by Reigning Royalty
        Royal Sanction—Banishment from the Royal Presence or Exile from the Realm

On **[Date], we [Name and Title of King and Queen]** issued a Royal Sanction -  [**Type of Royal Sanction**] against  [**Recipient Name**], known in the Society as  [**Recipient's Society Name**].    The sanction will expire on  [**Date Royal Sanction will end - no later than end of reign**]

2.    Sanction by Reigning Royalty
        Royal Sanction-- Expulsion from SCA

On **[Date], we [Name and Title of King and Queen]**, we issued a Royal Sanction –Expulsion from the SCA against  [**Recipient Name**], known in the Society as  [**Recipient's Society Name**].    The sanction will expire on **[Date of the end of the Royalty's Reign]**

3.    Suspension or removal from Kingdom or Principality office for due cause by Reigning Royalty

On **[Date], we [Name and Title of King and Queen]**, [removed—or—Suspended during the duration of Our Reign],  [**Recipient Name**], known in the Society as  [**Recipient's Society Name**], from the office of **[name office]**

SCA_000341

**C.  Notification Letters**

    1.  Administrative Sanction by Kingdom Officer

**[Officer Name]**
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]

**[Recipient Name]**
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Appropriate Society Officer**]
[**Name of Ruling Royalty**]

Dear  [**Recipient Name**]:

On this date, i.e. **[Date],** I issued an Administrative Sanction on you, [Recipient Name], known in the SCA as [SCA Name of Recipient] regarding the following issue(s):

**[List of issue(s) that led to the decision to issue an Administrative Sanction]**

The sanction will be reviewed by  [**Name of Appropriate Society Officer**].    Pending review, the sanction will last until  [**Date Sanction will end - no more than two years**].

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F ,  III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3,  III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.

Regards,

**[Your Name]**
[**Title**]

SCA_000342

2. Administrative Sanction by Society Officer

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]

[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC: [Name of the Society Seneschal if the Sanction is not imposed by the Society Seneschal]
[**Name of Board of Directors Ombudsman**]

Dear  [**Recipient Name**]:

On or about [date], I issued an Administrative Sanction at the Board Meeting on [date], regarding the following issue(s):

[**List of issue(s) that led to the decision to issue an Administrative Sanction**]

The sanction will be [has been] reviewed by the Board of Directors of the SCA.    Pending review, the sanction will last until  [**Date Sanction will end - only Board can issue permenant**].

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F ,  III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3,  III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.

Regards,

[**Your Name**]
[**Title**]

SCA_000343

3.    Suspension or Removal from Office by the Reigning Crown

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]


[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Society Seneschal**]

Dear[**Recipient Name**]:

On or about[**Date sanction was issued in open SCA Court**], we issued removed you for office for due cause—or—suspended you from office during the duration of Our Reign regarding the following issue(s):

[**List of issue(s) that led to the decision to issue a Royal Sanction**]

The sanction will last until[**Date Royal Sanction will end - no later than end of reign**].
You may refer to the SCA Sanction Guide, sections I.D.7 *Confidentiality*, I.F , III.1.a,  III.2.a,  III.3.a, E.8, *Notification*, VII. L. 3. Removal for Just Cause –or— Suspension for Just Cause of Officer IV.G.7, IV.H.4, VII.K.3, VII.L.1.  *Appealing Removal for Just Cause or Suspension for Just Cause of an Officer may be made to the Board of Directors as noted or inferred in these sections as the Board reserves unto itself all authority to Appeal such matters.*
Regards,


[**Your Name**]
[**Title**]

4.    Expulsion from the SCA /Exile from the Realm/Proscription from Active Participation in the SCA/Banishment from the Royal Presence by Ruling Royalty

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]



[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Ruling Royalty**]
[**Name of Society Seneschal**]

Dear[**Recipient Name**]:

On or about [date of sanction issued in open court], we [Crowns names and title] issued an Expulsion from the SCA, regarding the following issue(s):

[**List of issue(s) that led to the decision to issue an Explusion from the SCA**]
-Or-
[**List of issue(s) that led to the decision to impose an Exile from the Realm**]
-Or-
[**List of issue(s) that led to the decision to impose a Proscription from Active Participation**]
-Or-
[**List of issue(s) that led to the decision to a Banishment from the Royal Presence**]

[**Name of Society Seneschal**]  will notify the Board of Directors of our decision.    Additionally, [**Name of Society Seneschal**]  will contact you for any information you may deem pertinent.    Your expulsion from the SCA is in effect, while being reviewed by the Board of Directors.

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F ,  III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3,  III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.


Regards,


[**Your Name**]
[**Title**]

5. Follow-up Letter by Society Seneschal for Expulsion from the SCA

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]



[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Ruling Royalty**]
[**Name of Society Seneschal**]

Dear[**Recipient Name**]:

On[**Date sanction was issued in open SCA Court**], Their Majesties  [**Name of Ruling Royalty**]  issued an Explusion from the SCA for you.    Your expulsion was in regards to the following issue(s):

[**List of issue(s) that led to the decision to issue an Explusion from the SCA**]

I will notify the Board of Directors of your expulsion by Their Majesties[**Name of Ruling Royalty**]. Furthermore, my notification to the Board of Directors of your expulsion will result in a determination by the Board to ascertain if an investigation into Revocation and Denial of Membership is warranted. Your expulsion from the SCA is in effect, while being reviewed by the Board of Directors.

You may provide any information you deem pertinent to the issue(s) listed above.

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F ,  III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3,  III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.


Regards,


[**Your Name**]
[**Title**]

6.   Expulsion from the SCA by Society Seneschal

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]




[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Ruling Royalty**]
[**Name of Society Seneschal**]

Dear[**Recipient Name**]:

On or about [date], after consultation with the Chairman of the Board of Directors, [the Board of Directors],  [**Name of Kingdom Seneschal**]  and[**Name of Ruling Royalty**], I issued an Expulsion from the SCA regarding the following issue(s):

[**List of issue(s) that led to the decision to issue an Expulsion from the SCA**]

I will notify the Board of Directors of my announcement.    Furthermore, my notification to the Board of Directors of your expulsion will result in a determination by the Board to ascertain if an investigation into Revocation and Denial of Membership is warranted. Your expulsion from the SCA is in effect, while being reviewed by the Board of Directors.

You may provide any information you may deem pertinent to the issue(s) listed above.

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F ,  III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3,  III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.


Regards,


[**Your Name**]
[**Title**]

SCA_000347

7.   Expulsion from the SCA with Investigation of Revocation and Denial

[Name of Society Seneschal]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]

[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Ruling Royalty**]  [Name of Chairman of the Board]

ENCL: Original notification letter for Expulsion by  [**Name of Issuing Authority**]

Dear[**Recipient Name**]:

On[**Date sanction was issued in open SCA Court**],  [**Name of Issuing Authority**]  issued an Expulsion from the SCA against you.    Your expulsion was in regards to the following issue(s):

[**List of issue(s) that led to the decision to issue an Explusion from the SCA**]

On[**Date sanction was reviewed by Board**], the Board of Directors reviewed your Expulsion from the SCA and upheld the decision.    At that time, the Board determined that an investigation into Revocation and Denial of your membership in the SCA was warranted.    The Board directed  [**Name of Society Seneschal**] to appoint  [**Name of Investigator**] to conduct the investigation.  [**Name of Investigator**]  Will contact you.

You will be provided a copy of the transcript from your interview with the investigator.    You will not receive any information from other interviewees, unless express permission is granted.    For those interviewees who granted permission, you will only receive a redacted and summarized copy of their transcript.

The results of the investigation will be presented to the Board at the[**Date of next reasonable Board meeting**], located in[**Location Board meeting**].

You may refer to the SCA Sanction Guide, sections Confidentiality:  I.D.7, Notification:  I.F , III.1.a,  III.2.a, III.3.a, E.8, Expulsions: III.2.a.3, III.3,  E.5, Appealing Expulsions:  III.1.c, III.2.b, III.2.c, III.3.c  regarding your options to appeal, limitations of activities in the SCA, and responsibilities with regards to this sanction.

Regards,

[**Your Name**]
[**Title**]

8.   Revocation and Denial of Membership to the SCA

[**Your Name**]
[**Street Address**]
[**City, ST    ZIP Code**]
[**Date of Letter**]


[**Recipient Name**]
[**Street Address**]
[**City, ST    ZIP Code**]

CC:  [**Name of Kingdom Seneschal**]
[**Name of Ruling Royalty**]
[**Name of Society Seneschal**]

ENCL: Copy of notification letter for Expulsion by  [**Name of Issuing Authority**]
Copy of follow-up letter for Expulsion and Investigation of Revocation and Denial

Dear[**Recipient Name**]:

On[**Date sanction was issued in open SCA Court**], Their Majesties  [**Name of Ruling Royalty**]  issued an Expulsion from the SCA against you.    Your expulsion was in regards to the following issue(s):

[**List of issue(s) that led to the decision to issue an Expulsion from the SCA**]

On[**Date sanction was reviewed by Board**], the Board of Directors reviewed your Expulsion from the SCA and upheld the decision.    At that time, the Board determined that an investigation into Revocation and Denial of your membership in the SCA was warranted.    The Board directed  [**Name of Society Seneschal**] to appoint  [**Name of Investigator**]  to conduct the investigation.

Following review of the results of the investigation, presented to the Board on[**Date investigation findings were presented**], the Board of Directors of the SCA decided to impose a Revocation and Denial of Membership upon you.

You are precluded from taking part in any aspect of the SCA.    Furthermore, the decision by the Board to revoke and deny you any future membership in the SCA is permanent and final.


Regards,


[**Your Name**]
[**Title**]

SCA_000349

**D.  FORM FOR VOLUNTARY REVOCATION OF MEMBERSHIP AND DENIAL OF PARTICIPATION**

I, the undersigned, without duress, do accept this uncontested and voluntary Revocation of Membership and Denial of Participation (R&D) with the SCA.

I agree to accept a lifetime prohibition on attendance or participation in any way, shape, or form in any SCA activity, event, practice, or official gathering for any reason, at any time. This includes a ban on participation on officially recognized SCA social media sites (e.g., Facebook), officially recognized SCA electronic email lists, and officially recognized SCA webpages. This R&D is effective immediately upon receipt and unanimous acceptance of this notice by the SCA Board of Directors.

I understand that I am entitled to an administrative review of my R&D and I hereby waive that right. I retain my right to appeal the R&D at a later time. If I choose to appeal, my situation will be subject to the full sanction process as outlined in the SCA Sanction Guide and Corpora.

Signed this day

By:
[Modern Name]
[SCA Name]
[Address]

Witnessed this day

By:
[Modern Name]
[SCA Name]
[Address]

SCA_000350

# SOCIETY FOR CREATIVE ANACHRONISM, INC.
# SANCTIONS PROCEDURES AND POLICIES MANUAL

Effective as of 11/15/2019
Updated January 2020

Copyright 2020 by The Society for Creative Anachronism, Inc. All Rights Reserved.

This handbook is an official publication of The Society for Creative Anachronism, Inc., a nonprofit organization dedicated to research and recreation of pre-17th century European history. Copies of this document can be ordered from: SCA Marketplace, P.O. Box 360789, Milpitas, CA 95036-0789, or downloaded at www.sca.org.

Members of The Society for Creative Anachronism, Inc., may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the content. The contents of the document are posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.

Section 1:  Intent of these Procedures and Policies; Purpose of Sanctions

    A. This document sets forth the Sanction Procedures and Policies for the Society for Creative Anachronism.

    B. The purpose of a sanction is to protect the SCA and participants by removing or limiting the participation of an individual who has violated the published rules and policies of the SCA, Kingdom law, or modern law. Behavior that places the SCA or another participant at substantial risk is also subject to sanction by the Kingdom or the Society.

## Section 2:  Corporate Officers and Crowns; Authority to Act, generally

    A. The Board of Directors of the SCA reserves the right to sanction any individual or group of individuals in the SCA regardless of membership status, title or position. The Board reserves the sole right to modify or waive these policies as it deems necessary. The Board has the final authority on all sanctions.

    B. The Society Seneschal may investigate any complaint or incident.

    C. The Kingdom Seneschal may preliminarily investigate any complaint or incident within the boundaries of their Kingdom. They may notify or consult with the Society Seneschal as needed.

    D. The Crown may impose a royal sanction against an individual for violations of any provision of Corpora, SCA Corporate Documents, and/or Kingdom Law or suspend any Kingdom Officer for misconduct of office for the duration of their reign, consistent with this Manual.

## Section 3:  Overview of Administrative Actions and Sanctions

    **A. Administrative Actions against Kingdom, Principality and Local Officers**

        1. Suspension of an Officer:  Officers may be suspended by the Crown or their Superior Officer for cause stated in writing to the officer. Suspension by the Crown is limited to the duration of the reign. Suspension by the Superior Officer is limited to not more

than 90 days. The Deputy to the suspended Officer shall assume the responsibilities of office during the suspension.

2. Removal from Office of a Deputy to a Kingdom Officer:  Removal of a warranted deputy requires the approval of both the Kingdom Officer and the Crown of the Kingdom. In the event that the Crown and Kingdom Officer cannot agree to remove the deputy, they will refer the question of removal to the appropriate Society Officer.

3. If a deputy is removed on grounds that they reasonably believe are based upon discrimination of any protected class, they may request that the Society Seneschal or President review the removal.

4. Administrative Actions do not need to be announced in Court nor published in the Kingdom Newsletter.

5. Administrative Actions are not sanctions and are exempt from the Sanctions Process and sanctions appeals.


**B.  Kingdom Sanction: Banishment from the Royal Presence**

1. A Banishment from the Royal Presence, at any function, activity or event which the Sovereign or Consort attend, precludes the sanctioned individual from attending any Royal Court, any meetings where the Crown is present including Peerage or officer meetings, entry into the Royal Encampment, contacting the Crown in any manner, or otherwise being <u>within 50 feet of the Crown</u>.[1]

2. This Sanction is issued by the Crown.

3. This Sanction cannot be appealed. The Sanction expires at the end of the Reign.

4. This Sanction must be read in Court and published in the Kingdom Newsletter.


**C.  Kingdom Sanction: Exile from the Kingdom**

1. Exile from the Kingdom precludes engaging in any SCA activity in the Kingdom that issued the sanction. This does not preclude participation in activities in other Kingdoms. This precludes participation in any Kingdom-controlled Social or Electronic media.

2. This Sanction is issued by the Crown.

3. This Sanction terminates at the end of the Reign.

4. This Sanction must be read in Court and published in the Kingdom Newsletter.

5. No person shall be subjected to a continuance of a Sanction for more than two consecutive Reigns under the circumstances that prompted the original Crown to act.

6. The Society Seneschal will present this Sanction to the Board of Directors for review.

**D. Kingdom Sanction: Temporary Removal from Participation from the Society**

1. A Temporary Removal from Participation from the Society is issued by the Crown and Kingdom Seneschal after consultation with the Society Seneschal. Temporary Removal from Participation precludes the individual from attendance or participation in any manner at any SCA activity, event, practice, or official gathering for any reason, at any time. This includes a ban on participation in officially recognized SCA social media (e.g. "Facebook") sites, officially recognized SCA electronic email lists, and officially recognized SCA webpages.

2. This Sanction must be read in Court and published in the Kingdom Newsletter.

3. The Society Seneschal will present this Sanction to the Board of Directors for review.

4. Temporary Removal from Participation will last until the Board makes a final decision on the Sanction.

5. Grounds for the Issuance of a Temporary Removal from Participation from the Society include, but are not limited to:

   a. Serious transgressions of SCA rules which include violation of the Governing Documents or other rules of the SCA;

   b. Theft, misappropriation, or deliberate misuse of SCA funds or property;

   c. Situations in which an individual is under criminal investigation by a modern law enforcement agency or is considered to be a risk to the SCA or its participants due to conviction of a dangerous felony or violation of a civil law or court order which could put the SCA or its participants at risk;

   d. Behavior which could put the SCA or its participants at risk or fear of imminent harm;

   e. Actions that endanger public health and safety.

### E. Society Sanction: Emergency Temporary Removal from Participation

1. An Emergency Temporary Removal from Participation may be issued by the Society Seneschal with the approval of the Chairman of the Board after consultation with the Crown and/or Kingdom Seneschal of the applicable Kingdom. The Temporary Removal from Participation remains in effect until the Board reviews the decision and makes a final determination on the Removal, which can include a Revocation of Membership and Denial of Participation or lifting the Sanction, amongst other things.

2. The Society Seneschal must immediately notify the Crown and Kingdom Seneschal of the affected Kingdom and must also notify the Chairman of the Board and the President <u>within 24 hours</u> following the issuance of the Sanction. The Chairman is responsible for notifying the Board within a reasonable time.

3. Notification of the Emergency Temporary Removal from Participation shall be made to the public in a form and format deemed appropriate by the Society Seneschal and President.

4. The Society Seneschal will present this Sanction to the Board of Directors for review.

5. Emergency Temporary Removal from Participation will last until the Board makes a final decision on the Sanction.

### Section 4:  Initial Notification of Sanction

### A. Notice of Kingdom Sanction

1. The Kingdom Seneschal must notify or make a reasonable attempt to notify the sanctioned person via email or telephone as soon as possible but must also notify the sanctioned person by certified postal mail <u>within 15 days</u> of the announcement in Royal Court.

2. The Kingdom Seneschal should notify the Society Seneschal of the basic facts of the Sanction <u>within 24 hours</u> of issuance.

### B. Notice of Emergency Temporary Removal of Participation

1. The Society Seneschal must notify or make a reasonable attempt to notify the sanctioned person via email or telephone as soon as possible but must also notify the

sanctioned person by certified postal mail <u>within 15 days</u> of the announcement of the Emergency Temporary Removal of Participation.

2. The Society Seneschal must notify the President and Chairman of the Board <u>within 24 hours</u> following the issuance of the Sanction. The Chairman is responsible for notifying the Board within a reasonable time.

3. After an Emergency Temporary Removal from Participation has been issued, the appropriate Kingdom Seneschal(s) shall privately notify all local Seneschals in the affected Kingdom(s) of the Sanction.

4. Additional Kingdoms may need to be informed as necessary in the determination of the Society Seneschal.

## C. Contents of Notification

The written notice shall contain:

1. Type of Sanction / Description of Conditions

2. Issuing Authority (Crown and/or Kingdom Seneschal or Society Seneschal)

3. Date the Sanction was issued

4. For Kingdom Sanctions, the event at which the Sanction was announced

5. Time Limit of the Sanction (if applicable)

6. A Brief Statement of Facts Supporting the Sanction

7. Right of Appeal

## D. Standard Sanction Process[2]

1. Kingdom Level Process

The Kingdom Seneschal transmits the sanction package to the Society Seneschal. The package will include the following:

a. A complete statement of facts from both the Crown and Kingdom Seneschal. Both statements must state why the sanction was issued.

1. The statement of fact from the Kingdom Seneschal must also describe the initial notice or attempt at initial notice of the Sanction to the sanctioned person.

    b.   A copy of the initial notification letter, and proof of sending the letter by certified mail to the sanctioned party.

    d.   Proof of publication in the Kingdom newsletter or information indicating when the publication will take place.

    e.   Any statement from Complainant and any witnesses.

    f.   Statement from the sanctioned person, if any.

2.  Society Level Process

The Society Seneschal shall:

    a.   For a Kingdom Sanction, verify that the sanction package is complete and that all necessary steps have been taken.

    b.   For an Emergency Temporary Removal from Participation, prepare documentation of the Sanction.

    c.   Present the Sanction, including the full package and the case cover sheet, to the Board of Directors at their next meeting.

3.  Board of Directors Process

    a.   The Board of Directors reviews sanctions package.

    b.   At its discretion the Board may:

        1.  Uphold or overturn the sanction.

        2.  Extend the sanction and request the Society Seneschal investigate the matter for a determination of the need for additional action up to and including Revocation of Membership and Denial of Participation.

        3.  Impose other sanctions as needed.

        4.  Take any action the Board finds necessary under the circumstances.

**Section 5:  Appeals Process[2]**

**A.  Appealing a Kingdom Sanction to the Board of Directors**

1.  Any person who has received a Kingdom Sanction may appeal to the Board of Directors. Only the sanctioned person may bring the appeal.

2.  Appeals must have the following:

    a.   An introductory letter explaining the circumstances surrounding the Sanction.

    b.  Any information that the Board should consider which the sanctioned individual believes supports the appeal.

3. The person should provide all evidence to support the appeal, emailed to the Society Seneschal (seneschal@sca.org) or mailed to the SCA corporate office.

4. All questions about an appeal should be directed to the Society Seneschal.

**B.  Appealing a Sanction from the Board of Directors**

1. Only a sanctioned person may file an appeal.

2. Appeals may only be filed if there exists either sufficient evidence to conclude that the Board would have reached a different decision had the evidence discovered been reviewed by the Board, or a discovery of a material error of fact.

3. The Board is the ultimate determiner and arbiter of the rules of the Society, regardless of what authority it may delegate elsewhere.  All members of the Society shall therefore have the right of appeal to the Board, provided they follow proper channels for complaint and appeal.

4. The person should provide all evidence to support the appeal, emailed to the Society Seneschal (seneschal@sca.org) or mailed to the SCA corporate office.

5. All questions about an appeal should be directed to the Society Seneschal.

**Section 6:  Confidentiality within the Sanctions Process**

**A.  Confidentiality of the accused from public statements regarding allegations**

The Crown, the Kingdom Seneschal, the Society Seneschal, and any appointed investigator are prohibited from commenting outside the chain of command on any ongoing sanction or investigation into any matter that may lead to a sanction.

**B.  Confidentiality of Complainant and Witness Identity**

The statement of facts in the sanction letter shall be redacted in order not to directly identify the complainant or witnesses, who shall be referred to as "Complainant (#)" or "Witness (#)".

SANCTION MANUAL ANNEX

Footnotes and Updates

1. January 2020: The definition of the sanction Banishment from the Royal Presence was reviewed and further defined at the January 2020 Board meeting. It returns to an older definition of Banishment from the Royal Presence that prevents the sanction form being constructively used as an Exile from the Realm.

2. January 2020: The Sanction Casefile ver2.6 contains all of the forms for Sanctions and Appeals.


the society for creative anachronism, inc.

# Seneschal's Handbook
# January 2018 Edition

Copyright 2018 by The Society for Creative Anachronism, Inc. All Rights Reserved. This handbook is an official publication of The Society for Creative Anachronism, Inc., a nonprofit organization dedicated to research and recreation of pre-17th century European history. Copies of this document can be ordered from SCA Marketplace, P.O. Box 360789, Milpitas, CA 95036-0789, or downloaded at www.sca.org.

Members of The Society for Creative Anachronism, Inc., may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the content. The contents of the document are posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 6

II.     AFFILIATE AND INTERNATIONAL INFORMATION/NOTICE ............................................. 7
        A. General Information ..........................................................................7
        B. Existing International Affiliates.........................................................7

III.    PREPARING FOR THE KINGDOM SENESCHAL JOB ....................................................... 8
        A. Warrant of Office .............................................................................8
        B. Assemble a Reference Library, Resources and Tools ...................................8
        C. Avoiding Burnout.............................................................................9

IV.     ARBITRATING THE RULES AND THEIR PRECEDENCE ................................................... 10
        A. Guidelines ....................................................................................10
        B. Order of Precedence ........................................................................10
        C. Treaties and Charters ......................................................................11

V.      REPORTING AND COMMUNICATIONS ................................................................... 11
        A. Quarterly Reports to the Society Seneschal ............................................11
        B. Reporting Crown Victors ...................................................................11
        C. 48-72 Hour Reply Goal .....................................................................11
        D. Emergency & Sanction Communications ...................................................11
        E. Communication within the Kingdom ......................................................12
        F. Communication with the Crown ...........................................................13
        G. Communication with Other Kingdom Officers............................................14
        H. Electronic Communications Policy .......................................................14
        I. Websites and Social Networking Sites (including Facebook) ...........................15
        J. Corporate Mailing Labels ..................................................................16

VI.     DEPUTIES & SUCCESSION PLANNING................................................................... 16
        A. Deputies to the Kingdom Seneschal's Office ............................................16
        B. Emergency Replacement Deputy & Finding a Successor...............................16

VII.    KINGDOM FINANCIAL MATTERS ....................................................................... 17
        A. Financial Responsibilities .................................................................17
        B. Theft Procedures............................................................................17
        C. Grants.........................................................................................18
        D. Membership Drives and recruitment activities ..........................................19

VIII.   SUPERVISING BRANCH SENESCHALS ................................................................... 19
        A. Mentoring Branch Seneschals..............................................................19
        B. Appointing Local Branch Seneschals ....................................................20

SCA_000361

       C. Removing Local Seneschals ..................................................................................21

IX.     DEALING WITH MODERN LAW AND LEGAL AUTHORITIES ............................................... **22**

X.      DEALING WITH MINOR/YOUTH-RELATED POLICIES ...................................................... **23**

XI.    OVERSEEING BACKGROUND CHECKS ........................................................................ **25**

       A. Scope.................................................................................................................25

       B. Process for Conducting a Background Check ...................................................25

       C. Responsibilities of the Kingdom Seneschal for Background Checks ...........................26

XII.   MANAGING WAIVERS AND EVENT SIGN-IN SHEETS...................................................... **26**

       A. Waivers for Affiliate Organizations...................................................................26

       B. Types of Waivers .............................................................................................26

       C. When Waivers are Required .............................................................................27

       D. Minor Waivers..................................................................................................27

       E. Waiver Management .........................................................................................28

       F. Sign-In and Attendance Sheets .......................................................................29

XIII.  OVERSEEING CONTRACTS AND AGREEMENTS ........................................................... **29**

       A. Who May Sign Contracts..................................................................................29

       B. Limitations........................................................................................................29

XIV.  OVERSEEING KINGDOM EVENTS ............................................................................. **30**

       A. Publicized Events.............................................................................................30

       B. Kingdom Event Sites........................................................................................30

       C. Royal (Crown) Lists..........................................................................................31

       D. Removing SCA Sponsorship from an Event......................................................32

XV.   DEMO POLICY ...................................................................................................... **33**

XVI.  KNOWN WORLD EVENT POLICY .............................................................................. **34**

       A. General Guidelines...........................................................................................34

       B. Known World Collegia/Symposia ......................................................................34

       C. Known World Summit Meetings .......................................................................35

       D. Society Anniversary Events ..............................................................................35

       E. Proposal Checklist Society Anniversary Events (See Section XXIII)............................36

       F. Proposal Approval and Acceptance..................................................................36

       G. Before the Event..............................................................................................37

       H. After the Event.................................................................................................37

XVII. CHANGING AND MAINTAINING KINGDOM LAW ......................................................... **37**

       A. Changes to Corpora .........................................................................................37

       B. Changes to Kingdom Law ................................................................................38

SCA_000362

C. Maintaining Kingdom Law ..................................................................................................38

XVIII.   MANAGING KINGDOM BRANCH CHANGES ................................................................. 39

A. Establishing New Branches ................................................................................................39

B. Creation of a Barony (or Province) ....................................................................................42

C. Principality and Kingdom Elevations .................................................................................45

D. Branch Suspension ............................................................................................................46

E. Branch Abeyance (Dormancy) ..........................................................................................47

F. Lateral Branch Conversions ..............................................................................................47

G. Branch Demotion or Dissolution .......................................................................................48

XIX.   INSURANCE MATTERS ............................................................................................... 48

A. Regional Applicability ........................................................................................................48

B. Insurance Guidelines .........................................................................................................49

C. The SCA's General Liability Policy ....................................................................................49

D. The SCA's Directors' and Officers' Liability Policy ...........................................................49

E. Host Liquor Coverage ........................................................................................................49

F. Equestrian Coverage .........................................................................................................50

G. Insurance Related Clarifications .......................................................................................50

H. Ordering Insurance Certificates ........................................................................................51

I. Ordering Fees .....................................................................................................................52

XX.   OVERSIGHT OF SOCIETY-OWNED TRAILERS ............................................................. 52

A. Regional Applicability ........................................................................................................52

B. Maintenance of Records ....................................................................................................52

C. Procedure for Insuring SCA-Owned Trailers ....................................................................53

D. Frequently Asked Questions .........................................**Error! Bookmark not defined.**

XXI.   REGISTRATION AND LEGAL AGENTS .......................................................................... 53

A. Regional Applicability ........................................................................................................53

B. State and Province Registration ........................................................................................53

C. Legal Agents ......................................................................................................................54

D. Nonprofit Status .................................................................................................................54

XXII.   REPORTING INDEX ................................................................................................... 55

XXIII.   PROPOSAL CHECKLIST FOR SOCIETY ANNIVERSARY EVENTS ................................. 56

XXIV.   SOCIETY SENESCHAL POLICIES & INTERPRETATIONS ............................................. 58

XXV.   ANNOTATIONS REFERRING TO GOVERNING DOCUMENTS (GOVDOCS) ................... 60

XXVI.   ERRATA ..................................................................................................................6060

Guideline to Ethical Decision Making for SCA Seneschals

- Always comprehend the nature of one's words and actions and how they reflect upon you, your Kingdom and the SCA.

- Clarify your goals… what are your short term and long-term goals, i.e. what is the purpose for taking action or not taking action.

- Always strive for continuous personal improvement in serving others.

- Be aware of your ethical responsibility as an SCA Officer, i.e. without being respectful, caring, trustworthy, responsible and fair, you cannot fully serve the SCA's participants.

- In gathering facts, always attempt to get accurate, first-hand information from each side of a situation or conflict, speak directly to the parties or percipient witnesses and attempt to obtain complaints or statements in writing.

- Always be willing to adjust according to your observations and as such, do not take a position and then back it up with facts; rather, let the facts establish your position.

SCA_000364

# I. INTRODUCTION

1. The Seneschal's Handbook is an official document of the Society for Creative Anachronism, and as such delineates policy, procedure, and recommended best practices for SCA branch operations. This handbook supersedes all prior versions.

2. This handbook is a living document, and as changes to policies or procedures are needed, the Office of the Society Seneschal will issue policy statements, policy interpretations, and implementation guidance. As these are upheld by the Board of Directors, changes will be issued as necessary and incorporated or appended to this handbook.

3. The information included herein is specifically noted as Seneschal policy and has been approved by the SCA Board of Directors.

4. This document supports and complements the branch operations implementation of the governing documents, but does not supersede or supplant anything in the governing documents. While this handbook is meant primarily for Kingdom Seneschals, all branch Seneschals should be using the information contained herein.

5. Kingdom Seneschals are first and foremost corporate officers of the SCA, Inc. They are the official officers acting on behalf of the Corporation and its interests and policies on a local level in their regions, and the local officers representing and acting on behalf of the local and regional interests to the Corporation. Seneschals are responsible for coordinating the administration and ensuring the proper and effective operation of the Society's historical "game-side" re-creation.

6. While the Seneschal is a very important position in any branch, it is essential to remember that the position is a part of a larger team of branch officers who make the SCA happen. The office of the Seneschal is a facilitator of policy and procedure from the local to corporate level. Successful Seneschals avail themselves of good interpersonal skills and diplomatic skills, attention to detail, and objective issue management. Seneschals must work with and through people, and their success is completely dependent on the goodwill and relationships they can manage and foster.

7. The official job title of any SCA Kingdom Seneschal is "Regional Vice-President of the SCA, Inc."[1]  The Kingdom Seneschal is the only officer at the Kingdom level who is also defined as a Corporate officer. Note that different arrangements may exist within affiliate organizations.

8. The Kingdom Seneschal is the Kingdom's legal representative of the SCA, Inc. within their Kingdom and has responsibility for and authority in legal matters within the Kingdom.[2]  They are the interpreter/arbiter of Kingdom law and Kingdom Seneschallate Policies (this may vary by Kingdom). They are ultimately the one responsible for real-world legal, financial, and operational matters: sites, contracts, waiver policy, and making sure the SCA governing documents are followed. They may delegate some of this authority to local Seneschals and Event Stewards as appropriate under these documents and in accordance with Kingdom culture.

9. There is often much confusion about the separate lines of authority between the Kingdom Seneschal and the Crown.

SCA_000365

a.  The Crown has all ceremonial responsibility and authority making decisions regarding Kingdom courts, awards, etc. They are in charge of administering the "game side" of the SCA in their Kingdom, within the confines of the governing documents and current Kingdom Law, and are responsible for fostering an appropriate atmosphere of participation within their Kingdom. The Crown may create or change laws within the Kingdom, while following all internal requirements, though these laws may not conflict with modern law or any higher SCA level policy or document. The Crown is responsible for monitoring and confirming the performance and conduct of Kingdom officers, and appointing, removing, and replacing such officers when necessary in conjunction with Society officers and the laws of their Kingdom and the SCA.[3]

b.  A Kingdom Seneschal should keep the Crown informed of their actions and decisions. The Kingdom Seneschal and Crown must work cooperatively because their areas of authority frequently overlap.

10.  Be aware that in kingdoms that are wholly, or partly, covered by an SCA affiliate organization, certain policies or rules may differ as defined in the affiliation agreements or other board rulings. Seneschals should be aware of these differences and act accordingly.

11.  In regard to chain of command, Kingdom Seneschals report to the Society Seneschal who, in turn, reports to the SCA President who reports to the SCA's Board of Directors.[4]

## II.  AFFILIATE AND INTERNATIONAL INFORMATION/NOTICE

### A.  GENERAL INFORMATION

The SCA, Inc. is responsible for the oversight of the whole of the SCA. In turn, there are several constituent, affiliate organizations that accept Corpora but cover areas of different (potentially vastly different) modern law. The SCA recognizes the absolute precedence of law issued by civil authorities over any of its internal rules. The SCA, Inc. as a corporate entity, along with all of its members as citizens, must obey the law of whatever jurisdictions apply to them in exactly the same fashion as all other corporations or citizens in those jurisdictions.[5]  Any Seneschal is responsible for insuring compliance with modern law, but if you are a Kingdom Seneschal who is outside of the United States (US) and is under an affiliate agreement, make sure to check with your affiliate's governing documents for any exemptions or exceptions that your group may have been granted. Additionally, your local laws will be different than U.S. laws; while this document attempts to be of general applicability, make sure to check your local law for differences.

### B.  EXISTING INTERNATIONAL AFFILIATES

1.  The following are the Affiliate groups which cover non-US territory at the time of this revision:

    a.  SCA Australia (SCAA)

    b.  SCA New Zealand (SCANZ)

    c.  SCA Finland (SKA)

    d.  SCA Sweden (SKA)

SCA_000366

# III.   PREPARING FOR THE KINGDOM SENESCHAL JOB

## A. WARRANT OF OFFICE

1. Your warrant makes you the Kingdom Seneschal, officially and legally. Ideally your predecessor initiated this process. Kingdom officers may not simply appear on rosters, because Corpora specifies that officers whose appointments require confirmation at the Corporate level must have individual warrants.[6]

2. Kingdom Seneschals must use the Executive Warrant form located at http://www.sca.org/docs/pdf/govdocs.pdf which must be completed as prescribed in Corpora in Appendix B.

3. Once the Crown signs the warrant, it must be sent to the Society Seneschal (it is your responsibility to either send it or ensure the Crown sends the document). Keep a personal copy in case it gets lost in the mail. Refer to yourself as Acting Seneschal until you have a fully signed warrant, but don't wait for your warrant to get to work. Regularly check with the Society Seneschal to make sure the form you have is current; copy it as needed for yourself and other offices.

4. Complete your term of office. Kingdom law and custom will control your term of office. Within broad limits, the length of your term, the application of a period of probation, and the availability of renewals are all left to your Kingdom.

5. Don't let your warrant expire. Get a new warrant for yourself or your successor before your current warrant expires. The 45-day grace period mentioned in Corpora is designed to protect the Kingdom in case of unavoidable delays in the paperwork, not to provide a guaranteed extension for your term.[7]  It is recommended that you place a reminder for yourself on your calendar as soon as you receive your new warrant to renew your warrant at least 30-days prior to its expiration.

## B. ASSEMBLE A REFERENCE LIBRARY, RESOURCES AND TOOLS

1. From Corporate you will receive:

   a. Electronic access to the eNewsletters from all the other Kingdoms as well as the eBoard-Minutes.

   b. Listing on the Inter-Kingdom Directory on SCA.org, which lists Corporate staff and Crowns, Royal Heirs, Seneschals, Exchequers, and Chroniclers for all Kingdoms. Please check your listing to ensure accuracy.

   c. The Electronic Membership Listing, which is emailed monthly by the Registry to allow you to manage membership requirements in your Kingdom. Where all or part of the kingdom is covered by an affiliate organization, you should make arrangements with the appropriate registry to obtain membership information.

   d. An updated list of revoked memberships, which is sent out monthly by the corporate office (comes with the membership list).

   e. Access to an online membership verification tool that is especially helpful at Crown Tournament time. (May not apply to affiliates). https://membership.sca.org/index.php?choice=retrieve

2. From the Society Seneschal you should request:

SCA_000367

a. Big Book of Banishments. This is a document that shows all persons subject to sanctions, including the severity and duration of each sanction.

b. Membership in the Kingdom Seneschals' email discussion list at SCAKingdomSeneschals@yahoogroups.com. Your official seneschal email address should already be subscribed.

c. You should send an email to your Kingdom's Ombudsman on the Board of Directors to introduce yourself and facilitate communication (email addresses available on the SCA website).

3. From online sources you should download and familiarize yourself with:

a. The SCA's Organizational Handbook which includes Corpora, Bylaws, and the Corporate Policies of the SCA

b. The SCA Seneschal's Handbook (this document)

c. Society and Corporate Officers' Handbook

d. Branch Financial Policy

e. Your own Kingdom's financial policy and current law (and probably the last few editions of it)

f. Any current officer handbooks your Kingdom uses

g. The SCA Census

h. Insurance Ordering Instructions from sca.org (within affiliates, separate insurance arrangements exist)

i. http://www.sca.org/docs/library.html#officers is invaluable

## C. AVOIDING BURNOUT

1. No matter how much you like being Seneschal or how much you may disagree at first, you are nonetheless in danger of burning out. The rewards are internal and intangible, and the costs in time, money, and peace of mind are great. Accept that you are at risk, and take steps to monitor yourself to avoid the possibility. Be aware when you are over your head.

2. Classic burnout happens when the sufferer finds their job intolerable and impossibly dear at the same time, so they can't do it properly and can't bring themselves to accept help either. Ask questions. Accept help. Delegate when possible and appropriate. This is a very large, demanding job; while it provides great benefits and is of immense importance, it should not drive you out of the SCA after your term or cause you to end your term prematurely.

3. Once you accept the possibility, you can protect yourself. Conserve and refresh yourself from day to day, take breaks, and start training a couple of successors while you still feel strong enough to go on. Make certain to keep doing the things that help you find the fun in the SCA.

4. Step down while you're ahead. It is better to regret leaving an office than to keep it so long you regret the day you took it! When your term is up, consider very carefully whether it is appropriate to extend.

# IV.  ARBITRATING THE RULES AND THEIR PRECEDENCE

A. GUIDELINES

1. Modern Law and local regulations always take precedence over any organizational requirement or policy – and no "game-side" situation or circumstance should ever hinder or supersede modern law and local regulations. Where modern law differs in different parts of the Kingdom, then the most appropriate jurisdiction should apply – i.e., that which applies where the event or activity itself is held. If in doubt, contact the Society Seneschal.

2. Within the SCA, Inc., if there is any conflict among the provisions of the following types of Corporate rules, those higher on the list will govern over those lower. Policies and handbooks are guidelines to help facilitate and interpret our rules and governing documents for those responsible with administering our organization and implementing our rules. Ultimately, however, the Board and all Corporate Officers are responsible to modern law and our governing documents.

3. Kingdoms, Principalities, and Baronies can add local guidelines to govern the running of their lands, which would then not apply in other SCA lands. They may be used to "add to" the procedures and restrictions defined in a document "higher up" in the precedence, as long as they do not contradict or overrule the higher-level rules. Kingdoms can be more restrictive, but not less restrictive than Society rules. For example, the Crown cannot write a law saying the kingdom financial committee is composed of only 2 individuals (in contravention of the more restrictive SCA financial policy), or the kingdom may not allow grappling on the armored combat field as that violates the more restrictive SCA marshallate rules banning such behavior. The kingdom could, however, ban thrusting in combat – since that would be more restrictive than SCA level rules which currently allow such behavior.

4. Note once again that different rules may apply in affiliates. While they are bound by Corpora, they have many exceptions or modifications required to fit in with local law. Make sure to check these documents when dealing with legal matters.

B. ORDER OF PRECEDENCE[8]

1. Modern Law

2. The By-Laws of the Society for Creative Anachronism (SCA, Inc.)

3. The Corporate Policies of the SCA, Inc. (Different policies may apply to affiliates)

4. The Corpora of the SCA, Inc.

5. Affiliate governing documents, if applicable.

6. Interpretations of Corpora by the Society Seneschal approved by the SCA Board of Directors

7. Corporate Officer Policies and Handbooks

8. Individual Kingdom Financial Policies (Different policies may apply to affiliates)

9. Kingdom Law

10. Decisions of the Crown

11. Kingdom Officer Policies and Handbooks

SCA_000369

12. Principality Law

13. Decisions of the Coronet

14. Principality Officer Policies and Handbooks

## C. TREATIES AND CHARTERS

1. Treaties between Kingdoms are considered game-side-only, can be broken at will by the Crown, are non-enforceable, and are meant to add flavor and depth to the SCA experience; they hold no actual legal weight. Please note that large-event negotiations such as those which determine the legal structure and finances of Pennsic, Estrella, etc. do not fall in this category and should be changed only with the agreement of all parties.[9]

2. Branches and groups such as orders and guilds are permitted to create charters if they find it useful to codify their customs. Charters are primarily administrative tools that can help the group to define structure and procedures. Unless written into Kingdom or Principality law, organizational charters do not have the force of law. Branch charters may not be written into law.[10]

# V.  REPORTING AND COMMUNICATIONS

## A. QUARTERLY REPORTS TO THE SOCIETY SENESCHAL

1. Each Kingdom Seneschal must send a quarterly report to the Society Seneschal by the 15th of March, June, September, and December.

2. Use the online reporting tool found on the Society Seneschal's website.

3. Be sure to copy the Board Ombudsman for your Kingdom.

## B. REPORTING CROWN VICTORS

1. Kingdom Seneschals must immediately notify the Society Seneschal via text or preferably email of the winners of the Crown Lists along with their full contact information.

2. Be sure to copy (cc) the Board Ombudsman for your kingdom.

## C. 48-72 HOUR REPLY GOAL

1. Kingdom Seneschals should try for a 48 to 72 hour turn around on all email and phone communications. A simple "Got your message, I will get back to you" is just fine to ensure prompt response to communications.

2. A designated representative may respond in times when the Seneschal may be unavailable for 72 hours (business trips, non-SCA vacation, Pennsic, etc.).

## D. EMERGENCY & SANCTION COMMUNICATIONS

1. Notify the Society Seneschal of any impending Royal or administrative sanctions (all types) as soon as it is reasonable.[11]  If the Kingdom Seneschal tells the Society Seneschal before the Royalty pronounces the sanction, people can work together to make sure that the paperwork is all in order and proper procedures are being followed from the beginning. It has proven perilous for a Kingdom Seneschal or Crown to initiate sanctions which will require corporate level review without prior coordination with the Society Seneschal, or a designated deputy. The Board can, and does, sanction Kingdom level staff and/or Crowns who impose sanctions inappropriately.

SCA_000370

2.  Immediately notify the Society Seneschal about any occurrences that made it necessary to call the modern authorities (law enforcement, fire department, emergency medical) to the site of an SCA activity or event.[12]  Such emergencies include injuries in which the victim is transported by EMS or ambulance.

3.  Immediately notify the Society Seneschal of any threatened lawsuits.

4.  Immediately notify the Society Seneschal of any incidents that may produce a claim on SCA insurance; within affiliates, additionally notify the relevant local officer.

5.  Immediately notify the Society Seneschal and Crown of any suspected thefts, embezzlements, or other financial irregularities involving kingdom or branch funds, and ensure that the Kingdom Exchequer notifies the Society Exchequer immediately.[13] Kingdom Seneschals are not to attempt to 'make a deal' or negotiate in any way with the alleged perpetrator. Follow the procedures set forth by the Society Exchequer and branch financial policy for what to do in case of a theft from the SCA.

6.  Immediately notify the Society Seneschal at once if he or she believes that the Crown's actions or the actions of other Great Officers are violating the rules of the SCA, Inc. or the laws of the jurisdiction under which the Kingdom falls.

E. **COMMUNICATION WITHIN THE KINGDOM**

1.  Ensure Kingdom officers' meetings or curiae occur regularly as required by Kingdom law and appropriate for Kingdom tradition. Often the requirements for these are specified in your Kingdom law. Prepare an agenda before the meeting. Discuss the agenda with the Crown in advance of the meeting, and make sure any items they wish to discuss are included on the agenda. Preside if you can. If law and custom give this job to the Crown, make sure you sit near the Crown, and take an active interest in the entire meeting. If you are not running the meeting, assist in keeping things moving and bring the discussion back to the topic at hand when it strays. Share the results with the populace.

2.  Arbitrate disputes where possible. Encourage people to come to you or your designee with disputes they can't settle for themselves. Stay out of feuds yourself. Often disputes are best settled at the level at which they occur. Attempt to catch issues early, it is useful to have Regional deputies who can spot and deal with issues before they become large problems. In-Kingdom arbitration should almost always be the first step if possible, rather than a request for official Board intervention. When in doubt, it is suggested that you request advice on how to manage disputes from the Society Seneschal.

3.  Establish yourself as a source of reliable advice. Refer to your reference library when in any doubt as to an issue or question. Answer all questions cheerfully and patiently, with as much substantive information as you can, plus a referral to the officer in charge of the area, if there is one.

4.  Keep the official Kingdom Calendar. You can delegate the maintenance of the calendar to another officer or to a deputy, but the policies about scheduling and conflict resolution belong to you. Depending on the laws of the kingdom, the Crown can override you for an event or a reign, in which case you administer the Crown's policies rather than your own, but the default position should be that the calendar is your job and that you are the one who resolves any disputes with it. The policies for scheduling events should come from you and the Crown (unless written into Kingdom Law).

5.  Watch for things that need to get done. Keep an eye on the Kingdom as a whole, and look for things that the royalty or any of the officers might initiate to improve the general

quality of life in the SCA. You are responsible for the proper and efficient management of our "game-side" historical re-enactment, and pro-active management is often much more effective and efficient than reactive crisis management.

6. Listen. You'll find that a great many people want to talk to you, regardless of what you're doing or what you may be able to do for them. Though listening to the troubles and plans of the populace may eat a lot of time, especially at events, it is a great investment in proactive management and relationship-building to give an ear to what people have to say to you.

7. Reach out. In addition to listening to those who seek you out, you'll find it worthwhile to reach out. Call, travel to an event, and/or email people to notice work done well. Remember to thank people; you will feel better, and so will they. Much of the currency of the SCA is in recognition – both official and unofficial. Small words of recognition and encouragement are often as or more important than official awards and will buy both appreciation and goodwill.

8. Network. Develop a network of reliable contacts throughout the Kingdom. Find reliable sources of information and action across your region.

## F. COMMUNICATION WITH THE CROWN

1. Always treat the Crown with deference in public – regardless of the forum. No matter how you feel about some individuals on the thrones, your role in our shared activity requires you to behave as though these points are always true:

   a. The Crown is at the core of the SCA.

   b. The Crown is always worthy of respect.

2. Treat the Crown with courtesy at all times. Address the Crown (instead of the person wearing it) even when no one is watching, and avoid invoking your prior relationship with the people serving as royalty. There will be times when you can let your hair down, especially with old friends, but let them make the first move, and always in private.

3. Make the royal lives as easy as possible. If the Heirs don't have their own support group, help them organize to make sure that not only will their physical comfort gets looked after while they are on the thrones, but that they are similarly supported in the administrative functions necessary to make their reign more successful. It is worthwhile to have a welcome package available for new Heirs. This may include Kingdom law, Corpora and Governing documents, recent Kingdom Curia meeting minutes, as well as any other policy information you deem of critical importance. If prior Kingdom seneschals have not created one, it could well prove a worthy project during your tenure.

4. Work with the Kingdom Exchequer to make sure the Heirs are fully informed regarding financial and budgetary matters as soon as possible. The new Crowns need to understand their fiscal responsibilities, what will and will not be paid for under your Kingdom's financial policies, the workings of the Kingdom Financial Committee, and so on.

5. Keep your royalty and royal heirs well informed regarding happenings in the Kingdom, including reactions to things they've said and done. Offer all counsel to the Crown with respect and courtesy.

6. Deal with disagreement calmly. If the Crown seems determined to do something you regard as dangerous for the Kingdom or the SCA as a whole, start by talking privately

with the royal couple. Always seek to understand what they really plan and what they mean —second-hand reports are often misleading—and explain why you believe the action is unwise. If it's against the rules as you read them, quote the specific citation and point out that you will have to consult the Society Seneschal about it—which may then lead to Corporate intervention. Try to find an approach that will accomplish the royal goals without the ill-effects you predict. Do note, however, that if you believe that there is something going on against either the rules of the Society or modern law, and the Crown will not be deterred, you must contact the Society Seneschal at once!

7.  If you can't deflect the Crown from something you regard as unwise but not against the rules, focus on damage control. On one hand, look for explanations to help people accept the idea, and on the other hand, follow the commands in as neutral a fashion as you can.

8.  It is the responsibility and honor of the Crowns to establish and present Awards and Accolades as they shall deem proper, in accordance with the laws and customs of the Kingdom. Even ill-judged awards have a place, because they establish the reality of royal power. Advise the Crown as clearly, soberly and courteously as you can.

9.  The Crown may suspend a territorial Baron and/or Baroness for the duration of a reign, for just cause stated in writing and presented only to the Baron and/or Baroness. Suspension would prohibit the use of the baronial titles and arms, the conduct of baronial courts, and the presentation of baronial awards. The Crown may remove a territorial Baron and/or Baroness for just cause stated in writing and presented only to the Baron and/or Baroness; however, the Crown may request a written opinion from the populace of the barony before taking such action.[14]

10.  The Crown may suspend the warrant of a Kingdom Seneschal for the duration of a reign, for just cause stated in writing.[15]

11.  Warrants for Kingdom Officers are signed by the Crown and the corresponding Corporate Officer.[16]  Kingdom Seneschals should assist with and work toward an effective and positive outcome of this process.

G. **COMMUNICATION WITH OTHER KINGDOM OFFICERS**

1.  You need to know what is going on within your Kingdom in order to do your job, and to work with and through fellow Kingdom officers to do your job effectively. Ask the other Kingdom officers for a courtesy copy of their warrants and of their reports to the Crown and their Corporate superiors. Send them yours in exchange. Do not take active steps to second-guess another Kingdom officer unless there is a clear violation of Corpora or a complete loss of function in the office.

2.  Make sure the other Kingdom offices stay filled and be prepared to help find a replacement if another officer fails to do so.[17]

3.  Encourage the other Kingdom officers to talk to each other. The effective operation of our "game-side" historical re-enactment within a Kingdom requires all of its officers working smoothly together, the seneschal plays a vital role in seeing that communications remain clear so the Kingdom's work is done effectively and efficiently. Regular meetings are one way to ensure that communication happens. Rather than trying to "manage" other officers, try to coordinate and facilitate communications amongst and between you all.

H. **ELECTRONIC COMMUNICATIONS POLICY**[18]

1. It is important to remember that regardless of interpersonal relationships and informal modern communication links that may have been developed, Kingdom Seneschals are corporate officers and as such must communicate all official correspondences in a formal manner consistent with that corporate role.[19]

2. Formal communications to and from SCA officers may be directed through electronic means (email) as well as through postal or fax systems. However, messages posted for general attention on any public system may not be regarded as formal communications to an officer, whether or not that officer is known to participate on the electronic forum, email list or social media site in question.[20]

3. Formal email correspondence with an SCA officer is acceptable and official only when the officer has offered to communicate electronically by placing his or her email address in SCA publications, by releasing it for individual use, and by initiating email correspondence for official business.[21]

4. Formal email correspondence from an SCA officer is appropriate only as a reply to incoming email where electronic communication is clearly invited and welcomed by the recipient.

5. No personal and or identifiable information will be sent over email lists unless the individual gives permission to do so. A phone call or postal letter is also an acceptable means of communication.

6. If you and your local Seneschals or other Kingdom officers wish to do so, reports may be sent via email.

7. No messages posted to social media sites, general email lists, or other public electronic forums can be considered official communications. Therefore, these messages are not required to be part of your permanent files. However, it may be wise to keep copies of some messages if they could help to document a problem.

I. **WEBSITES AND SOCIAL NETWORKING SITES (INCLUDING FACEBOOK)**

1. For a digital site to be recognized by the SCA, it must represent an established branch of the Society and must have a warranted web minister responsible for its content. As they do not represent established branches of the Society, the SCA will not recognize sites for households or guilds. Group officers with a website are responsible for ensuring that the site complies with Society guidelines.

2. Personal information will not be published on any SCA recognized Internet site without first gaining permission from the individuals involved.

3. E-mail permission to electronically publish personal contact information is acceptable.

4. Permission to electronically publish the contact information of an individual is in effect until that same individual revokes permission.

5. Event Stewards may grant permission in writing to electronically publish the personal contact information of persons serving as event staff. In this case, it is understood that individuals volunteering to be event staff have granted this permission to the Event Steward.

6. Note that affiliates may have different publication policies.

7. See the Corporate Social Media Policy for more details.

SCA_000374

J. CORPORATE MAILING LABELS

1. You may request mailing labels for these purposes:

   a. Kingdom-approved Branch Polling

   b. Kingdom Newsletters

   c. Kingdom A&S Issues

   d. Kingdom Law Issues

   e. Other than the above cases (all of which must come through the Kingdom Seneschal or Kingdom Chronicler), the Corporate office cannot issue mailing labels/files for mailing to the membership.

2. As a reminder, when requesting the labels, please submit the postal codes, in numerical order, for the area you wish labels generated.

3. **Labels must be used within 10 days of receipt; then the file must be destroyed.**

# VI. DEPUTIES & SUCCESSION PLANNING

## A. DEPUTIES TO THE KINGDOM SENESCHAL'S OFFICE

1. Kingdom Seneschals may appoint additional deputies (with the Crown's approval) as needed to perform the duties of their office. These deputies are covered under the Kingdom Seneschal's warrant.[22]

2. Each Kingdom shall have a single responsible officer (i.e. "Waiver Secretary") as a deputy to the Kingdom Seneschal to ensure that all required waivers, rosters, and sign-in sheets are collected and safely stored within a reasonable time after each event. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required. Each Kingdom shall store all original executed waivers, roster, and sign-in sheets, or legally accepted facsimiles, in such a manner that a responsible party can easily retrieve any needed waivers.[23]

## B. EMERGENCY REPLACEMENT DEPUTY & FINDING A SUCCESSOR

1. All Kingdom Seneschals must have a designated emergency deputy at all times and must provide the Society Seneschal with this individual's name and contact information. This person should be someone who can step in until a successor is chosen, if you are suddenly unable to fulfill your role as Kingdom Seneschal.

2. The Society Seneschal must receive copies of any applications or resumes received for the Kingdom Seneschal's office.[24]

3. Both the Crown and Society Seneschal must agree on a candidate for the office of Kingdom Seneschal before they are put into office. The Society Seneschal will normally accept any reasonable choice the Kingdom Seneschal and the Crown propose.[25]

4. However, it is possible that a warrant may be refused. Grounds include but are not limited to:

   a. Failure to meet membership requirements as specified in Corpora.

   b. Being married or otherwise having too close of a relationship with the Society Seneschal or another Kingdom Seneschal. Also, too close a relationship (such as

SCA_000375

marriage) between the Kingdom Seneschal and the Chronicler or Exchequer of the same Kingdom.

c.   Being too biased. A seneschal has to be able to serve all sides and citizens of the Kingdom, and be prepared to help people see corporate policies in a reasonably favorable light. Perceived tendencies toward controversy or factional orientation are grounds for question and possible non-confirmation of any appointment.

d.   Failure to meet the Society Seneschal's requirements for the job. These include the ability to write Standard English, as well as having a phone, internet access, reliable email access, and a fixed mailing address.

# VII.  KINGDOM FINANCIAL MATTERS

## A. FINANCIAL RESPONSIBILITIES

1.   The Kingdom Seneschal serves as one vote on the Kingdom Financial Committee, and may also be required to sit on other Financial Committees for your Kingdom's large inter-Kingdom events, if you have one. [26]All SCA Financial Committees are required to include at least one Seneschal. The role of the Seneschal on these committees is an important one; you are the legal representative of the Kingdom.

2.   Remember that the Kingdom Seneschal is responsible for signing all contracts approved by the Kingdom Financial Committee. While this responsibility may be delegated, final responsibility rests with you.

3.   The Kingdom Seneschal is responsible for ensuring that Corpora guidelines, and the deadlines, event requirements, and officer policies defined for the Kingdom (including any separate affiliate financial policies where relevant), are considered and followed by the Kingdom Financial Committee.[27]

4.   A few limitations:

a.   The SCA shall not purchase, use, or sell fireworks.[28]

b.   SCA funds shall not be used to purchase alcohol in the US (different laws apply outside of the USA). The insurance policy for the SCA in the US does not cover the sale or purchase of alcohol. The international portion of the policy permits the purchase and sale of alcohol as long as it is not the business of the SCA.[29]

## B. THEFT PROCEDURES[30]

1.   If a local Seneschal or Exchequer suspects a theft from a local account or any other fiscal wrongdoing, they should immediately report it to both the Kingdom Seneschal and the Kingdom Exchequer. Kingdoms can determine whether they want Principality or regional officers in the reporting chain or not in these matters. Immediate reporting to the Kingdom officers applies regardless of the person—all suspected thefts must be reported immediately. The Kingdom officers or their deputies will confirm whether a theft has occurred. Do not have local officers try to confirm whether a theft has occurred or try to negotiate with the person involved.

2.   The Kingdom Seneschal and Kingdom Exchequer will be involved throughout this process, so both should be involved from the beginning. Good communication between the Seneschal and Exchequer is critical in this situation. Each must know what the other has done or is doing at all times when there is an investigation. Do not assume that the other officer is being kept in the loop by anyone else.

SCA_000376

3. If the Kingdom Seneschal or Kingdom Exchequer suspects that a Crown is misappropriating funds, call both the Society Seneschal and the Society Exchequer immediately. If a Kingdom Seneschal suspects a Kingdom Exchequer, or vice versa, call the Society Seneschal and the Society Exchequer immediately.

4. The Kingdom Exchequer or their deputy will verify whether the suspected theft has occurred, either by reviewing the documentation provided by the group or by performing an independent investigation as recommended by Kingdom or Society investigation procedure guidelines. If the Kingdom Exchequer is satisfied that there has been a theft (rather than an error in bookkeeping), they will work with the Kingdom Seneschal to resolve the matter.

5. Do not contact the suspected thief until and unless the Society Seneschal and the Society Exchequer direct you to do so. The Kingdom Officers acting together will contact the person involved regarding their investigation, and give the person the opportunity either explain why the suspicions are unfounded or incorrect, or to replace any stolen money/equipment. Note that a simple denial of guilt is not a sufficient explanation.

6. Once the Kingdom Officers are satisfied that a theft has taken place, they should include a full accounting of what occurred in a report to their Society superior officers and confer with the Crown about appropriate sanctions. Depending on the circumstances, this will at a minimum include a request for an administrative sanction, and may include a request for an Expulsion and revocation/denial of membership.

7. Note: A theft of $600 or more will necessitate the issuance of a 1099 form per IRS requirements.

## C. GRANTS

1. As a non-profit corporation, the SCA can pursue its mission locally, regionally, and nationally with funding provided by a range of local, regional, and national funding grants provided by a wide-range of public and private institutions. We encourage all local and Kingdom branches to determine if there are appropriate grants available, and to seek such funds to support our mission and the goals of the SCA. The Society President is the final signatory on all grants.

2. Make sure you are informed of grant applications before they are filed. Check to see whether statements about the SCA and the group submitting the bid are true and accurate, and that the project really does belong to the SCA. Grant agencies are generally too big to concern themselves with a single chapter of the SCA if they get unhappy—the Kingdom will surely be drawn in, so you should be involved from the start.

3. Confirm that the Kingdom and Society Exchequers have approved the accounting. Anyone wishing to apply for a grant in the name of the SCA must work out satisfactory accounting procedures, and must get written authorization from both the Kingdom and Society Exchequers before filing the grant application.

4. Do not permit grant applications on behalf of non-SCA people or groups. Many grant agencies will disburse money only to 501(c)(3) organizations, and so groups or individuals without that status often look for groups that do have it (like the SCA) to "stand fiduciary" for them, apply for the grant, and pass the money to them. Such arrangements are absolutely forbidden! Grant agencies can show up long after the money was spent and demand 'to the penny' accounting, which is bad enough if you spent the money yourself, and almost impossible if somebody else spent it.

SCA_000377

D. **MEMBERSHIP DRIVES AND RECRUITMENT ACTIVITIES**

1. Membership drives, demos, and other recruitment activities should stick to encouraging people to join the SCA. Branches are welcome to hand out forms, discuss benefits of membership, and provide lower site fees for members (beyond not paying the NMS), if Kingdom law and custom allow the difference.

2. They can even offer memberships as prizes if the funds to buy the prize memberships are donated and are not SCA funds (It is not allowed to use SCA funds to buy personal memberships, save where permitted by local affiliate financial policy).

3. No one but the Registry is authorized to sell memberships in the SCA! Tell your local Seneschals not to collect membership forms and payments to be forwarded to the Registry, and have them try to stop anyone in the branch from doing so.

# VIII.   SUPERVISING BRANCH SENESCHALS

A. **MENTORING BRANCH SENESCHALS**

1. Local Seneschals are your people. Advise them, support them, listen to them, let them operate on their own as long as things are going well; intervene if the members get unhappy with their Seneschal. If at all possible try to mitigate a situation before things get out of hand.

2. Make it a rewarding experience. Talk to your people—answer their letters and e-mails within two days— make sure they're the first to know the facts behind the rumors.

3. Don't try to run your own local branches. It's difficult, but you must avoid acting on information you know only because of proximity to where you live. Your local branches must be treated just like any others. Let the Seneschal take the initiative when it comes to discussing local problems with you. And don't hesitate to point out that you're hearing too much, if the local Seneschal starts trying to foist the management of the branch onto you.

4. All local Seneschals are required to read and be familiar with Corpora, Society policies, Kingdom Law, and affiliate agreements (where relevant). This document also provides a good frame of reference and broader context for a new local Seneschal.

5. Local Seneschals and Exchequers must be a part of their local Financial Committees. Each committee needs only one other person to make the required minimum of three members. The minimum for approval is a simple majority. For additional details on the composition of the Financial Committee, refer to Society Financial Policy or the Kingdom Exchequer Handbook.

6. Only paid members in good standing may be on the financial committee.

7. Branch seneschals are required to review branch financial reports and banking documents.

8. Help local Seneschals understand their role as coordinators. Local Seneschals can't hire and fire the rest of the branch staff, any more than you can do so at the Kingdom level.

9. Avoid concentrating local offices in one family or household. Work with the local Seneschal and your fellow Kingdom officers to divide things up as much as possible. The offices of Seneschal and Exchequer may not normally be combined in one house. The Seneschal and the Exchequer CANNOT be the same person! If for some reason a group

SCA_000378

cannot meet these requirements, they can apply to you and the Kingdom Exchequer for a variance. Use your own good judgment in deciding whether to grant it.

10. Training Local Seneschals on how to oversee local branch events:

   a. Local Seneschals play a key role in determining the SCA responsibility for events. Be clear in the difference between a published SCA event or activity and a private party or activity. A Society event must fulfill the requirements in Corpora—that is, it must be recorded with the local Seneschal, publicized at least to the membership of that group, and conducted in keeping with the SCA purpose and rules. Seneschals are reminded that all SCA events must be sponsored by an official branch of the SCA. Unofficial special interest groups--such as households, ships, guilds, or clans--wishing to host events must obtain the sponsorship of an official branch before proceeding.

   b. SCA money may not be spent on private parties.

   c. SCA insurance will not cover private parties. This includes household functions. If the event, revel, etc., is not sponsored by an officially recognized branch of the SCA, our insurance may not be used.

## B. APPOINTING LOCAL BRANCH SENESCHALS

1. Six months prior to the end of a local branch seneschal's term, either you or the local seneschal should open the office for applications by advertising the opening in the local newsletter and other appropriate venues (e.g., local meetings, email lists, or social media). The six-month timeframe allows for a three-month application period and a three- month training period for the incoming officer.

2. Encourage branches to seek consensus when choosing officers.

3. Endorse the person proposed by the outgoing branch Seneschal if you can. The ideal is that the outgoing Seneschal and the branch will find someone suitable for the job, and all you and the Crown need do is approve the choice. If you're getting complaints from the branch about the proposed candidate, talk to everyone before placing the person on a roster. The seneschals' job should always be posted in the local branch newsletter and any local e-lists.

4. Strategies for dealing with difficult or contested appointments:

   a. Ideally, each local Seneschal should select a deputy (acceptable to the Kingdom Seneschal) who can intervene in the event of an emergency vacancy. However, if the outgoing Seneschal leaves without proposing a successor or having an emergency deputy, you need to get the job filled as smoothly as possible. Depending on the local circumstances, any of the following steps may work:

      i. Ask the baron/baroness or another branch officer to hold a meeting to find somebody.

      ii. Pick a suitable person, and suggest they volunteer. While this may be a quick solution, it may leave the impression that you are selecting a "favorite". Step in only with substantial caution, and if no suitable candidate appears.

      iii. Announce that you (or your regional deputy) will act as branch Seneschal until a suitable candidate comes forward. You may establish a clear time frame for this solution, after which the branch will be expected to have a selected an acceptable candidate.

SCA_000379

    b.  Contested appointments: If the outgoing Seneschal and/or the branch propose a successor you don't regard as suitable for the job, proceed very carefully:

        i.  If it's a matter of relations between your personal household and another or a personality conflict between you and the candidate, with no glaring problem in the candidate, sign the warrant.

        ii.  If you have reservations about the candidate's communications skills or tact, issue a short-term warrant.

        iii.  If they are not qualified, ask for another name.

5.  Keep the local warrants up to date. http://www.sca.org/docs/pdf/govdocs.pdf has the SCA Executive Warrant form. You may use rosters or individual warrants, but both need royal signatures.[31] Per Corpora, rosters must include the following information for each officer: legal and Society names, address, telephone number, and appointment and expiration dates. A roster must be signed by both the appropriate Royalty and by you, and it must contain the statement that it is the current roster of the Seneschal's office of the Kingdom of (your Kingdom name here) of the Society for Creative Anachronism as of the current date.[32] It is best to update this and have it signed once per reign. The other Kingdom (and Principality) officers can use the same system for warranting their local subordinates as well.

6.  Help new Seneschals get oriented to the job. Serving as local Seneschal is often a member's first big step behind the scenes. Even other officers may think events happen spontaneously (except perhaps their own small parts), but the Seneschal knows for sure how much work there is! It's a good idea to send a job-description letter to every new Seneschal to be sure they have an idea of what they're supposed to be doing in their new office. Try to make some personal contact; it may come as a surprise to you, but newer members and newer officers will sometimes regard you as a VIP whom they have no business bothering! Combat these tendencies—make sure you're approachable.

## C. REMOVING LOCAL SENESCHALS

1.  Dismissal of any officer should be treated as a last resort. If a local Seneschal is in trouble, talk with them and look for a way to salvage the officer first. Find out what's really going on, work with the individual and establish a clear action plan and schedule for efforts and improvements moving forward. Give the Seneschal a chance to clear up any problems, real or perceived. If the Seneschal is involved in a difficult situation or adding to the trouble, even if the attacks are largely unwarranted, it may be best to let someone else (but NOT one of the attackers) try to smooth things out. You may wish to involve a more local impartial third party to assist in any investigation or resolution process. Per Corpora, any dismissal requires royal approval, unless Kingdom law specifies levels of inactivity or non-reporting are equivalent to resignation.[33]

2.  Note that the Society's grievance procedure does not apply to removal of an officer for cause (at any level). However, in a non-emergency situation, it is best to give the officer a warning and a chance to 'fix' the problem. Good management practices dictate trying to resolve problems with the person who is the problem.

3.  Local officers can be suspended on the same terms as Kingdom officers. You can suspend a local Seneschal for up to 90 days, and the Crown can do so for the duration of their reign. The warranted deputy (if one exists) steps in to fill the office.[34] Suspension is an effective way to put someone out of play while you figure out if dismissal is in order

SCA_000380

and reach agreement with the Crown, but it should be applied only after careful thought and communication with the officers concerned and with the branch.

4. Grounds for dismissal should be concrete and not related to personal relations with you and/or the Crown. Examples include:

   a. Repeated complaints from the branch. Encourage people to use orderly complaint procedures. If your Kingdom has a written complaint procedure, refer people to it; otherwise, refer them to the one in the Organizational Handbook.

   b. Encouraging activities detrimental to the SCA. The Seneschal should be leading branch opinion towards constructive activity and away from anything that would call our reputation or effective operations into question.

   c. Lack of judgment in dealing with the media.

   d. Inability to organize branch activities or to allow anyone else to do so.

   e. FAILURE to communicate. This isn't just a matter of assigned reports; it is also about how the Seneschal communicates with other branch members, other officers, as well as you.

   f. Egregious displays of lack of respect for the Crown.

## IX. DEALING WITH MODERN LAW AND LEGAL AUTHORITIES

1. If a Seneschal, one of their warranted deputies (such as an Event Steward), or an agent of the SCA (such as a warranted officer of any level of the SCA) is approached by a victim of a modern law crime, that victim be encouraged to go straight to the modern authorities.[35] If the reporting party refuses to summon the authorities, the incident should be documented in writing, including the time, date, name of the event at which it occurred (if applicable), name and signature of the officer to whom the report was made, and that the victim was encouraged to contact law enforcement but declined to do so. Then pass all info to the Society Seneschal.

2. To determine the circumstances where it is appropriate to call the authorities, you should apply the "Reasonable Person Test." Would a reasonable person call the authorities in this situation? Crimes of violence: yes. Crimes involving minors: yes. Crimes of a sexual nature: yes. Jaywalking: no. If you need help determining the appropriate course of action, contact the Society Seneschal for assistance immediately.

3. When a person is brought to event staff with injuries that appear to be the result of violence, the event staff should offer to call both EMS and the Police. If the authorities are called, do not question the alleged victim.

4. For Minor/Youth-related policies, see Section X.

5. SCA volunteers will not put themselves in the position of investigating criminal acts or interviewing alleged victims, unless involved in official sanction investigations after-the-fact. If modern authorities assume control and responsibility for the matter, this does not preclude the SCA from taking other measures as may prove appropriate.[36]

6. It is the policy of the Society Seneschal that the SCA, Inc. (and its affiliate bodies) do not administer modern-era court orders (such as child custody, visitation, domestic violence protective or other types of restraining orders or injunctions), and as such Seneschals and Event Stewards will refer participants to modern-era authorities for enforcement. If a

member went to the local mall, he/she would not expect a store manager to enforce a protective order against a spouse who shows up there–he/she would call the police. It is the same at an SCA event.

7. When an individual is injured at an SCA event, the individual will determine the type and form of medical care required, and assumes all responsibility for their own medical care and well-being. If the individual is unconscious, or appears incapacitated the event staff should summon emergency medical assistance. If the individual refuses aid, it is their choice, but the individual's refusal of aid should be noted.

8. You have access to our legal advisors through the offices of the President and Society Seneschal. If legal issues need to be addressed, do not hesitate to inform the Society Seneschal and the President. The Society Officers will assist with contacting the proper individuals. It is far better to seek professional assistance than to assume knowledge of appropriate legal interpretation.

9. Only the President has the ability to retain legal counsel (attorney, barrister, solicitor, et al), whether paid or unpaid (pro bono) on behalf of the SCA or any of its branches. No other officer, at any level of governance of the SCA has the authority to retain (even pro bono) legal counsel to advise or represent the SCA or any branch, without prior written authorization and confirmation of the retention of such counsel from the President.[37]

10. Americans with Disabilities Act/Disabled Participants: Refer to Section XIII of the SCA Corporate Policy.[38]

## X.  DEALING WITH MINOR/YOUTH-RELATED POLICIES

1. Minors are defined as anyone who has not reached the age of legal majority. This varies between countries, states and other jurisdictions. Be sure of the age(s) of majority in your area.

2. SCA is a member, family, and youth friendly social organization. SCA children, youth, and teen activities and classes are offered as a positive means of encouraging the participation of minors in the SCA with their families while encouraging fun-focused learning about history and the SCA. Those specifically dedicated and/or published youth-oriented activities (SCA Youth Activities) are overseen by warranted youth coordinators at any and all events and activities.

3. Parents or guardians of minors shall have ultimate responsibility for the welfare and behavior of their children at all times. It is the responsibility of the adult who brings a minor to an event to ensure that the minor is safe and not in danger. At events and activities in which youth participate in any way, participating minors must either have a parent or legal guardian present at the event/activity, or a temporary guardian present in possession of a properly executed "Medical Authorization Form for Minors."   This Medical Authorization Form must designate an adult present at the event or activity as able to authorize medical treatment in the case of emergency (a form of temporary guardianship).

4. All warranted Youth Officers (deputies who ultimately report up to the Kingdom Seneschal) must have a current SCA membership and an approved, current, and valid background check. Warranted means you are an official deputy to the Kingdom Youth Coordinator or to the Kingdom Seneschal or one of their deputies.

SCA_000382

5. All official or "published" SCA Youth Activities must have one background checked adult member who acts as the official "coordinator" for the SCA Youth Activity. For example if there are 10 youth A&S classes each in their own separate classroom, each classroom needs to follow the "2 Deep Rule" but there only needs to be one overall youth "coordinator" responsible for the all activity in all classrooms. There are many activities of the SCA where informal instruction (mentoring) occurs that are open to attendance by minors, but do not constitute dedicated and/or published SCA Youth Activities. They are known by many names (i.e. Practices, Meetings, and Guilds & Workshops). A Minor's attendance of an adult A&S class it does not mean that class becomes an SCA Youth Activity simply because a youth is in attendance.

6. The "2-deep" rule specifies that for all SCA Youth Activities, a minimum of 2 adults (at or above the age of legal majority in the state, province or country in which the activity occurs) unrelated to one another by blood, marriage or personal relationship must be present. This policy does not relieve parents of their primary responsibility for the welfare and behavior of their children. One of these two adults may also be acting as the official coordinator for the youth activities going on.

7. Persons who have been convicted of crimes against minors are not eligible to participate in SCA Youth programs.

8. In the case of minor-related crimes it is appropriate for the Seneschallate to call the modern authorities. If a minor appears to have been the victim of a violent crime, modern authorities MUST be contacted. Inform the Kingdom Seneschal immediately.

9. Branch and regional Seneschals, Marshals, Marshals-in-Charge, and Exchequers must be at least the age of majority for their jurisdiction. Be aware that the age of majority does vary between jurisdictions; these officers must be old enough to serve in each area that they serve.

10. Minors 15 years of age or older may serve as officers, except for the offices of: Event Steward, Marshal, Exchequer, and Seneschal. Minors may serve in the allowed capacities only with the express written approval of the parent or legal guardian and their Kingdom superior, after they are notified of the age of the minor.[39] In this and all cases involving minor participation at SCA Youth Activities, parental/guardian accompaniment and the "2-deep" rules still apply.

11. Minors less than age 15 may not serve as Head Gatekeeper, Reservationist, etc., for an event. Such minors may assist at the gate collecting funds, making change, etc., under the oversight of an individual permitted by SCA Corporate Policies to serve as an officer, who will be ultimately responsible for the accounting of the funds passing through the gate. Such minors serving in this capacity may not work unattended at an event gate at any time.

12. Medical treatment of minors is subject to the appropriate laws of the state, territory, province, and/or country where the event is held. In the case of a medical emergency involving a minor, the parent/legal guardian or, in the case of a minor attending with a non-parent/legal guardian, the temporary guardian with the Medical Authorization Treatment Form for Minors be located. See XII.D.

# XI.    OVERSEEING BACKGROUND CHECKS

## A. SCOPE

1.  A background check is required for the following officers: Kingdom Seneschals or Youth Coordinators at any level (or any other officer whose responsibility is the oversight of youth activities). Furthermore, it is required that when youth activities are held, there must be at least two non-related adults, one of which must have passed a background check. A background check is also required for all YAFA Program officers including volunteer mentors.

2.  These rules only apply to groups operating within the United States of America and Canada. If your group is outside of those two countries, please see your affiliate agreement and governing documents to ensure you follow procedures approved for your jurisdiction, if any.

## B. PROCESS FOR CONDUCTING A BACKGROUND CHECK

1.  Individuals required to submit to a background check must:

    a.  Fill out a blank background check authorization form and submit it only to the Corporate office, via e-mail, fax, or mail. Other methods of sending the form may also be approved by Corporate, as appropriate. It is up to each requestor to submit the paperwork for his or her own background check authorization. Forms contain personal data, and therefore should not be submitted to any Kingdom officer.

    b.  Notify the Kingdom Youth Coordinators that they have requested a background check.

2.  The Kingdom Youth Coordinators will provide the Kingdom Seneschal a list of all requested background checks.

3.  The Kingdom Seneschal will review and approve the list of requested background checks, and forward the list of approved requests to the Corporate office.

4.  Once the background check authorization form has been received, the Corporate office will:

    a.  Maintain a list of all approved requests for background checks.

    b.  Check the requestor's current membership status, and check the requestor's name against his or her kingdom's list of individuals for whom background checks have been approved.

        i.   If the requestor is not a current member of the SCA, they are not eligible for a background check, and their forms will be returned with an explanation of why they are currently ineligible.

        ii.  If the requestor's name is found on the "Approved by Kingdom Seneschal" list, then the requestor's data will be sent to the company conducting the background check to begin the process.

        iii. If the requestor's name is not found on the approved list, it will be added to a "Not Approved by Kingdom Seneschal" list for that kingdom, along with the date the name was added. Every month, Corporate will send the names of those on the "Not Approved by Kingdom Seneschal" list to the appropriate Kingdom Seneschals. If no approval is forthcoming from the Kingdom Seneschal in three months, or if a specific notice of disapproval is received, then the name will be

SCA_000384

struck and the form will be returned to the requestor along with a letter explaining that they have not been approved.

5. After a form has been passed to the company conducting the background investigation, the Corporate office will note a charge on the requesting kingdom's spreadsheet. Each month, each Kingdom will be invoiced for half of the charge of all requested background checks for the previous month for that Kingdom. Invoices are due and payable upon receipt.

6. Once the Corporate office has received the adjudication from the investigating company, the requesting member's information will be updated:

   a. If a "Pass" or "Fail" decision is returned, the Corporate office will notify the requestor via mail of the decision and the SCA, Inc. will update their records to reflect the "Pass" or "Fail" decision and the appropriate expiration date.
   b. If a decision of a "Hold" is returned, then that information will be updated in the SCA, Inc.'s records and further adjudication will be undertaken to provide a clear "Pass" or "Fail" response, as above.

7. Once a month, the Corporate office will send the Year to Date results to the Kingdom Seneschals for review.

8. Background checks must be renewed every two years.

C. **RESPONSIBILITIES OF THE KINGDOM SENESCHAL FOR BACKGROUND CHECKS**

1. The Kingdom Seneschal is responsible for distributing blank background check authorization forms to the Youth Coordinators in their Kingdom. SCA, Inc. will provide blank background check authorization forms to each Kingdom Seneschal as necessary for this purpose.

2. The Kingdom Seneschal will review and approve the list of requests for background checks as provided by the Youth Coordinator(s) of their Kingdom.

3. The Kingdom Seneschal will keep a record of all approved requests for background checks.

# XII.   MANAGING WAIVERS AND EVENT SIGN-IN SHEETS[40]

A. **WAIVERS FOR AFFILIATE ORGANIZATIONS**

1. Waivers as a whole are very country specific. If you are in an affiliate organization, it is the Seneschal's duty to see if there are any policies that alter the information below. SCA, Inc. waiver policy applies except where replaced by local regulations in affiliate organizations.

B. **TYPES OF WAIVERS**

1. Standard Waiver—formerly called the "Consent to Participate and Release Liability," this form contains the same waiver language as is found on a membership application. The Standard Waiver is also sometimes called an "Event Waiver," "Adult Waiver," "Fighter Practice Waiver," or "Consent to Participate."

2. Roster Waiver—same as the Standard Waiver but allows for multiple signatures.[41]

3. Minor Waiver— See XII.D. below

4.  Equestrian Waiver—formally called the "Waiver And Informed Consent To Participate In SCA, Inc. Equestrian Activities," this form is the waiver required for participation in any equestrian activities.

## C. WHEN WAIVERS ARE REQUIRED

1.  Waivers are required at all events at which any SCA activity is published which includes announcement of date, time, and location by an officially recognized branch of the SCA through any of their official communications media including newsletters, e-newsletters, e-lists, and official social media sites.. Business meetings, demos where there are no combat-related activities, guild meetings, dance practices, private activities and the like are not included in the waiver policies. If in doubt about whether a specific function falls under the waiver policy, make a ruling and report it to the Society Seneschal at the next opportunity.[42]

2.  Kingdoms may require all attendees at an event to sign waivers, if they wish. As Kingdom Seneschal, you may make the determination of whether an SCA function falls under the waiver policy or not.

3.  Who must sign a waiver:

    a.  If a person does not have a blue membership card with them that denotes both an SCA membership and a signed Consent to Participate **OR**

    b.  Is not a member of the SCA **OR**

    c.  Has forgotten their blue membership card[43]

4.  Individual Kingdoms or site owners may impose additional or more stringent requirements at their discretion. Site owners and Kingdoms may not change or modify the Society Waiver without Board approval.

5.  At events where published combat-related activities occur (such as a war or a fighter practice) Marshals, Heralds, and any other volunteers working directly with the fighters need to sign the waiver because they are on the field and are at risk.[44]

6.  That means SCA members who do not have their blue cards with them, or who have a non-blue membership card indicating that there is no signed waiver on file for them in the SCA Corporate Office, must sign a waiver to attend an event or participate in fighting activities at a published fighter practice.

7.  Any person participating in SCA published equestrian-related activities, including riding or authorization check rides, horse handling, ground crew, mounted games, and combat, marshaling, or even being present at published equestrian activities as an observer, is required to sign a Society for Creative Anachronism Waiver and Informed Consent to Participate in SCA Equestrian Activities form or roster. Equestrian waivers are available in the SCA Equestrian Handbook.

8.  Spectators at demos or any other published activity need to sign waivers if they become participants or if equestrian activities are held.

## D. MINOR WAIVERS

1.  Minors (persons under the age of legal majority in the state, province, or country in which the SCA function occurs) are welcome to participate in the activities of the SCA, subject to the following rules:

SCA_000386

a. a. Any minor attending an SCA event must have a Minor Waiver completed and signed by their parent or legal guardian. (Minors with blue cards indicating a waiver at the Corporate Office that is signed by a parent are treated the same as adult blue-card attendees with regard to waivers.) The parent/legal guardian needs to be on site with the minor at all times or an adult who is responsible for the minor as long as the parent/legal guardian completes and provides the appropriate paperwork, such an adult is termed a "temporary" guardian. Roster waivers are not acceptable for use with minors.

b. The parents or guardians of the minor must witness SCA combat, discuss with a witnessing marshal how it relates to the participation of their child, and execute a "Minor's Waiver and Informed Consent to Participate in SCA Combat-Related Activities." The witnessing Marshal must countersign the waiver. A Minor waiver must be signed if the minor is participating in fighting activities. Fighting activities include armored combat (heavy weapons), fencing, combat archery, marshalling, scouting, youth combat, or banner bearing in combat. In this case, parents should be carefully informed of what is going on. Corpora (Rules of the Lists) requires that parents "witness the activity, discuss it with a witnessing marshal, and execute a waiver for the minor." Witnessing marshals must be explicitly authorized to perform this function by the Kingdom Earl Marshal.

c. Authorization for combat in any of the forms listed above by minors can be performed only by the Kingdom Earl Marshal or those explicitly authorized to the task, with the exception of rapier combat, which must be authorized by the Kingdom Rapier Marshal or those explicitly authorized to the task.

d. In order to be authorized for armored combat or the marshalling of armored combat, a participant must be at least 16 years of age. The eligible age for authorization in all other adult combat-related activities is 14.[45]

e. From the Marshal's Handbook: "At any event in which the minor is involved in SCA combat-related activities, the minor must either have a parent or guardian present, or must be in possession of a properly executed "Medical Authorization Form for dMinors." Said Medical Authorization Form must designate an adult present at the event as able to authorize medical treatment in the case of an emergency." This document should stay with the parent, legal guardian or temporary guardian during the event in case of an emergency. See the appropriate sections of the Marshall's Handbook for details regarding all aspects of minor related combat activities.

## E. WAIVER MANAGEMENT

1. Waivers will be collected and sent to the Kingdom Waiver Secretary (a Deputy to the Kingdom Seneschal) for storage.[46] Kingdoms must create laws or Seneschal policy to implement this requirement.

2. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required.[47]

3. Adult waivers shall be maintained for 7 years and minor waivers for 20 years after which they should be destroyed.[48]

F. SIGN-IN AND ATTENDANCE SHEETS

1. Sign-in or attendance sheets are not required; however, if your Kingdom typically uses them, they become a part of the waiver package that must be sent to the Kingdom Waiver Deputy.

2. If your Branch Financial Policy requires that the sign-in sheet be kept, a legally accepted facsimile can be sent to the Waiver Deputy.

# XIII.  OVERSEEING CONTRACTS AND AGREEMENTS

A. WHO MAY SIGN CONTRACTS

1. Only local branch, Kingdom, and Corporate Seneschals, their specifically authorized delegates (like event stewards) or specifically approved corporate officers, may sign contracts in the name of the SCA, Inc.[49]

2. Only a paid member of the SCA may be delegated for this duty.[50]

3. Kingdoms or branches may involve other officers in discussing or approving contracts, but may not remove the Seneschal from the process.

4. Seneschals must execute this delegation of responsibility in writing via a formal warrant of their deputy in accordance with the process for warranting officers in their respective kingdom(s). Remember an Event Steward is a warranted deputy thus can sign contracts.

B. LIMITATIONS

1. No Seneschal may commit higher levels of the SCA to any action. The main limit on delegated contracting authority is that a Seneschal may only sign a contract for his or her own branch. For example, a Shire Seneschal can bind the Shire to support a civic activity, but cannot promise that the Kingdom will show up to back the group.

2. Minors may not sign legally binding contracts; therefore, Seneschals must have reached the age of majority for their jurisdiction.

3. When a person other than the warranted Seneschal is needed to sign facility use agreements in order to enjoy organizational use or discount privileges, the warranted Seneschal for that branch will review and initial the contract prior to it being signed. However, specific prior authorization is always required, and the delegated person must meet the membership requirements for officers as defined in Corpora and be a formally warranted deputy Seneschal of the sponsoring branch.

4. No agreements may extend the use of the SCA name to an outside group or individual. Do not permit contracts or activities extending the SCA name to an outside group. Some communities allow nonprofit organizations with 501(c)(3) status like ours to run bingo games or other fundraising events, which are otherwise prohibited, and people who want to hold such events look for qualified sponsors. The SCA forbids such arrangements.

5. The President must approve site contracts for any SCA events with expected attendance of 2,000 or more or have a total budget of $75,000 or more.

SCA_000388

# XIV.  OVERSEEING KINGDOM EVENTS

## A. PUBLICIZED EVENTS

1. Keep track of things that need Kingdom-level publicity. The SCA Inc. no longer makes a distinction between official and unofficial events (only published and unpublished), but certain things—the installation of Kingdom great officers or a new territorial baronage; the granting of awards of arms, grants of arm, or patent of arms; the announcement of law changes; and, of course, Crown or Coronet tournaments or investitures—can only occur at events that have been publicized in advance in the Kingdom newsletter (be it online or printed).

2. Events that must be publicized in advance must be publicized both on the Kingdom calendar and in a detailed announcement or flier in the Kingdom newsletter—the calendar notice is not enough on its own. Make sure your Crown and your local Seneschals are aware that this is required by Corpora.[51]

3. The Kingdom Seneschal, working in conjunction with the Crown, is responsible for creating and maintaining event-scheduling policies within a Kingdom. The Kingdom Seneschal is ultimately responsible for making sure that Crown, Coronation, and other events the Kingdom has designated as "Kingdom events" occur. The individuals leading those events are deputies of the Kingdom Seneschal for the time they are heading those event staffs.

4. Awards that carry precedence (AoAs, grants, and patents) cannot be given at events that have not been publicized in advance[52], but promises of future awards can be granted. If the Crown decides to attend an event that was only publicized locally, make sure that they remember that no awards of precedence can be presented at that event. However, the Crown can call forward deserving members, praise them in front of their friends, and announce their intent to present thus-and-such award at the earliest opportunity.

5. You may permit branches to mention local events on their local branch's published calendar without printing fliers for them, but make sure they understand that the calendar entry doesn't make the event eligible for royal action.

6. SCA events and event announcements need to enhance our reputation. Remember that all events announced in the newsletter should support our organizational purpose. This excludes, for example, events based around live-action fantasy role-playing games and activities involving drinking contests.

7. Seneschals are reminded that all SCA events must be sponsored by an official branch of the SCA.[53]  Unofficial special interest groups wishing to host events, such as households, kingdom orders, ships, guilds, or clans, should obtain the sponsorship of an official branch before proceeding.

## B. KINGDOM EVENT SITES

1. Kingdom-level events must have suitable sites. While some Kingdoms make the Seneschal directly responsible for selecting sites and finding Event Stewards for Kingdom-level events, others use site coordinators, require bids, or use a regular rotation. It is always and ultimately your responsibility to make sure that Crown, Coronation, and other events designated Kingdom events in your Kingdom have a place to happen.

SCA_000389

2. Event Stewards may not mislead site owners nor misrepresent their policies. If the owner has a no-alcohol policy, the site cannot be billed as permitting discreet use of alcohol. Policies on animals, number of people on-site, or other restrictions should also be publicized well in advance and adhered to.

3. Service animals should be admitted in accordance with relevant local or national legislation. You are permitted to ask the owner if the animal is a service animal but current law prohibits further inquiry, such as a request for documents or certifications. If the owner says yes, admit the animal. If the animal is aggressive or destructive, you are permitted to ask the owner and animal to leave. The only service animals permitted under US law are dogs and mini horses.

## C. ROYAL (CROWN) LISTS

1. Royal lists must be conducted at a tournament announced in the Kingdom newsletter as being for that purpose. Crowns or Coronets who wish to conduct a Royal List in a manner other than individual combat must obtain the prior approval of the Board of Directors.[54] Work with Royal Heirs early to ensure their desired format is within the confines of Corpora and Kingdom Law.

2. Publicize the membership rules for Crown and Coronet Lists. Corpora delineates the membership requirements and the rules on how membership is defined and enforced. Corpora specifies that "any officer of the SCA or representative of a Kingdom found responsible for allowing a non-member to participate, as an entrant or prospective consort, in a Royal List will be subject to sanctions."[55] Make sure your Royalty and list officials are aware of this fact! In addition, the Crown list winners have 10 days to show their membership will remain valid for the duration of the reign.[56] If the membership of either member of the Royal couple is set to expire at any time before their reign would end, advise them to immediately renew membership using the online renewal system. Note that local exceptions regarding membership duration may apply within international affiliates.

3. Accept proof of membership only if it comes from the appropriate registry (i.e. SCA, Inc. or your affiliate registry ('the Registry'). To establish membership, a person needs a current valid membership card, a current newsletter label, an entry on the Email Registry membership printout, or a postcard or letter from the Registry confirming that the membership has been received. Also acceptable are confirmations of valid membership from the on-line membership application. The phrase "letter from the Corporate Office confirming that the membership has been received" includes the downloaded form received from an online membership sale from the SCA website or an electronic notice from the SCA, Inc. Registrar of membership confirmation.[57]

4. It is your responsibility to check memberships for Crown entrants and consorts carefully! Document your membership verification. Printouts may be ordered from the registry.

5. Be generous in the face of conflicting information. If an individual has a card showing one date, while the Registry listing shows another date or misses the name entirely—you may accept whichever is more favorable to the member. However, you must send photocopies of both to the Registry immediately after the Lists, because these conditions indicate a potential problem in the computer system.

SCA_000390

6. You may accept suspended memberships for Crown participation only if all of the following apply:

   a. The problem involves the member's address, not a bad check. If so the Registry must be informed of the proper address immediately. If it is a bad check, the membership lists will say "BAD CHECK" under the expiration date, and that is how you can tell the difference.

   b. The membership must not have been in a state of suspension beyond the end of its term. You can find the original expiration date on the membership card or an old mailing label. Failing that, ask the Vice President for Corporate Operations (or appropriate affiliate officer) to check the master list for you.

   c. If the membership would still be good if it hadn't gone into suspension, you can allow the person to participate as soon as he or she gives you evidence that the Registry has been told to reactivate the membership. If the membership would have expired before the tournament in question, the suspended membership cannot be accepted as valid until the Registry actually reactivates it—which can take up to 14 business days.

7. Check membership on people serving as officers. All officers must be paid members of the SCA. This includes all Royalty, Territorial Barons and Baronesses, and Event Stewards. Once a year, take the Registry printout and look at the listings for your local Seneschals and your fellow officers at the Kingdom and Principality level.

8. Make sure your Crown is aware of any Kingdom laws requiring membership.

D. **REMOVING SCA SPONSORSHIP FROM AN EVENT**

1. "Removing SCA Sponsorship" means the Kingdom Seneschal declares that the SCA is no longer associated with an event, and that people who choose to remain on the site do so at their own risk.[58]  This is a very serious step, and the Society profoundly hopes you never have to take it. This is a last resort. Use it only if the Society's rules are being broken in ways that seriously endanger the populace or the organization. Before removing SCA sponsorship, be sure to explain to the Event Steward and the ruling nobles present what the problems are, and give them the opportunity to take corrective action. Explain the consequences that will follow if you are forced to remove SCA sponsorship and do it only if they refuse to work with you to correct the problems.

2. Once you have removed SCA sponsorship of an event, no further official SCA activities may be conducted, and people who choose to remain on the site are on their own. If the property is owned or rented by the SCA, people should leave at once. If it's unreserved public property, announce that the SCA and its insurance will not provide protection for anyone, regardless of what happens from there on. Besides announcing the decision throughout the site, you must make a serious attempt to notify the site owner, and you must file a full report with the Society Seneschal, any applicable affiliate officers, and your Board ombudsman—and your Crown, if they weren't there—as soon as possible.[59]  If you reach the site owner, describe the problem and ask whether he wants you to get assistance from the civil authorities in clearing the site; if you can't reach the site owner and it's not a public park open to anyone, call the police on your own if people don't depart. Expect that the Board will consider revoking memberships on the basis of your report—possibly yours, if they feel your action was frivolous.

SCA_000391

3. It is desirable to take some time in Kingdom Officer meetings and local Seneschals' meetings to make sure other officers understand the implications of removing SCA sponsorship, both for the organization and for themselves.

# XV. DEMO POLICY

1. A demo ("demonstration") is an organized educational effort to teach and/or display activities of pre-17century life, interest in general, and SCA interest in particular, to the general public. They are an important way of introducing ourselves to the community, fulfilling our organizational mission of education, and possibly finding new recruits for the SCA. However, not all demos are the type that results in new members. An elementary school demo is fun, but the likelihood of recruiting new members is low. A university or Renaissance Fair demo is more likely to attract new members, but does not necessarily contain the educational community-relations value of a school demo. Both are important, and a group should find a balance between them.

2. In order to be covered by SCA insurance, demos must be approved by the sponsoring group's Seneschal and the branch may restrict who may represent them to the public. Restricting participation should be done with extreme caution and care. A demo may also be an "event" if it meets the requirements for an event as outlined in Corpora and corporate policy.[60] At any demo, at least one paid SCA member must be present and in charge of the demo.

3. Demos where there are no combat-related activities do not require waivers unless they are held as part of an SCA "event." Therefore, if there is no combat, and the demo is not held at an SCA event, waivers are not required. Waivers may be completed individually, or a roster waiver may be used. It is not required that spectators at demos sign waivers, as long as they don't become participants.

4. As with all martial activities, an authorized marshal of whatever forms are being displayed must be present if there is fighting at a demo. SCA combatants must be authorized in that weapons' form/style in order to perform at the demo.[61]

5. Demo organizers should pay particular attention to site/host restrictions regarding SCA and weapons and activities. In general it is not a good idea to allow the general public to handle steel weapons at a demo and steel weapons must never be left unattended. All SCA weapons must never be left unattended and in plain sight and access of the public. (They may be stored unattended in tents, trucks, etc.)

6. Since observers of SCA demos are generally not familiar with SCA combat activities, special care for safety must be taken. Boundary ropes are strongly recommended, and sufficient safety personnel must be provided to ensure safety of combatants and observers.

7. A member of the SCA may not hit a member of the public with any weapon regardless of whether the member of the public is in armor and gives consent. Adult members of the public who wish to try armored combat should be referred to the nearest SCA group for instruction. (Note: target archery is not considered a "combat-related activity," and so waivers need not be signed for that activity, but be certain that all appropriate safety procedures are followed.)

8. With specific safety restrictions, supervised children age 12 and under may hit an armored SCA fighter with foam weapons only, not rattan weapons. Waivers are not

SCA_000392

needed from the parents of children who take part in "fight-a-knight" activities. Minimum safety standards include keeping unarmored observers at least 10 feet away from the armored fighter and child. Individual Kingdoms may make more restrictive policies.

9. Whenever a demo is done with children present, a minimum of two unrelated adults must also be in attendance at that demo (the "two-deep" rule). "Children" refers to anyone under the age of legal majority.

10. No one may bring weapons of any kind onto the grounds of a school without prior knowledge and consent of the school officials.

11. There is no SCA policy that prohibits an SCA group from charging a "demo" fee to the organization requesting the demo. However, most groups accept donations rather than charging a set fee. With either a donation or a "demo" fee, all monies should be in the form of a check, payable to the "SCA, Inc., [group name]". Under no circumstances should an individual receive cash or a check made out to them personally. SCA site fees may not be charged at a demo unless the demo is held as part of an SCA event. Outside the USA, payment should be made to the branch by the appropriate means if checks are not relevant.

12. Assuming appropriate safety precautions are in place, and with any necessary instruction, participation is a highly effective method of educating the demo guests—and fun for both the SCA member and guest.

# XVI.  KNOWN WORLD EVENT POLICY

## A. GENERAL GUIDELINES

1. There are 3 types of Society-Wide Events: Known World Collegia/Symposia, Known World Summit Meetings, and Society Anniversary Events.

2. Each one of these events, once approved, is a separate project of the SCA, Inc.

3. Each project is not complete until all required reports are completed, received, and approved by the appropriate Society Officers. Local or regional events cannot, by definition, style themselves as Known World Events.

4. Each Event will be allowed to print advertisements in all Kingdom Newsletters without charge. Space allocated in pamphlet-style newsletters will be one full page or two half-page ads. Space allocated in full-format style newsletters will be one half-page or two quarter-page ads. Kingdom Newsletters may require a payment to print advertisements over this allocation. Advertisements are subject to the submission deadlines set by each Kingdom. The formatting of the advertisement shall be at the Kingdom Chronicler's discretion, and must meet the Society standards for event advertisements.

5. Visit http://www.sca.org/docs/pdf/kweventpolicy.pdf for more details.

## B. KNOWN WORLD COLLEGIA/SYMPOSIA

1. Collegia/Symposia are large-scale events focused on specific areas of interest, (artistic, martial, or administrative) and open to general attendance and participation by SCA members and non-members.

2. Each Society Officer will make a policy regarding how and how often events focused on their joint or several venues are to be solicited, and as to what the content of these

events can or cannot be. The subject area sponsor (Society Officer, Deputy Officer, etc) may decide to schedule a symposium and invite the membership to proposal on the same, or a local person, branch, or organization may seek Society Event Sponsorship by proposing the same to the appropriate Society Officer.

3. Proposals for these events are collected by the Society Officer in charge of the focused area of interest.

4. Proposals are accepted by the Society Officer involved with a courtesy copy to the Society Seneschal.

5. Criteria for Bids/Proposals for Collegia/Symposia

   a. Criteria will be determined by the Society officer(s) responsible for the event.

   b. Minimum information in order for the event to appear on the Society Calendar is:

      i. Name/date/location of Event

      ii. Name of Event Steward

      iii. Planned Activities

      iv. Event Financials (as per Society Anniversary Event proposal)

      v. Evidence of Kingdom and Branch Support

## C. KNOWN WORLD SUMMIT MEETINGS

1. Known World Summit Meetings are events dedicated to a specific administrative venue and are restricted in attendance to Kingdom Officers, Kingdom-level deputies, and Society-level deputies.

2. Summit meetings are groups of officers and/or subject matter experts that get together in person for the purpose of improving the overall issues, efforts, and effects of the area of interest.

3. These events are not open to the general membership and participants of the SCA and are invitation-only.

4. Proposals as such are not solicited for summit meetings, but event proposals and plans are prepared by the appropriate Society Officer or their project manager for the meeting

5. Proposals are accepted by the Society Officer involved and copied to the Society Seneschal.

## D. SOCIETY ANNIVERSARY EVENTS

1. These events occur at a minimum every 10 years and in some cases every 5 years.

2. These events are large-scale events with a general focus and open to general attendance and participation by both SCA members and non-members.

3. The Society Seneschal will advise the Board when an anniversary opportunity exists and request a call for proposals be sent to the membership for action. The call for proposals should be submitted to the Board of Directors no less than 1 year before the date the proposals would be due. The initial due date for event proposals should be no less than 18 months and not more than 48 months before the desired event date.

4. Proposals for these events are collected by the Society Seneschal and accepted by the Board of Directors.

SCA_000394

E. **Proposal Checklist Society Anniversary Events (See Section XXIII)**

F. **Proposal Approval and Acceptance**

1. Society Anniversary Events

   a. The Society Seneschal will distribute the proposals to the Society Officers for review for 30 days. Any comments will be collected by the Society Seneschal and added to the proposal information.

   b. The Society Seneschal will review the proposals for completeness, request any missing information, and create a completed proposal packet for each proposal.

   c. The Society Seneschal will forward the completed proposals to the Board of Directors along with analysis and recommendations regarding the proposals.

   d. The Board of Directors will review the proposals and take one of the following actions:

      i. Award one or more of the proposals.

      ii. Direct the Society Seneschal to obtain additional information on one or more of the event proposals.

      iii. Extend the deadline and call for additional event proposals.

      iv. Elect not to award a proposal for that given event opportunity.

   e. Once the Board of Directors has awarded one of the proposals, the Society Seneschal will take the following actions:

      i. Inform the key contacts of the successful proposal.

      ii. Inform the key contacts of the unsuccessful proposals.

      iii. Inform the other Society Officers.

      iv. Inform the Kingdom Seneschals.

      v. Issue a warrant for the Event Steward(s) as Deputy Society Seneschal(s).

      vi. Once the Board of Directors has awarded one of the proposals, the Society Exchequer will issue a warrant for the event Exchequer as a Special Deputy until 6 months past the end of the event.

2. Known World Collegia and Symposia

   a. Each Society Officer will make a policy regarding how events focused on their joint or several venues are to be awarded. Once a Known World Event proposal has been awarded, the sponsoring Officer will inform the Seneschal of the Kingdom hosting the event. It is the responsibility of Society Officers to coordinate Known World Event activities to minimize scheduling and resource conflicts.

   b. Exchequers for Known World Events will be warranted as deputies to the Exchequer of the Kingdom hosting the event.

3. Known World Summit Meetings

   Each Society Officer will make policy regarding how and when summit, or business, meetings with high-level staff and Kingdom Officials are required, planned, and held.

SCA_000395

G. **BEFORE THE EVENT**

1. Status reports. The Event Steward will prepare a quarterly status report. For Anniversary Events, it will be sent to the Society Seneschal and the Seneschal of the Kingdom hosting the event. For Known World Events, it will be sent to the Society Officer involved and the Seneschal of the Kingdom hosting the event.

2. Financial reports. The Event Exchequer will prepare quarterly and yearly financial reports. For Anniversary Events, it will be sent to the Corporate Treasurer, Society Exchequer, and the Exchequer of the Kingdom hosting the event. For Known World Events, it will be sent to the Society Officer involved and the Exchequer of the Kingdom hosting the event.

3. Advertisement. Each Event will be allowed to print one full page or two half-page advertisements in all Kingdom Newsletters without charge. Kingdom Newsletters may require a payment to print advertisements over this allocation.

H. **AFTER THE EVENT**

1. Event summary report. After the Event has taken place, the Event Steward will file a final report with the Society Seneschal's office no later than 90 days after the event. This reporting package will include full operational report of the event, with a financial summary. This report will copy the Seneschal of the Kingdom hosting the event. For Known World Events, this report will also be sent to the Society Officer involved.

2. Financial report. The exchequer will file a final report with the appropriate Exchequer's office no later than 90 days after the event. This reporting package will include full financial reporting for the event. For Known World events, this report will also be sent to the appropriate Society Officer. If the event used a separate bank account, reports will continue to be filed until the account is closed and any money remaining is transferred to another SCA branch or the Corporate Office.

3. Postmortem report. The Society Seneschal and Society Exchequer's Office will jointly conduct a lessons learned effort for the event within 60 days of receipt of the final event reports. They will create a report distributed to the Society Officers and the Event Stewards, to be included in a lessons-learned knowledge database for future Society events.

4. Document retention – Follow the SCA Document Retention Policy

   a. The following documentation, as a minimum, will be sent to the Society Seneschal for review and inclusion into the Society Event Knowledge base.

   b. Copies of all Event proposals.

   c. Copies of all quarterly Event status reports, including financial reports.

   d. Copies of event wrap-up reports, including financial reports.

   e. Lessons-learned Report.

# XVII. CHANGING AND MAINTAINING KINGDOM LAW

A. **CHANGES TO CORPORA**

1. It is the responsibility of Kingdom Seneschals to keep informed about changes made to Corpora and about requests that the SCA Board of Directors makes for commentary on proposed Corpora changes.

SCA_000396

2. It is the responsibility of Kingdom Seneschals to read the Board Minutes for changes to Corpora. Once a change to Corpora is approved, you are responsible for explaining these changes to your Crown and other Kingdom Officers and making sure your Kingdom Law and Kingdom Officer Policies are modified so they align with new corporate guidelines.

## B. CHANGES TO KINGDOM LAW

1. Work closely with the Crown on proposed Kingdom (and Principality) law changes.[62]

2. Law changes must comply with Society rules. Kingdoms can be more restrictive, but not less restrictive than Corporate policies.[63]

3. Do not allow Kingdom law to encroach on modern law. The SCA cannot forbid nor permit anything it does not have the legal right to do; nor can it allow anything outside of modern law.[64]

4. Separate personal views from that of the governing documents; keep your formal written opinion as Seneschal to stating whether or not the required points are covered.[65]  You may make recommendations to the Crown regarding changes you think are appropriate, but theirs is the final decision, subject to your evaluation of the legality of the proposed change.

5. As Seneschal, you cannot refuse to sign a law that is legal, regardless of whether or not you agree with it! You do not have veto power over the Crown's decisions unless what they want to do is contrary to Corpora, SCA policies, or Kingdom or real-world law.

6. Kingdom law must be signed by the Sovereign, Consort, and Kingdom Seneschal.

7. Changes to Kingdom law must also be proclaimed at a publicized event in accordance with Corpora.[66]  The proclamation need not involve reading every syllable of the new law. Changes may be summarized in court as long as there are copies on site for people who wish to see the details. The more substantive the change, the more information about it should be given in Court.

8. Changes to Kingdom law must normally be published in the Kingdom newsletter before they go into effect.[67]  In order to minimize the financial impacts of publishing high-volume, lengthy law changes/inter-kingdom event conventions, it is considered to meet publication requirements within a primary/affected kingdom if:

    a. The entire text of the changes are published in the primary Kingdom Official Newsletter *or*

    b. The entire text of the changes are published on Primary Kingdom Websites in unchangeable formats with the additional stipulation that all substantive changes, as well as a URL to the location on the websites of all primary kingdoms, are published in Official Kingdom newsletters.

## C. MAINTAINING KINGDOM LAW

1. You are required to review kingdom law on a regular basis as defined by your kingdom law.[68]

2. Double-check Principality law. Insist that Principality Seneschals review Principality law first for compliance with Corpora and Kingdom law. Principality Law must be signed by the Prince, Princess, and Principality Seneschal, as well as the Sovereign, Consort, and Kingdom Seneschal.

SCA_000397

# XVIII.   MANAGING KINGDOM BRANCH CHANGES

## A. ESTABLISHING NEW BRANCHES

1. Setting Branch Geographic Borders

   a. Branches should have physical justification—not political expedience. Branch spacing varies a lot among Kingdoms, but is often based on reasonable driving distance.

   b. Territorial branches must have clear borders.[69]  ZIP or postal codes are the way the SCA, Inc. defines branch areas in most places. Whatever approach you develop should look reasonably contiguous on a map, regardless of postal code lines. Look at traffic patterns, town and county lines, and geographic features like rivers and mountains. Enlist the aid of local Seneschals in establishing or refining the area definitions for their branches. In the event of a dispute over which group has jurisdiction over a geographical area or postal code, check the membership listing for the area in question and learn the wishes of the members who reside there before making an assignment decision. Remember that cantons and ridings are by definition inside the borders of their parent baronies and provinces. However, even cantons and ridings should not produce 'doughnuts'— if a subsidiary group should become independent, it should not be surrounded by another branch.

   c. Institutional branches must be based at real institutions. That is, Colleges must be based at institutions of higher learning and Strongholds at military institutions. This should be documented in the branch's report. The SCA encourages establishment of institutional branches wherever appropriate, but the structure is not to be used as a way to get around territorial requirements for affinity-groupings of members. If most of the people in the branch are unaffiliated with the real-world institution which is its supposed base, the group should be designated a Shire (or Canton/Riding, if applicable). An institutional branch is a shell that exists independent of its population, so people can follow the demands of their studies or employers while the branch stays in place for members who move in as a result of similar transfers. It also provides a clear contact for the institutional authorities, which simplifies accounting for funds donated by the institution and allows the branch to adapt to institutional rules without affecting any larger SCA branch in the area. In addition, the institutional branch may make it easier to schedule SCA events in halls or grounds owned by the institution.

   d. Baronies and Provinces can sponsor and administer an institutional branch if the suitable institution falls within its immediate boundaries. If there's no geographical branch holding the land, an institutional branch can exist independently—but it automatically becomes part of any geographical branch that later develops in the area. It's simplest to regard a small independent institutional branch with flexible population requirements in each case.

   e. Basic financial reporting units may not usually cross state, province, or country lines.[70]  The Society has to be able to report its financial results on a state-by-state (or international) basis, so Corpora prohibits any branch below Principality level from crossing a state line without a specific variance from the Society Seneschal. The Society Seneschal is extremely reluctant to grant such variances.

2. Existing Claims to Branch Territory

SCA_000398

    a.   Respect existing land claims when supported by activity. If a branch holds a piece of land for the SCA, it has to be consulted before a new branch can be formed there. However, a branch should have members and activities throughout the area it holds. If a town has no meetings or other SCA services within a reasonable drive and there are people there who want to organize them, give the branch that "owns" the town the choice between helping the locals and turning them loose. If the established branch is a barony or province, it may help to point out that creating a canton or riding does not negatively affect the old branch's population total, since the smaller branches remain part of it.

    b.   Be generous about recognizing existing land claims. "Claimed territory" is whatever the branch application says, if one can be found. If this cannot be found, go by the memories of long-term members and notes on meetings and events in old newsletters. It may well cause trouble if you ignore old claims, even if they're supported only by oral tradition. However, it is not necessary that every postal code in your Kingdom be assigned to an established group. It may be best to leave unpopulated, distant areas unclaimed in order to allow for future growth.

3.   Creation of an Incipient Branch[71]

    a.   Appoint the primary organizer as a Deputy Seneschal for the area. The job may be defined as your own deputy or as a deputy to whatever branch or regional organization your Kingdom has placed in charge of the general area where the new branch will be located. However, until the branch has official status, there isn't an entity to which people may be appointed as officers. Encourage the rest of the Kingdom officers to take the same approach.

    b.   Make sure they have access to SCA Corporate documents and handbooks. Kingdom law, the SCA Governing Documents (and affiliate governing documents where applicable), The Known World Handbook, and the Local Officer's Handbook are extremely important tools, and the information and documentation you can provide, the more effective local organizers can become. The organizers need personal contact with established branches and officers as well. It may be valuable to appoint a special Deputy Seneschal for Incipient Groups expressly to deal with the needs of new groups.

    c.   Set and enforce consistent event sponsorship policies. Incipient branches may not sponsor Society events. You can authorize the warranted deputies-for-the-area to hold local meetings in the name of the supervising branch, but do not let them put events on the Kingdom Calendar on their own. They need to find a sponsoring branch, and the sponsor needs to offer more than just their name; if at all possible, they have to provide a person to cover the event and make sure it follows SCA rules and procedures, and offer some financial support as well since incipient branches may not hold SCA funds. If necessary, a Kingdom or Principality can sponsor events for an incipient branch, but it is better for one of the neighboring branches to do so. Incipient status provides a training period for the new branch, and it will work best if they have a consistent presence.

    d.   Remember that only a branch with a Marshal can sponsor a fighting event, and waivers must be signed, collected, and sent in to the Kingdom! If the most practical sponsor doesn't have a Marshal or the paperwork and manpower to comply with waiver requirements, the incipient branch needs to go further, if need be to the Kingdom or Principality, to line up the appropriate coverage. An incipient branch

SCA_000399

need not be exclusively sponsored by a single established group. Sponsorship could put a severe strain on the established group, both financially and in terms of personnel workload. Different events of an incipient group can be sponsored by different nearby groups. This not only spreads the work out, but it also enables the incipient group to become acquainted with more of its neighbors in the Kingdom.

e.  Keep the incipient period short. If a branch is not ready to leave incipiency after two years, you should actively investigate why they are not ready.

4.  New Branch Petition Review and Approval

a.  You must review all branch petitions before they can be approved.[72]  Per Corpora, you have the basic responsibility for deciding if a group meets the requirements for a branch and for advising the Crown accordingly. The Crown may refuse to establish a branch you have recommended, but may not establish one you have not approved. If the Crown wants to approve a branch against your recommendation to the contrary, refer the matter to the Society Seneschal.

b.  Consult the Society Seneschal before making any major change in existing borders.[73]  Land claims can be tense enough that it might help to slow things down and take a second look before making changes. You should poll the members affected by the change to determine their wishes before proposing a change. If the change involves creating a canton, college, stronghold, or riding within the borders of an existing barony, and everyone is agreeable to this, you can proceed on your own. In fact, any boundary change that is generally agreeable to everyone affected can be done at the Kingdom level, provided you promptly inform the Society Seneschal of the change. However, if the change is controversial, you need to send it on to the Society Seneschal to look over. Also, remember that elevations to barony always require the Society Seneschal's approval.

c.  If the change involves nothing more than reassigning a postal code from one branch to another, and both groups involved are amenable, or if you want to add a previously unassigned postal code to a branch's defined area (as long as it is geographically contiguous with the existing boundaries), then you can make this change without consulting the Society Seneschal.

d.  When action from the Society Seneschal is required, your presentation to the Society Seneschal should include the following materials:

i.  Your recommendations.

ii.  A clear description of the old and new boundaries with postal codes, with a map if appropriate.

iii.  Letters from the Seneschals of the branch or branches involved in the action. (Note: If any of them maintain they can't live with what you propose to do, you need very strong justification as to why it's necessary and they should be able to support and document their position.)

5.  Paperwork for New Branches (Below Barony/Province)

a.  Make sure each branch organizer has clear instructions regarding the expectations and milestones needed for the creation of the new branch.

b.  Keep detailed records on each new branch. Future Seneschals will need to know what territory the branch has, who started it, and when it achieved official status. It

SCA_000400

may be helpful to make branch organizers draw their borders on a map, as well as giving you a list of postal codes (or other relevant boundaries).

c.  Make sure the College of Arms has approved the branch name. According to Corpora, an incipient branch can use a tentative name, but it can't get full status until the name is registered. Be sure incipient groups are aware of this requirement, and encourage them to begin work on their name and get it submitted as soon as possible.

d.  Make sure every group finds an acceptable name.[74]  If you can show a consistent good-faith effort by a group to register a name over a long period of time, and the College of Arms has rejected their every attempt, you can apply to the Society Seneschal for a variance to allow the group to become official without a registered name.

e.  Give the branch a detailed record of its territory. When you decide that a branch is ready for official status, make any necessary adjustments to the borders and postal codes shown on their branch application. Note the date the Crown declares them a full-status branch of the SCA, and give them a signed copy for their records.

f.  Notify the Society Seneschal of new official branches.[75]  Please use the following format: Branch name (modern location), branch type, month, and year of status. Send this notice after the deed is done. Plans are subject to change, so the Society Seneschal has no interest in an incipient shire that is probably going to be made official next month. It's not real until its existence has been read into the record at a Board meeting.

g.  Here's a summary of what must be done in order for a branch to become official or full-status. These things are usually done in the order listed.

i.  The Kingdom Seneschal must approve the petition. At this point, the branch must start functioning as an official group, with officers, reports, etc.

ii.  The Crown must recognize the new branch in Court.

iii.  The Society Seneschal must be informed of the branch's existence.

iv.  The branch's status must be recognized by the Board of Directors.

## B. CREATION OF A BARONY (OR PROVINCE)

1.  The formal minimum requirements for baronial or provincial status are given in Corpora.[76] This is a description of what a Kingdom Seneschal has to do to make sure that the Board will not overturn a baronial/provincial creation for lack of paperwork or improper procedure.

2.  Baronies and provinces are large branches within and subject to the administration of a Kingdom (and Principality, if any). They are alike in status and in the ability to administer other branches within their borders, but differ in that baronies possess ceremonial representatives appointed by the Crown and therefore have the ability to administer Baronial awards, while provinces do not.[77]

3.  A branch or contiguous group of branches may petition for baronial or provincial status at the members' option, subject to the approval of the Crown and (if applicable) the Coronet, if the resulting entity meets the requirements listed below.

a.  At least 25 paid members in good standing. Strive for double that.

b. A set of officers acceptable to the Crown (and Coronet, if applicable).

c. A name and device registered with the College of Arms.

d. Consensus favoring advancement in branch status, and favoring the type of branch (barony or province) specified in the petition. (Note: If the branch is to be a barony, arrangements shall have been made with the Crown at the time of application for baronial status to select and appoint a Baron and/or Baroness in accordance with Kingdom law and custom.

e. A strong record of activity in a variety of fields of Society endeavor.[78]

4. At least 25 paid members in good standing means that there are enough members, more than the minimum of 25, to ensure that the group has sufficient diversity and adult participation to be sustainable moving forward. Here are some questions to ask when considering whether membership is strong enough to sustain a new SCA group:

a. Are the paid members from different families, households, areas of the postal codes being claimed? Will the branch lapse below 25 if one family moves and another lets its memberships lapse?

b. Do the paid members have a diversity of SCA activities and interests (arts and sciences, service, combat, archery) or will the branch lapse if one area of interest is discontinued?

c. Do the officers of the group come from different families and households?

d. How long have the members been playing?

5. A set of officers is generally considered to consist of the Great Officers required to run the group: Seneschal, Exchequer, Herald, Marshall, Chronicler, and Minister of Arts & Sciences. A Chirurgeon may not be required for any branch below the status of Principality. Other offices may be required at Kingdom option. The key item in evaluating the group's officers is whether the group has a successful history with each of the required offices functioning and reporting, and whether their superior officers feels the officer position is working in the group.

6. Unless the history is exceptional and well documented, the requirement for a registered name and device will not be waived for baronial/provincial advancement.

7. A strong record of activity means that there are regular meetings and practices, that the branch does not cater only to one specific SCA interest group (fighters, artists, etc.), that demos are done as appropriate, that the branch holds events on approximately the same frequency as other baronies/provinces in the Kingdom, and that people from the branch participate in other branches' events. A branch whose residents never venture outside their area is not ready to be advanced; this may be discounted in the case of geographically isolated groups where travel to other branches is especially difficult.

8. There must be a consensus in polling the area. This can be done by a mailing to the members, or by passing a petition around a meeting. The entire paid member population of the area must have a chance to comment (generally, in writing) on the proposal. The petition or poll must be unambiguous. Each page of signatures or each letter must include a preprinted explanation of what the signatures mean. This may take the form of a heading declaring that the undersigned all want a certain stated course of action, or it may involve columns for noting support, opposition, or indifference for a stated course of action.

9. Make sure that the people who signed the poll knew what kind of branch they were petitioning for, and in the case of a barony, that they knew how the first Baron and/or Baroness would be selected. It is best if this information is included on the petition or polling letter. Make sure that the petition or poll indicates membership status, which must be checked against a Registry list.

10. The Corporate Office can provide labels for a polling mailing. The Kingdom Seneschal should either order the set on behalf of the poll organizers or email or fax an authorization to the office authorizing the release of the labels to a specific person. There is no charge for the service. The request should specify the postal codes (in numeric order, giving ranges rather than individual codes where possible) to be included in the label set. Branch pollings as a rule must include all paid members in good standing of any type within the boundaries of the area being polled, and the Corporate Office requires that the labels be used within 10 days after they are issued. Persons who actively play in the area but live outside it may be polled at the discretion of the Kingdom Seneschal.

11. The members polled must understand that a petition or polling is not a vote! It is merely a way for the Kingdom Seneschal to assess the opinions of the people. The Seneschal will decide whether to recommend advancement of status. When you evaluate a poll, look for the following points:

    a. A substantial majority of the Society members in the area must have responded to the poll. Make sure everyone is informed of the polling.

    b. A substantial majority of the response must be favorable. You want general support from the people in the area, not a household power trip.

    c. The opposition must not be convincing. If there are more than two or three people against the change—that is, negative instead of neutral, find out what their reasons are and consider them carefully before forming your own conclusion.

    d. Non-member support can't replace member indifference or opposition. While non-members may be allowed to express an opinion, the gathering the wishes of the paying members is crucial.

12. The Kingdom Seneschal should also gather input from the other Kingdom officers, the Crown, and the Seneschals and ruling nobility in adjacent branches for their feelings on the proposed branch elevation.[79]  Especially ask the superior officers whether they feel that the branch officers are capable of handling the changed responsibilities.

13. As Kingdom Seneschal, it is your responsibility to prepare a detailed package for the Society Seneschal's review.[80]  Give the Society Seneschal your considered opinion as to whether or not the branch is ready for advancement, plus at least the following items:

    a. A statement from the Kingdom Seneschal that the membership thresholds have been met.

    b. A summary of the petition/polling process, with a copy of the petition or letter and a breakdown of the voting, separated into subscriber/other member/non-member.

    c. A list of the proposed postal codes (or other boundaries for international groups), especially if there are any changes being made.

SCA_000403

d. Statements from local and Kingdom officers, the royalty, and the neighbors supporting the advancement. The Kingdom officers should also give their opinions of the local officers.

e. The branch's own explanation of why it is ready to advance, along with a brief summary of activities in the area.

f. A plan for selecting the first Baron and/or Baroness, if the branch will be a Barony.

14. Occasionally a group will express a desire to become a Palatine Barony. A Palatine Barony is a barony that selects its baron and/or baroness periodically via some sort of competition: a tournament, an arts competition, or sometimes some combination of competitions. Palatine Barony status is used, extremely rarely, for groups that are remote enough from the rest of their Kingdom that they are unlikely to be able to participate regularly in the Kingdom's pageantry. If a group seeks Palatine Barony status, consult the Society Seneschal before proceeding.

C. PRINCIPALITY AND KINGDOM ELEVATIONS

1. Work with the Society Seneschal from the start.[81]  Principality and Kingdom elevations are rare and too individual for specific procedures to be useful, but you need to make sure that they include a comprehensive polling and review process (see instructions under Creation of a Barony). Any minority opinion must be addressed—the smaller group is not necessarily wrong, and a serious attempt to deal with their objections will do a lot to draw them into the life of the new realm. For a Principality or Kingdom polling, the Registry will prepare a set of labels at your request. Just specify the postal codes to be included. You may release these labels to the poll organizers, with the warning that they are to be used only for the poll itself, and that they must be used within 10 days.

2. Prepare a detailed package for the Society Seneschal's review.[82]  Give the Society Seneschal your considered opinion as to whether or not the group is ready for advancement, plus at least the following items:

a. A description of the polling process, including dates and copies of the information sent out to explain the poll.

b. The detailed results of the polling, including any areas where opinion runs strongly counter to the rest of the proposed Kingdom or Principality.

c. A map showing the borders of the proposed Principality or Kingdom.

d. A list of postal codes to be assigned to the new realm. Where possible, these should stick to 3-digit (known to the post office as SCFs) breaks. You must list all SCFs to be included in the new Kingdom, and all individual ZIP codes so affected if the new Kingdom is not claiming the entire SCF regardless of whether anyone lives there at the moment or not! Outside the USA, where the SCF doesn't apply, then the appropriate divisions of the postal code should be used.

e. If all or part of the proposed Principality or Kingdom lies outside the US, you will need to work with the Society Seneschal to determine the appropriate way to designate territory.[83]

f. Statements from officers supporting the change in status.[84]  For a Principality, include letters from at least the Earl Marshal, Kingdom Exchequer, Principal Herald, Minister of Arts/Sciences, and Chronicler, indicating their confidence in the area's

ability to operate at the new level. All the parent Kingdom's officers should comment on a proposed Kingdom elevation as well as their Corporate counterparts.

g.   Draft Law to be presented to the victors of the first royal Lists.[85]  (Note that the victors may choose to adopt different laws than the draft presented; this is their right as royalty.)

h.   Financial Policy for a potential Kingdom, and a plan, if applicable, for any asset transfers to the potential Kingdom.

i.   A date (or a range of dates) for the first Coronet or Crown Lists, and a statement regarding the plans for establishing the first set of royalty. Some realms choose a field-side investiture immediately after the Lists, while others prefer to hold a separate event. Either approach is acceptable, but the choice should be made well in advance, so no one is taken by surprise.

j.   For a Kingdom, statements from the Crown and Coronet supporting the transition plan, and the entry conditions for the tournament—or your explanation of the reasons why they weren't able to reach an agreement.

k.   For a Kingdom, a plan for the transition of the newsletter from 'unofficial' status to that of a newsletter covered by SCA membership.[86]  This includes getting the necessary mailing permits, etc.

l.   To avoid outside adjudication, Crown Lists and Coronation plans must be acceptable both to the new Kingdom and to its parent. The parent Crown, the new Crown and the last Coronet should settle on a format for the tourney and the release of the new Kingdom. Their Seneschals, Marshals, and Heralds should all contribute to a smooth and gracious agreement—and you are a key player in the process. If there's no resolution, Corpora gives the final choice to the Society Seneschal and the Board.

3.   Use "Crown Principality" status to recognize regional development. Where an area is obviously suitable for eventual Principality status, a Kingdom can reward and encourage the trend by declaring the area to be a Crown Principality. A Crown Principality is exactly and only a region with a fancy name and a line in the Coronation ceremony—the Sovereign and Consort also become Prince and Princess of the pseudo-Principality when they assume the thrones. It has no laws but the Kingdom laws. Its officers are regional deputies to the Kingdom officers. However, the name lends it extra emotional reality. The Kingdom can allow it to develop some customs of its own which will smooth the eventual transition.

4.   All the procedures for creating a Crown Principality are under Kingdom control, as long as the Kingdom doesn't attempt to hand over functions reserved to the royalty or officers of SCA Principalities. (That is, the ceremonial representatives for the Crown within a Crown Principality may NOT warrant subordinate officers, proclaim banishments, or bestow armigerous awards without specific Crown approval for individual recipients.)

5.   Please be cautious with the idea, and do some polling before advising your royalty to establish a Crown Principality.

D. **BRANCH SUSPENSION**

1.   The Kingdom Seneschal may suspend a branch for just and stated cause. The conditions under which a suspension will be lifted should be defined in writing for the group at the time it is imposed. Whenever possible, a status review date on which the

SCA_000405

suspension will be reconsidered should also be defined and announced to the group. In no cases should suspension or abeyance last longer than 6 months without a review of the suspension. A branch that has been put into suspension or abeyance for financial reasons may not handle money in the name of the SCA until the problems are corrected.

2.  A suspended branch may not handle money. If a branch fails to turn in its financial report in time to be included in the Kingdom report, the SCA report for the year is affected. The sanctions must prevent them from receiving or spending funds in the name of the SCA until they are restored to their full place in the Kingdom. Work with your Kingdom Exchequer to be sure that you have a procedure for keeping track of their prior assets, and for helping them survive the period of suspension. Note that the Exchequers' Year-End Reports (for branches within the U.S.) are compiled to form the SCA annual report to the IRS, and failure to file this report (by any branch) can imperil the SCA's tax-exempt status.

3.  Suspension is better as a threat than as a penalty. A branch very rarely goes into suspension because of a problem caused by all its members. When you apply penalties to a whole branch, you may reduce the quality of life in the SCA for a group of innocent members and potential members because of the carelessness or ill fortune of a few officers. You need to have sanctions to apply to a branch--but they should be a last resort, used only when reminders, replacement of officers, and offers of help have all failed to locate someone who can meet the requirements.

E. **BRANCH ABEYANCE (DORMANCY)**

1.  The Society Seneschal may take the recommendation of a Kingdom Seneschal and recommend that a group go into abeyance status if a majority of the group members have been assigned to other activities (i.e. military service and deployment and are away from the area for a period of time longer than three months).

2.  The Society Seneschal may take the recommendation of a Kingdom Seneschal and recommend that a group go into abeyance status if a majority of the group members have been affected by natural disasters such as severe flooding or a direct hit from a hurricane or tornado and are in need of extended time to rebuild.

3.  During this time the group will go dormant and the kingdom will recognize the group as being in abeyance status. When a group goes in abeyance, the group's bank account will be turned over to the kingdom to maintain until which time the group is out of abeyance or the group is dissolved due to lack of activity or interest. All heraldry will be maintained by the group throughout the abeyance. It will be the responsibility of the Kingdom Seneschal to report for the group while in abeyance status. The group may remain in abeyance status for up to two years. At this time, the status will be reviewed and either extended or revoked and the group will be dissolved. If the group is dissolved, all funds currently being handled by the kingdom will revert to the kingdom.

F. **LATERAL BRANCH CONVERSIONS**

1.  Lateral conversions include those between shire or canton and institutional branch and vice versa, and those between barony and province. They also include changes between shire and canton. You should consult the Society Seneschal regarding any questionable lateral conversions.[87]

2.  You must, at a minimum, poll the membership (paid members in good standing) of the affected area prior to a lateral change. Especially at the baronial or provincial level, you need to be as sure of the wishes of the membership as you would be for an elevation to

SCA_000406

that status. Kingdoms may also elect to create policy that allows polling persons who participate in the branch but are not paid members living within the confines of the branch. The polling must reflect that a compelling majority of the paid membership within the boundaries of the affected area are in favor of the proposed change.

3. Try other alternatives before making a barony into a province, unless the branch actively chooses this change. If a barony runs into trouble selecting new ceremonial heads, the Crown can appoint a vicar as an interim measure or take over as Baron and Baroness directly for a while. Before you agree to propose an outright status change, make sure that the people of the barony understand that baronial awards will be closed while the branch is a province—this may give them the incentive to resolve their differences. (Existing provincial awards were grandfathered when the 1989 Corpora was adopted. That privilege does not extend to provinces formed after that time, whether established as provinces or converted from baronies.)

G. **BRANCH DEMOTION OR DISSOLUTION**

1. Remember that while a Kingdom Seneschal can dissolve an incipient branch for cause, all other branch demotions and dissolutions must go to the Society Seneschal (and be upheld by the Board) for approval. Once a branch has advanced beyond incipient and gained official status, only the Board upholding a decision by the Society Seneschal can lower that status or take it away, per Corpora.

2. Demotion or dissolution of an SCA group that has gained official status is a last resort. Work with the people in a branch as long as it looks like there's any chance of saving it. Warn them before you recommend dissolution, and listen to the justifications they offer for staying in operation. In isolated areas, it may be possible to sustain a branch's status with fewer members than normally required—check with the Society Seneschal if you think a variance might be desirable.

3. Once you have decided that dissolution is the proper course of action, you will need to present the reasons, in writing, to the Board and the Society Seneschal.[88] When you set up the case for the Society Seneschal to give the Board, include good reasons, and the efforts already made to correct the problems. If population is low, give numbers at intervals to show that it's been low for a good while and is unlikely to recover. If the problem is lack of interest, define it in terms of inability to fill offices or file financial reports. If interpersonal problems have seriously damaged the SCA's reputation, describe specific incidents, and include letters or news stories from the area if you have them.

4. In order to be this specific, you have to know what's been going on. Dredging up old records in order to reconstruct population and reporting history is very difficult. Count your branches every year or so from the current ZIP code list, and keep a central tally of how they're doing.

# XIX.   INSURANCE MATTERS

A. **REGIONAL APPLICABILITY**

1. The following information applies only within the SCA, Inc. Within affiliates, different insurance arrangements may exist and local procedures should be followed.

SCA_000407

B. **INSURANCE GUIDELINES**

1. Most site owners require some sort of evidence that the SCA, Inc. has liability insurance. To provide documentation, the "Proof of Insurance" certificate is distributed to Kingdom Seneschals toward the end of each year. Promptly distribute the new form to your branch Seneschals, and have them destroy the old forms.

2. An "Additional Insured" Certificate may be requested for those site owners who require a higher level of protection. It specifically names the site/owner/managing organization as additionally insured on the SCA, Inc.'s policy. An "Additional Insured" certificate can be obtained from the Insurance Coordinator at the SCA national office—place your order at least 6 weeks in advance of the event. It is preferred that this fee be paid with a branch account check.

3. A special insurance fee must also be paid to activate the SCA Equestrian Policy whenever equestrian activities are scheduled for an event. The fee and request should be sent to the Insurance Coordinator at the SCA national office 6 weeks in advance of the event. If you also need an "Additional Insured" certificate for the site owner, an additional insured certificate is also required. It is preferred that this fee be paid with a branch account check.

4. Try to avoid claims. Call the Society Seneschal if it looks as though a claim may need to be filed and remember that there is a deductible.

5. Remind people that the SCA insurance does not cover participants for injuries to their person or damages to their personal property. This is why the SCA requires waivers, which offer protection for the Corporation and its officers. However, a site owned by an SCA member is covered for property damage the same way any other site is covered.

C. **THE SCA'S GENERAL LIABILITY POLICY**

Our General Liability Insurance covers the negligent acts of the SCA for third-party bodily injury and property damage, excluding participants, subject to policy conditions, exclusions, and limitations. Please note: vandalism is not covered by our policy. If damage to someone's person or property was willful or otherwise intentional, the SCA is not covered.

D. **THE SCA'S DIRECTORS' AND OFFICERS' LIABILITY POLICY**[89]

1. The purpose of Directors' and Officers' Liability Insurance is to provide the SCA and its officers and agents with insurance coverage for legal defense required to respond to lawsuits that name the SCA or its officers. Specifically, our Directors' and Officers' Liability Insurance covers insurance when actions are filed for wrongful acts, defined as, "...any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by the organization or by the individual insured in the discharge of their duties..."

2. The important factor is that all warranted officers and their agents are covered by insurance, and not just the Board of Directors and the officers at the Corporate level—all warranted officers of the SCA at all levels are covered within the bounds of performing their office in the SCA.

E. **HOST LIQUOR COVERAGE**

1. The SCA's US General Liability policy provides coverage for claims relating to the incidental use of alcohol at events, but not if we go into the business of selling or serving

alcohol. Specifically, the SCA cannot manufacture, distribute, sell, serve, or furnish alcoholic beverages. Hence, SCA-sponsored taverns are prohibited.

2. Further, SCA funds may not be used for the purchase of potable alcohol, except for that needed for use in cooking.[90] This issue differs in countries outside of the US and will be addressed via stated policy per country. Policies for other countries other than the US should be included as a part of relevant individual Kingdom Law.

3. The following section refers to the US only. A site may provide a bartender for an event who may sell alcohol or liquor pursuant to site and jurisdictional restrictions. This bartender may not be a participant at the event in any capacity outside the sale of alcohol, and will preferably be a non-member. No part of the revenue from these sales may go to any SCA group or member (except if that member should independently be the owner or operator of the site). The sponsoring group should provide no oversight or direction to him save through the site owner/operator.

## F. EQUESTRIAN COVERAGE

1. The SCA Corporate office must be informed each time the Equestrian Insurance Policy is to be activated for an SCA event, and a special insurance fee must be paid. The fee and request should be sent to the Insurance Coordinator at the SCA national office 6 weeks in advance of the event. If the site owner also wishes to be named as an additional insured, an "Additional Insured" certificate is also required. A significant, additional late fee may apply if you do not order in a timely manner.

2. Once the equestrian insurance coverage is activated, the following must be done for the insurance to apply for an event:

   a. Any person participating in the SCA equestrian-related activities, including riding or authorization check rides, horse handling, ground crew, mounted games and combat, marshaling, or being present at equestrian activities as an observer, is required to sign a Society for Creative Anachronism, "Waiver And Informed Consent to Participate in SCA Equestrian Activities" form or roster. Since anyone at an event may end up being an observer EVERYONE at an event should sign the waiver

   b. The special equestrian signage explained in The SCA Equestrian Handbook must be displayed where the equestrian activities are conducted.

## G. INSURANCE RELATED CLARIFICATIONS

1. Do I need to do anything to get liability coverage for my branch's published event?

   No. Our coverage applies equally to all SCA-sponsored activities. You do not need to do anything unless the site owner requests proof of insurance and refuses to accept the Society's letter describing the policies. Exception: If it's an equestrian event, you must order an insurance certificate from the Insurance Coordinator (there is a fee for this) see http://www.sca.org/docs/insurance.html.

2. Should I offer to have the site owner named as an additional insured?

   No. A site owner must specifically state in their contract if they need to be added as an additionally insured.

3. What should I tell a site owner about our insurance?

   If you're asked if we have coverage, say "yes." If the site owner wants something from the broker, cooperate and tell him you will provide a "Proof of Insurance" certificate, and do so. A certificate naming the site owner as additional insured can be issued, but wait for them to request it.

4. How do I avoid last-minute panic about insurance?

   When you reserve a site, ask about all the details you will need to know even if insurance is not a factor. Read the contract if there is one. If insurance has not been mentioned, ask, "So that's everything we need to do..." or "Is there anything else you need from us?" The above queries will most likely bring out any insurance questions.

5. What happens if you need an "Additional Insured" certificate from the SCA office?

   Request it at the same time you send your flier to your Kingdom newsletter. See www.sca.org for instructions. If a site owner wishes to be specifically named as additional insured, you can order an insurance certificate for a processing fee. The fee must be sent at the time the certificate is requested. Processing will not begin until the fee is received. If a site owner wishes simply to be the Certificate Holder without being named as Additionally Insured there is no fee for this document

6. Whenever horses will be present at an event, whether there is an additional insured or not, there is a fee required.

7. If fireworks or fire arts are performed, Society Seneschal approval and outside insurance coverage is required. The local groups are responsible for 100% of the cost and responsibility for this additional policy. Fire Arts, which include but are not limited to fire-walking, fire-breathing, explosives, and pyrotechnic displays may not be conducted as an SCA sponsored activity at events, demos, practices, or formally recognized gatherings. Variances must be requested of the Society Seneschal in writing and only take effect when granted in writing by that office. The Event site will pay for any additional insurance needed.

8. A single "Additional Insured" certificate or equestrian policy activation can cover a range of dates at a particular site (e.g., fighter practices). Consult with the Insurance Coordinator for more details on how to make use of this feature.

H. **ORDERING INSURANCE CERTIFICATES**

1. Always include your legal name and your daytime phone number.

2. Allow at least 60 days and preferably 8 weeks for the request to be processed. A late ordering fee will be charged for certificates requested fewer than 30 days before the event. If you can supply a letter from the site owner, on letterhead, stating that the reason for the delay is due to late notification by the site, you may get a refund of the late fee at a later date. However, the late fee must still be paid along with the certificate fee.

3. Visit http://www.sca.org/docs/insurance.html.Provide the requested information, on a separate sheet of paper for each certificate requested. If you have questions, call the Corporate Office for clarification.

SCA_000410

I. ORDERING FEES

1. General Liability Policy. If someone is to be named as Additional Insured there is an additional fee. If no additional insured is requested, the certificate is free. The fee must be received with the request. Processing will not begin until the fee has been received. It is preferred that this fee be paid with a branch account check

2. Equestrian Policy. Each time the Equestrian Policy is activated, whether there is additional insured or not, there is a fee. If the site owner wishes to be named as an additional insured, there is another additional fee. The fee must be received with the request. Processing will not begin until the fee has been received. It is preferred that this fee be paid with a branch account check.

3. Late Fee. If you do not adhere to the 30-day ordering period there will be a late ordering fee charged. Occasionally, the site will delay requesting a certificate and the fee may be waived by providing the Corporate Office with a letter from the site owner (on letterhead) detailing the cause of the delay. However, the late fee will still need to be sent with the certificate fee, and will be refunded after the site owner's letter has been reviewed

# XX.  OVERSIGHT OF SOCIETY-OWNED TRAILERS

A. REGIONAL APPLICABILITY

1. This section applies only within the SCA, Inc. Check local policy for registration and insurance arrangements in affiliates.

B. MAINTENANCE OF RECORDS

1. Each local branch, group, office, guild, or other officially recognized group (hereafter referred to as a "group") of the SCA that owns a trailer that is registered in the name of any group of the SCA must maintain all records as noted below.

2. When the vehicle is purchased:

   a. The Group should retain copies of the title, the current registration and current "proof of insurance" in the group's Exchequer files.

   b. The Group should retain copies of the title, the current registration and current "proof of insurance" in the group's Seneschal files.

   c. The Group should retain copies of the title, the current registration and current "proof of insurance" in the group's Regalia Officer files (if applicable)

   d. The Group should report the purchase of the trailer to the SCA Corporate office by sending a copy of the registration and current "proof of insurance" to the vehicle to the corporate office.

   e.  It is the responsibility of the group to obtain and maintain insurance for this SCA asset.

3. When the vehicle is sold:

   a. Retain the bill of sale in their group Exchequer files.

SCA_000411

      b.   Retain a copy of the bill of sale in their group Seneschal files.

      c.   Retain a copy of the bill of sale in their group Regalia Officer files (if applicable).

      d.   Follow the procedures listed below to report the sale of the trailer to the SCA Corporate office so SCA insurance can be cancelled for the trailer.

C. PROCEDURE FOR REPORTING THE PURCHASE, REGISTRATION, INSURANCE OR SALE OF SCA OWNED TRAILERS, VEHICLES OR WATERCRAFT.

Each branch, group, office, guild or other entity which is a part of the SCA (hereafter referred to as a "group") of the SCA that owns a trailer or any other vehicle or watercraft that is registered in the name of any group of the SCA, must send a copy (a copy, not the original) of the current registration to the Corporate Office. The Vice President of Corporate Operations or their designee will retain a copy of the current registration along with a copy of the current "proof of insurance" for our files.   You are directed to send a copy of the trailer, vehicle or watercraft that is registered in the name of the SCA as well a copy of the current "proof of insurance" to the following address within 30 days of obtaining registration:

      SCA Office Address for Trailer Registrations:
      Insurance Certificate Coordinator
      Society for Creative Anachronism, Inc.
      P.O. Box 360789
      Milpitas, CA 95036-0789
      (800) 789-7486 or (408) 263-9305
      (Mon–Thurs 9 am–4 pm)

D. **TRAILER INSURANCE**

All trailers, vehicles or watercraft purchased and owned by the SCA must be registered to the SCA group and must be insured by the SCA group at their own expense.   The group must also send A COPY OF THAT REGISTRATION MUST BE SENT TO THE CORPORATE OFFICE WITHIN 30 DAYS OF REGISTERING SAID TRAILER ET AL.
Do not register the group's trailer in the name of an individual or an officer of the group.   If a third party's person or property is damaged as a result of an accident involving a trailer when being towed, the individual who is towing the trailer bears responsibility for liability when the trailer is in transit and should contact their insurance carrier.   It is the responsibility of the seneschal of the group that owns the trailer to check to make sure that the tower/driver of said trailer has the appropriate motor vehicle liability insurance annually.   Some groups own a trailer that is used for storage only, i.e. it never moves from the storage site. If the state authority requires said "stationary" trailer to be registered, the group is responsible to follow the procedure as outlined above, i.e. a copy of the registration must be forwarded to the corporate office within 30 days of registration.

# XXI.   REGISTRATION AND LEGAL AGENTS

A. **REGIONAL APPLICABILITY**

   1.  This section applies only within the US and Canada.

B. **STATE AND PROVINCE REGISTRATION**

SCA_000412

1. The Society for Creative Anachronism, Inc. is incorporated as a non-profit corporation in California, and is registered to do business in all states and provinces where required by local law.

2. There are subsidiaries of the SCA, Inc. incorporated in various states. These incorporations are for corporate legal reasons and have no effect on "game side" activities. These subsidiaries affect no officers except at a Corporate level. Reporting by all officers should go up the standard chains of command.

C. **LEGAL AGENTS**

1. The SCA, Inc. has retained a corporation to act as its legal agent in all states for the purposes of receipt and service of legal documents. If any Society officer receives any official legal document naming the SCA or any branch requiring response or discussing legal action should report such to the Kingdom Seneschal who will report it to the Society Seneschal.

D. **NONPROFIT STATUS**

1. The Society is recognized by the United States Internal Revenue Service under Section 501(c)(3) of the United States Internal Revenue Code.

# XXII.   REPORTING INDEX

| What | To Whom | When |
|------|---------|------|
| Updated copies of Kingdom and Principality Law | Changes must be published in Kingdom Newsletter.<br><br>Copies must be available to populace from Kingdom & Principality Seneschal.<br><br>Copies of changes must be provided to Society Seneschal & Kingdom Ombudsman | After the change has been reviewed by the Seneschal and approved by the Crown, and after the change has been announced |
| Kingdom and Principality Officers Policies | Changes must be published in Kingdom Newsletter.<br><br>Copies must be available from Kingdom and Principality Officer.<br><br>Copies of changes must be provided to Society Superior as appropriate. | After the change has been announced to all branch officers |
| Local Jurisdiction Policies | Available from Seneschal of group | After the change has been announced to the branch |
| Resumes for applicants to the position of Kingdom Seneschal | Society Seneschal | Before the final selection is made at Kingdom level. |
| Kingdom Seneschal's Warrant | Society Seneschal | After it has been signed by the Crown and as soon as possible after you have been approved by the Society Seneschal |
| Kingdom Seneschal Quarterly Report | Society Seneschal and your Crown | 15th, March, June, September, December |
| Notification of winner of Crown lists | Society Seneschal | As soon as is reasonable after the event |
| Impending Royal or KS Administrative Sanctions | Society Seneschal | As soon as is reasonable after the decision |
| If you called fire, police, or EMS to an event | Society Seneschal | As soon as is reasonable after the event |
| Threatened lawsuit | Society Seneschal, President, Corporate Office | As soon as is reasonable after the event |
| Financial irregularities (theft, embezzlement, etc.) | Society Seneschal | As soon as is reasonable after the event |
| Violations of Rules/Laws by Crown or Great Officers | Society Seneschal | As soon as is reasonable after the event |
| The dissolution of an established branch | Society Seneschal | Before you announce it to the group; this must have Board approval |
| The existence of any new branches or lateral changes | Society Seneschal | As soon as is reasonable after the group has been recognized in court |
| Changes to your ZIP code assignments by the USPS or changes you have made in your Kingdom | Society Seneschal | In your next Quarterly Report |
| Bids or proposals for KW events | Society Seneschal | After approval by Kingdom Financial committee |
| Pulled SCA Sponsorship from an Event | Society Seneschal and Kingdom Ombudsman | As soon as is reasonable after the event |
| You need to file a claim against the SCA's insurance | Society Seneschal and Corporate Office. | As soon as is reasonable after the event |

SCA_000414

# XXIII.   PROPOSAL CHECKLIST FOR SOCIETY ANNIVERSARY EVENTS

- [ ] Site location
- [ ] Full address, including State/County/Municipality of the site.
- [ ] Contact person at site for questions
- [ ] Distance to closest major airport
- [ ] Shuttle service availability and rates
- [ ] Public transportation availability and rates
- [ ] Relationship to highway system
- [ ] Location of closest hospital
- [ ] EMS response time to site
- [ ] Trauma level
- [ ] Walk-in clinic or urgent-care center available nearby
- [ ] Distance to closest town or city
- [ ] Grocery stores
- [ ] Hardware stores
- [ ] Laundry facilities
- [ ] Distance to nearest hotel(s)
- [ ] Average single- and double-bed room prices
- [ ] Availability of group rates
- [ ] Other tourist attractions in the area
- [ ] Site facilities
- [ ] General description of site (open fields, heavy woods, rolling hills, etc.)
- [ ] Size of site
- [ ] Site capacity
- [ ] Parking lot capacity (permanent structure types and count)
- [ ] Water source on the site (municipal, well, or other)
- [ ] How many spigots at what distances apart?
- [ ] Number of toilets
- [ ] Flushing
- [ ] Portable
- [ ] How often will they be serviced (emptied)?
- [ ] Number and description of showers (indoor, outdoor, primitive, heated, solar, etc.)
- [ ] Are non-camping accommodations available on site?
- [ ] If yes, what and how many beds?
- [ ] Trash pickup arrangements
- [ ] Equestrian facilities
- [ ] Handicapped facilities provided by the site
- [ ] List any other facilities available on site.
- [ ] Site permissions and restrictions
- [ ] Alcohol policy for the site
- [ ] General pet policy

- [ ] Is coursing of hounds permitted?
- [ ] Is equestrian activity permitted?
- [ ] Other shelter options (such as rental tents) available
- [ ] Grounds use limitations
- [ ] Any local modern ordinances, permits or requirements that must be taken into consideration
- [ ] Proposed Dates List all possible dates in order of preference.
- [ ] Average weather and temperature range in that area for the time of year
- [ ] Possibility of catastrophic weather events in the area during the time requested (hurricane, tornado, flood, etc.)
- [ ] Other large modern events in the area just before, during, and after the event
- [ ] Personnel
- [ ] List contact information and relevant major event experience for the head person in all applicable positions.
- [ ] Event Steward
- [ ] Exchequer
- [ ] Pre-Registration
- [ ] Head Gatekeeper/Troll
- [ ] Security/Constable
- [ ] Chirurgeon in Charge
- [ ] Marshal-in-Charge
- [ ] Event Herald
- [ ] Head Cook
- [ ] Children's Activities Coordinator
- [ ] Activities Coordinator
- [ ] Merchant Coordinator
- [ ] Land Allocation/Hotel Liaison
- [ ] Media Liaison
- [ ] Volunteer Coordinator
- [ ] Event Proceedings Coordinator
- [ ] Other staff
- [ ] Event activities
- [ ] Describe the planned event activities under the headings that apply for the event.
- [ ] Meetings and classes
- [ ] Fighting
- [ ] Archery
- [ ] Arts & Sciences
- [ ] Children's activities
- [ ] Equestrian and/or coursing

SCA_000415

- ☐ Heraldry and on-site communication
- ☐ First Aid/Chirurgeon
- ☐ Main Courts/Royalty activities
- ☐ Land allocation
- ☐ Other activities
- ☐ Event financials
- ☐ Financial Policy for the event
- ☐ Who is on the Financial Committee
- ☐ How expenses get approved
- ☐ How emergency expenses get approved
- ☐ Proposed budget including:
- ☐ Proposed income using fees x expected attendance, not including NMS
- ☐ Proposed expenses by category and event activity
- ☐ Estimated front money needed to hold the event
- ☐ Proposed division of profit between the Corporation and the sponsoring group, and if applicable, any other groups.

- ☐ Proposed division of losses between the Corporation and the sponsoring group
- ☐ Evidence of Kingdom support
- ☐ Letters from the following officers stating that they have reviewed and support the proposal.
- ☐ Kingdom Seneschal
- ☐ Kingdom Exchequer
- ☐ Appropriate Kingdom Officers for the topic of the event
- ☐ Crown
- ☐ Obligation from Kingdom and Society Officers required
- ☐ Society Officer attendance at the event
- ☐ Cancellation/disaster plan
- ☐ Cancellation before the event
- ☐ Evacuation plan

SCA_000416

# XXIV. SOCIETY SENESCHAL POLICIES & INTERPRETATIONS

1. **Marijuana Laws –** (Jan 2013 BoD Meeting)

   In regards to marijuana laws, all SCA participants should follow modern law, both State and Federal. As it is still illegal under Federal law, marijuana is prohibited at SCA functions. Jan 2013 board Meeting.

2. **Slaughtering and Butchering –** (October 2016 BoD meeting)

   The butchering of animals as a Medieval science may be allowed as part of a class or a demonstration; however, all modern health regulations must be followed if the meat is to be used to prepare/serve at an SCA event.   Furthermore, all due caution should be observed so that individuals, both minors and adults, should not be subjected to a scene that would violate reasonable sensitivities.   Additionally, the slaughtering of animals (domesticated mammals) at events are prohibited at SCA events.   This ruling based upon the following prohibition against hunting (with noted exceptions) as per a previous ruling:

   HUNTING: Policy Text: "Live animal hunt activities are prohibited at SCA events, practices, demos and other functions. These include, but are not limited to, deer hunting, boar hunts, and game bird shoots."

   > Implementing Guidance:The Policy is effective as of 10/30/05.

   The Policy remains in effect until upheld or overturned by the Board of Directors. If upheld, it becomes a permanent policy. If it is overturned, it is eliminated at that time.

   Enforcement: as with all Seneschal policies, primary responsibility for enforcement lies with the Office of Kingdom Seneschal.

   The Policy does not address, nor restrict, fishing or falconry.

   The Policy does not address, nor restrict, individuals hunting on site-owner's land with proper permits, licenses, and in accordance with applicable modern laws, regulations and statute.

   The Policy does not address, nor restrict, the teaching of classes on period hunting techniques and the history of the same.

   The Policy specifically targets SCA-sponsored activities that include live animal hunting.

3. **Golf Carts –** (April 2017 BoD Meeting)

   When a group rents Golf Carts, the SCA's Golf Cart Insurance must be activated. The fee is $50.00 for this activation and may be subject to change as required by our insurance company. All other requirements set forth by the Corporate Office dealing with insurance apply including all pertinent late fees.

4. **Harassment and Bullying –** (July 2017 BoD Meeting)

   The SCA prohibits harassment and bullying of all individuals and groups. Harassment and bullying includes, but is not limited to the following:

   • offensive or lewd verbal comments directed to an individual;

   • the display of explicit images (drawn or photographic) depicting an individual in an inappropriate manner;

• photographing or recording individuals inappropriately to abuse or harass the individual;

• inappropriate physical contact; unwelcome sexual attention; or retaliation for reporting harassment and/or bullying.

Participants violating these rules are subject to appropriate sanctions. If an individual feels subjected to harassment, bullying or retaliation, they should contact a seneschal, President of the SCA, or the Kingdom's Board Ombudsman. If a participant of the SCA becomes aware that someone is being harassed or bullied, they have a responsibility pursuant to the SCA Code of Conduct to come forward and report this behavior to a seneschal, President of the SCA or Kingdom's Board Ombudsman.

The following statement must be posted at gate/troll at every SCA event in a size large enough for people to see it as they enter our events. This language must likewise be quoted in ALL site handouts at every event a site where a handout is made available.

THE SCA PROHIBITS HARASSMENT AND BULLYING OF ALL INDIVIDUALS AND GROUPS.

Participants engaging in this behavior are subject to appropriate sanctions. If you are subjected to harassment, bullying or retaliation, or if you become aware of anyone being harassed or bullied, contact a seneschal, President of the SCA, or your Kingdom's Board Ombudsman.

# XXV. Annotations referring to Governing Documents (GovDocs)

1  GovDocs III.B.
2  GovDocs Warrant Forms in Appendix B.
3  GovDocs IV.C.1-10.
4  Policy interpretation on GovDocs VII.A.
5  GovDocs I.A.2.
6  GovDocs VII.K.1.
7  GovDocs VII.L.1.
8  GovDocs I.A.2.
9  SocSen Policy
10  GovDocs I.A
11  GovDocs X.B.1.b.
12  Policy interpretation on GovDocs II.E.3.
13  Policy interpretation on GovDocs VII.
14  GovDocs V.A.1-3.
15  GovDocs IV.G.7.
16  GovDocs VII.K.1.
17  Policy interpretation on GovDocs VII.A .
18  Restatement of Corporate Communication Policy
19  GovDocs X.C.4.
20  GovDocs X.C.2.
21  GovDocs X.C.1.
22  Policy interpretation on GovDocs VII.A.
23  GovDocs VI.6.
24  Policy interpretation on GovDocs VII.
25  GovDocs VII.J.1.
26  SocSen Policy
27  GovDocs VII.B.
28  QtrlyMtg 4-15-2000,VI Section E Policy Decisions 1, Society Financial Policy
29  GovDocs VIII.
30  Policy interpretation on GovDocs VII.
31  GovDocs VII.J.4.
32  GovDocs VII.K.1.
33  GovDocs VII.L.3.
34  GovDocs VII.M.1
35  GovDocs II.E.1.
36  GovDocs II.E.1.
37  GovDocs XVI.
38  GovDocs XIII.
39  Policy interpretation on GovDocs II.C.2.a. & II.C.2.c.
40  GovDocs IV-VI.
41  GovDocs VI.2.
42  GovDocs VI.3-4.
43  GovDocs IV.C&D.
44  GovDocs V.A. & IX.A.5.
45  GovDocs IX.A.7.
46  GovDocs VI.6.
47  GovDocs VI.6.
48  GovDocs VI.

SCA_000419

[49] SocSen Policy
[50] Policy interpretation on GovDocs I.B.1. & XIII.A.1.
[51] Policy interpretation on GovDocs II.A.
[52] GovDocs II.C.
[53] GovDocs II.A.
[54] GovDocs IV.A.1.
[55] GovDocs IV.A.3.
[56] GovDocs IV.A.2.
[57] GovDocs IV.A.2.
[58] GovDocs II.E.2
[59] GovDocs II.E.2.
[60] Policy interpretation on GovDocs II.A.
[61] Policy interpretation on GovDocs V.A.
[62] Policy interpretation on GovDocs VII.B.
[63] GovDocs IV.F.
[64] Policy interpretation on GovDocs I.A.
[65] Policy interpretation on GovDocs X.C.4.
[66] GovDocs IV.F.2
[67] GovDocs IV.F.2.
[68] Policy interpretation on GovDocs Corpora VII.B.
[69] GovDocs III.B.
[70] Policy interpretation on GovDocs Corpora III.
[71] Policy interpretation on GovDocs III.
[72] GovDocs III.D.4
[73] GovDocs III.B.
[74] GovDocs III.D.3.
[75] Policy interpretation on GovDocs Corpora III.D.5-8.
[76] GovDocs III.C.5.
[77] GovDocs VII.B.4.
[78] GovDocs III.C.5.
[79] GovDocs III.D.4.
[80] Policy interpretation on GovDocs III.D.5-7.
[81] GovDocs III.D.1.
[82] Policy interpretation on GovDocs III.D.5-6.
[83] GovDocs III.B
[84] Policy interpretation on GovDocs III.C.4.
[85] GovDocs III.C.4.
[86] Policy interpretation on GovDocs III.C.3.
[87] GovDocs III.C.2.
[88] Policy interpretation on GovDocs III.E.
[89] By-Laws IX.
[90] GovDocs VIII.

SCA_000420

# XXVI. ERRATA

October 2016 – Slaughtering and Butchering Policy
April 27, 2017 – XI.A.1 – add "A background check is also required for all YAFA Program officers including volunteer mentors."
April 27, 2017 – XI.A.2 – change US to United States
April 2017 – Golf Cart Policy
July 2017 – Harassment and Bullying Policy

SCA_000421

**SOCIAL MEDIA POLICY OF THE SCA_V6**

**Social Media Policy**

The Office of Social Media is responsible for the use of social media on approved platforms to support the goals of the Society for Creative Anachronism, Inc. and to facilitate communication with its participants.

**Warrants & Management Roles**

**Warrants**

All Kingdom Social Media Officers (KSMO) will be a warranted deputy under the Kingdom Seneschal. Each KSMO will be responsible for all currently approved social media outlets for their respective Kingdoms.

**KSMO Role**

Each Kingdom will have a Social Media Officer (SMO) and an official online channel.

It is encouraged that each local group have a warranted Social Media Officer for their group.

Each official SCA social media site/outlet will have at least two administrators, one of which must be the SMO. It is encouraged that the appropriate Seneschal or Webminister fill that role to accompany the Social Media Officer. Each administrator will have equal administrative control of the official social media site/outlet.

Official SCA social media sites/outlets should be monitored and moderated by the Kingdom and Local Group Social Media Officers and/or Deputies.

Group Social Media Officers must notify their KSMO when they enter or leave office.

**Reporting**

Kingdom Social Media Officers are required to submit quarterly reports to the Society Social Media Officer by the SCA, Inc. Board of Directors meeting deadline.

**Permissions for Material Previously Released Outside the SCA**

For material for which an appropriate release is openly published including Creative Commons and those materials released into the public domain, it is not required to use SCA Release Forms in order to distribute that material through a presence covered by this policy, provided the use thereof does not infringe on the terms of use for the given platform or the terms of the release.

Account administrators shall follow all guidelines for use in a creative work's release, including attribution and linking, and shall be prepared to honor requests that content be removed when appropriate in accord with the standards set by Society Corpora and Kingdom laws and policies.

**Trademarks and Intellectual Property Within the SCA**

SCA members and nonmembers may request use of SCA trademarks and service marks. Such requests and approvals can requested to the President addressed to the SCA Corporate Office or via an email that is sent to president@sca.org.

**Restriction on Content**

There are particular categories of information which cannot be initially announced through a social media page/outlet, based on requirements present in the Governing Documents and other policies and handbooks. No social media site/outlet may publish content unless that content has already been published in the required SCA venue first. The following are the most common types of information applicable under this section and is not meant to be exhaustive; in all cases, verify the requirements for publication in the relevant policy.

- Unapproved changes to law, policy and handbooks;
- Initial event publication in a Kingdom Newsletter/Kingdom Website for official status;
- Administrative and Royal Sanction; and
- Official pollings, including branch status change and Baronial succession.

The SCA encourages creativity and innovation in the use of social media by its entities. Certain activities and information are inappropriate to any social media page/outlet. The following material, including but not limited to posted messages, comments, threads of discussion, or media, collectively known as "content," shall not be permitted on any presence associated with the SCA.

- Content that involves modern politics or political subjects, particularly any activity that may be interpreted as endorsement of a particular political party, candidate for political office, legislation or referendum.

- Content that involves modern religion or religious subjects.

- Content that broadcasts false or misleading information, including content which is intended to disparage, intimidate or negatively impact the reputation of an individual, branch, event, or other group.

- Content that distributes material under current copyright that has not otherwise been authorized for distribution with appropriate attribution.

- Content that involves potentially lewd or offensive material, harassment, hate speech, profanity, or pornography.

- Content that is otherwise disallowed by existing SCA policy, including but not limited to published Society and Kingdom Seneschal, Chronicler, and Webminister policies.

- Any other content that is deemed by the administrators or Social Media officers of the relevant entity to be inappropriate for the site/outlet according to any guidelines set for participation in that particular site/outlet.

**Approved Platforms**

Social Media is ever evolving and growing constantly. We have approved platforms that are used for social media. If you wish to pilot a platform that is not listed below, ask your KSMO. The KSMO must be informed and keep a current listing of any/all new groups' social media sites/outlets. Each group is required to maintain an Official Facebook Page. Each group is encouraged to have an Official Facebook group.

**Current Official Approved Platforms:**

- Facebook
- Twitter
- Instagram
- Google +
- Meetup
- Pinterest

**Outward Facing Outlets and being "Official"**

Social Media sites/outlets considered Official include Kingdom and Regional Branch Outlets. Social media sites/outlets for unrecognized groups such as households, fan groups and communities are not considered official. While there are many pages, sites, groups and other outlets, if you conduct the official business in that site/outlet, then it is Official and should be treated as such.

Discussion groups often have privacy settings that allow administrators to control how group's content is pasted and replied to. Branches (on Facebook) can choose between "open" or "closed". It is encouraged that groups are set to "closed" and that admins have the ability to approve profiles into the groups. Official SCA social media sites/outlets should never be "secret".

Any new official SCA social media sites/outlets for an official group, region or guild must be approved by the Kingdom Social Media Officer.

**Events and Calendar**

Kingdom Social Media Officers are responsible for providing assistance for other Local Officers in creating and updating events for local group activities, events and meetings. These event pages are to be created through Official outlets and not third-party presences.

These events are encouraged to not be created in groups, but on Official Pages. The KSMO and their approved Deputies will create the event and then add the event steward. If the Event Steward does not use social media, the Local Social Media Officer may be added as their proxy. If the Local Presence has a page, it will also be added as a "host".

Always go to the Kingdom Event Calendar on the kingdom website for the most official reference of the event.

For official event pages/outlets, equal administrative control must be given to the individual(s) in charge of the event.

**Disclaimers**

Official SCA social media sites/outlets are required to use standard disclaimers. There are multiple disclaimers, and it is encouraged that each Official SCA social media sites/outlets use at least one.

**Regional Presence Disclaimer:** This (account, page, event) is held and managed by (region name), a branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (regional seneschal's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Group Presences:** This (account, page, event) is held and managed by (Group name), a branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (group officer's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Event Presences:** This (account, page, event) is held and managed by (region/branch name), a region/branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (event steward's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Expectations of Conduct**

All SCA participants taking part in social media interactions shall recognize that such participation is voluntary and proactive, and that participation in social media sites/outlets is not required in order to receive official SCA announcements, policies, or materials (but may be an additional method of receiving and discussing those items). Accordingly, everyone taking part in an SCA social media site/outlet shall:

Conduct themselves with courtesy, honesty, and chivalry, as would be done in any personal, face-to-face interactions.

Recognize that behavior or communications deemed to be excessively insulting, belittling, exclusionary, or generally unkind may be removed/unposted at the administrator's discretion, and that repeated occurrences may result in removal from the page/site/outlet by the administrators. Further information on enforcement is found below.

Acknowledge that any behavior or interaction deemed deceptive, hateful, threatening, solicitous, or illegal by the administrators will be cause for immediate removal (without warning) from the social media. All participants in social media outlets have the responsibility to report such communication/behavior to the administrators. Such behavior/communication found on official SCA social media sites/outlets may be used as grounds for disciplinary action by representatives of the Society, up to and including revocation and denial of membership. Be responsible in your choice of material to post via SCA social media outlets, and be patient with others who post material on these outlets as well.

Any social media site/outlet which purports to represent a branch, officer, or event from whom express permission has not been granted to create said official SCA social media sites/outlets are not acceptable.

**Enforcement**

The Office of the Social Media, in conjunction with the Seneschal of the responsible branch, shall be responsible for enforcing the Social Media Policy. Failure to follow policies concerning official SCA social media sites/outlets may result in sanctions, removal from office, or prevention from participation in the official SCA social media sites/outlets.

**SOCIAL MEDIA POLICY OF THE SCA _ V7**
**Revision Date 26/08/2019**

**Social Media Policy**

The Office of Social Media is responsible for the use of social media on approved platforms to support the goals of the Society for Creative Anachronism, Inc. and to facilitate communication with its participants

**Warrants & Management Roles**

**Warrants**

All Kingdom Social Media Officers (KSMO) will be warranted deputy under the Kingdom Seneschal. Each KSMO will be responsible for all currently accepted Social Media Outlets for their respective Kingdom.

**KSMO Role**

Each Kingdom will have a Social Media Officer (SMO) and an official online channel.

 It is encouraged that each local group has a warranted Social Media Officer for their group.

Each official SCA social media site/outlet will have at least two administrators, one of which must be the SMO. It is encouraged that the appropriate Seneschal or Webminister fill that role to accompany the Social Media Officer. Each administrator will have equal administrative control of the official social media site/outlet.

All official Kingdom level pages/groups must have the Society Social Media Officer and the Society Communications Officer as administrators.

Official SCA social media sites/outlets should be monitored and moderated by the Kingdom and Local Group Social Media Officers and/or Deputies.

Group Social Media Officers must notify their KSMO when they enter or leave the office.

**Reporting**

Kingdom Social Media Officers are required to submit quarterly reports to the Society Social Media Officer by the SCA, Inc. Board of Directors meeting.

**Permissions for Material Previously Released Outside the SCA**

For material for which an appropriate release is openly published including Creative Commons and those materials released into the public domain, it is not required to use SCA Release

Forms in order to distribute that material through a presence covered by this policy, provided the use thereof does not infringe on the terms of use for the given platform or the terms of the release.

Account administrators shall follow all guidelines for use in a creative work's release, including attribution and linking, and shall be prepared to honor requests that content be removed when appropriate in accord with the standards set by Society and Kingdom laws and policies.

**Trademarks and Intellectual Property Within the SCA**

SCA members and nonmembers may request use of SCA trademarks and service marks. Such requests and approvals can request to the President addressed to the SCA Corporate Office or via an email that is sent to president@sca.org.

**Restriction on Content**

There are particular categories of information which cannot be initially announced through a social media page/outlet, based on requirements present in the Governing Documents and other policies and handbooks. No social media page/outlet may publish content unless that content has already been published in the required SCA venue first. The following are the most common types of information applicable under this section and is not meant to be exhaustive; in all cases, verify the requirements for publication in the relevant policy.

- Unapproved changes to law, policy, and handbooks
- Initial event publication in a Kingdom Newsletter/Kingdom Website for official status
- Administrative and Royal Sanction
- Official pollings, including branch status change and Baronial succession

The SCA encourages creativity and innovation in the use of social media by its entities. certain activities and information are inappropriate to any social media page/outlet. The following material, including but not limited to posted messages, comments, threads of discussion, or media, collectively known as "content," shall not be permitted on any presence associated with the SCA.

- Content that involves modern politics or political subjects, particularly any activity that may be interpreted as an endorsement of a particular political party, candidate for political office, legislation or referendum.

- Content that involves modern religion or religious subjects.

- Content that broadcasts false or misleading information, including content which is intended to disparage, intimidate or negatively impact the reputation of an individual, branch, event, or other group.

- Content that distributes material under current copyright that has not otherwise been

authorized for distribution with appropriate attribution.

- Content that involves potentially lewd or offensive material, harassment, hate speech, profanity, or pornography.

- Content that is otherwise disallowed by existing SCA policy, including but not limited to published Society and Kingdom Seneschal, Chronicler, and Webminister policies.

- Any other content that is deemed by the administrators or social media officers of the relevant entity to be inappropriate for the presence according to any guidelines set for participation in that particular presence.

**Approved Platforms**

Social Media is ever-evolving and growing constantly. We have approved platforms that are used for Social Media. If you wish to pilot a platform that is not listed below, ask your KSMO. The KSMO must be informed and keep a current listing of any/all new groups social media presences. Each group is required to maintain an Official Facebook Page. Each group is encouraged to have an Official Facebook group.

**Current Official Approved Platforms:**

- Facebook
- Twitter
- Instagram
- Meetup
- Pinterest

**Outward Facing Outlets and being "Official"**

Social Media pages/outlets considered Official include Kingdom and Regional Branch Outlets. Social media pages/outlets for unrecognized groups such as households, fan groups and communities are not considered official. While there are many pages, groups, and other outlets, if you conduct the official business in that page/outlet, then it is Official and should be treated as such.

Discussion groups often have privacy settings that allow administrators to control how a group's content is. Branches (on Facebook) can choose between "open" or "closed". It is encouraged that groups are set to "closed" and that admins have the ability to approve profiles into the groups. Official SCA social media sites/outlets should never be "secret".

Any new official SCA social media sites/outlets for an official group, region or guild must be approved by the Kingdom Social Media Officer.

**Events and Calendars**

Kingdom Social Media Officers are responsible for providing assistance for other Local Officers in creating and updating events for local group activities, events, and meetings. These event pages are to be created through Official outlets and not third-party presences.

These events are encouraged to not be created in groups  but on Official Pages. The KSMO and their approved Deputies will create the event and then add the event steward. If the Event Steward does not use social media, the Local Social Media Officer may be added as their proxy. If the Local Presence has a page, it will also be added as a "host".

Always go to the Kingdom Event Calendar on their website for the most official reference of the event.

For official event pages/outlets, equal administrative control must be given to the individual(s) in charge of the event.

**Disclaimers**

Official SCA social media sites/outlets are required to use standard disclaimers. There are multiple disclaimers, and it is encouraged that each Official SCA social media sites/outlets use at least one.

**Regional Presence Disclaimer:** This (account, page, event) is held and managed by (region name), a branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (branch seneschal's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Officer Presences:** This (account, page, event) is held and managed by (region name), a branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (regional officer's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Event Presences:** This (account, page, event) is held and managed by (region name), a branch of the Society for Creative Anachronism, Inc. and is considered the official presence of this group here. Questions regarding its content should be directed to (event steward's email) or to socialmedia@sca.org. Any discrepancies between the electronic version or any information and the printed version that is available from the originating office will be decided in favor of the printed version.

**Expectations of Conduct**

All SCA participants taking part in social media interactions shall recognize that such participation is voluntary and proactive  and that participation in presences is not required in order to receive official SCA announcements, policies, or materials (but maybe an additional method of receiving and discussing those items). Accordingly, everyone taking part in an SCA presence shall:

Conduct themselves with courtesy, honesty, and chivalry, as would be done in any personal, face-to-face interactions.

Recognize that behavior or communications deemed to be excessively insulting, belittling, exclusionary, or generally unkind may be removed/unposted at the administrator's discretion and that repeated occurrences may result in removal from the presence by the administrators. Further information on enforcement is found below.

Acknowledge that any behavior or interaction deemed deceptive, hateful, threatening, solicitous, or illegal by the administrators will be cause for immediate removal (without warning) from the social media. All participants in social media outlets have the responsibility to report such communication/behavior to the administrators. Such behavior/communication found on official SCA social media sites/outlets may be used as grounds for disciplinary action by representatives of the Society, up to and including revocation and denial of membership; Be responsible in their choice of material to post via SCA social media outlets, and be patient with others who post material on these outlets as well.

Not create any social media presence which purports to represent a branch, officer, or event from whom express permission has not been granted to create said official SCA social media sites/outlets.

**Enforcement**

The Office of the Social Media, in conjunction with the Seneschal of the responsible branch, shall be responsible for enforcing the Social Media Policy. Failure to follow policies concerning official SCA social media sites/outlets may result in sanctions, removal from office, or prevention from participation in the official SCA social media sites/outlets.

## *NATIONAL REGISTERED AGENTS, INC*
### *SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM*

To:  Renee Signorotti
Society For Creative Anachronism, Inc.
1759 S Main St Ste 108
PO Box 360789
Milpitas, CA 95035-6765

SOP Transmittal #  **539991810**

Entity Served:  SOCIETY FOR CREATIVE ANACHRONISM, INC.  (Domestic State: CALIFORNIA)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc or its Affiliate in the State of CALIFORNIA on this 29 day of July, 2021. The following is a summary of the document(s) received:

1. **Title of Action:**  Christiana Sunshine Long Way and Buenea Ventura Rivera, Pltfs. vs. The Society for Creative Anachronism, Inc., etc., Dft.

2. **Document(s) Served:**   Other: --

3. **Court of Jurisdiction/Case Number:** None Specified
Case # 721CV03142CS

4. **Amount Claimed, if any:**  N/A

5. **Method of Service:**

   _X_ Personally served by:   _X_ Process Server   ___ Law Enforcement   ___ Deputy Sheriff   ___ U. S Marshall

   ___ Delivered Via:   ___ Certified Mail   ___ Regular Mail   ___ Facsimile

   ___ Other (Explain):

6. **Date and Time of Receipt:**  07/29/2021 03:29:00 PM CST

7. **Appearance/Answer Date:** None Specified

8. **Received From:**   None Specified

9. **Carrier Airbill #** 1ZY041160193628939

10. **Call Made to:** Not required

11. **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

**Registered Agent: NATIONAL REGISTERED AGENTS, INC**          Copies To:

888-579-0286 - Telephone
213-614-9347 - Fax

The information contained in this Summary Transmittal Form is provided by NRAI for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. NRAI disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Transmitted by  Amanda Garcia

ORIGINAL



# PROCESS SERVER DELIVERY DETAILS

**Date:**                     Thu, Jul 29, 2021

**Server Name:**              Sarah Thompson

Entity Served                 SOCIETY FOR CREATIVE ANACHRONISM, INCORPORATED

Case Number                   21CV3142 (CS)

Jurisdiction                  CA



AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| Christiana Sunshine-Longway<br>Buenaventura Rivera | ) ) ) ) | |
| *Plaintiff(s)* | ) | |
| v. | ) ) | Civil Action No.  21cv3142 (CS) |
| | ) ) | |
| The Society for Creative Anachronism, Inc. | ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

     The Society for Creative Anachronism, Inc.

     A lawsuit has been filed against you.

     Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Christiana Sunshine-Longway
           543 Ashford Avenue Ardsley, NY 10502

          Buenaventura Rivera
          700 Scarsdale Avenue Apt. 3F Scarsdale, NY 10583

     If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____05/27/2021_____                    *Ashley A*
                                       *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  21cv3142 (CS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00

I declare under penalty of perjury that this information is true.


Date: _____

_____
Server's signature

_____
Printed name and title

_____
Server's address

Additional information regarding attempted service, etc:

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

CHRISTIANA SUNSHINE LONGWAY, and :
BUENEAVENTURA RIVERA

   Plaintiffs     :  No.:  CV

  v.          :

            :

THE SOCIETY FOR CREATIVE    :
ANACHRONISM, INC., a/k/a/ "SCA"  :
or "SCA, Inc.",        :  JURY TRIAL DEMANDED
    Defendant     :

## PLAINTIFFS' CIVIL ACTION COMPLAINT

### PARTIES, JURISDICTION & VENUE

1.  Plaintiff is Christiana Sunshine-Longway, a citizen and resident of the State of New York, with an address of 543 Ashford avenue, Ardsley, Westchester County.

2.  Plaintiff is Buenaventura Rivera ("Ben Rivera"), a citizen and resident of the State of New York with an address of 700 Scarsdale Avenue, Apartment 3F, Scarsdale, Westchester County.

3.  Defendant, Society for Creative Anachronism, Inc. (hereinafter referred to as the "SCA", "SCA, Inc."), is a foreign corporation or other organized business entity which, upon information and belief, maintains multiple offices in the State of New York and which maintains its worldwide headquarters and/or principal place of business in Milpitas, California, having a mailing address located at P.O. Box 360789, Milpitas, CA 95036-0789.

4.  Defendant the Society for Creative Anachronism regularly conducts business within New York, within the Southern District of New York and specifically within Westchester County.

5.  Among numerous other business activities, the SCA operates, in

New York, the "Kingdom of Ostgardr" also known as the East Kingdom which has

served and serves its numerous members in and around New York since 1968 and

otherwise services the greater New York area, its members and participants.

6.      This action is brought by Plaintiffs to the United States District Court for the

Southern District of New York pursuant to 28 U.S.C. Section 1332 (a)(1) in that the

amount in controversy exceeds the amount and/or value of $75,000.00 exclusive of the

interest and costs and the action currently is between citizens of different states.

7.      At the time of filing, venue is appropriate in this judicial district pursuant

to 28 U.S.C. section 1391(a)(2) in that a substantial part of the events giving rise to the

claim occurred in this judicial district.

8.      The Society for Creative Anachronism, Inc. (hereafter "SCA"), represents

that it is an international "non-profit volunteer educational organization. The SCA is

devoted to the research and re-creation of pre-seventeenth century skills, arts, combat,

culture, and employing knowledge of history to enrich the lives of participants through

events, demonstrations, and other educational presentations and activities."

9.      The SCA has further represented that it "is divided into twenty regions

called kingdoms. Each kingdom is ruled by a pair of monarchs who have competed in a

Crown Tournament to win the throne. Kingdoms contain local chapters known as

Cantons, Shires, and Baronies. The members of these local chapters are the ones who

actually plan and run all the events, practices, and other activities for SCA participants."

10.     The SCA has over 30,000 members residing in countries around the

world.

11.     The SCA was founded May 1, 1966 in Berkeley, California by a small

group of people.

12.     In 1968, the SCA spread to the eastern United States and started the "East

Kingdom".  By the 1970's the SCA had established four "kingdoms" in the United States

SCA_000437

which are still in existence today.

13.     While a person can become a formal member of the SCA, membership is not required to participate in SCA activities or events. Administrative functions, including management of memberships throughout the SCA is performed by SCA employees and/or volunteers at its Milpitas, California headquarters.

14.     The SCA is run by the Board of Directors who have ultimate authority concerning the interpretation of the SCA's by-laws, rules and policies. The Board of Directors can dissolve any subgroup within the SCA and sanction and expel members.

15.     The head administrative agent of the SCA is the Society Seneschal. "The Society Seneschal is responsible for coordinating the administration of the Society's historical recreation. This involves directing the activities of the Kingdom Seneschals and of Society-level deputies. Where questions arise concerning the intent of the [Society's laws and policies], the Board specifically authorizes the Society Seneschal to make interpretations and clarifications...the Society Seneschal is also responsible for reviewing all sanction related activities."

16.     Each kingdom has as its ruling authority a crown and a seneschal.

17.     The crown of a kingdom can create and amend the laws of their kingdom as they deem necessary. They can appoint officers of the kingdom and hold courts to administer the kingdom.

18.     The seneschal of a kingdom "is the chief administrative officer of the Society for the kingdom, which includes coordinating the other kingdom officers as required for the smooth operation of the kingdom and for its relations with outside agencies. The Seneschal is responsible for assisting new branches and for branch elevations."

19.     Plaintiffs Sunshine-Longway and Rivera are members of the SCA and were active in a subchapter of the SCA and the East Kingdom known as the Canton of Northpass

("Northpass").

20.    Northpass had over 44 paid members and twenty unpaid members. It ran 4-6 ran 4-6 successful events per year, had regular monthly meetings with 20-30 persons in attendance, typically had between 6 and 10 thousand dollars in its bank account, ran multiple weekly and monthly meetings for archery, fencing, A&S, games, general planning, and other activities.

21.    Northpass was considered a successful canton and had initiated the process for consideration to elevate its status within the East Kingdom to barony or shire status.

22.    SCA Northpass meetings took place in the homes of its members. On Tuesday, April 10, 2018, an SCA Northpass meeting was held at the home of Christiana Sunshine Longway, her husband Cameron and their child, Jenna. There were twenty people in attendance, including a deputy canton officer, Lettie Harris.

23.    Lettie Harris ("Lettie") expressed to Ben Rivera, the Chancellor of the Exchequer for Northpass, that they thought the meeting space was unkempt, and asked Mr. Rivera to contact child protective services ("CPS") in this regard. Mr. Rivera assured Lettie that the space was entirely within norms. Lettie expressed that they considered the conditions unsafe and would either be contacting mundane child welfare authorities or would be asking other people to do so in their stead.

24.    Mr. Rivera observed Lettie engage in a series of texts with an unknown third party while stating that they would have this third party handle this situation for them. Mr. Rivera advised Lettie that the space was within society norms, and looked reasonably safe, and that as a father of two (now grown) children he asked Lettie to reconsider calling Child Protective Services. Lettie seemed Mr. Rivera to reluctantly agree.

25.    Child Protective Services ("CPS"), however, knocked on the door of the Sunshine-Longway house, where the meeting had taken place, at 9 pm the next day, but did not make contact with the Sunshine-Longways. The second morning after the meeting CPS

made contact with the Sunshine-Longways and inspected their house.

26.     During the investigation, CPS forced the Sunshine Longways to unnecessarily update and renovate their home, forcing the Sunshine-Longways separate. The home essentially became a construction zone. Christiana Sunshine-Longway moved out of the home and lived separate to Cameron to protect Jenna from the dangers attendant to a construction zone while Cameron supervised the renovations. CPS also forced the family to undergo unnecessary counseling and evaluation while threatening to take away Jenna from them. The result of the investigation, however, was that the accusations that brought CPS to the Sunshine-Longways were unfounded.

27.     The investigation caused the Sunshine-Longways economic hardship due to multiple weeks of work missed and the additional renovation expenses incurred to further update their home.

28.     The economic hardship that the Sunshine-Longways suffered was insignificant compared to the emotional harm which manifested physically and psychologically in the Post-Traumatic Stress Disorder suffered by all members of the family, which required and still requires mental health counseling.

29.     During a meeting of the East Kingdom to discuss the false report of child neglect and/or child abuse made to CPS targeting the Sunshine-Longways, Lettie acknowledged knowing who had filed the complaint against Christiana, and that she had an extreme dislike of Christiana Sunshine-Longway that, it became clear, was rooted in jealousy, fear and envy. Lettie admitted to applying for and taking multiple offices within Northpass with the intent of shutting Christiana out of them. On information and belief, the false report of child abuse/neglect was made by Lettie or at Lettie's direction as an agent of the SCA.

30.     At an SCA Brew-U event a few weeks later, while representing the SCA, Lettie continued to slander and defame Christiana. Among other things, Lettie stated that

Christiana was a bully, a liar, a backstabber and an unfit mother and that there was a group

within the East Kingdom SCA that was targeting Christiana and the Sunshine-Longways

for harassment and/or physical harm. The Seneschal for Northpass asked her to desist from

these activities. Lettie then resigned from all positions in Northpass, made an informal

complaint to the East Kingdom that the Seneschal for Northpass had treated her unfairly,

and applied to become an officer of the East Kingdom.

31.      Christiana Sunshine-Longway filed a complaint with the East Kingdom

claiming harassment by Lettie and asking the East Kingdom to investigate Lettie's claim

that there was a group within the SCA that was targeting her family.

32.      Despite the complaint, the East Kingdom Seneschal, appointed Lettie to

several important offices including as the East Kingdom Diversity Officer. While the

complaint was investigated, the East Kingdom promoted Lettie within the kingdom and

provided her with the ability to continue her harassment and defamation of Christiana. The

investigation into the complaint by Christiana against Lettie was closed in contravention of

East Kingdom and SCA by-Laws, to include, for example, by failing to contact any

witnesses. Lettie continued to be promoted throughout the year by the East Kingdom

Seneschal.

33.      Shortly thereafter, Northpass was administratively suspended when the East

Kingdom Seneschal removed the Northpass Seneschal from office in contravention of the

by-laws, without a formal complaint being filed against him, without an investigation,

without notice and via social media. The East Kingdom kept Northpass punitively

suspended from the end of May to mid-July without explanation, in contravention of East

Kingdom and SCA by-laws.

34.      Christiana and other officers contacted the East Kingdom officers to find out

what led to Northpasses' suspension. The East Kingdom ignored their inquiries, stating

that it could not be discussed. Northpass Officers, to include Plaintiffs filed a formal

complaint concerning the suspension and removal of the Northpass Seneschal as per the by-laws with the SCA Seneschal, which was reviewed by the East Kingdom Seneschal.

35.     The East Kingdom Seneschal forced a series of meetings attended by the East Kingdom Crown, where there were approximately one hundred SCA members present, where the Crown stated that more light needed to be shone on Northpass to reveal where the cockroaches were hiding, and accused Northpass members, many of whom are part of the LGBTQ community of not being friendly to the LGBTQ community.

36.     The East Kingdom Crown presided over a meeting to elect a new Northpass Seneschal, but forced Northpass to follow a process outlined by the East Kingdom Seneschal, not Northpasses' by-laws, in contravention of SCA by-laws. Christiana Sunshine-Longway was elected Northpass Seneschal.

37.     Christiana ran the canton successfully for a time. She filed several valid complaints with the East Kingdom Seneschal and crown, which were ignored. She sent certified copies of the complaints to the East Kingdom Crown and Seneschal, as per SCA law, but the complaints were refused delivery by the recipients. Also, throughout this time, Lettie was promoted by the East Kingdom through several important offices.

38.     As a result, Christiana was unable to remain in office, due to her treatment by the SCA, its officers, and the continued trauma and PTSD resulting from the child welfare case, the failed East Kingdom investigation of her complaints and the fear that there was a group of people targeting her family.

39.     When Christiana stepped down, Northpass voted to instate a new seneschal of their choice as per their by-laws and SCA Law. However, the East Kingdom Seneschal proposed their own Northpass Seneschal. The newly elected Northpass Seneschal was told to stand down by the East Kingdom Seneschal, and essentially told that if they did not accept the East Kingdom Seneschal's choice for Northpass Seneschal, they would be suspended.  This process is in contravention of SCA by-laws.

40.    Northpass officers were forced to elect the East Kingdom Seneschal. Within

two meetings at Northpass, the new East Kingdom approved Northpass Seneschal stated

his intent to "burn down the bylaws," and "run the canton as a dictator," in contravention of

SCA by-laws. The officers of Northpass, to include Ben Rivera, planned to hold a no-

confidence vote to remove the Northpass Seneschal.

41.    During this time, the East Kingdom seneschal's office had passed from the

prior holder, Katherine Barr, to her protégé, Kellie Donovan. Ben Rivera emailed Kellie

Donovan a description of current circumstances, and the intent to remove the seneschal.

Kellie Donovan then suspended the canton and sanctioned all officers from holding office

within the East kingdom, for the period of a year, in contravention of SCA by-laws, citing

the officers' behavior and Christiana's stepping down as Northpass Seneschal as hostile

acts towards the East Kingdom.

42.    Upon the expiration of that year time period, the East Kingdom Seneschal

then announced via provincial email list that she was making a recommendation to the

Board of Directors to dissolve the canton, based on unspecified issues among the officers

of Northpass and her discovery that the Northpass bank accounts had not been properly

transitioned.

43.    However, the East Kingdom Seneschal had been publicly informed by Ben

Rivera that the canton was still waiting on the kingdom exchequer to complete the forms

required to properly change the canton officers listed on the bank account, which by East

Kingdom law must be forwarded to the SCA by the kingdom exchequer.

44.    The Board of Directors then voted to dissolve the Northpass Canton,

without an investigation or due process, in contravention of SCA by-laws and policies.

45.    As a result, the SCA owes a duty of reasonable care to its members

which plaintiff Christiana asserts was negligently or recklessly breached leading to her

injuries. Because of the nature of the organization and based upon its assumed duties,

Defendant SCA owes a duty of reasonable care to its members and non-member participants in its activities and functions.

46.     The SCA has, through its history, policies and procedures negligently and/or recklessly breached this duty.

47.     Plaintiff Christiana Rivera brings this action for physical, mental and emotional damage caused to her between 2018 to today by the Defendant SCA, as a result of Defendant's negligence and/or reckless acts.

48.     Defendant SCA knew or should have known of Lettie's targeted harassment, to include the false report of child abuse/neglect targeting Christiana Sunshine Longway.

49.     The SCA's acts of negligence and/or recklessness which led to Plaintiff's injuries and harm occurred from its inception in 1966 through 2021.

50.     Instead of taking any reasonable steps and exercising due care to protect Plaintiff Christiana Sunshine-Longway from harassment and abuse, the SCA adopted a "head in the sand" attitude to negligently and/or recklessly ignore the known problems described above.

51.     The SCA negligently failed to implement, enforce and/or follow protective measures including enforcing its own policies and procedures against bullying and harassment.

52.     Plaintiffs Christiana Sunshine-Longway and Ben Rivera bring this action for injunctive relief in that they were further harmed by the dissolution of the Northpass Canton and their suspension from holding office within the SCA by the SCA Board of Directors through a process that was in contravention to the SCA by-laws and polices and violated New York Non-Profit Corporations Law.

**COUNT I – NEGLIGENCE (PLAINTIFF CHRISTIANA SUNSHINE-LONGWAY)**

53.     Plaintiff incorporates herein by reference all the above allegations

contained in paragraphs 1 through 52 and throughout this entire complaint as though same were fully set forth herein at length.

54. The defendant was negligent and/or reckless including but not limited to, *inter alia*, the following:

a. negligently failing to adopt, enforce and/or follow adequate policies and procedures for the protection from harassment, defamation, slander, bullying and false allegations of child abuse/neglect at SCA related activities and/or events, of its members including plaintiff and, in the alternative, failing to implement and comply with such procedures which had been adopted;

b. failing to implement, enforce and/or follow adequate protective and supervisory measures for the protection of members from harassment, defamation, slander, bullying and false allegations of child abuse/neglect;

c. negligently failing to adopt, enforce and/or follow policies and procedures to protect its members;

d. negligently failing to provide plaintiff with any assistance in coping with the injuries sustained;

e. violating its own policies and/or by-laws regarding revocation/denial of membership;

f. negligently selecting and/or training SCA members, including Lettie Harris and officers within the SCA;

g. failing to adopt, implement and/or enforce policies and procedures for the reporting to SCA authorities and/or other authorities harassment, bullying, defamation, slander and false reports of child abuse/neglect;

55. As a proximate and direct result of Defendant's negligence and/or reckless conduct described herein, Plaintiff was harmed as a result and has sustained emotional injuries, mental anguish, pain and loss of enjoyment of life and life's pleasures;

56.     Plaintiff has been and will likely, into the future, be caused to incur medical expenses and may likely incur a loss of earning capacity in the future;

57.     Defendant SCA knew or should have known about the severe risk of their failure to take any appropriate precautions outlined above and acted in a reckless disregard to such risk for which plaintiff is entitled to and hereby seeks punitive damages pursuant to the requirements of New York law.

58.     Defendant SCA's actions and failures described herein are outrageous and were done recklessly with a conscious disregard of the risk of harm to Plaintiff and her rights or on other grounds for which plaintiff is entitled to and hereby seeks punitive damages in every count of this complaint.

WHEREFORE, Plaintiff claims of Defendant, The Society for Creative Anachronism, Inc., damages in excess of $75,000 together with costs, interest, punitive damages and attorneys fees as permitted by law.

## COUNT II - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (PLAINTIFF CHRISTIANA SUNSHINE-LONGWAY)

59.     Plaintiff incorporates herein by reference all the allegations contained in paragraphs 1 through 57 and throughout this entire complaint as though same were fully set forth herein at length.

60.     Defendant had a duty to plaintiff to ensure plaintiff was not harassed, defamed, slandered, put in fear of her families' safety or have a false report of child abuse/neglect filed against her.

61.     Defendant by and through its contact with plaintiff, as described above, negligently and/or recklessly committed multiple acts of extreme and outrageous conduct which caused severe emotional distress to plaintiff as described more fully above in an extreme, outrageous and harmful manner.

62.     Defendant negligently breached the trust to plaintiff leading to his damages and injuries.

WHEREFORE, Plaintiff claims of Defendant, The Society for Creative Anachronism, Inc., damages in excess $75,000 limit together with costs, interest, punitive damages and attorneys fees as permitted by law.

## COUNT III – INJUNCTIVE RELIEF (PLAINTIFFS' RIVERA AND SUNSHINE-LONGWAY)

63.     Plaintiff incorporates herein by reference all the allegations contained in paragraphs 1 through 62 and throughout this entire complaint as though same were fully set forth herein at length.

64.     Defendants had no right to dissolve the Canton of Northpass and suspend Plaintiffs from holding office within the SCA in violation of its own by-laws, laws and policies.

65.     That the decision of the Board of Directors to dissolve the Canton of Northpass and Suspend Plaintiffs from holding office within the SCA was a violation of New York Non-Profit Corporations Law.

66.     As described above, the Plaintiffs' enjoyment of their membership in the SCA and their rights as members have been adversely affected by the Defendant's violation of the SCA's by-laws, rules and policies.

67.     Simple damages cannot restore the Plaintiffs to their status prior to the adverse actions of the SCA.

68.     Irreparable harm will occur to Plaintiffs if the Northpass Canton remains dissolved and the officers are unable to hold office in that their rights as members of the SCA will continue to be violated and they will continue to be unable to benefit from their membership with the SCA.

69.     The Plaintiffs will be successful on the merits of the case, in that the SCA

has caused harm through violating its own policies and by-laws.

70.     The Plaintiffs will be successful on the merits of the case, in that the SCA

has caused harm through violating New York Non-Profit Corporations Law.

71.     Lastly, the benefits to the Plaintiffs in the restoration of Northpass and the

restoration of their rights to hold office within the SCA outweigh the burdens to the SCA

in allowing Northpass to remain dissolved and violating the Plaintiffs' rights as

members.

WHEREFORE, Plaintiffs request that the Court order the SCA to reinstate

Northpass as a Canton of the East Kingdom, returning it to its former status and by-laws,

and reinstate the Canton assets and moneys, and to allow the former officers, to include

plaintiffs, to hold office within the Canton and the SCA.

By Plaintiffs,

/s/ Buenaventura Rivera

BUENAVENTURA RIVERA (PRO SE)

700 Scarsdale Avenue, Apartment 3F,
Scarsdale, New York 10583
(914) 563-6009
Ben.rivera@systemsllc.com

/s/ Christiana Sunshine-Longway

CHRISTIANA SUNSHINE-LONGWAY (PRO SE)

543 Ashford Avenue,
Ardsley, New York 10502
914-3145066
clsunshinelongway@gmail.com

# the society for creative anachronism, inc.



# ORGANIZATIONAL HANDBOOK

Including Corpora, the By-Laws, Corporate Policies, and the Articles of Incorporation

Revised April 1, 2022

© Copyright 2022 - The Society for Creative Anachronism, Inc. All Rights Reserved.

Printed copies of this document can be ordered from
SCA Marketplace, PO Box 611928, San Jose, CA 95161

*Members of the Society for Creative Anachronism, Inc. may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the text. The contents of this document will be posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.*

# TABLE OF CONTENTS

AN INTRODUCTION TO ................................................................................................................ 6

GLOSSARY ................................................................................................................................... 7

THE CORPORA OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC. ........................... 9

I.   GENERAL .............................................................................................................................. 9
  A.   *Precedence of Law* ......................................................................................................... 9
  B.   *Role of Corpora* ............................................................................................................. 9
  C.   *Role of the Board* ........................................................................................................ 10
      1.   Rules .......................................................................................................................... 10
      2.   Intervention ................................................................................................................ 10
      3.   Publication of changes ............................................................................................... 10
      4.   Relationship with branches ........................................................................................ 10
      5.   Right of appeal ........................................................................................................... 11
      6.   Impeachment .............................................................................................................. 11
      7.   Communications with the Board of Directors of the SCA, Inc. ................................... 11
      8.   Operations outside the USA ....................................................................................... 11
  D.   *Membership Requirements* .......................................................................................... 12
      1.   General ....................................................................................................................... 12
      2.   Officers ....................................................................................................................... 12
      3.   Awards ........................................................................................................................ 12
  E.   *Unofficial Entities* ........................................................................................................ 12
  F.   *Sanctions* ..................................................................................................................... 12
II.  EVENTS ............................................................................................................................... 13
  A.   *Society Events Defined* ............................................................................................... 13
  B.   *Requirements for Participants at Society Events* ........................................................ 13
  C.   *Business Requiring Prior Announcement* .................................................................... 13
  D.   *Individuals in Charge of Events* .................................................................................. 13
  E.   *Duty to Enforce Requirements* .................................................................................... 13
  F.   *Policy on Religion* ........................................................................................................ 14
  G.   *Waterbearing* ............................................................................................................... 14
III. BRANCHES .......................................................................................................................... 14
  A.   *General* ........................................................................................................................ 14
  B.   *Borders* ........................................................................................................................ 15
  C.   *Branch Designations* ................................................................................................... 15
  D.   *Establishment and Advancement* ................................................................................ 18
  E.   *Reservations to the Board* ........................................................................................... 19
IV.  ROYALTY ............................................................................................................................. 19
  A.   *Selection* ...................................................................................................................... 19
  B.   *Qualifications* ............................................................................................................... 19
  C.   *Duties* ........................................................................................................................... 19
  D.   *Privileges* ..................................................................................................................... 20
  E.   *Limitations* ................................................................................................................... 20
  F.   *Kingdom and Principality Law* ..................................................................................... 21
  G.   *The Crown* .................................................................................................................... 21
  H.   *The Coronet* ................................................................................................................. 23
V.   TERRITORIAL BARONS AND BARONESSES ................................................................... 24
  A.   *Appointment and Removal* .......................................................................................... 24
  B.   *Responsibilities* ........................................................................................................... 24

SCA_000450

**VI.   SOCIETY OFFICERS** ..................................................................................................... 24
    **A.**    *General* ..................................................................................................... 24
        1.   Responsibilities ..................................................................................... 24
    **B.**    **Society Seneschal** ................................................................................. 26
    **C.**    **Laurel Sovereign of Arms and The College of Arms** ......................... 26
        1.   Laurel Sovereign of Arms ..................................................................... 26
        2.   College of Arms ..................................................................................... 26
        3.   Heraldic Administration ......................................................................... 26
    **D.**    **Marshal of the Society** ......................................................................... 26
    **E.**    **Minister of Arts and Sciences** ............................................................. 27
    **F.**    **Chronicler of the Society** .................................................................... 27
    **G.**    **Society Chancellor of the Exchequer** ................................................. 27
    **H.**    **Web Minister** ....................................................................................... 27
    **I.**    *Reservations to the Board* ..................................................................... 28
**VII.  KINGDOM, PRINCIPALITY, AND LOCAL OFFICERS** ........................................... 28
    **A.**    *General* ..................................................................................................... 28
    **B.**    **The Seneschal** ..................................................................................... 28
    **C.**    **The Principal Herald** ............................................................................ 28
    **D.**    **The Earl Marshal** ................................................................................. 29
    **E.**    **The Minister of Arts and Sciences** ...................................................... 29
    **F.**    **The Chancellor of the Exchequer** ....................................................... 29
    **G.**    **The Chronicler** ..................................................................................... 29
    **H.**    **Duties of Other Officers** ....................................................................... 29
    **I.**    **Appointment to office** .......................................................................... 29
    **J.**    **Warranting / Rosters** ............................................................................ 29
    **K.**    **Ending a term of office** ......................................................................... 30
    **L.**    **Suspension of an officer** ...................................................................... 30
**VIII. PERSONAL AWARDS AND TITLES** ..................................................................... 30
    **A.**    **Patents of Arms** ................................................................................... 30
        1.   General Requirements ........................................................................... 30
        2.   Order of Precedence Within the Peerage ............................................. 31
        3.   Departure from the Peerage ................................................................. 31
        4.   Patent Orders ....................................................................................... 31
    **B.**    **Other Awards** ...................................................................................... 33
    **C.**    **Membership Requirements for Receiving Awards** ............................. 34
    **D.**    **Titles** ..................................................................................................... 34
    **E.**    **Reservations to the Board** ................................................................... 35
        1.   Degradation from the Peerage .............................................................. 35
        2.   Revocation of Awards and Grants of Arms ........................................... 36
        3.   Granting and creation of new titles ....................................................... 36
**IX.   SOCIETY COMBAT** .................................................................................................... 36
    **A.**    **Society Martial Activities** ...................................................................... 36
    **B.**    **The Rules of the Lists** .......................................................................... 37
    **C.**    **Royal Lists** ........................................................................................... 38
**X.   GRIEVANCES AND SANCTIONS** ............................................................................. 38
    **A.**    **General** ................................................................................................. 38
    **B.**    **Sanctions** ............................................................................................. 38
        1.   Royal Sanctions ................................................................................... 38
        2.   Administrative Sanctions ...................................................................... 38
        3.   Temporary removal from Participation in the SCA ................................ 39
        4.   Reservations to the Board of Directors ................................................. 39

SCA_000451

**THE BY-LAWS OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ........................................................ 43

**I.   NAME** .................................................................................................................................... 43
**II.   OFFICES** .............................................................................................................................. 43
**III.   OBJECTIVES AND PURPOSES** ......................................................................................... 43
**IV.   DEDICATION OF ASSETS** ................................................................................................ 43
**V.   MEMBERS** ........................................................................................................................... 43
   **A.   Statutory Members** ......................................................................................................... 43
   **B.   Nonstatutory Members** ................................................................................................... 43
   **C.   General Conditions and Privileges Of Membership** ...................................................... 43
      1.   Access to Membership ................................................................................................ 43
      2.   Privileges of Members ................................................................................................. 44
      3.   Revocation/Denial of Membership .............................................................................. 44
      4.   Reservations to the Board ........................................................................................... 44
**VI.   BOARD OF DIRECTORS** ..................................................................................................... 44
   **A.   Powers** ............................................................................................................................ 44
   **B.   Number of Directors** ....................................................................................................... 44
   **C.   Qualifications of Directors** .............................................................................................. 44
   **D.   Restriction on Interested Directors** ................................................................................ 45
   **E.   Election and Term** ........................................................................................................... 45
      1.   Probationary Period ..................................................................................................... 45
      2.   Term of Service ........................................................................................................... 45
      3.   Resignation .................................................................................................................. 45
   **F.   Vacancies and Removal** ................................................................................................. 46
      1.   Dismissal of a Director ................................................................................................ 46
      2.   Filling Vacancies ......................................................................................................... 46
      3.   Leave of Absence ........................................................................................................ 46
   **G.   Place of Meetings; Meetings by Telephone** .................................................................. 46
   **H.   Regular Quarterly Meetings** ........................................................................................... 46
   **I.   Special Meetings** ............................................................................................................ 47
   **J.   Action at a Meeting; Quorum and Required Vote** .......................................................... 47
   **K.   Chairman and Vice-Chairman of the Board** .................................................................. 47
   **L.   Committees** .................................................................................................................... 47
   **M.   Reimbursement of Expenses** ........................................................................................ 47
**VII.   ADMINISTRATION** ............................................................................................................. 47
   **A.   Officers** ........................................................................................................................... 47
   **B.   Corporate Office** ............................................................................................................. 47
   **C.   Compensation** ................................................................................................................ 48
**VIII.   CONTRACTS, CHECKS AND FUNDS** ............................................................................. 48
   **A.   Execution of Corporate Instruments** .............................................................................. 48
   **B.   Checks, Drafts, Etc.** ....................................................................................................... 48
   **C.   Gifts** ................................................................................................................................ 48
**IX.   INDEMNIFICATION** ............................................................................................................. 48
**X.   BOOKS AND RECORDS** ..................................................................................................... 48
**XI.   FISCAL YEAR** ..................................................................................................................... 49
**XII.   AMENDMENT TO BY-LAWS** ............................................................................................. 49
**XIII.   DEFINITION OF STRUCTURE** ......................................................................................... 49
   **A.   The Corpora** ................................................................................................................... 49
   **B.   Corporate Policies of the SCA, Inc.** .............................................................................. 49
**XIV.   PARLIAMENTARY PROCEDURE** ..................................................................................... 49

**THE CORPORATE POLICIES OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ........................................ 50

  **I. MEMBERSHIP TYPES** ............................................................................................................. 50
    *A. Statutory Members* ......................................................................................................... 50
    *B. Non-Statutory Members* ................................................................................................. 50
  **II. GENERAL CONDITIONS AND PRIVILEGES OF MEMBERSHIP** ............................................ 51
    *A. Access to Membership* ................................................................................................... 51
    *B. Privileges of Members* .................................................................................................... 51
    *C. Eligibility for Office* ......................................................................................................... 51
    *D. Revocation/Denial of Membership* ............................................................................... 51
      1. Grounds ...................................................................................................................... 51
      2. Board Consideration .................................................................................................. 52
      3. Notification ................................................................................................................. 52
      4. Appeal ........................................................................................................................ 52
    *E. Reservation by the Board* ............................................................................................... 52
  **III. ADMINISTRATION** ................................................................................................................. 52
    *A. President* ......................................................................................................................... 53
    *B. Vice President for Operations* ......................................................................................... 53
    *C. Vice President for Corporate Operations* ....................................................................... 53
    *D. Secretary* ........................................................................................................................ 53
    *E. Treasurer* ......................................................................................................................... 53
    *F. Other Offices* ................................................................................................................... 53
  **IV. WAIVERS – GENERAL** .......................................................................................................... 54
  **V. WAIVERS - COMBAT** ............................................................................................................. 54
    *A. Waivers for SCA Combat-Related Activities* ................................................................... 54
    *B. Medical Authorization for Minors:* .................................................................................. 54
  **VI. WAIVERS - PROCEDURES** .................................................................................................. 54
  **VII. POLICY ON FINANCIAL RESPONSIBILITY AND REDRESS** ............................................... 55
  **VIII. POLICY ON ALCOHOL** ...................................................................................................... 55
  **IX. POLICY ON FIRST AID AT EVENTS OR SCA ACTIVITIES** ................................................... 56
  **X. POLICY ON ELECTRONIC COMMUNICATIONS** ................................................................... 56
    *A. Electronic Publication of SCA Documents* ..................................................................... 56
    *B. Participation of SCA Officials in Electronic Communications Media* ............................... 56
    *C. Electronic Communications to and from SCA Officers* ................................................... 56
  **XI. POLICY ON COINAGE AND CURRENCY** ............................................................................ 57
  **XII. POLICY ON TRADEMARKS** ............................................................................................... 57
  **XIII. POLICY ON ACCESSIBILITY TO SOCIETY FUNCTIONS** .................................................. 57
  **XIV. POLICY ON LAND USE / REAL ESTATE** ........................................................................... 57
  **XV. TRANSLATION OF CORPORATE DOCUMENTS** ................................................................ 57
  **XVI. AUTHORITY TO RETAIN LEGAL COUNSEL** ..................................................................... 58
  **XVII. AMENDMENT TO CORPORATE POLICIES** ..................................................................... 58
  **XVIII. ANTI-DISCRIMINATION POLICY** .................................................................................... 58

**THE ARTICLES OF INCORPORATION OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.** ........................ 59

# AN INTRODUCTION TO
# THE SOCIETY FOR CREATIVE ANACHRONISM (SCA)

### SCA Mission Statement:

"The Society for Creative Anachronism (SCA) is an international non-profit volunteer educational organization. The SCA is devoted to the research and re-creation of pre-17th century skills, arts, combat, culture, and employing knowledge of world history to enrich the lives of participants through events, demonstrations, and other educational presentations and activities."

---

In pursuing its mission, the SCA is committed to excellence in its programs, communications, and activities. The SCA expects that all its members and participants will conduct themselves in accordance with the SCA Core Values, to:

- Act in accordance with the chivalric virtues of honor and service in all interactions with SCA members and participants;
- Be a responsible steward of SCA resources;
- Deal fairly with others, and value and respect the worth and dignity of all individuals,
- Practice inclusiveness and respect diversity;
- Promote a safe and respectful environment for all SCA members and participants;
- Act with transparency, fairness, integrity, and honesty;
- Maintain a harassment-free environment in SCA spaces; and,
- Avoid behavior that reflects adversely on the SCA or other SCA members and participants.

The SCA provides an environment in which members can recreate various aspects of the cultures and technology of the period, as well as doing more traditional historical research. The SCA sponsors events, which may include tournaments, feasts, martial activities, classes, and other activities reflective of pre-17th century life. Members dress in pre-17th century clothing styles worn all over the world and participate in activities based on the civil and martial skills of the period. These activities recreate aspects of the life and culture, dress, pastimes, and above all the chivalric ideals of the period, unifying our events and activities. Members have free choice of what areas they will explore. The SCA is expressly welcoming to all people of any race, sex, religion, national origin, gender, sexual orientation, age, or disability.

The SCA currently has active branches in North America, Europe, Australasia, Asia, and Africa. This "Known World" is divided into Kingdoms. Each Kingdom has a Sovereign and Consort selected by tournament combat. Some of the Kingdoms include Principalities ruled by individuals also chosen by combat. These organizations are responsible for the smaller branches based in individual towns, cities, or counties.

These governing documents set forth the workings of the SCA, Inc. and of the Society.  Except where otherwise noted, the rules of the modern corporation (the By-Laws and the Corporate Policies of the SCA, Inc.) apply only to the US and other areas not separately incorporated, while the introduction and the document named Corpora governs all the Kingdoms of the Society, wherever they exist.

# GLOSSARY

In this volume, the following terms are used only with the meanings given here:

- **Society**: The entirety of the Society for Creative Anachronism (a worldwide group of affiliated organizations).

- **SCA, Inc. or SCA**: The Society for Creative Anachronism, Inc., California nonprofit (or not-for-profit) corporation

- **Board:** The Board of Directors of the SCA, Inc.

- **Governing documents**: *The Organizational Handbook*, which contains the Introduction, Corpora, the Articles of Incorporation of the SCA, Inc., the By-Laws of the SCA, Inc., the Corporate Policies of the SCA, Inc., and any amendments and appendices.

- **By-Laws**: The By-Laws of the SCA, Inc.

- **Corpora**: The policies governing historical re-creation within the Society, and those policies applicable to the entire Society.

- **Subscribing member**: A Sustaining or International member of the SCA, Inc. or its approved equivalent in an affiliated organization.

- **Society Member**: Membership in the Society is defined in the By-Laws of the SCA, Inc., or in the approved organizational documents of any corporation affiliated with the SCA, Inc.

- **SCA, Inc. Waiver Card:** A card which indicates that a properly executed waiver is on file at the corporate office. This card may also contain membership information.

- **Armigerous award:** An award that can convey Arms by Award, Grant, or Patent.

- **Consort**: The member for whom the combatant fights in a Royal Lists.

- **Coronet:** The Sovereign and Consort of a principality, acting together.

- **Court of Chivalry / Court of Inquiry:** A panel, defined according to kingdom law, convened to investigate issues and possibly recommend action to the appropriate Society authority.

- **Crown**: The Sovereign and Consort of a kingdom, acting together.

- **Officer:** A Society member serving in an appointed office as defined in Corpora, or as an appointed deputy in such an office, or in another office as may be defined by Kingdom Law, at any level of the Society, or in the role of organizer of a Society event (commonly referred to as "Autocrat" or "Steward"), or as a Territorial Baron or Baroness, or as Crown or Coronet or heir to a Crown or Coronet.

- **Peerage:** Collectively, the members of the populace who hold a patent of arms.  Any person holding a patent is a peer.

- **Period:** The era used by the Society as the base for its re-creation activities. The Society is based on the life and culture of the landed nobility of pre-17th Century history, focusing on the Middle Ages and the Renaissance.

- **Realm:** A kingdom (including any principalities), or a principality.

- **Royal Lists**: Properly constituted armored combat tournaments to determine the successors to current royalty. They are known as "Crown Lists" for kingdoms and "Coronet Lists" for principalities.

- **Royal heirs**: The victor in the Royal Lists and the victor's consort for the period between the victory and the Coronation (kingdom) or Investiture (principality).

- **Royal Peer:** An individual who has reigned as King or Queen, or as Prince or Princess of a principality, is referred to as a Royal Peer.

- **Royalty**: The persons who hold the offices of Sovereign or Consort of a kingdom or principality. The heirs to those positions are also considered royal, but Corpora uses the terms "royalty" and "reigning royalty" interchangeably, and only to refer to Sovereigns and Consorts.

- **Sovereign and Consort**: The victor in the Royal Lists and the victor's consort, respectively, after their Coronation or Investiture.

- **Subject**: Any person who physically resides within the borders of a realm for more than half the year. Those who do not maintain a residence meeting this definition may be considered subjects of the realm where they participate most frequently if they obtain written acknowledgment from the royalty of that realm. Those who participate in Society activities primarily in a realm other than the one where they reside may be considered subjects of that realm if they obtain written permission and acknowledgment from the royalty of both realms. Decisions of the Coronet in such matters depend upon the approval of the Crown.

SCA_000456

# THE CORPORA
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I.    GENERAL

### A.    Precedence of Law

1.    The approved English language version of any Society for Creative Anachronism, Inc. document is the official version.  In case of conflict between the English language version and a translation into another language, the English language version governs.

2.    Despite the use of the word "law" to describe the operating documents of its regional branches, the Society recognizes the absolute precedence of law issued by civil authorities over any of its internal rules. The SCA, Inc. as a corporate person, along with all of its members as citizens, must obey the law of whatever jurisdictions apply to them in exactly the same fashion as all other corporations or citizens in those jurisdictions.

3.    Within the Society, if there is any conflict among the provisions of the following types of rules, those higher on the list will govern over those lower:

    a.    The By-Laws of the appropriate organization

    b.    The Corporate Policies of the appropriate organization

    c.    The Corpora of the Society

    d.    Society Officers' Policies approved by the Board

    e.    Kingdom Law (within the kingdom that enacts it)

    f.    Decision of the Crown (within the kingdom and for the duration of the current reign)

    g.    Principality Law (within the principality that enacts it)

    h.    Decision of the Coronet (within the principality and for the duration of the current reign)

4.    If they find it useful to codify their customs, branches and organizations such as orders, guilds, et cetera, are permitted to create charters. Charters are primarily administrative tools that can help the group to define structure and procedures. Unless written into kingdom or principality law, organizational charters do not have the force of law. Branch charters may not be written into law.

### B.    Role of Corpora

Corpora serves as a framework for the structure of the historical re-creation activities of the Society, and applies equally to all branches worldwide, regardless of corporate affiliation. The various Board-approved Policies of Society officers provide guidance for the operations of those offices. Kingdoms may follow custom or make law in areas where these policies are silent, as long as they remain consistent with the general approach embodied therein. They may also impose additional rules and requirements for branches, offices, and awards within their jurisdiction, but may not reduce, contradict or waive any specified requirement contained at a higher level in the Precedence of Law.

## C.    **Role of the Board**

1.    Rules

The Board of Directors of the SCA Inc. establishes the rules of the Society's historical re-creation activities and the minimum administrative requirements for officers and branches; these are published in Corpora. It is the final arbiter of the interpretations of these rules as made by the officers of the Society. It reserves to itself various powers as described in Corpora, and these reservations apply to all branches, regardless of corporate affiliation.

2.    Intervention

If the Board finds it necessary to intervene in branch affairs to protect the SCA's legal standing, its action will be directed as nearly as possible at the individuals responsible for the lapse. The Board will move against a branch as a whole only if repeated failures prove it incapable of locating and maintaining reliable officers, to be determined and defined on a case-by-case basis.

3.    Publication of changes

a.    Under normal circumstances, the Board will publicize proposed changes to Corpora in sufficient time to allow comment from the membership before making a final determination.

b.    The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made Corpora. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

4.    Relationship with branches

a.    The Board will maintain a policy of non-interference with branch activities. The Board reserves the right to intervene in branch affairs if:

(i)    the events leading to such intervention appear to cause a threat to the integrity of the Society or the SCA, Inc.;

(ii)    the governing documents of the Society appear to have been violated;

(iii)    there is a threat to the SCA's legal standing; or

(iv)    the Board is asked to become involved.

b.    If the Board finds it necessary to intervene in branch affairs to protect the SCA's legal standing, its action will be directed as nearly as possible at the individuals responsible for the lapse. The Board will move against a branch as a whole only if repeated failures prove it incapable of locating and maintaining reliable officers.

c.    The application of any sanctions will depend upon the severity of the lapse, and the degree to which the affected parties were involved in either causing the problem or attempting to solve it.

d.    The Board shall ensure that each kingdom shall have a specific Board member, called an ombudsman, assigned to act as its representative to the Board, and vice versa, for matters concerning that kingdom.

5. Right of appeal

    a.    The Board is the ultimate determiner and arbiter of the rules of the Society, regardless of what authority it may delegate elsewhere. All members of the Society shall therefore have the right of appeal to the Board, provided they follow proper channels for complaint and appeal.

    b.    When individual actions or decisions are appealed to the Board, any Directors who have been personally involved with the matters in question within the medieval structure of the Society must declare the potential conflict of interest and withdraw from the ruling.

6. Impeachment

A Director's tenure on the Board can be challenged by means of a petition presented to the Board (via the Corporate Office) by a majority of either the current Crowns or current Kingdom Seneschals. Such a petition will invoke the impeachment procedures presented in the By-Laws of the SCA, Inc.

7. Communications with the Board of Directors of the SCA, Inc.

    a.    The Corporate Office serves as the primary channel of communications to and from the Board, and materials intended for the agenda must be sent to the Corporate Office for distribution, with a copy to the ombudsman for the affected kingdom and/or office and the administration of the affiliated corporation of which the correspondent is a member, if applicable. The Corporate Office prepares and distributes Board minutes, and arranges for publication of any decisions by the Board pertaining to the Governing Documents, any proposals for such decisions which the Board wishes disseminated for comment, and any other communications from the Board to the membership.

    b.    Decisions of the Board are effective immediately, but shall not be considered binding until made available to the segment of the membership they affect via direct mailing, printing in the appropriate corporate publications, or other methods the Board shall establish.

    c.    Any communication with the Board is considered public unless the author stipulates at the time of writing that the document is to be considered confidential. Confidential documents will not be distributed outside the corporate staff unless the author's permission has been obtained. Reasonable requests for copies of other communications must be made in writing to the corporate office, and all such requests are automatically considered public documents.

    d.    For communications to be considered by the Board, they must be dated and include the author's legal name. A Society name may also be included when appropriate. A method of contacting the author (either postal or email address) must be included.

    e.    The Board does not accept anonymous communications, and electronic communications with no identifier of the sender other than an email address will be considered anonymous.

8. Operations outside the USA

The Board recognizes that the development of branches outside the United States enhances the Society as a whole by providing additional sources of ideas and materials, and additional opportunities for travel and education among the membership. However, while it is desirable for the SCA, Inc. to make an effort to assist such branches in their early development, it is not appropriate for one group of members to subsidize another indefinitely. The members in each country must eventually contribute enough to cover the ongoing expenses of operation in their country.

D.  **Membership Requirements**

1.      General

Participants should expect to show proof of membership in order to qualify for member privileges. The level of proof required should be commensurate with the long-term risk to the Society posed by an erroneous claim to membership.

2.      Officers

a.      Officers at all levels of the Society must be Society members as defined in the Glossary and must have immediate access to the corporate newsletter for their area received at their residence. (Alternate access arrangements may be made for members of affiliated organizations or on a case-by-case basis for people with post office boxes and for International Members.) This standard also applies to deputies designated as successors to officers subject to this provision or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

b.      The warrants and/or appointments of officers found to be without a valid membership shall be considered terminated as of the date of the lapse.

c.      Warrants terminated due to a lapse in membership may or may not be reinstated upon demonstration of a valid membership at the pleasure of the warranting authority and within the confines of the governing documents and kingdom law.

3.      Awards

Each Kingdom may, if it so desires, require paid membership in the Society for any of the following: receiving a Patent of Arms; receiving a Grant of Arms; receiving an Award of Arms; admission to an armigerous order. Such requirements must be written into Kingdom Law and may not imply or state that a person must remain a member to retain such awards or titles once given. A Kingdom which establishes such laws must ensure that its populace is informed of these requirements and is responsible for their enforcement.

E.  **Unofficial Entities**

In many kingdoms, there are groups in which many people participate but which are not formally recognized by the Society. These can range from highly structured guilds to loosely associated camping groups. Entities that fall into this category can have many names, including but not limited to households, guilds, ships, and clans. Although these entities are not recognized by the Society in any formal way, some kingdoms have awards that can be given to these groups. Because they are not official Society groups, unofficial entities cannot sponsor Society events.

F.  **Sanctions**

1.      Sanctions and administrative actions should be proportionate and appropriate. Major sanctions, such as a ban on attendance or participation, should not be a substitute for appropriate administrative or legal action.

2.      Administrative sanctions include, but are not limited to, suspension or removal from office, revocation of authorization, or removal of a disruptive element from an event by the individual responsible for the event, as defined in the appropriate section of Corpora. The Royalty should work with the appropriate officers to impose any sanctions.

3.      Offenses against contemporary civil or criminal law should be dealt with through the appropriate legal system. This does not preclude the SCA from taking other appropriate actions.

## II.    EVENTS

### A.    Society Events Defined

The term "Society event" refers to tournaments, feasts, and other activities whereby participants can display the results of their research into the culture and technology of the period in an environment which evokes the atmosphere of the pre-17th century Middle Ages and Renaissance. It also refers to educational activities involving either one-time classes or ongoing Society university organizations, and meetings where participants share skills or discuss the business of the group. All Society events must be sponsored by official branches of the Society, registered with the Seneschal of the sponsoring branch, publicized at least to the members of that branch, and conducted according to Society rules.

### B.    Requirements for Participants at Society Events

Anyone may attend Society events provided they wear an attempt at pre-17th century clothing, conform to the provisions in Corpora, and comply with any other requirements (including but not limited to site fees or waivers) which may be imposed. At business meetings and informal classes, the requirement to wear pre-17th century dress may be waived. All participants are expected to behave in an appropriate and respectful manner.

### C.    Business Requiring Prior Announcement

Formal actions and announcements with long-term impact on the Society may occur only at Society events for which a full announcement including date, time, and place has been published in advance in the appropriate corporate publication. These actions include Crown and Coronet Tournaments, Coronations and Investitures, appointment of officers, presentation of awards and titles, proclamation of law, and the establishment or advancement of branches. However, deputy officers and officers below principality level need not be appointed at published events.

### D.    Individuals in Charge of Events

Each Society event must have one Society member appointed by the sponsoring branch in attendance and responsible for the general conduct of the event. Where an event involves only one type of Society activity, the responsible member is the appropriate branch officer, or someone designated by that officer (usually called an Event Steward). Where an event includes a variety of activities, the responsible member is the branch Seneschal, or someone designated by the branch Seneschal (usually called an Event Steward). Events including Society combat or combat-related activities must have at least one warranted marshal, designated by the Marshal of the sponsoring branch, in attendance and responsible for those activities.

### E.    Duty to Enforce Requirements

1.    The officer(s) of the sponsoring branch responsible for an event shall ensure that the event operates according to the rules set forth in this document. If transgressions occur which seriously compromise the integrity of the event or endanger the health and safety of the attendees, the responsible officers shall correct the problem immediately as follows:

2.    Disruptive elements at an event may be removed from the event by the individual responsible for that event or other appropriate officer. Offenses against contemporary civil or criminal law should be dealt with through the appropriate legal system. This does not preclude the Society from taking other appropriate actions as described in Corpora X.

3.    The responsible officer for the event may find it necessary to remove Society approval for the event, or call the appropriate civil authorities, such as police, fire, or medical personnel. If the responsible officer cannot or will not do so, the senior Seneschal present, or (in cases involving the Rules of the Lists) the senior Marshal present shall do whatever is necessary to end the

transgressions and notify the responsible officers and the owner of the site or the owner's agent that the Society will no longer be responsible for the event. In such a case, all official actions properly performed prior to the point when sanction was removed will be considered valid. However, no action taken after that point, including transfers of office or bestowal of awards, will be considered valid. If an event is terminated in this manner, the person(s) doing so must notify the Society Seneschal, the appropriate kingdom officers, and any other appropriate Society officers as soon as possible. They must also file a complete written report of the circumstances with the Society Seneschal, the appropriate kingdom officers, and any other appropriate Society officers within 30 days.

4.      It is not the responsibility of Crowns to deal with violations of modern law. When asked to resolve situations that fall under the jurisdiction of modern authorities, it is the Crown's responsibility to cooperate in referring such violations to the modern authorities. Further, it is the responsibility of the officers, particularly the local or Kingdom Seneschal, to ensure that the modern authorities are promptly notified.

## F.    **Policy on Religion**

1.      Having no wish to recreate the religious conflicts of the period under study, the Society shall neither establish nor prohibit any system of belief among its members. No one shall perform any religious or magical ceremony at a Society event (or in association with the name of the Society) in such a way as to imply that the ceremony is authorized, sponsored, or promulgated by the Society or to force anyone at a Society event, by direct or indirect pressure, to observe or join the ceremony. However, this provision is in no way intended to discourage the study of historical belief systems and their effects on the development of Western culture.

2.      Except as provided herein, neither the Society nor any member acting in its name or that of any of its parts shall interfere with any person's lawful ceremonies, nor shall any member discriminate against another upon grounds related to either member's system of belief.

## G.    **Waterbearing**

The activity of providing beverages to combatants and spectators at SCA Combat activities is not regulated, warranted, organized, controlled, or sanctioned by the SCA, Inc. or any affiliate or subsidiary entity.  Any warrants, authorizations, or other formal recognition of this activity which may currently exist are by publication of this change revoked.  The change does not address or restrict any volunteer activities regarding providing beverages to combatants or spectators at SCA Combat activities nor the methods by which such provisions may be made.  This does not preclude or affect SCA award recognition.

# III.   **BRANCHES**

## A.    **General**

1.      The Society defines standard categories for branches based on several criteria. Groups are encouraged to develop well beyond the required minimum levels before petitioning for a change in status, to assure the stability and permanence of the branch if the petition is granted. Since members have free choice of what areas they will explore, it follows that Society branches cannot decide to specialize. The choice of a single time and place for a branch would make it hard for members there to pursue other interests of their own.

2.      While international memberships may be used in the calculation of membership totals for branch status, a branch based on international memberships must have least one subscription to the appropriate corporate publication for their geographic area. The exact number required is a matter for negotiation among the Seneschals of the branch, principality, and kingdom, and the Society Seneschal. The required subscription(s) may be purchased communally by the branch.

## B.   Borders

1.      Each branch must have established borders, enclosing a single, contiguous area. At the Board's discretion, exceptions may be made in the case of overseas areas dependent upon kingdoms or principalities. Branch borders need not necessarily follow state lines or similar political divisions, if other clearly definable lines are available. In some cases, the "border" may be defined in terms of an institution rather than a specific map reference.

2.      Branches below principality level may not cross over state or national borders without the authorization of the Society Seneschal. The Kingdom Seneschal, with the approval of the Crown, may approve border adjustments below the principality level; specifically including adjustments to Baronial level borders to allow areas to form independent branches, as long as such adjustments are consistent with branch organization and designations.

3.      All kingdom and principality border adjustment petitions should be prepared by the Kingdom Seneschal(s) involved, and sent to the Society Seneschal, who will present them to the Board.

## C.   Branch Designations

1.      The designations given below are considered standard, and their use for branches of the appropriate type needs no special justification:

    a.      Kingdom: area ruled by a King and Queen

    b.      Principality: area within a kingdom ruled by a Prince and Princess

    c.      Barony: area administered by a Baron and/or Baroness, the ceremonial representative(s) of the Crown

    d.      Province: equivalent of a barony without a ceremonial representative

    e.      Shire: local branch reporting directly to a kingdom or principality

    f.      Canton: local branch reporting through a barony

    g.      Riding: local branch reporting through a province

    h.      College: institutional branch based at a school, research facility, etc.

    i.      Stronghold: institutional branch based at a military installation

    j.      Port: institutional branch based at a military installation in situations where groups of members will be detached for long periods, as with ships at sea

2.      The Society recognizes that the use of these terms has developed over time, and does not require branches which adopted any of them in a sense other than that described herein prior to release of the 1989 Governing Documents to conform to the policy. Further, the Society recognizes that equivalent terms exist in many languages and permits a branch to use any valid equivalent for the standard designation for a branch of its level, as determined by the College of Arms. Any branch wishing to use a term which has not yet been included on the College's list of established alternates should apply through its kingdom's College of Heralds for permission to use the new designation.

3.      Lateral changes in branch designation (such as between barony and province or between shire and college) must be submitted to the Society Seneschal for review and approval, in order to provide an outside confirmation that the needs of the membership will be served by the change.

4.      Kingdom: A kingdom is a sovereign entity within the Society which has the right to select a ruling King and Queen by armored combat. A branch or contiguous group of branches may petition for kingdom status if the resulting entity would fulfill the requirements listed below:

    a.      At least 400 members.

    b.      Candidates for all Great Officer positions, each of whom is acceptable to the Society Officer responsible for the direction of that aspect of Society activity.

    c.      A name and device registered with the College of Arms.

    d.      Consensus favoring advancement in branch status by the members in the proposed kingdom, demonstrated by procedures acceptable to the Kingdom and Society Seneschals.

    e.      A record of well-attended events together with regular study or guild meetings, demonstrations, and other educational activities for the benefit of the members and the community at large.

    f.      Sufficient members of the orders conferring Patents of Arms to advise the Crown regarding the admission of candidates to those orders and to foster the development of those orders and the skills they represent within the kingdom.

    g.      Sufficient fighters of such caliber as to invest the competition for the Crown with the dignity and value it merits.

    h.      A body of kingdom law which provides for the maintenance and succession of the Crown; for the definition and advancement of local branches; for the appointment and removal of territorial Barons and Baronesses; for the conduct of such courts as may be required for the maintenance of the realm; and for such other matters as are found necessary. Draft laws, in the form to be presented to the victors of the first Crown Lists, must accompany a petition for kingdom status.

    i.      A newsletter with quality and stability suitable for conversion to a corporate publication of the Society.

5.      Principality: A principality is a part of a kingdom which has the right to select a reigning Prince and Princess by armored combat. A branch or contiguous group of branches within a kingdom may petition for principality status if the resulting entity would fulfill the requirements listed below:

    a.      At least 100 members.

    b.      Candidates for all Great Officer positions, each of whom is acceptable to the kingdom officer responsible for the direction of that aspect of Society activity, and such other officers as kingdom law and custom may require.

    c.      A name and device registered with the College of Arms.

    d.      Consensus favoring advancement in branch status by the members in the proposed principality, demonstrated by procedures acceptable to the Kingdom and Society Seneschals.

    e.      A record of well-attended events together with regular study or guild meetings, demonstrations, and other educational activities for the benefit of the members and the community at large.

f.      Sufficient members of the orders conferring Patents of Arms to foster the development of those orders and the skills they represent within the principality.

g.      Sufficient fighters of such caliber as to provide appropriate competition for the Coronet.

h.      A body of principality law which provides for the maintenance and succession of the Coronet, and for any other matters delegated or permitted by the parent kingdom. Draft laws, in the form in which they will be presented to the victors of the first Coronet Lists, must accompany a petition for principality status.

6.      Baronies and Provinces: Baronies and provinces are large branches within and subject to the administration of a kingdom (or principality, if any). They are alike in status and in the ability to administer other branches within their borders, but differ in that baronies possess a Baron and/or Baroness, ceremonial representatives appointed by the Crown, and therefore have the ability to create and administer awards, while provinces do not. A branch or contiguous group of branches may petition for baronial or provincial status at the members' option, subject to the approval of the Crown and (if applicable) the Coronet, if the resulting entity meets the requirements listed below:

a.      At least 25 members.

b.      A set of officers acceptable to the Crown (and Coronet, if applicable).

c.      A name and device registered with the College of Arms.

d.      Consensus favoring advancement in branch status and favoring the type of branch (barony or province) specified in the petition. This consensus is determined by kingdom law and custom. If the branch is to be a barony, arrangements shall have been made with the Crown at the time of application for baronial status to select and appoint a Baron and/or Baroness in accordance with kingdom law and custom.

e.      A strong record of activity in a variety of fields of Society endeavor.

7.      Other local branches: Below baronial/provincial level, branch establishment proceeds according to kingdom law and custom, subject to the Society Seneschal's review and the requirements set forth below. These branches may adopt designations as provided for by the laws and customs of their kingdoms and as established in this document. Minimum requirements include:

a.      At least 5 members

b.      At least 3 officers, including a Seneschal, an Exchequer, and one of the following: a Herald, a Marshal, or a Minister of Arts and Sciences. Local branches are encouraged to fill all the latter positions.

c.      A name registered with the College of Arms.

d.      Consensus among members in the area favoring establishment of the proposed branch.

e.      A special type of local branch is available for use at schools or military bases, or in other situations where membership is likely to fluctuate for reasons beyond the members' control. The "territory" of such branches is defined in terms of affiliation with the institution where they are based, not in terms of physical boundaries. Institutional branches may report directly to a kingdom, but if their institution is located within the borders of a branch of any other class, they report through that branch. They differ from other local branches in that they

go dormant if membership falls below five (5), rather than being disbanded.

## D.   Establishment and Advancement

1.     The Society and Kingdom Seneschals will work together as necessary to process petitions for branch establishment or advancement. Society members who wish to form a branch, advance an existing branch in status, or advance a group of branches in status must first determine whether the area they have in mind is eligible for such treatment. This process shall involve consultation with the Kingdom (and Principality, if any) Seneschal, and with the Seneschals of any nearby branches.

2.     The Society permits very broad participation by people who are not members as defined in the By-Laws. However, no part of the Society can be required to solicit or heed non-member views regarding branch status, or any other situation where the opinion of the populace is to be consulted. Law, custom, or actual practice may allow consultation with nonmembers, but it cannot be required.

3.     If necessary, the members shall reach a consensus as to a proposed name (and device, where required) and register it with the College of Arms before any petition for recognition can be granted.

4.     The members of the proposed branch shall prepare a petition for the proposed action, stating the proportion of their numbers favoring the move, and demonstrating that the requirements are met. The petition shall be submitted as specified by kingdom law and custom. The Kingdom Seneschal shall review the petition to determine whether the proposed branch elevation conforms to Corpora and kingdom law and custom, consulting royalty and other kingdom or principality officers as appropriate for the level of branch under consideration. If the Kingdom Seneschal decides to recommend that the petition should be granted, the action to be taken depends on the level of branch, as follows:

   a.     Kingdoms: The Kingdom Seneschal of the parent kingdom shall determine whether the petition package is complete. The Seneschal shall forward the entire petition package (together with the accumulated recommendations, comments, and reasons for approval) to the Society Seneschal for review. The Society Seneschal shall bring the petition before the Board for formal action.

   b.     Principalities: The Kingdom Seneschal shall forward the entire petition package (together with the accumulated recommendations, comments, and reasons for approval) to the Society Seneschal for review. The Society Seneschal shall bring the petition before the Board for formal action.

   c.     Baronies and provinces: The Kingdom Seneschal shall forward the entire petition package, including statements regarding the opinions of the relevant officers and royalty, to the Society Seneschal for review. The Society Seneschal shall determine the acceptability of the petition and either notify the Seneschal that the branch advancement may proceed, or that there are deficiencies which need to be corrected before the petition can be approved. The Society Seneschal will report the change in status to the Board.

   d.     Institutional branches and local branches other than baronies and provinces: The Kingdom Seneschal shall advise the Crown if the petition is acceptable. After the Crown acknowledges the creation of the branch, the Kingdom Seneschal shall inform the Society Seneschal of the name, location and date of elevation and the Society Seneschal shall then notify the Board.

5.     Appeals: If a petition to change branch status is denied at any stage, the petition will be returned to the originator(s) together with the accumulated recommendations, comments, and reasons for denial. Any denial may be appealed to the next level.

SCA_000466

## E.    Reservations to the Board

The Board specifically reserves to itself the following functions with respect to branches of the Society:

1.    To set and revise the borders of principalities and kingdoms.

2.    To deny recognition to any group, regardless of other criteria met, for just cause, stated in writing to the affected people.

3.    To change the status of any branch to reflect its current qualifications.

4.    To dissolve a branch should it fail to continue to meet the qualifications for a branch of any level, or for other just cause, stated in writing to the affected people.

5.    To authorize a branch or group of branches to experiment with a non-standard class of organization. Any such authorization is specific to the branch obtaining it.

# IV.    ROYALTY

## A.    Selection

1.    Royal Lists must be conducted at a tournament announced in the kingdom newsletter as being for that purpose. Crowns or Coronets who wish to conduct a royal list in a manner other than individual combat must obtain the prior approval of the Board of Directors.

2.    Each competitor and prospective consort must hold a valid membership on the day of the Royal Lists. Within ten business days after being declared victor in a Crown or Coronet Tourney, the Victor and Consort must present to the Kingdom Seneschal proof that their memberships are current through at least the end of the prospective reign. Positive confirmation consists of: a valid membership card, appearance of the name with a valid membership on a printout from the Corporate Office; a membership label issued by the Corporate Office showing the name and expiration date; receipt of online membership (as downloaded from the renewal website); or, a postcard or letter from the Corporate office confirming that the membership has been received.

3.    Kingdoms and principalities will ensure that all competitors in Crown and Coronet Lists are aware of and meet the membership requirements for themselves and their prospective consorts at the time they register for the Lists. Any officer of the Society or representative of a Kingdom found responsible for allowing a non-member to participate as an entrant or prospective consort in a Royal List will be subject to sanctions.

## B.    Qualifications

1.    Each competitor in a Royal List must be fighting for a prospective consort.

2.    No one may take part in a Royal List, either as a competitor or as a prospective consort, who has any reason to believe that either member of that competing couple will be unable to fulfill the duties of royalty.

3.    Each competitor and prospective consort must have access to the appropriate corporate newsletter at their place of residence.

## C.    Duties

1.    Royalty must know and uphold the laws of their realm and Corpora.

2.    The royal pair must attend their Coronation or Investiture, preside over the Royal Lists to

select their successors, and attend the Coronation or Investiture of their successors. They must also attend such other events as may be dictated by the laws of their realm. Should extreme and extraordinary circumstances prevent a Crown, heir to the Crown, Coronet, or heir to the Coronet, from completing these requirements, the Board of Directors may, upon substantial petition and on a case-by-case basis, waive these requirements to allow the bestowing of a royal peerage or royal title.

3.      Royalty shall be the chief examples of chivalry, courtesy, and the other virtues appropriate to the ideals of the Society and shall inspire these virtues in their subjects. They shall be true and faithful rulers for their subjects, uphold their subjects' rights and work for their benefit, and maintain an impartial justice for all in the realm.

4.      Royalty shall give appropriate recognition to those worthy of such honor.

5.      Royalty shall foster an atmosphere that encourages new and prospective members to feel welcome to participate in Society activities.

6.      Royalty shall foster an atmosphere that encourages their subjects to participate in arts and sciences activities.

7.      Royalty, acting with and through the officers of the realm, administer the lands and branches which comprise the realm. Royalty consult the officers of the realm in matters concerning the officers' areas of responsibility and monitor the performance of their officers to the extent necessary to confirm that they are performing essential duties. They sign such internal documents as are necessary for the conduct of business within the realm.

8.      The Sovereign supervises combat on the field of honor.

9.      Royalty and the Royal Heirs must maintain their memberships until their term as Royalty is over. Should anyone serving as a Royal Heir or as Royalty be found in violation of the membership requirements, that individual's term ends as of the date of the membership lapse. Provisions for dealing with the situation are addressed in Kingdom Law within each individual kingdom. The individual shall not receive any recognition for having temporarily held the status of Royalty or Royal Heirs.

## D.   Privileges

1.      Royalty receive such gifts as may be made to the realm, use them appropriately in accordance with law and custom, and preserve them for their successors. If a gift is designated as personal by the donor, the royalty may retain it after the conclusion of the reign. During their reign, Royalty may use such items as the royal office shall already hold, in accordance with the law and custom of the realm.

2.      Royalty may delegate to any subject the execution of any legitimate royal power for a specific instance, such as the transmission of an award to an individual named and selected by them, subject to the laws and customs of the realm.

## E.   Limitations

1.      Royalty are subject to all current Society rules and kingdom and/or principality laws.

2.      No Sovereign or Consort may fight or be fought for in any Royal List, nor may anyone hold more than one royal office, except for those held by virtue of holding another. (For example, a King may be temporarily Prince of a principality, if the Coronet is vacated and the Kingdom laws regarding succession make this provision.) Neither the Sovereign nor the Consort may become either Sovereign or Consort of that realm in the reign immediately following their own.

3.      The Crown may delegate the following authority to those territorial princes and princesses within their Kingdom and may not delegate these powers or authorities to anyone else:

a.      decision making powers on legislation or principality law within the approval of the Crown;

b.      distribution of armigerous awards and orders with prior approval of the Crown;

c.      banishment within the principality with prior approval of the Crown; and

d.      signature authority for warrants and rosters with prior approval of the Crown.

4.      Royalty may grant armigerous awards to subjects of other realms only if all the following conditions apply:

a.      the service or achievements being recognized must have taken place in the realm of the conferring royalty,

b.      the conferring royalty must comply with all consultation provisions and other restrictions in the law of its realm,

c.      the conferring royalty must obtain prior written consent from the Crown of the realm of the recipient.

d.      For patent orders, the Crown of the realm of the recipient must likewise comply with any consultation provisions and other restrictions in its own law.

F.    **Kingdom and Principality Law**

1.      The Crown or the Coronet may make and amend such laws of their realm as they deem necessary, with the restriction that principality laws are subject to the approval of the Crown. (Note that law applies to all persons participating in Society activities within the borders of the realm, without regard to subject status or individual fealty.)

2.      Law must be kept current, and all changes thereto must be proclaimed at a Society event and published in the kingdom newsletter. No provision of law shall be in effect, nor shall the subjects of a realm be responsible for such provision, until such proclamation and publication have taken place.

3.      If a new law of the realm conflicts with an existing provision, the latter must be explicitly repealed. Any law declared null and void because of a conflict must be explicitly repealed. Laws that are repealed must be proclaimed and published in the same manner as the original law.

4.      No law may require members or branches to make donations to the treasury of the realm. Laws which discuss voluntary donations are acceptable, as are those which mandate reasonable fees for events and services or discuss financial arrangements for the realm's main events sponsored by local branches.

5.      Failure of the Reign or Succession: Procedures shall be established in the law of the realm to ensure the succession and to provide for the maintenance of the realm and its royal offices in the event of disaster, failure, or absence of any of the reigning royalty or their heirs. At kingdom option, the procedures for principality succession may be placed in kingdom law.

G.    **The Crown**

1.      The Crown may present Awards of Arms, the titles of Court Baron and Court Baroness, and Grants of Arms in accordance with the laws and customs of the kingdom. The Crown may establish and present such other awards as the Crown shall deem proper, in accordance with the laws and customs of the kingdom.

2.      The Crown may elevate subjects to the Peerage by granting membership in one of the Orders

conferring a Patent of Arms, after consultation with the members of the Order within the Kingdom, and in accordance with the laws and customs of the kingdom. Restriction: to advance a candidate to the Order of Knighthood, a Knight of the Society must bestow the accolade.

3.      The Crown shall acknowledge attainment of Ducal, County, or Viscounty rank by those who have met the requirements. The privilege of acknowledging Viscounty rank is designed for use when the Coronet is unavailable, as at the conclusion of a principality.

4.      The Crown may appoint, remove, and replace Great Officers of State in conjunction with the appropriate Society Officers, if any. The Crown may appoint, remove, and replace lesser officers of the kingdom in conjunction with the appropriate Great Officers, if any.

5.      The Crown may either control the appointment, removal, and replacement of principality officers in conjunction with the Great Officers of State, or it may delegate this authority to the Coronet.

6.      The Crown may appoint, remove and replace territorial Barons and Baronesses in accordance with this document, kingdom law and custom.

7.      The Crown may suspend any officer of the kingdom for just cause, stated in writing to the affected person, for the duration of the reign.

8.      No Sovereign or Consort may hold any office in the kingdom other than territorial Baron or Baroness for the duration of the reign.

9.      The Crown may establish and call such courts as may be necessary for the governance of the realm, in accordance with kingdom law and custom.

    a.      Any courts within the Society are presumed to be within the historical context of the Society and pertain only to conduct within the structure and definitions of the Society.

    b.      The primary purpose for these courts within the Society is for the investigation of questions and issues, for opening communications on issues; and for the clarification of issues. Only secondarily are courts considered to be for the purpose of trying members of the Society for alleged behavior or incidents. No courts of the latter type are to be established by any branch below kingdom level.

    c.      No court shall be held within any kingdom on individual behavior that falls within the jurisdiction of a civil or criminal court maintained by the nation or other political division where it takes place, nor shall any recommendation about individuals be made on such issues. However, a given action may have implications both in law and in the Society's rules of courteous behavior. A court which restricts itself to the latter may be held as long as the act in question occurred in a Society context.

    d.      If a court concludes that the appropriate action is one beyond the powers of the Crown or Kingdom to enact, the judgment should be issued in the form of a request to the Society Seneschal.

10.     Reservations to the Board.

The Board explicitly reserves to itself the discipline of members for actions taken while serving as Sovereign or Consort of a kingdom. However, the Board will not consider appeals against the Crown before the aggrieved parties have attempted to resolve their problem directly with the Crown, and then with the appropriate kingdom and corporate officers, including the Society Seneschal.

11.     The Crown may sanction subjects of their realm and visitors thereto in accordance with Corpora X.A. (Royal Sanctions)

H.      **The Coronet**

1.      The Coronet shall administer the principality, its branches and subjects on behalf of the Crown, uphold their people's rights, work for their benefit, maintain the Crown's justice, and be true and faithful servants of their Crown.

2.      The Coronet shall recommend to the Crown those subjects whose achievements and service within the principality are worthy of recognition that cannot be granted by the Coronet.

3.      The Coronet may make armigerous awards only where the right has been formally delegated to them by the Crown. Any such general delegation extends only to subjects of their principality; the Coronet must obtain specific authorization from the Crown for armigerous awards to other persons. They shall acknowledge the attainment of Viscounty rank by those who have met the requirements. The Coronet may establish and present non-armigerous awards specific to their principality.

4.      If authority has been delegated by the Crown, the Coronet may appoint, remove, or replace Great Officers of the principality in conjunction with the appropriate kingdom Great Officers. The Coronet may likewise appoint, remove, and replace Lesser Officers of the principality in conjunction with the appropriate kingdom or principality Great Officers, if any. The Crown may require consultation and prior approval for any or all of these steps. The Coronet may suspend any officer of the principality for just cause, stated in writing to the affected person, for the duration of the reign.

5.      No Sovereign or Consort may hold any office in the principality other than territorial Baron or Baroness, or any kingdom-level office, for the duration of the reign.

6.      The Coronet may call courts of inquiry only if the Crown approves.

7.      Reservations to the Crown

        a.      When the Crown believes the Coronet has overstepped the bounds of law and custom, the normal recourse should be to attempt in-kingdom mediation and then a Court of Chivalry, if needed.

        b.      If the Board upholds the judgment of such a Court, the affected parties may be subject to loss of any honors and privileges deriving from their reign, and nullification of any official acts dating back to the incident which led to the invocation of the Court.

        c.      If the Crown feels that rapid action is essential to protect the Society, it has the option of banishing the Coronet from the realm, effectively putting the principality reign into abeyance until either conditions change within the kingdom or the Board countermands the order. However, if the Board does not agree with the Crown's judgment regarding the urgency of the situation, the Board may choose to take action against the Crown as well as or instead of against the Coronet.

8.      Reservations to the Board

        a.      The Board reserves to itself the final determination regarding discipline of members for actions taken while serving as Sovereign or Consort of a principality. However, the Coronet remains subject to the Crown, and provisions regarding Courts of Chivalry and banishment still apply.

        b.      The Coronet may sanction subjects of their realm and visitors thereto in accordance with Corpora X.A. (Royal Sanctions).

# V.   TERRITORIAL BARONS AND BARONESSES

## A.   Appointment and Removal

1.      The Crown shall appoint a territorial Baron and/or Baroness according to the laws and customs of the kingdom when a branch is granted baronial status, or whenever a new Baron and/or Baroness are required. The barony's opinion on the matter must be requested and received in writing, and the appointments must not be substantially opposed by the populace of the barony. Territorial Barons and Baronesses are officers and must maintain appropriate membership status.

2.      The Crown may suspend a territorial Baron and/or Baroness for the duration of a reign, for just cause stated in writing and presented only to the Baron and/or Baroness. Suspension prohibits the use of the baronial titles and arms, the conduct of baronial courts, and the presentation of baronial awards.

3.      The Crown may remove a territorial Baron and/or Baroness for just cause stated in writing and presented only to the Baron and/or Baroness; however, the Crown must request a written opinion from the populace of the barony before taking such action.

## B.   Responsibilities

1.      The basic duties of the Baron and/or Baroness are ceremonial in nature in reflecting the royal presence in the barony. The Crown may assign additional duties and responsibilities according to the laws and customs of the kingdom.

2.      Territorial Barons and/or Baronesses are responsible to the Crown and (if the barony is within a principality) to the Coronet. The Baron and/or Baroness shall work with the baronial officers as circumstances dictate and shall keep these officers informed as necessary for the efficient performance of their duties and effective liaison within the barony.

3.      The privileges, duties, and rights, ceremonial and otherwise, of the office of territorial Baron and/or Baroness are established by the laws and customs of the kingdom. These shall include the right to make such awards as the Crown (or the Coronet, if applicable) shall specifically delegate, and to establish and present non-armigerous awards specific to the barony.

4.      A territorial Baron or Baroness may hold any other Society office for which he or she is fitted and qualified, save those of Baronial Seneschal and Baronial Exchequer, but must not allow the duties and responsibilities of such office and the office of Baron or Baroness to conflict.

# VI.   SOCIETY OFFICERS

## A.   General

The term "Society Officer" refers to the officers listed below in their administrative roles within the historical structure of the Society.

1.      Responsibilities

a.      Each Society Officer shall carry out the duties assigned to that office, and may, with the approval of the Board, appoint such deputies as may prove necessary. The following duties are common to all Society Offices:

b.      Coordinating appointment of Great Officers of State for their areas of responsibility, in cooperation with the Crown of each kingdom.

c.      Maintaining communications with their subordinates, and assuring the flow of

information on policies and developments in their areas of responsibility.

 d. Reporting to the Board quarterly, with copies to the Society Seneschal, regarding the status and activities of the kingdoms in the areas of their responsibility, and also submitting annual summaries of this information. Failure to submit these reports is tantamount to resignation, which may be accepted at the pleasure of the Board.

 e. Maintaining communications with other Society Officers as appropriate.

2. Requirements and Benefits

 a. Society Officers and their warranted deputies must be members.

 b. Society Officers and some deputies may receive certain corporate periodicals (except their home-kingdom newsletters) at Society expense, for the duration of their tenure. The Corporate Office maintains the distribution list for these publications, at the direction of the Board. The Kingdom Seneschal and Kingdom Chronicler may receive certain corporate periodicals other than their own kingdom newsletter at the Society's expense for the duration of their terms. The Board may from time to time designate additional officers to receive these publications.

 c. No Society Officer may hold more than one Society Office, or any kingdom or principality Great or Lesser Office of State.

 d. No Society Officer may serve as Crown or Coronet during their tenure in office. In order to fight or be fought for in a Crown or Coronet Lists, the officer must have served a minimum of one year in that office and must have an appointed deputy, approved by the Board, who is ready and willing to accept all responsibilities for that office. Committing to become a Crown or Coronet will be considered a resignation from office.

 e. The Board shall ensure that each Society Officer shall have a specific Board member, called an ombudsman, assigned to act as its representative to the Board, and vice versa, for matters concerning that office.

3. Sanctions

Society Officers may impose Administrative Sanctions within their area of authority, in accordance with Corpora X.

4. Appointment and Removal

 a. Appointment: Society Officers shall be appointed by the Board. All appointments will be for specific terms of service, renewable at the option of the Society Officer and the Board. The initial appointment will be for a trial period of six months. At the end of that period, the Board will either confirm the remainder of the term of office, or appoint another person to the office for the trial period.

 b. Warranting: Three Board members must sign the warrant for a Society Officer. For a deputy, two Board members and the appropriate Society Officer must sign the warrant.

 c. Resignation: Society Officers may resign by submitting written notification to the Board via the Secretary and Corporate Office.

 d. Removal: Any Society Officer or deputy may be removed by a two-thirds vote of the

Board.

## B.    Society Seneschal

The Society Seneschal is responsible for coordinating the administration of the Society's historical re-creation. This involves directing the activities of the Kingdom Seneschals and of Society-level deputies. Where questions arise concerning the intent of Corpora, the Board specifically authorizes the Society Seneschal to make interpretations and clarifications. Such rulings must be discussed with the Chairman at the earliest opportunity and reported to the Board at the following meeting. The Society Seneschal's rulings will stand until and unless overruled by the Chairman or the Board. The Society Seneschal is also responsible for reviewing all sanction related activities.

## C.    Laurel Sovereign of Arms and The College of Arms

### 1.    Laurel Sovereign of Arms

The Laurel Sovereign of Arms (Laurel) is the principal heraldic officer of the Society and the head of the College of Arms. Laurel is responsible for fostering the study and practice of heraldry, and for establishing rules and making determinations regarding names and armory, royal and noble titles, and geographical designations to be approved for use in the Society.

### 2.    College of Arms

The College of Arms of the Society consists of the Principal Heralds of the kingdoms and such other persons as Laurel may deem to be of assistance. It aids Laurel in studying historical heraldic usage, developing heraldic rules for the Society's use, and reviewing individual items prior to their registration for use in the Society.

### 3.    Heraldic Administration

a.    Standards of difference and other rules: Laurel shall define standards suitable to the type of item to be registered, and apply them uniformly to all such submissions. These standards shall be designed to support the historical re-creations of the Society and to provide sufficient difference from names and armory registered within the Society to avoid undue confusion, to avoid the appearance of unearned honors or false claims, and to provide sufficient difference from historical or fictional personages to prevent offense due to obvious usurpation of identity or armory. Members are encouraged to develop unique, historically valid names and armory.

b.    Any item once registered shall remain registered unless the owner requests its release, and shall be accepted in the Society for the person for whom it was registered without regard to changes in the rules and standards applied to future submissions, or to the membership status of the owner.

c.    The standards and rules employed by Laurel and the College of Arms shall be published so that participants in Society activities can obtain copies for their own reference. The Ordinary and Armorial listing registered names and armory shall also be made available to the membership.

d.    Laurel shall ensure that fees for the Society's heraldic publications and for its services in registering names or armory are sufficient to cover the cost of such services, both at the corporate level and within the kingdoms.

## D.    Marshal of the Society

The Marshal of the Society's area of authority is all martial and related activities practiced in the Society, both those described by the handbooks approved for the office and proposed as additions to those handbooks.

The Marshall will work to encourage the participated of all in the Society's martial activities and striving to expand and improve those activities for the benefit of the Society and its members.  The duties of the office also include

- directing the Earls Marshal of the Kingdoms in matters concerning the supervision of the martial and related activities at Society events

- overseeing the manner and conduct of duties of all marshals throughout the Society

- working to promote and improve the safety of the Society's martial activities

- working with the Minister of Arts and Sciences to encourage research in armor, weapons, and the practice of historical martial arts

The Board authorizes the Marshal to make interpretations and clarifications regarding the Rules of the Lists, with the proviso that such rulings must be reported to the Board at the following meeting.  The Marshal's rulings will stand until and unless overruled by the Board, and upon approval must then be incorporated into the relevant handbook.  The Board specifically authorizes the Marshal to conduct well documented and monitored experiments with new weapons, armor materials and martial formats in order to advance martial activities in the Society.  The Marshal will keep the Board informed regarding these experiments in their quarterly reports.

## E.    **Minister of Arts and Sciences**

The Minister of Arts and Sciences is responsible for fostering the study of period culture and technology, and of methods for producing historically accurate artifacts and performances. Duties include coordinating the efforts of kingdom officers in the field (regardless of whether or not the functions related to "Arts" and "Sciences" are combined in one job or kept separate); promoting the dissemination of accurate information about the fields under study; and assisting the Chronicler of the Society and the editors of the corporate publications in confirming the validity of research presented to the membership.

## F.    **Chronicler of the Society**

The Chronicler is responsible for overseeing the production of kingdom newsletters, local branch newsletters, and any other publications the Board may designate. In addition, the Chronicler establishes overall policies for Society-sponsored event and branch-related paper publishing at all levels, and serves as a source of publishing expertise and advice for the benefit of the Society.

## G.    **Society Chancellor of the Exchequer**

1.      The Society Chancellor of the Exchequer reports directly to the Treasurer as identified in the By-Laws.

2.      The Society Chancellor of the Exchequer shall cause to be kept and maintained adequate and correct accounts of the properties and business transactions of all branches and divisions of the Society except those controlled by the Treasurer and the Corporate Office. Such accounts shall include records of assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial reports.

3.      This officer accomplishes this directly, through the Kingdom Chancellors of the Exchequer, Kingdom Chroniclers (for regional corporate publications), or through other special deputies. The Society Chancellor of the Exchequer additionally collects and compiles reports on all such accounts for the Society's tax returns and other financial reports.

## H.    **Web Minister**

The Web Minister is responsible for overseeing the websites of kingdoms, local branches, and any other website the Board may designate. In addition the Web Minister serves as a source of web publishing

expertise and advice for the benefit of the Society. The Web Minister of the Society is responsible for collecting reports from Kingdoms, be they Greater or Lesser Officers.

## I.     Reservations to the Board

The board reserves the right to appoint and remove Society Officers.

# VII.   KINGDOM, PRINCIPALITY, AND LOCAL OFFICERS

## A.     General

1.     Officers assist Royalty in the administration of the lands and branches of the realm. Each officer has a specific area of specialization, and a defined geographic scope. Within those bounds, an officer coordinates branch activities, and may supervise deputies or lesser officers.

2.     Kingdom Great Officers are responsible directly to the Crown, but also report to a corresponding Society officer if such a Society officer exists. Each Kingdom's Great Officer corps must include the Seneschal, the Principal Herald, the Earl Marshal, the Minister of Arts and Sciences, the Chancellor of the Exchequer, and the Chronicler. No person may hold more than one of these Great offices at a time. The Crown may create additional Great Offices. Kingdom Lesser Officers and deputies are created by the Crown according to the needs of the kingdom. These officers may be supervised directly by the Crown, or be placed under the jurisdiction of a Greater Officer, and report accordingly. However, Great Officers retain ultimate responsibility for delegated functions.

3.     Principality Great and Lesser Officer structure and duties generally parallel that of the Kingdom, with the Great Officers responsible to the Coronet and corresponding superior kingdom officer. Lesser officers may be supervised directly by the Coronet, or be placed under the jurisdiction of a Principality Great Officer. Specific reporting requirements are established by Kingdom and Principality law or custom.

4.     Local officers are responsible to a superior officer, and possibly Royalty or a Territorial Baron and/or Baroness, depending on the particular administrative structure of that area.

5.     Kingdom and Principality Officers may impose Administrative Sanctions within their area of authority, in accordance with Corpora X.

6.     The duties of the Kingdom Great Officers are defined below:

## B.     The Seneschal

1.     The Seneschal is the chief administrative officer of the Society for the kingdom, which includes coordinating the other kingdom officers as required for the smooth operation of the kingdom and for its relations with outside agencies. The Seneschal is responsible for assisting new branches and for branch elevations.

2.     The Seneschal shall review all proposed changes to kingdom law to determine compliance with the governing documents of the Society and advise the Crown accordingly. The Seneschal shall with due promptness either acknowledge the propriety of the changes by signing them, prior to the Crown's enacting them, or shall state any conflicts in writing to the Crown and to the Great Officers of the kingdom. Once the law has been enacted, the Seneschal shall ensure that the Society Seneschal and the Board ombudsman for the kingdom receive current copies, which must include the Seneschal's opinion regarding apparent conflicts, if any.

## C.     The Principal Herald

The Principal Herald is the head of the kingdom's College of Heralds and is responsible for supervising field heraldry and court heraldry at events within the kingdom, and for College of Arms activities within the

kingdom, including the timely processing of submissions for names and armory.

## D.    The Earl Marshal

The Earl Marshal's area of authority is all martial and related activities practiced in their Kingdom, both those described by the Society handbooks approved for the office and proposed as additions to those handbooks. The Earl Marshal bears primary responsibility for promoting both the safety and the authenticity of the martial and related activities in the kingdom but works with other officers in their areas of mutual interest.  The Earl Marshal is responsible for issuing and maintaining authorizations for all participants and warranting marshals for their kingdom.

## E.    The Minister of Arts and Sciences

The Minister of Arts and Sciences is responsible for supporting the study of art forms, technologies, and those aspects of culture relating to their use, both in period and in Society activities.

## F.    The Chancellor of the Exchequer

The Chancellor of the Exchequer is responsible for maintaining the financial records of the kingdom, supervising the finances of the kingdom, and assembling financial reports and submitting them to the Society Chancellor of the Exchequer in a timely fashion.

## G.    The Chronicler

The Chronicler supervises all publishing activities of the kingdom, and is the editor or supervises the editor of the kingdom newsletter, which is responsible for all required announcements and notices of Society events, kingdom law, and other kingdom business. The Chronicler works with the Society Registrar on matters of mailing and circulation. The Chronicler is also responsible for accounting for the corporate stipend and other kingdom newsletter income, and reporting all such income and expenditures to the Society Chancellor of the Exchequer as required by that officer.

## H.    Duties of Other Officers

Specific duties of Kingdom Lesser Officers, deputies, Principality Officers, and Local Officers are defined by Royalty and the appropriate superior officer.

## I.    Appointment to office

1.    Kingdom Great Officers of State are appointed by the Crown after due consultation with the outgoing officer, the Seneschal, and any other appropriate Great Officer. The appointments take effect when and if ratified by the corresponding Corporate Officer by countersignature of the warrant. If there is no Corporate Officer, the Crown shall act unilaterally.

2.    Kingdom Lesser Officers are appointed by the Crown in a parallel manner, where the Great Officer takes the place of the Society Officer.

3.    Principality Great and Lesser Officers are appointed in a similar fashion, although the specific details are governed by kingdom law or custom.

4.    Local officer appointments are usually done by the next superior officer, and confirmed by Royalty, according to kingdom law and custom. Local officers must not be substantively opposed by the people of the branch, but the final decision remains with the superior officer and Royalty.

## J.    Warranting / Rosters

1.    Kingdom Great Officers' appointments are confirmed by a signature from the Corporate Level and the Crown, on the standard warrant form. All other Officer appointments may be listed on a roster

SCA_000477

that includes the legal and Society names, address, phone number, and the appointment and expiration dates for each officer. It must be signed by the appropriate Royalty and the responsible superior officer, and be updated regularly. The roster must contain a statement that it is the current roster of (office) for the (kingdom, principality) of the Society as of (date).

2.    Local Branch officers may be officers in their own right or be deputies of officers of an administering branch. Until a branch is proclaimed by the Crown, its officers must be deputies of their counterparts in the administering branch.

3.    Before a proposed officer can be placed on a roster or warrant, they must have a membership that provides immediate access to the corporate newsletter for their area. This also applies to deputies designated as an officer's successor.

## K.    Ending a term of office

1.    All office terms end upon the expiration date listed on the warrant or roster. Officers are normally responsible for presenting a potential successor to the appropriate Royalty before their term expires. Where a good-faith effort to fill the office is in progress, the Crown may authorize a Kingdom Great Officer to continue in office for up to 45 days after the expiration of the warrant. Officers may serve successive terms only as kingdom law and custom permit. Officers must turn over all office related materials to their successor in a timely and organized fashion when their term ends.

2.    All officers may resign by sending written notice to the people who signed their warrant or roster. Kingdom law may include provisions regarding levels of inactivity or non-reporting as equivalent to resignation.

3.    Officers may be removed for just cause, stated in writing to the officer, by joint action of the Crown and the corresponding superior officer. If there is no superior officer, the Crown may act unilaterally, in accordance with law and custom. An officer so removed may appeal to the Board.

## L.    Suspension of an officer

1.    Officers may be suspended by either the appropriate Royalty or the superior officer for just cause, stated in writing to the officer. Suspensions by the Royalty are for not more than the duration of the current reign. Suspensions by the superior officer are for not more than 90 days. A suspension takes effect upon declaration to the officer, but the Royalty or the superior officer must be informed as soon as possible. The suspension of a kingdom or principality great officer must be announced in the next available issue of the kingdom or principality newsletter.

2.    If a deputy has been designated as successor for the post, the deputy shall automatically assume the duties of the office at the moment of such suspension and shall continue fulfilling said duties until the suspension is terminated. If no designated successor exists for the post, the Royalty and superior officer (if any) shall reach an agreement as to how to carry out the duties off the post. The suspension stands until and unless overruled by the Board.

# VIII.    PERSONAL AWARDS AND TITLES

## A.    Patents of Arms

1.    General Requirements

Candidates for any order conferring a Patent of Arms must meet the following minimum criteria. Additional requirements may be set by law and custom of the kingdoms as deemed appropriate and necessary by the Crown.

   a.    They shall have been obedient to the governing documents of the Society and the

laws of the kingdom.

b.        They shall have consistently shown respect for the Crown of the kingdom.

c.        They shall have set an example of courteous and noble behavior suitable to a peer of the realm.

d.        They shall have demonstrated support for the aims and ideals of the Society by being as authentic in dress, equipment and behavior as is within their power.

e.        They shall have shared their knowledge and skills with others.

f.        They shall have practiced hospitality according to their means and as appropriate to the circumstances.

g.        They shall have made every effort to learn and practice those skills desirable at and worthy of a civilized court. To this end they should have some knowledge of a wide range of period forms, including but not limited to literature, dancing, music, heraldry, and chess, and they should have some familiarity with combat as practiced in the Society.

h.        They should participate in Society recreations of several aspects of the culture of the Middle Ages and Renaissance.

## 2.        Order of Precedence Within the Peerage

The Crown may establish the order of precedence within the peerage according to the laws and customs of the kingdom. However, the Chivalry, the Laurel, the Pelican and Defense are of equal precedence and must be considered as one group.

## 3.        Departure from the Peerage

Any member of an order conferring a Patent of Arms may resign from that order. To leave a Patent Order, the member must send a written resignation to the Crown, the Principal of the Order (if any), the Principal Herald, and the Board. The Crown bestows membership in Patent Orders. No 'interchangeability' exists from one order to another (as Knight to Master or Laurel to Pelican), and the acceptance of a person who has so resigned an order into any other order is solely at the discretion of the Crown according to the laws and customs of the kingdom.

## 4.        Patent Orders

The following institutions are established for all kingdoms in the Society. A Patent of Arms may be conferred only upon a person being admitted into one of these orders. Each candidate for a patent order must satisfy the general requirements listed above in A.1., as well as the specific requirements listed here.

a.        The Chivalry:

(i)        The Chivalry consists of two equal parts: Knighthood and Mastery of Arms. No one may belong to both parts of the order at one time. When a member is admitted to the Chivalry by the Sovereign, the choice of which part of the order to join is made by the new member. The candidate must be considered the equal of his or her prospective peers with the basic weapons of tournament combat. To become a Knight, the candidate must swear fealty to the Crown of his or her kingdom during the knighting ceremony. Masters of Arms may choose to swear fealty, but are not required to do so.

(ii)        The duties of the Chivalry are as follows:

(a)     To set an example of courtesy and chivalrous conduct on and off the field of honor.

(b)     To respect the Crown of the kingdom; to support and uphold the laws of the kingdom and Corpora.

(c)     To enrich the kingdom by sharing his or her knowledge and skills.

(d)     To support and uphold the Crown of his or her kingdom.

(e)     To enhance the renown and defend the honor of the peer's Lady or Lord.

(f)      To advise the Crown on the advancement of candidates for the Chivalry.

(g)     To bestow the Accolade of Knighthood upon a candidate for the Order of Knighthood, by sole right as both Sovereign and knight, or acting directly for a Sovereign who is not a knight.

b.     The Order of the Laurel:

(i)      Members of the Order of the Laurel may choose to swear fealty, but are not required to do so. The candidate must have attained the standard of excellence in skill and/or knowledge equal to that of his or her prospective peers in some area of the Arts or Sciences. The candidate must have applied this skill and/or knowledge for the instruction of members and service to the kingdom to an extent above and beyond that normally expected of members of the Society.

(ii)     The duties of the members of the order are as follows:

(a)     To set an example of courtesy and chivalrous conduct.

(b)     To respect the Crown of the kingdom; to support and uphold the laws of the kingdom and Corpora.

(c)     If in fealty, to support and uphold the Crown of his or her kingdom.

(d)     To enrich the kingdom by sharing his or her knowledge and skills.

(e)     To advise the Crown on the advancement of candidates for the Laurel.

c.     The Order of the Pelican.

(i)      Members of the Order of the Pelican may choose to swear fealty, but are not required to do so. The candidate must have attained the standard of service to the Society or any of its branches equal to that of his or her prospective peers, which is above and beyond that normally expected of members of the Society.

(ii)     The duties of the members of the order are as follows:

(a)     To set an example of courtesy and chivalrous conduct.

(b)     To respect the Crown of the kingdom; to support and uphold the Laws of the kingdom and Corpora.

(c)      If in fealty, to support and uphold the Crown of his or her kingdom.

(d)      To enrich the kingdom by sharing his or her knowledge and skills.

(e)      To advise the Crown on the advancement of candidates for the Pelican.

d.      The Order of Defense

(i)      Members of the Order of the Defense may choose to swear fealty, but are not required to do so. The candidate must be considered the equal of his or her prospective peers with the basic weapons of rapier and/or cut-and-thrust combat. The candidate must have applied this skill and/or knowledge for the instruction of members and service to the kingdom to an extent above and beyond that normally expected of members of the Society.

(ii)      The duties of the members of the order are as follows:

(a)      To set an example of courtesy and chivalrous conduct on and off the field of honor.

(b)      To respect the Crown of the kingdom; to support and uphold the Laws of the kingdom and Corpora.

(c)      If in fealty, to support and uphold the Crown of his or her kingdom.

(d)      To enrich the kingdom by sharing his or her knowledge and skills.

(e)      To enhance the renown and defend the honor of the peer's Lady or Lord.

(f)      To advise the Crown on the advancement of candidates for the Order of Defense.

e.      Royal Peerages: The titles assumed by former Crowns and Coronets may convey Patents of Arms if the laws and customs of the kingdom so provide. However, in order to receive a patent with the title, the recipient must meet the general requirements listed for peerage.

f.      The Order of the Rose: The Order of the Rose consists of former Royal Consorts of a kingdom. It is specifically charged with encouraging chivalrous and courteous behavior among all members of the Society. It may be non-armigerous, or it may be defined as a Patent Order according to the laws and customs of the kingdom. In the latter case, the general requirements for peerage must be met.

## B.   Other Awards

1.      The title of Baron or Baroness, whether territorial or of the court, shall carry at least an Award of Arms if the recipient is not already armigerous.

2.      Kingdoms may establish awards and orders conferring Awards or Grants of Arms, and the Crown may award membership in such orders according to the laws and customs of the kingdom. The names and armory of these awards and orders must be approved by the Laurel Sovereign of Arms. The order of precedence among orders conferring Awards or Grants of Arms shall be established according to the laws and customs of the kingdoms. Principalities may establish their own awards and orders, whose names and armory must be approved by the Laurel Sovereign of Arms,

but the approval of the Crown is required before these awards and orders may convey Arms.

3.      An armiger may resign any award or order. To do so requires a written statement, sent to the current royalty of the level which bestowed the award, the Principal of the Order, if any, the Principal Herald and the Board.

4.      Non-armigerous awards and orders may be established by a kingdom, principality or barony, according to the laws and customs of the kingdom. The names and insignia of these awards and orders must be ratified by the Laurel Sovereign of Arms. Below kingdom level, orders may not convey Arms, unless specifically delegated by the Crown. The Crown must approve any non-armigerous award or order before it may be recognized by the College of Heralds of a kingdom and given a place in its Order of Precedence.

5.      Only royalty and territorial Barons and Baronesses may bestow awards. If an award is established for a specific branch, only the royalty or Baronage of that branch may bestow the award, unless the power is specifically delegated in a manner consistent with Corpora and kingdom law and custom.

C.      **Membership Requirements for Receiving Awards**

1.      The Board authorizes each Kingdom to determine if they require paid membership in the Society for any of the following:

      a.      receiving a Patent of Arms;

      b.      receiving a Grant of Arms;

      c.      receiving an Award of Arms;

      d.      admission to an armigerous order.

2.      Such requirements must be written into Kingdom Law and may not imply or state that a person must remain a member to retain such awards or titles once given. A Kingdom which establishes such laws must ensure that its populace is informed of these requirements, and said Kingdom is responsible for their enforcement.

D.      **Titles**

1.      "Landedness" in the Society is an attribute of the Crown, the Coronet, and the territorial Barons and Baronesses. Other titles within the Society do not confer land, and no form of any title shall be taken or used which states or implies ownership or control of any geographic, demographic or sociographic area within or external to the Society in any sense, medieval or otherwise.

2.      The Society's standard titles are defined in (4) below. The Society recognizes that equivalent titles from other cultures may be more appropriate for individual members. Such alternate titles may be used by those entitled to the rank or award associated with them, provided the College of Arms has ruled that the title in question is an equivalent for the rank or award in question. All standard and alternate titles are specific to the Society, and convey no rank or precedence outside it. They may be used in a Society context only by those who have achieved the appropriate rank or award within the Society.

3.      Names and terms that imply relationships between Society members (such as apprentice, page, squire, etc.) or that carry vocational connotations (religious, military, scholarly, etc.) may be used in the Society on an informal basis, subject to the following restrictions: They must not assert or imply noble rank or territorial jurisdiction. They must not be offensive in themselves or in the context in which they are used. They may carry no precedence and must not be used in any manner which would suggest that they do so.

SCA_000482

4.      The titles listed here are considered standard and may be used by those who have earned or been granted the appropriate rank or award within the Society. The College of Arms publishes a more extensive list of titles and alternative forms, which may also be used freely by qualified persons. In addition, the College of Arms has full approval authority over new alternative titles, which must be added to their list before being released for use in the Society.

| TITLE (masculine/feminine/collective) | RANK OR AWARD |
|---|---|
| King/Queen/Crown | Rulers of a kingdom |
| Crown Prince/Crown Princess/(Royal) Coronet | Heirs to the Crown |
| Prince/Princess/Coronet | Rulers of a principality |
| Duke/Duchess | Persons who have reigned over a kingdom two or more times. The title is assumed at the end of the second complete reign. |
| Count/Countess | Persons who have once reigned over a kingdom. The title is assumed at the end of the first complete reign. |
| Viscount/Viscountess | Persons who have reigned over a principality. The title is assumed at the end of the first complete reign. |
| Master/Mistress | Members of the Orders of the Laurel, the Pelican, Mastery of Arms and Defense. |
| Sir/Sir | Members of the Order of Knighthood. Note that most women who are members of the order have chosen to use 'Sir'. |
| Baron (of placename)/ Baroness (of placename) | Ceremonial heads of a barony |
| (Court) Baron/ (Court) Baroness | Armigerous titles awarded at the discretion of the Crown. The word "Court" is often left out when referring to this title. |
| Lord/Lady | Basic titles for persons who hold Arms by Award or Grant |
| "my lord"/ "my lady"/ "good gentles" | **These are general forms of address rather than titles**. They are properly used informally, or any time the speaker does not know another form that would be more appropriate for the listener. |
| Master of (job name)/ Mistress of (job name) | Alternates for 'Minister of (job name)'. As with the standard designation for the office, **these are not personal titles, and should in no case be abbreviated or prefixed to the officer's personal name.** |

## E.      Reservations to the Board

### 1.      Degradation from the Peerage

The Board reserves the right to degrade a person from the Peerage. However, kingdom law may define conditions and procedures under which a recommendation for such action may be made to the Board. Unless stipulated otherwise by the Board, the Board's decision in such a case applies only to the matter at hand. Nothing prohibits a person who has been degraded from any order of the peerage from being elevated to the peerage at a later date, should the Crown determine that the person in question now meets the requirements of the order to which the person is being elevated.

2.      Revocation of Awards and Grants of Arms

As with Peerages, the Board specifically reserves the right to revoke any Award or Grant of Arms. Kingdom law may make provision for offering such a recommendation to the Board.

3.      Granting and creation of new titles

The Board reserves the right to define the circumstances for which new titles of rank may be granted and to coin any such titles either for general use or for specific individuals. A specific title granted by the Board upon just petition is unique to each case and does not make that title valid for any other use or person within the Society.

# IX.    SOCIETY COMBAT

## A.    Society Martial Activities

1.      Martial activities in the Society are defined as armored combat, fencing, combat archery and thrown weapons, equestrian, youth combat and marshaling. Other activities clearly falling within the scope of the above are also to be considered martial activities.

The Earl Marshal shall warrant marshals in order to conduct martial activities within their kingdom. Marshals are officers of the Society and shall be warranted in accordance with Society procedures laid down for warranting officers. In addition, marshals shall be warranted with particular authorities as defined by the Earl marshal, whether those be by discipline (e.g., armored vs. fencing), role (e.g., field marshal or authorizing marshal) or other defined roles in the chain of command (e.g., Deputy Earl Marshal).

Upon warranting, that warrant shall be registered and tracked by the kingdom, and proof of warrant shall be provided to the participant. This proof may be a physical warrant, or an accessible online system shall be available to the marshal, other marshals, and list officials in order to validate their status as needed. If a physical warrant is issued, that warrant must be shown to any marshal or lists official upon request.

2.      A participant in any of the Society combat-related activities as defined above must be authorized by a marshal warranted and designated by the Earl Marshal of a kingdom or their representative as able to authorize individuals in the appropriate activity.

3.      Requirements for authorization for all marshal activities are delineated several Marshal's handbooks. Kingdoms may define such additional types of authorization (such as weapons forms) as they deem necessary.

4.      Authorizations shall be registered with and kept on file by the Earl Marshal or other designated official of each kingdom.

5.      Waivers, indemnities, or other required documents must be signed as appropriate before training for authorization, being authorized, or participating in SCA martial activities. Proof that the required document, if applicable, has been signed must be presented before an individual may participate in the above-mentioned activities. (For more detailed information on waivers, see Corporate Policies of the SCA, Inc., section IV – VI.)

6.      Upon authorization, that authorization shall be registered and tracked by the kingdom, and proof of authorization shall be provided to the participant. This proof may be a physical authorization card, or a list, or an accessible online system shall be available to the participant, marshals, and list officials in order to validate authorization as needed. If a physical card is issued, that card must be shown to any marshal or lists official upon request. The Society Marshal shall establish standards for the issuance of combat authorizations.

7.      No person who has not attained their sixteenth (16th) birthday may be authorized in armored combat. No person who has not attained their fourteenth (14th) birthday may be authorized for fencing. These restrictions do not apply to Youth Combat, Youth Fencing, Equestrian activities, or to Target and Thrown Weapons.

8.      Prior to the authorization of a minor in any Society combat-related activity, the parent or guardian of the minor must witness the activity, discuss it with a witnessing marshal, and execute a waiver, indemnity, or other required document for the minor. The witnessing marshal must be explicitly authorized to perform this function by the Earl Marshal of the kingdom. The marshal who authorizes a minor person for any form of Society combat-related activity must be the Kingdom Earl Marshal or the Principality Marshal or a designated deputy. This need not be the same person as the witnessing marshal.

9.      Any minor involved in Society combat-related activities at an event must have a parent or a properly executed document designating some adult person present at the event as able to authorize medical treatment for that minor in the case of any emergency.

## B.    **The Rules of the Lists**

1.      Each fighter, recognizing the possibilities of physical injury to themselves in such combat, shall assume unto themselves all risk and liability for harm suffered by means of such combat. Other participants shall likewise recognize the risks involved in their presence on or near the field of combat and shall assume unto themselves the liabilities thereof.

2.      No person shall participate in martial activities requiring authorization outside of formal training sessions unless and until they have been properly authorized under Society and Kingdom procedures.

3.      All combatants must be presented to, and be acceptable to, the Sovereign or their representative.

4.      All combatants shall adhere to the appropriate armor and weapons standards of the Society, and to any additional standards of the kingdom in which the event takes place.

5.      The Sovereign or the Marshallate may bar any weapon or armor from use upon the field of combat. Should a warranted marshal bar any weapon or armor, an appeal may be made via the established marshallate chain of command up to and including the Sovereign to allow the weapon or armor.

6.      Combatants shall behave in a knightly and chivalrous manner and shall fight according to the appropriate Society and Kingdom Conventions of Combat.

7.      No one may be required to participate in marshal activities. Any combatant may, without dishonor or penalty, reject any challenge without specifying a reason. A fight in a tournament list is not to be considered a challenge, and therefore may not be declined or rejected without forfeiting the bout.

8.      Fighting with real weapons, whether fast or slow, is strictly forbidden at any Society event. This rule does not consider approved weaponry that meets the Society and kingdom standards for Society combat and/or Society rapier combat, used in the context of mutual sport, to be real weaponry.

9.      No projectile weapons shall be allowed, and no weapons shall be thrown within the Lists of a tournament. The use of approved projectile weapons for melee, war, or Combat Archery shall conform to the appropriate Society and Kingdom Conventions of Combat.

C. **Royal Lists**

Only Chivalric (rattan) combat shall be used for formal tournament lists for royal ranks.

# X. GRIEVANCES AND SANCTIONS

## A. General

1.      While the Society is devoted to courtesy, trustworthiness, and personal responsibility, tensions and disputes do arise.

2.      The Board is the final court of appeal for disputes that have escalated beyond the ability of the participants or the officers to handle. However, it is reluctant to play that role because its rulings affect the entire Society--often by restricting everyone's freedom and reducing their enjoyment of the organization. Corpora provides a right of appeal to the Board, but members should make every effort to work out their disputes at as low a level in the organization as possible.

3.      While it is not possible to prescribe a specific list of things to do or people to consult that will serve in all disputes, the general procedure outlined here should be adaptable to most of them. If you are directly involved in a dispute, you must go through a process at least as comprehensive as this one before asking the Board for help. If you are asked to intervene in someone else's dispute because of the office or title you hold, please don't rush in. First, urge the principals to try all measures recommended for attempting to reach a settlement without involving your level of the organization. Then, if you do intervene, make every effort to find a resolution the participants can accept, instead of escalating the dispute to higher levels of the organization.

4.      Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions up to and including revocation of membership and denial of participation.

Please report any possible instances of hate speech to your Kingdom Seneschal, the Society Seneschal or the President of the SCA immediately. For more information about hate speech and the reporting of same, please refer to the Society Seneschal's Handbook.

## B. Sanctions

1.      Royal Sanctions

a.      The Crown of a Kingdom may sanction subjects, residents, and visitors within the borders of the Crown's Kingdom for just and stated cause. Royal Sanctions take effect from the moment of proclamation but must be announced in court and also be published in the next available issue of the kingdom newsletter if the sanction is to remain in effect. Within 15 business days of the imposition of the sanction, the specific cause and occasion of the sanction must be explained in writing to the sanctioned individual.

2.      Administrative Sanctions

a.      Officers may impose Administrative Sanctions within their areas of authority, for just and stated cause, only in accordance with the rules defined in their office handbooks or specifically granted to their offices by the Governing Documents of the SCA. Only the Society Seneschal may impose an Administrative Sanction that precludes the holding of any office including that of Crown.

3.     Temporary removal from Participation in the SCA

    a.     Temporary removal from Participation precludes the individual from attendance or participation in any way, shape or form in any SCA activity, event, practice, or official gathering for any reason, at any time. This includes a ban on participation on officially recognized SCA social media (Facebook) sites, officially recognized SCA electronic email lists, and officially recognized SCA webpages. This sanction, once upheld by the Board of Directors, continues until the Board makes a final decision in the matter.

4.     Reservations to the Board of Directors

    a.     Sanctions on Individuals for Actions taken as Crown

The Board explicitly reserves to itself the discipline of individuals for actions taken while serving as Sovereign or Consort of a kingdom. However, the Board will not consider complaints against the Crown before the aggrieved parties have attempted to resolve their problem directly with the Crown, and then with the appropriate kingdom and corporate officers.

    b.     Sanctions upon Individuals for Actions taken as Coronet

The Board reserves to itself the final determination regarding discipline of members for actions taken while serving as Sovereign or Consort of a principality. However, the Coronet remains subject to the Crown, and provisions regarding Courts of Chivalry and sanctions. If the Crown believes the Coronet has overstepped the bounds of law and custom, the normal recourse should be in-kingdom mediation and then a Court of Chivalry. If the Board upholds the judgment of such a Court, the affected parties may be subject to loss of any honors and privileges deriving from their reign, and nullification of any official acts dating back to the incident which led to the invocation of the Court. If the Crown feels that rapid action is essential to protect the SCA, it has the option of imposing a Proscription from Active Participation upon the Coronet from the realm, effectively putting the principality reign into abeyance until either condition change within the kingdom or the Board countermands the order. However, if the Board does not agree with the Crown's judgment regarding the urgency of the situation, the Board may choose to take action against the Crown as well as, or instead of, against the Coronet.

    c.     Degradation from the Peerage

The Board reserves the right to degrade a person from the Peerage. However, kingdom law may define conditions and procedures under which a recommendation for such action may be made to the Board. Unless stipulated otherwise by the Board, the Board's decision in such a case applies only to the matter at hand. Nothing prohibits a person who has been degraded from any order of the peerage from being elevated to the peerage at a later date, should the Crown determine that the person in question now meets the requirements of the order to which the person is being elevated.

    d.     Revocation of Awards of Arms and Grants of Arms

As with Peerages, the Board specifically reserves the right to revoke any Award of Arms or Grant of Arms. Kingdom law may make provisions for offering such a recommendation to the Board.

April 1, 2020, Revision

APPENDIX B: STANDARD WARRANT FORMS



# The Society for Creative Anachronism, Inc.
PO Box 611928 . San Jose, CA 95161 800-789-7486

## WARRANT OF APPOINTMENT TO EXECUTIVE OFFICE

LEGAL NAME:

ADDRESS:

TELEPHONE: (HOME)                              (OTHER)

EMAIL ADDRESS:                           MEMBER NUMBER:

SCA REFERENCE NAME:

Let it be known that the above-referenced person is hereby appointed to the office of
[ ] President [ ] Vice-President for _____ [ ] Local President (Seneschal)  [ ] Other_____

FOR BRANCH:

EFFECTIVE AS OF:                         AND EXPIRING AS OF:

with all rights, privileges, insignia, precedence, and responsibilities appertaining to the office while the
Warrant is effective. This executive is specifically empowered to do business as a legal representative for
the above-referenced branch of the Society for Creative Anachronism, Inc., including but not limited to
making contracts involving the Society for Creative Anachronism, Inc. This Warrant supersedes any existing
or previous Warrant for this office.

PRINT:                                   PRINT:

SIGN:                                    SIGN:

OFFICE:                                  OFFICE:

DATE:                                    DATE:

PRINT:

SIGN:

OFFICE:

DATE:

> **Required signatures:**
> **President**: 3 members of the SCA Board of Directors.
> **Vice President for Operations (Society Seneschal):**
> three Board members.
> **Regional Vice President (Kingdom Seneschal):**
> Society Seneschal and the current Crown.
> **Regional Vice President (Principality Seneschal):**
> Crown or Coronet and the Kingdom Seneschal.
> **Local President (Seneschal)**: Kingdom Seneschal or
> Principality Seneschal and the current Crown.

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

April 1, 2020, Revision



# The Society for Creative Anachronism, Inc.

PO Box 611928 . San Jose, CA 95161 800-789-7486

## WARRANT OF APPOINTMENT TO FINANCIAL OFFICE

LEGAL NAME:

ADDRESS:

TELEPHONE: (HOME)                                    (OTHER)

EMAIL ADDRESS:                                    MEMBER NUMBER:

SCA REFERENCE NAME:

Let it be known that the above-referenced person is hereby appointed to the office of
[ ] Treasurer   [ ] Vice Treasurer for _____   [ ] Local Treasurer (Exchequer/Reeve) [ ] Other_____

FOR BRANCH:

EFFECTIVE AS OF:                                    AND EXPIRING AS OF:

with all rights, privileges, insignia, precedence, and responsibilities appertaining to the office while the Warrant is effective. This treasurer is specifically empowered to do business as a financial representative for the above-referenced branch of the Society for Creative Anachronism, Inc., including but not limited to managing financial transactions with financial institutions. This Warrant supersedes any existing or previous Warrant for this office.

PRINT:                                    PRINT:

SIGN:                                    SIGN:

OFFICE:                                    OFFICE:

DATE:                                    DATE:

PRINT:

SIGN:

OFFICE:

DATE:

> **Required signatures:**
> **Treasurer:** three members of the SCA Board of Directors.
> **Vice Treasurer (Society Exchequer):** three Board members.
> **Vice Treasurer (Kingdom Exchequer):** Society Exchequer and current Crown.
> **Vice Treasurer (Principality Exchequer):** Kingdom Exchequer and the current Crown or Coronet.
> **Local Treasurer (Exchequer/Reeve):** Kingdom Exchequer or Principality Exchequer and the current Crown.

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

SCA_000489

April 1, 2022, Revision



# The Society for Creative Anachronism, Inc.

PO Box 611928 . San Jose, CA 95161 800-789-7486

## WARRANT OF APPOINTMENT TO OFFICE

LEGAL NAME:

ADDRESS:

TELEPHONE: (HOME) (OTHER) MEMBER

EMAIL ADDRESS:

NUMBER:

SCA REFERENCE NAME:

Let it be known that the above-referenced person is hereby appointed to the office of [   ] A&S Officer

[   ] Herald  [   ] Chronicler [   ] Marshal  [   ] Other _____  FOR BRANCH: _____

EFFECTIVE AS OF:  AND EXPIRING AS OF:                  with all rights, privileges, insignia, precedence, and responsibilities thereto appertaining the office while the Warrant is effective. This Warrant supersedes any existing or previous Warrant for this office.

PRINT:                                PRINT:

SIGN:                                 SIGN:

OFFICE:                               OFFICE:

DATE:                                 DATE:

PRINT:

SIGN:

OFFICE:

DATE:

**Required signatures:** Corporate and Society Officers: three members of the SCA Board of Directors.
**Deputy Corporate/Society officers:** two Board members and the appropriate Corporate/Society officer.
**Kingdom Officers with Corporate Superiors:** Crown and the appropriate Corporate Officer.
**Other Great Officers and Lesser Officers:** Crown or Coronet and the appropriate kingdom or principality officer, if any.
**Other officers:** as established by Kingdom Law and custom, but must include more than one signature, and must include royalty.

*This form may be photocopied or reproduced in any mechanical medium that preserves the complete text and letterhead image.*

SCA_000490

# THE BY-LAWS OF
# THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I.    NAME

The name of this corporation shall be the Society for Creative Anachronism, Inc., herein referred to as the 'SCA'.

## II.    OFFICES

The principal office of the SCA shall be located in the State of California. The SCA may have other offices as the Board of Directors may determine or as the affairs of the SCA may require from time to time.

## III.    OBJECTIVES AND PURPOSES

The SCA shall be dedicated primarily to the promotion of research and re-creation in the field of pre-17thcentury Western culture, as stated in greater detail in Article II of the SCA's Articles of Incorporation.

## IV.    DEDICATION OF ASSETS

The properties and assets of the SCA are irrevocably dedicated to charitable purposes. No part of the net earnings, properties, or assets of this corporation, on dissolution or otherwise, shall inure to the benefit of any private person or individual, or any member, Director or officer of the SCA. On liquidation or dissolution, all properties and assets and obligations shall be distributed and paid over to an organization dedicated to charitable purposes which has established its tax-exempt status under Internal Revenue Service Code Section 501(c)(3).

## V.    MEMBERS

### A.    Statutory Members

The SCA is a public benefit corporation and shall not have any members within the meaning of Section 5056 of the California Corporations Code. It is not a mutual benefit nonprofit corporation permitting distributions to members.

### B.    Nonstatutory Members

The Board of Directors may designate categories of advisory membership. These will be detailed elsewhere in the Governing Documents of the SCA, Inc. Such advisory members are not members within the meaning of Section 5056 of the California Corporations Code.

### C.    General Conditions and Privileges Of Membership

1.    Access to Membership

Membership in the SCA is open to any interested individual, without restriction of age or citizenship. Memberships are not transferable or assignable. Membership can be terminated only by: (1) lapse following nonpayment of dues, or (2) action of the Board of Directors in accordance with the rules for Revocation and Denial of Membership as defined in the Corporate Policies of the Society for Creative Anachronism, Inc., II.D. (Revocation/Denial of Membership).

2.     Privileges of Members

a.   General Privileges of Members and Non-members.

Every member of the SCA is eligible for office and advancement within the SCA, subject to the requirements for such office or such advancement, and to the provisions established above. However, while a group or institution may obtain a membership in order to obtain the newsletters and/or increase its support of the SCA, such membership does not convey the privileges of membership to persons associated with that group or institution. Employment by the SCA as staff, as a contractual agent of the SCA, or as a paid consultant to the SCA does not require membership in the SCA.

b.   Eligibility for Office.

Officers at all levels of the SCA must be members and must have immediate access to the corporate newsletter for their area. This standard also applies to deputies designated as successors to officers subject to this provision or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

3.     Revocation/Denial of Membership

Membership in the SCA may be revoked and/or denied as provided in Paragraph C.1 of this Article for the following reasons:

a.     conviction of violation of civil or criminal law

b.     actions that endanger the SCA;

c.     violation of the By-Laws or Corpora of the SCA;

d.     formal recommendation arising out of procedures for the purpose defined in Corpora for the medieval structure of the SCA.

4.     Reservations to the Board

The Board shall have the sole authority to define the classes of membership and to establish and revise a schedule of dues. No dues may be set by any branch of the SCA. However, fees for admission to events other than regular business meetings of branches of the SCA shall not be considered dues.

# VI.   BOARD OF DIRECTORS

## A.   Powers

Subject to the provisions of the California Nonprofit Corporation Law, the activities and affairs of the SCA shall be managed and all corporate powers shall be exercised by or under the direction of the Board of Directors, herein referred to as the Board. The Board may delegate management of the day-to-day operation of the business of the SCA provided that the activities and affairs of the SCA shall be managed and all corporate powers shall be exercised under the ultimate direction of the Board subject to the limitations in the Articles of Incorporation.

## B.   Number of Directors

The authorized number of Directors of the SCA shall not be less than five (5) or more than seven (7) until changed by amendment of this Article of the By-Laws.

## C.   Qualifications of Directors

Each Director shall be a natural person at least 21 years of age, and shall be qualified for independent office under V.C.2.a. of these By-Laws.

It is the intent of the SCA that the composition of the Board shall represent a diversity of skills and experience, to enable the Board to make informed, well-balanced decisions on the SCA's activities.

## D.    Restriction on Interested Directors

1.      No Director may hold any office defined by the Governing Documents to be incompatible with active service on the Board. Any Director planning to take such an office must resign from the Board immediately upon committing to taking the office.

2.      In addition, not more than forty-nine percent (49%) of the Directors may be 'interested persons', defined as:

a.      any person compensated by the corporation for services rendered to it within the previous twelve (12) months, whether as a full-time or part-time employee, independent contractor, or otherwise, excluding any reasonable compensation paid to a Director as a Director; and

b.      any relative by blood or marriage of any such person. However, any violation of the provisions of this section shall not affect the validity or enforceability of any transaction entered into by the corporation.

## E.    Election and Term

Directors are elected by the unanimous vote of the Board.

### 1.    Probationary Period

Each Director shall be appointed for an initial trial period, commencing as of the date said Director assumes his position, and concluding with determination of confirmation by the remaining Directors. This confirmation shall occur within four (4) months of the end of the second regularly scheduled quarterly meeting of the Board of Directors following the date said Director assumes his position. If the Director is not confirmed, the remaining Directors shall appoint someone else to the Board to finish the assigned term, in which case the new Director is subject to the same initial trial period and confirmation vote as provided for in this section.

### 2.    Term of Service

Directors' terms shall be staggered so that one term ends each six months. Under ordinary circumstances, Directors shall serve fourteen quarters, dating from the meetings at which they are elected. A Director's term begins immediately upon election and acceptance. A Director whose term is expiring may, under extraordinary circumstances, be retained for up to two additional quarters. Such extensions may only be made by unanimous vote of the other Directors. The Director affected must abstain from voting but may decline to serve. The Board Minutes must describe the circumstances requiring the extension. The extension shall be considered part of the next full term, and a new Director shall be chosen to fill the remainder of that term. During the period between acceptance and his or her first meeting, a Director shall receive information routinely distributed to the Board and shall be bound by its policies regarding the behavior of Directors. Former Directors of the SCA may not be reelected to the Board until a period of at least one (1) year has elapsed after their departure from the Board.

### 3.    Resignation

Should a Director be unable to serve his or her full term, the remaining Directors shall either leave the position vacant until the end of the term, or elect someone to fill the remainder of the term. Failure to attend the last meeting of a term or extension for any reason shall be considered equivalent to resignation at the beginning of that meeting, unless (in the case of a normal term) prior arrangements for an extension were made by the Board and voted in at the current meeting. As specified in VI.B, the number of active Directors may not be allowed to go below 5, except during a meeting affected by an automatic resignation resulting from this paragraph.

## F.    Vacancies and Removal

Directors remain on the Board until expiration of their term of service, resignation, or removal. By a majority vote, the Board may remove any Director without cause at any regular or special meeting, provided that the Director to be removed has been notified in writing that such action would be considered at that meeting.

1.    Dismissal of a Director

    a.    Impeachment

A Director can be impeached by a letter signed by three (3) Directors, or by a petition signed by a majority of the Corporate Officers or 1,000 of the current advisory members. Additional procedures for petitions of impeachment arising out of the medieval structure of the SCA are defined in Corpora.

    b.    Removal

The removal of a Director shall be considered by the Board at its next regular meeting after an impeachment is filed, or at a special election meeting called as provided in VI.I, except that there must be at least ten (10) days' notice in writing to all Directors. If the next regular meeting is more than forty-five (45) days from the time of receipt of a petition of impeachment, a special election meeting shall be called.

2.    Filling Vacancies

All vacancies may be filled by unanimous vote of the Directors then in office, whether or not their numbers constitute a quorum.

3.    Leave of Absence

A Director may take leave of absence from the Board with the concurrence of the remaining Directors. Such leave of absence shall not extend the absentee's term of service on the Board. An interim replacement may be appointed by the Board with the concurrence of the Director taking the leave for the duration of a leave of absence. An interim Director must meet the requirements for a regular term on the Board, and shall have the same voting rights as a regular Director.

## G.    Place of Meetings; Meetings by Telephone

Regular or special meetings of the Board may be held at any place within or outside the State of California that has been designated from time to time by the Board. In the absence of such designation, meetings shall be held at the principal executive office of the SCA.

Notwithstanding the above provisions of this Section, a regular or special meeting of the Board may be held at any place consented to in writing by all the Board members, either before or after the meeting. If consents are given, they shall be filed with the Minutes of the meeting. Any meeting may be held by telephonic (including VOIP) or video conference or similar communications equipment, as long as all Directors participating in the meeting can hear one another, and all such Directors shall be deemed to be present in person at such meeting.  Should a meeting be held in person, any Director may be permitted to attend via telephonic (including VOIP) or video conference or similar communications equipment upon approval of the Chairman of the Board.

## H.    Regular Quarterly Meetings

The Board shall hold a regular meeting in each calendar quarter, for the purpose of appointing Directors and officers of the SCA, and for the transaction of other business. These meetings are open to any advisory member of the SCA. Notice of these quarterly meetings shall be given via publication in the Minutes of the previous meeting.

## I.     Special Meetings

1.       Special meetings of the Board may be called for any purpose at any time by the Chairman of the Board, or by any two other Directors.

2.       Written notice of the time and place of special meetings shall be delivered personally to each Director or communicated to each Director by telephone, electronic mail, or first-class mail, addressed to the Director at the Director's address as it is shown upon the records of the SCA. In case such notice is mailed, it shall be deposited in the United States mail at least ten (10) days prior to the time of the holding of the meeting. In case such notice is delivered personally or by telephone, or electronic mail, it shall be so delivered at least seventy-two (72) hours prior to the time of the holding of the meeting. Such mailing or delivery shall be due, legal and personal notice to each Director.

3.       Notice of a meeting need not be given to any Director who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes of the meeting, whether before or after the meeting, or who attends the meeting without protesting, prior to the meeting or at its commencement, the lack of notice to such Director. All such waivers, consents, and approvals shall be filed with the corporate records or made part of the Minutes of the meeting.

## J.     Action at a Meeting; Quorum and Required Vote

An act of the Board consists of an affirmative decision by a majority of the maximum authorized number of Directors, except as otherwise provided for in the By-Laws. A quorum shall be a majority of the maximum authorized number of Directors.

## K.     Chairman and Vice-Chairman of the Board

The post of Chairman shall be held for such period as the Board shall from time to time determine. No member shall be required to serve as Chairman. If the Chairman is not present or may not serve as Chairman for any reason, the Vice-Chairman shall act as Chairman. Both the Chairman and the Vice-Chairman shall be selected by unanimous consent of the Board.

## L.     Committees

The Board may designate one or more committees to serve at the pleasure of the Board. These committees shall serve as advisory bodies and shall not exercise the authority or power of the Board.

## M.     Reimbursement of Expenses

Directors and members of committees may receive such reasonable reimbursement for expenses as may be determined by the Board.

## VII.   ADMINISTRATION

## A.     Officers

1.       The officers of the corporation shall consist of a President, a Vice President for Operations, a Vice President for Corporate Operations, a Treasurer, a Secretary, and such others as the Board may from time to time designate. The office of President may be held by the Chairman of the Board of Directors.

2.       Officers of the corporation are elected by a unanimous save one vote of the Board and shall hold office until their term of service is over, they resign, or they are removed by a two-thirds vote of the Board. The term of service shall be as agreed upon between the officer and the Board. It may be limited or open.

## B.     Corporate Office

The SCA shall maintain a business office to carry out regular administrative work of the SCA. Where overall

benefit to the SCA will result, portions of the duties assigned to any officer described or referenced in Paragraphs VII.A.2-4 may be transferred to this office, and such duties as are not explicitly assigned to other officers may be assigned to and performed by this office.

## C.    Compensation

The salary and other compensation of other officers shall be fixed from time to time by resolution of or in the manner determined by the Board.

# VIII.   CONTRACTS, CHECKS AND FUNDS

## A.    Execution of Corporate Instruments

The Board may, at its discretion, determine the method and designate the signatory officer or officers or other person or persons, to execute any corporate instrument or document, or to sign the corporate name without limitation, except when otherwise provided by law, and such execution or signature shall be binding upon the SCA. Unless otherwise specifically determined by the Board or otherwise required by law, formal contracts and other corporate instruments and documents shall be executed, signed or endorsed by the Chairman of the Board, Vice-Chairman of the Board or the President and by the Secretary or Treasurer.

## B.    Checks, Drafts, Etc.

All checks and drafts drawn on banks or other depositories of funds to the credit of the corporation, or on special accounts of the SCA, shall be signed by such person or persons as the Board shall authorize to do so.

## C.    Gifts

The Board may accept on behalf of the SCA any contribution, gift, bequest, or devise for the general purposes of or for any special purpose of the SCA not inconsistent with the charitable limitations in the Articles of Incorporation.

# IX.   INDEMNIFICATION

1.     To the fullest extent permitted by law, the SCA may indemnify its Directors, officers, employees, and other persons described in Section 5238(a) of the California Corporations Code including persons formerly occupying any such position, against all expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by them in connection with any "proceeding," as that term is used in said section 5238(a), and including an action by or in the right of the SCA, by reason of the fact that the person is or was a person described in that Section. "Expenses" shall have the same meaning as in said Section.

2.     To the fullest extent permitted by law and except as otherwise determined by the Board in a specific instance, expenses incurred by a person seeking indemnification in defending any "proceeding" may be advanced by the SCA before final disposition of the proceeding upon receipt by the SCA of a contract from that person to repay such amount unless it is ultimately determined that the person is entitled to be indemnified by the SCA for those expenses.

3.     The SCA shall have power to purchase and maintain insurance to the full extent permitted by law on behalf of its officers, directors, employees and other agents, against any liability asserted against or incurred by such persons in such capacity or arising out of the person's status as such.

# X.   BOOKS AND RECORDS

The SCA shall keep correct and complete books of account and records and shall also keep Minutes of the proceedings of the meetings of its Board, and shall keep in the Corporate Office a record giving the names and addresses of the persons described in Article V, which record shall not be copied or viewed by any

person, except with the prior written permission of the Board. The books of account may be inspected by any member or member's agent, for any reasonable purpose at any reasonable time.

# XI.  FISCAL YEAR

The Fiscal Year of the corporation shall begin on the first day of January and end on the last day of December in each year.

# XII.  AMENDMENT TO BY-LAWS

1.      These By-Laws may be altered, amended or repealed and new By-Laws may be adopted by the unanimous consent of the Board. Such amendments and alterations must be made in writing, and must immediately be placed in the records of the SCA, and appended to copies of the By-Laws available to the membership.

2.      Under normal circumstances, the Board will publicize proposed changes to the By-Laws in sufficient time to allow comment from the membership before making a final determination.

3.      The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made to the By-Laws. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

# XIII.  DEFINITION OF STRUCTURE

## A.    The Corpora

The Board shall establish and maintain a document defining the structure of the medieval organization used by the SCA in its re-creations and including minimum requirements and guidelines for that organization. This document is referred to as the Corpora of the SCA. The Corpora may be altered, amended or repealed in part or in whole by a two-thirds vote of the Board. Such amendments and alterations must be made in writing and must immediately be placed in the records of the SCA and appended to copies of the Corpora available to the membership.

## B.    Corporate Policies of the SCA, Inc.

The Board shall establish and maintain a document defining policies applying to the SCA. This document is referred to as the Corporate Policies of the SCA, Inc. The Corporate Policies may be altered, amended or repealed in part or in whole by a two-thirds vote of the Board. Such amendments and alterations must be made in writing and must immediately be placed in the records of the SCA and appended to copies of the Corporate Policies available to the membership.

# XIV.  PARLIAMENTARY PROCEDURE

In the discretion of the Chairman of the Board, business meetings of the Board, or any portion of such meeting, shall be conducted according to the procedures defined in the latest edition of *The Standard Code of Parliamentary Procedure* by Alice Sturgis.

# THE CORPORATE POLICIES
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

## I. MEMBERSHIP TYPES

Membership in the SCA is open to any interested individual. Membership takes effect when the Corporate Office receives a prospective member's application. Positive confirmation of membership consists of:

- a valid membership card;

- appearance of the name with a valid membership on a printout from the Corporate Office;

- a membership label issued by the Corporate Office showing the name and expiration date;

- a postcard or letter from the Corporate Office confirming that the membership has been received;

- a proof of membership letter generated from the SCA membership webpage.

## A. Statutory Members

The SCA is a public benefit corporation and shall not have any members within the meaning of Section 5056 of the California Corporations Code. It is not a mutual benefit nonprofit corporation permitting distributions to members.

## B. Non-Statutory Members

The Board of Directors has designated the following categories of advisory membership. Such advisory members are not members within the meaning of Section 5056 of the California Corporations Code. California law supports the SCA's use of the terms "member" and "membership" in the common English meaning, referring to persons who have paid to be associated with the organization.

1. Sustaining Membership conveys eligibility to hold office in the SCA, a subscription to a Kingdom newsletter, the option to subscribe to other Corporate publications, and any other privileges designated by the SCA or its subdivisions as accruing to members of the SCA. This type of membership is considered a subscribing membership.

2. International Membership conveys the privileges of Section I.B.1. This membership type is available only in locations outside the United States which are part of the SCA, Inc., and not subject to an affiliate corporation. This type of membership is considered a subscribing membership.

3. Associate Membership conveys eligibility to hold office in the SCA, except where other membership categories are required Governing Documents. Associate membership also entitles the holder to any privileges designated by the SCA or its subdivisions as accruing to members of the SCA, except where another membership type is specifically required by the organization defining the privilege. This type of membership is not considered a subscribing membership.

4. Family Membership extends the privileges of Section I.B.1 to one additional adult and any children aged 21 or younger who live at the same physical address as a member defined in paragraphs B.1-B.2 of this Article. This type of membership is not considered a subscribing membership.

5. Institutional Membership allows a library or school to subscribe to Tournaments Illuminated and The Compleat Anachronist without acquiring the regional newsletter, and without any of the other privileges of membership. The Board reserves the right to determine whether or not a given organization qualifies for this membership type.

# II. GENERAL CONDITIONS AND PRIVILEGES OF MEMBERSHIP

## A. Access to Membership

Membership in the SCA is open to any interested individual, without restriction of age or citizenship. Membership can be terminated only by:

1.      lapse following nonpayment of dues, or

2.      action of the Board of Directors.

Memberships are not transferable or assignable.

## B. Privileges of Members

Every natural person holding membership in the SCA is eligible for office and advancement within the SCA, subject to the requirements for such office or advancement, and to the provisions established above. A group or institution may obtain a membership of the types listed in V.B.1-3 in order to obtain the newsletters and/or increase its support of the SCA; such membership does not convey the privileges of membership to any individual associated with that group or institution.

## C. Eligibility for Office

Officers at all levels of the SCA must be members as defined in I.B.1-4 above and must have immediate access to the corporate newsletter for their area provided by a subscribing membership at their residence. (Alternate access arrangements may be made on a case-by-case basis for people with post office boxes and for International Members.) This standard also applies to deputies designated as successors to officers subject to this provision or assigned independent administrative duties. Deputies who only assist with specific tasks are exempt from the newsletter access requirement.

1. No Director may hold any Crown, Principality Coronet, or Great Office of State of a kingdom or principality while serving on the Board.

2. Minors as officers

   a. Subject to Section C.2.c. below minors fifteen (15) years of age or over may serve as officers, only with the express written approval of their parent or legal guardian and their kingdom superior, who must first be notified of the age of the minor.

   b. Minors under fifteen (15) years of age may not serve as officers.

   c. Minors may not serve as group marshals or as marshal in charge, seneschal or exchequer.

## D. Revocation/Denial of Membership

A revocation or denial of membership by the Board enforces exclusion from all SCA functions in all SCA kingdoms.

## 1. Grounds

Membership in the SCA may be revoked and/or denied at the sole discretion of the Board of Directors for the following reasons:

- Actions that endanger public health and safety, or disturb the peace of an SCA activity, in a manner which would make it reasonable for the modern authorities to be called in for assistance.

- Actions in the course of performing official duties on behalf of the SCA which would make it reasonable for the modern authorities to be called in for assistance.

- Actions that endanger the SCA.

- Violation of the Governing Documents or other rules of the SCA.

- Conviction of violation of civil or criminal law.

Membership may also be denied if the reasons for a previous revocation of membership are still considered valid by the Board.

## 2. Board Consideration

The Board will consider a request for revocation or denial of membership in the SCA under any of the following circumstances:

- Petition to the Board by 30% or more of the membership of the kingdom of residence of the person being considered for such revocation or denial who are currently members of the SCA.

- Petition by a majority of the kingdom great officers and peers of the kingdom of residence who are currently members of the SCA.

- The recommendation of a duly constituted kingdom court of chivalry.

- Documentation of cause for absolute banishment.

- For such reasons described in the Sanctions Handbook.

## 3. Notification

Upon receipt of a request for Board action affecting membership, the Board shall notify the person(s) in question of when the matter will be considered and invite all relevant documentation and appeals.

Due to the serious nature of these proceedings the Board may elect to temporarily prohibit a person's participation in Society functions until a decision on revocation and denial of membership has been reached. In such a case, the Board shall make all reasonable efforts to expedite these proceedings and prevent unnecessary delay. See the Sanctions Handbook for details of the sanction process.

## 4. Appeal

A revocation or denial of membership may be appealed, but such appeal must be accompanied by new evidence that warrants re-examination by the Board. At the conclusion of the imposed term of revocation or denial, or if an appeal as provided above is accepted by the Board, exclusion from SCA events shall be lifted, and the individual shall be allowed to (re)apply for membership in the SCA, unless membership is again denied.

## E. Reservation by the Board

The Board shall have the sole authority to define the classes of membership and establish and revise a schedule of dues. No dues may be set by any branch of the SCA. However, fees for admission to events other than regular business meetings of branches of the SCA shall not be considered dues.

# III. ADMINISTRATION

The officers of the corporation shall consist of a President, a Vice President for Operations, a Vice President for Corporate Operations, a Treasurer, a Secretary, and such others as the Board may from time to time designate. The office of President may be held by the Chairman of the Board of Directors. The office of

President may be held by the Chairman of the Board of Directors.

Officers of the corporation are elected and serve as described in the By-Laws.

## A. President

The President is the principal spokesperson for the SCA. The President may sign and authorize such instruments as he or she deems appropriate to the conduct of the SCA's proper business, and may delegate similar responsibilities. In the event of absence or incapacity of the President, the duties shall be apportioned at the discretion of the Board.

## B. Vice President for Operations

The Vice President for Operations shall manage the administration of the SCA's historical re-creations through a network of Regional Vice Presidents, known as Kingdom Seneschals. The Vice President for Operations is authorized by the Board to sign instruments required for the conduct of the SCA's historical recreations, and may delegate similar responsibilities. This officer also serves as Society Seneschal. The duties of this position are further defined in Corpora.

## C. Vice President for Corporate Operations

The Vice President for Corporate Operations shall be responsible for maintaining the membership files of the SCA; for processing membership applications and depositing membership monies as instructed by the Treasurer; and for preparing mailing lists for publications of the corporation. The Vice President for Corporate Operations is in charge of the day-to-day operations of the Corporate Office and will supervise any office staff. The Vice President of Corporate Operations shall be financially responsible for all membership monies to the Treasurer.

## D. Secretary

The Secretary shall be responsible for the regular administrative duties of the Board and the corporation, including correspondence, Minutes of all meetings of the Board, and such other administrative duties as shall be assigned by the Board or the President. The Secretary shall maintain all necessary records of the corporation not maintained by other officers or offices. The Secretary shall be responsible to the President and the Board for the regular performance of the administrative duties of the corporation.

## E. Treasurer

The Treasurer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the SCA, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and other matters customarily included in financial statements.

The Treasurer shall deposit (or cause to be deposited) all monies and other valuables in the name of and to the credit of the SCA with all such depositories as may be designated by the Board. The Treasurer shall disburse (or cause to be disbursed) the funds of the SCA as may be ordered by the Board, shall render to the Board, whenever they request it, an account of all the Treasurer's transactions as Treasurer and of the financial condition of the SCA, and shall have such other powers and perform such other duties as may be prescribed by the Board or these By-Laws.

The Treasurer shall supervise a person known as the Exchequer holding a separate position within the structure of the Society's historical re-creation. The title and duties of this position are defined in Corpora.

## F. Other Offices

The Board may designate other offices as necessary.

# IV. WAIVERS – GENERAL

A.  The General Membership waiver shall be incorporated into the Membership Application form, to be filled out by the prospective or renewing member at the time the membership application form is filled out. This Waiver covers attendance and participation at Society events.

B.  A membership card ("blue card") with a condensed form of the waiver text printed on the back shall be provided to members who have executed the general waiver as part of becoming members or renewing their memberships.

C.  Members who have not executed the general waiver as a part of becoming members or renewing their memberships shall be issued a different colored membership card and shall be subject to the provisions contained in the General Waiver Policy as if they were not members of the SCA, Inc.

D.  Non-members, and members who have not brought their blue membership cards, are required to comply with the waiver signing provisions contained in the General Waiver Policy or they shall be denied admittance to SCA sponsored activities coming within the purview of said Waiver Policy.

# V. WAIVERS - COMBAT

## A. Waivers for SCA Combat-Related Activities

Waivers are required for participation in SCA combat and related activities. The SCA General Membership waiver is the text required for use in the United States. Alternative texts may be approved by the Board for use in other countries. Proof of waiver will be established as follows:

1.  To be authorized, or to engage as an authorized participant in SCA combat or related activities, a person must present a current valid membership card indicating that the appropriate waiver is on file with the SCA, Inc. or they must sign a waiver with the same text and comply with all the provisions of that policy.

2.  To train for authorization at SCA-sponsored practice sessions, a person must either present a current valid membership card indicating that the appropriate waiver is on file with the SCA, Inc. or they must sign a waiver with the same text and comply with all the provisions of that policy.

3.  Prior to the training of a minor in any SCA combat-related activity, the parent or guardian of the minor must witness the activity, discuss it with a witnessing marshal, and execute a Waiver for the minor. The witnessing marshal must be explicitly authorized to perform this function by the Earl Marshal of the kingdom. The marshal who authorizes a minor person for any form of SCA combat-related activity must be the Kingdom Earl Marshal or the Principality Marshal. This need not be the same person as the witnessing marshal.

## B. Medical Authorization for Minors:

Any minor involved in SCA combat-related activities at an event must have a parent or properly executed Medical Authorization Form for Minors designating some adult person present at the event as able to authorize medical treatment for that minor in the case of any emergency.

# VI. WAIVERS - PROCEDURES

1.  Anyone attending any event sponsored by a branch of the SCA Inc. who is not able to present a valid SCA Inc. waiver card/blue membership card must execute a waiver as follows:

    a.  All US Branches: must execute a waiver with the text adopted by the Board of Directors at each such event, practice or function

    b.  All non-US Branches

    i.   must execute a waiver with the text adopted by the Board of Directors at each such event, practice or function, or

    ii.   must use a country-specific waiver that has been approved by the US Board of Directors, or

    iii.   must submit to the US Board of Directors a letter of legal opinion stating that the waiver requirement is not necessary in that particular country.

2. The text of all waivers must be the language approved by the Board of Directors for waiver usage, subject to individual modern jurisdictional requirements. Such alternative texts must be approved by the Board of Directors prior to usage. Roster style waivers are acceptable providing that the full text of the waiver language is included.

3. An event, for the purposes of this section only, is defined as any recreation function announced in the branch, Kingdom, or Principality newsletter. Business meetings, demos, guild meetings, dance practices, or planning sessions are specifically excluded from these provisions. Combat or Fighter practices are not excluded, and waivers must be collected from those actively participating in the combat related activities at such practices.

4. Any function at which combat related activities will occur fall under the auspices of this waiver policy, regardless of what other activities may be occurring at the function. If there is a doubt about whether a specific function falls under this policy, the Kingdom Seneschal is directly empowered by the Board to make that determination and report same in their next regularly scheduled report.

5. The local Seneschal, or other officer in charge of any function at which waivers will be required, is responsible for ensuring that a copy of that Kingdom's Law and the current Organizational Handbook are available at that function.

6. Each Kingdom shall have a single responsible officer ("Waiver Secretary") as a deputy to the Kingdom Seneschal to ensure that all required waivers, rosters, and sign-in sheets are collected and safely stored within a reasonable time after each event. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required.

7. Each Kingdom shall store all original executed waivers, rosters, and sign-in sheets, or legally accepted facsimiles, including those stored on electronic media, in such a manner that a responsible party can easily retrieve any needed waiver.

Local groups need not maintain copies of these records. Kingdoms shall maintain the adult waivers for seven years and the minor waivers for 20 years.

# VII. POLICY ON FINANCIAL RESPONSIBILITY AND REDRESS

It is the policy of the Society for Creative Anachronism, Inc. to vigorously pursue legal action and redress on the part of the Society for Creative Anachronism, Inc. and its members in any case of financial malfeasance or misfeasance involving SCA funds.

# VIII. POLICY ON ALCOHOL

Manufacturing, distributing, selling, serving, or furnishing of alcoholic beverages by the SCA or its branches or subdivisions is prohibited within the United States and its territories.

The use of any SCA funds for the purchase of potable alcohol, except for such quantities as may be necessary for cooking, is prohibited in the United States and its territories.

Officers are not prohibited from serving alcohol; however, it must be done as individuals, and not as part of their official duties as officers.

SCA_000503

Officers are not prohibited from giving gifts of alcohol; however, it must be done as individuals, and not as part of their official duties as officers. Giving or receiving gifts of alcohol in court is not considered to be part of an officer's official duties.

# IX. POLICY ON FIRST AID AT EVENTS OR SCA ACTIVITIES

While organized first aid services are desirable at events, the Society and its branches may not be placed in the position of promising to provide these services. Therefore, while branches are encouraged to have qualified volunteer first aid personnel available, they are specifically prohibited from requiring the presence of a medical or first aid officer at events, and from in any way implying that the Society's sponsorship of an event depends upon the presence of organized first aid services.

There shall be no ownership or possession by any branch or recognized guild of the Society for Creative Anachronism, Inc. of the following Medical Equipment: Automated External Defibrillators (AED).

# X. POLICY ON ELECTRONIC COMMUNICATIONS

## A. Electronic Publication of SCA Documents

When official corporate documents are published electronically on a site not sponsored by the SCA, Inc., the original copyright notice for the document must be provided along with the text. The following addition should be made to the copyright notice:

"In cases of conflict, the governing version of this document is (title of document), copyright (date) by the Society for Creative Anachronism, Inc., and obtainable in printed form from the SCA Stock Clerk, PO Box 611928, San Jose, CA 95161. Disputes over the contents of this document will be decided in favor of the printed version available from the SCA, Inc."

## B. Participation of SCA Officials in Electronic Communications Media

1. Unless otherwise stated as a prerequisite of office, electronic communication is not required of any officer. Traditional paper correspondence is always acceptable and is the default means for official correspondence.

2. The SCA, Inc. neither prohibits nor requires members' or officers' participation in electronic communications media such as newsgroups or mailing lists.

## C. Electronic Communications to and from SCA Officers

1. Electronic communications to SCA officers may be regarded as formal communications only if approved in advance by the officer, or if a non-automated confirmation of receipt is obtained.

2. Messages posted for general attention on any public electronic communications forum are not regarded as formal communications to an officer, whether or not that officer is known to participate on the forum in question. Communications posted by corporate or kingdom officers to their officer-specific forums may be considered official communications to those officers subscribed to the forum only upon return of a non-automated confirmation of receipt.

3. Any policies or procedures governing the handling of correspondence, such as maintenance of file copies for correspondence with lasting effect, apply equally to electronic mail. Officers must ensure that any electronic files are passed on in a format readable by their successor.

4. SCA officers must distinguish between their personal opinions and official statements or policies of their office in electronic communications.

SCA_000504

# XI. POLICY ON COINAGE AND CURRENCY

While the SCA, Inc. supports and encourages the study of period numismatics, it is not the policy of the SCA, Inc. to endorse or require the acceptance of privately minted coinage or other tokens at SCA-sanctioned events. The SCA, Inc. or its branches shall not require the acceptance of privately minted coinage or other tokens as payment for any goods or services at any SCA-sanctioned events. Any such transactions may be conducted at the discretion of the individuals involved, as with any other barter transaction. In such cases, compliance with applicable tax laws is the responsibility of the individuals.

# XII. POLICY ON TRADEMARKS

The names and armory (devices and badges) of all groups and awards/orders which are registered on the registry of the Society Herald to any SCA Kingdom, Principality or any branch or subgroup thereof, are owned by the SCA.  This includes names and armory of guilds and other artisan groups registered with the Society Herald by the SCA or branches thereof, including any other such marks as would be considered "collective marks" designating quality, origin or distinguishing features or goods or services.  They may be used or reproduced only upon permission of the Society President or authorized delegate.

# XIII. POLICY ON ACCESSIBILITY TO SOCIETY FUNCTIONS

The SCA, Inc. will not discriminate against any member or participant on the basis of race, sex, religion, national origin, age or disability. The SCA, Inc. will comply with all laws of the nation in which the meeting or event is held. For any meeting or event held in the United States, the SCA, Inc. will comply with the Americans with Disabilities Act. The SCA, Inc. will provide reasonable accommodations to qualified individuals with disabilities to enable all participants to fully enjoy the events whenever it is possible to do so. The SCA, Inc. will at all times attempt to provide reasonable accommodations, while preserving the fundamental nature of the SCA event.

# XIV. POLICY ON LAND USE / REAL ESTATE

Funds may be designated to the purchase or improvement of real estate by branches, provided that the source, maintenance, and purpose of any such fund are clearly designated within the branch's financial policy.

No representative of the SCA may financially obligate the SCA to the purchase or substantial improvement of real estate without prior approval of the Board of Directors. An improvement will be considered substantial if:

    a.  It requires a building permit or other clearance from the local government;

    b.  It increases the fair market value of the property; or

    c.  It is constructed in a manner that makes its portability to another site questionable or not feasible.

A separate incorporation for the purpose of holding real estate may be required by the Board of Directors.

# XV. TRANSLATION OF CORPORATE DOCUMENTS

The following clause will be placed in all documents published by the Society for Creative Anachronism, Inc. or any of its branches that are translated into a language other than English and contain rules or policies of the Society for Creative Anachronism, Inc. or that branch.

*The approved English language version of any Society for Creative Anachronism, Inc. document is the official version.  In case of conflict between the English language version and a translation into another language, the English language version governs.*

SCA_000505

## XVI. AUTHORITY TO RETAIN LEGAL COUNSEL

Only the President of the Society for Creative Anachronism, Inc., has the ability to retain legal counsel (attorney, barrister, solicitor, et. al.), whether paid or unpaid (pro bono) on behalf of the society for Creative Anachronism, Inc. or any of its branches.  No other officer, at any level of governance of the Society for Creative Anachronism, Inc. has the authority to retain (even pro bono) legal counsel (attorney, barrister, solicitor, et. al.) to advise or represent the Society for Creative Anachronism, Inc. or any branch, without prior written authorization and confirmation of the retention of such counsel from the President.

## XVII. AMENDMENT TO CORPORATE POLICIES

Under normal circumstances, the Board will publicize proposed changes to Corporate Policies in sufficient time to allow comment from the membership before making a final determination.

The Board of Directors shall give a minimum of sixty (60) calendar days' notice to Kingdom Administration of the effective date of changes made to Corporate Policies. This notice shall be in written form and the sixty days shall count from the date of mailing. In case of an emergency, less notice may be given, such notice to be no less than thirty (30) days before the implementation date for such changes. In all cases where less than sixty days' notice was given, the notice shall be accompanied by a letter of explanation of the emergency prompting the change.

## XVIII. ANTI-DISCRIMINATION POLICY

The SCA does not discriminate on the basis of race, color, religion, sex, age, national origin, veteran status, sexual orientation, gender identity, disability, size, or any other basis of discrimination prohibited by law.

April 5, 2020, Revision

# THE ARTICLES OF INCORPORATION
# OF THE SOCIETY FOR CREATIVE ANACHRONISM, INC.

CERTIFICATE OF AMENDMENT OF ARTICLES OF INCORPORATION OF

THE SOCIETY FOR CREATIVE ANACHRONISM, INCORPORATED

HILDA POWERS and CLIVEDEN CHEW HAAS certify that:

They are the president and the secretary, respectively, of the SOCIETY FOR CREATIVE ANACHRONISM, INCORPORATED, a California Non-Profit Corporation.

The Articles of Incorporation shall be amended to read as herein set forth in full:

I.   The name of this corporation shall be Society for Creative Anachronism, Incorporated.

II.   This corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for charitable purposes. The purposes for which this corporation is formed include:

   a.   Research and education in the field of pre-17th-Century Western Culture.

   b.   Generally, to engage in research; publish material of relevance and interest to the field of pre-17th-Century Western Culture; to present activities and events which re-create the environment of said era, such as, but not limited to, tournaments, jousts, fairs, dances, classes, et cetera; to acquire authentic or reproduced replicas of chattels representative of said era; and to collect a library.

   c.   This corporation shall have and exercise all rights and powers conferred upon nonprofit corporations under the laws of the State of California, provided that all activities shall be incidental to and in the furtherance of the purposes set forth in II.a. and b. above.

III.   In accordance with the provisions of Section 9913 of the California Corporations Code, this corporation elects to be governed by all of the provisions of the California Nonprofit Public Benefit Corporation Law not otherwise applicable to this corporation under Sections 9910-9927 of the Corporations Code.

IV.   This corporation is organized and operated exclusively for charitable purposes within the meaning of Section 501(c) (3) of the Internal Revenue Code. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (1) by a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law), or (2) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States Internal Revenue Law).

   No substantial part of the activities of this corporation shall consist of the carrying on of propaganda or otherwise attempting to influence legislation, nor shall this corporation participate in or intervene in (including the publishing or distributing of statements) any political campaign on behalf of (or in opposition to) any candidate for public office.

The property of this corporation is irrevocably dedicated to charitable purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for charitable purposes, and which has established its tax exempt status under Section 501(c) (3) of the Internal Revenue Code.

# SOCIETY FOR CREATIVE ANACHRONISM, INC. SANCTIONS PROCEDURES AND POLICIES MANUAL

Effective as of 11/15/2019
Updated January 2020

Further updated October
2020

Copyright 2020 by The Society for Creative Anachronism, Inc. All Rights Reserved.

This handbook is an official publication of The Society for Creative Anachronism, Inc., a nonprofit organization dedicated to research and recreation of pre-17th century European history. Copies of this document can be ordered from: SCA Marketplace, P.O. Box 360789, Milpitas, CA 95036-0789, or downloaded at www.sca.org.

Members of The Society for Creative Anachronism, Inc., may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the content. The contents of the document are posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.

## Section 1: Intent of these Procedures and Policies; Purpose of Sanctions

A. This document sets forth the Sanction Procedures and Policies for the Society for Creative Anachronism. Where an area is governed by an affiliate agreement, the affiliate organization's rules will apply and may differ from the procedures outlined in this document.

B. The purpose of a sanction is to protect the SCA and participants by removing or limiting the participation of an individual who has violated the published rules and policies of the SCA, Kingdom law, or modern law. Behavior that places the SCA or another participant at substantial risk is also subject to sanction by the Kingdom or the Society.

## Section 2: Corporate Officers and Crowns; Authority to Act, generally

A. The Board of Directors of the SCA reserves the right to sanction any individual or group of individuals in the SCA regardless of membership status, title or position. The Board reserves the sole right to modify or waive these policies as it deems necessary. The Board has the final authority on all sanctions.

B. The Society Seneschal may investigate any complaint or incident.

C. The Kingdom Seneschal may preliminarily investigate any complaint or incident within the boundaries of their Kingdom. They may notify or consult with the Society Seneschal as needed.

D. The Crown may impose a royal sanction against an individual for violations of any provision of Corpora, the SCA Corporate Documents, and/or Kingdom Law, or suspend any Kingdom Officer for misconduct of office for the duration of their reign, consistent with this Manual.

## Section 3: Overview of Administrative Actions and Sanctions

### A. Administrative Actions

1. Suspension of an Officer: Officers may be suspended by the Crown or their Superior Officer for cause stated in writing to the officer. Suspension by the Crown is limited to the duration of the reign. Suspension by the Superior Officer is limited to not more than 90 days. The Deputy to the suspended Officer shall assume the responsibility of office during the suspension.

2. Removal from Office of a Warranted Kingdom Officer or Deputy: Removal of a warranted deputy or warranted local officer requires the approval of both the Kingdom Officer and the Crown of the Kingdom. In the event that the Crown and Kingdom Officer cannot agree to remove the deputy, they will refer the question of removal to the appropriate Society Officer. Removal of a warranted Kingdom Great Officer requires the approval of both the Crown and the relevant Society Officer.

3. If an officer is removed on grounds that they reasonably believe are based upon discrimination of any protected class, they may request that the Society Seneschal or President review the removal.

4. Other Administrative Actions: As defined in Corpora I.F, administrative actions are not limited to suspension or removal from office. Other administrative actions may be taken by kingdom officers in consultation with the Crown or appropriate Society officer. Such actions may include, but are not limited to, temporary removal of authorization or permission to participate in certain aspects of SCA activity.[3]

5. Administrative Actions must be proportional and appropriately related to the issue causing the action. The cause of the action must be explained in writing to the subject of the Administrative Action. They must also be informed of their right to appeal the Administrative Action to the Board of Directors.[3]

6. Removal of the ability to participate in an aspect of SCA activity within a kingdom cannot exceed the term of office of the officer imposing the restriction. If the next officer wishes to extend the restriction, and the Crown or Society Officer agrees, this can be done, but the total period of the exclusion cannot exceed two years. Only the Board of Directors can permanently ban somebody from an office or from participation in a particular activity.[3]

7. Administrative Actions do not need to be announced in Court nor published in the Kingdom newsletter.

## Section 4: Overview of Kingdom and Society Sanctions

### A. Kingdom Sanction: Banishment from the Royal Presence

1. A Banishment from the Royal Presence, at any function, activity or event which the Sovereign or Consort attend, precludes the sanctioned individual from attending any Royal Court, any meetings where the Crown is present including Peerage or officer meetings, entry into the Royal Encampment, contacting the Crown in any manner, or otherwise being within 50 feet of the Crown.[1]

2. This Sanction is issued by the Crown.

3. The Sanction expires at the end of the reign. While any Sanction may be appealed, the Crown has broad rights to impose a Banishment from the Royal Presence. Therefore, appeals of this sanction will not generally be considered.[3]

4. This Sanction must be read in Court and published in the Kingdom newsletter.

### B. Kingdom Sanction: Exile from the Kingdom

1. Exile from the Kingdom precludes engaging in any SCA activity in the Kingdom that issued the sanction. This does not preclude participation in activities in other Kingdoms. This precludes participation in any Kingdom-controlled social or electronic media.

2. This Sanction is issued by the Crown.

3. This Sanction terminates at the end of the reign. This Sanction must be read in Court and published in the Kingdom newsletter.

4. No person shall be subjected to a continuance of this Sanction for more than two consecutive reigns under the circumstances that prompted the original Crown to act.
5. The Society Seneschal will present this Sanction to the Board of Directors for review.

## C. **Kingdom Sanction: Temporary Removal from Participation in the Society**

1. A Temporary Removal from Participation in the Society is issued by the Crown and Kingdom Seneschal after consultation with the Society Seneschal. Temporary Removal from Participation precludes the individual from attendance or participation in any manner at any SCA activity, event, practice, or official gathering for any reason, at any time. This includes a ban on participation in officially recognized SCA social media (e.g. "Facebook") sites, officially recognized SCA electronic mail lists, and officially recognized SCA web pages.
2. This Sanction must be read in Court and published in the Kingdom newsletter.
3. The Society Seneschal will present this Sanction to the Board of Directors for review.
4. Temporary Removal from Participation will last until the Board makes a final decision on the Sanction.
5. Grounds for the issuance of a Temporary Removal from Participation in the Society include, but are not limited to:
   a. Serious transgressions of SCA rules which include violation of the Governing Documents or other rules of the SCA;
   b. Theft, misappropriation, or deliberate misuse of SCA funds or property;
   c. Situations in which an individual is under criminal investigation by a modern law enforcement agency or is considered to be a risk to the SCA or its participants due to conviction of a dangerous felony or violation of a civil law or court order which could put the SCA or its participants at risk;
   d. Behavior which could put the SCA or its participants at risk or fear of imminent harm;
   e. Actions that endanger public health and safety.

## D. **Society Sanction: Emergency Temporary Removal from Participation**

1. An Emergency Temporary Removal from Participation may be issued by the Society Seneschal with the approval of the Chairman of the Board, after consultation with the Crown and/or Kingdom Seneschal of the applicable Kingdom. The Temporary Removal from Participation remains in effect until the Board reviews the decision and makes a final determination on the Removal, which can include a Revocation of Membership and Denial of Participation or lifting the Sanction, amongst other things.
2. The Society Seneschal must immediately notify the Crown and Kingdom Seneschal of the affected Kingdom and must also notify the Chairman of the

Board and the President within 24 hours following the issuance of the Sanction. The Chairman is responsible for notifying the Board within a reasonable time.

3. Notification of the Emergency Temporary Removal from Participation shall be made to the public in a form and format deemed appropriate by the Society Seneschal and President.
4. The Society Seneschal will present this Sanction to the Board of Directors for review.
5. Emergency Temporary Removal from Participation will last until the Board makes a final decision on the Sanction.

## Section 5: Initial Notification of Sanction

### A. Notice of Kingdom Sanction

1. The Kingdom Seneschal must notify or make a reasonable attempt to notify the sanctioned person via email or telephone as soon as possible, but must also notify the sanctioned person by certified postal mail within 15 days of the announcement in Royal Court.
2. If the person's mailing address cannot be obtained, the Kingdom Seneschal must document attempts to notify the person by other means, and must include that documentation in the sanctions file.[3]
3. The Kingdom Seneschal should notify the Society Seneschal of the basic facts of the Sanction within 24 hours of issuance.

### B. Notice of Emergency Temporary Removal from Participation

1. The Society Seneschal must notify or make a reasonable attempt to notify the sanctioned person via email or telephone as soon as possible, but must also notify the sanctioned person by certified postal mail within 15 days of the announcement of the Emergency Temporary Removal from Participation. If the person's mailing address cannot be obtained, the Society Seneschal must document attempts to notify the person by other means.[3]
2. The Society Seneschal must notify the President and Chairman within 24 hours following the issuance of the Sanction. The Chairman is responsible for notifying the Board within a reasonable time.
3. After an Emergency Temporary Removal from Participation has been issued, the appropriate Kingdom Seneschal(s) shall privately notify all local Seneschals in the affected Kingdom(s) of the Sanction.
4. Additional Kingdoms may need to be informed as necessary in the determination of the Society Seneschal.

### C. Contents of Notification

The written notice shall contain:

1. Type of Sanction/Description of conditions

2. Issuing authority (Crown and/or Kingdom Seneschal or Society Seneschal)
3. Date the Sanction was issued
4. For Kingdom Sanctions, the event at which the Sanction was announced
5. Time limit of the Sanction (if applicable)
6. A brief statement of facts supporting the sanction
7. Right of appeal

D. **Responsibility for Notification[3]**

1. At both the Kingdom and Society levels, a good-faith attempt to notify the sanctioned individual at all appropriate junctures must be made and documented.
2. Inability of the SCA or its officers to obtain contact information for an individual, after due diligence, does not exempt the individual from being sanctioned.

**Section 6: Standard Sanction Process[2]**

A. The Kingdom Seneschal transmits the sanction package to the Society Seneschal. The package will include the following:
1. A complete statement of facts from both the Crown and Kingdom Seneschal. Both statements must state why the sanction was issued.
2. The statement of facts from the Kingdom Seneschal must also describe the initial notice or attempt at initial notice of the Sanction to the sanctioned person; a copy of the initial notification letter; and proof of sending the letter by certified mail to the sanctioned party.
3. Proof of publication in the Kingdom newsletter or information indicating when the publication will take place.
4. Any statements from the Complainant(s) and any witnesses.
5. Statement from the sanctioned person, if any.
B. Society Level Process

The Society Seneschal shall:

1. For a Kingdom Sanction, verify that the sanction package is complete and that all necessary steps have been taken.
2. For an Emergency Temporary Removal from Participation, prepare documentation of the Sanction.
3. Present the Sanction, including the full package and the case cover sheet, to the Board of Directors at their next scheduled meeting, or within 30 days, whichever is later.[3]
C. Board of Directors Process
1. The Board of Directors will review the sanctions package.
2. At its discretion the Board may:

a. Uphold or overturn the sanction.

      b. Extend the sanction and request the Society Seneschal investigate the matter for a determination of the need for additional action up to and including Revocation of Membership and Denial of Participation.

      c. Impose other sanctions as needed.

      d. Take any action the Board finds necessary under the circumstances.

3. Before the Board can consider a Revocation of Membership and Denial of Participation, the sanctioned person must be notified in accord with the Corporate Policies of the SCA, Inc. The Society Seneschal is responsible for sending this notification, which may be by email or postal mail.[3]

## Section 7: Appeals Process[2]

### A. Appealing a Kingdom Sanction to the Board of Directors

1. Any person who has received a Kingdom Sanction may appeal to the Board of Directors. Only the sanctioned person may bring the appeal.
2. Appeals must have the following:

      a. An introductory letter explaining the circumstances surrounding the Sanction.

      b. Any information that the Board should consider which the sanctioned individual believes supports the appeal.

3. The person should provide all evidence to support the appeal, emailed to the Society Seneschal (seneschal@sca.org) or mailed to the SCA Corporate Office.

4. All questions about an appeal should be directed to the Society Seneschal.

### B. Appealing a Sanction from the Board of Directors

1. Only a sanctioned person may file an appeal.
2. Appeals may only be filed if there exists either sufficient evidence to conclude that the Board would have reached a different decision had the evidence discovered been reviewed by the Board, or a discovery of a material error of fact.
3. The Board is the ultimate determiner and arbiter of the rules of the Society, regardless of what authority it may delegate elsewhere. All members of the Society shall therefore have the right of appeal to the Board, provided they follow proper channels for complaint and appeal.
4. The person should provide all evidence to support the appeal, emailed to the Society Seneschal (seneschal@sca.org) or mailed to the SCA Corporate Office.
5. All questions about an appeal should be directed to the Society Seneschal.

**Section 8: Confidentiality within the Sanctions Process**

**A. Confidentiality of the accused from public statements regarding allegations**

The Crown, the Kingdom Seneschal, the Society Seneschal, and any appointed investigator are prohibited from commenting on any ongoing sanction or investigation into any matter that may lead to a sanction. This prohibition does not include necessary privileged contact with additional appropriate Society and Kingdom officers.[3]

**B. Confidentiality of Complainant and Witness Identify**

The statement of facts in the sanction letter shall be redacted in order not to directly identify the complainant or witnesses, who shall be referred to as "Complainant (#)" or "Witness (#)".

## SANCTION MANUAL APPENDIX

### Footnotes and Updates

1. January 2020: The definition of the sanction Banishment from the Royal Presence was reviewed and further defined at the January 2020 Board meeting. It returns to an older definition of Banishment from the Royal Presence that prevents the sanction from being constructively used as an Exile from the Kingdom.
2. January 2020: The Sanction Casefile version 2.6 contains all the forms for Sanctions and Appeals.
3. October 2020: Changes further defining Administrative Actions, rights of appeal, and notification requirements were added. Confidentiality requirements were refined to make clear that kingdom and Society officers may be contacted as necessary.

# SCA Policy on Harassment and Bullying
# Revised 7/24/2022

1. The SCA prohibits bullying and harassment of all individual and groups.

2. Bullying is ongoing and unwelcome behavior which involves the use of influence, threat, intimidation, or coercion to cause hurt or harm to another person or group of people. When the bullying behavior is based on a protected class, that behavior is defined as harassment. Protected classes include race, sex, religion, national origin, gender, sexual orientation, age, or disability.

3. The test for bullying is both the reasonableness of the behavior and the impact of that behavior on the recipient.

4. Bullying and harassment may be overt, as in the following non-inclusive list of examples:

    a. Verbal abuse, including using racial, homophobic, transphobic, ableist epithets, etc.

    b. Non-consensual physical contact, threats of violence, or threatening gestures

    c. Displaying material that is offensive, degrading, or threatening to a protected class

    d. Consistent demeaning remarks or malicious teasing

    e. Stalking or predatory behavior

5. It may also be covert, as in the following non-inclusive list of examples:

    a. Spreading rumors or innuendo with malicious intent.

    b. Deliberate exclusion, isolation, or alienation of an individual without just cause.

    c. Using rank, title, or office to intimidate others.

6. Provided that the behavior does not rise to the criteria listed above, bullying and harassment is not:

    a. Single episodes of social rejection, dislike, tactlessness, or forgetfulness

    b. Mutual arguments, disagreements, or fights

    c. The termination, mutual or not, of a romantic relationship or friendship

    d. Reasonable constructive feedback or critique

    e. Reasonable instructions or guidance issued by officers or agents of the SCA in the performance of their duties.

7. Participants engaging in bullying/harassment are subject to appropriate sanctions. If an individual believes they have been subjected to or have witnessed harassment, bullying, or retaliation, that person should contact a seneschal, the President of the SCA, or that kingdom's Board Ombudsman.

8. The following statement must be posted at gate/troll at every SCA event in a size large enough for people to see it as they enter our events. This language must likewise be quoted in ALL site handouts at every event or site where a handout is made available.

**THE SCA PROHIBITS HARASSMENT AND BULLYING OF ALL INDIVIDUALS AND GROUPS.**

Participants engaging in this behavior are subject to appropriate sanctions. If you are subjected to harassment, bullying or retaliation, or if you become aware of anyone being harassed or bullied, contact a seneschal, President of the SCA, or your Kingdom's Board Ombudsman.



# Society
# for Creative
# Anachronism



# Seneschal Handbook

April 2021

Copyright 2021 by The Society for Creative Anachronism, Inc. All Rights Reserved. This handbook is an official publication of The Society for Creative Anachronism, Inc., a nonprofit organization dedicated to research and recreation of pre-17th century history. Copies of  this document can be ordered from SCA Marketplace, P.O. Box 360789, Milpitas, CA 95036-0789,  or downloaded at http://www.sca.org.


Members of The Society for Creative Anachronism, Inc., may photocopy this work in whole or in part for SCA use provided copyright credit is given and no changes are made to the content. The contents of the document are posted at http://www.sca.org and further reproduction on other Internet sites is expressly forbidden.

2

# Guidelines to Ethical Decision Making for SCA Seneschals

- Always comprehend the nature of your words and actions and how they reflect upon you, your Kingdom and the SCA.

- Clarify your goals…what are your short term and long-term goals, i.e., what is the purpose for taking action or not taking action.

- Always strive for continuous personal improvement in serving others.

- Be aware of your ethical responsibility as an SCA Officer, i.e., without being respectful, caring, trustworthy, responsible, and fair, you cannot fully serve the SCA's participants.

- In gathering facts, always attempt to get accurate, first-hand information from each side of a situation or conflict, speak directly to the parties or knowledgeable witnesses, and attempt to obtain complaints or statements in writing.

- Always be willing to adjust according to your observations and as such, do not take a position and then back it up with facts; rather let the facts establish your position.

SCA_000521

# Contents

**Guidelines to Ethical Decision Making for SCA Seneschals** . . . . **3**

**I. Introduction** . . . . . . . . . . **6**

**II. Affiliate and International Information** . . . . . . . **7**

**III. Preparing for the Kingdom Seneschal Job** . . . . . . **8**

**IV. Arbitrating the Rules and Their Precedence** . . . . . . **10**

**V. Reporting and Communications** . . . . . . . **11**

**VI. Overseeing Sanctions and Investigations** . . . . . . **17**

**VII. Deputies and Succession Planning** . . . . . . . **20**

**VIII. Kingdom Financial Matters** . . . . . . . . **21**

**IX. Supervising Branch Seneschals** . . . . . . . **23**

**X. Dealing with Modern Law and Legal Authorities** . . . . . **27**

**XI. Dealing with Minor/Youth Related Policies** . . . . . . **28**

**XII. Overseeing Background Checks** . . . . . . . **29**

**XIII. Managing Waivers and Event Sign-in Sheets** . . . . . **31**

**XIV. Overseeing Contracts and Agreements** . . . . . . **34**

**XV. Overseeing Kingdom Events** . . . . . . . . **34**

**XVI. Demo Policy** . . . . . . . . . . **37**

**XVII. Service Animal Policy** . . . . . . . . . **39**

**XVIII. Policy on Religious Ceremonies and Events** . . . . . **40**

**XIX. Harassment and Bullying** . . . . . . . . **40**

**XX. Sexual Misconduct Policy** . . . . . . . . **42**

**XXI. Firearms Policy** . . . . . . . . . . **43**

**XXII. Policy on Hunting, Slaughtering, and Butchering** . . . . . **44**

SCA_000522

**XXIII. Changing and Maintaining Kingdom Law** . . . . . . **44**

**XXIV. Managing Kingdom Branch Changes** . . . . . . **45**

**XXV. Insurance Matters** . . . . . . . . . **57**

**XXVI. Oversight of Society-Owned Trailers** . . . . . . **58**

**XXVII. Registration and Legal Agents** . . . . . . **59**

**XXVIII. Society Seneschal Policies and Interpretations** . . . . . **60**

**XXIX. Reporting Table** . . . . . . . . . **61**

**XXX. Known World Event Policy** . . . . . . . **63**

**XXXI. Annotations Referring to Governing Documents and Policy Decisions** . . **68**

SCA_000523

# I.  **Introduction**

1.  The Seneschal's Handbook is an official document of the Society for Creative Anachronism, and as such delineates policy, procedure, and recommended best practices for SCA branch operations. This Handbook supersedes all prior versions.

2.  This Handbook is a living document, and as changes to policies or procedures are needed, the Office of the Society Seneschal will issue policy statements, policy interpretations, and implementation guidance. As these are upheld by the Board of Directors, changes will be issued as necessary and incorporated or appended to this Handbook.

3.  Superscript annotations throughout refer to Section XXXI, which contains references to policy decisions and the Governing Documents.

4.  The information included herein is specifically noted as Seneschal policy and has been approved by the SCA Board of Directors.

5.  This document supports and complements the implementation of the governing documents by branches of the SCA, but does not supersede or supplant anything in the governing documents. While this Handbook is meant primarily for Kingdom Seneschals, all branch Seneschals should use the information contained herein.

6.  Kingdom Seneschals are first and foremost Corporate Officers of the SCA, Inc. They are the designated officers acting on behalf of the Corporation and its interests and policies on a local level in their regions, and the local officers representing and acting on behalf of the local and regional interests of their Kingdoms to the Corporation. Seneschals are responsible for coordinating the administration and ensuring the proper and effective operation of the Society's historical "game-side" re-creation.

7.  While the Seneschal is a very important position in any branch, it is essential to remember that the position is a part of a larger team of branch officers who make the SCA happen. The office of the Seneschal is a facilitator of policy and procedure from the local to Corporate level. Successful Seneschals avail themselves of good interpersonal and diplomatic skills, attention to detail, and objective issue management. Seneschals must work with and through people, and their success is completely dependent on the goodwill and relationships they can manage and foster.

8.  The official job title of any SCA Kingdom Seneschal is "Regional Vice-President of the SCA, Inc."[1] The Kingdom Seneschal is the only officer at the Kingdom level who is also defined as a Corporate Officer. Note that different arrangements may exist within affiliate organizations.

9.  The Kingdom Seneschal is the Kingdom's legal representative of the SCA, Inc. within their Kingdom and has responsibility for and authority in legal matters within the Kingdom.[2] They are the interpreter/arbiter of Kingdom law and Kingdom Seneschallate Policies. They are ultimately the one responsible for real-world legal, financial, and operational matters: sites, contracts, waiver policy, and making sure the SCA governing documents are followed. They may delegate some of this authority to local Seneschals and Event Stewards as appropriate under these documents and in accordance with Kingdom culture.

10. There is often much confusion about the separate lines of authority between the Kingdom Seneschal and the Crown. Those lines can be delineated as follows:

SCA_000524

a. The Crown has all ceremonial responsibility and authority in making decisions regarding Kingdom courts, awards, etc. They are in charge of administering the "game side" of the SCA in their Kingdom, within the confines of the Governing Documents and current Kingdom Law, and are responsible for fostering an appropriate atmosphere of participation within their Kingdom.

b. The Crown may create or change laws within the Kingdom, while following all internal requirements, though these laws may not conflict with modern law or any higher-level SCA policy or document.

c. The Crown is responsible for monitoring and confirming the performance and conduct of Kingdom officers, and appointing, removing, and replacing such officers when necessary in conjunction with Society officers and the laws of their Kingdom and the SCA.[3]

d. The Kingdom Seneschal is the legal representative for the Kingdom and retains control over interface with the modern world. This includes primary responsibility for investigating issues related to possible sanctions by the Crown.

e. The Kingdom Seneschal is responsible for making sure that the Kingdom's laws and actions are in accordance with the governing documents of the SCA, and that modern legal requirements in the appropriate jurisdictions are followed.

f. A Kingdom Seneschal should keep the Crown informed of their actions and decisions. The Kingdom Seneschal and Crown must work cooperatively because their areas of authority frequently overlap.

11. In Kingdoms that are wholly or partly covered by an SCA affiliate organization, certain policies or rules may differ as defined in the affiliation agreements or other board rulings. Seneschals should be aware of these differences and act accordingly.

12. Regarding chain of command, Kingdom Seneschals report to the Society Seneschal who, in turn, reports to the SCA President who reports to the SCA's Board of Directors.[4]

# II.  Affiliate and International Information

## A.  General Information

The SCA, Inc. is responsible for the oversight of the whole of the SCA. In turn, there are several constituent, affiliate organizations that accept Corpora but cover areas of different (potentially vastly different) modern law. The SCA recognizes the absolute precedence of law issued by civil authorities over any of its internal rules. The SCA, Inc. as a corporate entity, along with all of its members as citizens, must obey the law of whatever jurisdictions apply to them in exactly the same fashion as all other corporations or citizens in those jurisdictions.[5] Any Seneschal is responsible for insuring compliance with modern law, but if you are a Kingdom Seneschal outside of the United States (US) and all or part of your Kingdom is under an affiliate agreement or agreements, make sure to check with your affiliate's governing documents for any exemptions or exceptions that your group may have been granted. Additionally, your local laws will be different than U.S. laws; while this document attempts to be of general applicability, make sure to check your local laws for differences.

7

# III.  **Preparing for the Kingdom Seneschal Job**

## A. **Warrant of Office**

1. Your warrant makes you the Kingdom Seneschal, officially and legally. Ideally your predecessor initiated the process of obtaining your warrant. Kingdom officers may not simply appear on rosters, because Corpora specifies that officers whose appointments require confirmation at the Corporate level must have individual warrants.[6]

2. Kingdom Seneschals must use the Executive Warrant form located at https://www.sca.org/wp-content/uploads/2019/12/Warrant-exec.pdf, which must be completed as prescribed in Corpora.

3. Once the Crown signs the warrant, it must be sent to the Society Seneschal, who also must sign it. It is your responsibility to either send it or ensure the Crown sends the document. Keep a copy of the warrant for your files. Refer to yourself as Acting Seneschal until you have a fully signed warrant, but don't wait for your warrant to get to work.

4. Kingdom Law and custom will control the length of your term of office. Within broad limits, the length of your term, the application of a period of probation, and the availability of renewals are all left to your Kingdom.

5. Don't let your warrant expire. Get a new warrant for yourself or your successor before your current warrant expires. The 45-day grace period mentioned in Corpora is designed to protect the Kingdom in case of unavoidable delays in the paperwork, not to provide a guaranteed extension of your term.[7] It is recommended that you place a reminder for yourself on your calendar as soon as you receive your new warrant to renew your warrant at least 30 days prior to its expiration.

## B. **Assemble a Reference Library, Resources, and Tools**

1. From Corporate you will receive:

a. Listing Inclusion on the Inter-Kingdom Directory on sca.org, which lists Corporate staff and Kingdom Seneschals. Crowns, Royal Heirs, Seneschals, Exchequers, and Chroniclers for all Kingdoms. Your modern and SCA names, phone number, and officer email address will also be listed on the Society Seneschal's website. Please check your listing to ensure accuracy.

b. The Electronic Membership Listing, which is emailed monthly by the Registry to allow you to manage membership requirements in your Kingdom. If all or part of your Kingdom is covered by an affiliate organization, you should make arrangements with the appropriate registry to obtain membership information.

c. An updated list of revoked memberships, which is sent out monthly by the Corporate Office (comes with the membership list).

d. An updated list of people in your kingdom who have current SCA background checks.

2. From the Society Seneschal you should request:

8

SCA_000526

a. Big Book of Banishments. This is a document that shows all persons subject to sanctions, including the severity and duration of each sanction. Updates are sent to Kingdom Seneschals periodically. You may share this information with your local Seneschals. However, it needs to be read with care; it contains **all** Board actions regarding complaints and sanctions, including when sanctions are lifted, or the Board chooses not to impose a sanction.

b. You should send an email to your Kingdom's Ombudsman on the Board of Directors to introduce yourself and facilitate communication (email addresses are available on the SCA website).

3. From online sources you should download and familiarize yourself with:

a. The SCA's Organizational Handbook which includes Corpora, Bylaws, and the Corporate Policies of the SCA.

b. The SCA Seneschal's Handbook (this document)

c. Society and Corporate Officers' Handbook

d. SCA Branch Financial Policy

e. Your own Kingdom's financial policy and current law, as well as recent past editions

f. Any current officer handbooks your Kingdom uses.

g. The SCA Census

h. Insurance Ordering Instructions from sca.org (within affiliates, separate insurance arrangements exist)

i. http://www.sca.org/docs/library.html#officers is invaluable.

## C. **Avoiding Burnout**

1. No matter how much you like being Seneschal, you are nonetheless in danger of burning out. The rewards are internal and intangible, and the costs in time, money, and peace of mind are great. Accept that you are at risk and take steps to monitor yourself to avoid the possibility. Be aware when you are in over your head.

2. Classic burnout happens when the sufferer finds their job intolerable and impossibly dear at the same time. The officer may need help but is hesitant to ask for it for fear of appearing incompetent. This should never be the case. Please know that you are encouraged to ask questions, accept help, and delegate when possible and appropriate. This is a very large, demanding job; while it provides great benefits and is of immense importance, it should not drive you out of the SCA after your term or cause you to end your term prematurely.

3. Once you accept the possibility, you can protect yourself. Conserve and refresh yourself as needed, take breaks, and start training a couple of potential successors while you still feel strong enough to go on. Make certain to keep doing the things that help you find the fun in the SCA.

SCA_000527

4. Step down while you are ahead. It is better to regret leaving an office than to keep it so long you regret the day you took it! When your term is up, consider very carefully whether it is appropriate to extend.

# IV.   Arbitrating the Rules and their Precedence

## A. Guidelines

1. Modern law and local regulations always take precedence over any organizational requirement or policy, and no "game-side" situation or circumstance should ever hinder or supersede modern law and local regulations. Where modern law differs in different parts of the Kingdom, then the most appropriate jurisdiction should apply – i.e., that which applies where the event or activity itself is held. If in doubt, contact the Society Seneschal.

2. Within the SCA, Inc., if there is any conflict among the provisions of the Corporate rules listed below, those higher on the list will govern over those lower. Policies and handbooks are guidelines to help facilitate and interpret our rules and governing documents for those responsible for administering our organization and implementing our rules. Ultimately, however, the Board and all Corporate Officers are responsible to modern law and our governing documents.

3. Kingdoms, Principalities, and Baronies can add local guidelines to govern the running of their lands, which would then not apply in other SCA lands. They may be used to "add to" the procedures and restrictions defined in a document "higher up" in the precedence, as long as they do not contradict or overrule the higher-level rules. Kingdoms can be more restrictive, but not less restrictive, than Society rules. For example, the Crown cannot write a law saying that the Kingdom Financial Committee is comprised of only two individuals (in contravention of the more restrictive SCA financial policy requiring three individuals), or that the Kingdom may allow grappling on the armored combat field, since that violates the more restrictive SCA marshallate rules banning such behavior. The Kingdom could, however, ban thrusting in combat – since that would be more restrictive than SCA level rules which currently allow such behavior.

4. Note once again that different rules may apply in affiliates. While they are bound by Corpora, they have many exceptions or modifications required to fit in with local law. Make sure to check these affiliate documents when dealing with legal matters.

## B. Order of Precedence[8]

1. Modern Law

2. The By-Laws of the Society for Creative Anachronism (SCA, Inc.)

3. The Corporate Policies of the SCA, Inc. (Different policies may apply to affiliates.)

4. The Corpora of the SCA, Inc.

5. Affiliate governing documents, if applicable

6. Interpretations of Corpora by the Society Seneschal, approved by the Board of Directors

SCA_000528

7. Corporate Officer Policies and Handbooks

8. Individual Kingdom Financial Policies (Different policies may apply to affiliates.)

9. Kingdom Law

10. Decisions of the Crown

11. Kingdom Officer Policies and Handbooks

12. Principality Law

13. Decisions of the Coronet

14. Principality Officer Policies and Handbooks

## C. **Treaties and Charters**

1. Treaties between Kingdoms are considered game-side only, can be broken at will by the Crown, are non-enforceable, and are meant to add flavor and depth to the SCA experience; they hold no actual legal weight. Please note that large-event negotiations, such as those that determine the legal structure and finances of Pennsic, Estrella, etc. do not fall in this category and should be changed only with the agreement of all parties.[9]

2. Citizenship treaties: In accordance with the definition of "Subject" in the glossary of Corpora, some Kingdoms have chosen to create "citizenship treaties" to cover people who participate mostly in a Kingdom other than the one in which they physically reside. Such treaties are created at the pleasure of the royalty of the affected realms, and can be set up however the Kingdoms wish, but must be agreed to by the Crowns of all the involved Kingdoms.[10]

3. Branches and groups such as orders and guilds are permitted to create charters if they find it useful to codify their customs. Charters are primarily administrative tools that can help the group to define structure and procedures. Unless specifically written into Kingdom or Principality law, organizational charters do not have the force of law. Branch charters may not be written into law.[11]

# V.   **Reporting and Communications**

## A. **Quarterly Reports to the Society Seneschal**

1. Each Kingdom Seneschal must send a quarterly report to the Society Seneschal by the first of March, June, September, and December.

2. Use the online reporting tool found on the Society Seneschal's website.

3. Be sure to copy (cc) the Board Ombudsman for your kingdom.

## B. **Reporting Crown Victors**

11

1. Kingdom Seneschals must notify the Society Seneschal within 48 hours, via text or preferably email, of the winners of the Crown Lists along with their full contact information.

2. Be sure to copy (cc) the Board Ombudsman for your kingdom.

## C. **48- to 72-Hour Reply Goal**

1. Kingdom Seneschals should try for a 48- to 72-hour turnaround on all email and phone communications. A simple "Got your message, I will get back to you" is fine to ensure prompt response to all communications.

2. A designated representative may respond in times when the Seneschal may be unavailable for 72 hours (business trips, non-SCA vacation, Pennsic, etc.).

## D. **Emergency and Sanction Communications**

1. Notify the Society Seneschal of any impending royal or administrative sanctions (all types) as soon as it is reasonable.[12] If the Kingdom Seneschal tells the Society Seneschal before the royalty pronounces the sanction, people can work together to make sure that the paperwork is all in order and proper procedures are being followed from the beginning. It has proven perilous for a Kingdom Seneschal or Crown to initiate sanctions that will require Corporate-level review without prior coordination with the Society Seneschal or a designated deputy. The Board can, and does, sanction Kingdom-level staff and/or Crowns who impose sanctions inappropriately.

2. Immediately notify the Society Seneschal about any occurrences that made it necessary to call the modern authorities (law enforcement, fire department, emergency medical) to the site of an SCA activity or event.[13] Such emergencies include injuries in which the victim is transported by EMS or ambulance.

3. Immediately notify the Society Seneschal of any threatened lawsuits.

4. Immediately notify the Society Seneschal of any incidents that may produce a claim on SCA insurance; within affiliates, additionally notify the relevant local officer.

5. Immediately notify the Society Seneschal and Crown of any suspected thefts, embezzlements, or other financial irregularities involving Kingdom or branch funds, and ensure that the Kingdom Exchequer notifies the Society Exchequer immediately.[14] Kingdom Seneschals are not to attempt to "make a deal" or negotiate in any way with the alleged perpetrator. Follow the procedures set forth by the Society Exchequer and branch financial policy for what to do in case of a theft from the SCA.

6. Immediately notify the Society Seneschal if you believe that the Crown's actions or the actions of other Great Officers are violating the rules of the SCA, Inc. or the laws of the jurisdiction under which the Kingdom falls.

## E. **Communication within the Kingdom**

1. Ensure Kingdom officers' meetings or curiae occur regularly as required by Kingdom Law and appropriate for Kingdom tradition. Often the requirements for these are specified in

12

your Kingdom Law. Prepare an agenda before the meeting. Discuss the agenda with the Crown in advance of the meeting, and make sure any items they wish to discuss are included on the agenda. Preside if you can. If law and custom give this job to the Crown, make sure you sit near the Crown, and take an active interest in the entire meeting. If you are not running the meeting, assist in keeping things moving and bring the discussion back to the topic at hand when it strays. Share the results with the populace.

2.  Arbitrate disputes where possible. Encourage people to come to you or your designee with disputes they cannot settle for themselves. Stay out of feuds yourself. Often disputes are best settled at the level at which they occur. Attempt to catch issues early; it is useful to have Regional deputies who can spot and deal with issues before they become large problems. In-Kingdom arbitration should almost always be the first step if possible, rather than a request for official Board intervention. When in doubt, it is suggested that you request advice on how to manage disputes from the Society Seneschal.

3.  Establish yourself as a source of reliable advice. Refer to your reference library when in any doubt as to an issue or question. Do not rely on your memory of what Kingdom Law or the Governing Documents say; double-check. Answer all questions cheerfully and patiently, with as much substantive information as you can, plus a referral to the officer in charge of the area, if there is one.

4.  Keep the official Kingdom Calendar. You can delegate the maintenance of the calendar to another officer or to a deputy, but the policies about scheduling and conflict resolution belong to you. Depending on the laws of the Kingdom, the Crown may be able to override you for an event or a reign, in which case you administer the Crown's policies rather than your own, but the default position should be that the calendar is your job and that you resolve any calendar disputes. The policies for scheduling events should come from you and the Crown (unless written into Kingdom Law).

5.  Watch for things that need to get done. Keep an eye on the Kingdom as a whole and look for things that the royalty or any of the officers might initiate to improve the general quality of life in the SCA. You are responsible for the proper and efficient management of our "game-side" historical re-enactment, and proactive management is often much more effective and efficient than reactive crisis management.

6.  Listen. You will find that a great many people want to talk to you, regardless of what you're doing or what you may be able to do for them. Though listening to the troubles and plans of the populace may eat a lot of time, especially at events, it is a great investment in proactive management and relationship-building to give an ear to what people have to say to you.

7.  Reach out. In addition to listening to those who seek you out, you will find it worthwhile to reach out. Call, travel to an event, and/or email people to notice work done well. Remember to thank people; you will feel better, and so will they. Much of the currency of the SCA is in recognition, both official and unofficial. Small words of recognition and encouragement are often at least as important as official awards and will buy both appreciation and goodwill.

8.  Network. Develop a network of reliable contacts throughout the Kingdom. Find reliable sources of information and action across your region.

13

## F. **Communication with the Crown**

1. Always treat the Crown with deference in public regardless of the forum. No matter how you feel about some individuals on the thrones, your role in our shared activity requires you to behave as though these points are always true:

   a. The Crown is central to the "game side" of the SCA.

   b. The Crown is always worthy of respect.

2. Treat the Crown with courtesy at all times. Address the Crown (instead of the person wearing it) even when no one is watching. Avoid invoking your prior relationship with the people serving as royalty. There will be times when you can let your hair down, especially with old friends, but let them make the first move, and always in private.

3. Make the royal lives as easy as possible. If the Heirs do not have their own support group, help them organize to make sure that not only will their physical comfort get looked after while they are on the thrones, but that they are similarly supported in the administrative functions necessary to make their reign more successful. It is worthwhile to have a welcome package available for new Heirs. This may include Kingdom law, Corpora and Governing Documents, recent Kingdom Curia meeting minutes, as well as any other policy information you deem of critical importance. If prior Kingdom Seneschals have not created one, it could well prove a worthy project during your tenure.

4. Work with the Kingdom Exchequer to make sure the Heirs are fully informed regarding financial and budgetary matters as soon as possible. The new Crown needs to understand their fiscal responsibilities, what will and will not be paid for under your Kingdom's financial policies, the workings of the Kingdom Financial Committee, and so on.

5. Keep your Crown and Heirs well informed regarding happenings in the Kingdom, including reactions to things they have said and done. Offer all counsel to the Crown with respect and courtesy.

6. Deal with disagreement calmly. If the Crown seems determined to do something you regard as dangerous for the Kingdom or the SCA, start by talking privately with the royal couple. Always seek to understand what they really plan and what they mean (second-hand reports are often misleading) and explain why you believe the action is unwise. If it is against the rules as you read them, quote the specific citation, and point out that you will have to consult the Society Seneschal about it, which may lead to Corporate intervention. Try to find an approach that will accomplish the royal goals without ill effects. Do note, however, that if you believe that there is something going on against either the rules of the Society or modern law, and the Crown will not be deterred, you must contact the Society Seneschal at once!

7. If you cannot deflect the Crown from something you regard as unwise but not against the rules, focus on damage control. On one hand, look for explanations to help people accept the idea, and on the other hand, follow the commands in as neutral a fashion as you can.

8. It is the responsibility and honor of the Crown to establish and present awards and accolades as they shall deem proper, in accordance with the laws and customs of the

SCA_000532

Kingdom. Even ill-judged awards have a place because they establish the reality of royal power. Advise the Crown as clearly, soberly, and courteously as you can.

9. The Crown may suspend a territorial Baron and/or Baroness for the duration of the reign, for just cause stated in writing and presented only to the Baron and/or Baroness. Suspension would prohibit the use of the baronial title and arms, the conduct of baronial courts, and the presentation of baronial awards. The Crown may remove a territorial Baron and/or Baroness for just cause stated in writing and presented only to the Baron and/or Baroness; however, the Crown must request a written opinion from the populace of the Barony before taking such action.[15]

10. The Crown may suspend the warrant of any officer for the duration of a reign, for just cause stated in writing.[16] The Crown should consult the Society Seneschal before suspending a Kingdom Seneschal.

11. Warrants for Kingdom officers are signed by the Crown and the corresponding Corporate Officer.[17] Kingdom Seneschals should assist with and work toward an effective and positive outcome of this process.

## G. Communication with Other Kingdom Officers

1. You need to know what is going on within your Kingdom in order to do your job, and to work with and through fellow Kingdom officers to do your job effectively. Ask the other Kingdom officers for a courtesy copy of their warrants and their reports to the Crown and their Corporate superiors. Send them yours in exchange. Do not take active steps to second-guess another Kingdom officer unless there is a clear violation of Corpora or a complete loss of function in the office.

2. Make sure the other Kingdom offices stay filled. Be prepared to help find a replacement if another officer fails to do so.[18]

3. Encourage the other Kingdom officers to talk to each other. The effective operation of our "game-side" historical re-enactment within a Kingdom requires all of its officers working smoothly together. The Seneschal plays a vital role in seeing that communications remain clear, so the Kingdom's work is done effectively and efficiently. Regular meetings are one way to ensure that communication happens. Rather than trying to "manage" other officers, try to coordinate and facilitate communications amongst and between you all.

## H. Electronic Communications Policy

1. It is important to remember that, regardless of interpersonal relationships and informal modern communication links that may have been developed, Kingdom Seneschals are Corporate Officers and as such must communicate all official correspondences in a formal manner consistent with that corporate role.[19]

2. Formal communications to and from SCA officers may be directed through electronic means (email) as well as through postal or fax systems. However, messages posted for general attention on any public system may not be regarded as formal communications to an officer, whether or not the officer is known to participate on the electronic forum, email list or social media site in question.[20]

15

3. No personal or identifiable information will be sent over email lists or posted on social media unless the individual gives permission to do so. A phone call or postal letter is also an acceptable means of communication.

4. If you and your local Seneschals or other Kingdom officers wish to do so, reports may be sent via email.

5. No message posted to unofficial social media sites, general email lists, or other public electronic forums can be considered official communications. Therefore, these messages are not required to be part of your permanent files. However, it may be wise to keep copies of some messages if they could help to document a problem.

## I.  Websites and Social Networking Sites (Including Facebook)

1. For a digital site to be recognized by the SCA, it must represent an established branch of the Society and must have a warranted officer responsible for its content. As they do not represent established branches of the Society, the SCA will not recognize sites for households, fan groups and communities. Group officers with a website/channel are responsible for ensuring that the site complies with Society guidelines.

2. Personal information will not be published on any SCA-recognized internet site without first gaining permission from the individuals involved.

3. Email permission to electronically publish personal contact information is acceptable.

4. Permission to electronically publish the contact information of an individual is in effect until that same individual revokes permission.

5. Event Stewards may grant permission in writing to electronically publish the personal contact information of persons serving as event staff. In this case, it is understood that individuals volunteering to be event staff have granted this permission to the Event Steward.

6. Note that affiliates may have different publication policies.

7. See the Corporate Social Media Policy for more details.

## J.  Corporate Mailing Labels

1. You may request mailing labels for these purposes:

   a. Kingdom-approved Branch Polling

   b. Kingdom A&S Issues

   c. Kingdom Law Issues

2. Other than the above cases (all of which must come through the Kingdom Seneschal or Kingdom Chronicler), the Corporate office cannot issue mailing labels/files for mailing to the membership.

16

**3. Labels must be used within 10 days of receipt; then the file must be destroyed.**

4. Before ordering labels:

> a. Request membership listing from Corporate Office or Kingdom Seneschal and review for valid current members in the polling postal codes.

> b. Compile a spreadsheet with the postal code ranges to be polled. Only list postal codes that have current members on your spreadsheet.

> - Postal codes must be in numeric order.
> - If there are inclusive postal codes (i.e. – 94601-94699) please list them as such.

> c. Have polling letter printed and ready to mail.

5. To order labels:

> a. Email Corporate Office and Kingdom Seneschal (if a Deputy is ordering) to request the labels.

> b. Kingdom Seneschal must provide Corporate Office acknowledgment of the request (if a Deputy is ordering).

> c. Attach the numeric Postal Code Spreadsheet to the email.

> d. Include the deadline date for the mailing to go out.

> e. Include the requester's legal name and daytime phone number in email.

# VI. Overseeing Investigations and Sanctions

## A. Overview

1. One of your duties as Kingdom Seneschal is to receive complaints of violations of the SCA's rules and policies, to investigate such complaints, and to advise the Crown on appropriate sanctions, if it is determined that sanctions are necessary.

2. **Important: Nothing in this section supersedes the duty of the Kingdom or local Seneschal, or event staff, to contact modern law enforcement officials if a suspected criminal act has occurred at an SCA event!** Please see "Dealing with Modern Law and Legal Authorities" in this handbook for more information.

3. You should instruct your local, regional, and/or principality Seneschals to notify you at once if they receive a complaint about behavior that could put the SCA or its members at risk. This includes complaints that fall under the Bullying and Harassment Policy, found in Section XIX of this Handbook.

4. Complaints need to be made in writing. Text messages and IM services such as Facebook Messenger are not considered official channels for complaints. If you receive communication through those media, you are free to investigate further and determine if

SCA_000535

a formal complaint needs to be made, but ultimately such a complaint needs to come through an official channel. Email to an officer address is considered an official channel.

5. Corpora states that "The Board does not accept anonymous communications, and electronic communications with no identifier of the sender other than an email address will be considered anonymous."[21] It is the policy of the Society Seneschal's office that this extends to the Society Seneschal and Kingdom Seneschals as well. Complainants may maintain confidentiality, but completely anonymous complaints cannot be properly investigated and are therefore not actionable. They may, however, be kept on file in case further related complaints are received.

## B. Overseeing Investigations and Sanctions

1. The purpose of a Kingdom investigation is to gather the facts of the matter, and accounts of what occurred, as close to the time of the incidents as possible and in as objective a manner as possible, so you and the Crown (and possibly other Kingdom officers, depending on the nature of the complaint or offense) can decide what action, if any, is appropriate.

2. You need to notify the Crown that a complaint has been received. Exception: if the complaint is against the Crown, you must instead notify the Society Seneschal, who will refer the matter to the Board, and if an investigation is ordered, will assign an investigator from out of kingdom. Per Corpora,[22] only the Board of Directors may sanction someone for actions taken while serving as Crown.

3. Depending on the nature of the complaint and the size of your Kingdom, you may investigate the complaint yourself, or you may delegate someone else to investigate. Whoever you assign to investigate the complaint must be seen to be trusted, respected, and neutral. They cannot be associated with either party in the complaint nor have some other conflict of interest.

## C. Investigative Procedures

1. The job of the investigator is to collect statements and evidence. They must make attempts to interview the complainant or complainants, any witnesses, and the accused. These interviews must take place separately. They can be in person, or by phone or videoconference. Attempts to contact interviewees need to be documented, and multiple attempts need to be made if necessary, preferably by more than one method. If someone refuses to talk to the investigator, that needs to be noted. If someone only wants to submit a written statement, that should be allowed, but it should be noted in the investigator's report that the person declined to be interviewed.

2. Detailed notes (as close as possible to a transcript) need to be taken during the interviews. **Recording interviews may be legally problematic, depending on the jurisdiction, and must never be done without the express consent of the interviewee.** The person being interviewed should be given a copy of the notes and the opportunity to correct or add to the information if needed. They are not entitled to receive copies of any other interview notes or the investigator's final report.

SCA_000536

3. The investigator is required to maintain confidentiality during and after the entire process. This is very important! Investigations may not be discussed outside the chain of command. The chain of command includes the Kingdom Seneschal and any relevant deputy, the Crown (and Heirs if applicable), the investigator, and occasionally perhaps another Kingdom officer if the complaint or alleged offense falls under their purview.

4. The Crown, the Kingdom Seneschal, the Society Seneschal, and any appointed investigator are prohibited from commenting on any ongoing sanction or investigation into any matter that may lead to a sanction. This prohibition does not include necessary privileged contact with additional appropriate Society and Kingdom officers.[23]

## D. **After the Investigation**

1. Once the investigation is concluded, you and the Crown will need to review the information and decide what, if any, action is appropriate. Not every complaint needs to be acted upon. If you determine that it is an interpersonal conflict, mediation might be appropriate. You and the Crown are empowered to strongly suggest this, but it can't be required. It is also permissible to issue a letter to one or more parties, stating the conclusions reached and suggesting behaviors going forward that might mitigate the issues. Such a letter should be treated as confidential and kept on file by your office, as documentation should further related issues arise.

2. If you and the Crown decide to take no action, you should inform the complainant(s) and subject(s) of this decision. The complainant has the right to appeal this decision to the Board through the Society Seneschal, though the Board may or may not choose to act.[24]

3. Depending on the nature of the offense, an Administrative Action may be appropriate. Administrative Actions can include, but are not limited to, a suspension or removal from office, or limitation on participation in a particular aspect of SCA activity for a set period of time. Because an Administrative Action may involve activities under another Kingdom officer's purview, that officer must be consulted and must agree that the action is appropriate. Administrative Actions are not required to be announced or published, and they cannot be open-ended—they must have a clear end date. See the Sanction Guide for more information or contact the Society Seneschal.

4. If the decision is that a Royal Sanction is appropriate, you and the Crown will need to refer to the Sanctions Guide, located on the Society Seneschal's web page, for detailed information on enacting that sanction: http://socsen.sca.org/seneschal-resources/. The Sanctions Guide spells out all the procedural steps that need to happen for the sanction to be done correctly. It is important to be sure all the steps are followed—the Board can, and has, overturned sanctions that were improperly done. An improperly done sanction can also put you and the Crown at risk of sanction by the Board.

5. After the investigation is completed, report its results to the Society Seneschal, whether or not a sanction was enacted. Certain sanctions are automatically reported to the Board by the Society Seneschal to be reviewed and either upheld or overturned. If a Temporary Removal from Participation was enacted, it will be reviewed by the Board, and if upheld, an investigation by the Society Seneschal's office will probably occur. You will almost certainly

be contacted and interviewed by the investigator, so you need to keep all records of the investigation, including contact information for those involved. These should be kept on some form of independent, secure storage.

6. **Important:** The investigation files are a permanent part of your office files and need to be passed on to your successor. Do not delete an investigation file—someone might appeal a sanction years later!

7. For assistance in structuring your investigation packet for the Society Seneschal, please refer to the Sanctions Casefile located on the Society Seneschal's web page: http://socsen.sca.org/seneschal-resources/. If you still need help or have questions, please contact the Society Seneschal.

# VII. Deputies and Succession Planning

## A. Deputies to the Kingdom Seneschal's Office

1. Kingdom Seneschals may appoint additional deputies (with the Crown's approval) as needed to perform the duties of their office. These deputies are covered under the Kingdom Seneschal's warrant.[25]

2. Each Kingdom shall have a single responsible officer (i.e., "Waiver Secretary") as a deputy to the Kingdom Seneschal to ensure that all required waivers, rosters, and sign-in sheets are collected and safely stored within a reasonable time after each event. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required. Each Kingdom shall store all original executed waivers, rosters, and sign-in sheets, or legally accepted facsimiles, in such a manner that a responsible party can easily retrieve any needed waivers.[26]

## B. Emergency Replacement Deputy and Finding a Successor

1. All Kingdom Seneschals must have a designated emergency deputy at all times and must provide the Society Seneschal with this individual's name and contact information. This person should be someone who can step in until a successor is chosen if you are suddenly unable to fulfill your role as Kingdom Seneschal.

2. The Society Seneschal must receive copies of any applications or resumes received for the Kingdom Seneschal's office.[27]

3. Both the Crown and the Society Seneschal must agree on a candidate for the office of Kingdom Seneschal before they are put into office. The Society Seneschal will normally accept any reasonable choice the Kingdom Seneschal and the Crown propose.[28]

4. However, it is possible that a warrant may be refused. Grounds include but are not limited to:

   a. Failure to meet membership requirements as specified in Corpora.

SCA_000538

b. Being married or otherwise having too close of a relationship with the Society Seneschal or another Kingdom Seneschal. Also, too close a relationship (such as marriage) between the Kingdom Seneschal and the Chronicler or Exchequer of the same Kingdom.

c. Being too biased. A Seneschal must be able to serve all sides and citizens of the Kingdom and be prepared to help people see Corporate policies in a reasonably favorable light. Perceived tendencies toward controversy or factional orientation are grounds for question and possible non-confirmation of any appointment.

d. Failure to meet the Society Seneschal's requirements for the job. These include the ability to write Standard English, as well as having a phone, internet access, reliable email access, and a fixed mailing address.

# VIII. Kingdom Financial Matters

A. **Financial Responsibilities**

1. The Kingdom Seneschal serves as one vote on the Kingdom Financial Committee and may also be required to sit on other Financial Committees for your Kingdom's large inter-Kingdom events, if you have any.[29] All SCA Financial Committees are required to include at least one Seneschal. The role of the Seneschal on these committees is an important one; you are the legal representative of the Kingdom.

2. Remember that the Kingdom Seneschal is responsible for signing all contracts approved by the Kingdom Financial Committee. While this responsibility may be delegated, final responsibility rests with you.

3. The Kingdom Seneschal is responsible for ensuring that Corpora guidelines, and the deadlines, event requirements, and officer policies defined for the Kingdom (including any separate affiliate financial policies where relevant), are considered and followed by the Kingdom Financial Committee.[30]

4. A few limitations:

a. The SCA shall not purchase, use, or sell fireworks.[31]

b. SCA funds shall not be used to purchase alcohol in the US (different laws apply outside of the US). The insurance policy for the SCA in the US does not cover the sale or purchase of alcohol. The international portion of the policy permits the purchase and sale of alcohol as long as it is not the business of the SCA.[32]

B. **Theft Procedures**[33]

1. If a local Seneschal or Exchequer suspects a theft from a local account or any other fiscal wrongdoing, they must immediately report it to both the Kingdom Seneschal and the Kingdom Exchequer. Kingdoms can determine whether they want Principality or regional officers in the reporting chain in these matters. Immediate reporting to the Kingdom officers applies regardless of who may be involved. All suspected thefts must be reported immediately. The Kingdom officers or their deputies will confirm whether a theft has

SCA_000539

occurred. Do not have local officers try to confirm whether a theft has occurred or try to negotiate with the person involved.

2. The Kingdom Seneschal and Kingdom Exchequer will be involved throughout this process, so both should be involved from the beginning. Good communication between the Seneschal and Exchequer is critical in this situation. Each must know what the other has done or is doing at all times when there is an investigation. Do not assume that the other officer is being kept in the loop by anyone else.

3. If the Kingdom Seneschal or Kingdom Exchequer suspects that a Crown is misappropriating funds, inform both the Society Seneschal and the Society Exchequer immediately. If a Kingdom Seneschal suspects a Kingdom Exchequer, or vice versa, inform the Society Seneschal and the Society Exchequer immediately.

4. The Kingdom Exchequer or their deputy will verify whether the suspected theft has occurred, either by reviewing the documentation provided by the group or by performing an independent investigation as recommended by Kingdom or Society investigation procedure guidelines. If the Kingdom Exchequer is satisfied that there has been a theft (rather than an error in bookkeeping), they will work with the Kingdom Seneschal to resolve the matter.

5. Do not contact the suspected thief until and unless the Society Seneschal and the Society Exchequer direct you to do so. The Kingdom Officers acting together will contact the person involved regarding their investigation and give the person the opportunity to either explain why the suspicions are unfounded or incorrect, or to replace any stolen money/equipment. Note that a simple denial of guilt is not a sufficient explanation.

6. Once the Kingdom officers are satisfied that a theft has taken place, they should include a full accounting of what occurred in a report to their Society superior officers and confer with the Crown about appropriate sanctions. Depending on the circumstances, this will at a minimum include a request for an administrative sanction and may include a request for a Temporary Removal from Participation and revocation/denial of membership.

7. Note: A theft of $600 or more will necessitate the issuance of a 1099 form per IRS requirements.

## C. **Grants**

1. As a non-profit corporation, the SCA can pursue its mission locally, regionally, and nationally with funding provided by a range of local, regional, and national funding grants provided by a wide range of public and private institutions. We encourage all local and Kingdom branches to determine if there are appropriate grants available, and to seek such funds to support our mission and the goals of the SCA. The Society President is the final signatory on all grants.

2. Make sure you are informed of grant applications before they are filed. Check to see whether statements about the SCA and the group submitting the bid are true and accurate, and that the project really does belong to the SCA. Grant agencies are generally too big to concern themselves with a single chapter of the SCA if they become unhappy with the chapter's use of their funds – the Kingdom will surely be drawn in, so you should be involved from the start.

22

3. Do not permit grant applications on behalf of non-SCA people or groups. Many grant agencies will disburse money only to 501(c)3 organizations, so groups or individuals without that status often look for groups that do have it (like the SCA) to "stand fiduciary" for them, apply for the grant, and pass the money to them. Such arrangements are absolutely forbidden! Grant agencies can show up long after the money was spent and demand "to the penny" accounting, which is bad enough if you spent the money yourself, and almost impossible if somebody else spent it.

## D. Membership Drives and Recruitment Activities

1. Membership drives, demos, and other recruitment activities should stick to encouraging people to join the SCA. Branches are welcome to hand out forms and discuss benefits of membership including the Member Discount for event fees.

2. They can even offer memberships as prizes if the funds to buy the prize memberships are donated and are not SCA funds. It is not allowed to use SCA funds to buy personal memberships, save where permitted by local affiliate financial policy.

3. Only the Registry is authorized to sell memberships in the SCA! Tell your local Seneschals not to collect membership forms and payments to be forwarded to the Registry and have them try to stop anyone in the branch from doing so.

# IX. Supervising Branch Seneschals

## A. Mentoring Branch Seneschals

1. Local Seneschals are your people. Advise them, support them, listen to them, let them operate on their own as long as things are going well; intervene if the members get unhappy with their Seneschal. If at all possible, try to mitigate a situation before things get out of hand.

2. Make it a rewarding experience to work with you. Talk to your people – answer their calls, messages, and emails within two days – make sure they are the first to know the facts behind the rumors.

3. Do not try to run your own local branches. It is difficult, but you must avoid acting on information you know only because of proximity to where you live. Your local branches must be treated just like any others. Let the local Seneschal take the initiative when it comes to discussing local problems with you. And do not hesitate to point out that you're hearing too much, if the local Seneschal starts trying to foist the management of the branch onto you.

4. All local Seneschals are required to read and be familiar with Corpora, Society policies, Kingdom Law, and affiliate agreements (where relevant). This Handbook also provides a good frame of reference and broader context to a new local Seneschal.

5. Local Seneschals and Exchequers must be a part of their local Financial Committees. Each committee needs only one other person to make the required minimum of three members. The minimum for approval is a simple majority. For additional details on the

composition of the Financial Committee, refer to Society Financial Policy or the SCA Exchequer's Handbook.

6. Only paid members in good standing may be on the Financial Committee.

7. Branch Seneschals are required to review branch financial reports and banking statements.

8. Help local Seneschals understand their role as coordinators. Local Seneschals can't hire and fire the rest of the branch staff, any more than you can do so at the Kingdom level.

9. Avoid concentrating local offices in one family or household. Work with the local Seneschal and your fellow Kingdom officers to divide things up as much as possible. The offices of Seneschal and Exchequer may not normally be combined in one house. The Seneschal and the Exchequer CANNOT be the same person! If for some reason a group cannot meet these requirements, they can apply to you and the Kingdom Exchequer for a variance. Use your own good judgment in deciding whether to grant it.

10. Training local Seneschals on how to oversee local branch events:

    a. Local Seneschals play a key role in determining the SCA responsibility for events. Be clear in the difference between a published SCA event or activity and a private party or activity. A Society event must fulfill the requirements in Corpora – that is, it must be recorded with the local Seneschal, publicized at least to the membership of that group, and conducted in keeping with the SCA purpose and rules. Seneschals are reminded that all SCA events must be sponsored by an official branch of the SCA. Unofficial special interest groups – such as households, ships, guilds, or clans – wishing to host events must obtain the sponsorship of an official branch before proceeding.

    b. SCA money may not be spent on private parties.

    c. SCA insurance will not cover private parties. This includes household functions. If the event, revel, etc. is not sponsored by an officially recognized branch of the SCA, our insurance may not be used.

## B. Appointing Local Branch Seneschals

1. At about six months prior to the end of a local branch Seneschal's term, either you or the local Seneschal should open the office for applications by advertising the opening in the local newsletter and other appropriate venues (e.g., local meetings, email lists, or social media). The six-month timeframe allows for a three-month application period and a three-month training period for the incoming officer.

2. Encourage branches to seek consensus when choosing officers.

3. Endorse the person proposed by the outgoing branch Seneschal if you can. The ideal is that the outgoing Seneschal and the branch will find someone suitable for the job, and all you and the Crown need do is approve the choice. If you are getting complaints from the branch about the proposed candidate, talk to everyone before placing the person on a roster. The Seneschal's job should always be posted in the local branch newsletter and any local e-lists and social media outlets.

24

4. Strategies for dealing with difficult or contested appointments:

   a. Ideally, each local Seneschal should select a deputy (acceptable to the Kingdom Seneschal) who can intervene in the event of an emergency vacancy. However, if the outgoing Seneschal leaves without proposing a successor or having an emergency deputy, you need to get the job filled as smoothly as possible. Depending on the local circumstances, any of the following steps may work:

      • Ask the Baron/Baroness or another branch officer to hold a meeting to find somebody.

      • Pick a suitable person, and suggest they volunteer. While this may be a quick solution, it may leave the impression that you are selecting a "favorite". Step in only with substantial caution, and if no suitable candidate appears.

      • Announce that you (or your regional deputy) will act as branch Seneschal until a suitable candidate comes forward. You may establish a clear time frame for this solution, after which the branch will be expected to have selected an acceptable candidate.

   b. Contested appointments: If the outgoing Seneschal and/or the branch propose a successor you do not regard as suitable for the job, proceed very carefully:

      • If it is a matter of relations between your personal household and another, or a personality conflict between you and the candidate, with no glaring problem in the candidate, sign the warrant.

      • If you have reservations about the candidate's communication skills or tact, issue a short-term warrant.

      • If they are not qualified, ask for another name.

5. Keep the local warrants up to date. http://www.sca.org/docs/pdf/govdocs.pdf has the SCA Executive Warrant form. You may use rosters or individual warrants, but both need royal signatures.[34] Per Corpora, rosters must include the following information for each officer: legal and Society names, address, telephone number, and appointment and expiration dates. A roster must be signed by both the appropriate Royalty and by you, and it must contain the statement that it is the current roster of the Seneschal's office of the Kingdom of (your Kingdom name here) of the Society for Creative Anachronism as of the current date.[35] It is best to update this and have it signed once per reign. The other Kingdom (and Principality) officers can use the same system for warranting their local subordinates as well.

6. Help new Seneschals get oriented to the job. Serving as local Seneschal is often a member's first big step behind the scenes. Even other officers may think events happen spontaneously (except perhaps for their own small parts), but the Seneschal knows for sure how much work there is! It's a good idea to send a job-description letter to every new Seneschal to be sure they have an idea of what they're supposed to be doing in their new office. Try to make some personal contact; it may come as a surprise to you, but

newer members and newer officers will sometimes regard you as a VIP whom they have no business bothering! Combat these tendencies – make sure you are approachable.

## C. Removing Local Seneschals

1. Dismissal of any officer should be treated as a last resort. If a local Seneschal is in trouble, talk with them and look for a way to salvage the officer first. Find out what is really going on, work with the individual, and establish a clear action plan and schedule for efforts and improvements moving forward. Give the Seneschal a chance to clear up any problems, real or perceived. If the Seneschal is involved in a difficult situation or adding to the trouble, even if the attacks are largely unwarranted, it may be best to let someone else (but NOT one of the attackers) try to smooth things out. You may wish to involve a more local impartial third party to assist in any investigation or resolution process. Per Corpora, any dismissal requires royal approval, unless Kingdom Law specifies levels of inactivity or non-reporting that are equivalent to resignation.[36]

2. Note that the Society's grievance procedure does not apply to removal of an officer for cause (at any level). However, in a non-emergency situation, it is best to give the officer a warning and a chance to "fix" the problem. Good management practices dictate trying to resolve problems with the person who is the problem.

3. Local officers can be suspended on the same terms as Kingdom officers. You can suspend a local Seneschal for up to 90 days, and the Crown can do so for the duration of their reign. The warranted deputy (if one exists) steps in to fill the office.[37] Suspension is an effective way to put someone out of play while you figure out if dismissal is in order and reach agreement with the Crown, but it should be applied only after careful thought and communication with the officers concerned and with the branch.

4. Grounds for dismissal should be concrete and not related to personal relations with you and/or the Crown. Examples include:

   a. Repeated complaints from the branch. Encourage people to use orderly complaint procedures. If your Kingdom has a written complaint procedure, refer people to it; otherwise, refer them to the one in the Organizational Handbook.

   b. Encouraging activities detrimental to the SCA. The Seneschal should be leading branch opinion toward constructive activity and away from anything that would call our reputation or effective operations into question.

   c. Lack of judgment in dealing with the media.

   d. Inability to organize branch activities or to allow anyone else to do so.

   e. FAILURE to communicate. This isn't just a matter of assigned reports; it is also about how the Seneschal communicates with other branch members, other officers, as well as you.

   f. Financial impropriety.

   g. Egregious displays of lack of respect for the Crown.

SCA_000544

# X. Dealing with Modern Law and Legal Authorities

1. If a Seneschal, one of their warranted deputies (such as an Event Steward), or an agent of the SCA (such as a warranted officer at any level of the SCA) is approached by a victim of a modern law crime, that victim is to be encouraged to go straight to the modern authorities.[38] If the reporting party refuses to summon the authorities, the incident should be documented in writing, including the time, date, name of the event at which it occurred (if applicable), name and signature of the officer to whom the report was made, and that the victim was encouraged to contact law enforcement but declined to do so. Then pass all information to the Society Seneschal.

2. To determine the circumstances where it is appropriate to call the authorities, you should apply the "Reasonable Person Test." Would a reasonable person call the authorities in this situation? Crimes of violence: yes. Crimes involving minors: yes. Crimes of a sexual nature: yes. Jaywalking: no. If you need help determining the appropriate course of action, contact the Society Seneschal for assistance immediately.

3. When a person is brought to event staff with injuries that appear to be the result of violence, the event staff should offer to call both EMS and the police. If the authorities are called, do not question the alleged victim.

4. For Minor/Youth-related policies, see Section XI.

5. If the modern authorities have been called, SCA volunteers are not to interfere with their work. This includes investigating criminal acts or interviewing alleged victims. This does not preclude the SCA from taking later action as may prove appropriate.[39]

6. It is the policy of the Society Seneschal that the SCA, Inc. (and its affiliate bodies) do not administer modern-era court orders (such as child custody, visitation, domestic violence protective or other types of restraining orders or injunctions), and as such Seneschals and Event Stewards will refer participants to modern-era authorities for enforcement. If a member went to the local mall, they would not expect a store manager to enforce a protective order against a spouse who shows up there—they would call the police. It is the same at an SCA event.

7. When an individual is injured at an SCA event, the individual will determine the type and form of medical care required and assumes all responsibility for their own medical care and well-being. If the individual is unconscious or appears incapacitated, the event staff should summon emergency medical assistance. If the individual refuses aid, it is their choice, but the individual's refusal of aid should be noted.

8. You have access to our legal advisors through the offices of the President and Society Seneschal. If legal issues need to be addressed, do not hesitate to inform the Society Seneschal and the President. The Society Officers will assist with contacting the proper individuals. It is far better to seek professional assistance than to assume knowledge of appropriate legal interpretation.

9. Only the President has the ability to retain legal counsel (attorney, barrister, solicitor, et al), whether paid or unpaid (pro bono) on behalf of the SCA or any of its branches. No other officer at any level of governance of the SCA has the authority to retain legal counsel, even

27

pro bono, to advise or represent the SCA or any branch, without prior written authorization and confirmation of the retention of such counsel from the President.[40]

10. Americans with Disabilities Act/Disabled Participants: Refer to Section XIII of the SCA Corporate Policy.[41]

# XI. Dealing with Minor/Youth-Related Policies

1. Minors are defined as anyone who has not reached the age of legal majority. This varies between countries, states, and other jurisdictions. Be sure of the age(s) of majority in your area. In the US, it is usually, but not always, 18.

2. SCA is a member, family, and youth friendly social organization. SCA children, youth, and teen activities and classes are offered as a positive means of encouraging the participation of minors in the SCA with their families while encouraging fun-focused learning about history and the SCA. Dedicated and/or published youth-oriented activities (SCA Youth Activities) are overseen by warranted Youth Officers at any and all events and activities. These Youth Officers must have successfully passed an SCA approved background check and the Youth Officer (and if applicable, YAFA Administrator) must be warranted.

3. Parents or guardians of minors shall have ultimate responsibility for the welfare and behavior of their children at all times.[42] It is the responsibility of the adult who brings a minor to an event to ensure that the minor is safe and not in danger. At events and activities in which youth participate in any way, participating minors must either have a parent or legal guardian present at the event/activity, or be accompanied by an adult in possession of a properly executed "*Medical Authorization Form for Minors*." This Medical Authorization Form must designate an adult present at the event or activity as able to authorize medical treatment in case of emergency. This adult is also responsible for the minor's welfare and behavior in the absence of the parent or legal guardian.

4. All warranted Youth Officers (deputies who ultimately report up to the Kingdom Seneschal) must have a current SCA membership and an approved, current, and valid background check. "Warranted" is defined as having a signed warrant making the individual in question an official deputy to the Kingdom Youth Officer or the Kingdom Seneschal. Youth and Family Achievement (YAFA) administrators must likewise be warranted; they must also have passed a current SCA-approved background check.

5. All official or "published" SCA Youth Activities must have one background checked adult member who acts as the official "coordinator" for the SCA Youth Activity. For example, if there are 10 youth A&S classes each in their own separate classroom, each classroom needs to follow the "two-deep rule," but only one overall youth "coordinator" responsible for all activity in all classrooms is needed. There are many activities of the SCA where informal instruction (mentoring) occurs that are open to attendance by minors, but do not constitute dedicated and/or published SCA Youth Activities. They are known by many names (e.g., Practices, Meetings, and Guilds, and Workshops). A minor's attendance at an adult A&S class does not mean that class becomes an SCA Youth Activity simply because a youth is in attendance.

28

6. The "two-deep" rule specifies that for all SCA Youth Activities, a minimum of two adults (at or above  the age of legal majority in the state, province or country in which the activity occurs) unrelated to  one another by blood, marriage or personal relationship must be present. This policy does not  relieve parents of their primary responsibility for the welfare and behavior of their children. One of  these two adults may also be acting as the official coordinator for the Youth Activities going on.

7. For any criminal act involving a minor, modern authorities MUST be contacted. Inform  the Kingdom Seneschal immediately. The Society Seneschal must also be informed, within 48 hours.

8. Branch and regional Seneschals, Marshals, Marshals-in-Charge, and Exchequers must be at least the  age of majority for their jurisdiction. Be aware that the age of majority does vary between  jurisdictions; these officers must be of the age of majority in each area that they serve.

9. Minors 15 years of age or older may serve as officers, except as stated above. Minors may serve in the allowed capacities only with the  express written approval of the parent or legal guardian and their Kingdom superior, after they are  notified of the age of the minor.[43]

10. Minors younger than age 15 may not serve as Head Gatekeeper, Reservationist, etc., for an event.  They may assist at the gate collecting funds, making change, etc., under the oversight of an  individual permitted by SCA Corporate Policies to serve as an officer, who will be ultimately  responsible for the accounting of the funds passing through the gate. Minors younger than age 15 serving in this  capacity may not work unattended at an event gate at any time.

11. Medical treatment of minors is subject to the appropriate laws of the state, territory, province,  and/or country where the event is held. In the case of a medical emergency involving a minor, the  parent/legal guardian or, in the case of a minor attending with a non-parent/legal guardian, the  temporary guardian with the Medical Authorization Treatment Form for Minors must be located.  See Section XIII.D of this Handbook.

# XII. Overseeing Background Checks

## A. Scope

1. A background check is required for the following officers: Kingdom Seneschals or Youth Coordinators at any level (or any other officer whose responsibility is the oversight of Youth Activities). Furthermore, it is required that when youth activities are held, there must be at least two non-related adults, one of whom must have passed a background check. A background check is also required for all YAFA Program officers including volunteer mentors.

2. These rules only apply to groups operating within the US and Canada. If your group is outside of those two countries, please see your affiliate agreement and governing documents to ensure you follow the procedures approved for your jurisdiction, if any.

## B. Process for Conducting a Background Check

SCA_000547

1. Individuals required to submit to a background check must:

   a. Fill out a blank background check authorization form and submit it directly to the Corporate Office, via email, fax, or mail. Other methods of sending the form may also be approved by Corporate, as appropriate. It is up to each requester to submit the paperwork for their own background check authorization. Forms contain personal data, and therefore should not be submitted to any Kingdom officer.

   b. Notify the Kingdom Youth Coordinators that they have requested a background check.

2. The Kingdom Youth Coordinators will provide the Kingdom Seneschal a list of all requested background checks.

3. The Kingdom Seneschal will review and approve the list of requested background checks and forward the list of approved requests to the Corporate Office.

4. Once the background check authorization form has been received, the Corporate Office will:

   a. Maintain a list of all approved requests for background checks.

   b. Check the requester's current membership status and check the requester's name against their Kingdom's list of individuals for whom background checks have been approved.

     • If the requester is not a current member of the SCA, they are not eligible for a background check, and their forms will be returned with an explanation of why they are currently ineligible.

     • If the requester's name is found on the "Approved by Kingdom Seneschal" list, then the requester's data will be sent to the company conducting the background check to begin the process.

     • If the requester's name is not found on the approved list, it will be added to a "Not Approved by Kingdom Seneschal" list for that Kingdom, along with the date the name was added. Every month, Corporate will send the names of those on the "Not Approved by Kingdom Seneschal" list to the appropriate Kingdom Seneschals. If no approval is forthcoming from the Kingdom Seneschal in three months, or if a specific notice of disapproval is received, then the name will be struck, and the form will be returned to the requester along with a letter explaining that they have not been approved.

5. After a form has been passed to the company conducting the background investigation, the Corporate Office will note a charge on the requesting kingdom's spreadsheet. Each month, each Kingdom will be invoiced for half of the charge of all requested background checks for the previous month for that Kingdom. Invoices are due and payable upon receipt.

6. Once the Corporate Office has received the adjudication from the investigating company, the requesting member's information will be updated:

SCA_000548

a. If a "Pass" or "Fail" decision is returned, the Corporate office will notify the requester via mail of the decision and the SCA, Inc. will update their records to reflect the "Pass" or "Fail" decision and the appropriate expiration date.

b. If a decision of a "Hold" is returned, then that information will be updated in the SCA, Inc.'s records and further adjudication will be undertaken to provide a clear "Pass" or "Fail" response, as above.

7. Once a month, the Corporate Office will send the Year-to-Date results to the Kingdom Seneschals for review.

8. Background checks must be renewed every two years.

## C. Responsibilities of the Kingdom Seneschal for Background Checks

1. The Kingdom Seneschal is responsible for distributing blank background check authorization forms to the Youth Coordinators in their Kingdom. SCA, Inc. will provide blank background check authorization forms to each Kingdom Seneschal as necessary for this purpose.

2. The Kingdom Seneschal will review and approve the list of requests for background checks as provided by the Youth Coordinator(s) of their Kingdom.

3. The Kingdom Seneschal will keep a record of all approved requests for background checks.

# XIII. Managing Waivers and Event Sign-In Sheets[44]

## A. Waivers for Affiliate Organizations

1. Waivers as a whole are very country specific. If you are in an affiliate organization, it is the Seneschal's duty to see if there are any policies that alter the information below. SCA, Inc. waiver policy applies except where replaced by local regulations in affiliate organizations.

## B. Types of Waivers

1. Standard Waiver—formerly called the "Consent to Participate and Release Liability": this form contains the same waiver language as is found on a membership application. The Standard Waiver is also sometimes called an "Event Waiver," "Adult Waiver," "Fighter Practice Waiver," or "Consent to Participate."

2. Roster Waiver—same as the Standard Waiver but allows for multiple signatures.[45]

3. Minor Waiver—See XIII.D. below.

4. Equestrian Waiver—formally called the "Waiver and Informed Consent to Participate in SCA, Inc. Equestrian Activities," this form is the waiver required for attendance at any event where equestrian activities occur. The Equestrian Waiver must be signed regardless of membership status or whether the person has a waiver on file already.

31

## C. When Waivers are Required

1. Waivers are required at all published SCA events. This means any event sponsored by an official branch of the SCA and announced by the branch through any of their official communications media including newsletters, e-newsletters, e-lists, and official social media sites. Business meetings, demos where there are no combat-related activities, guild meetings, dance practices, private activities and the like are not included in the waiver policies. If in doubt about whether a specific function falls under the waiver policy, make a ruling and report it to the Society Seneschal at the next opportunity.[46]

2. Kingdoms may require all attendees at an event to sign waivers if they wish. As Kingdom Seneschal, you may make the determination of whether an SCA function falls under the waiver policy or not.

3. Anyone who is not a member of the SCA must sign a waiver. Further, anyone who cannot prove they are a member who has a signed waiver on file with the Corporate Office must sign a waiver. Proof consists of a physical membership card indicating the waiver (a "blue card") or a photograph or photocopy of same, or the printed or electronic proof of membership and waiver from the sca.org website.[47]

4. Individual Kingdoms or site owners may impose additional or more stringent requirements at their discretion. Site owners and Kingdoms may not change or modify the Society Waiver without Board approval.[48]

5. At events where published combat-related activities occur (such as a war or a fighter practice) Marshals, Heralds, and any other volunteers working directly with the fighters need to sign the waiver because they are on the field and are at risk.[49]

6. That means SCA members who do not have their blue cards with them, or who have a non-blue membership card indicating that there is no signed waiver on file for them in the SCA Corporate Office, must sign a waiver to attend an event or participate in fighting activities at a published fighter practice.

7. Any person participating in SCA published equestrian-related activities, including riding or authorization check rides, horse handling, ground crew, mounted games, and combat, marshaling, or even being present at published equestrian activities as an observer, is required to sign a Society for Creative Anachronism Waiver and Informed Consent to Participate in SCA Equestrian Activities form or roster. Equestrian waivers are available in the SCA Equestrian Handbook.

8. Spectators at demos or any other published activity need to sign waivers if they become participants or if equestrian activities are held.

## D. Minor Waivers

1. Minors (persons under the age of legal majority in the state, province, or country in which the SCA function occurs) are welcome to participate in the activities of the SCA, subject to the following rules:

   a. Any minor attending an SCA event must have a Minor Waiver completed and signed by their parent or legal guardian. (Minors with blue cards indicating a waiver at the

SCA_000550

Corporate Office that is signed by a parent are treated the same as adult blue-card attendees with regard to waivers.) The minor must be accompanied by a parent/legal guardian or an adult who is responsible for the minor's welfare and behavior. The parent, legal guardian, or responsible adult may not leave the event site without the minor accompanying them. The parent or legal guardian must complete all required paperwork. Roster waivers are not acceptable for use with minors.

b. The parents or guardians of the minor must witness SCA combat, discuss with a witnessing marshal how it relates to the participation of their child, and execute a Minor Waiver prior to the minor's being allowed to participate in fighting activities.[50] Fighting activities include armored combat (heavy weapons), fencing, combat archery, marshaling, scouting, youth combat, or banner bearing in combat. In this case, parents should be carefully informed of what is going on. Witnessing marshals must be explicitly authorized to perform this function by the Kingdom Earl Marshal.

c. Authorization for combat in any of the forms listed above by minors can be performed only by the Kingdom Earl Marshal or those explicitly authorized to the task, with the exception of rapier combat, which must be authorized by the Kingdom Rapier Marshal or those explicitly authorized to the task.

d. To be authorized for armored combat or the marshaling of armored combat, a participant must be at least 16 years of age. The eligible age for authorization in all other adult combat-related activities is 14.[51]

e. From the Marshal's Handbook: "At any event in which the minor is involved in SCA combat-related activities, the minor must either have a parent or guardian present, or must be in possession of a properly executed 'Medical Authorization Form for Minors.' Said Medical Authorization Form must designate an adult present at the event as able to authorize medical treatment in the case of an emergency." This document should stay with the parent, legal guardian or temporary guardian during the event in case of an emergency. See the appropriate sections of the Marshal's Handbook for details regarding all aspects of minor-related combat activities.

# E. Waiver Management

1. Waivers will be collected and sent to the Kingdom Waiver Secretary (a deputy to the Kingdom Seneschal) for storage.[52] Kingdoms must create laws or Seneschal policy to implement this requirement.

2. The Waiver Secretary shall ensure that waivers for each event can be located and provided to the appropriate officials in the event a specific waiver is required.[53]

3. Adult waivers shall be maintained for 7 years and minor waivers for 20 years, after which they should be destroyed.[54]

# F. Sign-in and Attendance Sheets

1. Sign-in or attendance sheets are not required; however, if your Kingdom typically uses them, they become a part of the waiver package that must be sent to the Kingdom Waiver Deputy.

SCA_000551

2. If your Branch Financial Policy requires that the sign-in sheet be kept, a legally accepted facsimile can be sent to the Waiver Deputy.

# XIV. Overseeing Contracts and Agreements

## A. Who May Sign Contracts

1. Only local branch, Kingdom, and Corporate Seneschals, their specifically authorized delegates (such as Event Stewards), or specifically approved Corporate Officers may sign contracts in the name of the SCA, Inc.[55]

2. Only a paid member of the SCA may be delegated for this duty.[56]

3. Kingdoms or branches may involve other officers in discussing or approving contracts but may not remove the Seneschal from the process.

4. Seneschals must execute this delegation of responsibility in writing via a formal warrant of their deputy in accordance with the process for warranting officers in their respective Kingdoms. Remember an Event Steward is a warranted deputy, and thus can sign contracts.

## B. Limitations

1. No Seneschal may commit higher levels of the SCA to any action. The main limit on delegated contracting authority is that a Seneschal may only sign a contract for his or her own branch. For example, a Shire Seneschal can bind the Shire to support a civic activity but cannot promise that the Kingdom will show up to back the group.

2. Minors may not sign legally binding contracts; therefore, Seneschals must have reached the age of majority for their jurisdiction.

3. When a person other than the warranted Seneschal is needed to sign facility use agreements in order to enjoy organizational use or discount privileges, the warranted Seneschal for that branch will review and initial the contract prior to its being signed. However, specific prior authorization is always required, and the delegated person must meet the membership requirements for officers as defined in Corpora and be a formally warranted deputy Seneschal of the sponsoring branch.

4. No agreements may extend the use of the SCA name to an outside group or individual. Do not permit contracts or activities extending the SCA name to an outside group. Some communities allow nonprofit organizations with 501(c)3 status like ours to run bingo games or other fundraising events that are otherwise prohibited, and people who want to hold such events will look for qualified sponsors. The SCA forbids such arrangements.

5. The President must approve site contracts for any SCA events with expected attendance of 2,000 or more or that have a total budget of $75,000 or more.

# XV. Overseeing Kingdom Events

SCA_000552

## A. **Publicized Events**

1. Keep track of things that need Kingdom-level publicity. The SCA, Inc. no longer makes a distinction between official and unofficial events (only published and unpublished), but certain things—the installation of Kingdom great officers or a new territorial baronage; the granting of awards of arms, grants of arms, or patents of arms; the announcement of law changes; and, of course, Crown or Coronet tournaments or investitures—can only occur at events that have been publicized in advance in the Kingdom newsletter.

2. Events that must be publicized in advance must be publicized both on the Kingdom calendar and in a detailed announcement or flier in the Kingdom newsletter—the calendar notice is not enough on its own. Make sure your Crown and your local Seneschals are aware that this is required by Corpora.[57]

3. The Kingdom Seneschal, working in conjunction with the Crown, is responsible for creating and maintaining event-scheduling policies within a Kingdom. The Kingdom Seneschal is ultimately responsible for making sure that Crown, Coronation, and other events the Kingdom has designated as "Kingdom events" occur. The individuals leading those events are deputies of the Kingdom Seneschal for the time they are heading those event staffs.

4. Awards that carry precedence (AoAs, grants, and patents) cannot be given at events that have not been publicized in advance,[58] but promises of future awards can be granted. If the Crown decides to attend an event that was only publicized locally, make sure that they remember that no awards carrying precedence can be presented at that event. However, the Crown can call forward deserving members, praise them in front of their friends, and announce their intent to present thus-and-such award at the earliest opportunity.

5. You may permit branches to mention local events on their local branch's published calendar without printing fliers for them, but make sure they understand that the calendar entry does not make the event eligible for royal action.

6. SCA events and event announcements need to enhance our reputation. Remember that all events announced in the newsletter should support our organizational purpose. This excludes, for example, events based around live-action fantasy role-playing games and activities involving drinking contests.

7. Seneschals are reminded that all SCA events must be sponsored by an official branch of the SCA.[59] Unofficial special interest groups wishing to host events, such as households, Kingdom orders, ships, guilds, or clans, should obtain the sponsorship of an official branch before proceeding.

## B. **Kingdom Event Sites**

1. Kingdom-level events must have suitable sites. While some Kingdoms make the Seneschal directly responsible for selecting sites and finding Event Stewards for Kingdom-level events, others use site coordinators, require bids, or use a regular rotation. It is always and ultimately your responsibility to make sure that Crown, Coronation, and other events designated as Kingdom events in your Kingdom have a place to happen.

SCA_000553

2. Event Stewards may not mislead site owners nor misrepresent their policies. If the owner has a no-alcohol policy, the site cannot be billed as permitting discreet use of alcohol. Policies on animals, number of people on-site, or other restrictions should also be publicized well in advance and adhered to.

3. Service animals should be admitted in accordance with relevant local or national legislation. Please see Section XVI of this Handbook for the complete SCA policy on service animals.

## C. Royal (Crown or Coronet) Lists

1. Royal Lists must be conducted at a tournament announced in the Kingdom newsletter as being for that purpose. Crowns or Coronets who wish to conduct a Royal List in a manner other than individual combat must obtain the prior approval of the Board of Directors.[60] Work with Royal Heirs early to ensure their desired format is within the confines of Corpora and Kingdom Law.

2. Publicize the membership rules for Crown and Coronet Lists. Corpora delineates the membership requirements and the rules on how membership is defined and enforced. Corpora specifies that "any officer of the SCA or representative of a Kingdom found responsible for allowing a non-member to participate as an entrant or prospective consort in a Royal List will be subject to sanctions."[61] Make sure your royalty and list officials are aware of this fact! In addition, the Crown list winners have 10 days to show that their membership will remain valid for the duration of the reign.[62] If the membership of either member of the royal couple is set to expire at any time before their reign would end, advise them to immediately renew membership using the online renewal system. Note that local exceptions regarding membership duration may apply within international affiliates.

3. Accept proof of membership only if it comes from the appropriate registry, i.e., SCA, Inc. or your affiliate registry ("the Registry"). To establish membership, a person needs a current valid membership card, a current newsletter label, an entry on the Email Registry membership printout, or a postcard or letter from the Registry confirming that the membership has been received. Also acceptable are confirmations of valid membership from the online membership application. The phrase "letter from the Corporate Office confirming that the membership has been received" includes the downloaded form received from an online membership sale from the SCA website or an electronic notice from the SCA, Inc. Registrar of membership confirmation.[63]

4. It is your responsibility to check memberships for Crown entrants and consorts carefully! Document your membership verification. Printouts may be ordered from the registry.

5. Be generous in the face of conflicting information. If an individual has a card showing one date, while the Registry listing shows another date or misses the name entirely, you may accept whichever is more favorable to the member. However, you must send copies of both to the Registry immediately after the Lists because these conditions indicate a potential problem in the computer system.

6. Confirm membership for people serving as officers. All officers must be paid members of the SCA. This includes all royalty, Territorial Barons and Baronesses, and Event

36

Stewards. Once a year, take the Registry printout and look at the listings for your local Seneschals and your fellow officers at the Kingdom and Principality level.

7. Make sure your Crown is aware of any Kingdom Laws requiring membership.

### D. Removing SCA Sponsorship from an Event

1. "Removing SCA Sponsorship" means the Kingdom Seneschal declares that the SCA is no longer associated with an event, and that people who choose to remain on the site do so at their own risk.[64] This is a very serious step, and the Society profoundly hopes you never have to take it. This is a last resort. Use it only if the Society's rules are being broken in ways that seriously endanger the populace or the organization. Before removing SCA sponsorship, be sure to explain to the Event Steward and the ruling nobles present what the problems are and give them the opportunity to take corrective action. Explain the consequences that will follow if you are forced to remove SCA sponsorship and do it only if they refuse to work with you to correct the problems.

2. Once you have removed SCA sponsorship of an event, no further official SCA activities may be conducted, and people who choose to remain on the site are on their own. If the property is owned or rented by the SCA, people should leave at once. If it's unreserved public property, announce that the SCA and its insurance will not provide protection for anyone, regardless of what happens from that point forward. Besides announcing the decision throughout the site, you must make a serious attempt to notify the site owner, and you must file a full report with the Society Seneschal, any applicable affiliate officers, and your Board ombudsman—and your Crown, if they weren't there—as soon as possible.[65] If you reach the site owner, describe the problem and ask whether they want you to get assistance from the civil authorities in clearing the site; if you can't reach the site owner and it's not a public park open to anyone, call the police on your own if people don't depart. Expect that the Board will consider revoking memberships on the basis of your report—possibly yours, if they feel your action was frivolous.

3. It is desirable to take some time in Kingdom officer meetings and local Seneschal meetings to make sure other officers understand the implications of removing SCA sponsorship, both for the organization and for themselves.

# XVI. Demo Policy

1. A demo ("demonstration") is an organized educational effort to teach and/or display activities of pre-17th century life, intended to spur historical interest in general, and SCA interest in particular, to the general public. Demos are an important way of introducing ourselves to the community, fulfilling our organizational mission of education, and possibly finding new recruits for the SCA. However, not all demos are the type that result in new members. An elementary school demo is fun, but the likelihood of recruiting new members is low. A university or Renaissance Fair demo is more likely to attract new members but does not necessarily contain the educational community-relations value of a school demo. Both are important, and a group should find a balance between them.

2. In order to be covered by SCA insurance, demos must be approved by the sponsoring group's Seneschal, and the branch may restrict who may represent them to the public.

Restricting participation should be done with extreme caution and care. A demo may also be an "event" if it meets the requirements for an event as outlined in Corpora and Corporate Policy.[66] At any demo, at least one paid SCA member must be present and in charge of the demo.

3. Demos where there are no combat-related activities do not require waivers unless they are held as part of an SCA "event". Therefore, if there is no combat, and the demo is not held at an SCA event, waivers are not required. When required, waivers may be completed individually, or a roster waiver may be used. It is not required that spectators at demos sign waivers, as long as they don't become participants.

4. As with all martial activities, an authorized marshal for whatever forms are being displayed must be present if there is fighting at a demo. SCA combatants must be authorized in that weapons form or style to perform at the demo.[67]

5. Demo organizers must pay particular attention to site/host restrictions regarding SCA and steel weapons and activities. In general, it is not a good idea to allow the general public to handle steel weapons at a demo, and steel weapons must never be left unattended. SCA weapons must never be left unattended and in plain sight and access of the public. (They may be stored unattended in tents, trucks, etc.)

6. Since observers of SCA demos are generally not familiar with SCA combat activities, special care for safety must be taken. Boundary ropes are strongly recommended, and sufficient safety personnel must be provided to ensure safety of combatants and observers.

7. A participant of the SCA may not hit a member of the public with any weapon regardless of whether the member of the public is in armor and gives consent. Adult members of the public who wish to try armored or rapier combat should be referred to the nearest SCA group for instruction.

8. With specific safety restrictions, supervised children age 12 and under may hit an armored SCA fighter with foam weapons only, not rattan weapons. Waivers are not needed from the parents of children who take part in "fight-a-knight" activities. Minimum safety standards include keeping unarmored observers at least 10 feet away from the armored fighter and child. Individual Kingdoms may make more restrictive policies.

9. Whenever a demo is held with children present, a minimum of two unrelated adults must also attend that demo (the "two-deep" rule). "Children" refers to anyone under the age of legal majority.

10. No one may bring weapons of any kind onto the grounds of a school without prior knowledge and consent of the school officials.

11. There is no SCA policy that prohibits an SCA group from charging a "demo" fee to the organization requesting the demo. However, most groups accept donations rather than charging a set fee. With either a donation or a "demo" fee, all monies should be in the form of a check, payable to "SCA, Inc., [group name]". Under no circumstances should an individual receive cash, or a check made out to them personally. SCA site fees may not be charged at a demo unless the demo is held as part of an SCA event. Outside the USA, payment should be made to the branch by the appropriate means if checks are not relevant.

SCA_000556

12. Assuming appropriate safety precautions are in place, and with any necessary instruction, participation is a highly effective method of educating the demo guests—and fun for both the SCA member and guest.

# XVII. Service Animal Policy[68]

A. The SCA abides by all national, state, and local regulations regarding service animals.

B. For United States entities:

Under the American with Disabilities Act (ADA), emotional support, therapy, comfort, or companion animals are not considered service animals. The only service animals permitted under law are dogs and miniature horses, and people with disabilities accompanied by service animals generally must be allowed the same access as those without service animals. Further, per the ADA, only two questions may be asked of the handler of a service animal:

1. Is the animal a service animal required because of a disability?

2. What work or task has the animal been trained to perform?

C. These questions may only be asked if it is not readily apparent what service the animal is performing. Every endeavor should be made to ensure these questions are asked only once, and only by the event steward or their designee (usually the head of gate). No one may ask what the disability is, nor can anyone demand to see the animal perform the task. The answers to these two questions may be noted.

D. Handlers of service animals must abide by all state and local vaccination and travel requirements for their animals.

E. Service animals must always remain under the control of their handler and must be housebroken. A handler assumes all liability for their animals. Dogs must remain on leash unless their duties demand that they be off leash, either for specific tasks or for the handler's disability. The dog must still be under control of the handler.

F. If a service animal is out of control and the handler does not take effective action to control it, the event steward or local (or Kingdom) seneschal may request that the animal be removed from the premises. This removal is to be based on the evaluation of whether the animal is under control, appropriately behaved for public accommodation, and not an evaluation of whether the animal is a service animal. The handler must be allowed back onto the premises after making arrangements for their animal. Removals from site or refusals of entry should be documented carefully with reasoning for why access was denied per SCA rules for removing someone from site.

G. Additional points:

1. Service animals are not required to wear identification, including medallions or other gear.

39

2. No additional fees may be levied against the handler of a service animal.

3. No paperwork may be required from handlers on their service animal.

4. No mandatory pre-registration of service animals is allowed.

# XVIII. Policy on Religious Ceremonies and Events[69]

1. Our game encompasses the pre-17th Century world and as such, Corpora's policy on religion is not meant to discourage the study of historical belief systems and their effects on the development of a global culture.

2. However, the Society, its Kingdoms and local groups, through its officers and participants, are not allowed to give the appearance of establishing, sponsoring or promulgating a religion or belief system.

3. Likewise, the Society may not prohibit any system of beliefs of its individual participants. As such, the Society is protecting the rights of individual participants by neither imposing any belief system upon its participants, nor banning the practice of any participant's belief system.

4. The use of aspects of historical accuracy for theatrical emphasis does not violate Corpora; however, a claim of historical accuracy or theatricality does not give the officers and participants of the Society the ability to abrogate the policy on religion as stated in Corpora.

5. Religious rituals performed in Royal Courts, whether historical, imaginary, or theatrical, violate the Society's Policy on Religion which protects individual participants from being subjected to a religious or quasi-religious ceremony. Forcing participants to observe religious ceremonies by either direct or indirect pressure is prohibited, and Royal Courts must not imply that any particular religious ceremony is authorized, sponsored, or promulgated by the Society.

6. Prayer in Royal Courts (in English or in a foreign language, ancient or medieval), whether individually spoken, group prayer, or a prayer calling for a response, violates the Society's policy.

7. Additionally, officers and participants in the Society may not make religious statements in official pronouncements (whether verbal or in writing). Officers and participants in the Society should take care to be respectful of others and to be reasonable in their words and deeds so that their words and deeds do not violate the Society's Policy on Religion.

# XIX. Harassment and Bullying[70]

1. The SCA prohibits bullying and harassment of all individual and groups.

2. Bullying is systematic and unwelcome behavior which involves the use of influence, threat, intimidation, or coercion to cause hurt or harm to another person or group of people. When the bullying behavior is based on a protected class, that behavior is defined as harassment.

SCA_000558

Protected classes include race, sex, religion, national origin, gender, sexual orientation, age, or disability.

3. Bullying and harassment may be overt, as in the following non-inclusive list of examples:

   a. Verbal abuse, including using racial, homophobic, transphobic, ableist epithets, etc.

   b. Non-consensual physical contact, violence, or threatening gestures

   c. Displaying material that is offensive, degrading, or threatening to a protected class

   d. Consistent demeaning remarks or malicious teasing

   e. Stalking or predatory behavior

4. It may also be covert, as in the following non-inclusive list of examples:

   a. Spreading rumors or innuendo with malicious intent.

   b. Deliberate exclusion, isolation, or alienation of an individual without just cause.

   c. Using rank, title, or office to intimidate others.

5. Provided that the behavior does not rise to the criteria listed above, bullying and harassment is not:

   a. Single episodes of social rejection, dislike, tactlessness, or forgetfulness

   b. Mutual arguments, disagreements, or fights

   c. The termination, mutual or not, of a romantic relationship or friendship

   d. Reasonable constructive feedback or critique

6. The test for bullying is the reasonableness of the behavior and the impact of that behavior on the recipient.

7. Participants engaging in bullying/harassment are subject to appropriate sanctions. If an individual believes they have been subjected to or have witnessed harassment, bullying, or retaliation, that person should contact a seneschal, the President of the SCA, or that kingdom's Board Ombudsman.

8. The following statement must be posted at gate/troll at every SCA event in a size large enough for people to see it as they enter our events. This language must likewise be quoted in ALL site handouts at every event or site where a handout is made available.

**THE SCA PROHIBITS HARASSMENT AND BULLYING OF ALL INDIVIDUALS AND GROUPS.**

SCA_000559

Participants engaging in this behavior are subject to appropriate sanctions. If you are subjected to harassment, bullying or retaliation, or if you become aware of anyone being harassed or bullied, contact a seneschal, President of the SCA, or your Kingdom's Board Ombudsman.

# XX. Sexual Misconduct Policy:[71]

## A. Policy:

1. The SCA prohibits all forms of sexual misconduct including, but not limited to, sexual assault, sexual harassment, stalking, and sexual violence. Such conduct violates SCA Core Values and puts the SCA and its participants at risk. In furtherance of this policy, the SCA highlights our Core Values as the code of conduct for participants in any of our activities.

a. SCA Statement of Core Values

In pursuing its mission, the SCA is committed to excellence in its programs, communications, and activities and to:

- act in accordance with the chivalric virtues of honor and service in all interactions with SCA members and participants;
- be a responsible steward of SCA resources;
- deal fairly with others, and value and respect the worth and dignity of all individuals;
- practice inclusiveness and respect diversity;
- promote a safe and respectful environment for all SCA members and participants;
- act with transparency, fairness, integrity and honesty;
- maintain a harassment-free environment in SCA spaces;
- avoid behavior that reflects adversely on the SCA or other SCA members and participants.

It is the expectation of the SCA that its members and participants, in all events and activities of the SCA, will conduct themselves in accordance with these tenets.[72]

## B. Definitions:

1. Consent means freely and affirmatively communicated willingness to participate in sexual activity, expressed by clear, unambiguous words.

a. Consent is a clear, verbal, voluntary agreement given by someone able to agree to an act.

b. Someone may lack the ability to consent, due, for example, to their age, intellectual or other disability, or incapacitation from the use of drugs or alcohol.

c. We will always view as unwelcome and nonconsensual any sexual activity between an adult and any person below the legal age of consent.

42

SCA_000560

d. Additionally, because consent is a voluntary agreement to engage in sexual activity:

- someone who is incapacitated cannot consent;
- past consent does not imply future consent;
- consent for one act does not imply consent for another;
- silence or an absence of resistance does not imply consent;
- consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another;
- consent can be withdrawn at any time during a sexual encounter; and
- coercion, force, or threat of either invalidates consent.

2. Sexual Assault is an actual or attempted sexual contact with another person without that person's  consent. Sexual assault includes, but is not limited to, acts that constitute sexual assault under  state law.

3. Sexual Harassment is any unwelcome verbal or physical conduct of a sexual nature that is  sufficiently severe, persistent, or pervasive such that it unreasonably interferes with, limits, or deprives someone of the ability to participate in or benefit from the SCA events and activities.  Sexual Harassment includes, but is not limited to, acts that constitute sexual harassment under  state law.

4. Sexual Misconduct is any unwelcome behavior of a sexual nature that is committed without consent  and/or by force, intimidation, coercion, or manipulation. Sexual misconduct includes, but is not  limited to, exposure of reproductive organs, sexual assault, sexual harassment, stalking, and sexual  violence. Sexual misconduct also includes, but is not limited to, acts that constitute sexual  misconduct under state law.

5. Stalking means engaging in a course of conduct directed at a specific person that would cause a  reasonable person to (a) fear for his or her safety or the safety of others, or (b) suffer substantial  emotional distress. Stalking behavior can include: (i) persistent, unwanted communications to the   victim by phone, email, and/or other social media; (ii) repeatedly sending the victim unwanted gifts; (iii) following  or waiting for the victim at home, school, work, or elsewhere; and (iv) direct or  indirect threat(s) by the stalker to harm herself or himself, the victim, or the victim's friends and  family, or to damage the victim's property. Stalking includes, but is not limited  to,  acts  that  constitute stalking under state law.

# XXI. Firearms Policy[73]

1. The possession of modern firearms at SCA events is prohibited, except for locations such as Alaska and the Northern Provinces of Canada where bears create issues of safety.

2. This rule does not impact law enforcement officers in the performance of their duties, park rangers, or site staff who maintain firearms in the performance of their duties on a private site owned by a party other than the SCA.

43

3. If possession and transport of a firearm is permitted by local, state, or federal law and by site regulations, a firearm may be stored out of sight in a vehicle in accordance with federal, state, and local laws. In addition to said laws, the firearm must be stored in a locked gun box and/or have a trigger lock. At no time may the firearm be removed from a vehicle while at an SCA event site, unless under circumstances described above.

4. The possession of air or carbon dioxide compressed air rifles or handguns firing pellets, BBs or air-soft pellets is prohibited at SCA events.

5. Any displays of pre-17th century firearms must be, incapable of discharge, and the barrel must be made of solid material such as a metal rod or wooden dowel.

6. No ammunition, wadding, or black powder is permitted on site. There is one exception for the Pennsic cannon, which is grandfathered into this regulation. The use of carbonate facsimile "cannons" or other noise making devices will be controlled by the event steward and/or the corresponding seneschal who will determine whether they will be allowed and under what circumstances, with all con- sideration given to those who might be impacted by the noise.

# XXII. Policy on Hunting, Slaughtering, and Butchering[74]

1. The hunting or slaughter of live animals is prohibited at SCA functions. This prohibition does not include fishing, nor does it include necessary actions taken to protect event attendees from dangerous animals. The butchering of animals may be allowed as part of a class, demonstration, or for food preparation; however, all modern health regulations must be followed if the meat is to be prepared or served as part of a feast or other such SCA-sponsored food service. Furthermore, SCA participants are not to be subjected unawares to a scene that would violate reasonable sensitivities.

# XXIII. Changing and Maintaining Kingdom Law

## A. Changes to Corpora

1. It is the responsibility of Kingdom Seneschals to keep informed about changes made to Corpora and about requests that the SCA Board of Directors makes for commentary on proposed Corpora changes.

2. It is the responsibility of Kingdom Seneschals to read the Board Minutes for changes to Corpora. While changes to Corpora are always noted in the Minutes, if the change is lengthy it might not be printed in the Minutes. If the Society Seneschal does not send the change to Kingdom Seneschals, you should contact them and ask for the language of the change. Once a change to Corpora is approved, you are responsible for explaining these changes to your Crown and other Kingdom officers and making sure your Kingdom Law and Kingdom Officer Policies are modified so they align with new Corporate guidelines.

## B. Changes to Kingdom Law

1. Work closely with the Crown on proposed Kingdom (and Principality) Law changes.[75]

44

2. Law changes must comply with Society rules. Kingdoms can be more restrictive, but not less restrictive than Corporate policies.[76]

3. Do not allow Kingdom Law to encroach upon modern law. The SCA cannot forbid nor permit anything it does not have the legal right to do; nor can it allow anything outside of modern law.[77]

4. Separate your personal views from that of the governing documents; keep your formal written opinion as Seneschal to stating whether or not the required points are covered.[78] You may make recommendations to the Crown regarding changes you think are appropriate, but theirs is the final decision, subject to your evaluation of the legality of the proposed change.

5. As Seneschal, you cannot refuse to sign a law that is legal, regardless of whether you agree with it! You do not have veto power over the Crown's decisions unless what they want to do is contrary to Corpora, SCA policies, or Kingdom or real-world law.

6. Kingdom Law cannot contradict itself. If the Crown wishes to enact a new law that is contrary to an existing Kingdom Law, the latter must be explicitly changed or repealed.[79]

7. Kingdom Law must be signed by the Sovereign, Consort, and Kingdom Seneschal.

8. Changes to Kingdom Law must also be proclaimed at a publicized event in accordance with Corpora.[80] The proclamation need not involve reading every syllable of the new law. Changes may be summarized in court as long as there are copies on site for people who wish to see the details. The more substantive the change, the more information about it should be given in Court.

9. Changes to Kingdom Law must normally be published in the Kingdom newsletter before they go into effect.[81] The changes are considered to meet publication requirements within a primary/affected kingdom if:

   a. The entire text of the changes is published in the primary Kingdom official newsletter, or

   b. The entire text of the changes is published on primary Kingdom websites in unchangeable formats with the additional stipulation that all substantive changes, as well as a URL to the location on the websites of all primary Kingdoms, are published in official Kingdom newsletters.

C. **Maintaining Kingdom Law**

1. You are required to review Kingdom Law on a regular basis as defined by your Kingdom Law.[82] If your Kingdom Law does not provide for this, you still need to do this at least once a year to ensure compliance with the Governing Documents.

2. Double-check Principality Law. Insist that Principality Seneschals review Principality Law first for compliance with Corpora and Kingdom Law. Principality Law must be signed by both Principality rulers and the Principality Seneschal, as well as the Sovereign, Consort, and Kingdom Seneschal.

# XXIV. Managing Kingdom Branch Changes

45

## A. Establishing New Branches

### 1. Setting branch geographic borders

a. Branches should have physical justification—not political expedience. Branch spacing varies a lot among Kingdoms, but it is often based on reasonable driving distance.

b. Territorial branches must have clear borders.[83] ZIP or postal codes are the way the SCA, Inc. defines branch areas in most places. You may use other methods such as counties, etc., if those descriptors are easier for the populace to understand, but remember that if a polling is needed, you will need to supply the appropriate postal codes to the Corporate Office in order to get mailing labels or a membership list. Therefore, your office should keep a listing of each group's postal codes. Whatever approach you develop should look reasonably contiguous on a map, regardless of postal code lines. Look at traffic patterns, town and county lines, and geographic features like rivers and mountains. Enlist the aid of local Seneschals in establishing or refining the area definitions of their branches. In the event of a dispute over which group has jurisdiction over a geographical area or postal code, check the membership listing for the area and learn the wishes of the members who reside there before making an assignment decision. Remember that cantons and ridings are, by definition, inside the borders of their parent baronies and provinces. However, even cantons and ridings should not produce "doughnuts"—if a subsidiary group should become independent, it should not be surrounded by another branch.

c. Institutional branches must be based at real institutions. That is, Colleges must be based at institutions of higher learning and Strongholds at military institutions. This should be documented in the branch's report. The SCA encourages establishment of institutional branches wherever appropriate, but the structure is not to be used as a way to get around territorial requirements for affinity-groupings of members. If most of the people in the branch are unaffiliated with the real-world institution that is its supposed base, the group should be designated a shire (or canton/riding, if applicable). An institutional branch is a shell that exists independent of its population, so people can follow the demands of their studies or employers while the branch stays in place for members who move in as a result of similar transfers. It also provides a clear contact for the institutional authorities, which simplifies accounting for funds donated by the institution and allows the branch to adapt to institutional rules without affecting any larger SCA branch in the area. In addition, the institutional branch may make it easier to schedule SCA events in halls or grounds owned by the institution.

d. Baronies and Provinces can sponsor and administer an institutional branch if the suitable institution falls within their immediate boundaries. If there is no geographical branch holding the land, an institutional branch can exist independently. A small independent institutional branch may have somewhat flexible membership requirements due to a transient population.

e. Basic financial reporting units may not usually cross state, province, or country lines.[84] The Society must be able to report its financial results on a state-by-state (or international) basis, so Corpora prohibits any branch below Principality level from crossing a state line without a specific variance from the Society Seneschal. The Society Seneschal is extremely reluctant to grant such variances.

SCA_000564

## 2. Existing claims to branch territory

a. Respect existing land claims when supported by activity. If a branch holds a piece of land for the SCA, it must be consulted before a new branch can be formed there. However, a branch should have members and activities throughout the area it holds. If a town has no meetings or other SCA services within a reasonable drive and there are people there who want to organize them, give the branch that "owns" the town the choice between helping the locals and turning them loose. If the established branch is a Barony or Province, it may help to point out that creating a canton or riding does not negatively affect the old branch's population total, since the smaller branches remain part of it.

b. Be generous about recognizing existing land claims. "Claimed territory" is whatever the branch application says, if one can be found. If this cannot be found, go by the memories of long-term members and notes on meetings and events in old newsletters. It may well cause trouble if you ignore old claims, even if they are supported only by oral tradition. However, it is not necessary that every postal code in your Kingdom be assigned to an established group. It may be best to leave unpopulated, distant areas unclaimed, to allow for future growth.

## 3. Creation of an incipient branch[85]

a. Appoint the primary organizer as a Deputy Seneschal for the area. The job may be defined as your own deputy or as a deputy to whatever branch or regional organization your Kingdom has placed in charge of the general area where the new branch will be located. However, until the branch has official status, there is not an entity to which people may be appointed as officers. Encourage the rest of the Kingdom officers to take the same approach.

b. Make sure they have access to SCA Corporate documents and handbooks. Kingdom Law, the SCA Governing Documents (and affiliate governing documents where applicable), the Known World Handbook, and the Local Officer's Handbook are extremely important tools, and the more information and documentation you can provide, the more effective local organizers can become. The organizers also need personal contact with established branches and officers. It may be valuable to appoint a special Deputy Seneschal for Incipient Groups expressly to deal with the needs of new groups.

c. Set and enforce consistent event sponsorship policies. Incipient branches may not sponsor Society events. You can authorize the warranted deputies-for-the-area to hold local meetings in the name of the supervising branch, but do not let them put events on the Kingdom calendar on their own. They need to find a sponsoring branch, and the sponsor needs to offer more than just their name. If at all possible, the sponsor needs to provide a person to cover the event and make sure it follows SCA rules and procedures and offer some financial support as well since incipient branches may not hold SCA funds. If necessary, a Kingdom or Principality can sponsor events for an incipient branch, but it is better for one of the neighboring branches to do so. Incipient status provides a training period for the new branch, and it will work best if they have a consistent presence.

d. Remember that a warranted Marshal must be present to sponsor a fighting event, and waivers must be signed, collected, and sent to the Kingdom! If the most practical sponsor

SCA_000565

does not have a Marshal or the paperwork and personnel to comply with waiver requirements, the incipient branch needs to go further, if need be to the Kingdom or Principality, to line up the appropriate coverage. An incipient branch need not be exclusively sponsored by a single established group. Sponsorship could put a severe strain on the established group, both financially and in terms of personnel workload. Different events of an incipient group can be sponsored by different nearby groups. This not only spreads the work out, but it also enables the incipient group to become acquainted with more of its neighbors in the Kingdom.

e. Keep the incipient period short. If a branch is not ready to leave incipiency after two years, you should actively investigate why they are not ready.

## 4. New branch petition review and approval

a. You must review all branch petitions before they can be approved.[86] Per Corpora, you have the basic responsibility for deciding if a group meets the requirements for a branch and for advising the Crown accordingly. The Crown may refuse to establish a branch you have recommended but may not establish one you have not approved. If the Crown wants to approve a branch against your recommendation to the contrary, refer the matter to the Society Seneschal.

b. Consult the Society Seneschal before making any major change in existing borders.[87] Land claims can be tense enough that it might help to slow things down and take a second look before making changes. You should poll the members affected by the change to determine their wishes before proposing a change. If the change involves creating a canton, college, stronghold, or riding within the borders of an existing Barony or Province, and everyone is agreeable to this, you can proceed on your own. In fact, any boundary change that is generally agreeable to everyone affected can be done at the Kingdom level, provided you promptly inform the Society Seneschal of the change. However, if the change is controversial, you need to send it on to the Society Seneschal to look over. Also, remember that elevations to Barony or Province always require the Society Seneschal's approval.

c. If the change involves nothing more than reassigning a postal code from one branch to another, and both groups involved are amenable, or if you want to add a previously unassigned postal code to a branch's defined area (as long as it is geographically contiguous with the existing boundaries), then you can make this change without consulting the Society Seneschal.

d. When action from the Society Seneschal is required, your presentation to the Society Seneschal should include the following materials:

- Your recommendation.
- A clear description of the old and new boundaries with postal codes, with a map if appropriate.
- Letters from the Seneschals of the branch or branches involved in the action. (Note: If any of them maintain they cannot live with what you propose to do, you need very strong justification as to why it's necessary, and they should be able to support and document their position.)

48

**5. Paperwork for new branches (below Barony/Province)**

a. Make sure each branch organizer has clear instructions regarding the expectations and milestones needed for the creation of the new branch.

b. Keep detailed records on each new branch. Future Seneschals will need to know what territory the branch has, who started it, and when it achieved official status. It may be helpful to make branch organizers draw their borders on a map, as well as giving you a list of postal codes (or other relevant boundaries).

c. Make sure the College of Arms has approved the branch name. According to Corpora, an incipient branch can use a tentative name, but it cannot get full status until the name is registered. Be sure incipient groups are aware of this requirement and encourage them to begin work on their name and get it submitted as soon as possible.

d. Make sure every group finds an acceptable name.[88] If you can show a consistent good-faith effort by a group to register a name over a long period of time, and the College of Arms has rejected their every attempt, you can apply to the Society Seneschal for a variance to allow the group to become official without a registered name.

e. Give the branch a detailed record of its territory. When you decide that a branch is ready for official status, make any necessary adjustments to the borders and postal codes shown on their branch application. Note the date the Crown declares them a full-status branch of the SCA and give them a signed copy for their records.

f. Notify the Society Seneschal of new official branches.[89] Please use the following format: Branch name (modern location), branch type, month, and year of status. Send this notice after the deed is done. Plans are subject to change, so the Society Seneschal has no interest in an incipient shire that is probably going to be made official next month. It's not real until its existence has been read into the record at a Board meeting.

g. Here is a summary of what must be done in order for a branch to become official or full status. These things are usually done in the order listed.

- The Kingdom Seneschal must approve the petition. At this point, the branch must start functioning as an official group, with officers, reports, etc.
- The Crown must recognize the new branch in Court.
- The Society Seneschal must be informed of the branch's existence.
- The branch's status must be recognized by the Board of Directors.

# B. Creation of a Barony or Province

1. The formal minimum requirements for baronial or provincial status are given in Corpora.[90] This is a description of what a Kingdom Seneschal has to do to make sure that the Board will not overturn a baronial/provincial creation for lack of paperwork or improper procedure.

2. Baronies and Provinces are large branches within and subject to the administration of a Kingdom (and Principality, if any). They are alike in status and in the ability to administer other branches within their borders but differ in that Baronies possess ceremonial

49

representatives appointed by the Crown and therefore have the ability to administer Baronial awards, while Provinces do not.[91]

3. A branch or contiguous group of branches may petition for Baronial or Provincial status as the members prefer, subject to the approval of the Crown and (if applicable) the Coronet, if the resulting entity meets the following requirements:

   a. At least 25 paid members in good standing. Strive for double that.

   b. A set of officers acceptable to the Crown (and Coronet, if applicable).

   c. A name and device registered with the College of Arms.

   d. Consensus favoring advancement in branch status and favoring the type of branch (Barony or Province) specified in the petition. Note: If the branch is to be a Barony, arrangements shall have been made with the Crown at the time of application for Baronial status to select and appoint a Baron and/or Baroness in accordance with Kingdom Law and custom.

   e. A strong record of activity in a variety of fields of Society endeavor.[92]

4. At least 25 paid members in good standing means that there are enough members, more than the minimum of 25, to ensure that the group has sufficient diversity and adult participation to be sustainable moving forward. Here are some questions to ask when considering whether membership is strong enough to sustain a new SCA group:

   a. Are the paid members from different families, households, and areas of the postal codes being claimed? Will the branch lapse below 25 if one family moves and another lets its membership lapse?

   b. Do the paid members have a diversity of SCA activities and interests (arts and sciences, service, combat, archery) or will the branch lapse if one area of interest is discontinued?

   c. Do the officers of the group come from different families and households?

   d. How long have the members been playing?

5. A set of officers is generally considered to consist of the Great Officers required to run the group: Seneschal, Exchequer, Herald, Marshal, Chronicler, and Minister of Arts and Sciences. Other offices may be required at Kingdom option. The key item in evaluating the group's officers is whether the group has a successful history with each of the required offices functioning and reporting, and whether their superior officers have observed the officer position working successfully within the group.

6. Unless the history is exceptional and well documented, the requirement for a registered name and device will not be waived for Baronial/Provincial advancement.

7. A strong record of activity means that there are regular meetings and practices, that the branch does not cater only to one specific SCA interest group (fighters, artists, etc.), that demos are done as appropriate, that the branch holds events on approximately the same frequency as other Baronies/Provinces in the Kingdom, and that people from the branch

50

SCA_000568

participate in other branches' events. A branch whose residents never venture outside their area is not ready to be advanced; this may be discounted in the case of geographically isolated groups where travel to other branches is especially difficult.

8. There must be a consensus in polling the area. This can be done by a mailing to the members, or by passing a petition around a meeting. Electronic pollings are acceptable as long as it can be verified that each person polled is returning one and only one response. The entire paid member population of the area must have a chance to comment (generally, in writing) on the proposal. The petition or poll must be unambiguous. Each page of signatures or each letter must include a preprinted explanation of what the signatures mean. This may take the form of a heading declaring that the undersigned all want a certain stated course of action, or it may involve columns for noting support, opposition, or indifference for a stated course of action.

9. Make sure that the people who signed the poll knew what kind of branch they were petitioning for, and in the case of a Barony, that they knew how the first Baron and/or Baroness would be selected. It is best if this information is included on the petition or polling letter. Make sure that the petition or poll indicates membership status, which must be checked against a Registry list.

10. The Corporate Office can provide labels for a polling mailing. The Kingdom Seneschal should either order the set on behalf of the poll organizers, or email or fax an authorization to the office authorizing the release of the labels to a specific person. There is no charge for this service. The request should specify the postal codes (in numeric order, giving ranges rather than individual codes where possible) to be included in the label set. Branch pollings as a rule must include all paid members in good standing of any type within the boundaries of the areas being polled, and the Corporate Office requires that the labels be used within ten days after they are issued. Persons who actively play in the area but live outside it may be polled at the discretion of the Kingdom Seneschal.

11. The members polled must understand that a petition or polling is not a vote! It is merely a way for the Kingdom Seneschal to assess the opinions of the people. The Seneschal will decide whether to recommend advancement of status. When you evaluate a poll, look for the following points:

    a. A substantial majority of the Society members in the area must have responded to the poll. Make sure everyone is informed of the polling.

    b. A substantial majority of the response must be favorable. You want general support from the people in the area, not a household power trip.

    c. The opposition must not be convincing. If there are more than two or three people against the change—that is, negative instead of neutral—find out what their reasons are and consider them carefully before forming your own conclusion.

    d. Non-member support cannot replace member indifference or opposition. While non-members may be allowed to express an opinion, gathering the wishes of the paying members is crucial.

SCA_000569

12. The Kingdom Seneschal should also gather input from the other Kingdom officers, the Crown, and the Seneschals and ruling nobility in adjacent branches for their feelings on the proposed branch elevation.[93] Especially ask the superior officers whether they feel that the branch officers are capable of handling the changed responsibilities.

13. As Kingdom Seneschal, it is your responsibility to prepare a detailed package for the Society Seneschal's review.[94] Give the Society Seneschal your considered opinion as to whether the branch is ready for advancement, and include the following items:

> a. A statement from you, as Kingdom Seneschal, that the membership thresholds have been met.

> b. A summary of the petition/polling process, with a copy of the petition or letter and a breakdown of the voting, separated into sustaining/other member/non-member.

> c. A list of the proposed postal codes (or other boundaries for international groups), especially if there are any changes being made.

> d. Statements from local and Kingdom officers, the royalty, and the neighbors supporting the advancement. The Kingdom officers should also give their opinions of the local officers.

> e. The branch's own explanation of why it is ready to advance, along with a brief summary of activities in the area.

> f. A plan for selecting the first Baronial ruler(s) if the branch will be a Barony.

14. Occasionally a group will express a desire to become a Palatine Barony. A Palatine Barony is a Barony that selects its Baron and/or Baroness periodically via some sort of competition: a tournament, an arts competition, or sometimes some combination of competitions. Palatine Barony status is used, extremely rarely, for groups that are remote enough from the rest of the Kingdom that they are unlikely to be able to participate regularly in the Kingdom's pageantry. If a group seeks Palatine Barony status, consult the Society Seneschal before proceeding.

## C. Principality and Kingdom Elevations

1. Work with the Society Seneschal from the start.[95] Principality and Kingdom elevations are rare and too individual for specific procedures to be useful, but you need to make sure that they include a comprehensive polling and review process (see instructions under Creation of a Barony). Any minority opinion must be addressed—the smaller group is not necessarily wrong, and a serious attempt to deal with their objections will do a lot to draw them into the life of the new realm. For a Principality or Kingdom polling, the Registry will prepare a set of labels at your request. Just specify the postal codes to be included. You may release these labels to the poll organizers, with the warning that they are to be used only for the poll itself, and that they must be used within 10 days.

SCA_000570

2. Prepare a detailed package for the Society Seneschal's review.[96] Give the Society Seneschal your considered opinion as to whether the group is ready for advancement, and include the following items:

    a. A description of the polling process, including dates and copies of the information sent out to explain the poll.

    b. The detailed results of the polling, including any areas where opinion runs strongly counter to the rest of the proposed Kingdom or Principality.

    c. A map showing the borders of the proposed Principality or Kingdom.

    d. A list of postal codes to be assigned to the new realm. Where possible, these should stick to 3-digit (known to the Post Office as SCFs) breaks. You must list all SCFs to be included in the new Kingdom, and all individual ZIP Codes so affected if the new Kingdom is not claiming the entire SCF regardless of whether anyone lives there at the moment or not! Outside the US, where the SCF does not apply, then the appropriate divisions of the postal code should be used.

    e. If all or part of the proposed Principality or Kingdom lies outside the US, you will need to work with the Society Seneschal to determine the appropriate way to designate territory.[97]

    f. Statements from officers supporting the change in status.[98] For a Principality, include letters from at least the Earl Marshal, Kingdom Exchequer, Principal Herald, Minister of Arts/Sciences, and Chronicler, noting their confidence in the area's ability to operate at the new level. All the parent Kingdom's officers should comment on a proposed Kingdom elevation, as well as their Corporate counterparts.

    g. Draft Law to be presented to the victors of the first Royal Lists.[99] (Note that the victors may choose to adopt different laws than the draft presented; this is their right as royalty.)

    h. Financial Policy for a potential Kingdom, and a plan, if applicable, for any asset transfers to the potential Kingdom.

    i. A date (or a range of dates) for the first Coronet or Crown Lists, and a statement regarding the plans for establishing the first set of royalty. Some realms choose a field-side investiture immediately after the Lists, while others prefer to hold a separate event. Either approach is acceptable, but the choice should be made well in advance, so no one is taken by surprise.

    j. For a Kingdom, statements from the Crown and Coronet supporting the transition plan, and the entry conditions for the tournament—or your explanation of the reasons why they were not able to reach an agreement.

    k. For a Kingdom, a plan for the transition of the newsletter from "unofficial" status to that of a newsletter covered by SCA membership.[100]

    l. To avoid outside adjudication, Crown Lists and Coronation plans must be acceptable both to the new Kingdom and to its parent. The parent Crown, the new Crown (if applicable), and the last Coronet should settle on a format for the tourney and the release of the new Kingdom. Their Seneschals, Marshals, and Heralds should all

53

contribute to a smooth and gracious agreement—and you are a key player in the process. If there is no resolution, Corpora gives the final choice to the Society Seneschal and the Board.

3. Use "Crown Principality" status to recognize regional development. Where an area is obviously suitable for eventual Principality status, a Kingdom can reward and encourage the trend by declaring the area to be a Crown Principality. A Crown Principality is exactly and only a region with a fancy name and a line in the Coronation ceremony—the Sovereign and Consort also become the titular rulers of the pseudo-Principality when they assume the thrones. It has no laws but the Kingdom laws. Its officers are regional deputies to the Kingdom officers. However, the name lends it extra emotional reality. The Kingdom can allow it to develop some customs of its own which will smooth the eventual transition.

4. All the procedures for creating a Crown Principality are under Kingdom control, as long as the Kingdom doesn't attempt to hand over functions reserved for the royalty or officers of SCA Principalities. That is, the ceremonial representatives for the Crown within a Crown Principality may NOT warrant subordinate officers, proclaim banishments, or bestow armigerous awards without specific Crown approval for individual recipients.

5. Please be cautious with the idea and do some polling before advising your royalty to establish a Crown Principality.

## D. Branch Suspension

1. The Kingdom Seneschal may suspend a branch for just and stated cause. Suspension is used when a branch has proven unable to follow the rules for being a branch, such as filling offices appropriately, following kingdom or Society policy, or conducting its affairs in a manner that provides a good SCA experience for the majority of the citizens of the branch.

2. The conditions under which a suspension will be lifted should be defined in writing for the group at the time the suspension is imposed. Whenever possible, a status review date on which the suspension will be reconsidered should also be defined and announced to the group. In no case should suspension last longer than six months without a review of the suspension.

3. A suspended branch may not handle money. If a branch fails to turn in its financial report in time to be included in the Kingdom report, the SCA report for the year is affected. The sanctions must prevent them from receiving or spending funds in the name of the SCA until they are restored to their full place in the Kingdom. Work with your Kingdom Exchequer to be sure that you have a procedure for keeping track of their prior assets, and for helping them survive the period of suspension. Note that the Exchequers' Year-End Reports (for branches within the U.S.) are compiled to form the SCA annual report to the IRS, and failure to file this report (by any branch) can imperil the SCA's tax-exempt status.

4. Suspension is better as a threat than as a penalty. A branch very rarely goes into suspension because of a problem caused by all its members. When you apply penalties to a whole branch, you may reduce the quality of life in the SCA for a group of innocent members and potential members because of the carelessness or ill fortune of a few officers. You need to have sanctions to apply to a branch—but they should be a last

54

resort, used only when reminders, replacement of officers, and offers of help have all failed to locate someone who can meet the requirements.

## E. Branch Abeyance (Dormancy)

1. The Society Seneschal may accept the recommendation of a Kingdom Seneschal that a group go into abeyance/dormant status (the terms are synonyms) if a majority of the group members have been assigned to other activities (e.g., military service and deployment) and are away from the area for a period of time longer than three months.

2. The Society Seneschal may accept the recommendation of a Kingdom Seneschal that a group go into abeyance status if a majority of the group members have been affected by natural disasters such as severe flooding or a direct hit from a hurricane or tornado and are in need of extended time to rebuild.

3. The Society Seneschal may accept the recommendation of a Kingdom Seneschal that a group go into abeyance status for lack of membership or lack of officers if the Kingdom Seneschal reasonably believes that the group can regain the numbers or officers needed within a set period of time.

4. During this time the group will go dormant, and the Kingdom will recognize the group as being in abeyance status. When a group goes into abeyance, the group's bank account will be turned over to the Kingdom to maintain until such time as the group is out of abeyance or the group is dissolved due to lack of activity or interest. All heraldry will be maintained by the group throughout the abeyance. It will be the responsibility of the Kingdom Seneschal to report for the group while in abeyance status.

5. The period of abeyance/dormancy (the terms are synonyms) cannot last indefinitely. If, after two years, the group has not regained sufficient membership or participation to be restored to active status, it should be dissolved unless the Kingdom can document reasons to continue the abeyance or dormancy.

6. If the group is dissolved, all funds currently being handled by the kingdom will revert to the Kingdom.

## F. Lateral Branch Conversions

1. Lateral conversions include those between shire or canton and institutional branch and vice versa, and those between Barony and Province. They also include changes between shire and canton. You should consult the Society Seneschal regarding any questionable lateral conversions.[101]

2. You must, at a minimum, poll the membership (paid members in good standing) of the affected area prior to a lateral change. Especially at the baronial or provincial level, you need to be as sure of the wishes of the membership as you would be for an elevation to that status. Kingdoms may also elect to create policy that allows the polling of persons who participate in the branch but are not paid members living within the confines of the branch. The polling must reflect that a compelling majority of the paid membership within the boundaries of the affected area are in favor of the proposed change.

SCA_000573

3. Try other alternatives before making a Barony into a Province unless the branch actively chooses this change. If a Barony runs into trouble selecting new ceremonial heads, the Crown can appoint a vicar as an interim measure or take over as Baron and Baroness directly for a while. Before you agree to propose an outright status change, make sure that the people of the Barony understand that baronial awards will be closed while the branch is a province—this may give them the incentive to resolve their differences. (Existing provincial awards were grandfathered when the 1989 Corpora was adopted. That privilege does not extend to Provinces formed after that time, whether established as Provinces or converted from Baronies.)

4. Per Corpora, lateral changes must be approved by the Society Seneschal.[102]

## G. Branch Demotion or Dissolution

1. Remember that while a Kingdom Seneschal can dissolve an incipient branch for cause, all other branch demotions and dissolutions must go to the Society Seneschal for approval and be upheld by the Board. Once a branch has advanced beyond incipient and gained official status, it can only be dissolved or lowered in status by a Board decision, per Corpora.[103]

2. Demotion or dissolution of an SCA group that has gained official status is a last resort. Work with the people in a branch as long as it looks like there's any chance of saving it. Warn them before you recommend dissolution and listen to the justifications, they offer for staying in operation. In isolated areas, it may be possible to sustain a branch's status with fewer members than normally required; check with the Society Seneschal if you think a variance might be desirable.

3. Once you have decided that dissolution is the proper course of action, you will need to present the reasons, in writing, to the Board and the Society Seneschal.[104] When you set up the case for the Society Seneschal to give to the Board, include good reasons, and the efforts already made to correct the problems. If population is low, give numbers at intervals to show that it's been low for a good while and is unlikely to recover. If the problem is lack of interest, define it in terms of inability to fill offices or file financial reports. If interpersonal problems have seriously damaged the SCA's reputation, describe specific incidents, and include letters or news stories from the area if you have them.

4. In order to be this specific, you have to know what's been going on. Dredging up old records in order to reconstruct population and reporting history is very difficult. Count your branches every year or so from the current postal code list and keep a central tally of how they're doing.

5. Demotion: If a Barony or Province has fallen below the 25-member minimum for a period of time, or is consistently unable to maintain a full slate of officers as required by Corpora, it may be necessary to demote the group to shire status (or canton or institutional branch status, if appropriate). Follow similar procedures before doing this as you would for dissolving a group that wasn't maintaining minimum requirements: Work with the group to try and solve their problems and maintain their status if it looks like they can recover in a reasonable time. If it does become necessary to demote the group, remember that the Board must approve this action. You will need to document it to the Society Seneschal in the same manner you would document a dissolution.

SCA_000574

# XXV. Insurance Matters

A. SCA, Inc. maintains insurance that covers the corporation and its officers in certain instances. Because the specifics of our insurance policies can and do change from time to time, any specific insurance questions need to be directed to the Corporate Office. They will get answers for you and help you with any processes related to activating insurance or acquiring proof of coverage.

B. You do not need to do anything special to activate the SCA's general liability insurance. This is the policy that covers, for instance, site damage. If a site owner wants proof of insurance, usually the "proof of insurance" letter available from the Corporate Office will suffice. If the site owner wants to be named as an "additional insured," there is a fee involved and lead time required. Follow the directions on the SCA web site for either of these circumstances or contact the Corporate Office for guidance.

C. There is also an additional fee and lead time required for equestrian or golf cart insurance. These policies must be activated whenever there will be horses (or similar animals) on site, or if the SCA is going to use golf carts at the event. Again, contact the Corporate Office for instructions.

D. When a group rents golf carts, the SCA's Golf Cart Insurance must be activated. All other requirements set forth by the Corporate Office dealing with insurance apply including all pertinent late fees.

E. If fireworks or fire arts are performed, Society Seneschal approval and outside insurance coverage is required.  The local groups are responsible for 100% of the cost and responsibility for this additional policy.  Fire Arts, which include but are not limited to firewalking, fire-breathing, explosives, and pyrotechnic displays may not be conducted as an SCA sponsored activity at events, demos, practices, or formally recognized gatherings. Variances must be requested of the Society Seneschal in writing and only take effect when granted in writing by that office.  The Event site will pay for any additional insurance needed.

F. The SCA carries Director and Officer (D&O) liability insurance. The purpose of D&O liability insurance is to provide the SCA and its officers  and agents with insurance coverage for legal defense required to respond to lawsuits that name the  SCA or its officers. All warranted officers and their agents are covered by  this insurance within the bounds of performing their office in the SCA.

G. If you have reason to believe there will be a claim against the SCA's insurance, you need to notify the Corporate office at once. Do remember that there is a deductible, so small claims for property damage will not meet the deductible.

H. You can also refer to the instructions on sca.org for more information.

SCA_000575

# XXVI. Oversight of Society-Owned Trailers

### A. Regional Applicability

1. This section applies only within the SCA, Inc. Check local policy for registration and insurance arrangements in affiliates.

### B. Procedure for Reporting the Purchase, Registration, Insurance or Sale of SCA Owned Trailers

1. Each branch, group, office, guild or other officially recognized entity (hereafter referred to as a "group") of the SCA that owns a trailer that is registered in the name of any SCA group, must send a copy (a copy, not the original) of the current registration to the Corporate Office. The Vice President of Corporate Operations or their designee will retain a copy of the current registration along with a copy of the current "proof of insurance" for our files. This needs to be done within 30 days of acquisition of the trailer.

### C. Maintenance of Records

1. Each branch, group, office, guild, or other officially recognized entity (hereafter referred to as a "group") of the SCA that owns a trailer that is registered in the name of any SCA group must maintain records of purchases and sales as noted below.

2. When the vehicle is purchased:

- Retain copies of the title, the current registration and current "proof of insurance" in both the group's Exchequer and Seneschal files. A copy must also be retained in the group's Regalia Officer files, if applicable.

- Report the purchase of the trailer to the SCA Corporate office by sending a copy of the registration and current "proof of insurance" for the vehicle to the corporate office.

- It is the responsibility of the group to obtain and maintain insurance for the trailer.

3. When the vehicle is sold:

- Retain the bill of sale in the group's Exchequer files, with copies in the group's Seneschal files and Regalia Officer files (if applicable).

- Report the sale of the trailer to the SCA Corporate Office so SCA insurance can be canceled for the trailer. Do this within 30 days of the sale.

## B. Trailer Insurance

1. All trailers purchased and owned by the SCA must be registered to an SCA group as defined above and must be insured by the SCA group at their own expense. The group must also send a copy of the registration to the Corporate office within 30 days of registration.

58

2. **Do not register the group's trailer in the name of an individual or an officer of the group.**

3. If a third party's person or property is damaged as a result of an accident involving a trailer when being towed, the individual towing the trailer bears responsibility for liability and should contact their insurance carrier. It is the responsibility of the Seneschal of the group that owns the trailer to check to make sure that the tower/driver of said trailer has the appropriate motor vehicle liability insurance.

4. Some groups own a trailer that is used for storage only, i.e., it never moves from the storage site. If such a "stationary" trailer is legally required to be registered, the group is responsible for following the procedure as outlined above.

# XXVII. Registration and Legal Agents

## A. Regional Applicability

1. This section applies only within the US and Canada.

## B. State and Province Registration

1. The Society for Creative Anachronism, Inc. is incorporated as a non-profit corporation in California, and is registered to do business in all states and provinces where required by local law.

2. There are subsidiaries of the SCA, Inc. incorporated in various states. These incorporations are for Corporate legal reasons and have no effect on "game side" activities. These subsidiaries affect no officers except at a Corporate level. No Kingdom-level or local officer should need to deal with these subsidiaries. Any questions about them should be referred to the Society Seneschal and the Corporate Office.

## C. Legal Agents

1. The SCA, Inc. has retained a corporation to act as its legal agent in all states and Canadian provinces for the purposes of receipt and service of legal documents. If any officer in your Kingdom, at any level, receives any legal document naming the SCA or any branch, they need to report it to you as Kingdom Seneschal, and you in turn need to inform the Society Seneschal and the President as soon as possible.

SCA_000577

# XXVIII. Society Seneschal Policies and Interpretations

**This section is reserved for adding future policies and interpretations to keep the Handbook current between revisions.**

SCA_000578

# XXIX. Reporting Table

| What | To Whom | When |
|---|---|---|
| Updated copies of Kingdom and Principality Law | <ul><li>Changes must be published in Kingdom Newsletter.</li><li>Copies must be available to populace from Kingdom and/or Principality Seneschal.</li><li>Copies of changes must be provided to Society Seneschal and Kingdom's Board Ombudsman.</li></ul> | After the change has been reviewed by the Kingdom Seneschal and approved by the Crown, and after the change has been announced |
| Kingdom and Principality Officer Policies | <ul><li>Changes must be published in Kingdom Newsletter.</li><li>Copies must be available from Kingdom and Principality Officer.</li><li>Copies of changes must be provided to appropriate Society Officer.</li></ul> | After the change has been announced to all branch officers |
| Resumes for applicants for the position of Kingdom Seneschal | Society Seneschal | Before the final selection is made at the Kingdom level |
| Kingdom Seneschal's Warrant | Society Seneschal | After it has been signed by the Crown and as soon as possible after you have been approved by the Society Seneschal |
| Kingdom Seneschal Quarterly Report | Society Seneschal and your Crown | First of March, June, September, December |
| Notification of winner of Crown Lists | Society Seneschal | As soon as is reasonable after the event |
| Impending Royal or Administrative Sanctions | Society Seneschal; relevant Society Officer if imposed by a Kingdom Officer other than the Seneschal | As soon as is reasonable after the decision |
| If fire, police, or EMS had to be called to an event | Society Seneschal, President, Corporate Office | As soon as is reasonable after the event |
| Threatened lawsuit | Society Seneschal and President | As soon as is reasonable after the event |
| Financial irregularities (theft, embezzlement, etc.) | Society Seneschal and Society Exchequer | As soon as is reasonable after the event or discovery |

61

| Violations of Rules/Laws by Crown or Great Officers | Society Seneschal | As soon as is reasonable after the event |
|---|---|---|
| Proposed dissolution of an established branch | Society Seneschal | Before you announce it to the group as official; this must have Board approval |
| Elevation of a new branch to official status | Society Seneschal | As soon as is reasonable after the group has been recognized in court |
| Elevation to barony/province or lateral change in branch status | Society Seneschal | Before you announce it to the group as official; these must have Society Seneschal approval |
| Changes to your postal code assignments by the post office, or changes you have made in your kingdom | Society Seneschal | In your next quarterly report; your office is responsible for tracking these and keeping records of them |
| You need to file a claim against the SCA's insurance | Society Seneschal and Corporate Office | As soon as is reasonable after the decision or discovery |
| SCA sponsorship was pulled from an event | Society Seneschal and Board Ombudsman | As soon as is reasonable after the decision |
| Bids or proposals for Known World events | Society Seneschal; Society A&S Minister for symposiums/collegiums | After approval by Kingdom Financial Committee |

SCA_000580

# XXX. Known World Event Policy

## A. General Guidelines

1. There are three types of Society-wide events: Known World Collegia/Symposia, Known World Summit Meetings, and Society Anniversary Events.

2. Each one of these events, once approved, is a separate project of the SCA, Inc.

3. Each project is not complete until all required reports are completed, received, and approved by the appropriate Society Officers. Local or regional events cannot, by definition, style themselves as Known World Events.

4. Each Event will be allowed to print advertisements in all Kingdom Newsletters without charge. Advertisements are subject to the submission deadlines set by each Kingdom. The formatting of the advertisement shall be at the Kingdom Chronicler's discretion and must meet Society standards for event advertisements.

5. Visit http://socsen.sca.org/wp-content/uploads/2013/06/kweventpolicy.pdf for more specific details.

## B. Known World Collegia/Symposia

1. Collegia/Symposia are large/scale events focused on specific areas of interest (artistic, martial, or administrative) and open to general attendance and participation by SCA members and non-members.

2. Each Society Officer will make a policy regarding how and how often events focused on their joint or several venues are to be solicited, and what the content of these events can or cannot be. The subject area sponsor (Society Officer, Deputy Officer, etc.) may decide to schedule a symposium and invite the membership to submit proposals on the same, or a local person, branch, or organization may seek Society Event sponsorship by proposing the same to the appropriate Society Officer.

3. Proposals for these events are collected by the Society Officer in charge of the focused area of interest.

4. Proposals are accepted by the Society Officer involved with a courtesy copy to the Society Seneschal.

5. Criteria for bids/proposals for Collegia/Symposia:

   a. Criteria will be determined by the Society Officer(s) responsible for the event.

   b. Minimum information in order for the event to appear on the Society Calendar is:

   - Name/date/location of event
   - Name of event steward
   - Planned activities
   - Event financials (as per Society Anniversary Event proposal)

63

- Evidence of Kingdom and branch support

## C. Known World Summit Meetings

1. Known World Summit Meetings are events dedicated to a specific administrative venue and are restricted in attendance to Kingdom officers, Kingdom-level deputies, and Society-level deputies.

2. Summit meetings are groups of officers and/or subject matter experts that get together in person for the purpose of improving the overall issues, efforts, and effects of the area of interest.

3. These events are not open to the general membership and participants of the SCA and are invitation-only.

4. Proposals as such are not solicited for summit meetings, but event proposals and plans are prepared by the appropriate Society officer or their project manager for the meeting.

5. Proposals are accepted by the Society officer and copied to the Society Seneschal.

## D. Society Anniversary Events

1. These events occur at a minimum of every ten years, and in some cases every five years.

2. These events are large-scale events with a general focus and are open to general attendance and participation by both SCA members and non-members.

3. The Society Seneschal will advise the Board when an anniversary opportunity exists and request a call for proposals be sent to the membership for action. The call for proposals should be submitted to the Board of Directors no less than one year before the date the proposals would be due. The initial due date for event proposals should be no less than 18 months and not more than 48 months before the desired event date.

4. Proposals for these events are collected by the Society Seneschal and accepted by the Board of Directors.

## E. Proposal Approval and Acceptance

1. Known World Collegia and Symposia

a. Each Society officer will make policy regarding how events focused on their joint or several venues are to be awarded. Once a Known World Event proposal has been awarded, the sponsoring officer will inform the Seneschal of the Kingdom hosting the event. It is the responsibility of Society officers to coordinate Known World Event activities to minimize scheduling and resource conflicts.

b. Exchequers for Known World Events will be warranted as deputies to the Exchequer of the Kingdom hosting the event.

64

SCA_000582

2. Known World Summit Meetings

    a. Each Society officer will make policy regarding how and when summit, or business, meetings with high-level staff and Kingdom officers are required, planned, and held.

3. Society Anniversary Events

    a. The Society Seneschal will distribute the proposals to the Society officers for review for 30 days. Any comments will be collected by the Society Seneschal and added to the proposal information.

    b. The Society Seneschal will review the proposals for completeness, request any missing information, and create a completed proposal packet for each proposal.

    c. The Society Seneschal will forward the completed proposals to the Board of Directors along with analysis and recommendations regarding the proposals.

    d. The Board of Directors will review the proposals and take one of the following actions:

- Award one or more of the proposals.
- Direct the Society Seneschal to obtain additional information on one or more of the event proposals.
- Extend the deadline and call for additional event proposals.
- Elect not to award a proposal for that given event opportunity.

    e. Once the Board of Directors has awarded one of the proposals, the Society Seneschal will take the following actions:

- Inform the key contacts of the successful proposal.
- Inform the key contacts of the unsuccessful proposals.
- Inform the other Society officers.
- Inform the Kingdom Seneschals.
- Issue a warrant for the Event Steward(s) as Deputy Society Senescchal(s).
- Once the Board of Directors has awarded one of the proposals, the Society Exchequer will issue a warrant for the event Exchequer as a Special Deputy until six months past the end of the event.

## F. Before the Event

1. Status reports: The Event Steward will prepare a quarterly status report. For Anniversary Events, it will be sent to the Society Seneschal and the Seneschal of the Kingdom hosting the event. For Known World Events, it will be sent to the Society officer involved and the Seneschal of the Kingdom hosting the event.

2. Financial reports: The Event Exchequer will prepare quarterly and yearly financial reports. For Anniversary Events, these will be sent to the Corporate Treasurer, Society Exchequer, and the Exchequer of the Kingdom hosting the event. For Known World Events, they will be sent to the Society officer involved and the Exchequer of the Kingdom hosting the event.

SCA_000583

3. Advertisement: Each Event will be allowed to print one full page or two half-page advertisements in all Kingdom Newsletters without charge. Kingdom Newsletters may require a payment to print advertisements over this allocation.

## G. After the Event

1. Event summary report: After the Event has taken place, the Event Steward will file a final report with the Society Seneschal's office no later than 90 days after the event. This reporting package will include a full operational report of the event, with a financial summary. This report will copy the Seneschal of the Kingdom hosting the event. For Known World Events, this report will also be sent to the Society officer involved.

2. Financial report: The exchequer will file a final report with the appropriate Exchequer's office no later than 90 days after the event. This reporting package will include full financial reporting for the event. For Known World Events, this report will also be sent to the appropriate Society officer. If the event used a separate bank account, reports will continue to be filed until the account is closed and any money remaining is transferred to another SCA branch or the Corporate office.

3. Postmortem report: The Society Seneschal and Society Exchequer's office will jointly conduct a lessons-learned effort for the event within 60 days of receipt of the final event reports. They will create a report distributed to the Society officers and the Event Stewards, to be included in a lessons-learned knowledge database for future Society events.

4. Document retention: Follow the SCA Document Retention Policy.

    a. The following documentation, as a minimum, will be sent to the Society Seneschal for review and inclusion into the Society Event knowledge base:

- Copies of all event proposals.
- Copies of all quarterly event status reports, including financial reports.
- Copies of event wrap-up reports, including financial reports.
- Lessons-learned report.

## H. Proposal Checklist for Society Anniversary Events

- ➢ Site location
- ➢ Full address, including State/County/Municipality of the site
- ➢ Contact person at site for questions
- ➢ Distance to closest major airport
- ➢ Shuttle service availability and rates
- ➢ Public transportation availability and rates
- ➢ Relationship to highway system
- ➢ Location of closest hospital
- ➢ EMS response time to site
- ➢ Trauma level
- ➢ Walk-in clinic or other urgent care center available nearby
- ➢ Distance to closest town or city
- ➢ Grocery stores
- ➢ Hardware stores
- ➢ Laundry facilities
- ➢ Distance to nearest hotel(s)
- ➢ Average single- and double-room prices
- ➢ Availability of group rates
- ➢ Other tourist attractions in the area
- ➢ Site facilities
- ➢ General description of site (open fields, heavy woods, rolling hills, etc.)
- ➢ Size of site
- ➢ Site capacity

SCA_000584

- ➢ Parking lot capacity (permanent structure types and count)
- ➢ Water source on the site (municipal, well, or other)
- ➢ How many spigots at what distance apart?
- ➢ Number of toilets
- ➢ Flushing
- ➢ Portable
- ➢ How often will they be serviced (emptied)?
- ➢ Number and description of showers (indoor, outdoor, primitive, heated, solar, etc.)
- ➢ Are non-camping accommodations available on site?
- ➢ If yes, what and how many beds?
- ➢ Trash pick-up arrangements
- ➢ Equestrian facilities
- ➢ Handicapped facilities provided by the site
- ➢ List any other facilities available on site
- ➢ Site permissions and restrictions
- ➢ Alcohol policy for the site
- ➢ General pet policy
- ➢ Is coursing of hounds permitted?
- ➢ Is equestrian activity permitted?
- ➢ Other shelter options (such as rental tents) available
- ➢ Grounds use limitations
- ➢ Any local modern ordinances, permits or requirements that must be taken into consideration
- ➢ Proposed dates: List all possible dates in order of preference
- ➢ Average weather and temperature range in that area for the time of year
- ➢ Possibility of catastrophic weather events in the area during the time requested (hurricane, tornado, floods, etc.)
- ➢ Other large modern events in the area just before, during, and after the event
- ➢ Personnel
- ➢ List contact information and relevant major event experience for the head person in all applicable positions
- ➢ Event Steward
- ➢ Exchequer
- ➢ Pre-Registration
- ➢ Head Gatekeeper/Troll
- ➢ Security Constable

- ➢ Marshal-in-Charge
- ➢ Event Herald
- ➢ Head Cook
- ➢ Children's Activities Coordinator
- ➢ Activities Coordinator
- ➢ Merchant Coordinator
- ➢ Land allocation/Hotel liaison
- ➢ Media Liaison
- ➢ Volunteer Coordinator
- ➢ Event Proceedings Coordinator
- ➢ Other staff
- ➢ Event activities
- ➢ Describe the planned event activities under the headings that apply for the event
- ➢ Meetings and classes
- ➢ Fighting
- ➢ Archery
- ➢ Arts & Sciences
- ➢ Children's activities
- ➢ Equestrian and/or coursing
- ➢ Heraldry and on-site communication
- ➢ First aid
- ➢ Main courts/Royalty activities
- ➢ Land allocation
- ➢ Other activities
- ➢ Event financials
- ➢ Financial Policy for the event
- ➢ Who is on the Financial Committee
- ➢ How expenses get approved
- ➢ How emergency expenses get approved
- ➢ Proposed budget including:
- ➢ Proposed income using fees x expected attendance, not including NMR
- ➢ Proposed expenses by category and event activity
- ➢ Estimated front money needed to hold the event
- ➢ Proposed division of profit between the Corporation and the sponsoring group, and if applicable, any other groups
- ➢ Proposed division of losses between the Corporation and the sponsoring group
- ➢ Evidence of Kingdom support
- ➢ Letters from the following officers stating that they have reviewed and support the proposal:
- ➢ Kingdom Seneschal
- ➢ Kingdom Exchequer

67

SCA_000585

- ➢ Appropriate Kingdom Officers for the activities of the event
- ➢ Crown
- ➢ Obligation from Kingdom and Society officers required

- ➢ Society officer attendance at the event
- ➢ Cancellation/disaster plan
- ➢ Cancellation before the event
- ➢ Disaster plan

# XXXI. Annotations Referring to Governing Documents and Policy Decisions

1. Corporate Policies III.B.
2. Warrant of Appointment to Executive Office on www.sca.org.
3. Corpora IV.C.
4. Policy interpretation on Corpora VII.A.
5. Corpora I.A.2.
6. Corpora VII.K.1.
7. Corpora VII.K.1.
8. Corpora I.A.2.
9. SocSen Policy.
10. Corpora IV.E.4; Corpora Glossary definition of "subject".
11. Corpora I.A.
12. Corpora X.C.
13. Policy interpretation on Corpora II.E.3.
14. Policy interpretation on Corporate Policies VII.
15. Corpora V.A.1-3.
16. Corpora IV.G.7.
17. Corpora VII.K.3.
18. Policy interpretation on Corpora VII.A.
19. Corporate Policies X.C.4.
20. Corporate Policies X.C.2.
21. Corpora I.C.7.a.
22. Corpora IV.G.10 and X.C.4.
23. Society Sanctions Manual, Section 8.
24. Corpora I.C.5.a.
25. Policy interpretation on Corpora VII.A.
26. Corporate Policies VI.6.
27. SocSen Policy.
28. Corpora VII.J.1.
29. SocSen Policy.
30. Corpora VII.B.
31. Qtrly Mtg. 4-15-2000, VI Section E Policy Decisions 1, Society Financial Policy
32. Corporate Policies VIII.

33. Policy interpretation on Corpora VII.
34. Corpora VII.J.4.
35. Corpora VII.K.1.
36. Corpora VII.L.3.
37. Corpora VII.M.1.
38. Corpora II.E.1.
39. Corpora II.E.1.
40. Corporate Policies XVI.
41. Corporate Policies XIII.
42. Policy wording approved by BoD at July 2019 meeting.
43. By-Laws II.C.2.
44. Corporate Policies IV-VI.
45. Corporate Policies VI.2.
46. Corporate Policies VI.3-4.
47. Corporate Policies IV.C & D.
48. Corporate Policies VI>2.
49. Corporate Policies V.A. and Corpora IX.A.5.
50. Corpora IX.A.8.
51. Corpora IX.A.7.
52. Corporate Policies VI.6.
53. Corporate Policies VI.6.
54. Corporate Policies VI.
55. By-Laws III.B.
56. SocSen Policy.
57. Corpora II.C.
58. Policy interpretation on Corpora II.A.
59. Corpora II.A.
60. Corpora IV.A.1.
61. Corpora IV.A.3.
62. Corpora IV.A.2.
63. Policy interpretation on Corpora IV.A.2.
64. Corpora II.E.2.
65. Corpora II.E.2.
66. Policy interpretation on Corpora II.A.
67. Policy interpretation on Corporate Policies V.A.

68

68. Policy approved by BoD at July 2020 meeting.
69. Policy interpretation on Corpora II.F.
70. SocSen policy revised by BoD at April 2020 meeting.
71. Policy enacted by BoD in April 2020.
72. Corpora Introductory Statement, adopted by Board March 2021.
73. SocSen policy upheld by BoD at October 2016 meeting; revision upheld at October   2020 meeting.
74. SocSen policy.
75. Policy interpretation on Corpora VII.B.
76. Corpora I.B.
77. Policy interpretation on Corpora I.A.
78. Policy interpretation on Corpora VII.B.
79. Corpora IV.F.3.
80. Corpora IV.F.2.
81. Corpora IV.F.2.
82. Policy interpretation on Corpora VII.B.
83. Corpora III.B.

84. Corpora III.B.2.
85. Policy interpretation on Corpora III.D.1-4.
86. Corpora III.D.
87. Policy interpretation on Corpora III>B.
88. Corpora III.C.7.
89. Corpora III.D.4.
90. Corpora III.C.6.
91. Corpora III.C.6.
92. Corpora III.C.6.
93. Corpora III.C.6.
94. Corpora III.D.4.
95. Policy interpretation on Corpora III.C.4-5.
96. Corpora III.D.1.
97. Policy interpretation on Corpora III.B.
98. Corpora III.B.4-5.
99. Corpora III.B.4.
100. Corpora III.B.4.
101. Corpora III.C.3.
102. Corpora III.C.3.
103. Corpora III.E.4.
104. Policy interpretation on Corpora III.E.

SCA_000587