# EXHIBIT 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE WESTERN DISTRICT OF WASHINGTON
 3                        AT TACOMA
 4
 5   GEORGE DC PARKER II and LORI A. )
     PARKER,                         )
 6                                   )
                 Plaintiff(s),       ) No. 3:23-cv-05069-RJB
 7                                   )
                                     )
 8   vs.                             )
                                     )
 9                                   )
     THE SOCIETY FOR CREATIVE        )
10   ANACHRONISM, INC., a/k/a/       )
     "SCA" or "SCA, Inc.", et.al,    )
11                                   )
                 Defendant(s).       )
12   _____
13
                 VIRTUAL REMOTE DEPOSITION OF
14
                         LORI PARKER
15
     _____
16
17
                        9:00 a.m.
18
                     JANUARY 5, 2024
19
                  Virtual Zoom Deposition
20
                    Washington State
21
22
23
24
25   REPORTED BY:  ANITA MITCHELL, CSR No. 2586
                        Page 1
```

                                            Page 1

```
 1    high-level question.  I don't want to get into the weeds
 2    and details of this.  It's really just, I kind of want
 3    more like a bullet point list, and I say that before I
 4    ask the question, so you can understand what I'm looking
 5    for, before you start answering.  When I ask the
 6    question, you may want to start answering, but I want to
 7    give you more structure first, okay?
 8        A.  All right.
 9        Q.  Now, what I want to know is, I want to know each
10    of the specific issues you take with the SCA as it
11    relates to this lawsuit.  I want you to identify each of
12    the items that you believe constitutes either the
13    negligence or hostile work environment or whatnot,
14    related to the SCA.  I want bullet points, you know,
15    that these are the issues that I'm taking, and then I
16    can dive into them on an individual basis.  I just first
17    want the complete list.  That way I don't forget to talk
18    about anything, and I can make sure you have a chance to
19    be heard.  Does that make sense?
20        A.  Yes, it does.  Because I'm probably going to
21    forget something, so you know.  I will be very clear
22    about the fact that this may not be a complete list,
23    however, so let me -- I don't know how to phrase the
24    answer.  I'm struggling with how to approach the answer
25    to this.
```

Page 28

1        The issues that we have are the hostile work
2    environment, as you mentioned, and the circumstances
3    surrounding my release from the Kindom YAFA Officer.
4    YAFA is Y-A-F-A Officer, and that is an acronym for
5    Youth and Family Achievement Officer.
6        The lack of protections that were given when
7    George and I were harassed by a peer, the outcomes of
8    the investigation on that, the circumstances surrounding
9    the Baronial polling in general, and specifically, the
10   attacks that were made on us.  And then finally, of
11   course, the business with George's exile and later his
12   R&D, his Relocation and Denial of membership.
13       Q.  Okay.
14       A.  That's broad.
15       Q.  100 percent.  I wanted the broad strokes, and
16   that way, I can come back and we can discuss them a
17   little more in detail now.  I wanted to get the broad
18   brush strokes, that these are the major complaints I
19   have.
20       And as we're talking about these, if you go, oh,
21   my goodness, this reminds me, I also have this issue.
22   Please consider this kind of an open-ended question
23   throughout this deposition.  If at any point you go --
24   you remember an additional term or additional item,
25   please throw it out because this is my opportunity to

Page 29

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
 1     your recollection at this point.  If you have a document
 2     that says it's a slightly different date, you know, that
 3     doesn't bother me.  I get it.
 4          Q.  And the Society-level YAFA position, was that a,
 5     was that a paid position?
 6          A.  No.
 7          Q.  It was a volunteer position?
 8          A.  Yes.
 9          Q.  Did you consider your position to be somewhat
10     educational in nature, that YAFA position?
11          A.  Absolutely.
12          Q.  Because you were helping to educate youth in, you
13     know, issues surrounding the, the Middle Ages and arts
14     and crafts, and that sort of thing, right?
15          A.  Yes, that's exactly right.
16          Q.  And in fact, that's one of your passions, is
17     instructing youth; is that fair?
18          A.  Yes, that's fair.
19          Q.  Now, when you moved into the Society-level YAFA
20     position, did you, you know, were there, were there any
21     actions that you considered to be, you know, hostile
22     towards you, in regard to that position.  And I want to
23     separate that out from, say, some of the other personal
24     interactions that were not related to your YAFA
25     position, that we'll talk about later, if that makes
```

