# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE WESTERN DISTRICT OF WASHINGTON
 3                          AT TACOMA
 4
 5    GEORGE DC PARKER II and LORI A. )
      PARKER,                         )
 6                                    )
                 Plaintiff(s),        ) No. 3:23-cv-05069-RJB
 7                                    )
                                      )
 8    vs.                             )
                                      )
 9                                    )
      THE SOCIETY FOR CREATIVE        )
10    ANACHRONISM, INC., a/k/a/       )
      "SCA" or "SCA, Inc.", et.al,    )
11                                    )
                 Defendant(s).        )
12    _____
13
                     VIRTUAL REMOTE DEPOSITION OF
14
                         GEORGE DC PARKER, II
15
      _____
16
17
                            2:00 p.m.
18
                         JANUARY 5, 2024
19
                      Virtual Zoom Deposition
20
                         Washington State
21
22
23
24
25    REPORTED BY:  ANITA MITCHELL, CSR No. 2586
                              Page 1
```

Page 1

```
 1        A.   Yep.  I like doing it that way.  That's perfect.
 2        Q.   Beautiful.  Now, the, the persona that you've
 3   developed for the medieval recreations, so I'm not going
 4   to limit it to just SCA, but you have a persona that
 5   you've developed for use in all of the Societies that,
 6   that you work with; is that correct?
 7        A.   Absolutely.
 8        Q.   And tell me about that, that persona.  I know I'm
 9   opening a can of worms.
10        A.   What exactly do you want to know.
11        Q.   Well, one, I want you to properly for me
12   pronounce the name, because I will butcher that up like
13   it's nobody's business, and then I want you to tell me
14   about how you created it, so I can understand a little
15   bit about you and who you are, if that makes sense.
16        A.   I have to chuckle a little bit when you said,
17   "Hakon" because -- and you spelled what you had for my
18   name, because actually H-A-K-O-N, in Norse Society in
19   the 700s, that would have been pronounced Ha'kon.
20   However, the correct spelling of my name is
21   H-A-apostrophe-K-O-N, which transforms Hakon (Hai-ken
22   phonetic) into Ha'kon (Haw-ken phonetic).
23   Ha'kon Thorgeirsson, and 'geirsson' is third son, so I
24   am the third son of Thor.
25             Um, it started out when I was working with
                            Page 24
```

```
 1        A.  I don't recall for sure.
 2        Q.  Do you recall if it was at the Society-level or
 3   Kingdom-level?
 4        A.  That's what I mean.  I definitely don't recall.
 5   I'm sure I sent it to a seneschal, whether it was
 6   Kingdom or Society, I don't recall.  There were so many
 7   e-mails going back-and-forth at that time, that I don't
 8   recall.
 9        Q.  Now, on the Facebook posting for LaToya's
10   Facebook posting, was that on LaToya's -- I know it's
11   LaToya's personal page, but was it on her page, where
12   she used the persona name she use in SCA events?
13        A.  I don't recall for sure.  I would have to look.
14        Q.  Was the name she used in the Society, 'Maude
15   Louisiana d'Orleans'?
16        A.  Yes.
17        Q.  So if it was -- so if it was a comment on
18   LaToya's Facebook page, that she used the name 'Maude
19   Louisiana d'Orleans,' that would have been on a Facebook
20   posting, with her using her persona she uses in the SCA?
21        A.  Yes.  And if you said that's the page it was on,
22   I wouldn't argue with you.
23        Q.  Well, maybe I should just do this.
24        A.  I think it was.
25        Q.  Does this --
```

Page 83

1   comment that you did at the time, was it due to
2   channelling the Ha'kon Thorgiersson, that persona, at
3   the time?
4        A.   No.  No, that was all George, absolutely.  That
5   was my sense of right and wrong.
6        Q.   Is that --
7        A.   It's not okay for me to say something offensive.
8   It's not okay for you to do it either.  And yet that's
9   exactly what they were doing.  I said that's offensive.
10  You say this is offensive, whatever 'this' is.  If
11  you're right, so am I.  If I'm wrong, so are you.  They
12  didn't see it that way, and to this day, they still
13  don't see it that way, as evidenced by the fact that no
14  one else was sanctioned on that entire list, no matter
15  what they did.  Rules for me and none for you.
16       Q.   At the R&D process -- let me take a step back.
17  In the e-mail chain, with Stacy Hall, in regard to the
18  Board's review of the exile, Ms. Hall gave you the
19  opportunity to have a verbal or video discussion to
20  explain your side of the story, right?
21       A.   Yes.
22       Q.   And you opted to not do that, but instead to
23  provide a written response and to answer any questions
24  that she may put to you in writing, so you can put a
25  written response back to her, right?

Page 86

Page 86

