# EXHIBIT U

| | |
|---|---|
| GEORGE DC PARKER II and LORI A. PARKER,<br><br>                              Plaintiff(s),<br>        v.<br><br>THE SOCIETY FOR CREATIVE ANACHRONISM, INC., a/k/a/ "SCA" or "SCA, Inc.", et.al,<br><br>                              Defendant(s). | NO. 3:23-cv-05069-RJB<br><br>DEFENDANT THE SOCIETY FOR CREATIVE ANACHRONISM, INC.'S FIRST INTERROGATORIES AND REQUESTS TO PLAINTIFFS GEORGE DC PARKER II AND LORI A. PARKER |

## PLAINTIFF STATEMENT

**The following statements are subject to revision, modification or correction in light of new evidence or circumstances. Plaintiffs reserve the right to amend, alter or otherwise change responses should new information become available.**

**All instances of emphasis (color, bold, italics, etc) are the Plaintiffs to illustrate salient points and to bring attention to relevant excerpts.**

### INTERROGATORIES AND REQUESTS FOR PRODUCTION 3

**INTERROGATORY NO. 1**: *State your full name and any other names by that you have been known during the last ten years, your present address, date of birth, place of birth, name of spouse(s), date(s) of marriage, and Social Security number. In addition to your present address, state all other addresses at which you have resided for the past ten years and the dates you resided at each address. [NOTE: To protect privacy concerns, the Social Security number may be provided separately from the Answers to these Interrogatories.]*

**ANSWER**:

The below listed information should be sufficient to establish identity.  Any additional information shall require

    George Daniel Charles Parker II
    Hakon Thorgeirsson von Eignersfjord
    10710 199th ST E , Graham, Wa. 98338 (2007- Current)
    5705 S. Charro Lane, Hereford, Az. 85615 (2018-current)
    3/1964, Mt Holly, N.J
    Spouse: Lori A Parker
    May 1995 - current
    SSN available once cause is shown

    Lori Ann Parker

Alizaunde Hawkonsife
Alizand Thorgiersson nee' LeFevre
10710 199th ST E , Graham, Wa. 98338 (2007- Current)
5705 S. Charro Lane, Hereford, Az. 85615 (2018-current)
2/1964, Pomona, CA
Spouse: George DC Parker II
May 1995 - current
SSN available once cause is shown


**INTERROGATORY NO. 2**: *State the name, address, and phone number of your employers for the past 10 years. For each employer, give the current or last known name, address, phone number, and name of your immediate supervisor and state your dates of employment, job titles, a description of your duties, and your hourly wage, salary, and your annual gross income for each year of employment.*

**ANSWER**: The Defendants have failed to demonstrate the relevance of the Plaintiffs' employment information, including wage and salary data, to the issues in this case. The Plaintiffs' claims are based on the Defendants' negligence, not on Plaintiffs' income or employment status. Therefore, the Plaintiffs object to the Defendants' request for such information as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


**INTERROGATORY NO. 3**: *Identify any and all disabilities you contend you have been diagnosed with or believe you have that you contend relates to this lawsuit and why.*

**ANSWER**: Plaintiff George Parker: Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiance Disorder (ODD), Autism Spectrum Disorder (ASD)- specifically Asperger's Syndrome
    See attached

 DSM IV Criteria for Asperger's Disorder:
 Qualitative impairment in social interaction, as manifested by at least two of the following:
   A.  marked impairments in the use of multiple nonverbal behaviors such as eye-to-eye gaze, facial expression, body postures, and gestures to regulate social interaction.
   B.  *failure to develop peer relationships appropriate to developmental level.*
   C.  a lack of spontaneous seeking to share enjoyment, interests, or achievements with other people (e.g. by a lack of showing, bringing, or pointing out objects of interest to other people).
   D.  *lack of social or emotional reciprocity.*

According to the Americans with Disabilities Act (ADA), a person has a disability if he/she
1: Has a physical or mental impairment that substantially limits one or more major life activities.
2: Has a history or record of such an impairment (such as cancer that is in remission).
3: Is regarded as having a substantially limiting impairment.


Plaintiff Lori Parker: Anxiety, Depression
    See attached

**REQUEST FOR PRODUCTION NO. 1**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 3.*

**RESPONSE**: Re: George Parker states that he lacks any documentation of his medical condition prior to attaining the age of majority. He asserts that his parents, who have passed away, were in possession of such documentation. He further declares that he did not seek any medical attention for his condition after becoming an adult.  See attached information regarding the disabilities.
Re: Lori Parker: see attached medical record excerpts.


**INTERROGATORY NO. 4**: *If you have ever been a party, as either plaintiff or defendant, to any bankruptcy, arbitration, divorce, administrative action, governmental action, Union grievance, and/or civil suit, including, but not limited to, employment discrimination or whistleblower actions, please identify and describe each action, and provide the date, place, court cause number, nature of the action, the current disposition, and the outcome/result.*

**ANSWER**: The Defendants have failed to demonstrate the relevance of the Plaintiffs' litigation information to the issues in this case. The Plaintiffs' claims are based on the Defendants' negligence, not on Plaintiffs' prior legal history. Such information is publicly accessible, and can be obtained from various public record sources. Therefore, the Plaintiffs object to the Defendants' request for such information as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 2**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 4.*

**RESPONSE**: The Defendants have failed to demonstrate the relevance of the Plaintiffs' litigation information to the issues in this case. The Plaintiffs' claims are based on the Defendants' negligence, not on Plaintiffs' prior legal history. Such information is publicly accessible, and can be obtained from various public record sources. Therefore, the Plaintiffs object to the Defendants' request for such information as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.


**INTERROGATORY NO. 5**: *Have you ever been arrested, indicted, or convicted of any traffic offense, misdemeanor, felony, or other crime? If so, please give the date, place, court cause number, charge, plea, nature of the offense, and disposition of each such arrest, indictment, conviction, or sentence imposed.*

**ANSWER**: The Plaintiffs object to the Defendants' demand for arrest records, if any. The Defendants have failed to demonstrate the relevance of such records to the present case. The Plaintiffs' allegations are based on the Defendants' negligence, not on Plaintiffs' criminal background. Such records are public and can be easily accessed from various sources. Therefore, the Plaintiffs contend that the Defendants' demand is overly broad, unduly burdensome, and not likely to result in the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 3**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 5.*

**RESPONSE**: The Plaintiffs object to the Defendants' demand for arrest records, if any. The Defendants have failed to demonstrate the relevance of such records to the present case. The Plaintiffs' allegations are based on the Defendants' negligence, not on Plaintiffs' criminal background. Such records are public and can be easily accessed from various sources. Therefore, the Plaintiffs contend that the Defendants' demand is overly broad, unduly burdensome, and not likely to result in the discovery of admissible evidence.

**INTERROGATORY NO. 6**: *Identify each expert you intend to call at the time of trial, including medical experts, and for each give their name and business address, the subject matter upon which the expert is expected to testify, the substance of all facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.*

**ANSWER**: No experts are expected to be necessary at this time. As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their expert witness list. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**REQUEST FOR PRODUCTION NO. 4**: *Produce all documents that relate in any way to your response to the preceding interrogatory, including without limitation a curriculum vitae for each expert witness that you intend to call to testify at trial; a list of all articles, chapters, and/or other publications authored or co-authored by the expert witness, including the name and date of the publication; a copy of all articles, chapters, and/or other publications relied upon by the expert witness; and a list of court cases in which the expert witness has been identified by a party in discovery/initial disclosures or has testified in court or at deposition; all correspondence, reports, memoranda, drawings, notes, photographs, diagrams, and/or objects reflecting the opinions, investigations, findings, and/or conclusions (preliminary and/or final) of all expert witnesses retained and/or consulted by you.*

**RESPONSE**: No experts are expected to be necessary at this time. As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their expert witness list. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**INTERROGATORY NO. 7**: *Did any person investigate any events that is the subject of your Complaint? If so, provide the identity of each person investigating the incidents, the date or dates on which the investigation occurred, and at whose request the investigation was performed.*

**ANSWER**: Please see DKT 9. Complaint
Beth Park (investigation of Heather Ruiter (Raphaella Di Contino)
Initiated by Plaintiffs July 2019
Kristen Chow (investigation of Heather Ruiter (Raphaella Di Contino)
Amanda Greyson (Attia Prima) (investigation of Heather Ruiter (Raphaella Di Contino) and later George Parker)

Initiated by Plaintiffs July 2019
Stacy Hall (investigation of George Parker)
Initiated by Amanda Greyson April 1, 2021
Liz Schearer (investigation of George Parker)
Initiated by Amanda Greyson April 1, 2021


The date of each investigation spanned months, and were on-again-off-again. Please see accompanying documentation and email threads for verification of dates.

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.


**REQUEST FOR PRODUCTION NO. 5**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 7.*

**RESPONSE**: See documents provided

The date of each investigation spanned months, and were on-again-off-again. Please see accompanying documentation and email threads for verification of dates.

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.


**INTERROGATORY NO. 8**: *Aside from plaintiff's health care providers, please name all persons who have knowledge regarding plaintiff's claims, injuries and damages related to the causes of action, and provide a brief description of each person's relevant knowledge. As to each such person in addition to their name, please provide their address and telephone number.*

**ANSWER**:

Please see witness list, already submitted

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.


**INTERROGATORY NO. 9**: *Identify and provide a detailed computation of each and every category of damages that you claim to have suffered as a result of Defendant's alleged actions. Defendant specifically requests that you provide an explanation of damages for the calculation of each dollar amount for each category, including but not limited to any claimed loss of income, loss of future earning capacity, past wage loss, and loss of benefits and/or pension. Please set forth in detail the dates you lost income, the amount lost, the reason you will lose future income and the amount, an estimate of how long you expect to be unemployed, and how you calculated your past and future income loss.*


**ANSWER**:

The interrogatory in question requests information that is not pertinent or necessary for the resolution of this case, according to the Plaintiffs. They argue that they are unable to provide a satisfactory answer to

some of this interrogatory, as it is vague, overbroad, and burdensome.

The Norse Gypsy Forge made an average of $1500 a month for several years. On average, the booth appeared at 1-2 events during the winter months, and 2-3 events every month during spring-fall. Plaintiffs are asking for 1 years' worth of proceeds ($30,000) to offset the now 2 years worth of Plaintiff George Parker's removal from the SCA.

The plaintiffs point out that cash sales accounted for at least 75% of the revenue, which makes it difficult to track the transactions. The only records available are the credit card statements, which are attached. The local groups can provide information on the expenses and attendance of the events, as they have copies of the site contracts and registration lists. Attendance at these events can be verified through sca -controlled documentation.

The Plaintiffs claim that their business specializes in selling products for the Society for Creative Anachronism (SCA) members, and further claim that they suffered significant financial losses as a result of the defendant's actions. The revocation of Plaintiff George Parker's membership prevented them from attending SCA events, where they used to sell products and network with potential customers. However, due to the defendant's interference, they were unable to sell these products or recoup their investment. The plaintiffs contend that the defendant's conduct was the direct and proximate cause of their inability to maintain their inventory and pay off their debts, which they had incurred before the revocation of Parker's membership. The business would have continued to be a viable resource for Plaintiffs without the R&D, as it could have maintained or increased its profits over the next decade.

The emotional harm caused to the plaintiffs is estimated by applying a factor of 2 to the $30000 base amount mentioned earlier, for each of them, as they have each experienced damage to their reputation, loss of enjoyment in life, and loss of a lifelong hobby. Moreover, Plaintiff Lori Parker has faced the most severe impact as she was never expelled from the membership, but was still ostracized, and prevented from participating in the events as she used to. She has endured anxiety due to the conduct with the officers in the organization, depression and insomnia.

Plaintiffs maintain that defendant is liable for causing $30000 of business loss and $60000 of damages to each of the plaintiffs, George Parker and Lori Parker (figured at 2x the loss for each Plaintiff i.e. $30,000 x 2 = $60,000 per each Plaintiff). Therefore, the total amount of compensation that the defendant has to pay is $150,000.

**INTERROGATORY NO. 10**: *List the names, addresses, and phone numbers of all medical care providers, including, but not limited to, mental health counselors, hospitals, clinics, osteopaths, chiropractors, psychologists, psychiatrists, physical therapists, or healers, who have treated you in the ten (10) years prior to the allegations in your Complaint, and the nature and dates of treatment.*

**ANSWER**: Plaintiff George Parker: answered in interrogatory # 3 and request for production #1
Plaintiff Lori Parker: answered in interrogatory # 3 and request for production #1

**REQUEST FOR PRODUCTION NO. 6**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 10, including producing all records from providers identified above.*

**RESPONSE**: Plaintiff George Parker: answered in interrogatory # 3 and request for production #1
Plaintiff Lori Parker: answered in interrogatory # 3 and request for production #1

**INTERROGATORY NO. 11**: *Identify any and all polices or procedures of SCA you contend were violated that serve as a basis of this lawsuit. Include both an identification of the policy that was violated and describe how you believe SCA violated the policy.*
*ANSWER: Listed below are excerpts from various SCA governing documents that contain the violations. The specific rule violated will be highlighted in red.*

*Corpora December 24, 2021, Revision*
*B. Role of Corpora*
***Corpora serves as a framework for the structure of the historical re-creation activities of the Society, and applies equally to all branches worldwide, regardless of corporate affiliation.*** *The various Board-approved Policies of Society officers provide guidance for the operations of those offices. Kingdoms may follow custom or make law in areas where these policies are silent, as long as they remain consistent with the general approach embodied therein. They may also impose additional rules and requirements for branches, offices, and awards within their jurisdiction, but may not reduce, contradict or waive any specified requirement contained at a higher level in the Precedence of Law.*

> **The sca breached its legal duty to act in accordance with the mission and purpose of the organization. By disregarding its obligation of fiduciary duty of Obedience, the sca violated the trust and confidence of its members.**

"Corpora" is a corporate document that applies only to the corporation and its officers, as shown above. It is not a member handbook, and there are no requirements to read or abide by this document. Nor is there a signed document by either Plaintiff showing that they have read or agree to abide by these documents.

Plaintiffs maintain that by reason of the documents own disclaimer, Corpora, the By-Laws, Corporate Policies, and the Articles of Incorporation are documents which solely govern the organizational administration and NOT the members,

> "*(These governing documents set forth **the workings of the SCA, Inc. and of the Society**. Except where otherwise noted, the rules of the modern corporation (the By-Laws and the Corporate Policies of the SCA, Inc.) apply only to the US and other areas not separately incorporated, while the introduction and the document named Corpora governs all the Kingdoms of the Society, wherever they exist. Govdocs 12.24.2021)"*
> and
> "*(The documents in this book **set forth the workings of the SCA, Inc. and of the Society**. Except as otherwise noted, the rules of the modern corporation (the By-Laws and the Corporate Policies of the SCA, Inc.) apply only to the US and other areas not separately incorporated, while the document named Corpora governsall(sic) the Kingdoms of the Society, wherever they exist. Govdocs 8.12.2018")*

The SCA has acted unfairly and inconsistently by enforcing these documents on Plaintiff George Parker, who did not know or agree to them beforehand, while ignoring the same for other participants (Heather Ruiter, Skamp Widgrin, Elizabeth Phipps, Angela Gallant and others

involved in the "Exile Thread" conversation, and including Beth Park, Amanda Greyson and Kirsten Chow and others named in DKT 9, Complaint). The SCA has failed to uphold any standards of conduct for the corporation and its officers as outlined in the documents in question, for officers or other members.