Page 34

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1    somebody, they're making you feel uncomfortable, and
2    then prove it.
3        Q.  So it sounds like it was more passive-aggressive
4    conduct that you're preferring to; is that fair?
5        A.  That's a very good, very good way to describe it.
6    Very passive-aggressive, yes.
7        Q.  Now -- okay, so as it relates again to the
8    Society-level YAFA position, is there anything else
9    about that position or any other conduct that you
10   believe constitutes a, a hostile work environment?
11       A.  Once I made it into the Society position, I
12   cannot recall anything specific.  The hostile work
13   issues were centered on my time as Kingdom Officer.
14       Q.  Now, I do want to talk about those issues, you
15   know, briefly, just to make sure I understand.  I want
16   to make sure I understand.  You can have a chance to
17   tell me your side of the story.  That's what I'm here
18   for.
19          The hostile work environment, in regard to the
20   Kingdom YAFA position, that's what your claim is about,
21   right?
22       A.  Yes.
23       Q.  And you briefly described for me the issue with
24   not the original person who appointed you, but the
25   following seneschal for the Kingdom, and you know,

                        Page 37

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1      A.   Um, in her e-mail, I believe that she specified,

2   without going back to confirm this, I believe she

3   specified other officers.

4      Q.   And then again, we discussed that you, you took

5   that issue up with your superior at the Society-level,

6   and he recommended that you not pursue it at the

7   Kingdom-level because he would be retiring soon and you

8   would be moving into the Society-level YAFA position; is

9   that fair?

10      A.   Essentially yes, that's fair.

11      Q.   Okay.  And that was the path you took at that

12   time, right?

13      A.   Yes.

14      Q.   Okay.  Now I want to shift gears to the next

15   issue, which I seem to recall was lack of protection

16   from harassment from, from a peer or peers.  And by

17   that, I don't mean like your peer, as in another person

18   on your same level, but peers of the realm, you know,

19   the officers at the Kingdom-level in An Tir; is that

20   fair?

21      A.   I am going to correct you.

22      Q.   Please do.

23      A.   Huge within the Society, it is a Society-level

24   award given by Kingdoms, so it holds status within the

25   Society as a whole.  However, they're not officers, but

Page 43

Page 43

1    Duchess after they've been King or Queen for two times,

2    and then they get that title.  That sort of thing,

3    right?

4        A.  Yes, yes.  The King and Queen are the ones who

5    give all the titles to participants, and I will help you

6    out here, because I know you're not part of this.  The

7    peerage circles are the groups of peers.  They advise

8    the King and Queen.  You become a peer if you exhibit

9    peer-like qualities, which is quote/unquote, "peer-like

10   qualities."

11        And once you obtain those peer-like qualities,

12   according to the people in the circle, then the King or

13   Queen may bestow upon you the peerage.

14       Q.  I understand.  And then there is a couple of

15   titles that are bestowed upon somebody, not necessarily

16   because the peerage circle, but because of the

17   accomplishment, for example, the King or Queen for two

18   different reigns, become Duke or Duchess, right?

19       A.  Yes.

20       Q.  Thank you for that clarification.  I really do

21   appreciate it.

22        Okay.  So now I want to, now that I understand

23   peerage a little bit better, I want to make sure I

24   understand the, the harassment that you contend you were

25   not protected from, in relationship to actions, I

Page 46

Page 46

```
1    believe you said of peers.  Which specific individuals
2    are you asserting were, were harassing you and you
3    weren't protected from?
4        A.  The major one was -- her name is Raphealla Di
5    Contino, and again her, her legal name is different, and
6    I have it somewhere in my notes, but I don't remember
7    what it was.
8        Q.  It's okay.  Is there a short term for Raphealla,
9    that we could use, that would be easier for the court
10   reporter to write down?
11       A.  We can just use Raphealla.
12       Q.  Okay.  And so you said Raphealla was the major
13   one.  Were there other minor ones that I should be
14   taking note of?  We'll do the deep dive on Raphealla.
15       A.  I do believe the current -- no, I don't think
16   they're current anymore.  The Baron and Baroness who
17   were current at the time of the polling were also
18   participants, and the seneschal of the Barony, who was
19   also a peer.
20       Q.  Okay.  And from an organizational standpoint,
21   because there are many layers of seneschals, you have
22   the Society-level seneschal, right?
23       A.  Um-hum, yes.
24       Q.  And then at the Kingdom-level, there is a Kingdom
25   Seneschal, right?
```