```
 1            A.   Yes.
 2            Q.   And that was your decision to make, about how to
 3      approach and how to be heard in the appeal -- or in the
 4      review process?
 5            A.   Yes.
 6            Q.   And then the exile was ultimately upheld and then
 7      there was the R&D process that came about after that,
 8      right?
 9            A.   Yes.
10            Q.   And were you contacted or did you have an
11      opportunity to present additional information to the R&D
12      process, if you so chose?
13            A.   Again, this goes to my issue with timelines.
14      Evidently there was a time when I responded to the
15      exile, and I didn't remember that one, but there was a
16      huge, long e-mail I sent in reference to Lis' query,
17      with very verbose responses, if I have the timeline.
18            Q.   Okay.  As we sit here, you don't have a
19      recollection, one way or the other, whether or not you
20      had the opportunity to provide additional information at
21      the R&D stage, beyond what you provided to the exile
22      review.  Would that be fair?
23            A.   I want to say I did have an opportunity to
24      present all the evidence I wanted to.  I'm not
25      contending -- what do you call it -- that's not a
```

Page 87

```
 1    I could, estimate that continuing trend.
 2          Now, we had a steady upward mobility in the
 3    revenue generated.
 4       Q.  Now, I understand that those numbers were revenue
 5    generated.  Those numbers did not include the, the
 6    expenses that would deduct from revenue, to equal
 7    profit, right?
 8       A.  Correct.
 9       Q.  And you don't have any documents that actually
10    identify how much profit The Norse Gypsy Forge obtained
11    or received in any given year, do you?
12       A.  I don't think so.  We treated it more as a hobby
13    than a business.
14       Q.  So how can you identify any lost profits in, in
15    regard to The Norse Gypsy Forge?
16       A.  Profits is your term, not mine.  I said "revenue,
17    revenue generated."  I don't mean to be argumentative.
18    If that was argumentative, I apologize.
19       Q.  Okay.  You understand what profits are, right?
20       A.  Absolutely.
21       Q.  And in fact, that's something that for your, your
22    business, Drakkar, you do track your profit in regard to
23    that company, correct?
24       A.  Absolutely.
25       Q.  And your, your income is actually largely based
                            Page 95
```

```
1              REPORTER'S CERTIFICATE
2
3              I, ANITA MITCHELL, the undersigned Certified
4    Court Reporter, pursuant to RCW 5.28.010, authorized to
5    administer oaths and affirmations in and for the State
6    of Washington, do herby certify that the sworn testimony
7    and/or proceedings, a transcript of which is attached,
8    was given before me via videoconference; that any and/or
9    all witness(es) were duly sworn to tell the truth; that
10   the sworn testimony and/or proceedings were by me
11   stenographically recorded and transcribed under my
12   supervision, to the best of my ability; that the
13   foregoing transcript contains a full, true, and accurate
14   record of all the sworn testimony and/or proceedings
15   given and occurring via videoconference; that a review
16   of which was requested; that I am in no way related to
17   any party to the matter, nor to any counsel, nor do I
18   have any financial interest in the event of the cause.
19
20   WITNESS MY HAND AND DIGITAL SIGNATURE THIS
21   18TH DAY OF JANUARY, 2024.
22
23
24
25       ANITA MITCHELL, CSR No. 2586
                         Page 106
```

Page 106