Furthermore, forcing a member to comply with policy specifically written for corporate officers is shortsighted and negligent. It is not a reasonable expectation to demand that members of an organization should be familiar with or adhere to the documents that govern its structure and operations. These documents are often lengthy, complex and inaccessible to the average person. Therefore, a reasonable person cannot assume that being a part of an organization implies consent or compliance with its documents that govern its structure and operations. By not providing a specific members handbook, or, at the very least providing a signature page for members to signal having read and understood such policies, the corporation has exhibited and encouraged negligence on the part of its officers. The corporation should have a handbook or a signature form for members. By not doing this, the corporation is careless and irresponsible.

The SCA also breached fiduciary Duty of Obedience by failing to follow the stated mission of the corporation, which states:

"The Society for Creative Anachronism (SCA) is an international non-profit volunteer educational organization. The SCA is **devoted to the research** and re-creation of pre-17th century skills, arts, combat, culture, and employing knowledge of world history to **enrich the lives of participants through events, demonstrations, and other educational presentations and activities**."

By engaging in politically oriented practices (DEIB, Pride Month, BLM, etc) and allowing members to display rainbows and other politically charged iconography on SCA managed pages (Facebook etc,) the corporation is skewing away from its stated purpose of "research and re-creation of pre-17th century skills, arts, combat, culture". By inconsistent application of policies written for corporate management to be used at will on members, the corporation also fails to follow its mandate of "enrich the lives of participants through events, demonstrations, and other educational presentations and activities". By monitoring, managing, sanctioning and punishing members for social media posts on private pages, the SCA also fails to follow its stated mission of enrichment for members, because that section of the statement specifies the venues of "events, demonstrations, and other educational presentations and activities", and fails to mention social media at all.


*VIII. PERSONAL AWARDS AND TITLES*
*A. Patents of Arms*
*1. General Requirements*
*Patents of Arms*
*General Requirements*
*Candidates for any order conferring a Patent of Arms must meet the following minimum criteria.*
*Additional requirements may be set by law and custom of the kingdoms as deemed appropriate and necessary by the Crown.*
*They shall have been obedient to the governing documents of the Society and the laws of the kingdom.*
*They shall have consistently shown respect for the Crown of the kingdom.*
*They shall have set an example of courteous and noble behavior suitable to a peer of the realm.*

*They shall have demonstrated support for the aims and ideals of the Society by being as authentic in dress, equipment and behavior as is within their power."...8.12.2018 page 30*

> As Heather Ruiter, Skamp Widgrin, Beth Park, Amanda Greyson, Lis Schraer, Stacy Hall, Kisrtsen Chow, Elizabeth Phipps and others named in DKT 9 are all Peers, they are, by the definition above, those who are supposed to be held to a higher standard of behavior.
>
> The SCA has acted unfairly and inconsistently by enforcing these documents on Plaintiff George Parker, who did not know or agree to them beforehand, while ignoring the same for other participants (Heather Ruiter, Skamp Widgrin, Elizabeth Phipps, Angela Gallant and others involved in the "Exile Thread" conversation, and including Beth Park, Amanda Greyson and Kirsten Chow and others named in DKT 9, Complaint). The SCA has failed to uphold any standards of conduct for the corporation and its officers as outlined in the documents in question, for a member.

*I. INTRODUCTION*
*1. The Seneschal's Handbook is an official document of the Society for Creative Anachronism, and as such **delineates policy, procedure, and recommended best practices for SCA branch operations.** This handbook supersedes all prior versions.*

> The Seneschals Handbook is a **corporate document** that applies only to the corporation and its officers, as shown above. These documents are not official guides for members, and they do not impose any obligations or expectations on them. They also do not contain any evidence of the Plaintiff's consent or acknowledgment of these documents, via signature of confirmation of receipt or compliance.
>
> The SCA has acted unfairly and inconsistently by enforcing these documents on Plaintiff George Parker, while ignoring the same for other participants (Heather Ruiter, Skamp Widgrin, Elizabeth Phipps, Angela Gallant and others involved in the "Exile Thread" conversation, and including Beth Park, Amanda Greyson and Kirsten Chow and others named in DKT 9, Complaint). The SCA has failed to uphold any standards of conduct for the corporation and its officers as outlined in the documents in question. The corporate documents were binding for the persons named in DKT 9, as they were officers of the organization at that time or still are. The corporation failed to enforce these documents on its own officers, which shows bias and negligence.
>
> Furthermore, forcing a member to comply with policy specifically written for corporate officers is shortsighted and negligent. It is not a reasonable expectation to demand that members of an organization should be familiar with or adhere to the documents that govern its structure and operations. These documents are often lengthy, complex and inaccessible to the average person. Therefore, a reasonable person cannot assume that being a part of an organization implies consent or compliance with its documents that govern its structure and operations.

*Harassment and Bullying Policy*
*The SCA Board of Directors at its July 2022 quarterly meeting approved slight revisions to the Harassment and Bullying Policy, as presented by the Society Seneschal. This revision supersedes all previous versions, including the one in the **2021 edition of the Seneschal's Handbook**. Questions about the policy should be directed to the Society Seneschal*

> The Seneschals Handbook is a corporate document that applies only to the corporation and its officers, as shown above. It is not a member handbook, and there are no requirements to read or

abide by this document. Nor is there a signed document by either Plaintiff showing that they have read or agree to abide by these documents.

The corporation failed to notify each member of the new policy. The corporation depended on announcements on the webpage and in newsletters, none of which is required for members to read or visit.

The threatened sanctions listed in the policy (found in the corporate handbook, NOT in a member handbook) clearly go against WAC 132Q-10-215, which states, in part:

> (4) Verbal threats - Include threats against a *specific person or group of persons* and places that person, or members of the specific group of persons, *in reasonable fear of harm to person or property.* The fear *must be a fear that a reasonable person would have under **all** circumstances*. If the threats are because of a person's perception of a victim's race, color, religion, ancestry, national origin, gender, sexual orientation, or mental, physical or sensory disability, the fear must be fear that a reasonable person who is a member of the victim's race, color, religion, ancestry, national origin, gender, or sexual orientation, or who has the same mental, physical, or sensory disability as the victim would have. ***Words alone do not constitute malicious harassment unless the context or circumstances surrounding the words indicate the words are a threat.***

The SCA has acted unfairly and inconsistently by enforcing these documents on Plaintiff George Parker, while ignoring the same for other participants (Heather Ruiter, Skamp Widgrin, Elizabeth Phipps, Angela Gallant and others involved in the "Exile Thread" conversation, and including Beth Park, Amanda Greyson and Kirsten Chow and others named in DKT 9, Complaint). The SCA has failed to uphold any standards of conduct for the corporation and its officers as outlined in the documents in question, for a member. The corporate documents were binding for the persons named in DKT 9, as they were officers of the organization at that time or still are. The corporation failed to enforce these documents on its own officers, which shows bias and negligence. Furthermore, the process of imposing sanctions and revoking or denying membership is vague, inconsistent and lacks transparent criteria for the members to adhere to.

*C. Sanctions*
*1. Royal Sanctions*
*a. The Crown of a Kingdom may sanction subjects, residents and visitors within the borders of the Crown's Kingdom, for **just and stated cause**. Royal Sanctions take effect from the moment of proclamation, but a notice must be announced in court and also be published in the next available issue of the kingdom newsletter if the sanction is to remain in effect. Within 15 business days of the imposition of the sanction, the specific cause and occasion of the sanction must be explained in writing to the sanctioned individual.  8.12.2018 page 39*
**or**
*C. Sanctions*
*1. Royal Sanctions*
*a. The Crown of a Kingdom may sanction subjects, residents, and visitors within the borders of the Crown's Kingdom for **just and stated cause**. Royal Sanctions take effect from the moment of proclamation but must be announced in court and also be published in the next available issue of the kingdom newsletter if the sanction is to remain in effect. Within 15 business days of the imposition of the sanction, the specific cause and occasion of the sanction must be explained in writing to the sanctioned individual.*

*December 24, 2021, Revision Page 40*

**The sca breached its legal duty to act in accordance with the mission and purpose of the organization. By disregarding its obligation of fiduciary duty of Obedience, the sca violated the trust and confidence of its members.**

Plaintiffs have copies of the 2018 version and the 2021 version of the corporate documents. as shown above, no changes were made to the entry of "C. Sanctions".

"Just and Stated Cause" was not adhered to in the Exile of Plaintiff George Parker. Just Cause in legal terms means " a legally sufficient reason" *https://definitions.uslegal.com/j/just-cause/*. In terms of employer/employee (drawing a parallel between the relationship of "employer/employee" and the "organization/member"), Just Cause has accepted criteria which were NOT followed. The US Dept. of Justice has a 7 point list of accepted criteria:

1. reasonable rule or order
2. notice
3. sufficient investigation
4. fair investigation
5. proof
6. equal treatment
7. appropriate penalty

Plaintiffs contend that the SCA failed to comply with at least 5 of the criteria listed. In addition, using *Douglas v. Veterans Administration, 5 MSPB 313, 331 (1981),* the Douglas Factors include 12 points of criteria to be used:

*(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;*

*(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;*

*(3) the employee's past disciplinary record;*

*(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;*

*(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties;*

*(6) **consistency of the penalty with those imposed upon other employees for the same or similar offenses;***

*(7) **consistency of the penalty with any applicable agency table of penalties;***

*(8) the notoriety of the offense or its impact upon the reputation of the agency;*

*(9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;*

*(10) the potential for the employee's rehabilitation;*

*(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, **harassment, or bad faith, malice or provocation on the part of others involved in the matter;** and*

*(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.*

Of which the SCA violated  or otherwise ignored #'s 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and #12.
In using the term "Just and stated cause" the corporation implies that it will abide by the
commonly held standards used to define "Just Cause".
In addition to the lack of "Just Cause" required by their own documents, Plaintiffs maintain that
the defendant breached the fiduciary duty and the implied covenant of good faith and fair dealing.
*It is an implied term in every contract or agreement*, which means that it is not explicitly stated but
is assumed to be present. The covenant requires that each party will not do anything to unfairly
interfere with the right of any other party to receive the benefits of the contract. A breach of the
implied covenant of good faith and fair dealing occurs when one party to a contract acts in bad
faith or unfairly interferes with the other party's performance of the contract, as happened with the
original Exile.

*Clear Counsel Law Group explains that tort liability for breach of the implied covenant of good
faith and fair dealing is appropriate where "the party in the superior or entrusted position has
engaged in grievous and perfidious misconduct".* Plaintiffs feel that the SCA and its officers,
acting as "a superior or entrusted position" most definitely engaged in actions most grievous (the
lack of due process in the complaint regarding Heathe Ruiter, the lack of significant action to
protect Plaintiff Lori Parker from retaliation by Tami Hayes and (later) Mary Larose (who in
submitted evidence, targeted Plaintiff George Parker with innuendo and unsubstantiated claims)
and in the failure to follow the "Just Cause" evidence necessary to revoke memberships.
Furthermore, the process of imposing sanctions and revoking or denying membership is vague,
inconsistent and lacks transparent criteria for the members to adhere to.

**F. Sanctions (Corpora pg 12, 8.2018)**
**1. Sanctions and administrative actions should be proportionate and appropriate.** *Major
sanctions, such as a ban on attendance or participation, should not be a substitute for appropriate
administrative or legal action.*

Plaintiffs maintain that the revocation and denial of membership over one comment on a non-sca
page is neither proportionate nor appropriate. Plaintiffs submit documentation to prove that others
have been given a chance to correct behavior (See Jean Pierr/Blain Herbert email threads), a
chance denied Plaintiff George Parker.
The corporation's attempt to sanction individuals for their private posts is unjustified and
unacceptable. The corporation does not have the authority to regulate what individuals say outside
of the official SCA social media platforms. The corporation is basing its actions on internal
documents that are not binding on the members. This infringes on the individuals' right to free
speech, and is an abuse of the corporation's power. The Board did not pass the motion to create and
enforce sanctions on private pages in the meeting of August 8, 2020 (see documentation).
Therefore, the corporation cannot apply this policy to member postings that are not on SCA
official channels. This is a covert attempt to insert the failed motion and a sneaky way of trying to
implement a rejected motion into corporate policy, bypassing the normal procedures for policy
development.

Furthermore, the process of imposing sanctions and revoking or denying membership is vague,
inconsistent and lacks transparent criteria for the members to adhere to.

*SoSen Handbook 4.2021*

*• In gathering facts, <span style="color:red">always attempt to get accurate, first-hand information **from each side of a situation or conflict**, speak directly to the parties or knowledgeable witnesses</span>, and attempt to obtain complaints or statements in writing. Page 3*

> The complaint against Raphaella Di Contino (Heather Ruiter) was not handled properly by the investigators. Amanda Greyson and Kristen Chow showed bias and retaliation towards the Plaintiffs, who were not interviewed until they contacted the Society Seneschal. Stacy Hall also failed to interview Alycia DuBry and others who witnessed a conversation involving the Plaintiffs, and instead used hearsay evidence of "prior bad acts".

*I. Introduction*

*1. The Seneschal's Handbook is an official document of the Society for Creative Anachronism, and as such <span style="color:red">delineates policy, procedure, and recommended best practices for SCA branch operations</span>. This Handbook supersedes all prior versions. page 6*

> The purpose of this document is to outline the policy and procedures that govern the branch operations of the corporation. This document is NOT intended for members, and they are not required to read or comply with the policies in this document.
>
> Forcing a member to comply with policy specifically written for corporate officers is shortsighted and negligent. It is not a reasonable expectation to demand that members of an organization should be familiar with or adhere to the documents that govern its structure and operations. These documents are often lengthy, complex and inaccessible to the average person.  Therefore, a reasonable person cannot assume that being a part of an organization implies consent or compliance with its documents that govern its structure and operations.

*D. Emergency and Sanction Communications*

*<span style="color:red">**1. Notify the Society Seneschal of any impending royal or administrative sanctions (all types) as soon as it is reasonable.**</span> If the Kingdom Seneschal tells the Society Seneschal before the royalty pronounces the sanction, people can work together to make sure that the <span style="color:red">paperwork is all in order and proper procedures are being followed</span> from the beginning. It has proven perilous for a Kingdom Seneschal or Crown to initiate sanctions that will require Corporate-level review without prior coordination with the Society Seneschal or a designated deputy. The Board can, and does, sanction Kingdom-level staff and/or Crowns who impose sanctions inappropriately. Pg. 12*

> Due to the speed with which the sanction was enacted (less than 24 hours from the time of posting), Plaintiffs maintain that this step was ignored. The society was not informed by the An Tir officers before they imposed the Exile.

*SoSen Sanctions Manual*

*Section 5: Initial Notification of Sanction*

*A. Notice of Kingdom Sanction*

*1. The Kingdom Seneschal must notify or make a reasonable attempt to notify the sanctioned person via email or telephone as soon as possible, <span style="color:red">but must also notify the sanctioned person by certified postal mail within 15 days of the announcement in Royal Court.</span>*

*Page 5, 2020 version*

> The Kingdom failed to follow the email notification with a registered letter, as per #1 above.

Plaintiffs maintain that this step was ignored

*C. Contents of Notification*
*The written notice shall contain:*
*1. Type of Sanction/Description of conditions*
*2. Issuing authority (Crown and/or Kingdom Seneschal or Society Seneschal)*
*3. Date the Sanction was issued*
***4. For Kingdom Sanctions, the event at which the Sanction was announced***
*5. Time limit of the Sanction (if applicable)*
*6. A brief statement of facts supporting the sanction*
*7. Right of appeal*
*Page 6*

The officers in An Tir failed to announce the Exile at an event, and such information was not in the email received by Plaintiffs. There was no statement of facts "supporting" the sanction, simply a statement alluding to a violation of the Code of Conduct and Hate Speech Policy. Both the Code of Conduct and the Hate Speech policy are found in the corporate documents, and Plaintiff was under no obligation to read or abide by policies clearly written to apply to corporate officers only. In addition, The SCA does not have any signed document where Plaintiffs agreed to read and abide by the corporate organization documents.