Page 47

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
1          The issues with this, this meeting were, you and
2     George felt personally attacked by Rapheable, right?
3      A.  Yes.
4      Q.  And the specific issues were her assertion that,
5     that George was a Nazi, that you were abusive or
6     aggressive and failed to have peer-like qualities,
7     right?
8      A.  Those are probably the high points.
9      Q.  Yeah.  And there may be some more granular items,
10    and some of which have kind of lost to the ether over
11    time, but broad strokes, those are really the key points
12    that really sit with you, right?
13     A.  And I'm going to correct you.  Yes, I agree with
14    you, but she said I was abusive, not aggressive.
15    Abusive was the word that she used.
16     Q.  Thank you for that clarification.  I appreciate
17    that.
18          Did any of the other peers or individuals who
19    were present, did they have any comments or did they
20    speak up at all?
21     A.  Not in public.
22     Q.  So all of the, the comments and conduct that
23    we're talking about here were comments made by Rapheable
24    alone, and not others; is that fair?
25     A.  Yes.
```

Page 52

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1       Q.   Did -- you mentioned that you were there with

2    LaToya, who was one of your friends; is that correct?

3       A.   Yes.

4       Q.   And did LaToya respond or say anything back to

5    the Raphealla during this interaction?

6       A.   Yes, she did.   I cannot recall exactly what it

7    was.

8       Q.   And this occurred before the voting for -- for

9    the polling, I should say, before the polling for Baron

10   and Baroness in 2018, correct?

11      A.   I believe it was 2019.

12      Q.   Thank you.

13      A.   But I think that -- I'm pretty sure it was 2019

14   that the polling was, and yes, it was in May.   I think

15   the polling was in June.

16      Q.   Okay.   So this event at the -- I don't know if it

17   was a pub or local establishment that you went to, this

18   occurred in May of 2019?

19      A.   Yeah.

20      Q.   Okay.

21      A.   I am almost positive it was 2019.

22      Q.   Okay.

23      A.   Yes, it was, it was done, what was nominally a

24   pub.   Within the event, the group set up a pub in the

25   event.   It had open sides, tables.   People would come in

Page 53

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
 1    asked a question, every time we posted anything, the
 2    other members of the Barony would immediately start
 3    attacking us online, which resulted in the, the feeling
 4    that George and I got, that she was continuing to spread
 5    her, her foul words because these are people that we had
 6    previously had pretty decent relationships with.
 7         Q.  And did you talk with any of those individuals to
 8    find out, you know, why there was that change in their
 9    behavior towards you and George?
10         A.  Um, we did question a few people that we trusted,
11    their, their take on the situation, and we were told it
12    was directly related to the things that Raphealla was
13    saying, Raphealla was saying.
14         Q.  And which individuals were those?
15         A.  Heather Vaerewyck and Kevin Wolfe, and I don't
16    remember the other name.  I don't remember.  I'll come
17    up with it eventually.
18         Q.  It's okay.  I'm trying to get the best of your
19    recollection.
20              And what kind of attacks were you, were you
21    suffering?  When somebody says, "I felt attacked," it
22    could mean a lot of different things.  I want to know,
23    to the best of your recollection, what were the actual
24    attacks that you felt you were suffering at that time?
25         A.  Well, I had a personal instant message
```

Page 64

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1    conversation with Jonnalyhn, who was -- her and
2    Francisca would constantly say things like, you know,
3    "You need to leave us alone.  We're doing our job.  You
4    know, you need to be more accepting."
5         Francisca was a postal carrier at the time and I
6    was asking for reports, and they jumped down my throat
7    because Francisca had a job that she couldn't get to it
8    right away, even though it had been a week.
9         It's just stuff like that, the nit-picking that
10   went on.  Nothing that we said was without comment, and
11   their comments were basically negative.
12   Q.  So it sounds like it was a lot of, you know,
13   negative comments, putting you off, putting you down in
14   general; is that fair?
15   A.  Yes.  We're very, again, to you use your word,
16   passive-aggressive behaviors on their part.
17   Q.  Were there any comments that were made towards
18   you and George, other than calling George a Nazi and
19   calling you, you know, abusive?  Let's set those
20   comments aside.  Were there other comments that were
21   made, that you know, would be something that you would
22   consider patently offensive?
23   A.  You know, I can't recall the specifics, but I
24   kind of, you know, I'm feeling like yeah, there probably
25   were several that were offensive, as in, they were

Page 65

Page 65

1    maligning my position as YAFA Officer.