Plaintiff George Parker asked several times for the details of the incident for which he was being sanctioned, and it was not until an email with Stacy Hall that the actual incident that resulted in his exile was confirmed. The other officers simply ignored his request for more detailed information. Furthermore, forcing a member to comply with policy specifically written for corporate officers is shortsighted and negligent. It is not a reasonable expectation to demand that members of an organization should be familiar with or adhere to the documents that govern its structure and operations. These documents are often lengthy, complex and inaccessible to the average person. Therefore, a reasonable person cannot assume that being a part of an organization implies consent or compliance with its documents that govern its structure and operations.

*Section 6: Standard Sanction Process[2]*
*A. The Kingdom Seneschal transmits the sanction package to the Society Seneschal.* **The package will include the following:**
*1. A complete statement of facts from both the Crown and Kingdom Seneschal.*
*Both statements must state why the sanction was issued.*
***2. The statement of facts from the Kingdom Seneschal** must **also describe the initial notice or attempt at initial notice of the Sanction to the sanctioned person; a copy of the initial notification letter; and proof of sending the letter by certified mail to the sanctioned party.***
*3. Proof of publication in the Kingdom newsletter or information indicating when the publication will take place.*
*4. Any statements from the Complainant(s) and any witnesses.*
***5. Statement from the sanctioned person, if any.***
*Page 6*

Plaintiffs did not receive a certified letter, and so proof of receipt could not have been made. There could be no statement from Plaintiff, as plaintiff was never interviewed prior to the sanction being enacted, therefore, no statement from him could have been included.

His comment was made, and within 24 hours, the exile was handed down, with no prior notice, nor attempt to contact him regarding the post, nor any attempt to interview him. The corporate documents specify the policy and procedures that the officers of the organization **must** (note the inclusion of the word MUST above) adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

*Section 5: Appeals Process*
*A. Appealing a Kingdom Sanction to the Board of Directors*
*1. Any person who has received a Kingdom Sanction may appeal to the Board of Directors. Only the sanctioned person may bring the appeal.*
*2. Appeals must have the following:*
  *a. An introductory letter explaining the circumstances surrounding the Sanction.*
  *b. Any information that the Board should consider which the sanctioned individual believes supports the appeal.*
*3. The person should provide all evidence to support the appeal, emailed to the Society Seneschal (seneschal@sca.org) or mailed to the SCA corporate office.*
*4. All questions about an appeal should be directed to the Society Seneschal.*
*page 7*

Plaintiff was given no opportunity to appeal the Kingdom Exile Prior to the exile being upheld at the Board meeting. When the Plaintiff emailed the society seneschal as directed, there was no response. Instead, Plaintiff was notified via email and registered letter that the matter would be proceeding to the Board for consideration. This is another instance of the SCA officers choosing to ignore emails and other communications of controversial subjects, hoping it would go away. Anecdotal and email evidence is submitted.

*Section 7: Appeals Process*
*A. Appealing a Kingdom Sanction to the Board of Directors*
*1. Any person who has received a Kingdom Sanction may appeal to the Board of Directors. Only the sanctioned person may bring the appeal.*
*2. Appeals must have the following:*
    *a. An introductory letter explaining the circumstances surrounding the Sanction.*
    *b. Any information that the Board should consider which the sanctioned individual believes supports the appeal.*

The Board refused the appeal request even after they were made aware by plaintiffs of the many ways in which the initial exile and the resulting investigation were flawed. Plaintiffs requested the appeal 3 times prior to warning the corporation of their intent to file a lawsuit. Plaintiffs outlined the disability Plaintiff George Parker has, enumerated the ways in which the disability impacted him and how it impacted his interactions on the thread in question. Plaintiff provided the Board with specific sections of the corporate documents and policies that the SCA officers violated. The Board refused the appeal in one meeting, but no mention of further appeals have been found in Board Minutes. This goes to show a bias and censorship on the part of the executive assistant Leslie Luther-Fulton and the society seneschal, Liz Schraer.

*Investigator's Guide Office of the Society Seneschal*

*January 2021*

*II. General Principles:*

*The following points **apply to all investigators and all officers involved in an investigation,  regardless of whether it is a Kingdom or Society investigation.***

*II. Types of Investigations:*

***1. Kingdom investigation with possible Crown-imposed sanction as a result.***

*2. Society investigation resulting from a Crown-imposed sanction, usually a Temporary  Removal from Participation (TRP).*

*3. Society investigation of an appeal to the Society Seneschal of a decision by a Crown to  take no action on a complaint. **An affected member may appeal a kingdom's decision;** the Society Seneschal will generally decide whether further investigation is needed. In some  cases, the Board may order an investigation directly.*

In reading the Sanctions manual, Kingdom investigations "usually" result in temporary removal **ONLY** for (TRP), for which the society will investigate. Nowhere does it state that Exiles are or will be investigated for revocation and denial of membership. In fact, the Kingdom of An Tir chose to issue the lesser exile, and the plaintiffs state where their membership was issued (Arizona) chose to do nothing at all. This lack of consistency in issuing sanctions, as well as what prompts an investigation is a clear violation of corporate documents.

Section II TYPES OF INVESTIGATIONS fails to include Exile as one of the investigation types. Also, The exile in question was not fully investigated, in violation of the above policy. Furthermore, the process of imposing sanctions and revoking or denying membership is vague, inconsistent and lacks transparent criteria for the members to adhere to. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

In addition, the records of the Board meetings reveal a pattern of selective enforcement before April 2021, when the Board did not initiate any inquiries into the cases of exiled members. This demonstrates that Plaintiff George Parker was singled out and discriminated against by some SCA members who wanted him out.

*III. Recusing a Society Officer, Kingdom Officer or Investigator:*

*1. Definition: For an investigator, recusal means declining or withdrawing from an  investigation assignment because of an actual or perceived conflict of interest.*

*2. Reasons for recusal may include, but are not limited to:*

*· **The officer or investigator has prior involvement in the matter to be investigated  in any way—as a witness, victim, or subject.***

*· **The officer or investigator has a close personal connection with a principal party  in the matter to be investigated** that could be seen to compromise their objectivity. · The officer or investigator has other previous life experiences that, in the  investigator's opinion, could interfere with their ability to be impartial.*

In the investigation of Raphaella Di Contino (Heather Ruite), the investigator assigned was Attia Prima (Amanda Greyson), who is also a Peer. In the SCA, Peers often meet face to face, at least 2 times per year. It is inconceivable that Amanda Greyson and Heather Ruite did not know each other and have dealings with each other. Therefore, clearly, Kirsten Chow assigning Amanda Greyson was in violation of Section III.2. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated. The corporate documents were

binding for the persons named in DKT 9, as they were officers of the organization at that time or still are. The corporation failed to enforce these documents on its own officers, which shows bias and negligence.

*IV. Conducting an Investigation at the Kingdom Level:*
*2. **If a complaint is received at the local level, local seneschals report it up to the  Kingdom Seneschal, who determines if an investigation is needed.***
A complaint against Heather Ruite was received, but never investigated. Instead, it was seen to be a "personal conflict". Once that conflict was identified, neither party was given the option of mediation as outlined in the Society Seneschal Handbook. pg 19:

> *D. After the Investigation*
> *1. Once the investigation is concluded, you and the Crown will need to review the information and decide what, if any, action is appropriate. Not every complaint needs to be acted upon. **If you determine that it is an interpersonal conflict, mediation might be appropriate.** You and the Crown are empowered to strongly suggest this, but it can't be required. It is also permissible to issue a letter to one or more parties, stating the conclusions reached and suggesting behaviors going forward that might mitigate the issues. Such a letter should be treated as confidential and kept on file by your office, as documentation should further related issues arise.*

At no time did any of the officers or investigators for the Heather Ruiter complaint ever indicate a conflict of interest in the matter- nor did any offer to recuse themselves.
By not offering mediation, and instead sanctioning Plaintiffs with a 6 month ban on posting to official Kingdom facebook pages, the Crown (Heather Holmes and Emerson Waite) and kingdom seneschal (Kirsten Chow) violated the Seneschal handbook section above. The corporate documents were binding for the persons named in DKT 9, as they were officers of the organization at that time or still are. The corporation failed to enforce these documents on its own officers, which shows bias and negligence.

*5. If an in-depth investigation is needed, **assign an investigator who is neutral, generally  respected, and not closely connected with any principal party in the complaint.***
At no time did any of the officers or investigators for the Heather Ruiter complaint ever indicate a conflict of interest in the matter- nor did any offer to recuse themselves.
Amanda Greyson was not neutral, and had ample opportunity to know and interact with Heather Ruiter. The initial complaint was taken by Beth Park, a known associate and great friend of Heather Ruiter. Beth Park failed to provide Plaintiffs with a copy of her report of the meeting where the complaint was made, despite several attempts by Plaintiffs to get a copy. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

*Steps in a kingdom investigation:*
*2. **The investigator MUST make every attempt to interview the complainant(s), the  subject(s), and any pertinent witnesses. Unsuccessful attempts to contact people must be  documented. If anyone refuses to be interviewed, that needs to be noted.** Interviews may  occur in person, via phone, or via videoconference.*
In the Heather Ruiter (Raphaella Di Contino) complaint, a witness named for the Plaintiffs was

never interviewed, specifically Zenobia Styles- a prominent Peer and "Duchess". Plaintiffs and 2 other of Plaintiffs witnesses were not interviewed until AFTER the society seneschal (Mike Watkins) intervened.

No witnesses were interviewed for the society investigation. Plaintiffs direct attention to DKT 34.2 wherein Stacy Hall's summary report is submitted. The report fails to enumerate any witnesses interviewed, and fails to include statements by witnesses, except hearsay evidence of Denise Coyle and Mary Larose.

The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

Documentation of Plaintiffs email to the society seneschal Mike Watkins attached

*5. If someone prefers to make a written statement, that is allowable, but make a note that  they chose that in lieu of an interview.*
**6. Supply the interviewee with a copy of your notes from their interview and allow them to  review the notes for accuracy.**

No copy of the notes were given to Plaintiffs despite several requests, in EITHER complaint nor investigation. To date, Plaintiffs have no idea what went in that report that was ultimately used to determine that a simple "interpersonal conflict" existed with Heather Ruite.

In addition, Stacy Hall never provided Plaintiff with a summary of his statement, as required above. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated. See documents provided.


*Follow-Up to Kingdom Investigations:*
*The Kingdom Seneschal and Crown decide what, if any, sanction is appropriate.*
*1. If a Royal Sanction is enacted, it MUST be read in court and published in the kingdom  newsletter.*
*See the Sanction Guide for detailed instructions.*

To date, Plaintiff are unaware of any published notice in the newsletter, or an announcement at Court. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

***2. Notify the sanctioned person per the instructions in the Sanctions Guide. The  complainant should also be notified of the sanction, but not of any details of the  investigation.***

No copy of the notes were given to Plaintiffs despite several requests, in EITHER complaint nor investigation. To date, Plaintiffs have no idea what went in that report that was ultimately used to determine that a simple "interpersonal conflict" existed with Heather Ruite. In addition, Stacy Hall never provided Plaintiff with a summary of his statement, as required above.

As noted elsewhere, proper notice of the sanction of 6 month suspension from social media was never mailed via certified letter. In addition, no certified letter was received regarding the exile, only an email.  The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

See documents provided

*V. Society Investigations*
*Investigations Resulting from a Kingdom Sanction:*
***1. If a Kingdom has enacted the sanction of Temporary Removal from Participation, and the Board upholds and extends the sanction, an investigation will normally be ordered.***
*2. The Society Seneschal will send a letter notifying the sanctioned person of the action and will instruct the Investigations Deputy to assign an investigator.*

> Section V of the Investigations Procedures Manual clearly states that Kingdom Sanctions that are the result of a Kingdom investigation are **limited** to Temporary Removal from Participation. This is also seen in the Kingdom_Seneschal_Investigations_and_Sanctions_Presentation.PDF written and presented by both Liz Schraer and Jessical van Hattem, written July, 2020. See documentation attached. The process of imposing sanctions and revoking or denying membership is vague, inconsistent and lacks transparent criteria for the members to adhere to. The Board, however, is constrained by the language of the document in terms of what it can do and decide. The document sets out criteria that limit the Board's authority and discretion. The Board must comply with the document and respect its provisions.

*Contacting interviewees:*
*2. If the person does not respond after two or three attempts at email contact, spaced several days apart,*
***the investigator should try to find alternate contact information:***
> *· Phone number*
> *· Alternate email*
> *· Facebook or other social media messaging*
> *· Mailing address*
> During the investigation of Heather Ruiter (Raphaella DiContino), the investigation was closed prior to Plaintiffs or their witnesses being interviewed. Plaintiffs are unaware of any documentation to support a claim of attempted contact. Emails attached.
> The society authorized investigator Stacy Hall failed to try alternate forms of contact during her investigation into Plaintiff George Parker. As evidenced by the email from Lis Schraer infoming Plaintiff George Parker of the closure of the investigation, copy of the email attached.
> The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

***3. The investigator should document all attempts at contact.*** *If contact is not made, this documentation needs to be included in the report. If someone refuses to be interviewed, or requests no further contact, that needs to be noted in the report.*
> During the investigation of Heather Ruiter (Raphaella DiContino), the investigation was closed prior to Plaintiffs or their witnesses being interviewed.
> Plaintiff eventually contacted the then-society seneschal Mike Watkins, who then emailed Kirsten Chow. Also goes to bias on the part of Kirsten Chow, Bath Park and Amanda Greyson.
> Plaintiffs are unaware of any documentation to support a claim of attempted contact with Plaintiffs

themselves or any of Plaintiffs witnesses. Emails included.

Plaintiffs are unaware of any documentation to support the claim that Stacy Hall tried any other form of contact outside of email. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. Plaintiff George Parker, as a mere member, did not have such obligations. The officers of the corporation breached their duties by not complying with the policy as stated.

*6. If the person has not responded after three or four attempts at contact, spaced over at least two weeks and if possible using at least two different methods,* **send a final email informing them that if they have not contacted you within one week, the investigation will proceed without their input.**

No such email was ever sent. During the investigation of Heather Ruiter (Raphaella DiContino), the investigation was closed prior to Plaintiffs or their witnesses being interviewed. Plaintiffs are unaware of any documentation to support a claim of attempted contact. Emails included.

No such email was ever sent. Plaintiffs are unaware of any documentation to support the claim that Stacy Hall tried any other form of contact outside of email. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

### Procedures for Conducting Interviews:

*3. Ask the Kingdom Seneschal and Crown if they have any reason to suspect any bias on the part of the complainant(s) or others.* **Ask to be filled in on any social background relevant to the situation. This may include things like long-term disagreements, household issues, etc**.

Kingdom: Amanda Greyson, Heather Ruiter, Beth Park, Kirsten Chow are all Peers. The Peerage circles in An Tir are small and tight-knit. Beth Park and Heather Ruiter are known associates, with Heathe Ruiter frequently attending functions both official and unofficial at the home of Beth Park and others. Clearly, this relationship was never divulged to the Kingdom or society. The relationships between these people clearly indicate a measure of bias and possible retaliation. The society was aware of these, yet nothing was done about it, showing that the society as a whole protects the peerages at the expense of common members.