2         I was also a Baronial Herald at one point, and

3    there was a lot of that passive-aggressive stuff that

4    went on there too.  In general, it's hard to be really

5    specific, because it's a couple of years ago now, and

6    it's just this vague feeling of, like I said, every time

7    we said something, somebody would get up there and drag

8    us down.

9         Q.  And this feeling that every time you post

10   something publically, others are going to go down there

11   and do their best to generally put you down?

12        A.  Yes.  In fact, it really felt like, in some

13   respects, it felt like we were being stocked by certain

14   people.  Rapheaella was one of them.  It was like she was

15   setting out to find what we posted, so that she can post

16   something else.  It was not confined to the Baronial

17   page, but it was also some of the Kingdom, unofficial

18   Kingdom pages.  So we began to feel very targeted, very

19   stocked, very attacked, just in general.

20        Q.  Okay.  Now, were any of the, the conduct that you

21   felt, you know, constituted the attacks on you, was any

22   of the conduct performed by somebody who was an officer

23   of the SCA or the Kingdom at the time when they engaged

24   in the conduct?

25        A.  Yes.

Page 66

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1    in common usage in depositions in general.  I know this

2    can be challenging.

3              COURT REPORTER:   Thank you.

4    Q.  (By Mr. Bolster) Okay.  Let's go back to the, I

5    think we were talking about the Instant Message

6    communications that were coming in, and if you can

7    describe that, that would be great.

8    A.  Let's see where to pick it up.  It wasn't just

9    the IMs and it wasn't just the Facebook messenger.  It

10   was, to be clear, that there were Facebook messenger.

11         It was just, you know, random postings like on

12   the unofficial Kingdom page, those things, on the

13   Baronial page, if I posted to, to like the Scribal

14   Group.  And so it was, it was a pretty broad list of

15   places that these kinds of things were occurring.

16   Q.  And what was being said on those, on those

17   postings?

18   A.  You know, it wasn't anything, but again, so this

19   is how they play their game.  It was not actionable.  It

20   was, like you said, passive-aggressive.  It was very

21   passive-aggressive.  It was kind of snarky, nothing that

22   you could really sit there and say that this is enough

23   to complain about.

24   Q.  And the acts, in totality, you felt that you were

25   being personally singled out and attacked by all these

                          Page 68

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1   any effect on us in the end, and the Baronial polling
2   that we had done had already taken place, and we had
3   absolutely no intention of ever doing that again.  I
4   mean, she could have told us the move was creating hits.
5   I wouldn't have remembered that either.
6       Q.  I understand.  It does look like, after your
7   concerns were raised, there were some changes made to
8   the Baronial polling process, to align more with the
9   Society-level expectations.
10      A.  Fair enough.  Like I said, we had no intention of
11  doing anything with any polling, in the future, so if
12  this was -- it wasn't important enough for me to like
13  really pinpoint and recognize.
14      Q.  I understand.  And then the, the Baronial polling
15  occurred in, in June or July of 2019?
16      A.  Yeah.  Yeah, that is about right.
17      Q.  Okay.  And then while this was going on, there
18  was still the complaint, dealing with Rapheualla, because
19  the sanctions -- I shouldn't say the sanctions -- the
20  suspension from social media use, that was handed down
21  in about February of 2020?
22      A.  Something like that.  I mean, again, I would have
23  to really look at my timeline notes, to be specific
24  about the time.
25      Q.  Sure.

Page 75

Page 75

1    speak to inflation.  I can't speak to things like, you

2    know, cost -- availability of product and things like

3    that, that all plays a part in what we spend on any

4    given day.  I really couldn't even throw something out

5    there and be respectable about it.

6        Q.  Okay.  Were there any books that were kept in

7    regard to the business, you know, profit and loss

8    sheets, anything to track how much you spent versus how

9    much you received, anything like that?