The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.See attached documentation

*Webpage for DEI:* [Society for Creative Anachronism (sca.org)](),

*"What does Diversity, Equity, and Inclusion mean for members of the SCA?*

*First, that we are aware of issues going on in the world we live in and we know that our organization is not insulated from the impacts of implicit bias.*

*Second, that to be successful we must welcome and value new and existing members who are different from 90% of our populace.*

*Third, that discrimination, sexual harassment, bullying, and hate speech will not be tolerated in our Society.*

*Lastly, that we take action. We value chivalry and live by those tenets we claim to hold as ideal. When a participant violates the code of conduct we require, we let them know so they can adjust their behavior."*

This quote is on a very public, easily accessible webpage hosted by the SCA. In advertising that participants who "violate" the code are given the opportunity to adjust their behavior, members

and prospective members can reasonably expect to be given an opportunity to amend behavior. The SCA did not give this opportunity to Plaintiff George Parker.

By failing to "value" Plaintiff George Parker and his stated, known "differences", they failed in following this stated Policy. Plaintiff George Parker is a 30 year member of the organization, a member who continuously contributed in terms of money, time and participation level. Plaintiff Lori Parker, having been adversely impacted by the negligence of Defendants via their action and inaction, should also have been a "valued" member of nearly 30 years, having committed time, money and resources to the organization. At the time of the revocation, Plaintiff Lori Parker was a Society Officer under the Society Seneschals office.

*Records Retention Policy:*

*10. It is imperative that the Company knows which documents have been retained and which documents have been discarded. Therefore, extra files including correspondence, notes, memoranda, computer discs, tapes, etc. which are maintained in individual offices, or any other approved off-site location are subject to these guidelines and shall not be retained in excess of these guidelines.* ***Such records shall not be stored and maintained at home or on personal computers at ay (sic) time.***

Email addresses show numerous SCA officers using their personal email for official communications- resulting in a violation of the records retention policy. The corporate documents specify the policy and procedures that the officers of the organization must adhere to. The officers of the corporation breached their duties by not complying with the policy as stated.

*C. Role of the Board*
*1. Rules*

*The Board of Directors of the SCA Inc.* ***establishes the rules of the Society's historical recreation activities and minimum administrative requirements for officers and branches****; these are published in Corpora. It is the final arbiter of the interpretations of these rules as made by the officers of the Society. It reserves to itself various powers as described in Corpora, and these reservations apply to all branches, regardless of corporate affiliation.*

Section C shows that there are RULES for activities and administrative requirements, not for member participation. The corporation continues to try to apply non-existent "rules" to member conduct, up to and including the "Code of Conduct" policy which states *"In pursuing its mission, the SCA is committed to excellence in its programs, communications, and activities."* This shows the code of conduct to be applicable to sca programs, sca communications and sca activities only. Therefore, revoking a member's membership for a violation of these policies is against the corporate policy itself.

There are no rules published in ANY corporate document or policy **that applies to members**. All corporate documents and policies are prefaced with the claim that they are documents that serve to outline administration and structure for the CORPORATION, not for members. Corpora *"serves as a framework for the structure of the historical re-creation activities of the Society, and applies equally to all branches worldwide, regardless of corporate affiliation.",* the Seneschals Handbook *"delineates policy, procedure, and recommended best practices for SCA branch operations."*

Forcing a member to comply with policy specifically written for corporate officers is shortsighted and negligent. It is not a reasonable expectation to demand that members of an organization should be familiar with or adhere to the documents that govern its structure and operations. These

documents are often lengthy, complex and inaccessible to the average person.  Therefore, a reasonable person cannot assume that being a part of an organization implies consent or compliance with its documents that govern its structure and operations.

Social Media Policy
> *September 1, 2020*
> *From: John Fulton, President of the Society for Creative Anachronism, Inc.*
> *Section regarding August 8, 2020 conference call:*
> *Motion by John St. Dennis:* <span style="color:red">*with regard to the potential sanctions for postings on non-official social media sites,*</span> *the Board will initially uphold the Kingdom action and refer the matter to the Society Seneschal for future review.  This review will take place at the Board's discretion but starting within three (3) months following receipt of the Social Media Committee's  recommendations for the handling of such postings.  No second.*  <span style="color:red">**Motion failed.**</span>

The corporation has no authority to penalize individuals for their online activities outside the sca domain. The motion that proposed such a measure was rejected and never resubmitted, amended or approved by the Board.
Social Media Policy ( 6.4.2018) fails to mention sanctions for postings on non-sca controlled pages, specifically personal pages. Instead, the disclaimer prominent of the first page states:
> *Social Media Policy*
> <span style="color:red">***The Office of Social Media is responsible for the use of social media on approved platforms***</span> *to support the goals of the Society for Creative Anachronism, Inc. and to facilitate communication with its participants.*

The officers and the corporation have limited authority and influence. They cannot monitor content on personal pages, but only support the organization's goals and help with communications.

The April 2021 Social Media Policy is vague at best concerning postings on non-sca social media:
> *II. Scope*
> *A. This policy applies to:*
> > *a. all people communicating through official SCA Inc. social media channels,*
> > <span style="color:red">*b. people using a profile or interacting on any social media, including unofficial channels, in a manner that demonstrates a direct connection to SCA Inc.,*</span>
> > *c. officers of SCA Inc. with responsibility for managing SCA Inc. social media channels.*

Part b attempts to regulate and manage content outside the sca managed social media site directly contradicts the opening section:
> *I. Objectives*
> *Through this policy, SCA Inc. seeks to:*
> > *A. encourage its members and participants to use creativity and innovation in the use of social media by its entities to increase connectivity and participation,*
> > *B. ensure* <span style="color:red">*that all content posted to official SCA social media channels*</span> *by any officer or participant supports the achievement of the Society's Mission, and its role as an international non-profit volunteer educational organization,*

The problem with this proposal is the vague criterion of *"a manner that demonstrates a direct connection to SCA Inc"*. This is hardly a reliable way to identify sca members, since many of them use their registered names and devices in other contexts, such as other historical groups, email addresses or social media platforms. Plaintiffs use their alias name to interact in business, as well as within other venues such as Viking Fest and in other places and organizations.

The corporation freely states that names and devices are the "property" of their members, and that the SCA has no claim to names or devices. However, the social media policy states those same names and devices will be used to *demonstrates(sic) a direct connection to SCA Inc."* The SCA both claims control over names, and denies control over names.

This policy has a major flaw: it relies on the unclear standard of "a manner that demonstrates a direct connection to SCA Inc" to determine who is an sca member. This is not a valid way to recognize sca members, because many of them use their registered names and devices for other purposes, such as joining other historical groups, creating email addresses or social media accounts. Plaintiffs also use their alias name for business transactions, as well as in other events like Viking Fest and in other places and organizations.

The corporation admits that names and devices are the "property" of their members, and that the SCA has no right to names or devices. Yet, the social media policy says that those same names and devices will be used to "demonstrates(sic) a direct connection to SCA Inc." The SCA contradicts itself by claiming control over names, and denying control over names.

The 4.21 Social Media FAQ document, specifically written to answer member questions, states:
> **2. Is the SCA looking at my personal Social media sites?**
> *The only aspect of the policy which applies to people's personal pages or online conduct outside official channels is the consideration of whether or not it is bullying, abusive, harassment, or hate speech, or a threat to the well-being of others* **if a profile could be seen to create a direct connection with the SCA.** *(Definitions can be found in the Society Seneschal's Handbook, p. 40, Section XIX and Corpora p. 37, X.A.4 ).*

The corporation has no right to impose sanctions on individuals for what they post outside of SCA social media platforms. The definitions that the corporation relies on are in internal documents that govern the organization. The FAQ does not mention anything about sanctions or how they are applied. This is a clear violation of the individuals' freedom of expression, an overreach and a misuse of the corporation's power. The Board meeting of August 8, 2020 (conference call) did not approve the proposal to establish and enforce sanctions on private pages. Therefore, it is inappropriate to include that item in the new social media policy (dated April, 2021). This is a covert attempt to insert it into corporate policy, circumventing the normal procedures for policy development.

The FAQ goes on to say:
> **8. Does SCA Inc. expect unofficial channels to enforce this policy?**
> **Nope**. Behaviour(sic) on an SCA related unofficial channel *may be used as part of a pattern of behaviour* if people are bullying, abusive, harassing, using hate speech, or threatening the well-being of others in an SCA context. That's it.

According to the FAQ of the corporation, they will track the postings of members that contain "unofficial"

content. However, they do not specify any sanctions for such postings. They only state that they will use them to detect a "pattern of behavior". This suggests that they are not intending to penalize members based on single postings, but rather on their overall conduct.

**ANSWER**: See additional Documentation

**REQUEST FOR PRODUCTION NO. 7**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. See additional Documentation*

**INTERROGATORY NO. 12**: *Identify any and all facts or evidence you have that the SCA was aware of or perceived you to have a disability.*

**ANSWER**: Kirsten Chow (via Bullying and harassment statement- copied here and attache)
Included in emails to the Board of Directors
Included in emails to the society seneschal
Provided to investigator
verbally informed Beth Park and other members of the group known as Blatha An Oir

**INTERROGATORY NO. 13**: *Set forth in detail each complaint you made regarding SCA's alleged unlawful conduct or behavior, including, but not limited to, date, name of person whom you complained to, description of the complaint, witnesses to each event and complaint, if any investigation was conducted, and the findings or conclusions of any investigation.*

**ANSWER**:
WAC 296-128-770
Retaliation.
(1) It is unlawful for an employer to interfere with, restrain, or deny the exercise of any employee right provided under or in connection with chapter 49.46 RCW. This means an employer may not use an employee's exercise of any of the rights provided under chapter 49.46 RCW as a negative factor in any employment action such as evaluation, promotion, or termination, or otherwise subject an employee to discipline for the exercise of any rights provided under chapter 49.46 RCW.
<snip>
    4) Adverse action means any action taken or threatened by an employer against an employee for their exercise of chapter 49.46 RCW rights, which may include, but is not limited to:
    (a) Denying use of, or delaying payment for, paid sick leave, minimum wages, overtime wages, all tips and gratuities, and all service charges, except those service charges itemized as not being payable to the employee or employees servicing the customer;
    (b) Terminating, suspending, demoting, or denying a promotion;

RCW 9A.08.010: General requirements of culpability.
    *General requirements of culpability.*
    *(1) Kinds of Culpability Defined.*
    *(a) INTENT. A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime.*
    *(b) KNOWLEDGE. A person knows or acts knowingly or with knowledge when:*
        *(i) He or she is aware of a fact, facts, or circumstances or result described by a*

*statute defining an offense; or*

*(ii) He or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.*

*(c) RECKLESSNESS. A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.*

*(d) CRIMINAL NEGLIGENCE. A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.*

*(2) Substitutes for Criminal Negligence, Recklessness, and Knowledge. When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly. When acting knowingly suffices to establish an element, such element also is established if a person acts intentionally.*

*(3) Culpability as Determinant of Grade of Offense. When the grade or degree of an offense depends on whether the offense is committed intentionally, knowingly, recklessly, or with criminal negligence, its grade or degree shall be the lowest for which the determinative kind of culpability is established with respect to any material element of the offense.*

*(4) Requirement of Wilfulness Satisfied by Acting Knowingly. A requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements plainly appears.*

The Plaintiffs maintain that the SCA officers showed intent by failing to address their complaints about the bullying, harassment and retaliation they faced from other officers, members and peers, and by minimizing their grievances.

Plaintiffs maintain the corporation's officers possessed sufficient evidence, including screenshots of conversations, that a rational person would regard as factual, proving knowledge as well as intent.

According to the complaint DKT 9, the corporation's officers knowingly disregarded the risks to Plaintiffs, failed to intervene when their colleagues harmed their reputation and business, and downplayed the consequences of those harms.

RCW 9A.08.030:  Entity and personal liability.

*(1) As used in this section:*

*(a) "Agent" means any director, officer, or employee of an entity, or any other person who is authorized to act on behalf of the entity;*

*(b) "Entity" includes any domestic entity formed under or governed as to its internal affairs by Title 23, 23B, 24, or 25 RCW or any foreign business entity formed under or governed as to its internal affairs by the laws of a jurisdiction other than this state;*

(c) "Governor" has the same meaning as provided in RCW 23.95.105.
(d) "High managerial agent" means a governor or person in a position of comparable authority in an entity not governed by chapter 23.95 RCW, and any other agent who manages subordinate employees.
(2) An entity is guilty of an offense when:
(a) The conduct constituting the offense consists of an omission to discharge a specific duty of performance imposed on entities by law; or
(b) The conduct constituting the offense is engaged in, authorized, solicited, requested, commanded, or tolerated by a high managerial agent acting within the scope of his or her duties and on behalf of the entity; or
(c) The conduct constituting the offense is engaged in by an agent of the entity, other than a high managerial agent, while acting within the scope of his or her duties and on behalf of the entity and
(i) the offense is a gross misdemeanor or misdemeanor, or
(ii) the offense is one defined by a statute which clearly indicates a legislative intent to impose such criminal liability on an entity.

The kingdom and society seneschal authorized and permitted the flawed investigations, despite being aware of the policy violations. Plaintiff showed evidence and SCA corporate documents excerpts to prove the violations, but the seneschal and Board of Directors (cc'd on the email) disregarded them. See documentation attached.

RCW 24.03A.340
Rights and obligations.
(1) The members of a membership corporation have only those rights, privileges, powers, or obligations specifically given or assigned to members in the articles, the bylaws, or RCW 24.03A.450.

Corp Policies 8.12.2018
B. Non-Statutory Members
The Board of Directors has designated the following categories of advisory membership. Such advisory members are not members within the meaning of Section 5056 of the California Corporations Code. California law supports the SCA's use of the terms "member" and "membership" in the common English meaning, referring to persons who have paid to be associated with the organization.
1. Sustaining Membership conveys eligibility to hold office in the SCA, a subscription to a Kingdom newsletter, the option to subscribe to other Corporate publications, and any other privileges designated by the SCA or its subdivisions as accruing to members of the SCA. This type of membership is considered a subscribing membership.
...
3. Associate Membership conveys eligibility to hold office in the SCA, except where other membership categories are required Governing Documents. Associate membership also entitles the holder to any privileges designated by the SCA or its subdivisions as accruing to members of the SCA, except where another membership type is specifically required by the organization defining the privilege. This type of membership is not considered a

*subscribing membership.*

*...*

*II. GENERAL CONDITIONS AND PRIVILEGES OF MEMBERSHIP*

*A. Access to Membership*

*Membership in the SCA is open to any interested individual, without restriction of age or citizenship. Membership can be terminated only by:*

*1. lapse following nonpayment of dues, or*

*2. action of the Board of Directors.*

*Memberships are not transferable or assignable.*

*B. Privileges of Members  Every natural person holding membership in the SCA is eligible for office and advancement within the SCA, subject to the requirements for such office or advancement, and to the provisions established above. A group or institution may obtain a membership of the types listed in V.B.1-3 in order to obtain the newsletters and/or increase its support of the SCA; such membership does not convey the privileges of membership to any individual associated with that group or institution.*

The corporate documents specify the policy and procedures that the officers of the organization must adhere to. Plaintiff George Parker, as a mere member, did not have such obligations. The officers of the corporation breached their duties by not complying with the policy as stated.

...

*RCW 24.03A.375*

*Termination and suspension of membership.*

*(1) A membership in a membership corporation may be terminated or suspended for the reasons and in the manner provided in the articles or bylaws.*

See above. Plaintiffs have answered this is question 7

Plaintiff Lori Parker, as an officer of the organization, was entrusted with the responsibility of safeguarding its interests and reputation. However, Plaintiff Lori Parker also deserved to work in a safe and respectful environment. The SCA failed to protect Plaintiff Lori Parker from harassment and retaliation by Tami Hayes. David Keen and A.J. Pongrantz were aware of the situation, but they did not take any action to stop it. This is unacceptable and violates the organization's policies and values. See documentation attached.