10       A.  I'm sure that there was at the time, but I know

11   that, as things filtered out, things were filtered out,

12   so anything, anything recent, I mean, there would be

13   nothing for '23 or '22 or '21.  I'm not sure how much

14   further back I can really go and get that kind of

15   information, because it's been so long.

16       Q.  As we sit here right now, you're not aware of any

17   documents that you could find, that would identify, you

18   know, the profits versus expenses versus -- just these

19   two dates, right?

20       A.  Probably not.  I mean, again, based on my

21   recollection, right now, I'm not sure I can come up with

22   something.

23       Q.  Okay.  Now I want to go back to the, the more,

24   you know, personal, emotional impact that this has had

25   on you, okay?

Page 107

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1    behavior was even worse.  He made one comment.  They

2    made comment, after comment, after comment, until he

3    lost this one.

4        Q.  And so it sounds like you don't know exactly what

5    you're asking, related to sanctions against them.  You

6    just want something additional to happen to them?

7        A.  I want the SCA to handle it.  I want the SCA

8    to -- like I said, personally, I want their peerages

9    removed.  That's what I want.  To me, they are not

10   peers.  Their behavior is less than peer-like and there

11   should be ramifications for that.

12       Q.  Okay.  Thank you.  What else are you going to be

13   asking the Court to award you and George?

14       A.  You know, we have damages for The Norse Gypsy

15   Forge.  We talked a little bit about the money.  I don't

16   know if we were clear, but basically we took those

17   dollar amounts, and we tripled it.  That's really --

18   that's how it was.

19            You know, it -- the damages to that business are

20   probably irrecoverable.  I don't think that we can

21   return to the SCA, even if we wanted to do it full-time

22   in Arizona.  I don't think we can return as The Norse

23   Gypsy Forge because of the bad comments, the bad press,

24   the chance for people, from outside of Atenveldt,

25   coming to an event here and trashing our business.  They

Page 128

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

1   gets really bad every time I have to go through this

2   stuff, because it's anxiety-based, and so yeah, I

3   believe we're entitled to punitive damages.  I believe

4   that we have been damaged enough that we deserve

5   something.

6        Q.  Okay.  Is there any rule or statute that you are

7   relying upon to get punitive damages, because you don't

8   just -- you know, the rules we have, you don't just get

9   punitive damages because you felt like you were damaged

10   and upset.  I want to understand what the basis is,

11   other than the emotional --

12        A.  Without going back through my paperwork, I don't

13   have anything right off-hand.

14        Q.  Okay.  You never filed a compliant with the EEOC

15   or the Washington Human Rights Commission, did you?

16        A.  No.

17        Q.  And you didn't file a complaint with any

18   governmental, you know, United States or state

19   governmental agencies relating to the SCA, did you?

20        A.  The only thing that I can recall that we did, is

21   the complaint to the BBC, Better Business Bureau, BBB, 3

22   'B's.

23        Q.  BBC -- BBB, Better Business Bureau.

24        A.  See.

25        Q.  You said "BBC."  I got that in mind.

                         Page 134

Veritext Legal Solutions
calendar-pnw@veritext.com 800.831.6973

```
 1                 REPORTER'S CERTIFICATE

 2

 3          I, ANITA MITCHELL, the undersigned Certified

 4     Court Reporter, pursuant to RCW 5.28.010, authorized to

 5     administer oaths and affirmations in and for the State

 6     of Washington, do herby certify that the sworn testimony

 7     and/or proceedings, a transcript of which is attached,

 8     was given before me via videoconference; that any and/or

 9     all witness(es) were duly sworn to tell the truth; that

10     the sworn testimony and/or proceedings were by me

11     stenographically recorded and transcribed under my

12     supervision, to the best of my ability; that the

13     foregoing transcript contains a full, true, and accurate

14     record of all the sworn testimony and/or proceedings

15     given and occurring via videoconference; that a review

16     of which was requested; that I am in no way related to

17     any party to the matter, nor to any counsel, nor do I

18     have any financial interest in the event of the cause.

19

20     WITNESS MY HAND AND DIGITAL SIGNATURE THIS

21     18TH DAY OF JANUARY, 2024.

22

23

24

25     ANITA MITCHELL, CSR No. 2586

                        Page 138

                                          Page 138
```