Instead of addressing the possible actionable threats (as noted by Stacy Hall, DKT 34.2) the corporation instead chose to archive the Facebook page (Blatha An Oir Populace Page) where they occurred, and did NOT inform Plaintiffs of said threats, or inform appropriate law enforcement agency, in short, actively covering up possible legally actionable content. Documentation emails attached

*RCW 24.03A.495*

*Standards of conduct for directors.*

*(1) Each director, when discharging the duties of a director, shall act:*

*(a) In good faith;*

*(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and*

*(c) In a manner the director reasonably believes to be in the best interests of the nonprofit*

*corporation.*

The Board acted negligently and in bad faith when it conducted a flawed investigation that led to the expulsion of a member based on a single remark and unsubstantiated allegations of previous misconduct. The investigation relied on hearsay evidence to "prove" "prior bad acts" that would have been dismissed as unreliable and irrelevant by any reasonable person. The Board's decision did not benefit the organization in any way, but rather harmed it by depriving it of the valuable contributions of both Plaintiffs, who were active and generous members of the Society, giving their time and artistic talents to benefit their local groups. Plaintiff Lori Parker had been society YAFA officer (stepping down after being notified that the Board would investigate Plaintiff George Parker for R&D), donated to their local chapters, organized events, held offices and more. See resumes attached.


**INTERROGATORY NO. 14**: *Identify any and all statements by individuals you understand or understood to be SCA Board Members, Administrators, Peerage, or other representatives of the SCA at the Society levor or the Kingdom of An Tir that you contend are discriminatory or demonstrate an animus towards you or your alleged disability. Identify whether the statement was oral or written and how it was conveyed to you.*


**ANSWER**:
Defendants DKT 34.2. Copy of Exhibit with notes included.
Email: Liz Schraer- 2 Sept 2021 copy attached
See emails and other documentation
Denise Coyle (Nykkyra) multiple adversarial postings on BAO page See attached
The officers of the SCA failed to even address complaints or allegations made by Plaintiffs in emails or other correspondence.
Plaintiffs expect to be able to answer this more fully as Defendants supply additional information that has been unavailable to Plaintiffs, such as the deliberately hidden BAO populace package (now archived) or other posts mentioned as being deleted by defendants witness Mary Larose.


**REQUEST FOR PRODUCTION NO. 8**: *Please produce any        messages or shared correspondences, including text messages, emails, letters, social media posts, status updates, messages, blogs and entries on social networking sites such as Facebook, Instagram, or Twitter related to any of the allegations in the Complaint or alleged damages.*


**RESPONSE**:
See attached information including screenshots, emails, text messages and social media posts. Plaintiffs expect to be able to answer this more fully as Defendants supply additional information that has been unavailable to Plaintiffs, such as the deliberately hidden BAO populace package (now archived) or other posts mentioned as being deleted by defendants witness Mary Larose. As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.
.
**REQUEST FOR PRODUCTION NO. 9**: *Please produce all communication including but not limited to emails, text messages, letters or any other communication with SCA personnel regarding the allegations in the Complaint or alleged damages.*

**RESPONSE**: See attached information including screenshots, emails, text messages and social media posts. Plaintiffs expect to be able to answer this more fully as Defendants supply additional information that has been unavailable to Plaintiffs.

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**REQUEST FOR PRODUCTION NO. 10**: *Please produce all communication including but not limited to emails, text messages, letters, or any other communication with any non-SCA personnel regarding the allegations in the Complaint or alleged damages.*

**RESPONSE**: None at this time. As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**REQUEST FOR PRODUCTION NO. 11**: *Please produce all personal notes, diaries, reports, and/or calendars, regarding your claimed injuries and damages, including those that corroborate any of the allegations in the Complaint or alleged damages.*

**RESPONSE**: Please see attached.As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**INTERROGATORY NO. 15**: *Please describe in detail each and every allegation you made in* ***Paragraph 46*** *of your Complaint,* **_including but not limited to_**:
*a.  the alleged hostile work environment;*
*b.  the alleged bullying and harassment; and*
*c.  SCA's policies that were allegedly violated.*
See above and see documentation provided. Asked and answered above.

**ANSWER**:
*c.  SCA's policies that were allegedly violated.*
See above interrogatory # 11, see documentation provided.

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

*a.the alleged hostile work environment; & b.  the alleged bullying and harassment;*
Oct 24, 2017 Here is the sequence of events, and my perception of what happened, prior to the Letter of Removal I was emailed October 22nd .
First of all, I started the YAFA page July 20,2016, and following the advice of several other people, made the Group an unofficial group, complete with the disclaimer statement (the official one-) I garnered from another FB page. I announced it as unofficial, and encouraged families, mentors and

officers, as well as interested parties to join. It has been used to chat about events, who's doing what, as well as a venue to advertise events, announce Tokens and workshops, really anything- it was still continuing as such until Sept. 29, when Tami Hayes (Visc. Lenora Truble) joined (added by the Summits Seneschal, Daniel Tharp). At this point, I'd like to say that I felt, and still strongly feel this latest incident and my ultimate removal from office is a direct result of the Background Check form discussion of Sept 23, as the timeline is just too coincidental. 6 days later, she suddenly joins the group after over a year? Immediately after, Mary Larose asked to join- at the time I had no idea who she was, but her profile obviously was SCAdian, so I okay'd her. At 12.03 Sept 29th, I received a FB messenger message from Mary Larose (Isabella Lucrezia) {see addendum A for complete record.} Mary Larose initially outline 4 points with which she took issue: "1) all An Tir social media groups must be "open groups" not closed. Please change the group settings for the An Tir YAFA- Youth And Family Achievement Program 2) All social media groups must have at least 2 admins, and this group only appears to have one Admin. Please find someone else in your group that can also act as an admin 3) All social media groups have specific language that must be used, as per Society. Here is a link that will show you that specific language. Please look at section 4B http://www.sca.org/docs/pdf/SCASocialMediaPolicy.pdf 4)

One this that was also brought to my attention is it seems that you have created an event for that group for Collegium. The event name you created is causing confusion for people. I am also confused, because in the group I can see that you already shared the link for the Official Event Page and then you named your event exactly the same name, which causes confusion. If you are going to have a second event for YAFA activities please change the name please change the name of the page to something like YAFA activities at Collegium. Personally I think you are better off adding info to the actual event itself, because people who don't know specifically about YAFA won't know about your activities, but that part is up to you."

As I was in a car, and reading this on my phone, I was somewhat surprised. As I told her, I didn't specifically set the group to closed- a year and more later, now, I think it was default. But Honestly, I didn't pay much attention when I was setting things up. My mistake was in saying so to Mary Larose. While on my phone, I was able to text a person for the second Admin she requested, and I finally managed to delete the event. I also immediately put "unofficial " on the title. I felt this was important to assure people did not mistake the group for official, and she questioned me about it- Also, the statement she asked me to include was already there ( it isn't now, its been replaced) but it was there already when she told me to put it there, indicating she had not really looked for it. She immediately questioned the move, stating "What is the purpose of saying it is unofficial? You are the Deputy in charge" I explained to her the page was unofficial-"It's a group for families and officers to share ideas and info. Always has been. "Mary's response "It should still be an official group" Mine "Why? I should have an official page connected to the kingdom page. I've been asking for over a year now. This was my answer to having somewhere I could talk to people, he then in touch with each other, discuss the ways and means of the program..... I post here, as well as every other page out there I can I'm looking over the rules. I may have some questions for you-I'd love to have it be official, but is like to find out how that works." At this point, I'm still in my car, trying to read the policy on my phone. The conversation kind of took a turn from therePlease see the complete transcript (Yafa-Social-media-conversation-Sept-2017).

 I did initially say I'd love to have it official, but after reading the policy, and seeing the group would have to be open, I backed off that idea. By making the group "open" anyone could view the content, including the pictures of youth and families. Again, its unfortunate I said anything, as she brought that up later on Oct.19th .

Meanwhile- At 1.33pm, Tami Hayes posted the new directions for obtaining a background check She followed with a FB message about the posting, and that was that. I continued to go 'round and round

with Mary Larose. I would ask why it needed to be official, since so many others were NOT. She said she was going to make them ALL official, and to my knowledge, hasn't approached anyone else (including the 3 other YAFA pages in the Kingdom run by officers, all of which were like mine, closed groups- said groups being prominently displayed at the top of the YAFA page-) At no time did she address my questions about why the page needed to be open. I asked over and over, in several different ways, without an answer. Then I got home and really read the policy. Immediately, I could see the section she was quoting (Section 3, A&B), and agreed it said that, if certain criteria was met, the group needs to be open. But sect. 3 C & D BOTH gave criteria by which the page DIDN'T have to be open, and therefore, not under the media policy. So, clearly, it was not a "Society Rule" as she would have me believe. I considered the families and kids whose pictures were posted on the page. Their privacy was an issue- as a teacher, I'm keenly aware of the impact, both good and bad, that social media can have. The safety of the kids is paramount, and as long as the policy said I didn't have to open the page (which is how I read it) for everyone to see, then I'd keep it that way. The matter went dormant for about 10 days. I unfortunately sprained my ankle Thursday (Oct 19) in the morning, so ended up with some unexpected time on my hands. I proceeded to email and post on FB about the upcoming Collegium. I forwarded an email to the Background Check Deputy from a prospective Mentor who was waiting for the paperwork for a month already, I began to set up my class for Collegium, when I got another FB message from Mary Larose. Now, throughout the previous conversation, and the new message, her tone was belligerent and "mean"- she presented as not wanting to deal with the issue at all, and indeed, stated she "had wasted too much time already " and she still refused to answer my questions. In her new message, she was even worse, which immediately set my defenses up.

THURSDAY OCT 19 THU 1:42PM Hello. I am following up on this, as it has been a couple of weeks and the group is still not changed to open. Is there a reason for this? Alizand Thank you- I am indeed still unclear, and still have questions- especially since it seems that you are asking me to make this "official" for no real reason- Section 3c states: c. A presence that meets the criteria in "subsection a" that does not allow the public to view any content unless the individual is subscribed or otherwise approved as a member of the relevant group will not be covered by the policy. For these presences, the relevant policies for the Webminister's office apply. By making the page a "PUBLIC" page, it would indeed fall under the media, but by leaving it "CLoSED" - it doesnt. SO why open it? Its certainly not official, and was never intended to be official. Its simply an easy means of communication- a place for us to share ideas and problems and victories. My official communications are via the kingdom newsletter- which I send articles to nearly every month. MaryI am now confused. In your first response to me, you said you did not even realize the group is closed and that was not your intent. You said you had asked many times and could not find out what the rules are. I have sent you the applicable document and this questions is clarified is section 3 A & B. You said that you would fix this when you were no longer on your phone. Now, over two weeks later you are arguing as to why I am asking you to do this. I am having to spend too much time on one simple request., which appears now to be simply because you desire to argue for no reason. Section 3A describes the policy as covering "; an officially recognized non-branch group within a Kingdom". You are the YAFA deputy and this would make this group fall under this description...which means 3B "that allows members of the public to view any or all of the content distributed through it without approval from a moderator or account holder will be covered by the policy" This means to have an open group as that is the only way to comply with this part of the policy. Given you are a Deputy to Viscountess lenora, I have now copied her into this exchange as I don't really have time to continue to argue on something that should have just been easy. Best Regards, Isabella

So- that was that. Next, she starts a group text with Tami Hayes (see Oct 19th text). And I am "ordered" to make the page open. At this point, I'm pretty upset. I have read the policy, I have quoted the policy, and

she doesn't even dignify me with an explanation that makes sense. I still feel it doesn't. I tried to alleviate her concerns while I waited for an answer from the Society Media officer. I emailed both David Keen, and Renee Signorretti, looking for whom I needed to contact with my questions. A copy of both emails are available at need.

 I put in place another Admin for the site, and removed myself.

I changed the description of the page (again) to be a clear as possible that the page was unofficial. At this point (the next day) feeling the need to blow off some steam, I posted to my personal page the following: Oct 20, 9.05 am So, yesterday I learned just how much of a sheep I am NOT. Don't tell me to do a thing, because you said so. Don't refuse to answer my question "why?", and only repeat "because I said so". Especially when I give you printed proof that what you ask me to do is contrary to what is in print. "Because I said so" is NOT an answer, nor is it a viable reason (Because I'm not under 18 any more!). The above scenario is guaranteed to have me figure out the best and clearest way to NOT do what you tell me to. So no. I didn't do what you wanted. Tough. Why didn't I? BECAUSE.

Perhaps not my finest thought- however, I clearly did NOT name names, nor was I specific as to who or what. And it WAS on my personal page, as a citizen, and certainly not as an officer or representative in any way. In response to another comment, I mentioned that I was keeping a log, because intimidation is a form of bullying. As a teacher, I get this training every year, and know that at the first sign of being uncomfortable, the best thing to do is recordkeeping.

At 12.58 pm, I received the following email from the Seneschal: From: An Tir Seneschal Sent: Friday, October 20, 2017 12:58 PM To: Kingdom Family Activities Officer Subject: Working with other officers Hello Alizand. Based on your recent post to your FaceBook feed, you appear to be confused as to your duties in the office of YAFA Deputy, specifically that of the need to work cooperatively with both Kingdom Officers and your fellow Seneschal Deputies. This is not the first time there has been a great deal of unnecessary conflict and resistance when you have been asked to follow certain procedures. In this case, the Social Media Deputy, Mistress Isabella (Mary Larose on FB), gave you some instructions to follow regarding the An Tir YAFA FaceBook page. She supplied the link to the SCA Social Media Policy. The conversation appeared to go fine at first but then you chose to be resistant to what she was telling you, which is when she brought me in. Both the Social Media Deputy and the YAFA Deputy offices report to the Kingdom Seneschal Office; as such, I requested that you follow the instructions that Isabella gave you regarding the page. Your response to both of us was silence, and your response on your FB newsfeed was: "So, yesterday I learned just how much of a sheep I am NOT. Don't tell me to do a thing, because you said so. Don't refuse to answer my question "why?", and only repeat "because I said so". Especially when I give you printed proof that what you ask me to do is contrary to what is in print. "Because I said so" is NOT an answer, nor is it a viable reason ( Because I'm not under 18 any more!). The above scenario is guaranteed to have me figure out the best and clearest way to NOT do what you tell me to. So no. I didn't do what you wanted. Tough. Why didn't I? BECAUSE." And to one of the comments to that post, you responded: "Yes. Because I said so is never a good reason. I'm actually starting to keep a log. Intimidation is bullying." I am truly at a loss as to why we continually end up in conflict situations between you and other officers or deputies. The fact that you are being asked by a fellow deputy to follow certain procedures is not bullying, it's a request for you to comply with policies and/or instructions that are either Kingdom or SCA. The fact that I asked you politely to comply with what Isabella has asked of you is not bullying. I do see that you are enthusiastic about this program, and have worked hard to support YAFA activities as we get it it up and running in An Tir. However, we are at a crossroads because this kind of behaviour cannot continue. If you can work cooperatively with other Officers and Deputies, you can continue in this position. If you are unable to do that necessary part of this job, I will have no choice but to ask you to step down. ---- Regards, Viscountess Lenora Truble (Tami Hayes) Kingdom Seneschal, An Tir

seneschal@antir.org

Quite frankly, I hadn't answered because I didn't know what to say without sounding belligerent and angry. I did and still believe the request was being made specifically to annoy, antagonize and irritate me. The fact that they BOTH refused to even address the 2 sections of the policy I quoted makes it clear to me that they didn't really care about the issue, but only cared about forcing me to do what they wanted – or rather, the seneschal was using this scenario to force me out of office. Clearly, she knew the passion I have for this program, and chose the best way to attack me- under the guise of doing her job.

 I received the Media Officer contact info, and immediately crafted an email to him asking the same questions I did of the local media officer. I sent the letter at 3.38 on Oct. 20th . A copy was supplied in an earlier email. I then sat down and answered the Seneschal- using much of what I had just sent to the Media Officer.

At 4.09pm, I sent it off. In my response, I did NOT mention the fact that she had taken something from my personal page, and used it as a threat against me (note: neither she nor Maty Larose were on my friends list)- however, it had a deep effect on me, as my husband and I have had a problem with something similar in the past- where someone stalked him on FB (I can provide court case numbers at need-) and so, I went into "protection " mode. I changed all my permissions on my profile page so that only Friends could see my posts, not "friends of friends" or "acquaintances" as it had been set. I checked on blocking (using the FB help) and concluded I could block them off my profile so I blocked Tami Hates, as well as Mary Larose, and a few others. I swept through my "friends" list, knocking it down from 250 to 188.

As you can see, FB specifically states that "blocking someone may not prevent all communications or interactions (ex. In apps or groups)."

All that aside, the fact that Tami Hayse quoted the action of "blocking" her as one of the reasons she released me seems especially wrong, since many populace members as well as officers and deputies are not even ON FB or don't use it extensively. I'm at a loss as to how she could "require" me to maintain that sort of connection. Especially as we weren't "friends" to begin with.

On Oct. 22nd, at 1.22 the Seneschal sent the following-
An Tir Seneschal <seneschal@antir.org> Sun, Oct 22, 2017 at 1:22 PM

To: "alizaunde@gmail.com" <alizaunde@gmail.com>
Cc: "yafa@sca.org" <yafa@sca.org>, "seneschal@sca.org" <seneschal@sca.org>, Kingdom Seneschal Contingency Deputy <seneschal.contingency@antir.org>
Hello Alizand.
Recently the Social Media Deputy requested you implement a change as per society social media policy. As your direct superior I again requested you make this legitimate request. I reiterated this request in my email to you on Oct 20th. The requested changes were simple, and Isabella has confirmed with the Society Social Media Deputy that the request for those
changes is valid. Since my email to you on Friday, October 20, you refused to make those changes, you have taken yourself off of the admin entirely for the YAFA page (something you were not asked to do), and you blocked both myself and Isabella from your Facebook profile, meaning that neither of us can see your posts to the YAFA page or any other group page. The Family Activities Deputy is a direct deputy of the Kingdom Seneschal office. Deliberately refusing a direct and reasonable request from me and then blocking me from seeing public FaceBook posts you make, on any group page, makes for an untenable working relationship. This latest incident adds to a growing list of issues you have had with both myself, with other officers and with event staff.

Effective immediately, you are removed from the position of Family Activities Deputy for An Tir. I will communicate with the two current deputies about handling the duties of the office until a successor is chosen, and make alternate arrangements for the YAFA class at the upcoming Collegium.

Thank you for your service, and I wish you well in your future endeavours. ---- Regards,

Viscountess Lenora Truble (Tami Hayes)  Kingdom Seneschal, An Tir seneschal@antir.org

I feel that this was abrupt, and did not follow guidelines for removal from office. I don't feel she listened fairly to me or my explanations regarding the YAFA page. And certainly, she seems more concerned about gaining control over the page than assuring the safety of the kids and families who have joined the page. From the 19th when contacted about the page by Mary Larose and the 22nd when released from office is only 4 days. That's a ridiculously short amount of time.

Her contention that I have not been able to work with others is simply not true. I have successfully worked with not only officers, but event stewards and other populous members repeatedly throughout my year and a half of service. 2 or 3 minor incidents that were handled at the time they occurred does not seem to me to constitute a great amount of upheaval or "continued" inability to work with others. I have successfully brought the YAFA program to events both big and small, which I would not have been able to do had I been as incapable of dealing with officers and event stewards as she wants to present.

Since my removal- I removed Kevin Wolfe (with his prior Knowledge) from the Admin position on the FB page. I did this so that he would not be in the line of fire- Indeed, on Oct 23rd, Tami Hays contacted one of the other Admins, Katrina Deakin, and requested that she (Tami Hayes) be made Admin on the page (as noted in my initial email to David Keen). In this, I believe that Tami Hayes has overstepped the bounds of her authority, as I am still the page owner, not the Kingdom.

I will continue to work with Kevin, should he take the interim position, to assure a smooth transition. Once the question of the page is settled, I will make whatever changes need to be made. Above all, the safety of the kids, and the YAFA program, remain my priority.

Timeline-

Sept 22- I told David Keen maybe KSen needed to hear it from someone else-

Sept 23 email from SoSen backing up my claim

Sept 29, both Tami Hayes and Mary Larose join YAFA page-

     Mary immediately sends private messages-attached

Oct 19th- Mary Larose again messaged about YAFA page-attached

Oct 20 12.58- received threat email from Tami Hayes

Oct 20 3.38 emailed Society Media officer for clarification (no response received)

Oct 20- 4.09 emailed Kingdom Seneschal

Oct 22 1.22 released from Office email

*b.  the alleged bullying and harassment*

Copy of emails also attached

Ever since I and my husband put in for B & B of Blatha An Oir, she has been targeting us with not only libel, but slander too. The first we became aware of it was shortly before May Crown, and at that event we gave her (and anyone else) the opportunity to address her concerns with us with a 3rd party moderator/witness. We put out publicly that we would be opening our camp for anyone who had questions of us. She responded to Maude de Louisiana that she would not go to our camp because she was afraid of being "ambushed". Raphaella suggested we come to her at the Fiddle and Flagon. After some discussion, and with much trepidation, we complied. So we; <span style="color:red">Hakon,myself, Maude, Duchess Zenobia and Bledyn Drwg de Caerdydd</span> all trooped over to the Fiddle. The Fiddle had several people hanging around, within hearing. When we sat down, we asked her what questions we might answer, <span style="color:red">and she proceeded to tell us</span>

we had no business putting in for B&B, that we had no PLQs, that Angharat had put in for it 4 times already and deserved it. She also said that Hakon is a Racist and Nazi. Hakon tried to answer her, telling her he defends the rights of all people to believe what they will, and she persisted in claiming that made him a nazi. She went on for several minutes in this way. She also targeted be, and continues to publically, on social media- claiming I am abusive. She explained that we were hated in the Barony because we "tell people how to do their jobs"- a reference to a conversation she was NOT a party to on the BAO page (and which our seneschal looked at and "sided" with us). She went on for nearly 20 minutes telling us how awful we were, how unsuited to the office of B&B etc. with everyone around us hearing her dressing us down.

Since the decision for B&B has been delivered, she has continued to attack us on our own pages on Social Media, and clearly, according to others, is posting on her own page about us. I am including her latest digs as attachments. I urge you to speak with Volk, Maude, the Duchess and Bledyn about the incident at May Crown as well as postings afterward.

Raphaella's name-calling and public social media targeting has become more than an irritant. Calling anyone a racist and nazi is highly-charged these days. There is no proof my husband is such, because he isn't. His family has a long military history, including his own service, of defending the rights of ALL to speak and believe what they will. That doesn't make him one of them. She continues to surf my FB page and targets her responses about me to the other posters, as recently as this morning. I have deleted several of her more directed responses because I need my page to NOT have those accusation upon it. I intend on blocking her, but that wont stop the damage she's already done as well as the damage she clearly intends to continue doing.

My position as Society YAFA Program Director means that I cannot allow this to continue. Accusations of abuse are very serious, and I simply cannot have her continuing to tell anyone, via spoken word or social media postings, that I am abusive. It impacts my effectiveness as a Society officer. In addition, I am a certified teacher. **These accusations can be detrimental to me in the Modern world as well.** I simple cannot have her continue. As she is a Peer, there must be SOMETHING that can be done!


Lori Parker <alizaunde@gmail.com> Wed, Jul 17, 2019 at 9:35 AM
To: BAO Seneschal <BlathaanOir.Seneschal@antir.org>

Greetings and Good Morning-
As it was suggested by the Kingdom Seneschal, I am bringing this to your attention. I would like the chance to discuss this privately with you and come to an understanding of what I may do next, if anything.
Please let me know of a good time to meet with you and discuss this.
Dans un service joyeux au rêve ~
HL Alizand Thorgeirsson née LeFevre


Lori Parker <alizaunde@gmail.com> Mon, Nov 25, 2019 at 11:19 PM
To: Attia Prima <attia@antir.org>
Cc: AAAGeorge Parker <thorgiersson@gmail.com>
Greetings-
Boy, this is a lot of information. I'm afraid there is such an abundance of conversations directed at us that it is hard to know just what to send.
So I've put everything in 2 zip files.
Please ask for any context or additional information you may need.

-A note- documents 1A and 1B are connected as to content. As a result of document 1A, complaints about our "telling people hoe to do their jobs" were made by both Jonnalyn and Francisca to Baroness Elspeth (the seneschal). The bullying has continued. Recently- there was an incident on the An Tir Scribal page involving Molly Boone- a BAO scribe I literally don't know except by sight, and with whom I have absolutely no dealings at all- I've also included a screenshot of that conversation as well.
(see attached for copies of documentation)


*Bullying Impact Statement- George Nov. 2019*
I would like to start by saying that I try to make it a policy to find good in any situation where I am lodging complaints about.  There are peers in this kingdom and even in my local area that have bent over backwards to make us feel welcomed and even to try to help us grow as a person and as members of the Society.  Most notably are Their Excellencies Barron Gernon and Baroness Alice.  They are excellent people with not an unkind word to say about a single soul.  His Excellency, when asked, has offered wise and helpful council that helped me understand how to handle these troubling times. To my mind they personify what Peer Like Qualities mean,  they are the people I would most like to emulate.

That said; First and foremost,  considering the fact that a good amount of this bullying has taken place very publicly and in full view of all of the peers in this area coupled with the fact that several peers have commented in agreement with the bullying statements being made, I have to conclude that it is acceptable behavior in this area.  The direct bullying that we have suffered at the hands of the other Peers, Sergeants and even the current Coronet of Blatha An Or has had a profound impact on how we can play the game in An Tir.  I realize that the attitudes being displayed towards us are not new.  In fact a person that I didn't even know and had never met private messaged me via Facebook a year ago claiming that "we know that you are still a Nazi".  She stated that her reason is the fact that I had made statements against the behavior (and direct statements) of the founder of Black Lives Matter.  I do realize that, as a kingdom, there is nothing that can be done about private incidents such as this, and I am not asking for actions on this incident, but I mention it merely to illustrate the extent of the sentiment being displayed in the current bullying incidents. E.g. Raffiella dressing us down in public and calling me a Nazi (while coincedently, citing the exact same reasons).  She alluded to the fact that she was friends with the aforementioned person in the messages.  This demonstrates the fact that there is a rumor mill at work here.  And again, there is little the kingdom can do about rumor mills but to be aware of the fact.  I do NOT feel it is the job of kingdom officers to act as babysitters for high school courtyard behavior from those who were never able to grow past such juvenile actions.  However, it is within the purview of said officers to curtail the public behavior of the peers and officers of the Kingdom.

After the cyber bullying incident where people who we thought were (and considered) friends all joined in on trashing us online we went to kingdom colegium where I was teaching a class.  I looked at people there with a new perspective, that of suspicion.  Who else is only pretending to be friendly to me while hating me behind my back?  "HEY so and so didn't even look at me, are this person be taking "their" side?"  But then a friend (who we thought might be a part of it all) came up to us and talked to us about what was going on.  It was then that I realized that maybe I was just being paranoid and allowing the haters to taint my perspective.  It is now going to take a lot of work to get past this (mis)perceived perspective of the world is against us and the feeling that we can trust no one.  Raffaella is the quintessential instigator of all this so to my mind she carries the weight of all this squarely on her shoulders.

*Bullying Impact Statement- Lori Nov. 2019*

<span style="color:red">I have been under a Doctors care for Anxiety and Depression.</span> I can provide proof of such as needed. I come from a previous marriage of 10 years where I was emotionally and physically abused- where much of my anxiety and depression stem from. In addition, <span style="color:red">George (Hakon) has been diagnosed as Asperger's and ADHD, and has also suffered from abuse</span>. These are important to remember as you view the evidence we have submitted. That said, I hope to help you understand the actual impact that this has had on me and my husband.

We have been very frustrated with our inability to face this head-on, as we were in the polling for Baron and Baroness. We felt we could not be public in answering the slander and lies being told about us. At May Crown, when Latoya put it out that we would be available for a Q&A should anyone desire, the only one who came forward was Raffaella. And she came not with questions, but with an all-out attack.

*Here is a copy of our initial email to the Kingdom Seneschal, dated July 3rd.*

*Ever since I and my husband put in for B & B of Blatha An Oir, she has been targeting us with not only libel, but slander too. The first we became aware of it was shortly before May Crown, and at that event we gave her (and anyone else) the opportunity to address her concerns with us with a 3rd party moderator/witness.*
*We put out publicly that we would be opening our camp for anyone who had questions of us. She responded to Maude de Louisiana that she would not go to our camp because she was afraid of being "ambushed". Raphaella suggested we come to her at the Fiddle and Flagon. After some discussion, and with much trepidation, we complied.*
*So we; Hakon,myself, Maude, Duchess Zenobia and Bledyn Drwg de Caerdydd all trooped over to the Fiddle. The Fiddle had several people hanging around, within hearing.*
*When we sat down, we asked her what questions we might answer, and she proceeded to tell us we had no business putting in for B&B, that we had no PLQs, that Angharat had put in for it 4 times already and deserved it.*
*She also said that Hakon is a Racist and Nazi. Hakon tried to answer her, telling her he defends the rights of all people to believe what they will, and she persisted in claiming that made him a nazi. She went on for several minutes in this way.*
*She also targeted me, and continues to publically, on social media- claiming I am abusive.*
*She explained that we were hated in the Barony because we "tell people how to do their jobs"- a reference to a conversation she was NOT a party to on the BAO page (and which our seneschal looked at and "sided" with us). She went on for nearly 20 minutes telling us how awful we were, how unsuited to the office of B&B etc. with everyone around us hearing her dressing us down.*

*Since the decision for B&B has been delivered, she has continued to attack us on our own pages on Social Media, and clearly, according to others, is posting on her own page about us. I am including her latest digs as attachments. I urge you to speak with Volk, Maude, the Duchess and Bledyn about the incident at May Crown as well as postings afterward.*

*Raphaella's name-calling and public social media targeting has become more than an irritant. Calling anyone a racist and nazi is highly-charged these days. There is no proof my husband is such, because he isn't. His family has a long military history, including his own service, of*

*defending the rights of ALL to speak and believe what they will. That doesn't make him one of them.*

*She continues to surf my FB page and targets her responses about me to the other posters, as recently as this morning. I have deleted several of her more directed responses because I need my page to NOT have those accusation upon it. I intend on blocking her, but that wont stop the damage she's already done as well as the damage she clearly intends to continue doing.*

*My position as Society YAFA Program Director means that I cannot allow this to continue. Accusations of abuse are very serious, and I simply cannot have her continuing to tell anyone, via spoken word or social media postings, that I am abusive. It impacts my effectiveness as a Society officer. In addition, I am a certified teacher. These accusations can be detrimental to me in the Modern world as well. I simple cannot have her continue.*
*As she is a Peer, there must be SOMETHING that can be done!*

Since that time, Raffaella has spoken the same words to others- some we know about, but we're positive there is a vast amount we DON'T know about.

The impact on those in the Barony has become apparent over the last few months:

As Baronial Herald, I was NOT part of the revisions to the BAO Ceremonials. That's was MY JOB to be included- and Jonnalyn made the revisions without my knowledge. It was presented to me as a completed document.
Any time we posted to the Baronial FB page, we were attacked by any and all- most especially Nykera (Denise Coyle), Francisca Ossiander and Dawn Chronister (Kira Mikkelsdotter). No one- not the seneschal, not the Baron or Baroness ever came to our defense, nor did they stop the very public attacks.

Bear in mind- <span style="color:red">Francisca is Elspeth's (Seneschal) Protege</span>. Dawn is Jonnalyn's Court Herald and Court Coordinator. <span style="color:red">Nykere is engaged to one of Gernon's Squires.</span>

My post to the Kingdom Scribal page is a prime example of what we have dealt with. We are afraid to post to the Baronial page- to simple be attacked again and again. <span style="color:red">Molly Boone</span>- whom I barely know, and haven't ever said more than 10 words to…attacked me with really, no cause at all.

I've been a member of the SCA since 1992. My membership number is 56581. I have a history of serving, of holding offices.  I have service awards from 2 Kingdoms. I'm currently a Society Officer….and I'm in tears just thinking about all this.  I do NOT deserve this from anyone- but especially, I do not deserve to be told I have NO PLQ's and have no "business" running for B&B.
I do not deserve to be brought to tremors just thinking about going to a meeting or to a event put on by this Barony. I've torn my hand to bleeding because of the stress (a condition I suffer- again, medically diagnosed as brought on by stress).

The post on Nykera's page (now deleted) was simply another nail in our coffin. EVERYONE including Baron Yusuf and Elspeth (the seneschal) is culpable. No one STOPPED it. They all "knew" who they were talking about- with enough references to me and George to make it obvious that WE were the targets. But NO ONE stopped it- <span style="color:red">not even the Kingdoms Seneschal Deputy for EDI- Yusuf.</span>
I may have erred in trying to get Baronial officers to do their jobs- the chronicler should NOT have been

asking if the populace "wanted a newsletter"- she should have known. Its easily found in the Chroniclers handbooks, which she clearly never read.

I should never have had to point out to the Seneschal HOW to run a background check, nor advise her that officer positions HAD to be advertised, and not just handed off as she and the B&B wanted to.

If I am guilty of telling people how to do their jobs, perhaps it is because they weren't doing them, and they seemed to have no idea what their job entails.

I may be guilty of that, but I certainly DON'T deserve being attacked over and over- for whatever I say. No one does.

In all my years in the SCA, I have never felt more ostracized, more outcast than I do now.

To let this go is to let Raffaella and her lies win. She needs to be brought to bear the consequences of this. And the consequences of her lies being spread to others.

What she has started is Slander and Libel. Prosecutable. Her words to the Crown for the polling (because you know as well as we that she said the same to the Crown as she said to us) is evidence we can subpoena. Her continued story-telling about us has bled over to many of the Barony. Dawn used to be a friend. Francisca used to be cordial. Nykera also- not a friend, maybe, but not an enemy- at least not until after the polling.

Yusuf- Baron- who posted anti-white racially-charged memes on his page prior to the Q&A- he should have stopped all this. He should have stepped up in his roll as EDI Officer and stopped this. **Because Anxiety and Aspergers/ADHD are invisible doesn't mean no protection needs to be given**. He should have stepped in and STOIPPED that whole conversation on Nykera's page.

**Elspeth- the seneschal**- should have STOPPED the conversation instead of giving her seal of approval by not only agreeing with what was said, but by "looking into" getting the persons they were talking about banned from the unofficial list- us banned? For what?

**Jonnalyn-Baroness**- took a month to answer my complaint of her Court Reporter telling me how to do my job. A MONTH. And instead of addressing it- she brushed my complaint aside.

**Dawn**- a former friend- unfriended me- then complained to my Pelican that I blocked her….-I blocked her Modern FB , NOT her SCA Facebook, which she herself said she would be using for all SCA communications.

**Denise**- whose opinion of us was well and truly laid out on her page- then deleted as soon as LaToya asked for people to quit "vague-booking" and just name names. We, neither George nor I have been nothing but gracious to her. Yet at every chance, since the polling she would get up on the page and write long missives as to why were horrible people and wrong on every single count. On a public page. Bashing us over and over.

**My anxiety has affected my modern job. My ability to focus as well as complete assigned tasks has suffered. Depression has made it difficult for me to attend my necessary YAFA tasks. I push through, but take little joy anymore**- just going through the motions. All the joy in the SCA is dimmed- colored by "who is talking about me now" and "why wont anyone hear MY SIDE?"

George has suffered too- vacillating between wanting to quit and wanting to stand up in public and call each and every one of them out- His Aspergers makes it difficult for him to understand what has motivated these people to try and destroy us- for that is what they are doing- trying to destroy us.

Please know we have stepped back and are doing nothing with the Barony at this time.  We do not post to the List (and havent since September). We do not attend meetings, nor events. We missed Harvest Feast because we knew we'd be targeted and talked about.

We know that simply because we are bringing this out in the open that we will once again be targets, and that the rumor-mill will be working overtime. We have accepted that we will once again be targeted, and that we will be vilified all over again. But this cannot continue. 4 Peers and a Protégé MUST be held accountable for their actions!

From: **Mike Watkins** <seneschal@sca.org>
Date: Mon, Apr 27, 2020 at 4:01 PM
Subject: RE: Bulling and Harassment complaint
To: Ha'kon Thorgeirsson <thorgiersson@gmail.com>

Greetings,
 I will be reaching out to the Kingdom Seneschal to make sure that you get interviewed along with your witnesses.

Respectfully,
Mike Watkins
Society Seneschal

**From:** Ha'kon Thorgeirsson [mailto:thorgiersson@gmail.com]
**Sent:** Sunday, March 15, 2020 10:51 PM
**To:** Mike Watkins; John Fulton
**Subject:** Re: Bulling and Harassment complaint

Master Aylwin,
As discussed in our previous email An Tir is beginning to show a pastern of behavior from the crowns for not following the rules, neither those of the kingdom nor the Society.  This is inductive of their lack of concerns for allegations of bullying especially when it concerns a peer.  We have heard from other members with similar complaints of this kind of treatment from members of the Royalty.

It has now been 11 days since we requested you look into our bullying complaint, yet we have heard nothing.
Today us Sunday, March 15.  We hope to hear from you by Friday, March 20th.
Thank you for your prompt attention to this matter.

On Wed, Mar 4, 2020 at 6:10 PM Ha'kon Thorgeirsson <thorgiersson@gmail.com> wrote:

Greetings Master Aylwin,

Last fall, we initiated a Bullying and Harassment complaint against a Peer in An Tir. Recently, we received the results of the investigation, and Their Majesties response. After careful consideration, and much conversation between ourselves, we have decided to appeal the Crown's decision.

Our request to appeal is based on these items:

1. We were never interviewed by the "investigator" assigned by the Kingdom Seneschal- even though she stated she would interview us in her first email. She only had our written complaint to consider.

2. We named 3 witnesses who were present at one of the major incidents. None of those witnesses were interviewed, nor were they asked to provide written statements.

3. In their response, the Crown stated that they were not "punishing" or "sanctioning" any of us, but yet denied us (both my wife, myself and the Peer in question) access to posting on the Baronial FB page for a time of 6 months.

4. The Crown determined that the behavior of all 3 of us was outside the bounds of Chivalry and Courtesy. My wife and I are not Peers and feel that the Peer should have been held to a higher standard. We do not know what we did that was outside those bounds, and requests for information regarding this have gone unanswered. My spouse or I may have made a misstep, but behaved in accordance with the example of other Peers that should have been there to guide us and not harass.

5. The Crown took our Bullying and Harassment complaint and downgraded it to a simple "interpersonal conflict" needing mediation.

6. The Crown neglected to consider the participation of other Baronial members, including the Baronial Seneschal, her Protégé and other Baronial officers in acts of bullying and harassment.

I have been in the SCA for 31 years and my wife for 28 years. The impact of these incidents have scarred us to the point that we no longer play within our own Barony, and we are losing any desire to contribute to the Kingdom as we have in the past.  Please consider our request to re-open our complaint.

Thank you for taking the time to review our request

**Appeal of Exile from Kingdom**

Greetings to the Board of Directors,
Recently I was R&D'd for an online incident (one comment) on the page of a (at the time) friend.

I would like to appeal that decision.

> *1. Only a sanctioned person may file an appeal.*
>
> *2. Appeals may only be filed if there exists either sufficient evidence to conclude that the Board would have reached a different decision had the evidence discovered been reviewed by the Board, or a discovery of a material error of fact.*

(SOCIETY FOR CREATIVE ANACHRONISM, INC.: SANCTIONS PROCEDURES AND POLICIES MANUAL Effective as of 11/15/2019 Updated January 2020 Further updated October 2020)

To refresh- the incident occurred April 2nd. Immediately, I was Exiled by the Crown of An Tir. I was Exiled for "Hate speech against a protected class".

The SCA Policy on Hate Speech state:

> *4. Hate speech is not tolerated in the Society. Hate speech is speech or symbols that offend, threaten, or insult individuals or groups, based on race, color, religion, national origin, sexual orientation, disability or other traits. Such symbols and speech have no essential part of any discussion of ideas and are of so little value to the Society that any benefit that may be derived from them is clearly outweighed by the harm caused. The use by any participant in the Society may result in possible sanctions **up to and including revocation of membership and denial of participation.***

I contend that rather than the horrible, hateful person claimed in the complaint, I am, in actuality, a VICTIM of the very hate I've been accused of. There was clear bias on the part of the crowns, the senaschalate and those party to that conversation.

I am one of the "protected classes" your policies claim to protect, yet I was unmercifully baited and called names by those members in the conversation, with no regard to my disabilities. I did not and still do not know or care what their sexual orientation is- only that they continued their UNCHIVALRIC and HOSTILE behavior.  I was the target of "hate speech" yet nothing has been done to those who perpetrated the hate on me. My comment was not made to any individual- it was unspecific and generalized, and there was no threat involved. My comment is protected by the US Constitution via the First Amendment. In addition to the First Amendment, as I stated in my first response to the R&D, even Facebook did not deem the comment offensive enough to ban me or censure me in any way.

My name was then put forth to the BoD for R&D. An officer of the Society Seneschal's office contacted me and asked that I give my "side" of the story for the investigation.

At that time, I informed her that I have been long diagnosed with Asperger's, one of the Autism Spectrum Disorders. This fact seems to have been ignored by the investigator, the Society Seneschal and the Members of the Board.

For your information- please note the items in BOLD:

> *Asperger's syndrome (also known as Asperger's Disorder) was first described in the 1940s by Viennese pediatrician Hans Asperger, who observed autism-like behaviors and **difficulties with social and communication skills in boys who had normal intelligence and language development.** Many professionals felt Asperger's syndrome was simply a milder form of autism and used the term "high-functioning autism" to describe these individuals. Uta Frith, a professor*

*at the Institute of Cognitive Neuroscience of University College London and editor of Autism and Asperger Syndrome, describes individuals with Asperger's as "having a dash of autism."*

*Asperger's Disorder was added to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) in 1994 as a separate disorder from autism. However, there are still many professionals who consider Asperger's Disorder a less severe form of autism. **In 2013, the DSM-5 replaced Autistic Disorder, Asperger's Disorder and other pervasive developmental disorders with the umbrella diagnosis of autism spectrum disorder.** (https://www.autism-society.org/what-is/aspergers-syndrome/)*

*Asperger's syndrome is one of the autism spectrum disorders. Asperger's patients usually display a distinctive symptom pattern. **Because their ability to intuitively recognize nonverbal signals in other persons is impaired, patients are considerably limited in their social interactions.** Their interest in other people is often limited; on the other hand, Asperger's patients typically have "special interests" that may seem unusual because of their subject matter or the intensity with which patients pursue them. Asperger's patients are also often fixated on ensuring that their external environment and daily routines remain constant; sudden changes may exceed their coping mechanisms.*

*Depending on the severity of their symptoms, Asperger's patients **may either exhibit unusual social behavior or be severely impaired in their social and professional life.***

*Although Asperger's syndrome is one of the more common differential diagnoses in child and adolescent psychiatry, in adults the disorder has received particular attention only recently.*

**DSM-IV extensions after Adult Asperger Assessment (AAA) (modified)**

 **A) Difficulties in understanding social situations and other people's thoughts and feelings**

**B) Tendency to think of issues as being black and white, rather than considering multiple perspectives in a flexible way**

Additionally: Qualitative impairments in verbal or nonverbal communication with at least three of the following symptoms:

1. **Tendency to turn any conversation back on to self or own topic of interest**

2. **Marked impairment in the ability to initiate or sustain a conversation with others. Cannot see the point of superficial social contact, niceties, or passing time with others, unless there is a clear discussion point/debate or activity.**

3. **Pedantic style of speaking, inclusion of too much detail**

4. **Inability to recognize when the listener is interested or bored**

5. **Frequent tendency to say things without considering the emotional impact on the listener**

(https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2695286/)

I have included the above excerpts to more clearly illustrate the problem that I have. It is real, and debilitating. It is verifiable, diagnosed and part of my life.

I have Asperger's/Autism. As such, I am not always aware of the impact of my actions or words on others. I have never been able to communicate fully or clearly, and indeed, my wife is helping me with this missive, since words fail me.

While I do not doubt my words on the post were poorly said, I was given no chance at all to remedy the situation. Neither by the Kingdom, nor the BoD.

I see on the SCA DEI website where disabilities are included in the DEI statements of Values. However, the actions mentioned on the website were never offered to me, instead, I was dismissed out of hand.

The SCA DEI website states:

> *The DEI office develops activities and training to cultivate a climate in which all members are treated fairly and able to thrive in a welcoming atmosphere.*

I do not believe I was treated fairly. There was ONE incident being investigated, not a long history of behaviors. I feel I was discriminated against because I was never offered any of the remedies mention on the website:

> *Lastly, that we take action. We value chivalry and live by those tenets we claim to hold as ideal.* **When a participant violates the code of conduct we require, we let them know so they can adjust their behavior.** *The phrase, "if you see something, say something" can be applied here.*

I was never given the chance to "adjust" my behavior.  This clearly violated the Value statement so clearly seen on the website.

So which is it? Do you, the BoD, simply remove anyone who falters? Or do you stand by your words and help people like me adjust and amend their behavior?

The website further state*:*

> *Our job as members isn't to judge other members but to be clear on what actions are acceptable. You can simply let a member know that, "we don't treat people that way in the SCA", or "that violates our core values", or "that action/statement isn't acceptable".*

Again, this alternative was never given to me. The Crowns of An Tir didn't offer me a way to apologize or indicate in any way that an apology would even be acceptable. No communication regarding how to amend my behavior or words, no suggestions as to how I could alleviate or rectify the situation at all, just an immediate and final banishment. Where was the DEI policy for me?

The Americans with Disabilities Act (ADA) became law in 1990. The ADA is a civil rights law that **prohibits discrimination against individuals** with disabilities in all areas of public life, including jobs, schools, transportation, and all public and private places that are open to the general public. The SCA frequently utilizes public places in their meetings, practices and events and is in fact bound by the ADA.

According to the Americans with Disabilities Act of 1990 (ADA) an individual with a disability is a person who: Has a physical or mental impairment that substantially limits one or more major life activities; has a record of such an impairment or is regarded as having such an impairment (Disability Discrimination).

I have told the Board, Stacy Hall as well as Lis Schraer that I have ASD. Yet this was not taken into consideration during the "investigation" that was done by Stacy Hall (indeed, there was a point where she complained to Lis Schraer about my behavior- behavior that was categorically my disability in action. Please see Addendum  Parker Case, An Tir, Investigator Assigned #1 thru 4, wherein I explained myself and subsequently  apologized for my words as they were not intended to be adversarial.

The seneschal Attia Prima (Amanda Grayson) and Crowns of An Tir (Emerson Waite and Heather Holmes) King Christian Bane and Queen Hélène d'Anjou discriminated against me when they did not take my disability into account when handing down the sanction. They did not offer me a remedy as laid out by the DEI Values on the webpage, even though they had been made aware of my disability in a prior complaint I filed against a peer in An Tir. They knew I have ASD. Neither did the BoD take this into consideration, even though they were made aware of my disability. To my mind, that feels targeted, and in direct violation of your own policies and Values.

The Social Media Policy states: *III. Policy Statement*

> *A. SCA Inc.'s expectations for functioning in an online world are stated in Corpora II.b* <mark>*'All participants are expected to behave in an appropriate and respectful manner.'*</mark> *Participants must consider how their online actions may impact the reputation of SCA Inc. 'Society for Creative Anachronism' and 'SCA' are trademarked by the Society and SCA Inc. reserves its rights to manage the use of these trademarks.*

> *B. Everyone taking part in an official SCA social media channel shall:*

> *a. adhere to SCA Inc. Core values,*

> *b.* <mark>*behave with courtesy, honor, chivalry, and respect, even in times of inevitable differences of opinion,*</mark>

> *Snip* <mark>*e. avoid personal attacks and limit their comments to the issues under discussion,*</mark>

The comment made was not in any official channel of the SCA. While I may not have adhered to the Policy, others in the conversation clearly DID NOT either. I made no personal attacks, while the others in the conversation clearly attacked me very personally. Where are their sanctions?

My words were rude and offensive. I get that. BUT- it was one instance. One time. And, honestly, the only time I have ever said anything remotely like that online or in person. No person was threatened or put in harm's way. No laws were broken. Not even Facebook felt it required sanction.  I feel that the punishment does not come close to fitting the offense. In fact, there are no laws in the US defining Hate Speech, as it directly opposes the Right to Free Speech (please see the Legalities of Hate Speech document).

An Tir is a hotbed of racism, elitism and cancel-culture, and I got caught up in it. It is a kingdom where Peers do and say what they want, without repercussions. Peers are know by the populace to bait, denigrate and attack overtly and covertly those they don't like. I have been a target for Peers in An Tir for

the last several years (I have additional screenshots if requested) and the comment I made is a result of that near-constant assault on me. See addendum "Doc EEE", a post made by Amanda Grayson a mere month after my exile, showing the state of An Tir in her own words.

Maude de Louisiana (LaToya Johnson) is also culpable. She constantly and consistently baits, hate-mongers and fosters resentment against many, many SCA folk. The post I responded to was hers. Even today, she continues to stir trouble and talk about people while claiming to be a friend. I was her target many times, unknown to me, and I regret even knowing her. She has been responsible for at least one other person's Sanctions via An Tir (removed from the SCA for a period of 3 years), a person who also suffers from some disability and was discriminated against. She is and will continue to spread hatred and animosity wherever she goes.

In addition, the removal of Emmerson Waite should also play a part in this. His abrupt removal (less than 1 week following the BoD meeting where my R&D was handed down) should speak loudly to his personal ethics. The sheer number of sanctions issued by him and Heather Holmes (the Queen of An Tir) during their reign should be cause for concern and further investigation. Each sanction should be reviewed for merit. He sanctioned me, a member not even of his Kingdom, for posting on the page of a person not even of his kingdom.

The seneschal who issued the statement to me (Amanda Grayson aka Attia Prima) was biased- she was the "investigator" who greatly mis-managed the investigation by refusing to interview our witnesses and ourselves until we complained upline to the then SoSen, Mike Watkins. Records of these conversations are available from the Society Seneschal, and I have included some emails here as part of my addendum. In short, all three An Tir parties, the two crowns and seneschal, had reason to be biased against me. Is that the reason I was judged so harshly?

Bias should not play a part in these kinds of decisions. The bias of those in An Tir and in the current Society Seneschal's office (Stacy Hall) should be of major concern to the Board Members. Clearly, I was not given fair treatment by those in offices where fair treatment is expected and required. Personal friendships between BoD members, Crowns and seneschals should not be allowed weight when deciding the fate of members.

You may feel as if I am strewing blame all over, but in reality, it all plays a part in what happened, and my responses to those in the thread. After being continually attacked over the last several years, my fuse was short. In fact, even now that I've been away from those people for over two years (having removed myself from An Tir in 2019), I am finding it difficult to offer the benefit of the doubt concerning their motives in any interaction. Check my facebook- there's nothing there, and never has been. It was one error in judgment.

I am not saying that the statement I made was right, appropriate or acceptable, but I feel the "punishment" far outweighs the incident. Do you want me to apologize? Just ask. I offered in my original response, even though I still contend it would fall on deaf ears, I am still willing. I have an abundance of accessory evidence that I am including with this missive. Please contact me if you have any additional questions, or if I can provide more information.

As a Board of Directors, you have the ability to mitigate the sanction imposed on me October 24th, 2021. The policy states "up to and including"....I am asking for relief from the worst possible outcome. Does the

punishment handed down to me really fit? Was one comment, one instance of thoughtlessness really enough to remove me completely? I will happily accept any other sanction- removal from all SCA social media, temporary removal, no offices or official positions.....?

I ask that you reconsider the R&D. I cannot take back the words, but I can comport myself better, given the chance. All I am asking is that you give me that chance as outlined in your own policies.

**REQUEST FOR PRODUCTION NO. 12**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 15.*

**RESPONSE**: See documentation provided

**INTERROGATORY NO. 16**: *Please identify any SCA's members involved in any events referred to in your Complaint, including but not limited to:*
    *a.  their names;*

    *b.  their contact details; and*

    *c.  the extent of their involvement in each event or allegation.*

**ANSWER**: See DKT 9: Complaint
See responses above
See documentation provided
SCA has access to modern names, addresses and other contact information not accessible by Plaintiffs via the membership rolls.

**REQUEST FOR PRODUCTION NO. 13**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 16.*

**RESPONSE**: See DKT 9: Complaint
See responses above
See documentation provided
SCA has access to modern names, addresses and other contact information not accessible by Plaintiffs via the membership rolls.

**INTERROGATORY NO. 17**: *Please describe in detail each and every damage you made in Paragraph 47 of your Complaint.*
*47. As a proximate and direct result of Defendant's negligence and/or reckless*
*conduct described herein, Plaintiffs were harmed as a result and have sustained emotional*
*injuries, mental anguish, pain and loss of enjoyment of life and life's pleasures;*

**ANSWER**:
See DKT 9: Complaint

See response, interrogatory 15 - including bullying impact statements

See responses above

See documentation provided

The R&D has deprived the Plaintiffs of the social benefits that they have enjoyed for three decades as members of the SCA. The Plaintiffs found love and friendship through the SCA, as they met and married at SCA events. They also shared their passions and hobbies with other SCA members. They have missed many occasions to celebrate and support their friends' achievements and honors in the SCA community because of the faulty investigation and negligent disregard for their own rules and documents.

The SCA was not only a social network for the Plaintiffs, but also a creative outlet. They enjoyed various crafts and arts that were related to the SCA's historical theme, such as woodworking, jewelry making, metalsmithing, painting and more. These hobbies enriched their lives and gave them a sense of purpose and fulfillment. Without the SCA, they have lost the motivation and the opportunity to pursue these hobbies, as they have no one to share or appreciate their work.

The plaintiffs were passionate about the SCA activities, where they could relive different cultures and periods through historical reenactment. However, the SCA unjustly expelled them for a minor infraction, taking away their hobby and identity. The plaintiffs had accomplished remarkable things in their areas of interest, such as Plaintiff George's recreation of Norse jewelry, which earned him recognition from the British Museum, an award from the Barony and the highest the Kingdom of An Tir award for arts shortly before his exile, and Plaintiff Lori Parker's work being featured, with an accompanying article, on the cover of the SCA magazine, Tournaments Illuminated, and which is still featured on the Tournaments Illuminated Facebook Page.

The plaintiffs suffered mental distress and anguish because of the loss of their beloved hobby. They had dedicated three decades of their lives to the organization and its activities, and they felt a deep sense of sorrow and loss over their involuntary departure. The Defendants' actions have caused the Plaintiffs to suffer severe social isolation and emotional distress. The Plaintiffs have been unable to maintain their normal social connections and activities, which are essential for their well-being and happiness. The Plaintiffs have missed out on many occasions to celebrate their friends' achievements and milestones. These are irreplaceable moments that the Plaintiffs have been deprived of by the Defendants' willful negligence.

**REQUEST FOR PRODUCTION NO. 14**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 17.*

**RESPONSE**:

See DKT 9: Complaint

See responses above

See documentation provided

**INTERROGATORY NO. 18**: *Please describe in detail the allegation you made in **Paragraph 49** of your Complaint, including the alleged "ignore it and it will go away" attitude, any SCA's personnel involved, and the extent of their involvement.*

*49. The SCA's acts of negligence and/or recklessness which led to Plaintiff George*
*Parker's Revocation and Denial of membership occurred from 2016 through 2021. Instead of*
*taking any reasonable steps and exercising due care to protect Plaintiffs George and Lori Parker*
*from harassment and abuse, the SCA adopted a "ignore it and it will go away" attitude to*

*negligently and/or recklessly ignore the known problems as described above.*

**ANSWER**:
See DKT 9: Complaint
See responses above
See documentation provided
See anecdotal evidence (screenshots, articles)
See unanswered emails.
 As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**REQUEST FOR PRODUCTION NO. 15**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 18.*

**RESPONSE**: See interrogatory 15 above.
See DKT 9: Complaint
See responses above
See documentation provided
SCA has access to modern names, addresses and other contact information not accessible by Plaintiffs via the membership rolls.
 As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**INTERROGATORY NO. 19**: *Please describe in detail the allegations and damages related to the business loss claim that you made in* **Paragraph 53 of your Complaint***.*
*53. Plaintiffs George and Lori Parker bring this action for injunctive relief in that they were further harmed by the removal and revocation of Plaintiff George Parker's membership, destroying their medieval business The Norse Gypsy Forge, leaving them with thousands of dollars debt, and thousands of dollars of inventory and supplies, through a process that was in contravention to the SCA by-laws and policies.*

**ANSWER**:
The Norse Gypsy Forge made an average of $1500 a month for several years. On average, the booth appeared at 1-2 events during the winter months, and 2-3 events every month during spring-fall. Plaintiffs are asking for 1 years' worth of proceeds ($30,000) to offset the now 2 years worth of Plaintiff George Parker's removal from the SCA.
The plaintiffs point out that cash sales accounted for at least 75% of the revenue, which makes it difficult to track the transactions. The only records available are the credit card statements, which are attached. The local groups can provide information on the expenses and attendance of the events, as they have copies of the site contracts and registration lists. Attendance at these events can be verified through sca -controlled documentation.
The Plaintiffs claim that their business specializes in selling products for the Society for Creative

Anachronism (SCA) members, and further claim that they suffered significant financial losses as a result of the defendant's actions. The revocation of Plaintiff George Parker's membership prevented them from attending SCA events, where they used to sell products and network with potential customers. However, due to the defendant's interference, they were unable to sell these products or recoup their investment. The plaintiffs contend that the defendant's conduct was the direct and proximate cause of their inability to maintain their inventory and pay off their debts, which they had incurred before the revocation of Parker's membership. The business would have continued to be a viable resource for Plaintiffs without the R&D, as it could have maintained or increased its profits over the next decade.

See inventory receipts, etc attached

See documentation

**REQUEST FOR PRODUCTION NO. 16**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 19, <u>including but not limited to</u>, your business license, annual tax and any other related financial documents.*

**RESPONSE**: See attached

**INTERROGATORY NO. 20**: *Please identify all locations where you have attempted to sell goods for The Norse Gypsy Forge from 2017 to present and the amount of income you received from each location, this includes an identification of sales made online, at SCA events or other non-SCA event locations such as art festivals or pop-up locations.*

**ANSWER**:

Detailed records are only kept for 3 years. Currently, that time spans 2020- current.

See attached documentation

**REQUEST FOR PRODUCTION NO. 17**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 20, <u>**including but not limited to**</u>, all documents that support your sales, gross receipts, and costs to attend such an event such as registration fees.*

**RESPONSE**: See attached documentation

The plaintiffs point out that cash sales accounted for at least 75% of the revenue, which makes it difficult to track the transactions. The only records available are the credit card statements, which are attached. The local groups can provide information on the expenses and attendance of the events, as they have copies of the site contracts and registration lists. Attendance at these events can be verified through sca -controlled documentation.

**REQUEST FOR PRODUCTION NO. 18**: *Please produce all documents that document or identify the profits received by The Norse Gypsy Forge from January 1, 2017 to present.*

**RESPONSE**: See attached The plaintiffs point out that cash sales accounted for at least 75% of the revenue, which makes it difficult to track the transactions. The only records available are the credit card statements, which are attached.

**INTERROGATORY NO. 21**: *Identify any other harms you contend you suffered from as a result of actions taken by SCA that you are seeking relief from in this lawsuit.*

**ANSWER**:

Loss of Reputation:  Plaintiff Lori Parker has been slandered on social media even though she has done no wrong.  SCA failed to sanction any persons doing so in direct violation of the exact same policies Plaintiff George was R&D's for.  Plaintiff Lori's life and/or health and/or well being has suffered credible threats on social media while the SCA covered it up and has hidden all information of the threats without reporting such threats to the Plaintiffs or Law Enforcement Authorities. Plaintiff's business has been equally slandered on social media by members of the SCA, including ranking members known as peers. See email  to Amanda Greyson regarding Jed Heimke and screenshots. See DKT 34.2 Stacy Hall Report

Loss of Enjoyment of Life:  For more than three decades, the plaintiffs had devoted themselves to the SCA activities, immersing themselves in the historical reenactment of various cultures and periods. However, the SCA abruptly terminated their membership over a trivial violation, depriving them of their passion and identity. The plaintiffs had achieved remarkable feats in their fields of interest, such as Plaintiff George's work in recreating Norse jewelry, which was recognized by the British Museum and the Kingdom of An Tir with prestigious awards shortly before he was exiled, and Plaintiff Lori Parker's work being showcased, with attending article, on the cover of the SCA publication, Tournaments Illuminated. The SCA Mission Statement of 2021 states:

> "The Society for Creative Anachronism (SCA) is an international non-profit volunteer educational organization. The SCA is devoted to the research and re-creation of pre-17th century skills, arts, combat, culture, and employing knowledge of world history to ***enrich the lives of participants through events, demonstrations, and other educational presentations and activities***."

The Plaintiffs have filed a lawsuit against the SCA, claiming that the organization violated its fiduciary duty. The Plaintiffs have maintained that the SCA failed to follow its own corporate documents, and failed to adhere to its stated mission of promoting research and education in medieval and Renaissance history and culture, and instead engaged in activities that were harmful to the plaintiff's interests and hobbies. The Plaintiffs maintain that the SCA's actions caused them BOTH to lose their enjoyment and passion for historical reenactment, and to suffer emotional distress and financial losses.

**REQUEST FOR PRODUCTION NO. 19**: *Please produce all documents that relate directly or indirectly or support your response to Interrogatory No. 21.*

**RESPONSE:** See DKT 9: Complaint

See responses above

See documentation provided

SCA has access to modern names, addresses and other contact information not accessible by Plaintiffs via the membership rolls.

As the discovery process unfolds and new facts emerge, the plaintiffs may need to modify or supplement their list of investigators. Therefore, the Plaintiffs reserve the right to do so as permitted by the applicable rules and procedures.

**The above statements are subject to revision, modification or correction in light of new evidence or circumstances. Plaintiffs reserve the right to amend, alter or otherwise change responses should new information become available.**